O. KENT MAHER (Nev. Bar No. 316)
kent@winnemuccalaw.com
PO Box 130
33 W Fourth Street
Winnemucca, Nevada 89446
Ph: (775) 623-5277
Fax: (775) 623-2468

*Local Counsel for Plaintiffs*

DOMINIC M. CAROLLO (Or. Bar. No. 093057)
[*Pro Hac Vice Pending*]
dcarollo@carollolegal.com
Carollo Law Group LLC
P.O. Box 2456
630 SE Jackson Street, Suite 1
Roseburg, Oregon 97470
Ph: (541) 957-5900
Fax: (541) 957-5923

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | | |
|---|---|---|
| **BARTELL RANCH, LLC,** a Nevada limited liability company and **EDWARD BARTELL**, | ) ) ) | Case No. |
| | ) | **COMPLAINT** |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| **ESTER M. MCCULLOUGH**, Winnemucca District Manager, Bureau of Land Management, **BUREAU OF LAND MANAGEMENT**, | ) ) ) ) ) | |
| Defendants. | ) ) | |

**INTRODUCTION**

1.      Plaintiffs Bartell Ranch, LLC and Edward Bartell (collectively, "Bartell Ranch")
challenge the decision by Defendant Ester M. McCullough, District Manager for the Winnemucca
District of the Bureau of Land Management ("BLM"), Department of Interior, to approve the
Thacker Pass Lithium Mine Project (the "Mine"), a proposal for a massive open pit lithium mine
with a disturbance area covering more than 5,000 acres and a total project area covering more than
17,000 acres of federal public land administered by BLM.  Bartell Ranch is the holder of a federal
grazing permit, private ranch lands, and water rights that are imminently threatened with
irreparable harm by the construction and operation of the Mine.  The Mine likewise threatens
irreparable harm to fish, wildlife, wetlands, and streamflows, including habitat for the Lahontan
Cutthroat Trout ("LCT"), which is listed as threatened under the Endangered Species Act ("ESA").

2.      On January 15, 2021, Defendant McCullough signed a Record of Decision
("ROD") approving the Mine.  The ROD selected Alternative A, the Proposed Action, from a
December, 2020 Final Environmental Impact Statement ("FEIS"), which was prepared by
consultants for the project proponent, Lithium Nevada Corporation ("LNC"), and which presents
a one-sided, deeply-flawed, and incomplete analysis and characterization of the proposed project
and its likely adverse environmental impacts, and in particular to water resources affecting
wetlands, streamflows, LCT and LCT habitat, as well as the water rights and private rangelands
held and owned by Bartell Ranch.   The project consultants relied upon grossly inaccurate,
incomplete, and inadequate data for constructing baselines and models purporting to estimate
impacts to water resources caused by the groundwater pumping that would be associated with the
Mine.   The project consultants did so in a manner that masks, or will mask, the likely

environmental impacts and, in addition, makes the proposed mitigation concepts and strategies meaningless, inadequate and ineffective.

3.     As described in the FEIS and approved in the ROD, the Mine will be located entirely on public land administered by BLM in Humboldt County, Nevada. The sprawling 17,933-acre project area is to be located approximately 17 miles north-northwest of Orovada, Nevada, in a highly sensitive ecological area that is famously dry, with a commensurately limited and delicate network of water resources. The Mine will require pumping substantial quantities of groundwater for its operations, at 2,600 acre-feet annually during Phase 1, and 5,200 acre-feet annually during Phase 2. The groundwater reserves within the "Orovada Subarea," where this pumping will take place, is already overallocated by approximately 30,271 acre-feet a year.  Additionally, the approximately 400' deep open pit will draw down water tables, and the North and South Exploration operations will drop water tables by allowing water to flow from upper aquifers to lower aquifers, as has happened with prior LNC exploration. In addition, the Mine intends to use a mining and processing method that will involve the use of millions of tons of toxic sulfuric acid and the deposit of contaminated tailings containing sulfates, arsenic, antimony, and uranium.

4.     The Mine and the associated pumping will pose significant adverse harm to several sensitive and protected species—including LCT and Greater Sage Grouse—through direct, indirect, and cumulative impacts. It is well-established within the academy of hydrological science, as well as within Ninth Circuit case law, that excessive groundwater pumping in an already-overallocated basin is inextricably linked to reductions in streamflows within the hydrological nexus. In addition, in signing the ROD, BLM has wholesale ignored the inconsistency of the Mine with BLM's Sage Grouse plans and associated regulations.

