1  Julie Cavanaugh-Bill (State Bar No. 11533)
2  Cavanaugh-Bill Law Offices, LLC
3  Henderson Bank Building
4  401 Railroad Street, Suite 307
5  Elko, NV 89801
6  (775) 753-4357
7  julie@cblawoffices.org
8
9  William Falk (Utah Bar No. 16678)
10 2980 Russet Sky Trail
11 Castle Rock, CO
12 (319) 830-6086
13 falkwilt@gmail.com
14
15 Terry J. Lodge (Ohio Bar No. 29271) *Pro Hac Vice Application To Be Filed*
16 316 N. Michigan St., Suite 520
17 Toledo, OH 43604-5627
18 (419) 205-7084
19 tjlodge50@yahoo.com
20 Attorneys for Reno-Sparks Indian Colony and Atsa koodakuh wyh Nuwu

21
22                **UNITED STATES DISTRICT COURT**
23                   **DISTRICT OF NEVADA**
24
25 WESTERN WATERSHEDS PROJECT,      ) Case No. 3:21-cv-103-MMD-CLB
26 *et al.,*                         )
27              Plaintiffs,          ) **INTERVENING PLAINTIFFS'**
28                                   ) **MOTION FOR PRELIMINARY**
29 and                              ) **INJUNCTION**
30                                   )
31 RENO-SPARKS INDIAN COLONY and ATSA )
32 KOODAKUH WYH NUWU/ PEOPLE OF RED )
33 MOUNTAIN                          )
34                                   )
35         Plaintiff-Intervenors,    ) **ORAL ARGUMENT**
36 v.                               ) **REQUESTED**
37                                   )
38 UNITED STATES DEPARTMENT OF THE   )
39 INTERIOR, *et al.,*               )
40                                   )
41              Defendants          )
42                                   )
43 and                              )

1

1
2    LITHIUM NEVADA CORP.                              )
3                                                      )
4               Defendant-Intervenor                   )
5    _____ )
6
7          Now come Intervening Plaintiffs Reno-Sparks Indian Colony (RSIC) and Atsa

8    koodakuh wyh Nuwu/People of Red Mountain (together "Intervening Plaintiffs"), by and

9    through counsel, and hereby move for a Temporary Restraining Order and Preliminary

10   Injunction in this matter to enjoin physical disturbance of Thacker Pass pursuant to

11   activities undertaken in furtherance of the Thacker Pass Lithium Mine Project ("the

12   Project") Record of Decision (ROD), Plan of Operations (PoO), or Historic Properties

13   Treatment Plan (HPTP). The original name for Thacker Pass in the local Numic dialect

14   spoken by members of Plaintiff Intervenor, Atsa koodakuh wyh Nuwu/People of Red

15   Mountain, is "Peehee mu'huh," and that will be used instead of Thacker Pass.

16   Dated this 29th day of July, 2021
17
18                          By: /s/Julie Cavanaugh-Bill
19                          Julie Cavanaugh-Bill (State Bar No. 11533)
20                          Cavanaugh-Bill Law Offices
21                          401 Railroad Street, Suite 307
22                          Elko, NV 89801
23                          (775) 753-4357
24                          julie@cblawoffices.org
25
26                          /s/ William Falk
27                          William Falk, Esq (Utah Bar No. 16678)
28                          (319) 830-6086
29                          falkwilt@gmaail.com
30
31                          Terry J. Lodge, Pro Hac Vice Application To Be Filed.
32                          Terry J. Lodge, Esq. (Ohio Bar No. 29271)
33                          316 N. Michigan St., Suite 520
34                          Toledo, OH 43604-5627
35                          (419) 205-7084
36                          tjlodge50@yahoo.com
37                          Co-Counsel for Intervenors

1

2          **MEMORANDUM OF POINTS AND AUTHORITIES**
3
4          The RSIC received a letter from Defendant Bureau of Land Management ("BLM)

5   on July 12, 2021 denying its request for government-to-government consultation under

6   the National Historic Preservation Act (NHPA), section 106 while Atsa koodakuh wyh

7   Nuwu/People of Red Mountain received a letter on July 20, 2021 denying  their request

8   for NHPA section 106 consultation. On June 8, in exchange for a two-week extension to

9   file response briefs to the Plaintiffs' Motion for Preliminary Injunction, the BLM and

10  Defendant-Intervenor Lithium Nevada Corp. ("Lithium Nevada") stipulated that no

11  Project area ground disturbance activities would occur before July 29, 2021. At the

12  Preliminary Injunction Hearing on July 21, 2021, when the BLM was asked  when it

13  expects to issue the necessary permits to begin ground disturbance, it did not provide a

14  date or timeline. If the BLM plans on issuing an archaeological permit before the week

15  of August 23, this Court has ordered the BLM to notify it so a preliminary injunction

16  hearing can be heard before that issuance.

