# Exhibit 1

# Exhibit 1

Louis M. Bubala III (Nevada Bar No. 8974)
KAEMPFER CROWELL
50 West Liberty Street, Suite 700
Reno, Nevada  89501
Telephone:   (775) 852-3900
Facsimile:    (775) 327-2011
Email:  lbubala@kcnvlaw.com

Rick Eichstaedt (Washington Bar No. 36487)
Will comply with L.R. 1A 11-2 within 14 days
WHEAT LAW OFFICES
25 West Main Avenue, Suite 320
Spokane, Washington  99201
Telephone:    (509) 251-1424
Email:  rick@eichstaedtlaw.net

Attorneys for the Burns Paiute Tribe

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| BARTELL RANCH LLC, *et al.*, <br><br> Plaintiffs, <br><br> *vs.* <br><br> ESTER M. McCULLOUGH, *et al.*, <br><br> Defendants, | *Lead Case:* <br> Case No.:   3:21-cv-00080-MMD-CLB |
| WESTERN WATERSHEDS PROJECT, *et al.*, <br><br> Plaintiffs, <br><br> *vs.* <br><br> UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*, <br><br> Defendants. | *Consolidated with:* <br> Case No.:    3:21-cv-00103-MMD-CLB <br><br><br> **[PROPOSED] BURNS PAIUTE TRIBE'S COMPLAINT-IN-INTERVENTION FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Intervenor-Plaintiff Burns Paiute Tribe ("Tribe") alleges the following against Defendants:

KAEMPFER CROWELL
50 West Liberty Street, Suite 700
Reno, Nevada  89501

# INTRODUCTION

1.     This is an action for declaratory and injunctive relief challenging: (1) the failure of the DOI to consider and analyze impacts of the Thacker Pass Lithium Mine Project ("the Project") on archaeological and cultural resources, as required by the National Environmental Policy Act ("NEPA"),  42 U.S.C. § 4321 *et seq*., and its regulations; (2) to comply with the substantive and procedural requirements and regulations of the National Historic Preservation Act, 16 U.S.C. § 470, *et seq*. ("NHPA"); and (3) to comply with the requirements the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.,* in the issuance of the Final Environmental Impact Statement ("FEIS"), the Historic Properties Treatment Plan ("HPTP"), and the Record of Decision ("ROD") for the Project.

# JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1361 (action to compel an officer of the United States to perform her/his duty), and 28 U.S.C. §§ 2201-2202 ("creation of remedy" and "further relief" provisions establishing power to issue declaratory judgments in case of actual controversy).  The Tribe has a right to bring this action pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706. Defendant's issuance of the ROD on January 15, 2021, approving the Project constitutes final agency action.

3.     Venue is properly vested in this Court under 28 U.S.C. § 1391(e).

# THE PARTIES

4.     Intervenor-Plaintiff, the Burns Paiute Tribe ("Tribe") is a federally recognized Indian Tribe.  The Tribe consists of 210 members headquartered in Burns, Oregon.

5.      Tribal members continue to hunt, fish, gather, and visit sites within their traditional territory as an important part of their cultural, spiritual, and subsistence life.

KÆMPFER CROWELL
50 West Liberty Street, Suite 700
Reno, Nevada  89501

6.    Since time immemorial, the Burns Paiute Tribe has occupied and utilized approximately 5,250 square miles of land in central-southeastern Oregon, northern Nevada, northwestern California, and western Idaho, including the Thacker Pass area that is subject to this litigation.

7.    The scope of the Tribe's traditional territory is depicted on the map below.



**Traditional Territory (Burns Paiute Tribe)**

The Burns Paiute Tribe traditional aboriginal territory extends from the east foothills of the Cascades up north to The Dalles, extending east into Boise, Idaho, south to Smokey Spring, Nevada, and into California, to the southern tip of Goose Lake.

Scale: 1:3,000,000

8.    As tribal members travelled throughout their traditional territory, they buried their dead, and left evidence of their use and occupation of the land, including the areas impacted by this litigation.  This evidence of the Tribe's long-standing use and occupation includes clothing

KAEMPFER CROWELL
50 West Liberty Street, Suite 700
Reno, Nevada 89501

made from animal and bird hides and sandals made from sagebrush fibers believed to approximately 10,000 years old.

9.      Tribal traditions include a respect and reverence for their ancestors and their historic and cultural sites which creates a powerful voice for responsible land stewardship.  This is well illustrated by the Tribe's Culture and Heritage program, which is committed to the preservation and protection of the Tribe's cultural resources within traditional cultural and historical boundaries of the Tribe.

