TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

ARWYN CARROLL (MA Bar 675926)
LEILANI DOKTOR (HI Bar 11201)
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Phone: (202) 305-0465
Fax: (202) 305-0506
arwyn.carroll@usdoj.gov
leilani.doktor@usdoj.gov

*Attorneys for Federal Defendants*

**UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA**

| | |
|---|---|
| BARTELL RANCH LLC, *et al.*, | Case No. 3:21-cv-80-MMD-CLB |
| Plaintiffs, | Related Case No. 3:21-cv-103-MMD-CLB |
| v. | (Consolidated) |
| ESTER M. MCCULLOUGH, *et al.*, | **FEDERAL DEFENDANTS'** |
| Defendants. | **OPPOSITION TO PLAINTIFF-** |
| | **INTERVENORS' MOTION FOR** |
| | **PRELIMINARY INJUNCTION** |
| WESTERN WATERSHEDS PROJECT, *et al.*, | |
| Plaintiffs, | |
| v. | |
| UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*, | |
| Defendants. | |

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................. 1

BACKGROUND .................................................................................................. 2

    I.      Previous consultation concerning the Thacker Pass area ............................... 3

    II.     The public's, tribes', and interested parties' opportunities to engage with the Thacker Pass Project NHPA process ..................................................... 5

    III.    The Memorandum of Agreement, HPTP, and ARPA permit ....................... 7

LEGAL STANDARDS ....................................................................................... 10

    I.      A preliminary injunction is an extraordinary remedy .................................. 10

    II.     The National Historic Preservation Act ...................................................... 11

    III.    Administrative Procedure Act review of agency action .............................. 13

ARGUMENT ....................................................................................................... 13

    I.      Plaintiff-Intervenors are not likely to succeed on the merits of their claims ................................................................................................................ 13

          A.      Pursuant to the NHPA, BLM made a good faith and reasonable effort to identify tribes for consultation ............................................ 14

          B.      BLM provided the consulting tribes, Plaintiff-Intervenors, and the public a reasonable opportunity to consult on the Project's effects on historic properties. ................................................................... 16

          C.      BLM correctly executed a Memorandum of Agreement and invited participating tribes to be concurring parties. ........................ 18

    II.     Plaintiffs cannot demonstrate imminent, irreparable harm ......................... 19

    III.    The public interest and balance of equities disfavor an injunction .............. 23

CONCLUSION .................................................................................................... 24

1

## TABLE OF AUTHORITIES

2
**Cases**

3
*All. for the Wild Rockies v. Cottrell,*
   632 F.3d 1127 (9th Cir. 2011) ........................................................ 10
4

5
*Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity,*
   950 F.2d 1401 (9th Cir. 1991) ........................................................ 11
6
*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.,*
7   462 U.S. 87 (1983) ........................................................ 13

8
*Caribbean Marine Servs. Co. v. Baldrige,*
   844 F.2d 668 (9th Cir. 1988) ........................................... 19, 21
9
*Concerned Citizens & Retired Miners Coal. v. U.S. Forest Serv.,*
   279 F. Supp. 3d 898 (D. Ariz. 2017) .................................... 17
10

11
*Conservation Cong. v. U.S. Forest Serv.,*
   720 F.3d 1048 (9th Cir. 2013) .................................... 10, 13
12
*Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs,*
   No. CV 14-1667 PSG (CWX), 2015 WL 12659937 (C.D. Cal. June 30, 2015) .............. 15
13
*Ctr. for Competitive Politics v. Harris,*
14   784 F.3d 1307 (9th Cir. 2015) ........................................ 10

15
*Ctr. for Food Safety v. Vilsack,*
   636 F.3d 1166 (9th Cir. 2011) ........................................ 11
16
*Drakes Bay Oyster Co. v. Jewell,*
17   747 F.3d 1073 (9th Cir. 2014) ........................................ 23

18
*E. Bay Sanctuary Covenant v. Trump,*
   932 F.3d 742 (9th Cir. 2018) ........................................ 23
19

20
*eBay Inc. v. MercExchange, LLC,*
   547 U.S. 388 (2006) ........................................ 23
21
*Friends of Sierra R.R., Inc. v. ICC,*
22   881 F.2d 663 (9th Cir. 1989) ........................................ 18

23
*Gov't of Guam v. United States,*
   744 F.2d 699 (9th Cir. 1984) ........................................ 18
24
*Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Social & Rehab. Servs.,*
   31 F.3d 1536 (10th Cir. 1994) ........................................ 21
25

26
*Lands Council v. McNair,*
   537 F.3d 981 (9th Cir. 2008) ........................................ 13
27
*Lujan v. Nat'l Wildlife Fed'n,*
   497 U.S. 871 (1990) ........................................ 13
28

*Lydo Enterprises, Inc. v. City of Las Vegas*,
    745 F.2d 1211 (9th Cir. 1984) ................................................................................... 21

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997) ................................................................................................... 10

*Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins.*,
    463 U.S. 29 (1983) ..................................................................................................... 13

*Muckelshoot Indian Tribe v. U.S. Forest Service*,
    177 F.3d 800 (9th Cir. 1999) .................................................................11, 13, 15, 16

*Native Ecosystems Council v. Dombeck*,
    304 F.3d 886 (9th Cir. 2002) ..................................................................................... 13

*Pueblo of Sandia v. United States*,
    50 F.3d 856 (10th Cir.1995) ....................................................................................... 16

*Quechan Indian Tribe v. U.S. Dep't of Interior*,
    547 F. Supp. 2d 1033 (D. Ariz. 2008) ....................................................................... 12

*Quechan Tribe of Fort Yuma Indian Rsrv. v. U.S. Dep't. of Interior*,
    755 F. Supp. 2d 1104 (S.D. Cal. 2010) ...................................................................... 16

*Quechan Tribe of Ft. Yuma Indian Rsrv. v. U.S. Dep't of Interior*,
    927 F. Supp. 2d 921 (S.D. Cal. 2013) ........................................................................ 16

*Quechan Tribe of the Fort Yuma Indian Rsrv. v. U.S. Dep't of Interior*,
    673 F. App'x 709 (9th Cir. 2016) .............................................................................. 16

*Shiny Rock Mining Corp. v. United States*,
    906 F.2d 1362 (9th Cir. 1990) ................................................................................... 17

*Slockish v. U.S. Fed. Highway Admin.*,
    No. 3:08-CV-1169-ST, 2012 WL 3637465 (D. Or. June 19, 2012) ............................ 14

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ................................................................................................... 19

*Summit Lake Paiute Tribe of Nev. v. U.S. Bureau of Land Mgmt.*,
    496 F. App'x. 712 (9th Cir. 2012) ............................................................................. 12

*Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dep't of Interior*,
    608 F.3d 592 (9th Cir. 2010) ..................................................................................... 16

*Tough Traveler, Ltd. v. Outbound Prods.*,
    60 F.3d 964 (2d Cir. 1995) ......................................................................................... 21

*Winnemen Wintu Tribe v. U.S. Forest Serv.*,
    No. 2:09-cv-01072-KJM-KJN, 2017 WL 1093902 (E.D. Cal. Mar. 23, 2017) ............... 15

*Winter v. Nat. Res. Def. Council*,
    555 U.S. 7 (2008) ......................................................................................... 10, 13, 19

