1  Laura K. Granier (Nevada Bar No. 7357)
   Erica K. Nannini (Nevada Bar No. 13922)
2  HOLLAND & HART LLP
3  5441 Kietzke Lane, Suite 200
   Reno, NV 89511-2094
4  Phone: 775.327.3000
   lkgranier@hollandhart.com
5  eknannini@hollandhart.com

6  Hadassah M. Reimer, Esq (Wyo. Bar No. 6-3825)
7  *Admitted Pro Hac Vice*
   HOLLAND & HART LLP
8  P.O. Box 68
   Jackson, WY 83001
9  Tel: 307-734-4517
   hmreimer@hollandhart.com
10

11 *Attorneys for Defendant-Intervenor*
   *Lithium Nevada Corp.*

12

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

13

14

15  BARTELL RANCH, LLC, et al.,      )   ***Lead Case:***
                                     )   **Case No. 3:21-cv-00080-MMD-CLB**
16                      Plaintiffs,  )
                                     )
17  v.                               )   **LITHIUM NEVADA CORP.'S**
                                     )   **OPPOSITION TO RENO-SPARKS**
18  ESTER M. McCULLOUGH, et al.,     )   **INDIAN COLONY, ATSA KOODAKUH**
                                     )   **WYH NUWU/PEOLE OF RED**
19                      Defendants,  )   **MOUNTAIN'S & BURNS PAIUTE**
                                     )   **TRIBE MOTION FOR PRELIMINARY**
20  and                              )   **INJUNCTION**
                                     )
21  LITHIUM NEVADA CORP.,            )
                                     )   **EVIDENTIARY HEARING**
22            Defendant-Intervenor.  )   **REQUESTED**
                                     )
23  ─────────────────────────────── )

24

25       Lithium Nevada Corp. ("Lithium Nevada") submits these points and authorities in

26  opposition to the Motion for Preliminary Injunction (ECF 45 & 62) and requests an evidentiary

27  hearing. *Charlton v. Est. of Charlton*, 841 F.2d 988, 989 (9th Cir. 1988) (unless a party waives

28  its right, an evidentiary hearing should be held where essential facts are in dispute).

*(left margin)* HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

Extensive prior surface disturbance including trenching, bulk sampling and mineral exploration drilling under numerous prior BLM authorizations[1] has occurred in the Thacker Pass project area over the past eleven years. Yet, it was not until just three weeks ago the Reno-Sparks Indian Colony ("RS Colony") and Atsa koodakuh wyh Nuwu/People of Red Mountain ("the People"), later joined by the Burns Paiute Tribe (collectively the "Intervenors"), sought to assert their claim that cultural resource mitigation on less than 0.3 acre in this same area will cause irreparable harm. Within this same project area, multiple prior BLM authorizations for mining, including two open pits for clay mining have issued after tribal consultation in compliance with the National Historic Preservation Act of 1966 ("NHPA"). During these authorization processes, tribal consultation, and years of disturbance in the Thacker Pass project area, Intervenors had never objected to much greater disturbance on acreage many times larger than the 0.3 acre at issue here.

BLM and Lithium Nevada take very seriously the agency's tribal consultation obligations and, as discussed below, extensive notices, communications and collaboration have been ongoing. BLM and Lithium Nevada have, for years, worked with the interested tribes on identifying and addressing any issues. None of those tribes have expressed concerns about their consultation process. Moreover, as the Intervenors' own filings with this Court reflect, the BLM, although not required, in its discretion, has offered them consultation for the pending "ARPA" permit which is a separate process from consultation for the overall project but is an opportunity for them to have

---

[1] FEIS Table 2.1, Previously Authorized and Existing Surface Disturbance (citing, for example, BLM Casefile No. N85255, authorized Jan. 25, 2010, for 75 acres of surface disturbance for the Kings Valley Lithium Exploration Project & BLM Casefile No. N91547, authorized May 15, 2014 for 114 acres of disturbance for the Kings Valley Clay Mine).

BLM consider their concerns of alleged imminent harm for the cultural resource mitigation at issue in the Motion.  Therefore, as discussed below, the Motion is premature.

Because BLM has offered Intervenors consultation prior to issuance of the permit under the Archaeological Resources Protection Act ("ARPA"), 43 C.F.R. Part 7, and the cultural resource mitigation cannot commence without that permit, this claim is not ripe. BLM invited Intervenors to contact BLM to participate in consultation on issuance of the ARPA permit.  (ECF 43-6).  If Intervenors reject this offer or have not responded, their asserted harm from lack of consultation is of their own making and, such inequitable conduct should preclude injunctive relief.

Intervenors cannot establish a likelihood of success on the merits because (a) through not only the multi-year review process for this project but also numerous authorizations since 2009, Intervenors never provided BLM notice that the Project area is of cultural or religious significance to them, until June 2021; and (b) the People are not a tribe under the NHPA. Intervenors also cannot establish that without injunctive relief they will suffer irreparable harm because BLM has invited them to consult on the ARPA permit where they can provide all of the information they wish and propose efforts they want to see in how the cultural resource mitigation is performed. They have the opportunity through that consultation to share all relevant information about the locations of concern to them, the details of those concerns and any proposals they have for mitigation – before the cultural resource mitigation can commence. That their concerns may be ameliorated through the offered consultation that is pending renders their Motion premature.

The Thacker Pass Project ("Project") will be an open-pit lithium mine on Lithium Nevada's unpatented mining claims approximately 17 miles from Orovada. Record of Decision ("ROD") at 1 (Pl. Ex. 1). The Project's review was extensive, thorough and required many years of work, including collection of significant baseline data. Lithium Nevada's commitment to mitigation is

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

substantial, including millions of dollars to relocate the Project to avoid the Montana Mountains, one of the places Intervenors identify of concern in their Motion.

The Project is important to leveraging domestic lithium reserves to secure our nation's critical supply chain. The Department of Interior has identified Lithium as a critical mineral. President Biden's Executive Order 14017 (**Ex. 1**), identifies the need for the U.S. to leverage sizeable lithium reserves to expand electric vehicle battery production to help "tackle the climate crisis."[2] President Biden also seeks to ensure that the U.S. is not dependent on foreign sources for critical minerals as a matter of national security.[3] Because the activity the Intervenors seek to enjoin is cultural resource mitigation work on less than 0.3 acre of land in the Project area where significant surface disturbance has occurred for years without objection and Intervenors still can consult on that work before it commences, *any* alleged harm is speculative, no legal basis exists to enjoin the mitigation and to do so would be contrary to the public interest in development of a project with strategic importance to national security.

