1
2
3                    UNITED STATES DISTRICT COURT
4                         DISTRICT OF NEVADA
5                                * * *
6    BARTELL RANCH LLC, *et al.*,                Case No. 3:21-cv-00080-MMD-CLB
7                                 Plaintiffs,              ORDER
8         v.
9    ESTER M. MCCULLOUGH, *et al.*,
10                               Defendants.

11   **I.    SUMMARY**

12        Plaintiffs[1] and Intervenor-Plaintiffs[2] in this consolidated case challenge the Bureau

13   of Land Management of the U.S. Department of Interior[3] ("BLM")'s approval of Intervenor-

14   Defendant Lithium Nevada Corporation's ("Lithium Nevada") plan to build a lithium mine

15   near Thacker Pass, Nevada (the "Project") under the Administrative Procedure Act, 5

16   U.S.C. § 701, *et seq.* ("APA"), the National Environmental Policy Act ("NEPA"), 42 U.S.C.

17   §§ 4321-61, the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701-

18   1787, and the National Historic Preservation Act, 54 U.S.C. §§ 300101 ("NHPA"). (ECF

19   Nos. 1, 46, 83.) *See also Western Watersheds Project, et al. v. Bureau of Land*

20   *Management of the U.S. Department of the Interior, et al*., Case No. 3:21-cv-00103-MMD-

21   CLB, ECF No. 1 (D. Nev. Filed Feb. 26, 2021) (since consolidated into this case). Before

22   the Court is the Tribes'[4] motion for a preliminary injunction requiring BLM to engage in

23   _____

24        [1]Bartell Ranch LLC and Edward Bartell (collectively, the "Rancher Plaintiffs"), along
     with Western Watersheds Project, Wildlands Defense, Great Basin Resource Watch, and
25   Basin and Range Watch (collectively, the "Environmental Plaintiffs").

26        [2]Atsa Koodakuh Wyh Nuwu/People of Red Mountain ("the People"), Reno-Sparks
     Indian Colony ("RSIC"), and the Burns Paiute Tribe (collectively, the "Tribes").

27        [3]Ester M. McCullough, the District Manager of BLM's Winnemucca office, along
28   with the Department of the Interior, are also named Defendants.

1   further consultation under the NHPA with the Tribes before BLM and Lithium Nevada may

2   proceed with an archeological survey of the Project area known as the Historic Properties

3   Treatment Plan ("HPTP"). (ECF No. 45 ("Motion").) Environmental Plaintiffs do not

4   oppose, and indeed encourage the Court to grant the Motion. (ECF No. 61.) Rancher

5   Plaintiffs did not file a response to the Motion. Defendants and Lithium Nevada oppose

6   the Motion.[5] (ECF Nos. 65, 66.) The Court held a hearing on the Motion on August 27,

7   2021. (ECF No. 89 (the "Hearing").)

8         Primarily because the Tribes have not shown they are likely to prevail on their claim

9   that BLM's decision not to consult them on the Project was unreasonable or made in bad

10  faith, have not presented sufficiently specific evidence of irreparable harm that will likely

11  occur if the HPTP proceeds, and as further explained below, the Court will deny the

12  Motion. However, this order does not resolve the merits of the Tribes' claims. Moreover,

13  in considering the Tribes' equitable relief request, the Court is not unpersuaded by the

14  Tribes' broader equitable and historical arguments, but the Court must operate within the

15  framework of the applicable laws and regulations.

16  **II.    BACKGROUND**

17        The Court first incorporates by reference the factual background it included in its

18  order denying the Environmental Plaintiffs' preliminary injunction motion in the *Western*

19  *Watersheds* case subsequently consolidated into this one and does not recite it here. *See*

20  *Western Watersheds*, Case No. 3:21-cv-00103-MMD-CLB, ECF No. 48 ("July 23 Order")

21  at 2. The Background provided there explained the documents BLM issued regarding its

22  ultimate approval of the Project.

23  ///

24

25        [4]The Burns Paiute Tribe joined the Motion (ECF No. 62), but the Court will refer to
    it as the Tribes' Motion for convenience, though the Court will cite individual documents
26  and refer to arguments made by either RSIC or the Burns Paiute Tribe as appropriate.

27        [5]Through the resolution of various motions, the Court also reviewed some replies,
    errata, and supplements to the Motion and the responses to it. (ECF Nos. 69, 71, 72, 73,
28  84, 85, 86, 87.)

1  The Project is an open-pit lithium mine in the Thacker Pass basin area of

2  Northeastern Nevada. (ECF No. 65-1 at 8.) The Project area "includes 17,933 acres of

3  land[,]" but the "total disturbance footprint would be approximately 5,695 acres[.]" (*Id.*) For

4  illustrative purposes, here is a map of the Project area proffered by Lithium Nevada without

5  objection from any other party.



19  (ECF No. 66-2 at 9.)

20  Construction of the mine has not yet started. The Tribes seek to enjoin Defendants

21  from proceeding with the HPTP, a preliminary step that must be completed before Lithium

22  Nevada may proceed with actually starting construction on the mine. The Court

23  incorporates by reference here its description of the HPTP provided in the July 23 Order.

