1  Julie Cavanaugh-Bill (State Bar No. 11533)
2  Cavanaugh-Bill Law Offices
3  Henderson Bank Building
4  401 Railroad Street, Suite 307
5  Elko, NV 89801
6  (775) 753-4357
7  julie@cblawoffices.org
8
9  William Falk (Utah Bar No. 16678)
10  2980 Russet Sky Trail
11  Castle Rock, CO
12  (319) 830-6086
13  falkwilt@gmail.com
14
15  Terry J. Lodge (Ohio Bar No. 29271)
16  316 N. Michigan St., Suite 520
17  Toledo, OH 43604-5627
18  (419) 205-7084
19  tjlodge50@yahoo.com
20
21  Attorneys for Reno-Sparks Indian Colony and Atsa koodakuh wyh Nuwu
22
23                          UNITED STATES DISTRICT COURT
24                                DISTRICT OF NEVADA
25
26  BARTELL RANCH LLC, et al.,                )     Case No.: 3:21-cv-80-MMD-CLB
27                                            )     (**LEAD CASE**)
28              Plaintiffs,                   )
29                                            )
30  v.                                        )
31                                            )
32  ESTER M. MCCULLOUGH, et al.,              )     **INTERVENING PLAINTIFFS'**
33                                            )     **MOTION FOR**
34              Defendants,                   )     **RECONSIDERATION OF THIS**
35  and                                       )     **COURT'S ORDER DENYING**
36                                            )     **PRELIMINARY INJUNCTION**
37  LITHIUM NEVADA CORPORATION,               )     REDACTED VERSION
38                                            )
39              Intervenor-Defendant.         )
40  _____
41
42  WESTERN WATERSHEDS PROJECT, et al.,  )     Case No.: 3:21-cv-103-MMD-CLB
43                                       )     (**CONSOLIDATED CASE**)
44              Plaintiffs,              )
45                                       )
46  RENO SPARKS INDIAN COLONY, et al.,   )

1

| 1 | )
| 2 | Intervenor-Plaintiffs, )
| 3 | )
| 4 | and )
| 5 | )
| 6 | BURNS PAIUTE TRIBE, )
| 7 | )
| 8 | Intervenor-Plaintiff. )
| 9 | )
| 10 | v. )
| 11 | )
| 12 | UNITED STATES DEPARTMENT OF THE )
| 13 | INTERIOR, et al., )
| 14 | )
| 15 | Defendants, )
| 16 | and )
| 17 | )
| 18 | LITHIUM NEVADA CORPORATION, )
| 19 | )
| 20 | Intervenor-Defendant. )
| 21 | 

The Reno-Sparks Indian Colony (RSIC) and Atsa Koodakuh wyh Nuwu/People of Red Mountain (together "Intervening Plaintiffs") respectfully move this Court to reconsider its September 3, 2021 order denying the Intervening Plaintiffs' Motion for Preliminary Injunction, under FRCP 60(b)(2) and Local Rule 59-1(a). Alternatively, Intervening Plaintiffs respectfully move this Court to amend its judgment pursuant to FRCP 52(b).

Reconsideration or amendment is proper for several reasons. First, in its order, this Court overlooked or misunderstood controlling Supreme Court and Ninth Circuit precedent giving the Intervening Plaintiffs, as interested members of the public who have demonstrated a sufficient and concrete interest in the preservation of the historical properties in the Thacker Pass project area, standing to challenge the Bureau of Land Management's (BLM) failure, before the issuance of the Record of Decision (ROD), to

1   provide the Fort McDermitt Paiute-Shoshone Tribe, the Pyramid Lake Paiute Tribe,  the

2   Summit Lake Paiute Tribe, and the Winnemucca Indian Colony "a reasonable

3   opportunity to identify their concerns about historic properties, advise on the

4   identification and evaluation of historic properties, articulate their views on the

5   undertaking's effects on such properties, and participate in the resolution of adverse

6   effects" in contravention of 36 CFR § 800.2(c)(2)(ii)(A).

7        Second, this court wrote "A court may reverse an agency decision *only* 'if it is

8   arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"

9   citing 5 USC § 706(2)(A) (emphasis added). But, 5 USC § 706(2) creates 5 more

10   grounds for holding agency unlawful or setting agency action aside beyond Section A.

11   This Court overlooked 5 USC § 706(2)(D) which requires this Court to "hold unlawful

12   and set aside agency action, findings, and conclusions found to be without observance

13   of procedure required by law." BLM's failure to consult with Fort McDermitt, Summit

14   Lake, and the Winnemucca Indian Colony on all the things required by 36 CFR § 800

15   was "without observance of procedure required by law." If this Court considered the so-

16   called consultation that BLM claims with Fort McDermitt, Summit Lake, and

17   Winnemucca Indian Colony, then case law shows how BLM's efforts were insufficient.

18        Therefore, the Intervening Plaintiffs are likely to succeed on the merits of this

19   claim, or, at the very least, have established serious questions going to the merits of this

20   claim. In either articulation, this Court's proper application of the Supreme Court's and

21   Ninth Circuit's current standing analysis and 5 USC § 706(2)(D) would result in the

22   Intervening Plaintiffs meeting the requisite likelihood of success on the merits *Winter*

23   factor.