5.     Immediately north of the proposed Mine site are several perennial streams known to be inhabited by LCT, and the presence of which is well-understood and comprehensively

documented throughout decades of catalogued research and reports completed by the Nevada Department of Wildlife ("NDOW") in conjunction with the U.S. Fish and Wildlife Service ("FWS"). Two of the streams immediately to the north of the proposed Mine location where LCT are known to inhabit are Pole Creek and Crowley Creek. Indeed, in NDOW's 2012 LCT Study for the Western Region, one of the specific objectives of the study was identifying genetically-pure LCT in Crowley Creek via electroshocking, and then transporting them in aerated tanks to various reaches of Pole Creek where they were then released to supplement the Pole Creek population. This effort was described as one "to salvage and protect the last pure LCT within the Crowley Creek drainage," which was undertaken through "extensive genetic sampling and mapping, salvaging pure LCT and reintroducing them into the Pole Creek tributary of Crowley Creek[,]" and confirms the existence and importance of the Pole Creek LCT population to the continued existence and recovery of the species.

6.     In approving the FEIS and ROD for this project, BLM acknowledges that the Mine's proposed pumping volume has "the potential for mine related groundwater aquifer drawdown," and that "[w]ater produced and used by the mine from the proposed production wells could also affect surface water stream flows in nearby perennial and intermittent streams or springs." In the FWS 1995 Recovery Plan for the Lahontan Cutthroat Trout, "[r]eduction and alteration of stream discharge" is listed as the very first of the "[m]ajor impacts to LCT habitat and abundance[.]"

7.     Instead of adhering to the statutory duties imposed upon the agency with respect to the protection of sensitive species such as the LCT, BLM relied entirely upon flawed and error-laden findings made by a third-party contractor that compiled data for the EIS at the direction of, and in return for payment from, the project applicant LNC. The FEIS made the arbitrary and capricious finding that the proposed Mine and its associated pumping would not pose any threat

to ESA-listed LCT, noting in the FEIS that "[a]ccording to Piteau Associates, simulated flow losses to [Lahontan Cutthroat Trout] occupied reaches of Crowley and Pole Creek due to water use requirements from the proposed Project would not be expected." In completely ignoring impacts to LCT, LCT habitat, and other sensitive wildlife species and habitats, BLM acted in a manner that is arbitrary, capricious, an abuse of discretion, and contrary to law under the National Environmental Policy Act ("NEPA") 42 U.S.C. §§ 4321–61, Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701–1787, and Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.,* requiring vacatur of the ROD by this Court.

8.      For example, but without limitation, BLM approved the ROD based on the FEIS's inadequate, incomplete, and, in several cases, misrepresented analysis and collection of the baseline streamflow data and, thereby, failed to consider the likely impacts of the Mine on the LCT population in Pole Creek. In the FEIS, BLM relied upon reports that make the conclusory and objectively inaccurate determination that "Pole Creek is an ephemeral stream." The existence of a residential LCT population necessarily precludes the characterization of this stream as anything other than a perennial stream.  As a result of the objectively inaccurate characterization of the *perennial* flows on Pole Creek, the FEIS's data on pre-mining calibration flux targets and all other modeling based upon this incorrect data and characterization as an "ephemeral creek" are fundamentally flawed.

9.      By approving the ROD based on the FEIS's inadequate, incomplete, and in some cases objectively flawed collection of baseline data, the ROD was approved based on the FEIS's inadequate and incomplete analysis of likely impacts of the Mine on LCT and LCT habitat. Even though the FEIS acknowledged that the Mine-associated pumping will have an impact on the groundwater levels and surface flows (and even that the test-pumping conducted during the

analysis impacted groundwater tables), the FEIS failed to address the likely direct, indirect, and cumulative impacts of the Mine on LCT and their habitats, in violation of NEPA.[1]

10.    If the proposed Mine project is allowed to commence—permanently altering the water table and streamflows that an ESA-protected species rely on—it will cause irreparable harm to LCT and their habitat in Pole Creek, which flows immediately north of the project area. Construction of the Mine is imminent, with Phase 1 of the project commencing as early as 2021, with mining and ore-processing estimated to commence as early as 2022. Accordingly, Plaintiffs seek immediate relief, including preliminary injunctive relief, from this Court to set aside and remand BLM's ROD and FEIS, order BLM to prepare a new, lawful FEIS, enjoin the project and preserve the environmental status quo during the interim period, and protect the ecological integrity of Pole Creek and the residential LCT therein, as well as the host of other environmental impacts that were ignored by BLM in the FEIS and in approving the ROD.