17         Absent an order enjoining the BLM and Lithium Nevada from physically

18  disturbing a massacre site, possible burial sites, and historic properties eligible for

19  inclusion on the National Register of Historic Properties (NRHP), BLM will permit ground

20  disturbance of historic properties to which  Native American tribes attach cultural and

21  religious significance before those  tribes or the public have been adequately consulted

22  under the NHPA. First, however, Intervening Plaintiffs establish standing.

23         **I.        The Intervening Plaintiffs Have Standing To Proceed**

24         The Intervening Plaintiffs allege a procedural injury based on the NHPA, relying

25  on the APA. To establish standing, "[t]he plaintiff must have (1) suffered an injury in fact,

1   (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is

2   likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S.

3   Ct. 1540, 1547 (2016), as revised (May 24, 2016) (*quoting Lujan v. Defs. of Wildlife*, 504

4   U.S. 555, 560 (1992)). At this stage, standing may be judged based on the allegations

5   in the Intervening Plaintiffs proffered Complaint. *See Susan B. Anthony List v. Driehaus*,

6   134 S. Ct. 2334, 2342 (2014).

7        A plaintiff shows a procedural injury-in-fact "when a procedural requirement has

8   not been met, so long as the plaintiff also asserts a 'concrete interest' that is threatened

9   by the failure to comply with that requirement." *City of Sausalito v. O'Neill*, 386 F.3d

10   1186, 1197 (9th Cir. 2004) (quoting *Citizens for Better Forestry v. U.S. Dep't of Agric.*,

11   341 F.3d 961, 969–70 (9th Cir. 2003)). A "concrete interest" implicated by a procedural

12   requirement may reflect "aesthetic, conservational, and recreational" values and does

13   not need to be an economic harm. *Sierra Club v. Morton,* 405 U.S. 727, 738 (1972). "To

14   allege a cognizable procedural harm, plaintiffs must identify an injury that follows the

15   violation of a procedural right, which was afforded to them by statute and designed to

16   protect  their threatened concrete interests." *St. Croix Chippewa Indians of Wis. v.*

17   *Salazar*,  384 Fed.Appx. 7, 8 (D.C. Cir. 2010) (unreported).

18        The Supreme Court has stated that, while suing under the APA, the interest a

19   Plaintiff asserts "must be arguably within the zone of interests to be protected or

20   regulated by the statute that he says was violated." *Match-E-Be-Nash-She-Wish Band*

21   *v. Patchak*,132 S. Ct. 2199, 2210 183 L. Ed. 2d 211 (2012) (internal citation omitted).

22   This test "is not meant to be especially demanding." *Id.* And, the Supreme Court has

1   "always conspicuously included the word 'arguably' in the test to indicate that the benefit

2   of any doubt goes to the plaintiff." *Id.*

3        NHPA's regulations require federal agencies to provide interested members of

4   the public reasonable opportunity to participate in the Section 106 process. "Thus, any

5   member of the public who can demonstrate sufficient interest in the preservation of the

6   historical lands at issue falls within the zone of interests protected by the NHPA."

7   *Montana Wilderness Ass'n v. Fry*, F.Supp 2d 1127, 1150-51 (D. Montana 2004) The

8   Intervening Plaintiffs have a strong interest in preserving Peehee mu'huh and the

9   historic properties found there.

10       Here, the Intervening Plaintiffs allege concrete aesthetic interests in the

11  enjoyment of Peehee mu'huh as a site for hunting and gathering in support of their

12  traditional and tribal cultures. They also suggest considerable history of their ancestors'

13  use, habitation and consequential tribal events having taken place in and around this

14  mountain pass as a significant portal through the mountain chain for animals and

15  people. The Intervening Plaintiffs further point to requirements related to and/or

16  contained within the statute and regulations of the NHPA, and allege that the BLM has

17  not satisfied these requirements. The threat to the Intervening Plaintiffs' interests by the

18  Government's failure to satisfy the procedural requirement is clear because the

19  requirement directly relates to "the effect of the undertaking on the property" within the

20  meaning of NHPA § 402. 54 U.S.C. § 307101(e).  The Intervening Plaintiffs satisfy the

21  first element of Article III standing. *See Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d

22  768, 779 (9th Cir. 2006) (finding injury-in-fact requirement met where plaintiffs pointed

23  to use of affected area and activity that will lessen enjoyment of use).

1       The next requirement of standing is whether the injury in question is "fairly

2    traceable" to the conduct of the Government. Here, the Government's conduct is failure

3    to take into account the effects of the mine project on Peehee mu'huh's cultural and

4    historic resources, and also, to have failed to consult with affected indigenous peoples.

5    A claim of procedural injury affects the standing analysis, and can relax some

6    requirements. *See Massachusetts v. E.P.A.*, 549 U.S. 497, 517–18 (2007). Where, as

7    here, claims rest on a procedural injury, "the causation and redressability requirements

8    are relaxed." *California ex rel. Imperial Cty. Air Pollution Control Dist. v. U.S. Dep't of*

9    *the Interior,* 767 F.3d 781, 790 (9th Cir. 2014) (quoting *Cantrell v. City of Long Beach,*

10   241 F.3d 674, 682 (9th Cir. 2001)).