10.     Defendant Bureau of Land Management ("BLM") is an agency of the Defendant United States Department of the Interior ("DOI").  BLM has oversight responsibility for the federal lands affected by the Project.  BLM's Winnemucca District Office issued the 2020 FEIS and the 2021 ROD.

11.     Defendant Ester M. McCullough, the District Manager of the BLM Winnemucca District Office, was the Authorized Officer for the challenged FEIS and ROD.  She is sued in her official capacity.

**STATUTORY AND REGULATORY FRAMEWORK**

**A.      National Environmental Policy Act**

12.     NEPA establishes a "national policy [to] encourage productive and enjoyable harmony between man and his environment." NEPA is intended to reduce or eliminate environmental damage and to promote "the understanding of the ecological systems and natural resources important to" the United States. 42 U.S.C. § 4321.

13.     Under NEPA, the agencies must complete an EIS that includes a detailed statement regarding among other things: (i) "the environmental impact of the proposed action," (ii) "any adverse environmental effects which cannot be avoided should the proposal be implemented," and (iii) "alternatives to the proposed action."  42 U.S.C. § 4332(2)(C).  NEPA's purpose is twofold:

KÆMPFER CROWELL
50 West Liberty Street, Suite 700
Reno, Nevada 89501

first, to ensure that federal agencies undertaking a major federal action take a "hard look" at a proposed project's environmental impacts before deciding how to proceed, and second, to ensure that relevant information about the impacts of a proposed project and its alternatives is made available to members of the public, to provide a meaningful opportunity for their comment and participation in the federal decision-making process.

14.     An EIS must identify and provide a full and fair discussion of all significant environmental impacts caused by the proposed action/project.   42 U.S.C. § 4332; 40 C.F.R. § 1502.1.  EISs shall not serve as a means of justifying decisions already made or a rubber stamp for a project.  40 C.F.R. § 1502.2(g).  The EIS shall describe the environment of the area.  40 C.F.R. § 1502.15.  The EIS shall also describe all direct, indirect, cumulative effects and their significance. 40 C.F.R. § 1502.16.

15.     The agency must take a "hard look" at identifying and evaluating potential adverse environmental impacts.  *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1376 (9th Cir. 1998).  Courts will set aside an EIS as arbitrary or capricious if the agency can identify no "rational connection between the facts found and the choice made;" that is, if the "explanation for its decision [ran] counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

16.     Essential to an agency's obligations under NEPA is the duty to ensure that "high quality" information is available to the public before decisions are made and before actions are taken. 40 C.F.R. § 1500.1(b).

17.     The CEQ regulations require that agencies "make every effort to disclose and discuss at appropriate points in the draft environmental impact statement all major points of view on the environmental impacts of the alternatives including the proposed action." 40 C.F.R. § 1502.9(a).

KAEMPFER CROWELL
50 West Liberty Street, Suite 700
Reno, Nevada 89501

Agencies are required to discuss at appropriate points in the final environmental impact statement any responsible opposing view not adequately discussed in the draft statement and indicate the agency's response to the issues raised. *Id.* at § 1502.9(b).

18.     Under the CEQ regulations, "[w]hen an agency is evaluating reasonably foreseeable significant adverse effects on the human environment in an environmental impact statement and there is incomplete or unavailable information, the agency shall always make clear that such information is lacking." 40 C.F.R. § 1502.22. Further, if the incomplete information "is essential to a reasoned choice among alternatives" and the costs to obtain complete information are "not exorbitant," the agency must include complete information in the EIS. *Id.* at § 1502.22(a).

19.     To ensure that an agency has complete information, the CEQ regulations require that Federal agencies consult with Tribe early in the NEPA process.  40 C.F.R. § 1501.2(d)(2).

**B.     National Historic Preservation Act**

20.     Under Section 106 of the National Historic Preservation Act ("NHPA"), federal agencies, when undertaking any federally assisted action within the United States, "shall take into account the effect of the undertaking on any historic property." 54 U.S.C. § 306108; *Morongo Band of Mission Indians v. FAA*, 161 F.3d 569, 581 (9th Cir. 1998).

21.     Like NEPA, the NHPA "is a stop, look, and listen provision that requires each federal agency to consider the effects of its programs." *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 805 (9th Cir. 1999); *see also Illinois Commerce Comm'n v. ICC*, 848 F.2d 1246, 1261 (D.C. Cir. 1988); *United States v. 0.95 Acres of Land,* 994 F.2d 696, 698 (9th Cir. 1993) (Section 106 sets forth procedural requirements "similar to NEPA except that it requires consideration of historic sites, rather than the environment.").