**Statutes**

5 U.S.C. § 706(2) ............................................................................................. 13

5 U.S.C. §§ 701-706 ......................................................................................... 13

54 U.S.C. § 306108 ........................................................................................... 11

54 U.S.C. § 306112 ........................................................................................... 11

**Regulations**

36 C.F.R. § 800.16(l)(1) ................................................................................... 11

36 C.F.R. § 800.16(y) ....................................................................................... 11

36 C.F.R. § 800.2(c)(1)-(2) .............................................................................. 12

36 C.F.R. § 800.2(c)(2)(B)(ii) .......................................................................... 14

36 C.F.R. § 800.2(c)(2)(ii) ........................................................................... 12, 14

36 C.F.R. § 800.2(c)(2)(ii)(A) ................................................................. 12, 13, 14

36 C.F.R. § 800.2(c)(2)(ii)(C) ........................................................................... 16

36 C.F.R. § 800.2(c)(5) ..................................................................................... 15

36 C.F.R. § 800.3 .............................................................................................. 11

36 C.F.R. § 800.3(f)(3) ..................................................................................... 15

36 C.F.R. § 800.4 .............................................................................................. 12

36 C.F.R. § 800.4(a)(1) ..................................................................................... 12

36 C.F.R. § 800.4(b)(1) ................................................................................ 12, 17

36 C.F.R. § 800.4(d)(2) ..................................................................................... 12

36 C.F.R. § 800.5 .............................................................................................. 11

36 C.F.R. § 800.6 .............................................................................................. 11

36 C.F.R. § 800.6(c) .......................................................................................... 18

42 C.F.R. § 800.2(d)(3) ....................................................................................... 5

43 C.F.R. § 7.1(b)(1) ........................................................................................... 8

43 C.F.R. § 7.5(a) ................................................................................................ 8

43 C.F.R. § 7.7(a)(1) ........................................................................................... 8

43 C.F.R. § 7.7(a)(2) ........................................................................................... 8

43 C.F.R. § 7.7(a)(2)-(3) .................................................................................... 22

43 C.F.R. § 7.7(a)(3) ........................................................................................... 8

**Other Authorities**

85 Fed. Reg. 3413-02 (Jan. 21, 2020)..................................................................... 6

85 Fed. Reg. 45,651 (July 29, 2020)..................................................................... 6

85 Fed. Reg. 78,349 (Dec. 4, 2020)....................................................................... 7

# TABLE OF ACRONYMS

| ARPA | Archaeological Resources Protection Act |
|------|------------------------------------------|
| BLM | Bureau of Land Management |
| DEIS | Draft Environmental Impact Statement |
| FEIS | Final Environmental Impact Statement |
| HPTP | Historic Properties Treatment Plan |
| MOA | Memorandum of Agreement |
| NAGPRA | Native American Graves Protection and Repatriation Act |
| NEPA | National Environmental Policy Act |
| NHPA | National Historic Preservation Act |
| RMP | Resource Management Plan |
| ROD | Record of Decision |
| RSIC | Reno-Sparks Indian Colony |
| SHPO | State Historic Preservation Office |

**TABLE OF EXHIBITS**

| Exhibit | Description |
|---------|-------------|
| 1 | Thacker Pass Lithium Mine Project Record of Decision |
| 2 | Winnemucca Field Office RMP and Record of Decision Excerpt |
| 3 | BLM Winnemucca Field Office RMP, Ethnographic Assessment Excerpt |
| 4 | Kings Valley Lithium Exploration Project EA |
| 5 | Montana Mountains Cooperative Fuels Treatment Project EA |
| 6 | Western Lithium Corporation Kings Valley Clay Mine EA Excerpt |
| 7 | Programmatic District Wide Vegetation Management Plan EA |
| 8 | December 12, 2019, Initiating Consultation Letter to Tribes. for the Thacker Pass Lithium Project |
| 9 | Thacker Pass Lithium Project Scoping Report Excerpt |
| 10 | Thacker Pass Lithium Project Draft EIS Excerpts |
| 11 | Thacker Pass Lithium Project Draft EIS Appendix G and Table J Excerpts |
| 12 | Letters to Tribes Soliciting Comments on the Thacker Pass Lithium Project Draft EIS |
| 13 | Letters to Tribes Soliciting Comments on the Thacker Pass Lithium Project Final EIS |
| 14 | Memorandum of Agreement between BLM Nevada and Nevada State Historic Preservation Office |
| 15 | Letter to Tribes Soliciting Comments on the Thacker Pass Lithium Project Memorandum of Agreement and HPTP |
| 16 | May 4, 2021 Letter from Fort McDermitt Paiute-Shoshone Tribe |
| 17 | June 4, 2021 Fort McDermitt Paiute-Shoshone Tribe Consultation Meeting Notes |

| 18 | June 3, 2021 Letter from RSIC; June 16, 2021 Letter from Burns Paiute Tribe; June 24, 2021 Letter from the People |
|----|---|
| 19 | Response Letters to Tribes Inviting ARPA Consultation |
| 20 | August 12, 2021 Letters to RSIC and Burns Paiute Tribe Inviting ARPA Consultation |
| 21 | August 10, 2021 Email to RSIC |
| 22 | 2014 BLM Nevada Protocol Agreement |
| 23 | BLM COVID Protocol for Public Hearings and Consultation Guidance Document |
| 24 | Correspondence between BLM and SHPO |
| 25 | August 3, 2021, Letter from RSIC Requesting Consultation |
| 26 | Declaration of Mark Hall (August 12, 2021) |

## INTRODUCTION

Complying with the requirements of the National Historic Preservation Act (NHPA), the United States Bureau of Land Management (BLM) entered into a Memorandum of Agreement (MOA) with Nevada's State Historic Preservation Office (SHPO) that approved a Historic Properties Treatment Plan (HPTP) for the Thacker Pass Project.[1] Plaintiff-Intervenors, the Reno-Sparks Indian Colony (RSIC) and Atsa koodakuh wyh Nuwu/People of Red Mountain (the People), joined by the Burns Paiute Tribe, now ask the Court to enjoin archeological surveys and data collection, including excavation, conducted in accordance with the HPTP.[2] Plaintiff-Intervenors assert that these treatments will harm their interests in Thacker Pass by disturbing the sort of archeological elements that the HPTP is designed to protect. Though Plaintiff-Intervenors had decades to bring their interests in the Thacker Pass area to BLM's attention, they did not do so until June 2021—after the NHPA consultation period closed and the Record of Decision (ROD) issued approving the Thacker Pass Project.

In order to obtain the drastic and extraordinary remedy of an emergency injunction, Plaintiff-Intervenors must show that they are likely to succeed on the merits of their claims. They cannot do so because BLM made a reasonable and good-faith determination of which tribes to consult with, consulted with the tribe of which the People are members, and provided all tribes and the public a reasonable opportunity to participate in the NHPA process. Moreover, BLM had no notice that RSIC or the Burns Paiute Tribe may have had a relationship with places of cultural or religious significance in Thacker Pass until well after approving the Project.

---

[1] Pl-Intervenors' Mot. for Prelim. Inj. and Mem. in Supp. ("Pl.-Intervenors' Mem."), ECF No. 45.  Plaintiff-Intervenor the Burns Paiute Tribe has joined in support of RSIC's and the People's motion. *See* ECF No. 62.

[2] The RSIC and Burns Paiute Tribe are federally recognized tribes within Nevada and Oregon respectively. Because the People of Red Mountain include members of Fort McDermitt Paiute-Shoshone Tribe, but are not a separately federally recognized tribe, this brief discusses consultation efforts with the Fort McDermitt Tribe.

Even if Plaintiff-Intervenors could demonstrate a likelihood of success on the merits, they have failed to demonstrate the second requirement to obtain a preliminary injunction: that the activities contemplated in the HPTP would irreparably harm them. They cannot do so because the HPTP itself contains provisions that address Plaintiff-Intervenors' concerns. BLM has also invited Plaintiff-Intervenors to consult on the permit that must issue under the Archaeological Resources Protection Act (ARPA) before any excavation under the HPTP begins, which— if the Burns Paiute Tribe, RSIC, or the People identify mitigation measures that can be applied—could ameliorate any harms.