## BACKGROUND

Because the Court is familiar with the BLM's approval of the Project, Lithium Nevada provides the following brief discussion of background relevant to the Motion and incorporates by reference the detailed background information provided in ECF 31.

### A.    History of Surface Disturbance in Thacker Pass Project Area

Lithium Nevada has been working in the Thacker Pass area on public lands that are open to mineral entry, for more than a decade. **Ex. 2**, Catherine Clark Dec. ¶ 3. Over the course of that

---

[2] *See also* White House Statements and Releases, *FACT SHEET: Securing America's Critical Supply Chains*, (Feb. 24, 2021) (explaining President Biden's EO to help create more resilient and secure supply chains for critical and essential goods) (Ex. 1).

[3] *See also* Ex. 1 ("Critical minerals are an essential part of defense, high-tech, and other products. . . the United States needs to ensure we are not dependent upon foreign sources or single points of failure in times of national emergency.").

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

time, employees, contractors and the BLM have walked the project area extensively for environmental baseline, other studies and in the course of conducting trenching, exploration drilling and other previously authorized disturbance. *Id.* ¶¶ 5, 14; **Ex. 3**, Randal Burns Dec. ¶3-6. In over a decade of work in the area including trenching, road building, and digging test pits (all authorized by BLM after tribal consultation) Intervenors never came forward or provided BLM any notice of the information they now put before this Court, until June 2021. *Id.*, ¶¶ 6-14. In the years of work in the Project area, no employees or contractors have observed any religious events or encountered any human remains, funerary items, sacred objects or objects of cultural patrimony. Had any such items of cultural importance been encountered, work would have come to an immediate halt with notice to BLM. *Id.* ¶14; **Ex. 3** ¶6-9, **Ex. 3A**.  Over the past eleven years of work at Thacker Pass, Lithium Nevada has reached out numerous times and coordinated with BLM to reach communities and stakeholders including Tribes. **Ex. 4**, Maria Anderson Dec. ¶¶2-21, 35; **Ex. 2** ¶7.  No traditional cultural property ("TCP") issue or concern has ever been identified in the Thacker Pass Project area before the Intervenors' June 2021 letter to the BLM. **Ex.2** ¶ 14; *Id.*; **Ex.4** ¶13-16, 18, 20-21.

In 2009, BLM approved the Kings Valley Lithium ("KVL") Exploration Project across approximately 3,549 acres and digging up to 75 acres in the project area – the same area Intervenors assert should not be disturbed. **Ex. 2** ¶ 10-12, Exhibit 2A (map showing Thacker Pass project area overlap with prior disturbance). The KVL Exploration Plan approved drilling, road building, trenching, and other disturbance. To date, approximately 50 acres of disturbance have occurred. *Id.* ¶ 12; Ex.2C-D. In 2014, BLM approved the Kings Valley Clay Mine located in the project area, and clay mining from two open pits with stockpiling on-site. The open pits, waste rock disposal areas, roads and ancillary facilities were authorized over 114 acres of disturbance within a 796-acre project boundary with a project life of approximately 20 years. *Id.*¶ 13.

4

Despite a full public process for prior BLM authorizations and obvious significant disturbance in the Project area for years, Intervenors never objected to many acres of trenching, digging and drilling in this area. Extensive surface disturbance has occurred in the Project area through hundreds of exploration drill holes, trenching, and clay mining pits (**Ex. 2C-D & Ex. 3**) with no objection from Intervenors and no encounters or discovery of any religious or cultural materials (which would have immediately halted work and been reported to the BLM) through any of the many acres of disturbance. *Id.*; Ex. 3A.

### B.    NHPA Consultation for the Record of Decision

As required by NHPA, BLM initiated consultation from the "early stages (October 2018)" of the Project and continued that consultation throughout the National Environmental Policy Act ("NEPA") review. ROD at 5. Before the NEPA scoping process began in early 2020, BLM initiated consultation with the Fort McDermitt Paiute and Shoshone Tribe (within the Project region), the Summit Lake Paiute Tribe (125 miles from the Project area), and the Winnemucca Indian Colony (70 miles from the Project area).[4] BLM continued outreach throughout the NEPA process.

### C.    Extensive Notice, Interaction & Engagement at Fort McDermitt

For years, Lithium Nevada has provided notices and worked on community outreach and engagement with all stakeholders including the Fort McDermitt Tribe. In addition to public notice the BLM provided through the course of prior authorizations and the Thacker Pass project, the project has attracted the attention of the Reno-Sparks local media (**Ex. 2 ¶4**), and Lithium Nevada has made substantial efforts to notify all possible interested stakeholders and community members

---

[4] Lithium Nevada respectfully requests the Court to take judicial notice of the approximate distances of each of the consulted tribes from the Project area developed from online mapping resources. *United States v. Perea-Rey*, 680 F.3d 1179, 1182 n.1 (9th Cir. 2012).

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

about the project and hold meetings and host gatherings to provide information and hear any issues from stakeholders including tribal members. **Ex. 4** ¶7; **Ex. 5,** Dec. of Pepi Bengoa; **Ex. 7** ¶12. Many tribal members have responded to that outreach, engaging in collaborative efforts with Lithium Nevada, voicing their opinions, and participating in the BLM's process. **Ex. 4, Ex. 7**. These notices, meetings and communications began before the pandemic and continue through today and were provided both on social media (including an active Facebook group called the "McDermitt People Reporting News" which includes many residents of the Fort McDermitt Paiute-Shoshone Reservation among its more than 800 members) and in local frequented locations at Fort McDermitt to maximize the scope of availability of the information. **Ex. 4, Ex. 5** ¶ 2-9. Notice has also extended well beyond the McDermitt area; Lithium Nevada has worked with local tribal leaders to publicize employment opportunities to tribal members who work elsewhere and want to return home. **Ex.4,** ¶32.