24  *See Western Watersheds*, Case No. 3:21-cv-00103-MMD-CLB, ECF No. 48 at 6-7. To

25  reiterate, the HPTP was prepared in conjunction with the Nevada State Historic

26  Preservation Officer ("SHPO"). (ECF No. 65-14 (the HPTP).) The HPTP will be carried out

27  by a contractor paid by Lithium Nevada. (*Id.* at 3.) Before the contractor may begin carrying

28  out the HPTP, BLM must issue the contractor a permit under the Archaeological

3

Resources Protection Act ("ARPA"). (*Id.* at 44.) As of the date of the Hearing, BLM had not yet issued the ARPA permit, as BLM remained in consultation with the Tribes and other Native American tribes about the HPTP.

Because the Motion focuses on BLM's consultation with Native American tribes under Section 106 of the NHPA, BLM stated in the Record of Decision approving the Project (ECF No. 65-1 ("ROD")) that it began consultation with tribal governments about the Project beginning in October 2018, and specifically sent letters initiating formal consultation under Section 106 with the "McDermitt Paiute and Shoshone Tribe, the Pyramid Lake and Summit Lake Paiute Tribes, and Winnemucca Indian Colony tribes" in December 2019. (*Id.* at 10.) BLM further states in the ROD that it mailed copies of the various documents associated with the NEPA process to these three tribes in partial compliance with its Section 106 obligations. (*Id.*) BLM also stated in the ROD that "[n]o comments or concerns have been raised during formal government to government consultation for the Project by the tribes." (*Id.*)

However, BLM did not engage in consultation about the Project with RSIC or the Burns Paiute Tribe before issuing the ROD in January 2021. (ECF Nos. 65 at 23-25, 65-1.) The reasonableness of this decision is the focus of the parties' arguments regarding the Tribes' likelihood of success on the merits of their claims under the NHPA, and the Court discusses both the parties' arguments and the evidence they have proffered to support those arguments in detail in Section IV.A. below. In June 2021, the Tribes sent BLM letters raising concerns about the Project. (ECF Nos. 65-18.) This was the first time the Tribes raised their concerns about the Project with BLM.

## III.   LEGAL STANDARD

Federal Rule of Civil Procedure 65 governs preliminary injunctions. "'An injunction is a matter of equitable discretion' and is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 32 (2008)). To qualify for a preliminary injunction, a plaintiff must

1  demonstrate: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm;

2  (3) that the balance of hardships favors the plaintiff; and (4) that the injunction is in the

3  public interest. *See Winter*, 555 U.S. at 20. A plaintiff may also satisfy the first and third

4  prongs under a "sliding scale" approach by showing serious questions going to the merits

5  of the case and that a balancing of hardships tips sharply in plaintiff's favor. *See All. for*

6  *the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (holding that the Ninth

7  Circuit's "sliding scale" approach remains valid following the *Winter* decision). The plaintiff,

8  however, must still show a likelihood of irreparable harm and that an injunction is in the

9  public interest. *See id.* at 1135.

10 **IV.   DISCUSSION**

11       The Court first addresses several threshold issues, then the parties' arguments as

12 to likelihood of success on the merits, and then irreparable harm. Because the Tribes have

13 not made a sufficient showing on the first two *Winter* factors, the Court does not address

14 the third and fourth factors. *See id.* ("*Winter* . . . requires the plaintiff to make a showing

15 on all four prongs."). Further, because the Court will deny the Motion, it does not address

16 the parties' arguments as to whether the Tribes should be required to post a bond. (ECF

17 Nos. 45 at 21, 66 at 25.)

18       **A.  Threshold Issues**

19       Lithium Nevada argued both in its briefing and at the Hearing that the Tribes' claims

20 are not ripe because BLM has not yet issued the ARPA permit. (*Id.* at 20-21.) The Court

21 addresses this issue first because it arguably[6] goes to the Court's jurisdiction to entertain

22 the Tribes' claims. *See Bishop Paiute Tribe v. Inyo Cty.*, 863 F.3d 1144, 1153-54 (9th Cir.

23 2017) (explaining that ripeness is a doctrine designed to ensure that courts adjudicate live

24 cases or controversies containing both a constitutional and prudential component).

25 However, both Defendants and Lithium Nevada also conceded at the Hearing that the

---

[6]Lithium Nevada appears to be making a prudential ripeness argument without explicitly saying so, but the Court nonetheless addresses this argument at the outset. (ECF No. 66 at 20-21.)

Tribes' consultation rights as part of the ARPA process are more limited than their consultation rights under the NHPA. But more importantly, the Tribes challenge BLM's decision to issue the ROD in contravention of the NHPA in this case, not any decision related to the ARPA process. (ECF Nos. 46 at 3, 83 at 2.) Indeed, the Court understands Lithium Nevada's ripeness argument as more of an argument that the consultation BLM is engaging in with the Tribes under the ARPA process may somewhat mitigate the Tribes' proffered irreparable harm. The Court finds the Tribes' claims and Motion are ripe.