1      The third reason reconsideration or amendment is proper is an abundance of

2  new evidence supporting the Intervening Plaintiffs' contentions that the Thacker Pass

3  project area encompasses part of the September 12, 1865 massacre site where at least

4  31 Paiute men, women, and children were murdered by federal soldiers; that the

5  specific archaeological digs described in the Historic Properties Treatment Plan (HPTP)

6  will disturb the massacre site and human remains; and that many members of the

7  People of Red Mountain are directly related to the Paiutes murdered in Thacker Pass.

8  (Exhibit 1, Dorece Antonio Declaration)

9      This new evidence includes a September 30, 1865 account of the massacre in

10  *The Owyhee Avalanche* newspaper. (Exhibit 2). This account, published just several

11  weeks after the massacre, described the soldiers as approaching the Paiute camp from

12  the east. This makes the most logical escape route to the west and into the project area.

13  The account also stated that the soldiers "fought the scattering devils over several miles

14  of ground for three hours," which means the massacre was almost certainly not

15  confined to the Paiute Camps that Lithium Nevada located in its proffered map.

16      The new evidence also includes two eyewitness accounts of the Thacker Pass

17  Massacre, both of them given to the well-known American labor organizer Big Bill

18  Haywood and recounted in *The Autobiography of Big Bill Haywood*. (Exhibit 3). The first

19  account comes from Jim Sackett, one of the soldiers in the 1st Nevada Cavalry who

20  participated in the massacre. The second comes from one of the massacre survivors, a

21  Paiute man named Ox Sam, whom many of the People of Red Mountain directly

22  descend from. These two accounts also confirm an east to west approach of the Paiute

23  Camp and make it almost certain that people ran west into the project area to escape

from the soldiers. So far, the Intervening Plaintiffs have found the Thacker Pass

Massacre described in 6 publicly available sources[1]. This undermines the BLM's claims

that its efforts were reasonable or in good faith.

This new evidence supports a fresh look at the irreparable harm the Intervening

Plaintiffs will suffer if BLM proceeds with the HPTP and means that the Intervening

Plaintiffs meet the irreparable harm *Winter* factor for preliminary injunctions. Because

the Intervening Plaintiffs also meet the other two *Winter* factors, this court should

reconsider, and grant, the Intervening Plaintiffs' motion for preliminary injunction.

## I.      Legal Standards For Reconsideration or Amendment

Federal Rule of Civil Procedure 60(b)(2): "On motion and just terms, the court

may relieve a party or its legal representative from a final judgment, order, or

proceeding for… newly discovered evidence."

Local Rule 59-1(a): "A party seeking reconsideration under this rule must state

with particularity the points of law or fact that the court has overlooked or

misunderstood...The court possesses the inherent power to reconsider an interlocutory

order for cause, so long as the court retains jurisdiction. Reconsideration also may be

appropriate if (1) there is newly discovered evidence that was not available when the

original motion or response was filed, (2) the court committed clear error or the initial

decision was manifestly unjust…"

---

[1] In addition to 1868 Field Notes, *Owyhee Avalanche* article, and *The Autobiography of Big Bill Haywood*, descriptions of the Thacker Pass Massacre in: Angel, Myron (editor). *History of Nevada*, Thompson and West, 1881, pg. 174; Michno, Gregory. *The Deadliest Indian War in the West: The Snake Conflict, 1864-1868.* Caxton Press, 2007, pgs. 131-32; and Smith, Philip D. *The Sagebrush Soldiers: Nevada's Volunteers in the Civil War.* PD Smith, 1962, pgs. 79-80.

1    F.R.C.P. 52(b) provides that, upon motion by a party, the court may amend its

2  findings or make additional findings and may amend the judgment. "A motion made

3  pursuant to Rule 52(b) will only be granted when the moving party can show either

4  manifest errors of law or fact, or newly discovered evidence; it is not an opportunity for

5  parties to relitigate old issues or to advance new theories." *Penncro Assocs., Inc. v.*

6  *Sprint Spectrum L.P.*, No. 04-2549-JWL, 2006 WL 1999121, at *2 (D. Kan. July 17,

7  2006) (citing *Myers v. Dolgencorp*, Inc., No. 04-4137-JAR, 2006 WL 839458, at *1 (D.

8  Kan. Mar. 25, 2006)).

9    So long as both are filed within 28 days, a motion under Rule 52(b) may

10  accompany a Rule 59 motion.  Fed. R. Civ. P. 52(b).

11    According to F.R.C.P. 59(a)(1)(B), the court may grant a new trial on some or all

12  of the issues "for any reason for which a rehearing has heretofore been granted in a suit

13  in equity in federal court." Under Rule 59(a)(2), "[a]fter a nonjury trial, the court may, on

14  motion for a new trial, open the judgment if one has been entered, take additional

15  testimony, amend findings of fact and conclusions of law or make new ones, and direct

16  the entry of a new judgment."  "[T]he purpose of a Rule 59(a)(2) motion is to correct

17  manifest errors of law or fact, or, in some limited situations, to present newly discovered

18  evidence." *Waugh v. Williams Cos., Inc. Long Term Disability*, 323 F. App'x 681, 684-85

19  (10th Cir. 2009) (internal citations and quotations omitted).

20    A Rule 59(e) motion is similarly limited. See *Adams v. Reliance Standard Life*

21  *Ins. Co.*, 225 F.3d 1179, 1186 n.5 (10th Cir. 2000). It provides the court with an

22  opportunity to correct manifest errors of law or fact, to hear newly discovered evidence,

1    or to consider a change in the law.  *Servants of the Paraclete v. Does*, 204 F.3d 1005,

2    1012 (10th Cir. 2000).