## JURISDICTION AND VENUE

11.    Jurisdiction is proper in this Court under 28 U.S.C. 1331 (federal question) because this action arises under the laws of the United States, including NEPA, 42 U.S.C. §§ 4321–4370(h), the APA, 5 U.S.C. § 701 *et seq.*, the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, and the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq*. An actual, justiciable controversy exists between the parties, and the requested relief is therefore proper under 28 U.S.C. §§ 2201–2202 and 5 U.S.C. § 701–06.

12.    Venue is proper in this Court under 28 U.S.C. § 1391 because all or a substantial

---

[1] Contemporaneously with filing this Complaint, Bartell Ranch is serving a 60-day notice of intent to sue on the BLM, other appropriate federal agencies, and LNC, providing notice of violations of the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531, et seq.  Following the 60-day notice period, Bartell Ranch intends to amend this Complaint to allege violations of the ESA, including that BLM failed to undertake formal consultation under Section 7 of the ESA.

part of the events or omissions giving rise to the claims herein occurred within this judicial district, Defendants reside in this district, and the public lands and resources and agency records in question are located in this district.

13.    The federal government has waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

**PARTIES**

14.    Plaintiff Edward Bartell in an individual American citizen who resides in Humboldt County, Nevada, and owns and operates an active ranching operation (through Plaintiff Bartell Ranch, LLC) on both private and leased public lands within the immediate vicinity of the proposed Mine and the LCT-inhabited streams at issue in this action. Mr. Bartell is a co-owner in Bartell Ranch, LLC.  As a BLM grazing permit holder for the area at issue and a passionate steward of the lands within and adjacent to the proposed Mine, Bartell Ranch has gone to great lengths to protect LCT and LCT habitat in the area of the proposed Mine, and has real, genuine interests in the species' conservation and protection as a threatened and protected species. These actions include moving cattle herds away from LCT habitat, as well as extensive construction of fencing to protect surface waters with residential LCT populations in Pole Creek. Many of these efforts were undertaken after or during communications with BLM in connection with administration of the Bartell Ranch federal grazing permit.

15.    Defendants' violations of federal laws and regulations, as alleged herein, directly harm the interests of Plaintiffs in recovery of LCT and protection of LCT habitat, which have been and will continue to be injured and harmed by Defendants' actions as complained of herein. Unless the relief prayed for is granted, Plaintiffs will suffer ongoing and irreparable harm and injury to their interests.

16.     In addition to Bartell Ranch's interests in LCT, Bartell Ranch are the owners of private ranch lands and water rights that will, like LCT habitat, be negatively impacted by the Mine.  The FEIS and ROD ignored, severely discounted, or simply mispresented the likely negative impacts to Bartell Ranch's water rights and the productivity of their private ranch lands as result of flawed, incomplete, error-laden, and mispresented data collection and modeling work done by the project consultants and blindly incorporated and relied upon by BLM in the FEIS and ROD.

17.     Defendant Ester M. McCullough is the District Manager of the Winnemucca District of the BLM, and has the statutory authority and responsibility to comply with all federal laws and regulations in the management of federal public lands at issue here, including NEPA, the ESA, and APA. She is sued in her official capacity.

18.     Defendant BLM is an agency or instrumentality of the United States, within the Department of Interior, and is charged with managing the public lands and resources of the area at issue in accordance and compliance with federal laws and regulations. BLM was the lead agency that officially released the FEIS and subsequent ROD at issue in this action.

## LEGAL BACKGROUND

19.     NEPA, 42 U.S.C. § 4321 *et seq*., is our "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). It serves two purposes: (1) "it ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts," and (2) it "guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decision-making process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

20.     NEPA requires agencies to prepare an environmental impact statement (EIS) for

"major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The EIS must "provide full and fair discussion of significant environmental impacts." 40 C.F.R. § 1502.1. Agencies must consider every significant aspect of the environmental impact of a proposed action. This includes studying the direct, indirect, and cumulative impacts of the action. *See* 40 C.F.R. §§ 1508.7, 1508.8.