11       The NHPA violations arise from BLM's failure to consult and to take into account

12   information relevant for making a determination as to whether the mine will adversely

13   affect the cultural and historic resources and sites at Peehee mu'huh. And, if so, how

14   those effects may be avoided or mitigated. The challenged activity is not the

15   undertaking itself, but the process by which the effects of the undertaking are

16   considered and assessed.

17       The final standing question is whether the Intervening Plaintiffs can establish

18   redressability. The plaintiff must show it is likely that the injury "will be redressed by a

19   favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528

20   U.S. 167, 181 (2000). "Plaintiffs alleging procedural injury can often establish

21   redress[a]bility with little difficulty, because they need to show only that the relief

22   requested—that the agency follow the correct procedures—may influence the agency's

23   ultimate decision of whether to take or refrain from taking a certain action." *Salmon*

1   *Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1226–27 (9th Cir. 2008). That is

2   the circumstance here. Lithium Nevada's permit application was rushed through BLM

3   processing, resulting in permit issuance before the NHPA review was anywhere near

4   completion.

5       Intervening Plaintiffs' claims, then, are redressable, and courts should not "pre-

6   judge the outcome of any consultations" that may take place. *Tyler v. Cuomo,* 236 F.3d

7   1124, 1134 (9th Cir. 2000). "At this point . . . it is impossible for us to know with any

8   degree of certainty just what the end result of the NHPA process would be," and under

9   those circumstances we avoid "shortcutting the process which has been committed in

10  the first instance to the responsible federal agency." *Id.* (quoting *Vieux Carre Prop.*

11  *Owners, Residents & Assocs., Inc. v. Brown*, 948 F.2d 1436, 1446–47 (5th Cir. 1991))

12  (noting the need to consider a range of outcomes and not merely a binary between no

13  change or a completely altered approach). "Whether a plaintiff has a legally protected

14  interest (and thus standing) does not depend on whether he can demonstrate that he

15  will succeed on the merits." *Louisiana Energy & Power Auth. v. Federal Energy*

16  *Regulatory Comm'n*, 141 F.3d 364, 368 (D.C. Cir. 1998) (citation and internal quotation

17  marks omitted).

18      **II.**      **Standards for Preliminary Relief**

19      To gain preliminary injunctive relief, a plaintiff must successfully "establish that he

20  is likely to succeed on the merits, that he is likely to suffer irreparable harm in the

21  absence of preliminary relief, that the balance of equities tips in his favor, and that an

22  injunction is in the public interest." *Winter v. Natural Resources Defense Council*, 555

23  U.S. 7, 20 (2008). A plaintiff may also satisfy the first and third prongs under a "sliding

1   scale" approach by showing serious questions going to the merits of the case and that a

2   balancing of hardships tips sharply in plaintiff's favor. *All. for the Wild Rockies v. Cottrell,*

3   632 F.3d 1127, 1134-35 (9th Cir. 2011) (holding that the Ninth

4   Circuit's "sliding scale" approach remains valid following the Winter decision).

5          Ninth  Circuit courts focus on the harms that will result during the full pendency of

6   the case while the injunction is in place when deciding whether to grant a preliminary

7   injunction. See *League of Wilderness Defs. v. Connaughton*, 752 F.3d 755, 765-66 (9th

8   Cir. 2014). The 9th Circuit has also clarified that "[s]erious questions need not promise a

9   certainty of success, nor even present a probability of success, but must involve a 'fair

10  chance of success on the merits." *Republic of the Phil. v. Marcos*, 862 F.2d 1355, 1362

11  (9th Cir. 1988) (citations omitted).

12         Intervening Plaintiffs successfully meet all four aspects of this test. In cases

13  where federal agencies were found to have failed to meet the NHPA Section 106

14  consultation requirements for Indian tribes, those failing agencies engaged in more

15  efforts at consultation than the BLM, Winnemucca District Office here. So, the

16  Intervening Plaintiffs are likely to succeed on the merits.

17         In the absence of preliminary relief, an archaeological contractor will cause

18  irreparable harm by gouging seven, 40-meter-long, several-meter-deep trenches and

19  hand-dig as many as 525 holes into land hallowed by the massacre of the Intervening

20  Plaintiffs' ancestors, where artifacts created by the Intervening Plaintiffs' ancestors can

21  be found, and where some of the Intervening Plaintiffs' ancestors are buried. Digging

22  these trenches and holes is likely to destroy artifacts and human remains. This

23  desecration would cause the Intervening Plaintiffs extreme emotional and spiritual

1    distress. See Eben and Hinkey Declarations. Also, this Court noted in its decision

2    granting the Intervening Plaintiffs permission to intervene that "The Tribes persuasively

3    argue that the digging incident to this plan will cause them irreparable harm." (Order,

4    7/28/21, ECF 59 at 8).