22.     NHPA "does not itself require a particular outcome, but rather ensures that the relevant federal agency will, before approving funds or granting a license to the undertaking at

issue, consider the potential impact of that undertaking on surrounding historic places." *Business & Residents Alliance v. HUD*, 430 F.3d 584, 591 (2d Cir. 2005) (citations omitted). "The Act imposes a dual obligation on federal agencies: the substantive duty to 'weigh effects' in deciding whether to undertake the federal action and the procedural duty to consult with [ACHP]." *See Save Our Heritage v. FAA*, 269 F.3d 49, 58 (1st Cir. 2001).

23.     NHPA regulations developed by the Advisory Council on Historic Preservation ("ACHP") recognize that the "Federal Government has a unique legal relationship with Indian tribes" and requires consultation with Indian tribes to be "conducted in a sensitive manner respectful of tribal sovereignty" and that consultation "must recognize the government-to-government relationship between the Federal Government and Indian tribes." 36 C.F.R. § 800.2(c)(2)(ii). An agency must "consult with any Indian tribe or Native Hawaiian organization that attaches religious and cultural significance to historic properties that may be affected by an undertaking." *Id*. Consultation with Indian tribes "should commence early in the planning process, in order to identify and discuss relevant preservation issues and resolve concerns about the confidentiality of information on historic properties." *Id*.

24.     An agency, in consultation with "any Indian tribe . . . that attaches religious and cultural significance to identified historic properties" "shall apply the criteria of adverse effect to historic properties within the area of potential effects." 36 C.F.R. § 800.5(a). An adverse effect is "when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association." 36 C.F.R. § 800.5(a)(1). Examples of adverse effects on historic properties include, but are not limited to, physical destruction of all or part of the property; alteration of the property; removal of the property; change of the character of the property's use or of physical

features; introduction of visual, atmospheric or audible elements that diminish the integrity of the property; and the transfer, lease or sale of property out of federal ownership.   36 C.F.R. § 800.5(a)(2).

**C.     Administrative Procedure Act**

25.     The APA, 5 U.S.C. §§ 701-706, provides for judicial review of federal agency actions such as those at issue here. The APA requires a reviewing court to hold unlawful and set aside any agency action found to be arbitrary capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

**D.     Declaratory Judgment Act**

26.     The Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, authorizes "any court of the United States" to "declare the rights and other legal relations of any interested party seeking such declaration."

**E.     DOI/BLM Consultation Obligations**

27.     The Department of Interior and BLM have a number of agency orders, policies, and other guidance for the implementation of government-to-government consultation with Tribes.

28.     The Interior Secretarial Order No. 3317 (December 1, 2011) provides guiding principles and a general description of the attributes to ensure meaningful government-to-government consultation between government officials. Consultation is defined as a process that aims to create effective collaboration with Indian tribes and to inform Federal decision-makers. Bureaus and offices are required to promote cooperation, participation, and efficiencies between agencies with overlapping jurisdictions, special expertise, or related responsibilities when a Departmental action with tribal implications arises.

29.     Chapter 5 of the Interior Departmental Manual provides the procedures and process for DOI government-to-government consultation between tribal officials and DOI officials.   The

Departmental Manual provides that "[b]ureaus and offices must consult tribes and … whenever a DOI plan or action with tribal implications arises."  Departmental Manual §5.4(A).

30.     BLM Manual 1780 (Tribal Relations) provides comprehensive guidance concerning government-to-government consultation for the BLM.  Among other requirements, these manuals provide, "The BLM recognizes Indian religious and cultural values as an important, living part of our Nation's heritage. The BLM commits to addressing and, where practicable, minimizing potential disruption of the traditional expression or maintenance of these values that might result from BLM land use decisions." BLM Manual 1780 § 1.6(A)(11).

31.     BLM Handbook 1780-1 (Improving and Sustaining BLM-Tribal Relations) provides guidance concerning tribal relations.  The Handbook states, "Consultation is designed to ensure meaningful and timely meetings or discussions with elected or duly appointed tribal leaders (or their authorized representatives) and BLM decision makers as they pertain to proposed BLM actions. Consultation is an opportunity for tribes to discuss the potential effects of planned agency actions on tribal interests and to make recommendations to the agency."  BLM Handbook 1780-1 § III(A)(3).

## FACTUAL AND PROCEDURAL BACKGROUND

A.     **Significance of Thacker Pass to the Tribe**

32.     The Tribe and its members attach significant religious and cultural value to Thacker Pass.  It is considered a spiritually powerful place that contains the remains of tribal ancestors and, according to tribal beliefs, their spirits.  It contains plants and wildlife that the tribal members hunted and gathered and continue to hunt and gather, including chokecherries and mule deer. It is also the habitat to golden eagles, which tribal members believe have a spiritual connection to the Creator.   The area was also an important place for the gathering of obsidian used to make arrowheads and other tools.