Finally, the public interest and balance of equities favor denying a preliminary injunction under the facts and posture of this case. Plaintiff-Intervenors' motion for a preliminary injunction should therefore be denied.

## BACKGROUND

In July 2019, Lithium Nevada submitted proposed plans of operations to develop a lithium mine in the Thacker Pass area of Humboldt County, Nevada, and to explore for additional lithium resources in the vicinity of the proposed mine. On January 15, 2021, BLM issued a ROD approving both plans. The mining and exploration plans of operations collectively comprise Lithium Nevada's Thacker Pass Lithium Mine Project. The Project Area encompasses approximately 18,000 acres of public lands, though actual disturbance is anticipated at approximately 5,700 acres.[3]

Before approving the Project, BLM conducted a robust analysis under the National Environmental Policy Act (NEPA) as described in Federal Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction. In parallel, it also engaged in the process required by the NHPA. Because that process complied with the NHPA and applicable regulatory requirements, Plaintiff-Intervenors are unable to demonstrate a likelihood of success on the merits.

---

[3] Exhibit 1, Thacker Pass Lithium Mine Project Record of Decision ("ROD") at 3.

I.      Previous consultation concerning the Thacker Pass area

Plaintiff-Intervenors in this case are two federally recognized tribes—RSIC and the Burns Paiute Tribe—and an "unincorporated association" made up of members of the Fort McDermitt Paiute-Shoshone Tribe—the People.[4] They contend that excavation in Thacker Pass will disturb an area to which they attach cultural and religious significance.[5] But, although BLM has previously engaged in several analyses of and consultations with local tribes—including the three tribes at issue here—in connection with multiple decisions going back almost twenty years, no tribe previously asserted a cultural, religious or historical interest in the Thacker Pass area in connection with a massacre or any other cultural site.

BLM's consultation efforts related to Thacker Pass date back to at least 2006 when it consulted the RSIC, Fort McDermitt Tribe, Burns Paiute Tribe, and other tribes on an ethnography in connection with preparation of the Winnemucca Resource Management Plan (RMP). The Winnemucca RMP, which was approved in 2015, included a goal of identifying, preserving, and protecting "significant cultural resources" under the NHPA and ARPA through "consultation with the Nevada SHPO and local Native American groups and in compliance with the programmatic agreement between BLM and SHPO."[6] At least four tribes provided input into the ethnography, including the Fort McDermitt Tribe, the Pyramid Lake Paiute Tribe, and RSIC.[7] In fact, RSIC's declarant, Michon Eben, attended a meeting held at the Pyramid Lake Paiute Tribal Offices in Nixon, Nevada, on August 25, 2005.[8] The Burns Paiute Tribe indicated at that time that it "would defer consultation to the tribes that had reservations closer to the study area" and that "it would

---

[4] *See* Hinkey Decl. ¶ 2, ECF No. 46-2; Compl. ¶ 10, ECF No. 46.
[5] Pl.-Intervenors' Mem. at 18–19.
[6] Exhibit 2, Winnemucca Field Office RMP Record of Decision ("Winnemuca RMP") excerpt at 1-34 and 2-35. *See also id.* at 2-35–2-40.
[7] Exhibit 3, BLM Winnemucca Field Office Resource Management Plan, Ethnographic Assessment excerpt at 85–88.
[8] *Id.* at 87.

not be necessary to keep the tribe on the mailing list" for the Winnemucca RMP.[9] BLM included a list of massacre sites provided by the tribes in the ethnography—but no tribe identified Thacker Pass as such.[10] The only massacre site of cultural importance identified near Thacker Pass was Disaster Peak, located at least 15 miles away.[11]

BLM used the ethnography to identify and protect cultural sites under the Winnemucca RMP.[12] BLM also continued to consult with tribes with an interest in the planning area during the remainder of the RMP preparation process. In 2010, BLM sent requests for consultation to some 20 tribes, including the Fort McDermitt Tribe, the Burns Paiute Tribe, and RSIC. BLM engaged in consultation meetings with the Fort McDermitt Tribe in September and December 2010.[13] RSIC and the Burns Paiute Tribe did not respond.

Plaintiff-Intervenors had at least four other opportunities to inform BLM of an interest in cultural properties affected by development in the Thacker Pass area before the Thacker Pass Project—and thus to put BLM on notice that the area was one of cultural or religious importance. They never did so.

First, BLM prepared an Environmental Assessment for the Kings Valley Lithium Exploration Project, which issued in December 2009. This project covered the same footprint as the Thacker Pass Project.[14] In that process, BLM made project-related documents publicly available and consulted with the Fort McDermitt Tribe, which told BLM that it "had no concerns about the Project."[15] Second, in connection with the Montana Mountains Cooperative Fuels Treatment Project, which also covered the Thacker Pass area, BLM consulted with the Fort McDermitt Tribe, Winnemucca Indian Colony, and Summit Lake

---

[9] *Id.* at 92.

[10] *See id.* at I.11.

[11] *Id.*; *see also* Exhibit 5, Montana Mountains Cooperative Fuels Treatment Project Environmental Assessment at 18–19, 21–22.

[12] Exhibit 2, Winnemucca RMP at 2-35–2-37.

[13] *See id.* at 1-34.

[14] Exhibit 4, Kings Valley Lithium Exploration Project Environmental Assessment at 1.

[15] *Id.* at 3-6.

Paiute Tribe, among others.[16] Third, BLM consulted with the Fort McDermitt and Summit Lake Tribes in connection with the Western Lithium Corporation Kings Valley Clay Mine in 2013,[17] an open-pit clay mine with the same footprint as the Thacker Pass Project. Finally, BLM consulted with a number of tribes, including RSIC and the Fort McDermitt Tribe, between 2011 and 2017 when preparing the Environmental Assessment for the Programmatic District Wide Vegetation Management Plan, which also covered the Thacker Pass area and was approved in 2017.[18] At no time during any of these consultations or analyses did any tribe apprise BLM of any cultural, religious, or historical interest in the site of the Thacker Pass Project or raise concerns about a massacre site in Thacker Pass.

## II.  The public's, tribes', and interested parties' opportunities to engage with the Thacker Pass Project NHPA process

Public involvement for BLM's NHPA process for the Thacker Pass Project began almost two years ago and public participation—including, participation from local tribes—was encouraged and welcomed. Consistent with its usual practice, BLM initiated formal consultation prior to scoping with three local tribes—the Fort McDermitt Tribe, Summit Lake Paiute Tribe, and Winnemucca Indian Colony—via letter dated December 12, 2019.[19]

Next, on January 21, 2020, BLM published the Notice of Intent for the Thacker Pass Project in the Federal Register. The Notice, which initiated the formal scoping process, indicated that BLM would

> use and coordinate the NEPA scoping process to help fulfill the public involvement process under the NHPA as provided in 42 CFR 800.2(d)(3). The information about historic and cultural resources within the area potentially affected by the proposed project will assist the BLM in identifying and

---

[16] Exhibit 5, Montana Mountains Cooperative Fuels Treatment Project Environmental Assessment at 18–19, 21–22, 97–98.

[17] Exhibit 6, Western Lithium Corporation Kings Valley Clay Mine Environmental Assessment excerpt at 1, 84, 123–124.

[18] Exhibit 7, Programmatic District Wide Vegetation Management Plan at 104–05, 154–55.