### D.    Activity at Issue in Intervenors' Motion & Remaining ARPA Process

Intervenors' assert the cultural resources mitigation which will disturb no more than 0.25 acres with anticipated trenching on only 0.04 acres will cause irreparable harm. (ECF 30-1 ¶11). The work is intended to mitigate impacts on any eligible historic properties through treatment measures including avoidance, data recovery at selected sites, public outreach and interpretation and other approved methods. *Id.* ¶9. This cultural resource mitigation that can occur only at certain times of the year, weather dependent, is part of the critical path for project construction, and must commence soon to ensure that the project development remains on track to deliver lithium to the United States market by 2025. **Ex. 6**, J. Lowry Dec ¶15; **Ex. 7** A. Zawadzki Dec. ¶20-22**.**

Notably this mitigation and the 0.29 acre disturbance Intervenors assert will cause irreparable harm will not occur until BLM issues an APRA permit (a process for which they have offered Intervenors consultation). ARPA requires this BLM permit before any excavation or

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

removal of any archaeological resource on public lands. 16 U.S.C. § 470cc(a); *see also* 43 C.F.R. § 7.5(a). The ARPA regulations provide that upon request, "the Federal land manager may meet with official representatives of any Indian tribe or group to discuss their interests, including ways to avoid or mitigate potential harm or destruction such as excluding sites from the permit area." *Id*. § 7.7(a)(3). Any adopted mitigation measures must be incorporated into the terms and conditions of the ARPA permit. *Id*.; *see also id*. § 7.9(c).

Intervenors seek to enjoin the cultural resources mitigation and argue that absent injunctive relief, physical disturbance will occur at "a massacre site, possible burial sites, and historic eligible for inclusion on the National Register of Historic Properties." (at 3). However, Intervenors do not explain why they never (before June 2021) notified BLM of the importance of this area even through all the prior authorizations for substantial disturbance. Over the past eleven years Lithium Nevada has worked in the Thacker Pass area and received multiple BLM approvals and Intervenors never objected or expressed concern that the area is a Traditional Cultural Property or sacred.

In addition, Intervenors' area of importance does not appear to be within the Project area. Intervenors describe caves where their ancestors hid from soldiers, but the Project area is mostly flat. Lithium Nevada surveyed over 18,000 acres and did not identify any caves within the baseline survey area for the Project. **Ex. 2** ¶ 9, **Ex. 2B** (aerial photograph of Thacker Pass project area). There also is now showing of irreparable harm because while Intervenors have not identified with any specificity the locations of concern to them, their descriptions appear to be of an area other than Thacker Pass given that the Fort McDermitt tribe's culture is not to bury the remains of their ancestors but instead to wrap them in a blanket and pile rocks on top of the remains and not bury the remains of their ancestors in the ground. **Ex. 10**, Alice Crutcher Dec. ¶4.

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

7

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

**ARGUMENT**

**I.     Judicial Review under the APA & Standard for Preliminary Injunction**

The Administrative Procedure Act ("APA") provides a limited scope of judicial review of agency actions. 5 U.S.C. §§ 701-06; *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 778 (9th Cir. 2006). A court may reverse an agency decision only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency's decision may be overturned only if the agency relied on factors Congress did not intend it consider, entirely failed to consider an important aspect of the problem, offered an explanation counter to the evidence before it, or is so implausible it could not be ascribed to a difference in view or the product of agency expertise. *McFarland v. Kempthorne*, 545 F.3d 1106, 1110 (9th Cir. 2008). The standard of review is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Nat'l Mining Ass'n v. Zinke*, 877 F.3d 845, 866 (9th Cir. 2017). A court "may not substitute its judgment for that of the agency." *Envtl. Def. Ctr. v. EPA*, 344 F.3d 832, 858 n.36 (9th Cir. 2003).

A preliminary injunction is "an extraordinary and drastic remedy" that requires the movant, "*by a clear showing*," to "carr[y] the burden of persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). Preliminary injunctive relief requires demonstration of (1) likelihood of success on the merits, (2) likelihood of irreparable harm absent an injunction, (3) the balance of equities tips in its favor, and (4) the injunction is in the public interest. *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008). Irreparable injury must be "*likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (rejecting a "possibility" of irreparable harm standard). Intervenors here show only a speculative possibility of harm particularly given the consultation process is ongoing.

1

2

## II.    Plaintiffs Are Not Likely to Succeed on the Merits & Lack Standing

Intervenors argue that BLM violated its NHPA obligations and that BLM's identification of the tribes affected by the Project was unreasonable because Intervenors were not identified. However, the Intervenors do not explain why they have never before disclosed their interest in the Thacker Pass area to the BLM, through a request for consultation, to seek an eligibility determination, or even a request for notice of any surface disturbing activities in the Project area. Plaintiffs do not explain why, with more than a decade of substantial disturbance ongoing at Thacker Pass, they have never before raised these concerns when the BLM authorizations for nearly two hundred acres of disturbance in the same area (*see, e.g.*, Ex.2A, 2G) occurred years ago, long before the COVID pandemic. To the extent this Project may have reawakened Intervenors' interest in Thacker Pass that they have never before disclosed, BLM has demonstrated a willingness to consult with the tribes in future actions – including the pending ARPA permit – but the agency was not obligated to anticipate the Intervenors' previously undisclosed interest in the area.

The NHPA is intended to "foster conditions under which our modern society and our historic property can existing in productive harmony," 54 U.S.C. § 300101(1). "Like NEPA, '[s]ection 106 of NHPA is a "stop, look, and listen" provision that requires each federal agency to consider the effects of its programs.'" *Te-Moak Tribe v. U.S.*, 608 F.3d 592, 607 (9th Cir. 2010). NHPA "requires federal agencies to 'make a reasonable and good faith effort' to identify historic properties that might be affected by an action, and to 'take [those potential effects] into account.'" *Wildearth Guardians v. Provencio*, 923 F.3d 655, 676 (9th Cir. 2019).

"Properties of traditional religious and cultural importance to an Indian tribe . . . may be determined to be eligible for inclusion on the National Register." 54 U.S.C. §302706(a). "The BLM refers to such properties as 'properties of cultural and religious importance' or 'PCRIs.' *Te-*

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

9

*Moak Tribe*, 608 F.3d at 607. "The term 'TCP' [traditional cultural property] is analogous to 'PCRI'; it describes land that Native American tribes have identified as having cultural or religious significance. *Te-Moak*, 608 F.3d at 607-08 n.16. "The goal of consultation is to identify historic properties potentially affected by the undertaking . . . ." 36 C.F.R. § 800.1. Upon identification by a tribe during or prior to consultation, BLM may evaluate a TCP to determine whether it is eligible for listing on the National Register and therefore protected by the NHPA.