Moving on to another threshold issue, Defendants and Lithium Nevada argue the People lack prudential standing to assert a claim under the NHPA because they are members of the Fort McDermitt Paiute Shoshone Tribe, who was consulted here, are not a federally recognized tribe who must be consulted, and did not affirmatively request consultation before the ROD issued. (ECF Nos. 65 at 24-25, 66 at 16-19.) The Tribes do not respond to this argument, and indeed the Burns Paiute Tribe's reply brief only mentions RSIC and the Burns Paiute Tribe. (ECF Nos. 71, 73.) The Court agrees with Federal Defendants and Lithium Nevada.

The People are not a proper party to this case because they are not a federally recognized tribe entitled to consultation, and the People do not even argue—much less present evidence—that they requested in writing to participate in the NHPA process regarding the Project before the ROD issued, which could have given them consultation rights. (ECF Nos. 45-2, 65-1 at 4 (showing the date the ROD issued).) *See also Snoqualmie Indian Tribe v. F.E.R.C.*, 545 F.3d 1207, 1216 (9th Cir. 2008) (finding that a tribe who was not federally recognized at the time the record closed was not entitled to NHPA consultation); *Winnemem Wintu Tribe v. United States Forest Serv.*, Case No. 209CV01072KJMKJN, 2017 WL 1093902, at *3 (E.D. Cal. Mar. 23, 2017) (finding that non-federally recognized tribe was not automatically entitled to consultation, but instead must affirmatively request consultation during the consultation period). Indeed, the People's declarant states that she is an enrolled member of the Fort McDermitt Paiute-Shoshone Tribe (ECF No. 45-2 at 2) and describes the People as an unincorporated

1    association of members of that tribe (*id.*). There is no dispute here that the Fort McDermitt

2    Paiute-Shoshone Tribe was consulted regarding the project. (ECF No. 65-8 at 2-4.) There

3    is also no dispute here that the People did not request consultation on the Project until

4    June 2021, after the ROD issued in January 2021. (ECF Nos. 45-2 at 6, 65-1 at 4, 65-18

5    at 8-12.) The People therefore are not a proper party to prosecute their NHPA claim

6    against Defendants. *See Snoqualmie Indian Tribe*, 545 F.3d at 1216; *Winnemen Wintu*

7    *Tribe*, 2017 WL 1093902, at *3. The Court will accordingly disregard the Hinkey

8    Declaration (ECF No. 45-2),[7] and not refer to the People in the remainder of this order.

9        Finally, RSIC's counsel argued at the Hearing that BLM violated the consultation

10   rights of the tribes it did consult with. But RSIC's counsel cannot make such an argument

11   on behalf of other tribes that he does not represent, who are not participating in this case.

12   *See, e.g.*, *San Juan Citizens All. v. Norton*, 586 F. Supp. 2d 1270, 1293 (D.N.M. 2008)

13   (expressing skepticism that a group of tribal members could assert claims on behalf of a

14   tribe that declined to join the litigation). The Court will accordingly not further address

15   RSIC's arguments regarding the quality of consultation offered to the tribes BLM did

16   consult with about the Project—the Fort McDermitt Tribe, Summit Lake Paiute Tribe, and

17   Winnemucca Indian Colony. (ECF Nos. 65 at 14, 65-8.) With all of this said, the Court

18   turns to the parties' arguments on the Tribes'[8] likelihood of success on the merits.

19       **B. Likelihood of Success on the Merits**

20       The Tribes argue they are likely to prevail on the merits of their NHPA claim

21   because BLM did not consult them before issuing the ROD, allegedly because BLM did

22   not first make a reasonable, good-faith effort to identify that it should consult them. (ECF

23   No. 45 at 9-18; *see also* ECF No. 62 at 2-5.) Defendants counter that BLM made a

24

25       [7]Daranda Hinkey offers her declaration as the People's secretary (ECF No. 45-2 at 2), and her declaration is offered as the evidence that supports the People's claims and arguments (*see generally id.*; *see also* ECF Nos. 45, 46.) Because the People are not a proper party to assert a Section 106 consultation claim under these circumstances, Hinkey's declaration is not a proper part of the record.

26

27

28       [8]From this point forward, this shorthand refers only to RSIC and the Burns Paiute Tribe.

reasonable and good faith effort to identify tribes for consultation resulting in a reasonable decision not to consult the Tribes about the Project, provided the Tribes with a reasonable opportunity to raise their concerns, sought and considered the public's views, and did not issue the ROD until after it signed a memorandum of understanding with the Nevada SHPO.[9] (ECF No. 65 at 22; *see also id.* at 22-28.) Lithium Nevada makes similar arguments to Defendants and criticizes the Tribes for failing to raise any objection to the Project or request consultation until recently though significant ground disturbances have been occurring in the Project area for some 10 years, suggesting that the Tribes' silence followed by the Motion places an unreasonable burden on BLM to identify the Native American tribes with whom it must consult. (ECF No. 66 at 10-13; *see id.* at 19-20.)