3    **II.    The Intervening Plaintiffs have successfully alleged procedural**
4    **standing.**
5
6         This Court denied consideration of the People of Red Mountain's claims under

7    NHPA because supposedly they lack prudential standing. ECF 92-6. This Court also

8    ruled that the Intervening Plaintiffs lacked standing to challenge BLM's failure to follow

9    the National Historic Preservation Act, Section 106 consultation procedure respecting

10   the Fort McDermitt Paiute-Shoshone Tribe, the Summit Lake Paiute Tribe, and the

11   Winnemucca Indian Colony.

12        It was improper to foreclose review of the BLM's lack of consultation with Fort

13   McDermitt, Summit Lake, and the Winnemucca Indian Colony on prudential standing

14   grounds, given the Supreme Court's and Ninth Circuit's current standing analyses in

15   Administrative Procedure Act (APA) cases.

16        This Court wrote: "RSIC's counsel argued at the Hearing that BLM violated the

17   consultation rights of the tribes it did consult with. But RSIC's counsel cannot make

18   such an argument on behalf of other tribes that he does not represent, who are not

19   participating in this case." Order. pg. 7. This is a misstatement of the Intervening

20   Plaintiffs' argument.

21        The Intervening Plaintiffs argue that BLM's consultation failures contravene the

22   procedural requirements of 36 CFR § 800.2(c)(2)(ii)(A). The Intervening Plaintiffs also

23   argue that BLM's issuance of the ROD "without seeking and considering the views of

24   the public in a manner that reflects the nature and complexity of the undertaking"

25   contravenes 36 CFR § 800.2(d)(1). Both of these failures violate *the Intervening*

1   *Plaintiffs' procedural rights*, as interested members of the public who have

2   demonstrated a sufficient and concrete interest in the preservation of historical

3   properties in the Thacker Pass project area.

4        When NHPA was enacted, Congress declared that "the spirit and direction of the

5   Nation are founded upon and reflected in its historic heritage;" that "historic properties

6   significant to the Nation's heritage are being lost or substantially altered often

7   inadvertently, with increasing frequency;" and that "the preservation of this irreplaceable

8   heritage is in the public interest so that its vital legacy of cultural, educational, aesthetic,

9   inspirational, economic, and energy benefits will be maintained and enriched for future

10   generations of Americans." Section 1 of the National Historic Preservation Act, Pub. L.

11   No. 89-665, as amended by Pub. L. No. 96-515.

12        In an effort to preserve this "irreplaceable heritage," NHPA obligates federal

13   agencies with statutory responsibilities to follow specific procedures to ensure that

14   federal agencies have adequate information before approving projects that will

15   adversely affect historic properties. In fact, NHPA's implementing regulations at 36 CFR

16   § 800.1(a) state "The procedures in this part define how Federal agencies meet these

17   statutory responsibilities." These implementing regulations also require that "[t]he

18   agency official shall acknowledge that Indian tribes and Native Hawaiian organizations

19   possess special expertise in assessing the eligibility of historic properties that may

20   possess religious and cultural significance to them." 36 CFR § 800.4(c)(1).

21        Fort McDermitt, Summit Lake, and the Winnemucca Indian Colony, then,

22   "possess special expertise in assessing the eligibility of historic properties." And, just

23   like the Intervening Plaintiffs, as members of the public who use and enjoy Thacker

1  Pass, have an actionable interest in ensuring that BLM consulted with other consulting

2  parties like the Nevada State Historic Preservation Officer, the Intervening Plaintiffs

3  have an actionable interest in ensuring that BLM consulted with Fort McDermitt, Summit

4  Lake, and the Winnemucca Indian Colony.

5  **A. Intervening Plaintiffs' Successfully Established Article III Standing**

6  The APA and National Historic Preservation Act (NHPA) grant the Intervening

7  Plaintiffs a right to a review of whether the BLM properly observed the NHPA's

8  procedures. These procedures required BLM to provide a reasonable opportunity to the

9  Fort McDermitt, Summit Lake, and Winnemucca Indian Colony tribes to consult on all of

10  the issues described in 36 CFR § 800.2(c)(2)(ii)(A). Under current Supreme Court

11  procedural injury and prudential standing jurisprudence, plaintiffs who successfully

12  establish Article III standing through procedural injury and who fall within the "zone of

13  interests" protected by the relevant statute, are free to challenge BLM's failure to

14  adequately consult with tribes who were proper consulting parties, under NHPA's

15  implementing regulations.

16  To establish Article III, constitutional standing, "[t]he plaintiff must have (1)

17  suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the

18  defendant, and (3) that is likely to be redressed by a favorable judicial decision."

19  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), as revised (May 24, 2016). A

20  plaintiff may satisfy the injury-in-fact requirement by asserting a "procedural injury."

21  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573 n. 8 (1992).

22  "To establish procedural standing, the plaintiff must show: (1) that it has been

23  accorded a procedural right to protect its concrete interests, and (2) that it has a

threatened concrete interest that is the ultimate basis of its standing." *Churchill County*

*v. Babbitt*, 150 F.3d 1072, 1078 (9th Cir. 1998). "The requisite weight of proof for each

element of the test [for standing] is lowered…for 'procedural standing.'" *Id.*. "Procedural

standing is standing based on a plaintiff's procedural injury. A plaintiff may claim

'procedural standing' when, for example, it seeks 'to enforce a procedural requirement

the disregard of which could impair a concrete interest of the plaintiffs." *Id.*

The Ninth Circuit has noted that "The Supreme Court recognized the lower

standards of proof for such procedural standing in a footnote:

There is much truth to the assertion that 'procedural rights' are special: The person who has been afforded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy. Thus, under our case law, one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years.

*Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572, n. 7).

Here, the Intervening Plaintiffs seek to enforce NHPA's procedural requirements,

the disregard of which could impair the Intervening Plaintiffs use and enjoyment of

Peehee mu'huh (Thacker Pass). The Intervening Plaintiffs are accorded a procedural

right to protect their interests under the Administrative Procedure Act, 5 U.S.C., § 702.

The Intervening Plaintiffs have also shown that they have a threatened concrete interest

that is the ultimate basis of their standing.

Specifically, the Intervening Plaintiffs allege concrete aesthetic interests in the

enjoyment of Peehee mu'huh as a site for ceremony, for education about tribal history

including the two massacres that happened in Peehee mu'huh, for learning about the

artifacts and practices of their ancestors, and for hunting and gathering. They also

1  allege that they will continue visiting, studying their ancestors' artifacts, practicing

2  ceremony, and hunting and gathering in Peehee mu'huh in the future.

3       Both the construction of the mine and the prerequisite archaeological digs will

4  harm the Intervening Plaintiffs' ability to use and enjoy Peehee mu'huh. Providing any or

5  all of the Indian tribes who attach religious and cultural significance to Peehee mu'huh

6  including RSIC – and also including Fort McDermitt, Summit Lake, and the Winnemucca

7  Indian Colony  – a reasonable opportunity to identify their concerns about historic

8  properties, advise on the identification and evaluation of historic properties, articulate

9  their views on the undertaking's effects on such properties, and participate in the

10 resolution of adverse effects, as required by NHPA, could have caused the Record of

11 Decision to be withheld or altered so that the Intervening Plaintiffs' use and enjoyment

12 of Peehee mu'huh was not affected. Therefore, RSIC and the People of Red Mountain

13 have a concrete interest in the BLM making a reasonable effort to consult with other

14 Tribes.

15      For the other two Article III standing requirements, the Intervening Plaintiffs'

16 injury is "fairly traceable" to BLM's failure to adequately consult and to take into account

17 information about cultural and historical resources in Peehee mu'huh and how those

18 effects may be avoided or mitigated. Finally, keeping in mind that "Plaintiffs alleging

19 procedural injury can often establish redressability with little difficulty, because they

20 need to show only that the relief requested – that the agency follow the correct

21 procedures – may influence the agency's ultimate decision of whether to take or refrain

22 from a certain action," the Intervening Plaintiffs possess oral history and knowledge of

23 traditional practices in Peehee mu'huh that the BLM has already admitted it was not

1  aware of. *Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1226-27 (9th

2  Cir. 2008). This may influence the agency's ultimate decision of how to treat historic

3  properties in Thacker Pass.

**B. Intervening Plaintiffs successfully meet the "zone of interests" test and, therefore, establish prudential standing.**

8      "The Supreme Court has long held that a person suing under the APA must

9  satisfy not only Article III's standing requirements, but an additional test: The interest he

10  asserts must be 'arguably within the zone of interests to be protected or regulated by

11  the statute' that he says was violated." *Match-E-Be-Nash-She-Wish Band v. Patchak*,

12  567 US 209; 132 S. Ct. 2199, 2210, 183 L.Ed.2d 211 (2012) (quoting *Association of*

13  *Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 153 (1970). When

14  reviewing claims under the APA "prudential standing is satisfied when the injury

15  asserted by a plaintiff arguably falls within the zone of interests to be protected or

16  regulated by the statute in question." *Federal Election Comm'n v. Akins*, 524 US 11, 20

17  (1998).

18      "The prudential standing test [plaintiffs] must meet 'is not meant to be especially

19  demanding.'" *Match-E-Be-Nash-She-Wish Band v. Patchak*, at 2210 (quoting *Clarke v.*

20  *Securities Industry Assn.*, 479 U.S. 388, 399, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987).

21  The Supreme Court applies "the test in keeping with Congress's 'evident intent' when

22  enacting the APA 'to make agency action presumptively reviewable.'" *Id.* And, the

23  Supreme Court has "always conspicuously included the word 'arguably' in the test to

24  indicate that the benefit of any doubt goes to the plaintiff." *Id.* "The test forecloses suit

25  only when a plaintiff's 'interests are so marginally related to or inconsistent with the

1    purposes implicit in the statute that it cannot reasonably be assumed that Congress

2    intended to permit the suit.'" *Id.*

3
4    The Ninth Circuit has ruled that:
5
6    "Congress enacted NHPA based on its findings that 'historical and cultural foundations of the
7    Nation should be preserved as a living part of our community life and development in order to
8    give a sense of orientation to the American people.' NHPA was enacted to 'encourage the public
9    and private preservation of all usable elements of the Nation's historic built environment.'"
10
11   *Presidio Golf Club v. National Park Service,* 155 F.3d 1153, 1158 (9th Cir.
12   1998)(internal citations to the NHPA omitted).
13
14           The Intervening Plaintiffs, who regularly visit Peehee mu'huh for the area's

15   historical and cultural foundations and who educate the public about these foundations,

16   fall squarely within the "zone of interests" protected by NHPA. The Intervening Plaintiffs

17   have suffered a legal wrong or injury that falls within the "zone of interests" created by

18   the NHPA. It is not clear why this Court doubts whether the Intervening Plaintiffs have

19   standing to challenge the BLM's consultation with parties BLM was statutorily required

20   to consult with, but because "any doubt goes to the plaintiff,"  the APA makes "agency

21   action presumptively reviewable," and the Intervening Plaintiffs' interests are more than

22   "marginally related" to the purposes implicit in the NHPA, they should be allowed to

23   challenge the BLM's lack of consultation with Fort McDermitt, Summit Lake, and the

24   Winnemucca Indian Colony.

25           In support of its contention that RSIC's counsel cannot make arguments on

26   behalf of other tribes that he does not represent, this Court cited *San Juan Citizens*

27   *Alliance v. Norton*, 586 F. Supp. 2d 1270, 1293 (D.N.M. 2008) (expressing skepticism

28   that a group of tribal members could assert claims on behalf of a tribe that declined to

29   join the litigation).