21.     Cumulative impacts are impacts that "result [] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . undertakes such other actions." 40 C.F.R. § 1508.7. Cumulative impacts "can result from individually minor but collectively significant actions taking place over a period of time." *Id.*

22.     In analyzing the cumulative effects of a proposed action, an agency must do more than just catalogue "relevant past projects in the area": it must also include a "useful analysis of the cumulative impacts of past, present and future projects." *City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1160 (9th Cir. 1997). Agencies must provide "some quantified or detailed information" about cumulative impacts – "[g]eneral statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided." *Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989, 993 (9th Cir. 2004). When an EIS does not "sufficiently identify or discuss the incremental impacts" expected from successive projects, or "how those individual impacts might combine or synergistically interact with each other to affect the [] environment," it does not satisfy NEPA. *Id.*

23.     In addition, an agency must disclose and discuss any "responsible opposing view which was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised." 40 C.F.R. §1502.9(b). "This disclosure requirement obligates the agency to make available to the public high-quality information, including accurate scientific analysis, expert

agency comments and public scrutiny, before decisions are made and actions are taken." *Ctr. for Biol. Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1167 (9th Cir. 2003).

24.     BLM has breached its statutory duties and abused its discretion under NEPA by relying upon a one-sided, inadequate, in in many cases misrepresented data, modeling, and analysis in the FEIS to approve the ROD for the Mine and associated groundwater pumping while downplaying or ignoring a host of significant environmental impacts.

**STATEMENT OF FACTS**

25.     The area of the proposed Mine, situated deep in northern Nevada's high desert, is a spectacular area with a rich geological and ecological diversity, wildlife habitat, and recreation opportunities.

26.     Despite being in the high desert, several perennial, but sensitive and delicate, spring-fed streams flow through the area at issue in this action. At least two of these streams— Pole Creek and Crowley Creek—are inhabited by residential populations of LCT, which were listed under the ESA as "endangered" in 1970, and then as "threatened" in 1975. Pole Creek and Crowley Creek are immediately north of the proposed footprint for the mining operation subject to this action.

27.     The lands subject to this action also benefit from water tables that are abnormally high; so high that vegetation can access wetted soil. As water levels drop in this area, the lands are quickly converted from productive grasslands to barren desert. Big game species and Greater Sage Grouse depend on the numerous springs in this area for drinking water, and migratory waterfowl are dependent upon the down-system wetlands that exist due to the abnormally high water tables. This area is home to one of the largest Greater Sage Grouse populations in northern Nevada, and one of the few areas with streams that host residential populations of native LCT outside of the Truckee Basin.

28.     As holders of several vested, certificated, and permitted water rights for irrigation and stock watering in the area subject to this action, Plaintiffs are intimately familiar with the sensitivity of the hydrology. These water rights include groundwater rights with wells in the area, enabling Plaintiffs to measure groundwater levels. Accordingly, Plaintiffs have been and continue to be uniquely situated so as to both assess the efficacy of the test pumping data compiled by LNC's contractor (and subsequently adopted into the FEIS), and to suffer significant injury caused by initiation of this mining operation.

29.     Through the data and reports compiled by LNC and its consultants—subsequently adopted by BLM wholesale and incorporated into the FEIS—it can be seen that even after a short period of test pumping, LNC's proposed production well has already shown harmful impacts to water levels in one of Plaintiffs' stock water wells. Thus, the substantial groundwater pumping planned by LNC in conjunction with its mining-related operations poses an imminent threat not only to Plaintiffs' existing water rights, but also to streamflows, the sensitive terrestrial and riparian species that depend on them for survival, and the entire ecosystem as a whole.

30.     Plaintiffs hold the approximately 50,000-acre Crowley Creek grazing lease, which is immediately to the north and west of the proposed open pit and within the proposed project area for the Mine. Within the boundaries of that lease, Plaintiffs own a 320-acre parcel of land through which Crowley Creek flows. This parcel of Plaintiff's private land is approximately 1.5 miles from the proposed "North Exploration Area" within the FEIS. The confluence of Crowley and Pole Creeks is within the Mine's "North Exploration Area," as well as most of Lower Pole Creek. Even more disturbing is the fact that a considerable reach of Pole Creek (which is home to a resident population of ESA-listed LCT) flows directly through the Mine's area of operations, inside the "Disturbance within the Proposed Project Area" boundary, upstream of the confluence with Crowley Creek (which is also known to be inhabited by LCT).