5         Hence the balance of equities tips in the Intervening Plaintiffs' favor because the

6    only hardship BLM and Lithium Nevada face from the Intervening Plaintiffs' motion is a

7    delay in archaeological digs. If BLM is set on permitting, and Lithium Nevada is set on

8    constructing, a mine that will destroy a massacre site, a place where the Intervening

9    Plaintiffs' ancestors survived genocide, burial sites, and artifacts, the NHPA cannot stop

10   it. The NHPA only requires that BLM adequately consult with Indian tribes and the

11   general public before permitting this destruction. Lastly, the public has a strong interest

12   – especially as multiple new lithium mines are proposed around the country – in federal

13   agencies fulfilling the consultation obligations with which Congress has burdened them.

14   **A. The Intervening Plaintiffs Are Likely to Succeed on the Merits.**

15        The Intervening Plaintiffs challenge BLM's failure to complete the NHPA's

16   Section 106 obligatory consultation process, as provided for at 36 Code of Federal

17   Regulations (CFR). Section 800, Protection of Historic Properties (2004) in issuing a

18   Record of Decision (ROD) for the Thacker Pass Lithium Mine Project (the Project)

19   without making a reasonable and good faith effort to identify Indian tribes that should

20   have been consulted with because they attach religious and cultural significance to

21   Peehee mu'huh, in contravention of 36 CFR § 800.2(c)(2)(ii)(A); without providing to

22   Indian tribes who attach religious and cultural significance to Peehee mu'huh a

23   reasonable opportunity to identify their concerns about historic properties, advise on the

1    identification and evaluation of historic properties, articulate their views on the

2    undertaking's effects on such properties, and participate in the resolution of adverse

3    effects, also in contravention of 36 CFR § 800.2(c)(2)(ii)(A); without seeking and

4    considering the views of the public in a manner that reflects the nature and complexity

5    of the undertaking, in contravention of 36 CFR § 800.2(d)(1); and for issuing a ROD

6    before a draft Memorandum of Agreement with the Nevada State Historic Preservation

7    Officer (SHPO) was made available for public comment, in contravention of the 2014

8    BLM-SHPO State Protocol Agreement ("the Protocol"). Because of these failures, the

9    ROD and HPTP are invalid and will likely be set aside.

10        The Ninth Circuit has emphasized that federal agencies owe a fiduciary duty to

11    all Indian tribes, and that at a minimum this means agencies must comply with general

12    regulations and statutes. *Pit River Tribe v. U.S. Forest Serv.,* 469 F.3d 768, 788 (9th

13    Cir. 2006). Violation of this duty to comply with NHPA requirements during the process

14    of reviewing and approving projects vitiates the validity of that approval and may require

15    that it be set aside. *Id.*

16        The National Historic Preservation Act (NHPA) obligates the Bureau of Land

17    Management ("BLM"), in cooperation with Indian tribes, private organizations, and

18    individuals, "to administer federally owned, administered, or controlled historic property

19    in a spirit of stewardship for the inspiration and benefit of present and future

20    generations…" (54 U.S.C. § 300101(3)). When the NHPA was passed, Congress

21    explained that the purpose of the NHPA is to remedy the dilemma that "historic

22    properties significant to the Nation's heritage are being lost or substantially altered,

1   often inadvertently, with increasing frequency" (*Montana Wilderness Ass'n v. Fry*, 310

2   F.Supp. 2d 1127, 1151 (D. Montana, 2004) (quoting 16 U.S.C. § 470(b)(3).

3         36 CFR§ 800 *et seq* was enacted to govern implementation of NHPA's Section

4   106 consultation process. 36 CFR § 800.1(a) states the purposes of the section 106

5   process, in pertinent part:

6   "The section 106 process seeks to accommodate historic preservation concerns with
7   the needs of Federal undertakings through consultation among the agency official and
8   other parties with an interest in the effects of the undertaking on historic properties,
9   commencing at the early stages of project planning. **The goal of consultation is to**
10  **identify historic properties potentially affected by the undertaking, assess its**
11  **effects and seek ways to avoid, minimize or mitigate any adverse effects on**
12  **historic properties** (emphasis added)."
13

14        § 800.1(c) adds: "The agency official shall ensure that the section 106 process is

15  initiated early in the undertaking's planning, so that a broad range of alternatives may

16  be considered during the planning process for the undertaking."

17        § 800.2(d)(1) describes the important role the public plays in helping federal

18  agencies steward historic properties and states: "The views of the public are essential to

19  informed Federal decision-making in the section 106 process."