KÆMPFER CROWELL
50 West Liberty Street, Suite 700
Reno, Nevada 89501

33.    The Thacker Pass area is a shared use area by regional tribes, including the Burns Paiute Tribe, who continue to attribute cultural, spiritual, and historic value to the area.

34.    Thacker Pass, known as *Peehee mu'huh* or "rotten moon," is the location of a massacre where tribal members were murdered and left unburied.  In more recent times, tribal members used caves and rocks in Thacker Pass to evade officials and removal from their lands.

35.    The Tribe and tribal members continue to utilize Thacker Pass and recognize its significant cultural, spiritual, and historic value.

36.    The actions associated with the Project threaten areas of significant historic and cultural significance to the Tribe in Thacker Pass.

**B.    The Thacker Pass Lithium Mine Project.**

37.    The Thacker Pass Lithium Mine Project covers 17,933 acres of public land administered by the BLM. 10,468 of those acres are associated with the Mine Plan and 7,465 of them are associated with the Exploration Plan. Project facilities include the development of an open pit mine, waste rock storage facilities, a coarse gangue stockpile, a clay tailings filter stack, growth media stockpiles, haul and secondary roads, and additional mine facilities to support mining and lithium production operations.

38.    The FEIS states that the area contains over 1,000 cultural resource sites, including the Double H/Whitehorse Obsidian Procurement District, which would be impacted by the Project. The BLM and the Nevada State Historic Preservation Officer have also concluded that the Project would adversely affect 56 historic properties eligible for listing on the National Register of Historic Places.

39.    Ground disturbing activities and project infrastructure development could directly, indirectly, and cumulatively affect one or more of the NRHP integrity aspects of 85 historic properties and one district.

40.     Due to a lack of adequate government-to-government consultation, the FEIS failed to address the impacts to cultural resources that would have been raised by the Burns Paiute Tribe and otherwise failed to consider information that would have been obtained from the Tribe.

41.     Likewise, the FEIS failed to address impacts and information that would have been obtained by other tribes had Defendants engaged in proper government-to-government consultation.

**C.      Lack of Consultation with the Tribe.**

42.     The Burns Paiute Tribe did not learn about the Project until May 2021.

43.     The Tribe has never received information from the Defendants, the mining company, or anyone else about the Project or engaged in government-to-government consultation about the Project, including any impacts to cultural resource sites or proposed mitigation measures to address impacts to cultural resources, including the development of the Historic Properties Treatment Plan.

44.     Once the Tribe learned about the Project, the Tribal Council sent a letter on June 16, 2021, to the Winnemucca District Office of the BLM.

45.     In this letter, the Tribe requested that "any plan for mechanical trenching operations and other construction activities" associated with the Project be halted "until meaningful government-to-government consultation with [the Tribe] and all of the tribes that are connected to Thacker Pass has concluded."

46.     No response was provided to the Tribe to this letter.

47.     Had consultation occurred with the Tribe prior to the issuance of the FEIS, ROD, and HPTP, the Tribe would have provided Defendants with information about potential impacts

Kᴀᴇᴍᴘꜰᴇʀ Cʀᴏᴡᴇʟʟ
50 West Liberty Street, Suite 700
Reno, Nevada 89501

associated with the Project to cultural resources and otherwise provided Defendants with information that should have been considered in the NEPA and NHPA process.

48.     The failure to properly consult and otherwise comply with the requirements of federal law and agency policies has adversely affected and continue to affect the Tribe's rights and interests.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Violations of NEPA, its Implementing Regulations, and the APA: Failure to Adequately Assess and Disclose Environmental Impacts, Mitigation, and Alternatives**

49.     Intervenor-Plaintiff realleges and incorporates the allegations of all the preceding paragraphs of this Complaint.

50.     NEPA requires federal agencies to prepare an EIS in connection with all "major Federal actions significantly affecting the quality of the human environment."   42 U.S.C. § 4332(2)(C).

51.     NEPA requires federal agencies to take a "hard look" at the direct, indirect, and cumulative impacts of proposed major Federal actions, and at alternatives that could reduce or eliminate those environmental impacts. 42 U.S.C. § 4332(2)(C)(i)-(ii); 40 C.F.R. §§ 1502.16, 1508.7, 1508.8, 1508.25.