[19] Exhibit 8, December 12, 2019 Initiating Consultation Letter to Tribes for the Thacker Pass Lithium Project.

evaluating impacts to such resources in the context of both NEPA and the NHPA.[20]

The Notice also invited "Federal, State, and local agencies, along with tribes and other stakeholders that may be interested in or affected by the proposed project . . . to participate in the scoping process," submit comments on issues to be considered in the EIS until February 20, 2020, and attend two scoping meetings, one to be held in Winnemucca, Nevada, and the other in Orovada, Nevada.[21] The two scoping meetings were held in person in Winnemucca and Orovada on February 5 and 6, 2020, respectively. Two Fort McDermitt Tribe members attended the February 6 meeting in Orovada.[22] BLM, however, did not receive any letters or comments from any tribe or tribal member during the scoping process regarding historical or cultural properties in the Thacker Pass.[23]

The Draft Environmental Impact Statement (DEIS), made available for public comment on July 29, 2020, delineated cultural resources identified through the scoping process, archival background research, and pedestrian inventories.[24] BLM noted its determination that adverse impacts to historic or cultural properties were anticipated and that a plan would be developed to address them, and listed and described the cultural resources of which it was aware.[25] The Notice of Availability again invited "tribes and other stakeholders that may be interested in or affected by the proposed Project . . . to participate in the comment process," and noted that comments were due 45 days after publication.[26] A physical copy of the DEIS, with an additional invitation to consult, was sent to the Fort

---

[20] Notice of Intent, 85 Fed. Reg. 3413-02, 3414 (Jan. 21, 2020).

[21] *Id.*

[22] Exhibit, ROD 1 at 1, 6. *See* Exhibit 9, Thacker Pass Scoping Report Excerpt (Orvada Feb. 6 sign-in sheet).

[23] *See* Exhibit 9, Thacker Pass Scoping Report at App'x C.

[24] Exhibit 10, Thacker Pass Lithium Project DEIS Chapter 4 excerpt at 4-75.

[25] Exhibit 11, Thacker Pass Lithium Project DEIS Appendix G and Table J.1 excerpts.

[26] 85 Fed. Reg. 45,651, 45,651-52 (July 29, 2020).

McDermitt Tribe, Summit Lake Paiute Tribe, and Winnemucca Indian Colony.[27] After providing at least 15 days advance notice through the BLM website, BLM held two virtual meetings on August 19 and 20, 2020.[28] Despite these consultation efforts, no concerns were raised about cultural properties in Thacker Pass

Finally, the Notice of Availability for the Final Environmental Impact Statement (FEIS) was published on December 4, 2020, and the FEIS was made available for review on BLM's ePlanning website. The Notice indicated that a final decision on the proposal would not issue for a minimum of 30 days, thus giving additional public notice.[29] A physical copy of the FEIS was sent to the Fort McDermitt Tribe, Summit Lake Paiute Tribe, and Winnemucca Indian Colony on December 19, 2020.[30]

### III.   The Memorandum of Agreement, HPTP, and ARPA permit

After completing its NHPA review, BLM, in consultation with the Nevada SHPO, determined that the Thacker Pass Project would have an adverse effect on a number of historic properties within the Project's "area of potential effect."[31] Plaintiff-Intervenors do not argue any defect in the determined area of potential effect, which encompasses the entire Project Area and extends beyond it.[32] On November 5, 2020, BLM and the Nevada SHPO signed a Memorandum of Agreement which approved the HPTP and also imposed conditions on the excavations conducted under it.[33]

---

[27] Exhibit 12, Letters to Tribes Soliciting Comments on the Thacker Pass Lithium Project DEIS.

[28] Exhibit 1, ROD at 1.

[29] 85 Fed. Reg. 78,349, 78,349 (Dec. 4, 2020).

[30] Exhibit 13, Letters to Tribes Soliciting Comments on the Thacker Pass Lithium Project FEIS.

[31] Exhibit 1, ROD at 5–6; *see also* Declaration of Mark E. Hall ¶ 4, *W. Watersheds Project v. Bureau of Land Management*, Case No. 3:21-cv-103-MMD-CLB (D. Nev. consolidated July 30, 2021) ECF No. 30-1.

[32] Exhibit 14, Memorandum of Agreement between BLM Nevada and Nevada State Historic Preservation Office, App'x C (HPTP) at 1–4.

[33] Exhibit 14, MOA.

ARPA governs excavation of archeological sites on public lands and removal of archeological artifacts from those sites. A permit under ARPA must issue before the cultural resources contractor can "excavate and/or remove archaeological resources from public lands" or "carry out activities associated with such excavation . . . ." 43 C.F.R. § 7.5(a). Before the permit could issue in this case, BLM was required to "notify any Indian tribe which may consider the site as having religious or cultural importance" by sending notice "to the chief executive officer or other designated official of the tribe." *Id.* § 7.7(a)(1). *See also* id. § 7.1(b)(1) (requiring BLM to "seek to identify" such tribes). While BLM "may provide notice to any other Native American group" that it knows "to consider sites potentially affected as being of religious or cultural importance," such notice is not required. *Id.* § 7.7(a)(2). The permit may not issue until 30 days after the required notice, during which BLM "may meet with official representatives of any Indian tribe or group to discuss their interests, including ways to avoid or mitigate potential harm or destruction such as excluding sites from the permit area." *Id.* § 7.7(a)(3).

In accordance with ARPA's consultation requirements, BLM sent copies of the HPTP to the Fort McDermitt Tribe, Summit Lake Paiute Tribe, and the Winnemucca Indian Colony on April 14, 2021, with letters requesting those tribes' assistance "in identifying cultural and social values, religious beliefs, sacred places, and traditional practices . . . which could be affected by [BLM] actions on public lands" in Thacker Pass "and where feasible to seek opinions and potential agreement on measures to protect those tribal interests."[34] The Fort McDermitt Tribe responded raising—for the first time with respect to the Project— concerns about cultural, historical, and religious resources in Thacker Pass.[35] BLM held a consultation meeting concerning the ARPA permit with the Fort McDermitt Tribe on June

---

[34] Exhibit 26, Declaration of Mark Hall ("Second Hall Decl.") ¶ 5; *See also* Exhibit 15, Letter to Tribes Soliciting Comments on the Thacker Pass Lithium Project MOA and HPTP.

[35] Exhibit 16, May 4, 2021 Letter from Fort McDermitt Paiute-Shoshone.

4, 2021.[36] At that meeting, representatives raised concerns about disturbance to places of cultural or religious importance, including possible burials, archaeological sites, and historic groves of plants important to hunting and gathering.[37] BLM committed to on-going consultation for appropriate mitigation of any damage to these sites and confirmed the on-going arrangement to hire tribe members as cultural monitors at the Project area.[38]

It was not until June 2021 that the RSIC, the People, and the Burns Paiute Tribe raised any concerns about the Thacker Pass Project.[39] And prior to its June 16, 2021 letter, the Burns Paiute Tribe had not previously informed BLM that it considered its traditional territory to include the Thacker Pass area.[40] Though the NHPA consultation period for the Thacker Pass Project and thus the HPTP itself closed in 2020, BLM invited the RSIC, the People, and the Burns Paiute Tribe to consult on the ARPA permit and propose any appropriate mitigation measures.[41] Plaintiff-Intervenors filed their complaint while the ARPA consultation period remained open, seeking an injunction against activities into which they still had—and as of this filing,[42] continue to have—opportunities to provide input into ways to avoid or mitigate potential harm during activities conducted under the HPTP.

---

[36] Exhibit 17, June 4, 2021 Fort McDermitt Paiute-Shoshone Tribe meeting notes.

[37] *Id.*

[38] *Id.*

[39] Exhibit 18, June 3, 2021 Letter from RSIC; June 16, 2021 Letter from Burns Paiute Tribe; June 24, 2021 Letter from the People.