The NHPA regulations provide additional detail regarding consultation. BLM must "make a reasonable and good faith effort to identify Indian tribes and Native Hawaiian organizations that shall be consulted in the section 106 process." 36 C.F.R. § 800.2(c)(2)(ii)(A). "Further, '[c]onsultation [with Indian tribes] should commence early in the planning process, in order to identify and discuss relevant preservation issues,' . . . and 'must recognize the government-to-government relationship between the Federal Government and Indian tribes." *Te-Moak*, 608 F.3d at 607. (quoting § 800.2(c)(2)(ii)(C)).

As noted by Intervenors (at 14), BLM and the State Historic Preservation Office ("SHPO") negotiated the State Protocol Agreement (revised Dec. 22, 2014), which governs the procedures by which BLM completes Section 106 consultations in Nevada.[5] The State Protocol Agreement identifies the type of undertaking that requires consultation with the SHPO, how BLM and the SHPO communicate regarding determinations of whether the undertaking will have an adverse effect on historic properties and the procedures in the case of an adverse effect determination.

A.    BLM Complied with the State Protocol

Intervenors allege BLM violated a "bright-line" standard by failing to prepare a Memorandum of Agreement ("MOA") prior to the ROD. (at 14-15). This is inaccurate. The

---

[5] The State Protocol Agreement is available at https://shpo.nv.gov/uploads/documents/BLM_Nevada_State_Protocol_Agreement_2014.pdf.

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

publicly available MOA Between the DOI, BLM Winnemucca District Office and the Nevada SHPO Regarding the Lithium Nevada Thacker Pass Project Humboldt County ("Thacker Pass MOA") is posted on the SHPO website.[6] The MOA was signed on October 29, 2020 and November 5, 2020, prior to the completion of the FEIS on December 4, 2020, and the ROD in January 2021.

Intervenors assert that the draft MOA should have been made available for public comment. Again, the text of the Thacker Pass MOA indicates that this took place. The Thacker Pass MOA recites that BLM notified the Fort McDermitt Paiute and Shoshone Tribe, Summit Lake Paiute Tribe, and the Winnemucca Indian Colony about the Project and offered them "the opportunity to be concurring parties" to the Thacker Pass MOA. **Ex. 9** at 1. It further recites that BLM "coordinated public participation for [the] MOA through the process set forth in the National Environmental Policy Act, and has determined that there are no interested members of the public who might have concerns regarding the effect of the Project on historic properties." *Id.* at 1-2. The SHPO, which per the State Protocol Agreement "cooperatively implements" Section 106 compliance with BLM, signed the Thacker Pass MOA, indicating its endorsement that the public and tribal outreach efforts recited in the document satisfy the Protocol. Thus, contrary to Intervenors' claims that BLM violated "bright-line" requirements in the Protocol, the BLM satisfied, and the SHPO concurred in, all applicable requirements in the Protocol.

**B.    BLM Reasonably Identified Appropriate Tribal Entities for Consultation**

BLM completed its Section 106 compliance, including tribal consultation, and the SHPO concurred in BLM's conclusions. Yet, Intervenors argue that BLM had an obligation to consult with them as well. Intervenors are not likely to succeed on this argument because BLM was not

---

[6] *See* **Ex. 9**, Thacker Pass MOA, *available at* SHPO
https://shpo.nv.gov/uploads/documents/BLM_-
_WN_Lithium_Nevada_Thacker_Pass_Project_MOA.pdf.

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

on notice of their interest in the Project area, Intervenors' claim undermines the required respect for the sovereignty of the consulted tribes, Intervenors failed to exhaust their administrative remedies, and the People lack standing to bring this argument.

### 1. *BLM Was Not on Notice of the Intervenors' Interest*

BLM satisfied its obligation to make "reasonable and good faith" efforts to identify tribes that may attach significance to the Project area under Section 800.3(f)(2). BLM consulted broadly with tribes in the Project area region and beyond. Notably, membership in the tribes with whom BLM consulted and their shared history is the basis for the Intervenors' concerns. Eben Dec., ECF 45-1 ¶¶ 6-7, 13 (discussing shared culture and history); Hinkey Dec., ECF 45-2 ¶¶ 1, 8-9; Teeman Dec., ECF 62-1 ¶ 11. While the Intervenors rely on their shared history and membership with the tribes that were consulted here, nothing in the record suggests any of those consulted tribes ever mentioned the events and oral history identified by the Intervenors. While Intervenors only generally identify areas of concern, accounts of a Fort McDermitt Elder and tribal members (**Ex. 10, 8**), the Thacker Pass actual characteristics that do not match the Intervenors' descriptions (regarding caves and the Montana Mountains), and the lack of discovery in all the years of ongoing work in the Thacker Pass project area (**Ex. 2, 3**), indicate a different location altogether than the Thacker Pass project area (and, therefore, there's no showing of irreparable harm as discussed above). Thus, BLM was not reasonably on notice that more distant tribes, relying on their shared history with the tribes closer to the Project, might have such concerns and even the information recently provided leaves questions as to whether the Intervenors' concerns are in the Thacker Pass Project area. In addition, BLM further consulted with the SHPO, which did not identify a need to consult with Intervenors.

BLM conducted outreach to tribes both local to the project area and those more distant. The list of tribes BLM consulted demonstrates that BLM appropriately sought to identify tribes

12

with an interest in the Project area, not simply those local to the Project. The fact that none of the tribes consulted, who share the cultural history upon which Intervenors rely, identified the Intervenors' concerns, supports BLM's reasonableness in identifying tribes for consultation.

Intervenors' argument that BLM may not rely on consultation with one tribe or "group" of tribes misses the mark here. It is correct that BLM may not "group" tribes when it is on notice or has reason to believe that other tribes may have an interest in the project area. However, the cases Intervenors cite are inapposite. In *Standing Rock Sioux Tribe v. U.S.,* 205 F. Supp. 3d 4 (D.D.C. 2016) and *Quechan Tribe v. U.S.*, 755 F. Supp. 2d 1104, 1112, 1118 (S.D. Cal. 2010), it was not disputed that the agency knew of the plaintiff tribe's interest in the project area. The question was whether the agency's consultation with that tribe was sufficient. The question before this Court is whether BLM had reason to know that the Intervenors had any interest in the Project area. Where Intervenors do not identify any notice they ever provided BLM of their asserted interests, and none of the consultations completed for work over the preceding decade nor its consultations with more local tribes gave BLM any indication the Project area was of significance to Intervenors, the agency lacked the notice that was present in *Standing Rock Sioux Tribe* and *Quechan Tribe*.