The Tribes bring their claims under the NHPA through the APA. (ECF Nos. 46 at 2, 83 at 2.) The APA limits the scope of judicial review of agency actions. A court may reverse an agency decision only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency's decision may be reversed as arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "To make this finding, the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been

---

[9]RSIC raised this issue both in its Complaint and its Motion. (ECF Nos. 45 at 10, 46 at 3-4, 15-16, 21.) Defendants countered that this was merely a mistake in the ROD (ECF No. 65 at 27), supported by a declaration of a BLM official (ECF No. 65-26 at 4). Defendants further proffered the dates on the Memorandum of Agreement ("MOA") as to the SHPO and the ROD to demonstrate that BLM entered into the MOA with the SHPO before the ROD issued. (ECF No. 65 at 27.) RSIC did not further address this issue either in reply or at the Hearing, an apparent concession. However, to the extent RSIC has not abandoned its argument based on the inaccurate statement in the ROD, the Court finds Defendants' explanation of what happened sufficiently well supported such that the Court rejects RSIC's argument.

1  a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416

2  (1971) (citation omitted).

3  But in reviewing an agency's decision under this standard, "the reviewing court may

4  not substitute its judgment for that of the agency." *Env't Def. Ctr., Inc. v. U.S. Env't Prot.*

5  *Agency*, 344 F.3d 832, 858 n.36 (9th Cir. 2003) (citation omitted). Rather, the function of

6  the district court is only to determine whether as a matter of law the evidence in the

7  administrative record permitted the agency to make the decision it did. *See Occidental*

8  *Eng'g Co. v. I.N.S.,* 753 F.2d 766, 769-70 (9th Cir. 1985). Although this review is narrow,

9  "a reviewing court must conduct a searching and careful inquiry into the facts." *Nw.*

10  *Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation

11  omitted). "A satisfactory explanation of agency action is essential for adequate judicial

12  review, because the focus of judicial review is not on the wisdom of the agency's decision,

13  but on whether the process employed by the agency to reach its decision took into

14  consideration all the relevant factors." *Asarco, Inc. v. U.S. Env't Prot. Agency*, 616 F.2d

15  1153, 1159 (1980). "The burden is on the Tribe[s] to show any decision or action was

16  arbitrary and capricious." *Quechan Tribe of Fort Yuma Indian Rsrv. v. U.S. Dep't of Interior*,

17  755 F. Supp. 2d 1104, 1108 (S.D. Cal. 2010) (citation omitted).

18  Because Defendants conceded that BLM did not consult with the Tribes under

19  Section 106, the focus of the parties' arguments as to the first *Winter* factor has shifted to

20  resolution of one primary question: whether BLM made "a reasonable and good faith effort

21  to identify" them before deciding not to consult them on the Project. 36 C.F.R. §

22  800.2(c)(ii)(A). (ECF Nos. 65 at 22-28, 71 at 3-5, 73 at 3-13.) On this key question, the

23  Court agrees with Defendants that, on the record before the Court, BLM made a

24  reasonable and good faith effort to identify the Tribes it should consult with on the Project,

25  and reasonably decided not to consult with the Tribes.

26  The limited caselaw either presented by the parties or located by the Court in its

27  own research that specifically addresses the reasonableness of a decision not to consult

28  a particular Native American tribe under 36 C.F.R. § 800.2(c)(ii)(A) suggests that it is a

fact-intensive, case-by-case inquiry. *See, e.g.*, *Ctr. for Biological Diversity v. United States Army Corps of Engineers*, Case No. CV 14-1667 PSG (CWX), 2015 WL 12659937, at *20-*21 (C.D. Cal. June 30, 2015), *aff'd sub nom. Friends of Santa Clara River v. United States Army Corps of Engineers*, 887 F.3d 906 (9th Cir. 2018); *Norton*, 586 F. Supp. 2d at 1293-94. The two cases the parties identified at the Hearing as most strongly supporting their respective positions, *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 805 (9th Cir. 1999) (Defendants) and *Pueblo of Sandia v. United States*, 50 F.3d 856, 862-63 (10th Cir. 1995) (RSIC), dealt with the related but not identical question of whether the pertinent agency had made a reasonable and good faith effort to identify historic properties. They are accordingly not directly on point, though they are instructive to the extent they more generally indicate what constitutes a reasonable and good faith effort. In any event, the facts in the record discussed further below show that the Tribes have not established a likelihood of success on the merits—that BLM made an unreasonable or bad faith decision not to consult them. *See All. For Wild Rockies*, 632 F.3d at 1135 ("*Winter* . . . requires the plaintiff to make a showing on all four prongs.").

To the contrary, BLM appears to have made a reasonable decision not to consult the Tribes because representatives of both Tribes disclaimed an interest in the area including the Project area in discussions regarding the Winnemucca RMP, and neither tribe subsequently put BLM on notice that they considered the Project area sacred or culturally significant until after BLM issued the ROD. To start, BLM offered unrebutted evidence that it contacted both RSIC and the Burns Paiute Tribe in 2010 as part of an ethnography for the Winnemucca Resource Management Plan ("RMP") with the goal of identifying, protecting, and preserving significant cultural resources in an area including the Project area. (ECF No. 65-2 at 39 (stating that copies of the Winnemucca RMP and a request for a consultation meeting were sent to, among others, RSIC and the Burns Paiute Tribe), *id.* at 51-53 (explaining that some of the goals for the Winnemucca RMP are identification and protection of cultural resources in consultation with Native American tribes).) RSIC's declarant Michon Eben participated in an in-person meeting regarding the