It is important to note that the Intervening Plaintiffs have offered a case directly contradicting the skepticism expressed in *San Juan Citizens Alliance*. In *Montana Wilderness Ass'n v. Fry*, F. Supp 2d 1127, 1150-51 (D. Montana 2004), the District of Montana held that a Plaintiff who was not a member of the tribes that he alleged BLM failed to consult with, under NHPA, could, nevertheless, challenge BLM's failure to consult those tribes. Specifically, the *Montana Wilderness Ass'n* court stated: "Any member of the public who can demonstrate sufficient interest in the preservation of the historical lands at issue falls within the zone of interests protected by the NHPA." *Id*. In *San Juan Citizens Alliance,* the court only expressed skepticism, in *dicta*, without actually ruling on the issue. In *Montana Wilderness Ass'n,* by contrast, the court's statement was central to the ruling and is therefore of much greater precedential value.

**C. The general, prudential prohibition against a litigant raising another person's legal rights is not implicated here.**

It appears that this Court might be relying on the general prohibition on a litigant's raising another person's legal rights. But, RSIC and the People of Red Mountain have not rested their claims on the legal rights or interests of third parties. RSIC and the People of Red Mountain have asserted their own procedural rights and interests in NHPA's consultation requirements. In cases like these, plaintiffs only have to show that a decision to which NHPA obligations attach is made without the informed historical and cultural considerations that NHPA requires because the harm that NHPA intends to prevent has been suffered. *See Nulankeyutmonen Nkihtaqmikon v. Impson,* 503 F. 3d 18, 28 (1st Cir. 2007); and *United States v. 0.95 Acres of Land*, 994 F.2d 696, 698 (9th

1  Cir.1993) (holding ""NHPA is similar to NEPA except that it requires consideration of

2  historic sites, rather the environment.").

3        This point is further supported by the text of the NHPA's implementing

4  regulations which state: "The agency official shall acknowledge that Indian

5  tribes...possess special expertise in assessing the eligibility of historic properties that

6  may possess religious and cultural significance to them." 36 CFR § 800.4(c)(1). By

7  failing to engage with tribes that possess this expertise, the BLM has committed a

8  procedural injury against the Intervening Plaintiffs and in doing so, the BLM has ensured

9  that the harm NHPA intends to prevent will be suffered.

10        Furthermore, the Ninth Circuit has warned district courts that even when

11  "possible relief may appear to some to be irrelevant, trivial, or prohibitively expensive, a

12  district court should beware of shortcutting the process which has been committed in

13  the first instance to the responsible federal agency." *Tyler v. Cuomo*, 236 F.3d 1124,

14  1134 (9th Cir. 2000).

15        The Supreme Court has ruled that relying on prudential standing to decline

16  adjudication of claims properly within federal courts' Article III jurisdiction "is in some

17  tension with our recent reaffirmation of the principle that a federal court's obligation to

18  hear and decide cases within its jurisdiction is virtually unflagging." *Lexmark Intern. v.*

19  *Static Control,* 134 S. Ct. 1377, 1386 (2014) (internal citations removed). When asking

20  whether RSIC or the People of Red Mountain fall within the class of plaintiffs whom

21  Congress has authorized to sue under the APA and NHPA, the Supreme Court asks

22  whether the plaintiff has a cause of action under the statute. *Id.* at 1387-88. That

23  question requires this Court "to determine the meaning of the congressionally enacted

1  provision creating a cause of action." *Id*. at 1388. In doing so, this Court should "apply

2  traditional principles of statutory interpretation." *Id.* "Just as a court cannot apply its

3  independent policy judgment to recognize a cause of action that Congress has denied,

4  it cannot limit a cause of action that Congress has created merely because 'prudence'

5  dictates." *Id.*

6         Congress created a cause of action for the Intervening Plaintiffs. The Intervening

7  Plaintiffs have successfully established Article III standing through the requirements for

8  pleading a procedural injury. The Intervening Plaintiffs fall squarely within the "zone of

9  interests" NHPA protects. So, this Court cannot decline to adjudicate the Intervening

10  Plaintiffs' claims that BLM violated the Intervening Plaintiffs' procedural rights as

11  described by NHPA merely because 'prudence' dictates.