31.     The NDOW and FWS have put great effort and energy into studying and protecting the residential populations of LCT in Pole and Crowley Creeks, immediately north of the proposed Mine site. After introductions of non-native trout species into these systems, LCT began to hybridize with the non-native fish in Pole Creek. In an effort to mitigate the genetic dilution of the protected species, Pole Creek was chemically treated to eliminate non-native fish and genetically-pure LCT were collected in Crowley Creek (for which Pole Creek is a tributary) and then transported and reintroduced into Pole Creek by the NDOW in 2012. Over the years, Plaintiffs have undertaken great efforts to protect Pole Creek in order to enhance conditions for LCT. Plaintiffs are active participants in the conservation efforts of LCT in this water-sensitive area, and are substantially invested and interested in the conservation and protection of this ESA-listed species.

32.     The harm caused by over-pumping the groundwater in this area to the sensitive hydrological conditions not only means harm to forage availability for grazing purposes, but it means harm to Greater Sage Grouse and LCT and LCT habitat. Through their endeavors to be good stewards of this land and the ecosystems therein, Plaintiffs know that fluctuations to the water table, which <u>will</u> be caused by the monumental volume of groundwater pumping proposed by this project, create an immediate and significant threat to the sensitive balance that exists on this unique landscape. There exists a delicate balance to the biological status quo of this landscape that is maintained in large part through Plaintiffs' disciplined rotational grazing practices, mindful water use, and being proactive and flexible land stewards and managers.

33.     Over the course of the efforts related to protecting the LCT habitat, Plaintiffs have met with BLM staff several times to discuss LCT-issues on Pole Creek, and BLM has prepared NEPA documentation related to the fencing efforts to protect Pole Creek and its resident LCT populations. Plaintiffs' rotational grazing operation and extensive fencing efforts were designed to

minimize impacts to LCT habitat and protect this vulnerable species and its riparian habitat. Prior to LNC even beginning its work on the application for this Mine, BLM has been well aware that Pole Creek is both a perennial stream and that it contains a residential population of the ESA-listed and protected LCT.

34.     Over the course of the last several years, "studies" on the water features of this area have been paid-for and carried out on behalf of LNC in conjunction with the application process to develop this Mine. Within these studies are numerous erroneous figures that purport to show that Pole Creek is an ephemeral stream that lacks any standard annualized flow. On numerous occasions—through correspondence with BLM, LNC, and LNC's contractors, as well as comments submitted throughout the scoping process—Plaintiffs have informed BLM that perennial reaches (those with year-round flow) of Pole Creek were being erroneously labeled as ephemeral (flows that only exist briefly after rainfall or snowmelt). Hence, both LNC's contractors, LNC itself, and the BLM have been aware of these inaccuracies in the data since before the EIS process even began.

35.     BLM accepted reports submitted by LNC and completed on its behalf that form the basis of the FEIS that mischaracterize Pole Creek as "an ephemeral stream" with sections that "*may*" flow perennially, "but are not continuous year-round." Not only is this characterization of Pole Creek (as an ephemeral stream, but one with non-continuous perennial reaches) a completely nonsensical and contradictory statement in and of itself, but it is well-established in studies and reports completed by NDOW that Pole Creek is considered a perennial stream that has resident LCT. This "ephemeral" distinction for the entirety of Pole Creek in the FEIS is at odds with the fact that NDOW and FWS recognize Pole Creek as a perennial stream.

36.     Despite awareness of these inaccuracies in the baseline data, BLM accepted the objectively flawed Hydrologic Data Collection Report ("Report," compiled by the applicant

LNC's contractors) into its baseline data for the FEIS. This Report purports that the entirety of Pole Creek is an ephemeral stream. These inaccuracies were then used to calibrate groundwater modeling which comprise the central basis of BLM's decision-making in the draft EIS. The groundwater-modeling was calibrated using calibration flux targets of **zero flow** for all reaches of Pole Creek.

37.    In the FEIS, in response to objections from Plaintiffs regarding the flaws and omissions in the data relied upon within the draft EIS, BLM (and, thereby, LNC) advanced the position that even though LNC's contractors calibrated the groundwater model with **zero flow** for all reaches of Pole Creek, the model still somehow arrived at the correct baseflow. Supporting this reasoning, BLM incorporated new data provided by LNC into the FEIS, which the public had never seen before. As Plaintiffs noted in their comments to the FEIS, which was supported by an expert hydrologist, these new data are highly erroneous and controversial due to site bias and failure to consider evapotranspiration, and even then, they still do not match the modeled data.