20        Also, § 800.2(d)(1) requires that "[t]he agency official shall seek and consider the

21  views of the public in a manner that reflects the nature and complexity of the

22  undertaking and its effects on historic properties [and] the likely interest of the public in

23  the effects on historic properties…"

24        36 CFR § 800.2(c)(2)(B)(ii) states that NHPA, Section 101(d)(6)(B) "requires the

25  agency official to consult with **any** Indian tribe or Native Hawaiian organization that

26  attaches religious and cultural significance to historic properties that may be affected by

1    an undertaking. The requirement applies regardless of the location of the historic

2    property." (emphasis added)

3         The NHPA's tribal "consultation requirement is not an empty formality; rather it

4    'must recognize the government-to-government relationship between the Federal

5    Government and Indian tribes'." *Quechan Tribe of Fort Yuma Indian Reservation v. US*

6    *Dept. of Interior*, 755 F.Supp.2d 1104, 1108-1109 (SD Calif. 2010) (quoting §

7    800.2(c)(2)(ii)(C)). "Furthermore, under § 800.2, consulting parties that are Indian tribes

8    are entitled to special consideration in the course of an agency's fulfillment of its

9    consultation obligations." *Id.* at 1109.

10        The Reno-Sparks Indian Colony, Fort McDermitt Paiute and Shoshone Tribe,

11   Summit Lake Paiute Tribe, Burns Paiute Tribe of Oregon, Duck Valley Shoshone-Paiute

12   Tribe, Lovelock Paiute Tribe, Battle Mountain Band Colony of the Te-Moak Tribe of

13   Western Shoshone, Winnemucca Indian Colony, Cedarville Rancheria, Ft. Bidwell

14   Indian Community, Fallon Paiute-Shoshone Tribe, and the Pyramid Lake Paiute Tribe

15   attach religious and cultural significance to Pehee mu'huh. See Eben Declaration, ¶ 13.

16        Under § 800.2(c)(2)(B)(ii)(A),

17   "[t]he agency official shall ensure that consultation in the section 106 process provides
18   the Indian tribe...**a reasonable opportunity to identify its concerns about historic**
19   **properties, advise on the identification and evaluation of historic properties,**
20   **including those of traditional religious and cultural importance, articulate its**
21   **views on the undertaking's effects on such properties, and participate in the**
22   **resolution of adverse effects**. It is the responsibility of the agency official **to make a**
23   **reasonable and good faith effort** to identify Indian tribes...that shall be consulted in
24   the section 106 process."
25
26   § 800.2(c)(2)(B)(ii)(A) reminds agency officials, once again, that section 106

27   consultation should commence early in the planning process.

The Reno-Sparks Indian Colony and all the tribes who attach religious and cultural significance to Peehee mu'huh have been denied a reasonable opportunity to identify their concerns about historic properties, advise on the identification and evaluation of historic properties, articulate their views on the undertaking's effects on such properties, and participate in the resolution of adverse effects.

§ 800.2(c)(2)(B)(ii)(C) advises that "Consultation with an Indian tribe must recognize the government-to-government relationship between the Federal Government and Indian tribes...[c]onsultation with Indian tribes should be conducted in a manner sensitive to the concerns and needs of the Indian tribe..."

Consultation conducted in good faith and in a manner sensitive to the concerns and needs of Indian tribes would have accounted for the fact that the worst pandemic in at least 100 years was raging around the world, especially when those Indian tribes were disproportionately affected by the COVID-19 pandemic. Many tribal offices, including RSIC's and Fort McDermitt's, were closed for most of 2020.

Consultation conducted in good faith and in a manner sensitive to the concerns and needs of Indian tribes would have also taken into account the many warnings in federal regulations, manuals, and handbooks about how "an Indian tribe...may be reluctant to divulge specific information regarding the location, nature, and activities associated with [lands of religious and cultural significance to them]." § 800.4(a)(4). And, how "knowledge of traditional cultural values may not be shared readily with outsiders" as such information is "regarded as powerful, even dangerous" in some societies." See *Pueblo of Sandia v. US*, 50 F.3d 856, 861 (10th Cir. 1995) (quoting the

1   National Register Bulletin No. 38 that BLM uses to evaluate Traditional Cultural

2   Properties."

3          Originally, all of 36 CFR § 800 governed implementation of NHPA's Section 106

4   consultation process, but the BLM Nevada State Office, under a National Programmatic

5   Agreement (NPA, 1997, as amended 2012) among BLM, the Advisory Council of

6   Historic Preservation (ACHP), and the National Conference of State Historic

7   Preservation Officers, replaced the procedures set forth in 36 CFR § 800.3 through §

8   800.7 with the 2014 BLM-State Historic Preservation Officer (SHPO) Protocol

9   Agreement ("the Protocol").

10          The Protocol's Preamble declares that the Protocol is "...designed to enhance the

11   participation of consulting parties, the general public and Native American tribes in the

12   section 106 process..." The Protocol includes this bright-line rule about public

13   participation, at Section V.F.4.a-b:

14   "4. BLM will negotiate a [Memorandum of Agreement] addressing adverse effects when
15   BLM and SHPO agree that the adverse effects are known prior to the approval of the
16   undertaking.
17   a.        The MOA establishes BLM-SHPO concurrence regarding the resolution of
18   project-related adverse effects according to a [Historic Properties Treatment Plan], as
19   well as other stipulations and measures that may be specified in the MOA. BLM must
20   initiate consultation with SHPO regarding eligibility, effects, and resolution of adverse
21   effects with sufficient lead time to allow for development of an MOA on a schedule
22   meeting the undertaking's anticipated DR or ROD. BLM will also consult with Indian
23   tribes and other consulting parties, as appropriate. The MOA must be signed by the
24   appropriate parties _prior_ to BLM's issuance of a DR or ROD for the undertaking.
25
26   b.        Draft PAs and MOAs should be made available for public comment." (emphasis
27   with original.)
28
29          Despite BLM and SHPO agreeing that adverse effects to historic properties in

30   Peehee mu'huh were known prior to approval of the undertaking, the MOA was not

31   signed by the appropriate parties prior to BLM's issuance of the ROD. Nor were draft

1   Programmatic Agreements or Memorandums of Agreement made available for public

2   comment.

3          Inexplicably, the Notice of Availability of the Final Environmental Impact

4   Statement for the Proposed Thacker Pass Project, published December 4, 2020, stated

5   that "[t]he BLM and Nevada SHPO recently executed a Memorandum of Agreement to

6   resolve adverse effects to the 57 historic properties." But, then, the Record of Decision

7   contradicted the Notice of Availability and stated:

8          "In accordance with the requirements of Section 106 of the National Historic

9   Preservation Act, the BLM coordinated and consulted with the State Historic

10  Preservation Office (SHPO). The BLM received a letter dated Wednesday, October 7,

11  2020, providing the SHPO's concurrence on the cultural resource report and finding of

12  adverse effect. A Memorandum of Agreement and treatment plan are being prepared,

13  and the BLM will continue to consult with the SHPO on the Project and treatment plan in

14  accordance with programmatic protocols."

15          According to the ROD, the following is the extent of BLM's "Native American

16  Consultation" prior to issuing the ROD:

17  "The BLM has been in contact with tribal governments regarding this Project from its
18  early stages (October 2018) and through the ensuing National Environmental Policy Act
19  (NEPA) process.
20
21  In December 2019, BLM sent certified letters to Fort McDermitt, Pyramid Lake, Summit
22  Lake, and Winnemucca Indian Colony 'initiating formal consultation.' These tribes are
23  also on the Project EIS mailing list to receive updates, and the BLM notified the tribes of
24  the availability of the draft EIS in July 2020. The tribes also received notification and
25  copies of the final EIS by certified mail in December 2020. No comments or concerns
26  have been raised during formal government to government consultation for the Project
27  by the tribes."
28

1      This was contradicted in a letter received by the RSIC on July 12, 2021 from

2    Kathleen Rehberg, Field Manager, BLM Winnemucca, Humboldt River Field Office who

3    stated that only the Fort McDermitt Paiute-Shoshone tribe, the Summit Lake Paiute

4    tribe, and the Winnemucca Indian Colony were invited to consult on the project and its

5    impact.

6      In *Pueblo of Sandia v. United States*, 50 F.3d 856 (10th Cir.1995), the 10th

7    Circuit ruled that the US Forest Service did not make a reasonable and good faith effort

8    to identify historic properties despite the Forest Service mailing letters to local Indian

9    tribes, including the plaintiff Sandia Pueblo, and to individual tribal members who were

10    known to be familiar with traditional cultural properties. The letters requested detailed

11    information describing the location of the sites, activities conducted there, and the

12    frequency of the activities. The Forest Service also asked tribes to provide maps of the

13    sites as well as provide documentation of the historic nature of the property. See *Pueblo*

14    *of Sandia v. United States*, 50 F.3d 856, 860 (10th Cir.1995).

15      In addition to mailing form letters to the tribes and individuals, Forest Service

16    officials also participated in meetings of the All Indian Pueblo Council and the San

17    Felipe Pueblo. None of the tribes or individuals provided the Forest Service with the

18    type of information requested in the letters and meetings. *Id*.

19      Despite the Forest Service's efforts, the 10th Circuit ruled these efforts were not

20    enough to meet the reasonable effort to identify historic properties in affected areas

21    required by the NHPA. Of particular note the 10th Circuit stated, "The record reveals

22    that the Forest Service did request information from the Sandia Pueblo and other local

23    Indian tribes, but a mere request for information is not necessarily sufficient to constitute

the 'reasonable effort' section 106 requires." *Pueblo of Sandia v. United States*, 50 F.3d

856, 860 (10th Cir.1995) Compared to the efforts of the Forest Service in *Pueblo of*

*Sandia*, the BLM, Winnemucca District Office has done even less to satisfy the

reasonable effort standard under the NHPA.