52.     The FEIS, HPTP, and ROD fail to comply with the requirements of NEPA, its implementing regulations, and the relevant case law for reasons including:

a)      Failing to take the requisite "hard look" at the archaeological and cultural resources impacts of the HPTP and the Project and available alternatives to mitigate impacts;

b)    Did not adequately study, disclose, or mitigate archaeological and cultural resources impacts; and

c)     Relied on less than adequate information by failing to engage in meaningful consultation with Tribes.

53.     Defendants acted arbitrarily and capriciously in approving the FEIS, HPTP, and ROD based on a factual record that contains both questionable data and gaping omissions.

54.     By their actions and inactions as alleged above, Defendants are currently violating the NEPA and its implementing regulations.  Defendants' actions and inactions are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the requirements of NEPA and its implementing regulations and are reviewable under the APA, 5 U.S.C. §§ 701–706.

## SECOND CLAIM FOR RELIEF

### Violations of NEPA, its Implementing Regulations, and the APA: Failure to Engage in Government-to-Government Consultation

55.     Intervenor-Plaintiff realleges and incorporates the allegations of all the preceding paragraphs of this Complaint.

56.     NEPA regulations require that federal agencies consult early in the NEPA process with "Indian tribes." 40 C.F.R. § 1501.2(d)(2).

57.     The FEIS, HPTP, and ROD fails to comply with the requirements of NEPA regulations by failing to consult with Burns Paiute Tribe to ensure that necessary information was received to assess impacts of the Project.

58.     By their actions and inactions as alleged above, Defendants are currently violating the NEPA and its implementing regulations.  Defendants' actions and inactions are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the requirements of

KAEMPFER CROWELL
50 West Liberty Street, Suite 700
Reno, Nevada 89501

NEPA and its implementing regulations and are reviewable under the APA, 5 U.S.C. §§ 701–706.

### THIRD CLAIM FOR RELIEF

#### Violations of NHPA and the APA: Failure to Consult

59.     Plaintiff-Intervenor realleges and incorporates the allegations of all the preceding paragraphs of this Complaint.

60.     Defendants failed to follow the consultation mandate of the NHPA and its regulations, including 36 C.F.R. §§ 800.1, 800.2, by failing to consult with the Tribe regarding the Project.

61.     Defendants' failure to consult with the Tribe is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the requirements of NHPA and its implementing regulations and is reviewable under the APA, 5 U.S.C. §§ 701–706.

### FOURTH CLAIM FOR RELIEF

#### Violations of the APA: Failure to Comply with Agency Policy Regarding Consultation

62.     Under the Administrative Procedure Act, a reviewing court "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A).

63.     An agency must comply with its own internal policies even if those policies are more rigorous than procedures required by the APA. At minimum an agency must consider its own policies that apply to an action and explain any decision to depart from those policies.

64.     Where a federal agency has established a policy requiring prior consultation or coordination with affected tribal governments, and therefore created a justified expectation that each affected tribal government will receive a meaningful opportunity to express its views before policy or decisions are made, that opportunity must be given.

KAEMPFER CROWELL
50 West Liberty Street, Suite 700
Reno, Nevada 89501

65.     Defendants failed to consult or coordinate with the Tribe or fully comply with DOI and/or BLM tribal consultation policies and other federal-tribal consultation law and policy prior to issuing the FEIS, HPTP, and ROD.  Defendants also failed to even consider their own tribal consultation policy or explain their decision to depart from the policy by failing to consult with the Tribe.

66.     Defendants' failure to comply with its own policy requiring it to consult with the Tribe is illegal, arbitrary, and capricious, and an abuse of discretion.

### PRAYER FOR RELIEF

WHEREFORE, the Burns Paiute Tribe respectfully requests the following relief:

1.     Adjudge and declare that any ground disturbing activities planned by Defendants associated with the Project have violated NEPA, NHPA, their implementing regulations, and the APA;

2.     Adjudge and declare that Defendants' FEIS, HPTP, and ROD violate the requirements of NEPA, NHPA, their implementing regulations, and the APA;

3.     Vacate the FEIS, HPTP, and ROD and remand to the Defendants;

4.     Enjoin any ground disturbing activities;

5.     Award the Tribe its reasonable fees, costs, expenses, and disbursements, including attorneys' fees, associated with this litigation; and

6.     Grant the Tribe such additional or different relief as it deems just and proper, or as the Tribe may hereinafter request.

Dated this 2nd day of August, 2021.