[40] Exhibit 26, Second Hall Decl. ¶ 4.

[41] Exhibit 19, Letters to RSIC, the People, and Burns Paiute Tribe Inviting ARPA Consultation.  Contrary to the Burns Paiute Tribe's contention, *see* Teeman Decl. ¶ 20, ECF No. 62-1, BLM responded to the Burns Paiute Tribe's June 16, 2021 letter on July 8, 2021 via certified mail, and invited the Burns Paiute Tribe to consult on the ARPA permit.

[42] On August 12, 2021, BLM sent letters to RSIC, the Burns Paiute Tribe, and the People, again inviting them to consult on the ARPA permit and discuss "ways to avoid or mitigate potential harm or destruction."  *See* Exhibit 20, August 12, 2021 Letters to the Burns Paiute Tribe, Pyramid Lake Paiute Tribe, and RSIC Inviting ARPA Consultation; Exhibit 21, August 10, 2021 Email to RSIC.

## LEGAL STANDARDS

### I.   A preliminary injunction is an extraordinary remedy

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008) (citation omitted). To obtain this extraordinary remedy, Plaintiffs must carry "the heavy burden of making a 'clear showing' that [they are] entitled to a preliminary injunction." *Ctr. for Competitive Politics v. Harris*, 784 F.3d 1307, 1312 (9th Cir. 2015). The "requirement for substantial proof is much higher" for a motion for a preliminary injunction than it is for a motion for summary judgment. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam).

A plaintiff seeking a preliminary injunction must show: "(1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm if the preliminary injunction is not granted; (3) the balance of equities tips in its favor; and (4) an injunction is in the public's interest." *Conservation Cong. v. U.S. Forest Serv.*, 720 F.3d 1048, 1054 (9th Cir. 2013) (citing *Winter*, 555 U.S. at 20, 22). In the Ninth Circuit, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of a preliminary injunction," albeit only "so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011). Under either test, a plaintiff must "establish that irreparable harm is *likely*, not just possible," *id.* at 1131, and a deficiency in any one of the required elements precludes extraordinary relief, *Winter*, 555 U.S. at 24.

Under this standard, it is not enough for a court considering a request for injunctive relief to ask whether there is a good reason why an injunction should *not* be issued; rather, a court must determine that an injunction *should* issue. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157–58 (2010). Thus, an injunction should issue only where a plaintiff makes a clear showing and presents substantial proof that an injunction is warranted, *Mazurek*, 520 U.S. at 972, and does more than merely allege imminent harm sufficient to establish

standing, *see Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity*, 950 F.2d 1401, 1410 (9th Cir. 1991); *Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1171 n.6 (9th Cir. 2011).

## II.     The National Historic Preservation Act

The NHPA sets forth procedural requirements for federal agencies to "take into account the effect of [an] undertaking on any historic property." 54 U.S.C. § 306108. The NHPA, like NEPA, "is a stop, look, and listen provision that requires each federal agency to consider the effects of its programs." *Muckleshoot Indian Tribe v. U.S. Forest Service*, 177 F.3d 800, 805 (9th Cir. 1999). The Advisory Council on Historic Preservation (ACHP) administers the NHPA, *see* 54 U.S.C. § 306112, and has promulgated regulations to govern federal agency compliance with the NHPA consultation process, codified at 36 C.F.R. Part 800. Pursuant to a National Programmatic Agreement, the BLM Nevada State Office, the ACHP, and the National Conference of State Historic Preservation Officers replaced the procedures set forth in 36 C.F.R. § 800.3 through § 800.7 with the 2014 BLM-State Historic Preservation Office (SHPO) Protocol Agreement ("the Protocol").[43] The Protocol establishes the ensuing process once a federal agency identifies a project as an "undertaking" in Nevada that "has the potential to cause effects on historic properties."[44] *Id.* § I(A); 36 C.F.R. § 800.16(y).

First, the federal agency identifies the "historic properties" within the area of potential effect that are listed or eligible for listing on the National Register. The Protocol § V(A); 36 C.F.R. § 800.3 (defining "historic property"). Second, the agency evaluates the proposed undertaking's effects on those properties. The Protocol § V(C); 36 C.F.R. § 800.5. Third, if an adverse effect is found, the agency considers measures to avoid, mitigate, or minimize those effects. The Protocol § V(A); 36 C.F.R. § 800.6.

---

[43] Exhibit 22, 2014 BLM Nevada State Protocol Agreement (Updated December 22, 2014).

[44] The regulations define historic properties as "any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion in, the National Register of Historic Places maintained by the Secretary of the Interior." 36 C.F.R. § 800.16(l)(1).

In the context of identifying "historic properties," *see* The Protocol § V(A); 36 C.F.R. § 800.4, the agency must consult with the SHPO to "[d]etermine and document the area of potential effects," which it did here. The Protocol § IV(A-C); 36 C.F.R. § 800.4(a)(1). And the agency must "make a reasonable and good faith effort" to identify historic properties within the undertaking's area of potential effects. *See* The Protocol § V(A); 36 C.F.R. § 800.4(b)(1); *Quechan Indian Tribe v. U.S. Dept. of Interior*, 547 F. Supp. 2d 1033, 1046–47 (D. Ariz. 2008). The Protocol identifies several different methods an agency may use to satisfy this requirement, including background research, consultation, oral history interviews, sample field investigation, and field survey," *Id.* § V(A); 36 C.F.R. § 800.4(b)(1), but the NHPA regulations' good-faith standard does not require the agency to use all of those techniques, *Summit Lake Paiute Tribe of Nev. v. U.S. Bureau of Land Mgmt.*, 496 F. App'x. 712, 715 (9th Cir. 2012).

For engagement with Native American tribes, the Protocol defers to 36 C.F.R. §§ 800.2(c)(1)-(2). Protocol at 2. Accordingly, the agency must "consult with any Indian tribe or Native Hawaiian organization that attaches religious and cultural significance to historic properties that may be affected by an undertaking," 36 C.F.R. § 800.2(c)(2)(ii), and must "provide[ ] the Indian tribe . . . a reasonable opportunity to identify its concerns about historic properties, advise on the identification and evaluation of historic properties, including those of traditional religious and cultural importance, articulate its views on the undertaking's effects on such properties, and participate in the resolution of adverse effects." *Id.* § 800.2(c)(2)(ii)(A). If the agency finds that sites listed or eligible for listing on the National Register may be affected, it must solicit the views of various parties. Protocol § V(F); 36 C.F.R.§ 800.4(d)(2). The agency then applies the criteria of the regulations to determine if there is an adverse effect, *id.*, and if so, engages in further consultation regarding the resolution of any such adverse effects, *id*.

### III.    Administrative Procedure Act review of agency action

Where a statute, such as the NHPA, does not provide for a private right of action, the APA, 5 U.S.C. §§ 701-706, provides for judicial review of the merits for challenges to final agency actions. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882-83 (1990) (NEPA). Final agency action is reviewed under 5 U.S.C. § 706(2). Such review is highly deferential. *Lands Council v. McNair*, 537 F.3d 981, 992–94 (9th Cir. 2008), *overruled in part on other grounds*, *Winter*, 555 U.S. at 22. Agency decisions may be overturned only if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002) (citation omitted). An agency action will be upheld if the agency has considered the relevant factors and articulated a rational connection between the facts found and choice made. *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983). The court may not substitute its judgment for that of the agency. '*Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983).