### 2. *Intervenors' Claim Undermines the Required Respect for the Sovereignty of the Consulted Tribes*

If Intervenors disagree with the positions taken by the designated tribal representatives in the consulted tribes (MPI at 12), such disagreements are not appropriately resolved through a challenge to BLM's Section 106 compliance. The NHPA regulations mandate that BLM's consultation be "respectful of tribal sovereignty" and "recognize the government-to-government relationship between the Federal Government and Indian Tribes." 36 C.F.R. 800.2(c)(ii)(B), (C). Courts have long held that allowing third parties, or individual members of a tribe to assert claims on behalf of the tribe would "in effect, be allowing [the third party or tribal member] to disregard the Tribe's right to be the final arbiter and, thereby, the final spokesman for intra-tribal affairs

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

through a procedure characterized by one court as a 'back door method of . . . attempting to represent a tribe without approval or authority." *San Juan Citizens Alliance v. Norton*, 586 F. Supp. 2d 1270, 1293 (D. N.M. 2008) (quoting *National Indian Youth Council v. Andrus*, 501 F. Supp. 649, 684 (D. N.M. 1980)). "Doing so would violate the regulatory requirement to recognize the tribe as a sovereign authority." 586 F. Supp. 2d at 1293. Thus, the Intervenors' claims arising from or on behalf of Fort McDermitt tribe members are improper as a matter of law.

### 3.    *Intervenors Failed to Exhaust Their Administrative Remedies*

Intervenors' claim is also unlikely to succeed on the merits because they failed to exhaust their administrative remedies. "As a general rule, [courts] will not consider issues not presented before an administrative proceeding at the appropriate time." *Nat'l Parks & Conservation Ass'n v. Bureau of Land Management*, 606 F.3d 1058, 1065 (9th Cir. 2009). The Project is a well-publicized effort that has been ongoing for years – including activity that significantly predates the current pandemic. *See* Background, Section A. Indeed, one member of The People has been on Lithium Nevada's project mailing list since February 2019. **Ex. 4**, Anderson Dec. ¶¶ 6-7. Further, the declarant for RS Colony asserts that she is the tribe's longtime Tribal Historic Preservation Officer ("THPO"),[7] with extensive experience in consultations and describes the RS Colony as "an active leader in protecting Native American culture." This well qualified individual admittedly experienced with Section 106 made no effort to identify any part of the Project area as a TCP during the decade of prior disturbance that has occurred in the area and did not submit comments or otherwise participate in any of those prior authorizations or the Project review but contacted BLM for the very first time about the Project area only months after the ROD was signed. (ECF 45-1, ¶¶ 3-5). In addition to the public outreach under the NEPA process, BLM also consulted with

---

[7] A THPO is a tribal officer appointed by the tribe's "chief governing authority" who assumes the role of the SHPO on tribal lands.  36 C.F.R. § 800.16(w).

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

tribes throughout northern Nevada and the SHPO. None of these efforts resulted in any evidence or documentary record of the Intervenors' interest in the Project area. *See supra.*

Where, as here, there is no record evidence of information to have put BLM on notice of the Intervenors' interest in the Project to allow BLM to understand and act on or respond to the issue, exhaustion applies to such claims from an out-of-region tribe. The Intervenors' silence for years of disturbance and prior BLM authorizations in the Project area notwithstanding numerous solicitations for public participation should result in their claims being barred for failure to exhaust administrative remedies. *See Battle Mountain Band of the Te-Moak Tribe of Western Shoshone Indians v. U.S. Dep't of the Interior*, 2016 U.S. Dist. LEXIS 115093, \*36 (D. Nev. Order dated August 26, 2016) (the public interest is "disserved" by allowing parties to object to a lengthy NHPA process well after the ROD has issued).

### 4. *The People Lack Standing to Bring the Consultation Claim.*

Finally, the People are not within the statutory definition of "Indian Tribe" with whom the NHPA requires consultation, failed to timely request discretionary consulting party status and, therefore, lack standing to challenge the BLM's consultation process. The NHPA defines "Indian Tribe" or "tribe" as "an Indian Tribe, band, nation or other organized group or community . . . which is recognized as eligible for the special programs and services by the United States to Indians because of their status as Indians".  54 U.S.C. § 300309; 36 C.F.R. §800.16(m) (same).[8] An

---

[8] Section 106 and its accompanying regulations, 36 C.F.R. Part 800, require government-to-government consultation with Indian tribes. 36 C.F.R. § 800.2(c)(2) (designating Indian tribes as a consulting party); *see* National Programmatic Agreement, Section 4.f. (consistent with 36 C.F.R. § 800.2(c)(2), "BLM will consult with the tribal government's official designee").  However, entitlement to government-to-government consultation is limited to federally recognized Indian tribes. Id. § 800.16(m) (defining "Indian tribe" as "an Indian tribe, band, nation or other organized group or community, . . . recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians."); *Snoqualmie Indian Tribe v. FERC*, 545 F.3d 1207, 1216 (9th Cir. 2008) ("[w]hen the record was closed, the Tribe was not federally

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

organization must qualify under this definition to enforce the NHPA's tribal consultation requirements. *Slockish v. United States Fed'l Hwy. Admin.*, 682 F. Supp. 2d 1178, 1202-03 (D. Or. 2009). The People is an unincorporated group and make no claim to have been formally recognized as an Indian tribe by the Secretary of the Interior. (ECF 46 ¶ 2,10). As such, it was not entitled to participate in government-to-government consultation under 36 C.F.R. § 800.2(c)(2); *Snoqualmie Indian Tribe*, 545 F.3d at 1216. Rather, consistent with BLM's obligations under Section 800.2(c)(2) and the National Programmatic Agreement, BLM engaged in consultation with the Fort McDermitt Paiute and Shoshone Tribe official designees. *See,* e.g., **Ex. 4** ¶¶18-21. The Programmatic Agreement does not change this requirement. Programmatic Agreement at 2 ("BLM . . . shall consider all written requests of individuals and organizations to participate as consulting parties (36 CFR 800.3(f)).").