Winnemucca RMP. (ECF No. 65-3 at 58.) As to the Burns Paiute Tribe, Charisse Snapp (Cultural Resource Representative) told a BLM official in a July 28, 2005 telephone call that "the tribe would defer consultation to the tribes that had reservations closer to the study area[,]" and that "it would not be necessary to keep the tribe on the mailing list for the RMP/EIS." (*Id.* at 63.) Nobody identified the Project area as containing a massacre site during that process leading to the Winnemucca RMP. (*See generally id.*) Moreover, neither RSIC nor the Burns Paiute Tribe indicated they had any particular cultural interest in the Project area during this RMP process. (*See generally id.*)

In 2015, Arlan D. Melendez sent BLM a letter with an official resolution of RSIC and cultural resources map attached identifying its official areas of cultural interest. (ECF No. 72-2; *see also* ECF No. 86-1 (including a page that was omitted from the version of the resolution Defendants filed).) RSIC's declarant Eben was carbon copied on the letter and listed as the contact for any follow up questions about it. (ECF No. 72-2 at 2.) Mr. Melendez explained in the letter that the attached map was intended to put BLM on notice of the areas where RSIC asserts a cultural interest, and therefore expected to be consulted if any projects occurred within the boundary marked on the map. (*Id.*) However, Mr. Melendez also noted that there may be projects outside the map boundary on which RSIC may request consultation. (*Id.*) The resolution similarly explains that RSIC expects consultation on projects within the boundary marked on the map, but also reserves the right to request consultation on other projects falling outside that area. (ECF No. 86-1 at 2-3.)

Defendants introduced the 2015 letter into the record through a motion for leave to file supplemental evidence (ECF No. 72) that the Court granted (ECF No. 76). RSIC argued at the Hearing that the Court should not consider the 2015 letter because Defendants' counsel did not locate the letter until after Defendants filed their opposition to the Motion. However, the Court disagrees with RSIC's counsel that this somehow means the letter is not properly part of the record. There is no dispute that RSIC sent BLM the letter in 2015. Moreover, RSIC had an opportunity to respond to the letter before (ECF No.

86) and at the Hearing—and did not question its authenticity. The 2015 letter further is not meaningfully distinguishable from the 1868 field survey notes that RSIC's counsel apparently did not locate until after the Motion was filed. The Court also already deemed the 2015 letter a part of the record in granting Defendants' motion to supplement in any event. (ECF No. 76.) In sum, the 2015 letter is properly part of the record here.

RSIC proffered a second declaration from Eben with its reply where she explained that she felt BLM was acting in bad faith in deciding not to consult RSIC on the Project because BLM consulted her on several other projects. (ECF No. 73-2 at 9.) Defendants responded that BLM consulted with RSIC on projects falling within its area of cultural interest identified on the map it sent BLM in 2015 and did not consult with RSIC on the Project because it fell outside the area identified on RSIC's map. (ECF No. 84 at 3-4.) Lithium Nevada made the same argument and supported it with a map prepared by Jennifer Schonlau, an environmental engineer who works for Lithium

///

Nevada, showing that the projects Eben mentions were within RSIC's map boundary, though the Project is not. This is the map Schonlau proffered with her declaration:



(ECF No. 87-1 at 21.) Though given the chance to object to the map at the Hearing, the Tribes did not. The Project area is the small area shaded black towards the top-right of the map, which is outside the red boundary line indicating RSIC's area of cultural interest. The map accordingly supports Defendants' argument that they consulted RSIC on projects within the area indicated on RSIC's map but did not consult RSIC on the Project because the Project is located outside that area. There is also no evidence before the Court that RSIC proactively requested consultation on the Project as contemplated by the reservation of rights in RSIC's 2015 letter and resolution before the ROD issued. This all indicates that BLM reasonably decided not to consult RSIC about the Project because BLM understood the Project as falling outside RSIC's area of cultural interests.

RSIC also proffered some 1868 field survey notes found in BLM's records describing a potential massacre as evidence that BLM was on notice of a massacre within

the Project area and therefore should have consulted with RSIC on the Project. (ECF No. 73 at 3, 6-7 (relying on ECF No. 73-1 at 5-6).) However, Defendants persuasively respond that nothing about these notes would reasonably put BLM on notice that RSIC had an interest in the Project area because the notes only describe the scattered remains of 'Indians' generally, with no further description specifically identifying them as the ancestors of RSIC members, and the location described in the notes falls outside RSIC's stated area of cultural interest in any event. (ECF Nos. 73-1 at 5-6, 84 at 5.) Defendants further argue that the remains described in these field notes either do not fall within the Project area, or fall just within the area of indirect impacts, much less any specific location that will be excavated under the HPTP. (ECF No. 84 at 4-5.) The Court finds these arguments persuasive. The 1868 field notes do not necessarily put BLM on reasonable notice that it should have consulted with RSIC on the Project.