12  **III.    BLM's Letters to Fort McDermitt, Summit Lake, Pyramid Lake, and the**
13  **         Winnemucca Indian Colony Were Not Consultation**

15         If this Court considered Intervening Plaintiffs' claims that BLM failed to

16  adequately consult with the Tribes BLM claims it consulted with, case law shows why

17  this consultation was, in fact, inadequate. The only documented efforts at consultation

18  that BLM has provided are a December 19, 2019 letter to Fort McDermitt, Summit Lake,

19  and the Winnemucca Indian Colony. ECF 65-8. A July 29, 2020 letter to Fort McDermitt,

20  Pyramid Lake, Summit Lake, and the Winnemucca Indian Colony. ECF 65-12. And, a

21  November 30, 2020 letter to Fort McDermitt, Pyramid Lake, Summit Lake, and

22  Winnemucca Indian Colony. ECF 65-13. BLM has provided a letter to Fort McDermitt

23  purportedly "soliciting comments on the Thacker Pass Lithium Project Memorandum of

24  Agreement and HPTP" but the letter is not dated and there is no proof of certification.

1    Meanwhile, BLM stated in the July 12 Rehberg letter to RSIC that "[t]he

2    consultation period for the public and Native American tribes on potential effects and

3    resolution of those effects on historic properties from the Thacker Pass lithium project

4    opened in January 2020 and closed November 5, 2020." ECF 47-2.  If the consultation

5    period closed on November 5, 2020, then the November 30, 2020 letter cannot be

6    considered part of the required NHPA consultation, leaving BLM with only two

7    documented section 106 contacts with the Tribes.

8    Just because BLM uses the proper buzzwords – terms like "initiating formal

9    consultation" and "formal government to government consultation," this does not mean

10   BLM actually engaged in formal government-to-goverment consultation. It is true that

11   BLM's letters requested information, "but a mere request for information is not

12   necessarily sufficient to constitute the 'reasonable effort' section 106 requires." *Pueblo*

13   *of Sandia v. US*, 50 F.3d 856, 860 (10th Cir. 1995). Similarly, "[c]ontact, of course, is not

14   consultation…" *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers,* 205

15   F.Supp. 3d 4, 32 (D. DC 2016) (citing *Quechan Tribe of Fort Yuma Indian Reservation*

16   *v. U.S. Dep't of Interior*, 755 F.Supp.2d 1104, 1112, 1118 (S.D.Cal. 2010)).

17   While this Court distinguished *Pueblo of Sandia* because in that case the

18   question was whether the Forest Service engaged in reasonable efforts to identify

19   historic properties and in this case the question is whether the BLM engaged in a

20   reasonable effort to identify Indian tribes, there is no reason to distinguish the definition

21   of "reasonable effort" in *Pueblo of Sandia* from the way it should be applied in this case.

22   The Forest Service's effort that the *Pueblo of Sandia* court found was

23   unreasonable was much more extensive than the BLM's effort was here. In *Pueblo of*

1  *Sandia*, the Forest Service mailed letters to local Indian tribes, including the Sandia

2  Pueblo, and individual tribal members who were known to be familiar with traditional

3  cultural properties. *Id*. Forest Service officials also addressed meetings of the All Indian

4  Pueblo Council and the San Felipe Pueblo and requested specific information at these

5  meetings. *Id*. In this case, BLM never mailed letters to individual tribal members who

6  were known to be familiar with traditional cultural properties. Nor did they attend

7  meetings with the Tribes.

8      In *Quechan Tribe of Fort Yuma Indian Reservation v. U.S. Dep't of Interior*, 755

9  F.Supp.2d 1104 (S.D. Cal. 2010), the court found that BLM's consultation was

10  inadequate after *14 contacts* with the Quechan Tribe's president including 9 written

11  letters from BLM to the Tribe's president. The court also found that BLM's consultation

12  was inadequate after *31 contacts* with the Quechan Tribe's historic preservation officer,

13  who received the same letters and follow-up calls as did the Tribe's president, and had

14  additional contact with BLM.

15      Of particular note, the *Quechan* court engaged in an extensive review of each of

16  the documents the BLM offered to show consultation. After engaging in this review, the

17  *Quechan* court stated:

18  "First, the sheer volume of documents is not meaningful. The number of letters, reports, meetings,
19  etc. and the size of various documents doesn't in itself show the NHPA-required consultation
20  occurred. Second, the BLM's communications are replete with recitals of law (including Section
21  106), professions of good intent, and solicitations to consult with the Tribe. But mere *pro forma*
22  recitals do not, by themselves, show BLM actually complied with the law."
23
24  *Id.* at 1118.

25      Compared to the BLM's efforts in the *Quechan* case, BLM made even less of an

26  effort to engage in government-to-government consultation. All BLM did here was make

27  contact twice before the NHPA consultation process had concluded, and once after.

1      The Thacker Pass mine will be the biggest lithium mine in the nation, and the

2  biggest open pit lithium mine in the world. It will adversely affect over 1000 cultural

3  resource sites and 57 properties eligible for inclusion on the National Register of

4  Historic Places. When NHPA requires that "The agency official should plan consultation

5  appropriate to the scale of the undertaking…" much more was required than the mere

6  contacts BLM made with a few of the many interested Tribes. § 800.2(a)(4).

**IV.   The Intervening Plaintiffs Have Already Suffered Irreparable Harm. They will suffer more irreparable harm absent a preliminary injunction.**

10      This Court overlooked the irreparable, procedural harm the Intervening Plaintiffs

11  established. A procedural injury may serve as a basis for a finding of irreparable harm

12  when a preliminary injunction is sought. See *N. Mariana Islands v. U.S.*, 686 F.Supp.2d

13  7, 17 (D.D.C. 2009) (finding, in preliminary injunction analysis, that "[a] party

14  experiences actionable harm when 'depriv[ed] of a procedural protection to which he is

15  entitled' under the APA") (quoting *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289

16  F.3d 89, 94–95 (D.C. Cir. 2002) ); *Save Strawberry Canyon v. Dep't of Energy*, 613

17  F.Supp.2d 1177, 1189–90 (N.D. Cal. 2009) (finding irreparable harm requirement

18  satisfied where plaintiff claimed procedural violation of National Environmental Policy

19  Act). "A failure to comply with APA procedural requirements therefore itself causes

20  irreparable harm because 'the damage done by [the Agency's] violation of the APA

21  cannot be fully cured by later remedial action.'" *Invenergy Renewables LLC v. US*, 422

22  F.Supp. 3d 1255, 1290 (Ct. Int'l Trade 2019) (quoting *N. Mariana Islands v. United*

23  *States*, 686 F.Supp. 2d, 7, 18 (D.D.C. 2009). A court's analysis focuses on whether

24  harm is irreparable, "irrespective of the magnitude of the injury." *Simula, Inc. v. Autoliv,*

25  *Inc.*, 175 F.3d 716, 725 (9th Cir. 1999).