38.    BLM also failed to require LNC to establish long-term gauging stations on any portion of Pole Creek, or to correct any of the clearly erroneous calibration flux targets for Pole Creek. Instead, BLM accepted this after-the-fact flow data with little to no explanation in the FEIS in order to backfill clear errors in the Report. Amazingly, in the Report, LNC's contractors only documented two (2) side channel springs that feed Upper Pole Creek and Middle Pole Creek, while ignoring the flow in the main channel of the Creek itself, and numerous other springs along Upper/Middle Pole Creek. Furthermore, photographs that accompany the Report purport to represent a particular Spring that was allegedly measured (SP-036) were taken a substantial distance *downstream* from the actual spring itself. Likewise, BLM refused to consider NDOW data presented in Plaintiffs' comments on the perennial flows of Pole Creek from 2020, 2009, 2003, 1998, and 1987, and instead, unbelievably, opted to base its "ephemeral" characterization of

this entire stream solely on the LNC contractors' improperly-collected data from two (2) solitary side channels that feed Pole Creek, instead of any actual data from the mainstem of Pole Creek itself. There are countless other omissions and errors in the baseline data upon which LNC's contractors' Report is based that were addressed in detail within the numerous comments submitted by Plaintiffs following the publication of the draft EIS and the FEIS.

39.     LNC's own Report—paid for and submitted in support of its application—also shows that LNC mining operation is significantly altering the area's hydrology by as much as 90-feet in certain areas where exploratory wells were dug by LNC, in addition to falsifying key pump-result data graphing to arbitrarily move elevations of separate test wells so as to argue that water elevation levels are lower in the area at issue and thereby erroneously minimize the potential impacts of long-term pumping.

40.     Despite being aware of the errors in the baseline data, the FEIS makes the following two contradictory conclusions: (1) "[w]ater produced and used by the mine from the proposed production wells could also affect surface water stream flows in nearby perennial and intermittent streams or springs[;]" and (2) "[a]ccording to Piteau Associates [LNC], simulated flow losses to LNC occupied reaches of Crowley and Pole Creek due to water use requirements from the proposed Project would not be expected." These statements are irreconcilable and highlight the gross material errors in the FEIS, which states, falsely, that the Mine will have no impact on LCT or LCT habitat, despite acknowledging more generally elsewhere in the FEIS that water used by the Mine could, indeed, effect surface water stream flows—i.e., LCT habitat.

41.     Despite this Mine's potential to reduce streamflow on nearby perennial and ephemeral streams, BLM opted for its proposed Alternative A, which extends the 10-foot threshold drawdown area only a mere 1.4 miles from the project area.    The modeled 10-foot drawdowns are compromised by erroneous model inputs.  Moreover, the 10-foot drawdowns are the alleged

extent of confidence in model accuracy, not the extent of impacts. Any drawdown underneath springs supplying water to Pole Creek will impact flows, and by extension LCT habitat.

42.     LNC's contractors doctored and/or misreported the data that BLM unquestioningly incorporated into the FEIS, which had the effect of materially altering the baseline, associated modeling, and the public disclosure of environmental impacts and, if not corrected, will aid LNC in avoiding the triggering of the proposed mitigation measures.

43.     BLM did more than simply incorporate the data submitted by LNC contractors into the FEIS; the erroneous data constitutes the vast majority of the baseline hydrological data utilized and relied upon in the FEIS.

44.     With respect to BLM's statutory consultation duties associated with approving a project with known ESA-listed species' habitat immediately adjacent to and even *within* the project area boundaries, BLM likewise failed to initiate a consultation with FWS as required by Section 7 of the ESA. Plaintiffs included an inquiry in their comments as to why this statutorily-mandated consultation process had not been initiated, to which BLM tersely responded: "[e]ffects on LCT are not anticipated to occur from the project, therefore, no formal Section 7 consultation was required." Insofar as it has been disclosed to the public in the NEPA process, including the FEIS, this single sentence is the entirety of BLM's consideration of its obligations under the ESA in considering whether to authorize the Mine.

45.     This failure to anticipate effects on the ESA-listed LCT and thereby initiate a formal consultation is directly undermined by and fundamentally at odds with the following:

      a.     A stream (Pole Creek) with well-studied residential LCT population flows *within* the proposed area of surface disturbance for this project;

      b.     BLM's own identification of mine-related environmental issues in the FEIS includes "modifications to existing water rights, the potential for <u>mine related groundwater</u>

aquifer drawdown, contamination of ground or surface water from unintended materials releases (spills) and the potential for adverse effects to groundwater resulting from surface water infiltration into the open pit or through above ground mine facilities. Water produced and used by the mine from the proposed production wells could also affect surface water stream flows in nearby perennial and intermittent streams or springs[;]" and

c.      BLM's own conclusion in the FEIS that "[i]f the flow from the perennial spring or stream is controlled by discharge from the aquifer affected by mine-induced drawdown, a reduction of groundwater levels would likely result in a reduction of the groundwater discharge perennial springs or streams with a corresponding reduction in spring flows, lengths of perennial stream reaches, and their riparian/wetland areas."