In *Quechan Tribe of Fort Yuma Indian Reservation v. US Dept. of Interior*, 755

F.Supp.2d 1104 (SD Calif. 2010), the BLM offered documentation of consultations with

tribes different from the plaintiffs, with other agencies, and with the public. However, the

federal district court noted:

"While this other consultation appears to be required and serves other important
purposes, it doesn't substitute for mandatory consultation with the Quechan Tribe. In
other words, that BLM did a lot of consulting in general doesn't show that its
consultation with the Tribe was adequate under the regulations. Indeed, [the BLM]
grouping tribes together (referring to consultation with 'tribes') is unhelpful: Indian tribes
aren't interchangeable, and consultation with one tribe doesn't relieve the BLM of its
obligation to consult with any other tribe that may be a consulting party under NHPA."
*Quechan Tribe of Fort Yuma Indian Reservation v. US Dept. of Interior*, 755 F.Supp.2d
1104, 1118 (SD Calif. 2010)

*The Quechan Tribe* court also stated: "...the BLM's communications are replete

with recitals of law (including Section 106), professions of good intent, and solicitation to

consult with the Tribe. But mere pro forma recitals do not, by themselves, show BLM

actually complied with the law. *Id.*

BLM and Lithium Nevada will likely try to lump all the tribes together and insist

that contact with two or three tribes is sufficient. However,, federal courts have ruled

"[c]ontact, of course, is not consultation, and 'consultation with one tribe doesn't relieve

the [agency] of its obligation to consult with any other tribe." *Standing Rock Sioux Tribe*

*v. U.S. Army Corps of Engineers*, 205 F.Supp.3d 4, 32 (D. DC 2016) (citing *Quechan*

*Tribe of Fort Yuma Indian Reservation v. U.S. Dep't of Interior*, 755 F.Supp.2d 1104,

1    1112, 1118 (S.D.Cal. 2010)). Lithium Nevada, in its Opposition to the Intervening

2    Plaintiffs' Motion to Intervene claimed that the BLM engaged in government-to-

3    government consultation with the Fort McDermitt Tribe beginning in 2018. But this is

4    contradicted by the July 12 Rehberg letter to RSIC which says NHPA consultation for

5    the Project "opened in January 2020 and closed November 5, 2020." Even if this is true,

6    the Fort McDermitt Tribe is only 1 of many tribes BLM should have consulted with.

7         The only so-called consultations the BLM can demonstrate for the Thacker Pass

8    project are mere *pro forma* recitals, requests for information, and feeble attempts at

9    contacting a fraction of the number of tribes who attach religious and cultural

10   significance to Peehee mu'huh.   Because of this, the Intervening Plaintiffs are likely to

11   succeed on the merits.

12   **B. The BLM's Failure to Follow NHPA Regulations Is Irreparable Harm**

13        In the absence of preliminary relief, the Intervening Plaintiffs are likely to suffer

14   irreparable harm.  As previously discussed in the standing section of this Memorandum,

15   the harm is in the form of procedural injury -- but it is procedural injury infused with

16   damage to culture, religious practices, personal and collective history and tradition.

17   For instance, he Thacker Pass Project Area encompasses a massacre site. This

18   massacre is how Peehee mu'huh got its name. Peehee mu'huh means "rotten moon" in

19   English. The Intervening Plaintiffs' oral histories describe an event where Paiute hunters

20   went away from Peehee mu'huh to hunt and, when the hunters returned, they found

21   their loved ones massacred with their intestines strewn and rotting across the sage

22   brush in a part of the Pass shaped like a crescent moon. Because they were massacred

23   there, the flesh, blood, and bones of the Intervening Plaintiffs' ancestors are physically

1   resting place of the Intervening Plaintiffs' murdered ancestors is a desecration of the

2   highest order and would irreparably harm them. This Court observed, when granting

3   the Intervening Plaintiffs permission to intervene that "The Tribes persuasively argue

4   that the digging incident to this plan will cause them irreparable harm." (Order, 7/28/21,

5   ECF 59 at 8).

6          Intervening Plaintiffs, other Indian tribes who attach religious and cultural

7   significance to Peehee mu'huh, and the general public all had a right to meaningful

8   consultation *before* the ROD was issued by the BLM, under the NHPA Section 106

9   process. Allowing the BLM and Lithium Nevada to proceed under this invalid ROD

10  without the BLM's fulfillment of Section 106 obligations is irreparable harm.

11         BLM and its permittees often claim that they will backfill test-pits and other holes

12  upon completion of data collection. But even if BLM plans on backfilling the trenches

13  and holes, there could be human remains and artifacts below the ground surface. The

14  excavators and shovels could harm the very human remains and artifacts the

15  archaeologists would be looking for.