KAEMPFER CROWELL                    WHEAT LAW OFFICE

By:/s/*Louis M. Bubala III*              By:/s/*Rick Eichstaedt*
LOUIS M. BUBALA III                   RICK EICHSTAEDT

                                      Attorneys for Burns Paiute Tribe

**KAEMPFER CROWELL**
50 West Liberty Street, Suite 700
Reno, Nevada 89501

# Exhibit 2

# Exhibit 2

1  Louis M. Bubala III (Nevada State Bar No. 8974)
   Kaempfer Crowell
2  50 West Liberty Street, Suite 700
   Reno, Nevada 89501
3  Telephone: (775) 398-4741
   lbubala@kcnvlaw.com

4
   Rick Eichstaedt (Washington State Bar No. 36487) *Pro Hac Vice Application to Be Filed*
5  Wheat Law Offices
   25 West Main Avenue, Suite 320
6  Spokane, Washington 99201
   Telephone: 509.251.1424
7  rick@eichstaedtlaw.net

8  Attorneys for the Burns Paiute Tribe

9
                    **UNITED STATES DISTRICT COURT**
10                      **DISTRICT OF NEVADA**

11  WESTERN WATERSHEDS PROJECT, *et al.*,  | Case No.: 3:21-cv-103-MMD-CLB

12              Plaintiffs,    | **DECLARATION OF DIANE TEEMAN**
    v.
13
    UNITED STATES DEPARTMENT OF THE
14  INTERIOR, *et al.*,

15              Defendants.

16
    I, DIANE TEEMAN, declare as follows:

17     1.     I serve as the Cultural and Heritage Director of the Burns Paiute Tribe

18  ("Tribe"). I am an enrolled member of the Tribe. I am over the age of 18 and competent to

19  testify. I make this declaration based on my personal knowledge.

20     2.     The Burns Paiute Tribe is a federally recognized sovereign tribal nation

21  headquartered in Burns, Oregon.

22     3.     Since time immemorial, the people of the Burns Paiute Tribe occupied and

    utilized on more than 5250 square miles of land in central-southeastern Oregon, Northern
23
    Nevada, northwestern California, and western Idaho, including the Thacker Pass area. This

    traditional territory is depicted below.

1

1

2

3

**Traditional Territory (Burns Paiute Tribe)**

The Burns Paiute Tribe traditional aboriginal territory extends from the east foothills of the Cascades up north to The Dalles, extending east into Boise, Idaho, south to Smokey Spring, Nevada, and into California, to the southern tip of Goose Lake.



Scale: 1:3,000,000

4.      Today's tribal members are primarily the descendants of the "Wadatika" band of Paiutes. Paiute legends say that the Paiutes have lived in this area since before the Cascade Mountains were formed, coming from the south as part of a migration through the Great Basin. Burns Paiute members were basket makers who used fibers of willow, sagebrush, tule plant, and Indian hemp to weave baskets, sandals, fishing nets, and traps. Following the seasons, the members of the Burns Paiute Tribe hunted, fished, and gathered edible plants, harvesting their diet from lakes, marshes, streams, and uplands throughout their territory.

5.      As tribal members travelled throughout their traditional territory, they buried their dead and left evidence of their use and occupation of the land, including the areas impacted by

1  this litigation. Archeologists have found clothing made from animal and bird hides and sandals
2  made from sagebrush fibers believed to be close to 10,000 years old.

3      6.      The Tribe's history is both tragic and inspiring to living tribal members. The
4  Tribe's ancestors resisted encroachment of settlers, refused to cede their lands, and fought to
5  preserve their traditional life ways. A treaty of "Peace and Friendship" was eventually signed,
6  but never ratified. An Executive Order established a 1.8 million acres reservation in 1869 in the
7  Malheur Valley, but that reservation was short-lived. An uprising, the Bannock War, resulted in
8  the abandonment of the reservation to escape further conflict. After the "war," tribal members
9  were forcibly marched over 300 miles in knee-deep snow to Fort Simcoe and Fort Vancouver in
10 Washington State. After a time, tribal members escaped the forts and eventually those remaining
11 at the forts were given the option to leave. Those tribal members who returned and found that the
12 Tribe was now landless. In their absence, the Malheur Reservation was returned to "Public
13 Domain." A makeshift tribal encampment was established on the outskirts of the town of Burns,
14 Oregon.

15     7.      Since that time, the Tribe has purchased land that has been converted to federal
16 trust status. The purchased land is now the Burns Paiute Reservation.

17     8.      Despite this adversity, the Tribe has preserved of the language and many
18 traditional subsistence and cultural practices. Tribal ways endured because returning survivors
19 lived in a tight-knit tribal encampment with very limited resources, and they relied on one
20 another to stay alive. A gradual shift toward increased use of English as a first language did not
21 occur in earnest until the 1960s. Many traditional cultural practices endured and are still
22 practiced among living tribal members.