### ARGUMENT

### I.    Plaintiff-Intervenors are not likely to succeed on the merits of their claims

Plaintiff-Intervenors must demonstrate a likelihood of success on the merits of any of their claims to obtain preliminary injunctive relief. *Conservation Cong.*, 720 F.3d at 1054. They cannot do so here because: (1) BLM made a "reasonable and good faith effort" to identify tribes for consultation, *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 805 (9th Cir. 1999); (2) BLM has provided Plaintiff-Intervenors a "reasonable opportunity to identify [their] concerns about historic properties, advise identification and evaluation of historic properties, articulate their views on the undertaking's effects on such properties, and participate in the resolution of adverse effects," 36 C.F.R. § 800.2(c)(2)(ii)(A); (3) BLM sought and considered the views of the public; and (4) BLM did not issue the ROD before the MOA was signed.[45] Plaintiff-Intervenors have not presented facts or legal support to the contrary, so their motion should be denied.

---

[45] *See* Pl.-Intervenors' Mem. at 9–10.

### A.   Pursuant to the NHPA, BLM made a good faith and reasonable effort to identify tribes for consultation

Plaintiff-Intervenors cannot succeed on their claim under the NHPA because BLM complied with the NHPA, its implementing regulations, and State Protocol Agreement in identifying tribes for consultation on the Project. Though Plaintiff-Intervenors argue that BLM was obligated to "consult with *any* Indian tribe . . . that attaches religious and cultural significance to historic properties that may be affected by" the Project,[46] BLM is only required to "make a reasonable and good faith effort to identify any Indian tribes" to be consulted in the NHPA process, 36 C.F.R. § 800.2(c)(2)(ii)(A). BLM did so here.

First, BLM's effort to identify Indian tribes with which to consult under the NHPA was properly informed by its decades-long history of consulting with tribes regarding other projects in the area, described *supra*. Based on what BLM learned in prior consultations, BLM reasonably decided to consult with the Fort McDermitt Tribe, Summit Lake Paiute Tribe, and the Winnemucca Indian Colony about the Thacker Pass Project—tribes with geographic proximity to Thacker Pass that had previously engaged in consultation or identified places of cultural and religious significance in the Thacker Pass area.[47] Because there was no evidence in BLM's past planning, research or studies of the Thacker Pass area that Plaintiff-Intervenors would "attach[ ] religious and cultural significance to historic properties that may be affected by" the Project, 36 C.F.R. § 800.2(c)(2)(ii), BLM's determination of which tribes to consult was made in good faith, *Slockish v. U.S. Fed. Highway Admin.*, No. 3:08-CV-1169-ST, 2012 WL 3637465, at *7 (D. Or. June 19, 2012), *report and recommendation adopted*, No. 3:08-CV-01169-ST, 2012 WL 3637715 (D. Or. Aug. 22, 2012). Plaintiff-Intervenors have not shown that this determination was unreasonable or in bad

---

[46] *Id.* at 11–12 (quoting 36 C.F.R. § 800.2(c)(2)(B)(ii)).

[47] In doing so, BLM did not, as Plaintiff-Intervenors suggest, "lump all the tribes together," Pl.-Intervenors' Mem. at 17, but instead accounted for each tribe's previously-demonstrated engagement and identification of sites of cultural and religious significance.  And though Plaintiff-Intervenors purport to identify other tribes with such connections to Thacker Pass, *see* Eben Decl. ¶ 13, ECF No. 45-1, they do not indicate that Ms. Eben is authorized to speak for those tribes or any support from those tribes for the proposition that they identify sites of cultural and religious significance in Thacker Pass.

faith, and so cannot succeed on the merits. *Muckleshoot Indian Tribe*, 177 F.3d at 807 (finding that without evidence that an agency failed to make a "good faith" effort to engage in NHPA consultations, the agency complied with the NHPA requirements).

Second, BLM's consultation with the Nevada SHPO further evidences that its determination was made in good faith. *See Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs*, No. CV 14-1667 PSG (CWX), 2015 WL 12659937, at *21 (C.D. Cal. June 30, 2015), *aff'd sub nom.*, *Friends of Santa Clara River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906 (9th Cir. 2018). BLM consulted with the Nevada SHPO in identifying both the area of potential effect and the tribes to be consulted in connection with the Project.[48] In February 2020, the SHPO reviewed and signed off on BLM's identification of the Fort McDermitt Tribe, Summit Lake Paiute Tribe, and Winnemucca Indian Colony.[49] The SHPO did not indicate that any other tribe had identified places of cultural and religious significance or should be consulted in connection with the Project.[50]

Finally, BLM was not required to consult with the People separate from its consultation with the Fort McDermitt Tribe of which the People are a part because the People are not a federally recognized tribe to which the NHPA's consultation requirements extend. "[A] non-federally recognized Indian tribe, is not automatically entitled to consulting party status." *Winnemen Wintu Tribe v. U.S. Forest Serv.*, No. 2:09-cv-01072-KJM-KJN, 2017 WL 1093902, at *3 (E.D. Cal. Mar. 23, 2017). Instead, the People "'may' be eligible to participate as a consulting party because [they have] a 'demonstrated interest,' but first [they] must request consulting party status, in writing, from the agency." *Id.* (citing 36 C.F.R. §§ 800.2(c)(5), 800.3(f)(3)). The People did not request consulting party status during the NHPA consultation period. Nor do Plaintiff-Intervenors point to evidence in the record showing that any of the People were acting as the requisite "representatives designated or

---

[48] Exhibit 24, Correspondence between BLM and SHPO.
[49] *Id.*
[50] *Id.*

identified by the tribal government." 36 C.F.R. § 800.2(c)(2)(ii)(C). The NHPA thus imposed no obligation on BLM to initiate separate consultations with them.

      **B.**    **BLM provided the consulting tribes, Plaintiff-Intervenors, and the public a reasonable opportunity to consult on the Project's effects on historic properties.**

BLM's engagement with the tribes identified for consultation also satisfied the requisite standards for NHPA consultation efforts. Once it identified tribes for consultation, BLM initiated consultation early in the scoping process.[51] From that point on, BLM repeatedly contacted those tribes and provided the Draft EIS and MOA for comment in accordance with the NHPA.[52] Courts have routinely found this level of engagement with consulting tribes adequate.[53] *See Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dep't of Interior*, 608 F.3d 592, 609 (9th Cir. 2010). In *Quechan Tribe of Ft. Yuma Indian Rsrv. v. U.S. Dep't of the Interior*, the court rejected the reasoning in *Quechan Tribe of Fort Yuma Indian Reservation v. U.S. Dept. of Interior*, 755 F. Supp. 2d 1104 (S.D. Cal. 2010), finding instead that where BLM made numerous attempts to engage in government to government consultation and those requests were ignored or rebuffed, BLM had satisfied the NHPA requirements for consultation. 927 F. Supp. 2d 921, 933 (S.D. Cal. 2013), *aff'd.*, *Quechan Tribe of the Fort Yuma Indian Rsrv. v. U.S. Dep't of the Interior*, 673 F. App'x 709 (9th Cir. 2016).

And in *Muckleshoot Indian Tribe,* 177 F.3d at 807, the Ninth Circuit Court of Appeals explicitly distinguished cases like this from *Pueblo of Sandia v. United States*, 50 F.3d 856, 860 (10th Cir.1995), on which Plaintiff-Intervenors rely. In *Pueblo of Sandia*, the agency solicited information by form letter and failed to perform a good faith consultation with the

---

[51] Exhibit 8, December 12, 2019, Initiating Consultation Letter to Tribes.

[52] *See e.g.* Exhibits 8, 12, 13, 15.

[53] Plaintiff-Intervenors suggest, without explaining how, that closures due to COVID-19 impacted BLM's compliance with the NHPA's consultation requirements. *See* Pl.-Intervenors' Mem. at 13. But BLM identified tribes for consultation and sent its initial consultation letters in December 2019, before any COVID-19 closures. And consistent with direction from the Department of the Interior, BLM continued the NEPA and NHPA process but provided for participation in virtual public meetings. Exhibit 23, BLM COVID Protocol for Public Hearings and Consultation Guidance Document.