Consultation with the People as "individuals [or an] organization[ ] with a demonstrated interest in the undertaking" based on "the nature of their legal or economic relation to the undertaking or affected properties, or their concern with the undertaking's effects on historic properties[,]" 36 C.F.R. § 800.2(c)(5) is not mandatory. Rather, to qualify for this consultation the People were required to make their request in writing.[9] If an interested individual or organization

_____

recognized. Therefore, NHPA § 106 did not require [the agency] to consult with the Tribe on a government-to-government basis.").

[9] Courts within the Ninth Circuit considering an agency's obligation to consult with "individuals and organizations" under section 800.2(c)(5) uniformly view such consultation as permissive. *See, e.g., Winnemen Wintu Tribe v. United States Forest Serv.*, No. 2:09-cv-01072-KJM-KJN, 2017 U.S. Dist. LEXIS 42690, at *7 (E.D. Cal. Mar. 22, 2017) ("[A] non-federally recognized Indian tribe, is not automatically entitled to consulting party status. Instead, the Tribe 'may' be eligible to participate as a consulting party because it has a 'demonstrated interest,' 36 C.F.R. § 800.2(c)(5), but first it must request consulting party status, in writing, from the agency[.]"); *La Cuna De Aztlan Sacred Sites Prot. Circle Advisory Comm. v. U.S.*, No. CV 11-00400 DMG (DTBx), 2013 U.S. Dist. LEXIS 123331, at *26 (C.D. Cal. Aug. 16, 2013) ("Other 'individuals and organizations with a demonstrated interest in the undertaking *may* participate as consulting parties,' by written request, but their participation is subject to the discretion of the agency." (emphasis in original)); *Slockish v. U.S.*, No. 3:08-cv-1169-ST, 2012 U.S. Dist. LEXIS 118718, at *19 (D. Or. June 19,

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

fails to make a request to participate as a discretionary consulting party, that individual or organization "is therefore entitled only to general notice and comment, and to have its views considered, as a member of the public." *Winnemen Wintu Tribe*, 2017 U.S. Dist. LEXIS 42690, at \*7; 36 C.F.R. § 800.2(d). The People make no showing that it followed the process to request discretionary consulting party status under 36 C.F.R. §§ 800.2(c)(5) or 800.3(f)(3) at the appropriate time (i.e. in 2020 when BLM was engaged in the publicized consultation process or any time prior to June 2021). ECF 46 ¶¶ 47-49, 54-60; ECF 45 at 9-18. Therefore, its members could only participate as members of the public. And, in any event, its members were already represented in the consultation process through the official designees of their respective federally-recognized Indian tribes—the official designees of the Fort McDermitt Paiute and Shoshone Tribe. These requirements for consultation are necessary to avoid individual tribal members undermining the government-to-government consultation process already concluded with the tribes.

Moreover, and critical to the People's complaint and request for injunction, "[a]n organization that fails to make a request for discretionary consulting party status cannot later challenge the Section 106 . . . process for excluding them." *Okinawa Dugong*, 330 F. Supp. 3d at 1184. As one court has aptly explained, while the plaintiffs may define themselves as having a demonstrated interest in the undertaking, if they fail to follow the process to obtain discretionary consulting party status, under "the unambiguous wording of 36 CFR § 800.3(f)(3), plaintiffs have no standing as 'additional consulting parties' and cannot state a claim under the NHPA for failing

2012) (explaining that plaintiffs "'are not automatically entitled to be consulting parties,' but under 36 CFR § 800.2(c)(5), due to their economic interest, 'they may be added as consulting parties but they must first make a request in writing.'" (quoting *Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F3d 520, 553 (8th Cir 2003))). *See* 36 C.F.R. § 800.3(f)(3)."); *Friends of Hamilton Grange v. Salazar*, 2009 U.S. Dist. LEXIS 21855, at \*31 n.7 (S.D.N.Y. Mar. 12, 2009) ("To become a consultant, the party must request participation in writing and be granted consulting party status by the agency overseeing the undertaking. 36 C.F.R. § 800.3(f)(3).").

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

to consult with them on that basis." *Slockish*, 2012 U.S. Dist. LEXIS 118718, at *20. Therefore, the People lacks standing to challenge BLM's consultation process. *Okinawa Dugong*, 330 F. Supp. 3d at 1184; *Slockish*, 2012 U.S. Dist. LEXIS 118718, at *20.

        **C.**    **BLM's Consultation Satisfied Its Obligations Under Section 106.**

        Intervenors lack standing to complain about the consultation between BLM and the tribes with whom BLM consulted.  Any claims the Intervenors assert on behalf of any other tribes regarding the sufficiency of consultation with those other tribes must be dismissed. For example, Intervenors argue that BLM should have been more sensitive to the fact that the Fort McDermitt Paiute and Shoshone Tribe offices were closed during the pandemic (at 13), but a 7th-Generation Member of that Tribe was so upset with Intervenors' suggestion that she, or the elected representatives of her Tribe, had failed to adequately protect their religious and cultural heritage and traditions that she provided a declaration rebutting their claims. **Ex. 8,** Crutcher Dec. ¶ 11-12.

        Similarly, Intervenors imply that the reason BLM had identified no information about their interest is that the tribes with whom BLM consulted for this Project (and others in the area over the last decade) may have been "reluctant to divulge specific information regarding the location, nature, and activities associated" with the area. (at 13). As Intervenors demonstrate by quoting 36 C.F.R. § 800.4(a)(4), federal agencies must respect the confidentiality of sensitive sites. Intervenors present no evidence that BLM failed to do so here or that any tribe withheld any information due to such concerns. While the Crutcher Declaration (**Ex. 8**) rebuts such insinuations, Ms. Crutcher should not have to submit a declaration in litigation to verify her tribe's position. The respect due to each tribe requires BLM and the courts to take their positions at face value. Intervenors have no basis on which to speculate or standing to proffer positions for other tribes.

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

BLM made a reasonable and good faith effort to identify tribes with interests in the Project area. That Intervenors were not identified in this process because they had never provided any notice of their asserted interest in the Project area, is not a legal basis to enjoin the cultural work.