Like with the arguments discussed above and supported by the second Eben Declaration, Lithium Nevada made the same argument as BLM regarding the 1868 field notes but supported it with another map prepared by Schonlau plotting the likely location of the remains described in the 1868 field notes on a map that also includes the outlines of the Project area. The Tribes were given an opportunity to object to this evidence at the Hearing, but did not. Schonlau's map indicates that the remains identified in the field notes fall outside the Project area:

///



(ECF No. 87-1 at 19.) As indicated by the key in the map, the small black triangles towards

the bottom-right of the map are the locations described in the 1868 field notes, which are

just barely within the area shaded red indicating private lands. (*Id.*) They are not within the

Project area. (*Id.*) Therefore, even if the Court were to assume that the remains described

in the 1868 field notes had some connection to RSIC—and disregarded the fact that they

are outside of the area of cultural interest RSIC identified in its letter to BLM—they would

not reasonably put BLM on notice that it should have consulted RSIC about the Project

because they lie outside the Project area.

    As for the Burns Paiute Tribe, they argue in reply[10] that BLM was on notice of their

interest in the Project area, and should have consulted them about the Project, because

_____

    [10]Much of the evidence the Tribes presented regarding the Motion accompanied
their replies because of Defendants' response conceding that they did not consult the
Tribes, but reasonably decided not to, shifted the argument before the Court. (ECF No.
65.) The declarations proffered in support of the Motion focused more on establishing
irreparable harm and that the Tribes were not consulted on the Project. (ECF Nos. 45-1,
62-1.) Because the Tribes raised new evidence in their replies, the Court granted the
parties' stipulation to let Defendants and Lithium Nevada file sur-replies. (ECF No. 79.)

1    BLM notified them about human remains that were looted from Elephant Mountain Cave

2    and then subsequently recovered. (ECF No. 71 at 3-4.) Defendants and Lithium Nevada

3    respond that this evidence does not show BLM should have consulted the Burns Paiute

4    Tribe on the Project because Elephant Mountain cave is more than 50 miles from the

5    Project area, BLM's notification about Elephant Mountain Cave was made under the

6    Native American Graves Protection and Repatriation Act ("NAGPRA"), 28 U.S.C. § 3001,

7    *et seq.*, which casts a broader consultation net than the NHPA, and because the Burns

8    Paiute Tribe did not respond to the notice they received regarding Elephant Mountain

9    Cave. (ECF Nos. 84 at 2-3, 85 at 2-3.) The Court agrees with Defendants and Lithium

10   Nevada that the fact BLM consulted the Burns Paiute Tribe about the remains looted from

11   Elephant Mountain Cave does not show BLM's decision not to consult them about the

12   Project was unreasonable.

13        While the Court does not place much weight on the distance between Elephant

14   Mountain Cave and the Project Area, the Court finds Defendant and Lithium Nevada's

15   other arguments persuasive. Specifically, BLM could reasonably cast a wider net for

16   notification of tribes under NAGPRA than it would under NHPA because NAGPRA focuses

17   on "known lineal descendants," 43 C.F.R. § 10.5(a), who would logically spread out into a

18   much larger area than the area of a particular tribe's territory. The Court also finds it

19   significant that the Burns Paiute Tribe did not respond to the notification regarding

20   Elephant Mountain Cave, *see* Notice of Inventory Completion: U.S. Department of the

21   Interior, Bureau of Land Management, Nevada State Office, Reno, NV, 78 FR 59958-

22   0259959, 2013 WL 5408745, at *59959 (Sept. 30, 2013).  Indeed, the Burns Paiute Tribe's

23   lack of response suggests that this exchange would not have changed BLM's apparent

24   working assumption based on the Winnemucca RMP process that the Burns Paiute Tribe

25   was not interested in consulting on projects near the Project Area. The Court accordingly

26   concludes that that the Elephant Mountain Cave evidence does not suggest BLM should

27   have consulted with the Burns Paiute Tribe on the Project, or that its decision not to consult

28   was unreasonable.

Regarding tribal and public notice about the Project more broadly, BLM initiated formal consultation with the Fort McDermitt Paiute and Shoshone Tribe, the Summit Lake Paiute Tribe, and the Winnemucca Indian Colony via letters BLM sent on December 12, 2019. (ECF No. 65-8.) The Nevada SHPO signed off on BLM's decision about the three tribes to consult with. (ECF No. 65-24 at 10.) BLM also invited public comment on the Project by publishing a notice in the federal register. *See* Notice of Intent, 85 Fed. Reg. 3413-02, 3414 (Jan. 21, 2020). And as previously noted, while it is undisputed that BLM did not formally consult either the Burns Paiute Tribe or RSIC about the Project, this evidence regarding public notice of the Project tends to show that the Tribes could have learned about the Project and affirmatively requested consultation.

But it does not stand alone. The Court finds the evidence described above showing that the Tribes opted-out of consultation on projects near the Project more persuasive here in finding that BLM made a reasonable and good faith determination not to consult them. Moreover, BLM did consult three tribes on this Project, and Nevada's SHPO signed off on that decision—additional factors that tend to support the Court's finding that BLM made a reasonable and good faith effort to identify the tribes it should consult with about the Project, though BLM ultimately decided not to consult with the Tribes.