1    Here, BLM failed to comply with APA procedural requirements, which, in turn,

2    obligate BLM to comply NHPA procedural requirements, and as evidenced by BLM's

3    persistent refusal to take new evidence of the massacre into account or to edit the

4    HPTP to reflect the evidence of the massacre, the damage done by BLM's violation

5    cannot be fully cured by later remedial action. See ECF 73, Exhibits 3-6. NHPA

6    provides for the protection of the nation's historic heritage by requiring that federal

7    agencies follow specific procedures to ensure that they have adequate information

8    before adversely affecting historic properties. All American citizens suffer injury when

9    federal agencies neglect to gather this information. And, the American citizens who

10   descend from those massacred on historic properties, who routinely visit and use those

11   historic properties, and who plan on doing so in the future are especially injured.

12   The Ninth Circuit has stated: "A close statutory analog to NHPA is [NEPA].

13   What § 106 of NHPA does for sites of historical import, NEPA does for our natural

14   environment." *San Carlos Apache Tribe v. US*, 417 F.3d 1091, 1097 (9th Cir. 2005).

15   The Ninth Circuit spelled out its reasoning for treating NHPA like NEPA: "Both Acts

16   create obligations that are chiefly procedural in nature; both have the goal of generating

17   information about the impact of federal actions on the environment; and both require

18   that the relevant federal agency carefully consider the information produced." *Pres.*

19   *Coalition, Inc. v. Pierce,* 667 F.2d 851, 859 (9th Cir.1982).

20   And, in the NEPA context, "Procedural" injury is tied to a substantive "harm to the

21   environment" — "'the harm consists of added risk to the environment that takes place

22   when governmental decisionmakers make up their minds without having before them an

23   analysis (with public comment) of the likely effects of their decision on the environment.

1   NEPA's object is to minimize that risk, the risk of uninformed choice. . . .'" *West v. Sec'y*

2   *of Dep't of Transp.*, 206 F.3d 920, 930 n. 14 (9th Cir. 2000) (quoting *Sierra Club v.*

3   *Marsh*, 872 F.2d 497, 500 (1st Cir. 1989)). Applying this rationale to the Intervening

4   Plaintiffs' claims under NHPA, here, there is an added risk to sites of historical import

5   that has taken place when BLM decisionmakers made up their minds without having

6   before them an analysis from all the proper consulting parties (including Fort McDermitt,

7   Summit Lake, and Winnemucca Indian Colony) of the likely effects of their decision on

8   historical sites.

9   **A. New Evidence Confirms the HPTP Will Disturb the Thacker Pass Massacre Site**
10  **and Probable Human Remains.**

11

12          Even if this Court denies this irreparable, procedural harm, an abundance of new

13  evidence demonstrates that it is much more likely that the mechanical trenching

14  operations, hand dug holes, and surface scraping actions specified in the HPTP will

15  disturb the Thacker Pass Massacre site and the remains of the Paiutes shot to death in

16  Thacker Pass in the project area.

17          This court noted that "the 1868 field notes do not show a massacre happened

18  within the Project area." Order, pg. 28. However, Lithium Nevada's Environmental

19  Engineer mapped the 1868 map's "Remains of Indian Lodgings in relation to the

20  Thacker Pass Project" and placed the Indian Lodgings just to the east of the project

21  area. ECF 87-1, pg. 4. The proximity of the Indian Lodgings to the project area,

22  combined with the Intervening Plaintiffs' oral histories describing how Paiute people,

23  being hunted by the US cavalry, hid in Thacker Pass, and especially the new accounts

24  of the massacre make it very likely that the September 12, 1865 massacre happened, at

25  least partially, within the project area.

1        The discovery of a September 30, 1865 account of the massacre in *The Owyhee*

2    *Avalanche* newspaper supports Intervening Plaintiffs' contentions. This account,

3    published just several weeks after the event, stated that Paiute camp fires were noticed

4    on the west side of the Quinn River Valley (where Thacker Pass is located); that the 1st

5    Nevada Cavalry camped the night before on Willow Creek (to the east of the Indian

6    Lodgings and Thacker Pass); that the 1st Nevada Cavalry approached the Indian

7    Lodgings from Willow Creek; that the soldiers "fought the scattering devils over several

8    miles of ground for three hours, in which all were killed that could be found;" that "a

9    search among the sage resulted in the discovery of thirty-one permanently friendly

10   Indians;" and that "[m]ore must have been killed and died from their wounds, as a strict

11   search was not made, and the extent of the battlefield so great."

12       Meanwhile, the author of the 1868 Field Notes, US Deputy Surveyor Abed Alley

13   Palmer, described "the sage land between the mountains and the meadow…" which

14   likely means the land crossed moving east to west from the Quinn River Valley ("the

15   meadow") towards the Double H and Montana mountains forming Thacker Pass ("the

16   mountains"). (ECF 76, pg. 4). And, Palmer noted that "[t]here are many Indian skulls

17   and other remains to be found scattered over this portion of the Township," further

18   corroborates the likelihood that the Intervening Plaintiffs' ancestors fled a long distance

19   into the project area. (ECF 76, pg. 5).

20       The Intervening Plaintiffs have also discovered two eyewitness accounts of the

21   Thacker Pass Massacre, both of them given to the well-known American politician and

22   labor organizer Big Bill Haywood and recounted in *The Autobiography of William D.*

23   *Haywood.* The first account comes from one of the soldiers in the 1st Nevada Cavalry,

Jim Sackett. The second comes from a survivor of the massacre, a Paiute man named Ox Sam, whom many of the People of Red Mountain directly descend from.

Sackett's eye-witness account confirms the soldiers' approach from the east. Sackett explained that, when the soldiers were camping at the mouth of Willow Creek (east of Thacker Pass), the captain "pointed across the valley in the direction of what is now called Thacker Pass" to explain that he had seen Paiute campfires. (Exhibit 3, pg. 5 (pg. 27 in Haywood's book)) After a heartless and heartbreaking narration of "pouring in our bullets" into Paiute wikiups where people were sleeping and murdering Paiute children because "Nits make lice," Sackett also said one Indian rode away and escaped. (Exhibit 3, pgs. 5-6).

The second eye-witness account Haywood describes belongs to Ox Sam, the one Indian adult who rode away. (Exhibit 3, pgs. 6-7). Sam indicated to Haywood that the massacre was in Thacker Pass ("That's time Thacker Pass"). Before stating that his father, mother, sisters, and brothers were killed, Sam said that he rode away from Thacker Pass to Disaster Peak, which is west and north of Thacker Pass, and is most easily accessible from where the Indian Lodgings were via Thacker Pass. (Exhibit 3, pg. 7).

Sackett's and Sam's accounts are also significant for the atrocity that they describe. It is important to remember that before the establishment of the reservation at Fort McDermitt, there was no such thing as "the Fort McDermitt Tribe." The Fort McDermitt Tribe was created by the American government out of the survivors of the Thacker Pass and other massacres. Just like Plymouth Rock or Jamestown are central locations in the history of the formation of the American nation, Thacker Pass is central

to the formation of the Fort McDermitt Tribe. And, whether federal agencies want to

uncover this history or not, even when they possess the records of these massacres,

the genocide the federal government perpetrated against Native peoples like those

camped in the Quinn River Valley on September 12, 1865 is an important part of

American history – all-the-moreso for the shame in that history.

With the new evidence that the massacre carried into the project area, leaving

the remains of massacred Paiutes in the project area, it also becomes clear that the

specific excavations planned for the project area will likely disturb these human remains

and cause irreparable harm. The Historic Properties Treatment Plan provided to RSIC

includes a confidential map of cultural resource sites that will be adversely affected by

the mine (HPTP, Appendix B, pg. 1). It also includes a table listing the first sites to be

trenched, dug, or otherwise excavated (Table 2. Pg. 19).

RSIC's GIS Specialist Maureen Vazquez, using Lithium Nevada's proffered map

showing the locations of the Paiute camps and GIS information included in the HPTP,

created a map showing how close excavation will occur to the Paiute camps. (Exhibit 4)

These excavation sites are also likely within the massacre site. [REDACTED] is very

close (within easy running distance) to the Paiute Camps, for example. And, according

to the HPTP, BLM plans on permitting an archaeological firm to dig a 30-meter trench,

to dig 3 control units, to perform 3 surface scrapes, and to dig 14 shovel test units.

[REDACTED] is close enough to the Paiute Camps that it is very likely Paiutes were

massacred in that site and human remains will be disturbed by the archaeological digs.

[REDACTED] is another site, likely within the area where Paiutes fled from the

massacre, where a 30-meter trench will be dug, 2 control units will be dug, 2 surface

scrapes will be performed, and 5 shovel test units will be dug. At [REDACTED], both very close to the Paiute camps, especially the more southern camp, 20-meter trenches will be dug at each site. This is sufficiently specific irreparable harm.

By: /s/ Terry J. Lodge
Terry J. Lodge, Esq. (Ohio Bar No. 29271)
316 N. Michigan St., Suite 520
Toledo, OH 43604-5627
(419) 205-7084
tjlodge50@yahoo.com

Julie Cavanaugh-Bill (State Bar No. 11533)
Cavanaugh-Bill Law Offices
Henderson Bank Building
401 Railroad Street, Suite 307
Elko, NV 89801
(775) 753-4357
julie@cblawoffices.org

William Falk, Esq (Utah Bar No. 16678)
2980 Russet Sky Trail
Castle Rock, CO 80108
(319) 830-6086
falkwilt@gmail.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on Friday, October 1 2021, I filed the foregoing using the United States District Court CM/ECF, which caused all counsel of record to be served electronically.

/s/Terry J. Lodge
Terry J. Lodge, Esq. (Ohio Bar No. 29271)

**EXHIBIT INDEX**

| EXHIBIT | DESCRIPTION | # OF PAGES |
|---|---|---|
| 1 | Declaration of Dorece Antonio | 6 |
| 2 | *The Owyhee Avalanche* September 30, 1865 Article | 3 |
| 3 | *The Autobiography of Big Bill Haywood* Excerpts | 8 |
| 4 | Proximity of Paiute Camps To Archaeological Digs Map | 2 |