46.      In the section dedicated to LCT within the FEIS, BLM concisely showcases both the arbitrary and capricious nature of its mischaracterization of Pole Creek as "an ephemeral stream" as well as the potential for irreparable harm posed by this project in a single sentence: "[c]onnectivity into the reaches within the project boundaries in high water years is a possibility with spring flows (January through April) being the most likely time for LCT to move down into the ephemeral reaches. During high water years, care must be taken not to disturb Pole and Crowley Creek until after the water naturally recedes out of the ephemeral portion."

47.      Accordingly, not only does this reference to isolated and identifiable "ephemeral reaches" along Pole Creek which BLM incorporates into the FEIS in Appendix P (*i.e.* "Pole Creek is an ephemeral stream which originates in the Montana Range") undermine the description of the *entirety* of Pole Creek, it is an express admission that ESA-listed fish will be *within* the Mine's project boundaries during high water events, despite BLM's failure to initiate a formal consultation. Furthermore, despite the vague statement that "care must be taken not to disturb" Pole Creek during high water events, there are no limits whatsoever on LNC's ability to continue

pumping at the outstandingly high volume of 2,600-5,200 acre-feet per year in either LNC's water right permits or the FEIS, rendering this cautionary statement entirely meaningless.

48.     Plaintiffs have exhausted all necessary administrative remedies.  Although BLM has provided the public the opportunity to file an appeal of the ROD with the Interior Board of Land Appeals ("IBLA"), an IBLA appeal is not necessary because the ROD was made effective upon execution and would remain in effect during the pendency of the administrative appeal unless stayed by the IBLA.  The ROD is final agency action subject to judicial review under the APA and threatens irreparable harm to Plaintiffs.  Plaintiffs intend to seek preliminary injunctive relief against the ROD from this Court.

49.     Plaintiffs have also exhausted and preserved all issues it presents in this Complaint, by raising its concerns with BLM during the NEPA process for the draft EIS and FEIS, as well as through its additional correspondence with both the BLM and LNC. On information and belief, BLM now intends to implement the final decisions approving the ROD. Implementation of the ROD will adversely and irreparably impact the water levels, ecology, fish and wildlife habitat, and other values on these public lands, as well as the water rights and property rights held and owned by Bartell Ranch.

**FIRST CLAIM FOR RELIEF**

50.     Plaintiffs reallege and incorporate by reference all preceding paragraphs.

51.     This First Claim for Relief challenges BLM's violations of the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq*., and NEPA's implementing regulations in approving the ROD based on the faulty, incomplete, and inadequate FEIS. Plaintiffs bring this claim pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

52.     Defendants violated NEPA and implementing regulations in multiple respects through issuance of the challenged ROD based on the FEIS, including but not limited to:

a.      Failing to take the requisite "hard look" at all of the significant and potential direct, indirect, and cumulative impacts of the proposed Mine and associated groundwater pumping on the environmental baseline, including impacts to: (1) LCT and LCT habitat; (2) Sage-Grouse and Sage-Grouse habitat; (3) wetlands and streamflows; (4) Bartell Ranch's water rights and productivity of their private ranch lands; (5) air quality due to doubling the amount of sulfur proposed to be used between the draft EIS and FEIS; (6) visual resources based on BLM's Visual Resource Management ("VRM") classifications and associated regulations; and (7) water quality by virtue of groundwater contamination associated with the deposit and storage of waste rock laden with toxins such as arsenic, antimony, and uranium—and all without adequate baseline data and based on fundamentally flawed modeling and analysis;

b.      Failing to ensure scientific integrity and failing to discuss and address responsible opposing views in the FEIS, in a supplemental FEIS, and/or in the ROD;

c.      Failing to make material and necessary data and information relied upon in the draft EIS, FEIS and/or the ROD available to the public and Plaintiffs in a timely or meaningful manner;

d.      Reliance on mitigation concepts and strategies that are based on inadequate or false baseline data and inadequate or fundamentally flawed models and monitoring schemes and not reasonably likely to occur or otherwise provide effective or meaningful mitigation for the likely impacts of the Mine; and

e.      Failing to consider an adequate range of alternatives, including alternative mining, extraction, or processing methods or techniques that would reduce or eliminate the amount of sulfuric acid utilized and groundwater pumping.