16         **C. The Intervening Plaintiffs' Interest In Participating in NHPA Consultation**
17         **Outweighs BLM's and Lithium Nevada's Interest Proceeding with the**
18         **Project**
19
20         The balance of equities favors the Intervening Plaintiffs. For the BLM and Lithium

21  Nevada, the most serious possible injury that could be caused by a preliminary

22  injunction order is a temporary delay in the Project's operations. The BLM and Lithium

23  Nevada may argue that the public has an economic interest in mine, but the Intervening

24  Plaintiffs echo the Plaintiffs' invocation of *S.E. Alaska Conservation Council v. U.S.*

1   *Army Corps of Engineers*, 472 F.3d 1097, 1011 (9th Cir.) where the Ninth Circuit

2   minimized the hardship caused by temporary delays in construction activities:

3   "Although the public has an economic interest in the mine, there is no reason to believe

4   that the delay in construction activities caused by the court's injunction will reduce

5   significantly any future economic benefit that may result from the mine's operation."

6   In fact, pausing right now so that BLM can adequately consult with Indian tribes before

7   the Project would destroy land sacred to the tribes, might actually *improve* economic

8   benefits in the future as socially-conscious investors shy away from projects accused of

9   violating Native American rights.

10          For the Intervening Plaintiffs, however, the desecration performed by heavy

11  machinery digging seven trenches and hand shovels digging as many as 525 holes

12  cannot be undone once it begins. The destruction caused by trenching and digging are

13  likely to restrict the Intervening Plaintiffs' ability to suggest alternatives to avoid,

14  minimize, or mitigate the Project's adverse effects on historic properties. It's possible,

15  too, that inadvertent destruction of cultural resource sites, burial sites, human remains,

16  and artifacts is used as an excuse to justify mitigation measures that are less sensitive

17  to the concerns of Native people.

18          **D. The Public Has A Strong Interest In Meaningful Consultation To Preserve**
19          **Historic Properties**
20
21          Granting preliminary relief to the Intervening Plaintiffs so that the BLM can

22  adequately consult with RSIC, Atsa koodakuh wyh Nuwu/People of Red Mountain, other

23  Indian tribes, and the general public benefits the public more than allowing the BLM to

24  get away with shirking its responsibilities under the NHPA. The public has a strong

25  interest in having federal administrative agencies follow the consultation regulations .

1   Even after centuries of genocide and racism, the NHPA does not give Indian tribes the

2   power of consent to stop federal agencies and archaeological firms working for mining

3   corporations from impairing their traditional lands. At the very least, the federal agencies

4   must be required to follow regulations that only burden them with hearing Indian tribes'

5   concerns before they begin the impairment. It's not completely just that federal agencies

6   are required only to listen to their Native victims before they destroy their land. But, it is

7   the law.

8            III.        **No Bond Is Necessary in the Case**

9            In order to obtain a preliminary injunction, a plaintiff may be required to post a

10   bond as the court deems proper. Fed. R. Civ. P. 65(c). "The court has discretion to

11   dispense with the security requirement, or to request a mere nominal security, where

12   requiring security would effectively deny access to judicial review." *Cal. ex rel. Van De*

13   *Kamp v. Tahoe Reg'l Plan Agency*, 766 F.2d 1319, 1325-26 (9th Cir. 1985). In *Cal. ex*

14   *rel. Van De Kamp v. Tahoe Reg'l Plan Agency*, the court did not require a bond where

15   the plaintiffs were public interest organizations seeking to protect the environment.

16   Atsa koodakuh wyh Nuwu/People of Red Mountain is composed of members belonging

17   to one of the poorest tribes in the nation. They seek to protect their ancestral lands and

18   ensure that the BLM follows the NHPA regulations. They have a very limited capacity to

19   post a bond. RSIC also seeks to protect lands religiously and culturally important to it. It

20   is also trying to help BLM follow the NHPA regulations, in part so that BLM does not

21   establish a pattern of ignoring consultation requirements across Indian Country.

22   Anything more than a nominal bond would be very difficult for the Intervening Plaintiffs

23   to post and would effectively deny their access to judicial review.

Respectfully submitted this 29th day of July, 2021.

By: /s/Julie Cavanaugh-Bill
Julie Cavanaugh-Bill (State Bar No. 11533)
Cavanaugh-Bill Law Offices
Henderson Bank Building
401 Railroad Street, Suite 307
Elko, NV 89801
(775) 753-4357
julie@cblawoffices.org

William Falk, Esq (Utah Bar No. 16678)
2980 Russet Sky Trail
Castle Rock, CO 80101
(319) 830-6086
falkwilt@gmaail.com

Terry J. Lodge, Esq. (Ohio Bar No. 29271), Pro Hac Vice
Application To Be Filed
316 N. Michigan St., Suite 520
Toledo, OH 43604-5627
(419) 205-7084
tjlodge50@yahoo.com
Co-Counsel for Intervenors

## CERTIFICATE OF SERVICE

I hereby certify that on July 29, 2021, I filed the foregoing using the United States

District Court CM/ECF, which caused all counsel of record to be served electronically.

By: /s/Julie Cavanaugh-Bill
Julie Cavanaugh-Bill (State Bar No. 11533)

1