23     9.      The Tribe continues to hunt, gather food, and do beadwork and drum-making in
traditional ways and continues to have strong ties to the landscape throughout its traditional

3

1  territory. The Tribe continues to attribute significant cultural and spiritual value to throughout its
2  ancestral territory, including Thacker Pass.

3       10.      The Tribe attaches significant religious and cultural value to Thacker Pass. It is
4  known as a spiritually powerful place blessed by the presence of the remains of tribal ancestors
5  and, according to tribal beliefs, their spirits. It is an area that contains plants and wildlife that the
6  Tribe hunted and gathered and continue to hunt and gather, including chokecherries and mule
7  deer. It is also the habitat to golden eagles that the Tribe believes have a spiritual connection to
8  the Creator. For thousands of years, the area was also an important place for the gathering of
9  obsidian used to make arrowheads and other tools. It continues to be important today.

10       11.      The Thacker Pass area is a shared use area by regional tribes, who continue to
11  attribute cultural, spiritual, and historic value to the area.  Thacker Pass, known as *Peehee*
12  *mu'huh* or "rotten moon," is the location of a massacre where tribal members were murdered and
13  left unburied. This event gives the site additional cultural significance to the Tribe and to other
14  Tribes.

15       12.      In more recent times, tribal members used caves and rocks in Thacker Pass to
16  hide to avoid being rounded up and removed from their lands.

17       13.      The Tribe believes that the actions associated with the Project threatens these
18  areas of significant historic and cultural significance to the Tribe.

19       14.      The Final Environmental Impact for the Project states that the area contains over
20  1,000 cultural resource sites, including the Double H/Whitehorse Obsidian Procurement District,
21  which would be directly impacted by the Project.

22       15.      The BLM and the Nevada State Historic Preservation Officer have also concluded
23  that the Project would adversely affect 56 historic properties eligible for listing on the National
Register of Historic Places.

4

16.    The Burns Paiute Tribe did not learn about the proposed Thacker Pass Lithium Mine Project until May 2021 and was never contacted by the BLM.

17.    At no time did the DOI, the BLM, the mining company, or anyone else contact the Tribe to provide information about the Project or engage in government-to-government consultation about the Project, including any impacts to cultural resource sites or proposed mitigation measures to address impacts to cultural resources, including the development of a cultural resource memorandum of agreement.

18.    Once the Tribe learned about the Project, it sent a letter on June 16, 2021 to the Winnemucca District Office of the BLM. A copy of this letter attached.

19    In this letter, the Tribe requested that any plan for mechanical trenching operations and other construction activities associated with the Project be halted until meaningful government-to-government consultation with the Tribe and all the tribes that are connected to Thacker Pass has concluded.

20.    No response was provided to the Tribe to this letter. If the Tribe were contact, we would have shared information about impacts to cultural resources and information about the significance of the area to the Tribe.

21.    Considering the lack of response and the actions of the Reno-Sparks Indian Colony and the People of Red Mountain to intervene in this proceeding, the Burns Paiute Tribal Council voted to intervene.

5

22.   I certify under the penalty of perjury that the foregoing is true and correct.

DATED this 29th day of July 2021.

DIANE TEEMAN

6

# Attachment A

# Attachment A



*Burns Paiute Tribe*
*100 Pasigo Street*
*Burns, OR 97720*

June 16, 2021

Ms. Ester McCullough, District Manager
Mr. Ken Loda, Project Manager
Shannon Deep, Archaeologist
Bureau of Land Management
Winnemucca District Office
5100 East Winnemucca Blvd.
Winnemucca, NV 89445

Dear Ms. McCullough, Mr. Loda, and Ms. Deep,

The Burns Paiute Tribe request that you halt any plans for mechanical trenching operations and any other construction activities as part of the Thacker Pass Lithium Mine Project ("the Project") until meaningful government-to-government consultation with us and all of the tribes that are connected to Thacker Pass has concluded. Because you have not engaged in *any* consultation with us the Thacker Pass Project's Record of Decision and Plan of Operations must be rescinded.

We attach religious and cultural significance to Thacker Pass. Thacker Pass is a spiritually powerful place blessed by the presence of our ancestors and other spirits; contains our traditional foods and medicines including toza, ibi, yapa, and chokecherries; has been a place where our people have gathered obsidian to make arrowheads and other tools for thousands of years; provides habitat for wildlife we hunt including groundhog and mule deer; and is home to sacred golden eagles, who we believe are directly connected to the Creator. The BLM Winnemucca District Office must understand that Thacker Pass is a shared use area by a number of tribes. Just because regional tribes have been isolated and forced on to reservations relatively far away from Thacker Pass does not mean these regional tribes do not possess cultural connections to the Pass.