SHPO. *Id.* Here, as discussed above, BLM performed the necessary scoping research, engaged with the tribes with a demonstrated interest in the project area, and executed a MOA with the Nevada SHPO to approve a HPTP. The record demonstrates that BLM fully satisfied its obligation to "make a reasonable and good faith effort" to identify and consult with tribes to identify historic properties within the undertaking's area of potential effects through multiple communications and continuing consultations—thus complying with the NHPA consultation requirements. 36 C.F.R. § 800.4(b)(1).

Though the People assert that they were not aware of the Project until February 2021, as explained *supra*, BLM repeatedly reached out to the Fort McDermitt Tribe, of which the People are a part, concerning the Project—but the People never separately responded. Courts within the Ninth Circuit have found that a lack of response is an adequate basis for continuing the NHPA process without further tribal consultation. *E.g.*, *Concerned Citizens & Retired Miners Coal. v. U.S. Forest Serv.*, 279 F. Supp. 3d 898, 942 (D. Ariz. 2017) ("Were the Court to find that an agency had not satisfied the NHPA's consultation requirements simply because no actual consultation occurred, a tribe could block any undertaking by refusing to cooperate. The NHPA does not guarantee actual meaningful consultation, only that the tribe will have a reasonable opportunity for such consultation."). And as discussed above, the RSIC and the Burns Paiute Tribe were contacted for consultation on the Winnemucca RMP, but either disclaimed an interest or did not respond to BLM's request for consultation.[54] The agency cannot be expected to reach out to every tribe within the United States for each federal undertaking; it must reasonably proceed with agency action within the NHPA parameters based on the information available to it, as it did here.

BLM also provided opportunities for public involvement in the NHPA process. Specifically, it issued several public notices, including in the Federal Register, and so gave "notice to the world." *See Shiny Rock Mining Corp. v. United States*, 906 F.2d 1362, 1364-65 (9th Cir. 1990) ("'Publication in the Federal Register is legally sufficient notice to all

---

[54] Exhibit 2, Winnemuca RMP at 1-34; Exhibit 3, Winnemucca RMP Ethnography at 92.

interested or affected persons regardless of actual knowledge or hardship resulting from ignorance.'" (quoting *Friends of Sierra R.R., Inc. v. ICC*, 881 F.2d 663, 667-68 (9th Cir. 1989)); *Gov't of Guam v. United States*, 744 F.2d 699, 701 (9th Cir. 1984) (holding that publication in Federal Register "constituted formal notice to the world"). It also held multiple public meetings after providing advance notice, at which any of the concerns now expressed by Plaintiff-Intervenors could be raised—but they were not.

### C.   BLM correctly executed a Memorandum of Agreement and invited participating tribes to be concurring parties.

Plaintiff-Intervenors also contend that BLM failed to follow the Protocol and faultily executed the MOA with the SHPO. But, despite an oversight in the ROD suggesting the contrary,[55] the MOA was in fact signed by BLM and the Nevada SHPO on November 5, 2020, before the ROD issued on January 15, 2021, as is plainly evidenced by the date on both documents.[56]

Three categories of parties may sign an MOA. 36 C.F.R. § 800.6(c). First, the "signatories" are the parties with "authority to execute, amend, or terminate the agreement in accordance with this subpart." *Id.* § 800.6(c)(1). These are the federal agency official and the SHPO or, if involved, the ACHP. Second, the agency official has authority to invite parties to be "invited signatories." *Id.* § 800.6(c)(2). "Invited signatories" have the power to amend or terminate an MOA, but not to bring it into existence—if an invited signatory declines to sign on it does not invalidate the agreement. *Id.* Third, the agency official may also invite other consulting parties to concur in an MOA. *Id.* Concurring parties do not have the power to amend or terminate an MOA. *Id.* § 800.6(c)(3).

The MOA for this project was properly signed on November 5, 2020 by the two required signatories, BLM and the Nevada SHPO. Lithium Nevada was an invited signatory

---

[55] That is, the sentence in the ROD indicating that "[a] Memorandum of Agreement and treatment plan are being prepared," ROD at 6, should have indicated that the MOA and HPTP had been prepared. Exhibit 26, Second Hall Decl. ¶ 6.

[56] Exhibit 14, MOA at 4; Exhibit 1, ROD.

and did not sign. BLM sent copies of the MOA to the Fort McDermitt Tribe, Summit Lake Paiute Tribe, and Winnemucca Indian Colony, inviting them to be concurring parties, but they did not sign.[57] And though the Protocol acknowledges that "[d]raft . . . MOAs *should* be made available for public comment," § V.F.4.a-b (emphasis added), it does not affirmatively *require* public comment on draft MOAs. The MOA thus complied with the NHPA regulations and was properly executed.

## II.    Plaintiffs cannot demonstrate imminent, irreparable harm

Plaintiff-Intervenors must show a "likelihood of irreparable injury—not just a possibility—in order to obtain preliminary relief." *Winter*, 555 U.S. at 21. To do so, they must "*demonstrate* immediate threatened injury," and cannot "merely allege imminent harm . . . ." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (citation omitted). "Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Id.* (citation omitted).

As an initial matter, there is no presumption of irreparable harm from violation of a procedural statute like the NHPA. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) (discussing procedural injury *in vacuo*). So even if the Court finds Plaintiff-Intervenors likely to succeed on the merits, they must still prove irreparable harm. And as the Court has previously acknowledged, sweeping assertions that mining operations associated with the Project would cause irreparable harm at some point in the future do not satisfy the immediacy requirement, especially in light of Lithium Nevada's commitment to provide 60 days' notice before commencing any major ground-disturbing activities authorized under the ROD challenged in this action.[58] *See Caribbean Marine Servs.*, 844 F.2d at 674 (requiring demonstration of "immediate threatened injury").

---

[57] Exhibit 26, Second Hall Decl. ¶ 5.

[58] *See* Order denying motion for preliminary injunction, Case No. 3:21-cv-103-MMD-CLB ECF No. 48; Order Approving Joint Stipulation, ECF No. 39 ¶ 1.

Plaintiff-Intervenors must therefore focus on the harms they allege they will suffer from excavation for cultural resources under the HPTP.[59] The only harm they assert in connection with those activities is that excavation for purposes of mitigating adverse effects to cultural resources and archeological artifacts from the proposed mining operation—an excavation specifically designed to protect and preserve cultural properties—may encounter and harm "human remains and artifacts below the ground surface."[60]

But they have not demonstrated with any specificity that those harms are likely to occur. As described *supra*, nothing in BLM's previous analyses of the area has indicated that a massacre occurred in Thacker Pass. As the HPTP demonstrates, historic properties in the area "were identified and documented through archival background research and by conducting intensive pedestrian inventories" of the area.[61] No evidence that Thacker Pass contains a massacre site was found during those surveys, even though the Project Area has been disturbed in the past. For example, the Project Area "was plowed with rubber-tired tractors and then seeded" after a wildfire burned the area in 1963.[62] And any caves, which Plaintiff-Intervenors mention in declarations[63] (but not in their memorandum), are mainly located more than half a mile away from and at higher elevations than the proposed excavations, outside of the area of direct effects, and thus unlikely to be disturbed by the contemplated, limited excavation within the Project Area.[64]

---

[59] In the context of granting RSIC's and the People's motion to intervene, the Court observed that "[t]he Tribes persuasively argue that the digging incident to this plan will cause them irreparable harm." Order of July 28, 2021, Case No. 3:21-cv-103-MMD-CLB, ECF No. 59 at 8. But in making that observation in the intervention context, the Court did not have before it the benefit of full briefing on the preliminary injunction standards—nor could it have at that time, as it had already set a schedule contemplating separate preliminary injunction briefing.