## III.   Intervenors Fail to Demonstrate Irreparable Harm Absent Injunctive Relief

Intervenors must demonstrate that they are likely to suffer irreparable harm in the absence of an injunction to be entitled to relief. *Winter*, 555 U.S. at 22; *Sampson v. Murray*, 415 U.S. 61, 88 (1974). There is no "thumb on the scales" in favor of injunctive relief in NEPA matters, and no support for a claim that the NHPA should be treated any differently.[10] *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157-58 (2010). The Ninth Circuit has rejected arguments that "*any* potential environmental injury automatically merits an injunction." *Earth Island Inst. v. Carlton*, 626 F.3d 462, 474 (9th Cir. 2010). To qualify as irreparable harm, the injury must be "both certain and great." *San Diego Bev. & Kup v. United States*, 997 F. Supp 1343, 1347 (S.D. Cal. 1998). Even where irreparable harm is demonstrated, an injunction must be narrowly tailored to avoid only the specific harms shown. *Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004).

Intervenors allege immediate injury from limited "mechanical trenching" of up to seven sites within the Project area as part of the cultural resource mitigation. The ground disturbance at issue in this Motion is the proposed work on less than half an acre in an area with prior and continuing authorized surface disturbance of nearly 200 acres. **Ex. 7** ¶¶29,32.  Intervenors have not demonstrated harm (as they have not identified specific areas for the BLM to consider) nor is their claim for injunctive relief ripe. No ground-disturbing work will begin before BLM issues an

---

[10] The cases the Burns Tribe cites to support its argument that Tribal rights are presumed to be irreparable are based on potential injuries to *treaty* rights, not NHPA violations, and Intervenors have not alleged a treaty violation. *See United States v. Michigan*, 508 F.Supp. 480, 492 (W.D. Mich. 1980)(holding that a state may not constitutionally abrogate or diminish "federal treaty right to fish"); *Nez Perce Tribe v. U.S. Forest Serv.* No. 3:13-cv-348-BLW, 2013 WL 5212317, at *7 (D. Idaho Sept. 2013)(plaintiffs were seeking "to preserve their Treaty rights").

ARPA permit. BLM is still reviewing the APRA permit and invited Intervenors to consult in that process. Intervenors have the opportunity to identify concerns with BLM prior to the cultural mitigaiton. This process may well ameliorate Intervenors' concerns without the need for judicial intervention.

Intervenors' statements of interest in the area are vague, making it impossible to determine whether the proposed activity will cause "certain and great" impacts to their interests. For example, they assert cultural and religious significance in the Thacker Pass area – which may not be the specific Project area – for four reasons:  (1) a massacre of their ancestors occurred in the area (Eben Dec.¶ 20; Hinkey Dec. ¶¶ 4, 7; Teeman Dec. ¶ 11), (2) some members of the Fort McDermitt Paiute and Shoshone Tribe hid in the Montana Mountains to evade cavalry (Eben Dec ¶ 20; Hinkey Dec ¶¶ 4, 9; Teeman Dec at ¶ 12), (3) ancestors are likely buried in the area (Hinkey Dec ¶ 11; Teeman Dec at ¶ 5), and (4) tribal members have traditionally used and continue to use the area for cultural and religious reasons (Eben Dec ¶ 6; Hinkey Dec ¶¶ 4, 9, 14-15; Teeman Dec ¶ 3-4, 10). Based on the information Intervenors provided, it seems certain that at least the second element (the Montana Mountain sites where Fort McDermitt Paiute and Shoshone Tribe ancestors sought refuge) will not be affected by the proposed activities because, Lithium Nevada undertook significant expense to relocate the project away from the Montana Mountains. **Ex. 7 ¶¶** 4-8.

With the exception of the Montana Mountains, Intervenors are not clear which parts of the 17,933-acre Project Area (FEIS at ES-1) are considered sacred. "Although it is understandable that the [Intervenors] value[] the landscape of the project as a whole, the NHPA requires the that BLM protect only against adverse effect on the features of the area that make them eligible for the National Register." *Te-Moak Tribe of Western Shoshone of Nevada v. U.S.*, 608 F.3d 592, 611 (9th Cir. 2010). While they offer that if BLM had solicited consultation with them, they would provide details about each of the four bases upon which they hold the area sacred (Eben Dec ¶¶ 20-22), for

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

a preliminary injunction, the burden is on the moving party to make a "clear showing" of imminent irreparable harm. *Lopez*, 680 F.3d at 1072.  In addition, there are no caves in the Thacker Pass Project area (**Ex.2 ¶9, Ex. 2B**) and according to a Fort McDermitt Elder, the tribe would not have buried their ancestors in the ground but would have covered them in rocks above ground. **Ex. 10 ¶4.**  Despite substantial trenching, digging, drilling and road building as well as cultural resource and environmental surveying in the Thacker Pass Project area over the course of more than a decade, no evidence of a massacre or any cultural or religious artifacts or events ever have been encountered. **Ex. 2 ¶¶5,8,10-11,14, Ex.2C-D**; **Ex. 3 ¶4,9.**  Given the stringent review, training and procedures to halt work and notify BLM if anything is discovered the evidence does not demonstrate any irreparable harm or that the Thacker Pass Project area is the area of concern to Intervenors.  **Ex. 2, Ex. 3 ¶4,9, Ex.3A.**

Intervenors' asserted harm[11] is highly speculative and falls well short of the "clear showing" standard necessary to support an injunction. They speculate that the less than 0.5 acre disturbance for cultural resource mitigation will adversely affect areas of importance to them. However, the declarations they submit do not make clear whether the sites of concern to them are in the (previously disturbed) Project area at all, or potentially impacted by the extremely limited cultural resources mitigation proposed, subject to completion of the ARPA process. Intervenors further speculate that if they participate in the APRA permit review, BLM will not consider and

---

[11] The Burns Tribe argues that an injunction is warranted because procedural harm is presumed irreparable.  However, "mere procedural harm is not an appropriate basis" for such relief. *Northwest Envtl. Def. Ctr. v. US Army Corp of Eng'rs*, 817 F.Supp.2d 1290, 1316 (D. Or. 2011). The Supreme Court has made clear that a procedural right "'in vacuo' is insufficient to support standing," and, therefore, it is insufficient to support "entitlement to any court relief." *Id.* (quoting *Summers v. Earth Island Institute*, 555 U.S. 488 (2009). Because Intervenors have not shown a *likelihood* of irreparable harm to a concrete interest, they are not entitled to injunctive relief.