The Tribes make a couple other arguments that, while not ultimately persuasive, the Court will address here. For example, the Tribes point out that BLM's own handbook on tribal consultation includes a section explaining that Native American tribes may be reluctant to share information about their sacred sites, and other sections stating that tribes are not obligated to consult with BLM, to make the valid point that BLM could have done more and consulted them. (*See, e.g.*, ECF No. 73 at 7-9.) There is no question BLM could have done more here. And "reticence to disclose details of [tribal] cultural and religious practices was not unexpected[,]" even back in 1995. *Pueblo of Sandia*, 50 F.3d at 861. However, all that the applicable regulation requires is that BLM make a "reasonable and good faith effort." 36 C.F.R. § 800.2(c)(ii)(A). As explained above, the Court finds that BLM did that given the information it had. Moreover, the Tribes' argument contains no limiting

principle, while 36 C.F.R. § 800.2(c)(ii)(A) does—reasonableness. BLM is not required to consult every Native American tribe on every project it approves. And it is reasonable to use an understanding developed over the course of years about which Tribes have historical and cultural interests in a given area to decide which Tribes to consult with. Thus, the Tribes' argument that BLM should have understood their silence to mean they would like to be consulted on the Project is not ultimately persuasive.

The Tribes further argue that their decisions not to request consultation on prior projects near the Project area would not reasonably suggest to BLM that they would not want to be consulted on the Project because those projects were either less disruptive or otherwise distinguishable from the Project. (ECF No. 71 at 4, 73 at 9-11.) However, again, 36 C.F.R. § 800.2(c)(ii)(A) only requires that BLM make reasonable decisions based on the information that it has. If the Tribes had requested consultation on any of the prior projects in or near the Project area that BLM describes in its response to the Motion, it would have weighed against BLM's argument that its decision not to consult with them on the Project was reasonable. (ECF No. 65 at 13-14.) But they did not. Therefore, and contrary to the Tribes' argument, the Tribes' silence in response to past, publicly noticed projects in or near the Project area, particularly in light of the context of their respective approaches in communications with BLM regarding the Winnemucca RMP, supports Defendants' contention that its decision not to consult them on the Project was reasonable.

In sum, and especially considering that, "[t]he court may not substitute its judgment for that of the agency[,]" *Motor Vehicle Mfrs. Ass'n.*, 463 U.S. at 43, the evidence before the Court suggests that BLM's decision not to consult the Tribes was reasonable. Said otherwise, the Court finds the Tribes unlikely to prevail on the merits of their claim that BLM's decision not to consult them on the Project was unreasonable or made in bad faith.

### C. Irreparable Harm

Moving to the second *Winter* factor, the Tribes argue they will be irreparably harmed if a preliminary injunction does not issue here because they have suffered procedural injury by not being consulted before BLM issued the ROD, and that procedural injury is

"infused with damage to culture, religious practices, personal and collective history and tradition." (ECF No. 45 at 18.) The Tribes further argue they will suffer irreparable harm in that the entire Thacker Pass area is sacred to them and carrying out the HPTP could involve digging up the remains of their ancestors.[11] (*Id.* at 19.)

Defendants counter that there is no presumption of irreparable harm from the violation of a procedural statute like the NHPA. (ECF No. 65 at 28; *see also id.* at 31-32.) Defendants further argue that the Tribes have failed to demonstrate with any specificity that their alleged harms are likely to occur, especially considering that BLM invited the Tribes to consult with BLM before BLM issues the ARPA permit, and before the HPTP may commence—which will allow the Tribes to raise, and the BLM to address, any of the Tribes' concerns other than to insist on no action to implement the HPTP. (*Id.* at 29-30.) Defendants also note that there are already protocols in place to address the Tribes' concerns about digging up remains. (*Id.* at 30.) Defendants additionally argue that the Tribes' delay in seeking injunctive relief weighs against an irreparable harm finding. (*Id.* at 30-31.) Lithium Nevada similarly argues the Tribes' claims of harm lacks the requisite specificity. (ECF No. 66 at 20-21.) Lithium Nevada further suggests that the Tribes' declarations proffered in support of their Motion may not actually describe the Project area, so do not support an irreparable harm finding. (ECF No. 66 at 21-23.)

The Court agrees with the Tribes in part, but overall finds they have not met their burden to show they will be irreparably harmed if an injunction does not issue pending a resolution of this case on the merits. To start, the Court notes that it intends to issue a

---

[11]The Burns Paiute Tribe also mentions that some courts have found "the nature of Tribal rights warrant unique protection in the preliminary injunction context because harm to them is presumed to be irreparable." (ECF No. 62 at 5.) However, as Lithium Nevada points out, the "cases the Burns Tribe cites to support its argument that Tribal rights are presumed to be irreparable are based on potential injuries to treaty rights, not NHPA violations, and Intervenors have not alleged a treaty violation." (ECF No. 66 at 20 n.10.) Indeed, the courts who issued *United States v. State of Mich.*, 508 F. Supp. 480, 492 (W.D. Mich. 1980), *aff'd*, 712 F.2d 242 (6th Cir. 1983) and *Tribe v. U.S. Forest Serv.*, Case No. 3:13-CV-348-BLW, 2013 WL 5212317, at *7 (D. Idaho Sept. 12, 2013) were discussing treaty rights, not Section 106 consultation rights. These two decisions are distinguishable and accordingly do not support the Burns Paiute Tribe's argument.