53.     BLM's FEIS and ROD constitute final agency actions judicially reviewable by this Court pursuant to 5 U.S.C. § 706.

54.     Based on their violations of NEPA and implementing regulations, BLM's approval of the challenged FEIS and ROD is arbitrary, capricious, an abuse of discretion, and not in accordance with law, and will allow serious ecological degradation as well as harm to the public and Plaintiffs' interests, unless vacated by this Court. Accordingly, the FEIS and ROD must be vacated and set aside pursuant to the APA, 5 U.S.C. § 706.

**SECOND CLAIM FOR RELIEF**

55.     Plaintiffs reallege and incorporate by reference all preceding paragraphs.

56.     This Second Claim for Relief challenges BLM's violations of FLMPA, including the requirement that the agency "take any action required to prevent unnecessary or undue degradation of the lands and their resources or to afford environmental protection[,]" 43 U.S.C. § 1782(c); to "manage the public lands under principles of multiple use and sustained yield, in accordance with the land use plans[,]" 43 U.S.C. § 1732(a); and to minimize impacts on soils, vegetation, wildlife, air, water, and cultural resources, 43 C.F.R. § 8342.1(a)– (c). Plaintiffs bring this claim pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

57.     Defendants have violated FLPMA in multiple respects through issuance of the challenged ROD based on the FEIS, including but not limited to:

    a.     Allowing a processing method that involves the importation, burning, and disposal of millions of tons of sulfur on public lands when less environmentally harmful methods and techniques exist;

    b.     Allowing storage and ultimately in-pit disposal of waste rock in a manner that risks contaminating public lands and groundwater with toxins such as arsenic, antimony, and uranium;

c.    Failing to adequately protect and conserve Sage-Grouse and Sage-Grouse habitat; and

d. Failing to comply with the Visual Resource Management designations; the FEIS explicitly says "Alternative A would not meet the current VRM Class II objectives, and would not conform with the existing ROD/RMP".

58.    Based on their violations of FLPMA and implementing regulations, BLM's approval of the challenged FEIS and ROD is arbitrary, capricious, an abuse of discretion, and not in accordance with law, and will allow serious ecological degradation as well as harm to the public and Plaintiffs' interests, unless vacated by this Court. Accordingly, the FEIS and ROD must be vacated and set aside pursuant to the APA, 5 U.S.C. § 706.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for a judgment granting the following relief;

A.    Order, adjudge, and declare that the FEIS and ROD violate NEPA and FLPMA, in violation of the APA, 5 U.S.C. § 706;

B.    Reverse, set aside, vacate, and remand the FEIS and ROD;

C.    Enter temporary, preliminary, or permanent injunctive relief as hereinafter prayed for by Plaintiffs, including by enjoining Defendants from allowing construction to commence on the LNC Mine through ground-clearing, site preparation, or other such actions until such time as Defendants have fully complied with law;

D.    Award Plaintiffs their reasonable costs, litigation expenses, and attorney's fees associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. §§ 2412 *et seq.*, and/or all other applicable authorities; and/or

E.    Grant such further relief as Plaintiffs may pray for hereafter or as the Court deems

necessary or appropriate to redress Defendants' legal violations and protect the public lands and

resources of the sensitive area in question from further degradation.

Respectfully submitted this 11th day of February, 2021.

s/ O. Kent Maher_____
O. KENT MAHER (Nev. Bar No. 316)
kent@winnemuccalaw.com
PO Box 130
33 W Fourth Street
Winnemucca, Nevada 89446
Ph: (775) 623-5277
Fax: (775) 623-2468

*Local Counsel for Plaintiffs*


DOMINIC M. CAROLLO (Or. Bar. No.
093057)
[*Pro Hac Vice Pending*]*
dcarollo@carollolegal.com
Carollo Law Group LLC
P.O. Box 2456
630 SE Jackson Street, Suite 1
Roseburg, Oregon 97470
Ph: (541) 957-5900
Fax: (541) 957-5923

*Attorneys for Plaintiffs*

*Out-of-state counsel will comply with LR IA 11-2 within three business days of this filing.