We also possess powerful historical connections to Thacker Pass. Some of our ancestors were massacred in Thacker Pass. In our Numic language, the name for Thacker Pass is *Peehee mu'huh*, which in English translates to "rotten moon." *Peehee mu'huh* was named so because our ancestors were massacred there while our hunters were away. When the hunters returned, they found their loved ones murdered, unburied, rotting, and with their entrails spread across the sage brush in a part of the Pass shaped like a moon. To disturb this massacre site in *Peehee mu'huh* would be like disturbing Pearl Harbor or Arlington National Cemetery.

In addition to the massacre, when American soldiers were rounding our people up to force them on to reservations, many of our people hid in Thacker Pass. There are many caves and rocks in Thacker Pass where our people could see the surrounding land for miles. The caves, rocks, and view provided our ancestors with a good place to watch for approaching soldiers. Disturbing cultural sites in Thacker Pass, may very well destroy camp sites our ancestors used when hiding from American soldiers. Destroying these sites destroys our history. And, it makes us wonder if an underlying motivation for this mine is to destroy the historical evidence of the genocide perpetrated against our people.

The Thacker Pass Final Environmental Impact Statement (DOI-BLM-NV-W010-2020-00120-EIS) ("FEIS") states that archival background research and pedestrian inventories have identified over 1000 cultural resource sites, including the Double H/Whitehorse Obsidian Procurement District, that would be directly affected by the Project's Mining and Exploration Plans. The Thacker Pass Component of this Obsidian Procurement District is a National Register of Historic Places-eligible district under Criterion D through BLM-State Historic Preservation Office (SHPO) consultation in 2009. BLM and Nevada SHPO have also concurred that the Project would adversely affect 56 historic properties that are eligible for listing in the National Register of Historic Places.

We have just learned, through a Motion for Preliminary Injunction filed in the case *Western Watersheds Project v. United States Department of the Interior* (Case No. 3:21-cv-00103) that, as soon as June 23, 2021, Lithium Nevada Corporation ("LNC") intends to begin mechanical trenching operations at seven undisclosed sites within the Project area, each up to 40 meters long and a few meters deep. LNC also plans to dig up to 5 feet deep at 20 other undisclosed sites, all pursuant to a new historical/cultural resources plan that we were never consulted about. If LNC is allowed to proceed with digging up artifacts, cultural sites, and possibly even human remains in Thacker Pass, this will be a violation of federal law including the National Environmental Policy Act (NEPA) and the National Historic Preservation Act (NHPA).

As you know, NEPA's Implementing Regulations at 40 CFR § 1501.2(4)(ii) requires you to consult early with appropriate tribal governments. Executive Order 13175 further directs the BLM to establish regular meaningful consultation and collaboration with Native American Tribal governments on the development of regulatory policies and permit approvals for proposed projects that could substantially or uniquely affect tribal communities.

Section 101(d)(6)(B) of the National Historic Preservation Act and 36 C.F.R. § 800.2 require you to consult with any Indian tribe that attaches religious and cultural significance to historic properties that may be affected by an undertaking. This requirement applies regardless of the location of the historic property. Finally, President Biden, in a January 26, 2021 Memorandum on Tribal Consultation and Strengthening Nation-to-Nation Relationships, charged "all executive departments and agencies with engaging in regular, meaningful, and robust consultation with Tribal officials in the development of Federal policies that have Tribal implications." If President Biden's new administration, of which you are a part, is to gain the public's trust and confidence, it must put meaning behind the words "regular, meaningful, and robust consultation."

So far, that isn't happening. The FEIS (at Appendix G.1.17.1) only lists the following "episodes of consultation":

- the transmission of a consultation letter in December 2019 to tribal representatives at the Fort McDermitt Paiute and Shoshone Tribe, Summit Lake Paiute Tribe, and Winnemucca Indian Colony
- in-field meeting and project discussion at Thacker Pass with tribal members of the Fort McDermitt Paiute and Shoshone Tribe on October 3, 2018.

You've also tried to list BLM literature searches and ethnographic studies as well as a consultation with the Fort McDermitt and Summit Lake Tribes on a different project in 2014 as "episodes of consultation." But, we have not been contacted or consulted about this project what-so-ever.

Therefore, the Project's Record of Decision and Plan of Operations must be rescinded and you must stop any plans to disturb cultural resources or historic properties in Thacker Pass. If you do not make this rescission, stop the construction operations, and begin meaningful consultation with us, we are prepared to initiate legal action.

Sincerely,

Jody Richards
Burns Paiute Tribal Chairwoman


Cc:    Deb Haaland, US Department of the Interior