[60] Pl.-Intervenors' Mem. at 8, 19–20.

[61] Exhibit 14, MOA App'x C (HPTP) at 7.

[62] Exhibit 4, Kings Valley Lithium Exploration Project Environmental Assessment at 3-2.

[63] *See* Hinkey Decl. ¶ 9.

[64] Exhibit 26, Second Hall Decl. ¶ 7.

Furthermore, even if the contractor may encounter unanticipated archeological artifacts or human remains during excavation under the HPTP, both the HPTP and the MOA provide for cessation of work and notification of appropriate parties. Specifically, the MOA requires that any "[h]uman remains and associated grave goods discovered on public lands will be addressed in accordance with the Native American Graves Protection and Repatriation Act (NAGPRA) and the processes outlined in the HPTP."[65] The HPTP, in turn, acknowledges that the discovery of human remains during the data recovery process "would be important to local tribes."[66] If any "human skeletal remains, associated and unassociated funerary objects, or sacred objects are found during" this process, "all work will cease immediately within 50 . . . meters of the find," and BLM would be "notified immediately" and, in turn, "notify the appropriate tribes to ensure compliance with the requirements of ARPA and NAGPRA."[67] The contractor would then "secure the area and move work to another location until appropriate tribes and agencies make decisions regarding proper disposition of the remains."[68] Finally, the HPTP requires that the "decision to protect and preserve in place or remove . . . . be made by the BLM *in consultation with the tribes*."[69] Plaintiff-Intervenors have not identified any further, concrete steps that could be taken to address their concerns.

Plaintiff-Intervenors' delay in seeking relief also cuts against any finding of irreparable harm. *See Lydo Enterprises, Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984); *Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Social & Rehab. Servs.*, 31 F.3d 1536, 1543–44 (10th Cir. 1994); *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995). Though Plaintiff-Intervenors allege that they only became aware of the actions contemplated under the HPTP as of May 2021, as described above, BLM has approved several projects and plans

---

[65] Exhibit 14, MOA at 5.

[66] Exhibit 14, MOA App'x C (HPTP) at 51.

[67] *Id.*

[68] *Id.*

[69] *Id.* (emphasis added).

connected with Thacker Pass over the last ten years. Over all that time, despite persistent public notice and being invited to consult on multiple projects, no tribe put BLM on notice that Thacker Pass contained the sort of cultural and historic properties that Plaintiff-Intervenors now invoke. BLM also issued repeated public notices concerning the Project during the NEPA and NHPA process—the initial Notice of Intent, the DEIS, the FEIS—as well as sending copies of the DEIS, FEIS, and HPTP to the Fort McDermitt Tribe and others. That Plaintiff-Intervenors failed to assert the harms they now raise for years until shortly before the previous preliminary injunction motion hearing in this case weighs against a finding of irreparable harm.

Finally, but perhaps most importantly, as of this filing, Plaintiff-Intervenors still have an opportunity to mitigate the harms they allege they will suffer here. BLM invited all Plaintiff-Intervenors to consult on the ARPA permit.[70] During that process, BLM would "meet with official representatives of any Indian tribe or group" that is known "to consider sites potentially affected as being of religious or cultural importance," in order "to discuss their interests, including ways to avoid or mitigate potential harm or destruction such as excluding sites from the permit area." 43 C.F.R. § 7.7(a)(2)-(3). And "[a]ny mitigation measures which are adopted" through that process "shall be incorporated into the terms and conditions of the permit . . . ." *Id.* § 7.7(a)(3). RSIC asked to consult on the ARPA process on August 3, 2021, after filing their motion for injunctive relief.[71] BLM has consulted on the permit with the Fort McDermitt Tribe, is presently engaged in discussions with RSIC, and is open to consultation with the Burns Paiute Tribe.[72] This process affords Plaintiff-Intervenors an opportunity to propose specific mitigation measures to alleviate the harms they allege or identify specific locations of concern within Thacker Pass so as prevent any

---

[70] Exhibit 19, Letters to RSIC, the People, Ft McDermitt, Burns Paiute Inviting ARPA consultation.

[71] Exhibit 25, August 3, 2021, Letter from RSIC Requesting Consultation.

[72] *See* Exhibit 20, August 12, 2021 Letters; *e.g.*, Exhibit 17, June 4, 2021 Fort McDermitt Tribe meeting notes.

accidental damage during the surveying process. *See id.* § 7.7(a)(3) (providing that the agency may exclude sites from the permit area based on information learned during the consultation process). Until that process is concluded, it is unclear what, if any harm will occur—let alone whether the harm would be irreparable—given that the agency has not yet concluded what, if any, stipulations might be incorporated into the terms and conditions of the permit in light of that consultation.

Ultimately, even were Plaintiff-Intervenors successful on the merits and consultation were required under the NHPA process, in light of the determination that the Project would cause adverse effects to historic properties, that process would likely lead to preservation of any identified cultural artifacts through the sort of process described under the HPTP. *See* The Protocol § V(F). Plaintiffs thus have not established a likelihood of imminent, irreparable harm arising from the actions that they seek to enjoin. Because they have failed to carry their burden on that element, their motion should be denied.

## III.   The public interest and balance of equities disfavor an injunction

Plaintiff-Intervenors must prove that a preliminary injunction would serve the public interest. *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). When the government is a party, the analyses of the public interest and balance of equities merge, *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citation omitted). Absent the necessary showing on the first two elements a court "need not dwell on the final two factors" and, "when considered alongside the [movant's] failure to show irreparable harm, the final two factors do not weigh in favor of a stay." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 778–79 (9th Cir. 2018). But two strong public interests outweigh Plaintiffs' anticipatory and speculative allegations of irreparable harm.

First, the orderly administration of government and the protection of reasonable investment-backed expectations are public values that would be disserved by allowing parties to belatedly attack a lengthy, expensive, and complex NEPA/NHPA process after forgoing numerous earlier opportunities to consult on that process and with no real justification for

the delay. Plaintiff-Intervenors' suit is not barred by the applicable statute of limitations, but their delay tilts the equities sharply against the injunction.

Second, as described above, Plaintiff-Intervenors have had myriad opportunities to assert their interests in connection with this and previous public processes concerning the Thacker Pass area—some of which they participated in without raising any concerns about the Thacker Pass area as a massacre site. Were the Court to grant their motion, it would suggest that anyone in a similar position could silently wait out an administrative process while the government expends time and resources reviewing and analyzing plans of operations, only to raise a hitherto-undisclosed NHPA claim at the eleventh hour.

## CONCLUSION

Plaintiff-Intervenors have not carried their burden of demonstrating any of the elements required to obtain preliminary injunctive relief. Plaintiffs have not shown even a serious question as to whether BLM made a reasonable and good faith effort to identify and consult with tribes with a cultural or historical interest in the Thacker Pass area. Plaintiff-Intervenors have also failed to meet their burden to submit facts demonstrating an immediate and irreparable harm, and the balance of harms and public interest weigh against an injunction. Federal Defendants therefore respectfully request that the Court deny Plaintiff-Intervenors' motion.

Respectfully submitted this 12th day of August 2021.

TODD KIM
Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Div.

 /s/ Arwyn Carroll
ARWYN CARROLL (Mass. Bar # 675926)
LEILANI DOKTOR (HI Bar # 11201)
Trial Attorneys
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611

Phone:  202-305-0465
Fax:  202-305-0506
arwyn.carroll@usdoj.gov
leilani.doktor@usdoj.gov

*Attorneys for Federal Defendants*