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

address their concerns appropriately. This speculative harm and their speculative conclusion about the BLM's process, as a matter of law, does not support the extraordinary relief of injunction.

**IV.    The Balance of Hardships and Public Interest Disfavors the Requested Injunction**

Courts "must balance the competing claims of injury and consider the effect on each party of granting or withholding injunctive relief with "particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24.  Here, the balance of hardships and public interest tip sharply against the requested injunction. Battery storage is "vital to combatting climate change and very lithium dependent." Ex. 6, Lowry ¶14. Global lithium demand is forecasted to triple by 2025 and to outstrip supply as electrification of the transportation sector intensifies.  The current U.S. demand for lithium is approximately 18,000 tons per year of lithium carbonate equivalent ("tpa LCE"). By 2025, the U.S. is forecasted to require approximately 100,000 tpa LCE, increasing to about 350,000 tpa LCE by 2030.  This demand increased even more with President Biden's Executive Order on August 5, 2021 aimed at making half of all new vehicles sold in the U.S. electric by 2030. Thacker Pass is the only project positioned to meet that demand. The U.S. currently produces less than 5,000 tpa LCE from just one facility.  At a proposed capacity of 66,000 tons per year LCE at full buildout, the Thacker Pass project is positioned to become a cornerstone of the U.S. lithium supply for batteries necessary for renewable energy objectives.  There are no other U.S. alternative to Thacker Pass that provide the scale, grade or timeline to production required to keep pace with electrification of the transportation sector and reduction of carbon, in addition to providing the lithium products required by the military for national security. Ex. 7 ¶¶21-26; Ex. 6, Lowry Dec. ¶¶11, 13-14, 15-18.  "Thacker Pass is critical to the domestic and global lithium demand necessary to combatting climate change, transportation electrification and expanding renewable energy sources that require battery storage."  Ex. 6 ¶14.

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

Because cultural resource mitigation must be completed prior to pre-construction infrastructure installation and can only be completed during certain times of the year due to weather, delay of this mitigation disturbing less than half an acre would halt development of the largest and most advanced lithium mine in the U.S. with no alternative, eliminating the only currently known domestic source of lithium to meet demands for combatting climate change and important to national security. Ex. 7 ¶25; Ex. 6 Lowry Dec. "The public interest would be disserved by allowing [the Intervenors] to attack a lengthy, expensive, and complex NHPA process [six months] after the conclusion of the ROD and after an interested party like [Lithium Nevada] has invested millions of dollars in the project under the approved ROD." *Battle Mountain Band*, 2016 U.S. Dist. LEXIS 115093, *36.

Lithium Nevada has engaged with the Fort McDermitt Tribe and partners to build a local, skilled workforce for the Project. Ex. 4, Anderson Dec. (describing one-on-one meetings, completed training sessions with numerous tribal members, numerous job opportunities and significant tribal interest). Tribal Members are supportive of the Project and feel strongly about its importance to the community, their extensive involvement in the process and continuing involvement in the Project and are concerned about the positions being asserted here contrary to their own views. Ex. 4¶21, Ex. 8, Ex. 10.

**V.     If an Injunction Issues, Intervening Plaintiffs Must Post a Bond.**

If the Court issues an injunction, it should order Intervenors to post a bond sufficient to cover "the costs and damages sustained" by Lithium Nevada if it is "found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The Court has the discretion to determine whether to require a bond and the extent of that bond as a condition of issuance of a preliminary injunction, *Cal. ex rel. Van De Kamp v. TRPA*, 766 F.2d 1319, 1325 (9th Cir. 1985), and "each case is fact-specific." *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005).

Lithium Nevada would be significantly harmed by delaying the cultural resource mitigation Intervenors challenge.  Delay of the cultural resource work could lead to substantial delays that would cause Lithium Nevada significant costs.  Ex. 7 ¶ 33.  Lithium Nevada projects that such a delay will cost the company over $5 million in overhead costs and over $900 million in revenue on an annual basis.  *Id.* ¶ 35.  It may also affect Lithium Nevada's ability to obtain the financing necessary to fund future mine development.  *Id.* ¶¶ 34, 36.  Intervenors argue that The People has "a very limited capacity to post a bond," but makes no such claim as to RS Colony, instead arguing that its efforts to "ensure that the BLM follows the NHPA regulations" are sufficient basis to excuse it from anything more than a nominal bond.  However, this does not address the substantial costs Intervenors seek to impose on Lithium Nevada. A bond to offset the financial and operational risk of a wrongful injunction is appropriate under the circumstances and should be significant given the potential damage to Lithium Nevada and risk to national policies and security.

## CONCLUSION

For all of these reasons Intervenors' Motion should be denied.

DATED this 12thth day of August, 2021.

HOLLAND & HART LLP

/s/ Laura K. Granier
Laura K. Granier, Esq (SBN 7357)
Erica K. Nannini, Esq (SBN 13922)

lkgranier@hollandhart.com
eknannini@hollandhart.com

*Attorneys for Defendant-Intervenor Lithium Nevada Corp.*

## CERTIFICATE OF SERVICE

I hereby certify that on August 12, 2021, I filed the foregoing using the United States District Court CM/ECF, which caused all counsel of record to be served electronically.

/s/ *Laura K. Granier*
Laura K. Granier, Esq (SBN 7357)

17183647_v2

25

# EXHIBIT INDEX

| EXHIBIT | DESCRIPTION | # OF PAGES |
|---------|-------------|------------|
| 1. | President Biden's Executive Order 14017 | 9 |
| 2. | Catherine Clark Declaration | 41 |
| 3. | Randal Burns Declaration | 11 |
| 4. | Maria Anderson Declaration | 37 |
| 5. | Pepi Bengoa Declaration | 3 |
| 6. | Joe Lowry Declaration | 20 |
| 7. | Alexi Zawadzki Declaration | 40 |
| 8. | Alana Crutcher Declaration | 6 |
| 9. | Thacker Pass Memorandum of Agreement | 20 |
| 10. | Alice Crutcher Declaration | 3 |

17221185_v1

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094