decision on the merits of this case before any construction starts on the actual Project. The harm the parties are arguing about is therefore limited to the harm caused by carrying out the HPTP. As explained in the July 23 Order, the HPTP "involves a contractor digging between two and 25 holes by hand at each of the 21 precontact historic sites and digging seven mechanical trenches (presumably by backhoe) at some of the sites—of up to a few meters deep and 40 meters long." *See Western Watersheds*, Case No. 3:21-cv-00103-MMD-CLB, ECF No. 48 at 7. This digging will only disturb an area that Lithium Nevada estimates at "no more than 0.25 acres with anticipated trenching on only 0.04 acres." (ECF No. 66 at 7.) And at least as catalogued in the HPTP, none of these sites are burial or massacre sites; they are primarily locations where the Tribes' ancestors gathered obsidian to make arrowheads. (ECF No. 65-14 at 114-169.) In any event, the irreparable harm at issue for purposes of the Motion is not any harm that may be caused by the Project writ large, but instead only the harm that may be caused by executing the HPTP.

As to the digging incident to the HPTP, the Tribes assert two different types of irreparable harm; a generalized harm that will occur if there is any digging at all in the entire Project area, and a specific harm—excavation of burial and/or massacre sites. The generalized harm is reflected in the Eben and Teeman declarations—basically, the Tribes consider the entire Thacker Pass area sacred, so any digging anywhere in that area causes harm. (ECF Nos. 45-1 and 62-1.) Defendants do not dispute that the Tribes consider the entire Thacker Pass area sacred. However, the NHPA does not give the Tribes the right to prevent all digging in the entire Project area. It merely provides for consultation. *See* 36 C.F.R. § 800.6(a) ("The agency official shall consult with the SHPO/THPO and other consulting parties, including Indian tribes and Native Hawaiian organizations, to develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects on historic properties."). And the Court has found that the Tribes are unlikely to prevail on the merits of their consultation claim. Moreover, the Tribes did not respond to Lithium Nevada's proffered evidence showing the authorized, extensive ground disturbance that has already occurred within

the Project area. (ECF No. 66-2.) This evidence counters the implication the Tribes appear to be raising that allowing the HPTP to proceed apace constitutes an initial disturbance of the Thacker Pass area. The Court cannot find that the generalized though unrebutted harm the Tribes presented in support of their Motion reflecting their contention that any digging anywhere in the Project area constitutes irreparable harm to satisfy the second *Winter* prong.

As to the Tribes' claimed specific harm—disturbance of burial and/or massacre sites—the evidence before the Court does not support their claims. As discussed above as to likelihood of success on the merits, the 1868 field notes do not show a massacre happened within the Project area. Further, the HPTP states that archival background research and extensive pedestrian surveys yielded the historic properties in the plan, none of which are listed as burial or massacre sites, raising the reasonable implication that there are no burial or massacre sites within the Project area. (ECF No. 65-14 at 32.) And the HPTP includes a plan if human remains are unexpectedly discovered. (*Id.* at 76.) In addition, at least one member of the Fort McDermitt Paiute Shoshoe Tribe says that her ancestors would not be buried in the ground, suggesting that there are no burial sites within the Project area that would be disturbed by digging. (ECF No. 66-10 at 3.) Further, despite extensive trenching and digging in the Project area over the past 10 years, no human remains have been found. (ECF No. 66-2 (including pictures as attachments); *see also* ECF No. 66-3.) And neither the Eben nor Teeman declarations describe a specific location for the massacre and/or burial sites they believe exist within the Project area with information sufficiently specific to place those sites within the Project area. (ECF Nos. 45-1, 62-1, 71-1, 73-2.) Thus, the Court cannot substantiate the Tribes' allegations that digging incident to the HPTP will disturb any burial sites. The Tribes have accordingly not met their burden to show irreparable harm. *See Colorado River Indian Tribes v. U.S. Dep't of the Interior*, Case No. CV 12-4291-(DTBX), 2012 WL 12894189, at *4 (C.D. Cal. May 24, 2012) ("In contrast, as noted by the Federal Defendants . . . it is undisputed that no human remains have been discovered at the Site. The Federal Defendants note that the

declarations submitted by [tribe] members in support of their application for a TRO largely focus on the irreparable harm that would occur if there were human remains or burial sites discovered at the Site; this is not the situation, however.") (internal punctuation and citations omitted).

In sum, while the Court finds the Tribes' arguments regarding the spiritual distress that the HPTP will cause persuasive, the Court must nonetheless reluctantly conclude that they have not shown sufficiently specific irreparable harm that aligns with the relief they could ultimately obtain in this case. Because the Tribes have not made a sufficient showing on either the first or second *Winter* prong, the Court will deny the Motion.

## V.   CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the Motion.

It is therefore ordered that the Tribes' motion for preliminary injunction (ECF No. 45) is denied.

DATED THIS 3rd Day of September 2021.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE