O. KENT MAHER (Nev. Bar No. 316)
kent@winnemuccalaw.com
PO Box 130
33 W Fourth Street
Winnemucca, Nevada 89446
Ph: (775) 623-5277
Fax: (775) 623-2468

*Local Counsel for Plaintiffs*

DOMINIC M. CAROLLO (Or. Bar. No. 093057)
*Pro Hac Vice*
dcarollo@carollolegal.com
Carollo Law Group LLC
P.O. Box 2456
630 SE Jackson Street, Suite 1
Roseburg, Oregon 97470
Ph: (541) 957-5900
Fax: (541) 957-5923

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| **BARTELL RANCH, LLC,** a Nevada limited liability company and **EDWARD BARTELL**, <br><br> Plaintiff, <br><br> vs. <br><br><br> **ESTER M. MCCULLOUGH**, Winnemucca District Manager, Bureau of Land Management, **BUREAU OF LAND MANAGEMENT**, <br><br> Defendant, <br><br> and <br><br> LITHIUM NEVADA CORP., <br> Defendant-Intervenor. | Case No.: 3:21-cv-00080-MMD-CLB <br><br><br> **BARTELL PLAINTIFFS' MOTION TO COMPLETE AND SUPPLEMENT ADMINISTRATIVE RECORD** |

## TABLE OF CONTENTS

MOTION…………………………………………………………….………….………1

MEMORANDUM OF POINTS AND AUTHORITIES…………………………...……………..2

I.   INTRODUCTION………………………………………………………………….....2

II.  BACKGROUND………………………………………………………………...…………......4

III. ARGUMENT…………… ………………………………………...………………….…………8

A.   BLM Should be Required to Complete the Record. ………………………….……….8

Category 1: Contracts, memorandums of understanding, and conflict of interest disclaimers between BLM, Lithium Nevada Corporation, the third-party contractor ICF, and any other third-party consultants regarding the completion of the EIS. ...……………………………………………….……….………..….11

Category 2: Agency communications with the third-party contractors and consultants, and communications among these third parties, including but not limited to communications by or with consultants with Piteau Associates, who was responsible for the baseline report and estimates for impacts to water resources, including Plaintiffs' water rights. ………………………………... …...12

Category 3: Intra-agency communications, inter-agency communications, and communications by or with higher levels at the Department of the Interior regarding the project or the NEPA process…………………….………………......13

Category 4: Field data reports from consultants and contractors relied on in preparation of all reports, memorandums, and analysis, including by outside contractors Piteau Associates and Tamzen Stringham/Range and Riparian Services LLC, who evaluate impacts to water resources and rangeland resources, respectively……………………………………………….……......13

Category 5: Communications by or among BLM or Interior officials, third-party contractors, and consultants to the NEPA process involving the Stringham report, file TPEIS 0343 in the AR………………………………......14

Category 6: Communications regarding TPEIS 0403 and TPEIS 0400………..…14

**Category 7**: All versions of the "Piteau 2020c" report (current version included as TPEIS-0374), which evaluated impacts to water resources, including drafts and markups……………………………………….…………..…......14

**Category 8**: Transmittal emails and emails discussing the documents referenced in TPEIS 0406, 443, and 545, and copies of the documents referenced…………………………….……………………………………………......15

**Category 9**: Comments to and from Plaintiffs to BLM officials and officials at Lithium Nevada Corporation, in BLM's possession……………………….…….15

B.   The Court Should Permit Limited Discovery and Supplementation of the Record………………………………………………...………………...…16

     1.   Supplementation is necessary to determine if BLM has considered all relevant factors………………………………….………..…..17

     2.   BLM has acted in bad faith and supplementation is warranted…......18

C.   The Deliberative Process Privilege does not Apply to the Requested Documents…………………………………………………………………......19

D.   A Privilege Log must be Produced……………………………….………...…....23

IV. CONCLUSION……………………………………………………………………..24

## **Table of Authorities**

**CASES**

*Amfac Resorts, L.L.C. v. U.S. Dep't of the Interior*,
143 F. Supp. 2d 7(D.D.C. 2001) ................................................... 9

*Animal Def. Council v. Hodel*,
840 F.2d 1432 (9th Cir. 1988), amended, 867 F.2d 1244 (9th Cir. 1989) ............................. 16, 18

*Animal Legal Def. Fund v. Vilsack*,
110 F. Supp. 3d 157 (D.D.C. 2015) ................................................... 9

*Camp v. Pitts*,
411 U.S. 138 (1973) ................................................... 8

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) ................................................... 8, 24

*Ctr. for Biological Diversity v. Zinke*,
2018 WL 8805325 (D. Alaska Nov. 16, 2018) ................................................... 10-11

*Ctr. for Food Safety v. Vilsack*,
2017 WL 1709318 (N.D. Cal. May 3, 2017) ................................................... 12

*Cty. of San Miguel v. Kempthorne*,
587 F. Supp. 2d 64 (D.D.C. 2008) ................................................... 9

*Environmental Protection Agency v. Mink*,
410 U.S. 73 (1972) ................................................... 20

*F.T.C. v. Warner Commc'ns Inc.*,
 742 F.2d 1156 (9th Cir. 1984) ................................................... 19

*Gill v. U.S. Dep't of Justice*,
2015 WL 9258075 (N.D. Cal. Dec. 18, 2015) ................................................... 9

*Hestia Educ. Grp., LLC v. King*,
2016 WL 362226 (N.D. Cal. Jan. 29, 2016) ............................................................. 16

*Hunters v. Marten*,
470 F. Supp. 3d 1151 (D. Mont. 2020), appeal dismissed sub nom. *Helena Hunters & Anglers*
  *Ass'n v. Marten*, No. 20-35771, 2020 WL 8678109 (9th Cir. Dec. 28, 2020) ............. 16, 17, 19

*Idaho State Snowmobile Ass'n v. U.S. Forest Serv.*,
2014 WL 971151 (D. Idaho Mar. 12, 2014) ............................................................. 16

*In re Nielsen*,
No. 17-3345, (2nd Cir. Dec. 27, 2017) ................................................................... 24

*In re Sealed Case*,
121 F.3d 729 (D.C. Cir. 1997) ............................................................................. 20

*In re United States*,
875 F.3d 1200 (9th Cir. 2017) .............................................................................. 9

*Indigenous Env't Network v. United States Dep't of State*,
2018 WL 1796217 (D. Mont. Apr. 16, 2018) ............................................................ 10

*Institute for Fisheries Resources v. Burwell*,
2017 WL 89003 (N.D. Cal. 2017) ...................................................................... 10, 12

*Karnoski v. Trump*,
926 F.3d 1180 (9th Cir. 2019) ........................................................................ 20, 23

*Ksanka Kupaqa Xa'lcin v. United States Fish & Wildlife Serv.*,
2020 WL 4193110 (D. Mont. Mar. 9, 2020) ............................................................ 10

*Lands Council v. Powell*,
 395 F.3d 1019 (9th Cir. 2005) ............................................................................. 16

*Lower San Pedro Watershed All. v. Barta*,
2020 WL 8020085 (D. Ariz. Nov. 30, 2020) ............................................................ 16

*Montrose Chemical Corp. of California v. Train*,
491 F.2d 63 (D.C. Cir.1974) ................................................................................ 20

iv

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ............................................................................................ 9, 17

*Nat'l Audubon Soc'y v. Hoffman*,
132 F.3d 7 (2d Cir. 1997) ......................................................................................... 18

*Nat'l Wildlife Fed'n v. U.S. Forest Serv.*,
861 F.2d 1114 (9th Cir. 1988) ............................................................................. 19-20

*New York v. United States Dep't of Com.*,
345 F. Supp. 3d 444 (S.D.N.Y. 2018) ...................................................................... 18

*Oceana, Inc. v. Pritzker*,
2017 WL 2670733 (N.D. Cal. June 21, 2017) ............................................................ 9

*Oregon Nat. Desert Ass'n v. Jewell*,
840 F.3d 562 (9th Cir. 2016). .............................................................................. 6, 8

*Pac. Fisheries, Inc. v. United States*,
539 F.3d 1143 (9th Cir. 2008) ................................................................................ 20

*People of State of Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*,
2006 WL 708914 (N.D. Cal. Mar. 16, 2006) ................................................. 9, 10, 12

*Pinnacle Armor, Inc. v. United States*,
923 F. Supp. 2d 1226 (E.D. Cal. 2013) .................................................................... 17

*Portland Audubon Soc'y v. Endangered Species Comm.*,
 984 F.2d 1534 (9th Cir. 1993) .............................................................................. 8, 9

*Regents of Univ. of California v. United States Dep't of Homeland Sec.*,
2017 WL 4642324 (N.D. Cal. 2017) .............................................................. 11, 12, 24

*Safari Club Int'l v. Jewell*,
2016 WL 7785452 (D. Ariz. July 7, 2016) ................................................................. 9

*Save the Colorado v. United States Dep't of the Interior*,
517 F. Supp. 3d 890 (D. Ariz. 2021) ........................................................................ 24

*Sharks Sports & Ent. LLC v. Fed. Transit Admin.*,
2020 WL 511998 (N.D. Cal. Jan. 31, 2020) ............................................................ 16

*Thomas v. Cate*,
715 F. Supp. 2d 1012 (E.D. Cal. 2010),
order clarified, No. 1:05CV01198LJOJMDHC,
2010 WL 797019 (E.D. Cal. Mar. 5, 2010) …………………………………………..21-22

*Thompson v. U.S. Dept. of Labor*,
885 F.2d 551 (9th Cir. 1989) .................................................................................... 8

*United Farm Workers v. Adm'r, EPA*,
2008 WL 3929140 (N.D. Cal. Aug. 26, 2008) ........................................................ 12

*United States v. Fernandez*,
231 F.3d 1240 (9th Cir. 2000) ................................................................................ 20

*W. Watersheds Project v. Bureau of Land Mgmt.*,
2012 WL 13937 (D. Nev. Jan. 4, 2012) .................................................................... 9

*Wiener v. FBI*,
943 F.2d 972 (9th Cir. 1991) .................................................................................. 24

*Wild Rockies v. Pena*,
 2017 WL 8778579 (E.D. Wash. Dec. 12, 2017) ................................................21-22

*WildEarth Guardians v. Bernhardt*,
 507 F. Supp. 3d 1219 (C.D. Cal. 2020) .................................................................... 9

**STATUTES:**

5 U.S.C. §§ 706 et seq. ………………………………………………………………..…09

## MOTION

Plaintiffs Bartell Ranch, LLC and Edward Bartell (collectively, "Plaintiffs") respectfully move the Court for an order requiring Federal Defendants, the Bureau of Land Management ("BLM"), to complete the Administrative Record ("AR"), and/or in the alternative, to supplement the record through the authorization of limited discovery.

Pursuant to the Joint Case Management Report & Stipulations counsel for the parties exchanged multiple emails and held at least one phone call concerning the scope of the AR, specific documents that Plaintiffs requested be added to the AR, and Plaintiffs' requests for documents from the government. BLM largely refused to produce requested documents and/or include specifically-identified documents in the record, necessitating this motion. The attached declaration and exhibits provide true and correct copies of the conferral correspondence.

Plaintiffs request the following documents be added or supplemented to the record or, alternatively, that the Court compel limited discovery from BLM to search for and produce such documents for the AR:

1. Contracts, memorandums of understanding, and conflict of interest disclaimers between BLM, Lithium Nevada Corporation, the third-party contractor ICF, and any other third party consultants regarding the completion of the EIS.

2. Agency communications with the third-party contractors and consultants, and communications among these third parties, including but not limited to communications by or with consultants for Piteau Associates, who was responsible for the baseline report and estimates for impacts to water resources, including Plaintiffs' water rights.

3. Intra-agency communications, inter-agency communications, and communications by or with higher levels at the Department of the Interior regarding the project or the NEPA process.

4. Field data reports from consultants and contractors relied on in preparation of all reports, memorandums, and analysis, including by outside contractors Piteau Associates and Tamzen Stringham/Range and Riparian Services LLC, who evaluated impacts to water resources and rangeland resources, respectively.

5. Communications by or among BLM or Interior officials, third-party contractors, and consultants to the NEPA process involving the Stringham report, file TPEIS 0343 in the AR.

6. Communications regarding TPEIS 0403 and TPEIS 0400.

7. All versions of the "Piteau 2020c" report (current version included as TPEIS-0374), which evaluated impacts to water resources, including drafts and markups.

8. Transmittal emails and emails discussing the documents referenced in TPEIS 0406, 443, and 545, and copies of the documents referenced.

9. Comments to and from Plaintiffs to BLM officials and officials at Lithium Nevada Corporation, in BLM's possession.

This motion is supported by the following points and authorities, the Declaration of Dominic M. Carollo, submitted herewith, and the filings of record. The Bartell Plaintiffs further join, in full, in the AR motion being filed by the Conservation Group Plaintiffs.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Overarchingly, this motion seeks a *full* record of the BLM and third-party contractors' development of the *facts and data*, and the scientific *analyses*, of the environmental baseline and expected impacts to water resources and rangeland resources. These issues are of profound significance to Plaintiffs, their water rights, and their grazing operations, as well as to wildlife species important to Plaintiffs such as threatened Lahontan Cutthroat Trout ("LCT") and Sage Grouse. Plaintiffs allege, *inter alia*, that the third-party contractors BLM utilized "relied upon grossly inaccurate, incomplete, and inadequate data for constructing baselines and models purporting to estimate impacts to water resources caused by the groundwater pumping that would be associated with the Mine" and that they "did so in a manner that masks, or will mask,

the likely environmental impacts and, in addition, makes the proposed mitigation concepts and strategies meaningless, inadequate and ineffective." First Amended Complaint at ¶ 2 (ECF 28).

These serious allegations did not come out of thin air.  Part of the basis for these allegations come from the analysis and comments that Plaintiffs submitted to BLM from their own independent expert, Dr. Erick Powell, as well as Plaintiffs' own observations and measurements of wetlands, springs, seeps, and streamflows that they depend on for their livelihood.  However, Plaintiffs' complaint also arises from BLM's refusal to fully open the curtain on the work mysteriously being done by third-party contractors that substantially completed the Final Environmental Impact Statement ("FEIS"), particularly the work of Tyler Cluff, a Senior Hydrogeologist for Piteau and Associates, who completed the baseline report and impacts report for water resources. Among other things, Mr. Cluff completed a proposed mitigation report specifically addressing impacts to some of Plaintiffs' water rights, which appears in the proposed AR.   TPEIS-0403.  Meanwhile, Mr. Cluff is currently serving as an expert for the project proponent, Lithium Nevada Corporation (LNC), in a separate water right protest proceeding (where Plaintiff Bartell Ranch, LLC is a protestant) in which Mr. Cluff is relying on much of the same data and work he did for the FEIS to support LNC's water right change in use applications before the State of Nevada.  *See* Carollo Decl. at ¶ 9; *id.*, Exhibit 8.

This unusual relationship between a third-party contractor for the NEPA analysis, Piteau, and LNC suggests that Piteau was not working for BLM on the FEIS in a neutral and independent capacity but, rather, was working directly for LNC.  This might explain why, as just a single example, Piteau used calibration targets of <u>zero flow</u> for Pole Creek in its groundwater impacts modeling, thereby effectively precluding meaningful and accurate assessment impacts to the *perennial* flow in Pole Creek. ECF 28 at ¶¶ 36-37.  Not only was it

known to LNC that impacts to flow in Pole Creek was of vital significance to Plaintiffs, but also that it was essential to LCT survival and recovery. *See id.* at ¶¶ 31, 33-38, 41.   Yet, the AR contains no communications nor transparent explanations for why these choices were made. These circumstances call into question, among other things, under what authority Piteau was working on the FEIS, and whether Piteau had conflicts of interest that should have precluded it from contributing to the NEPA analysis.  It also calls into question why it is that BLM refuses to disclose *any* information that would answer these questions, including even the contracts with third-party consultants authorizing them to do the work.

As a threshold matter, Plaintiffs contend that the AR is incomplete on its face by virtue of the fact that it contains very few records or communications pertaining to third-party contractors' work on the EIS. *See* Carollo Decl. at ¶¶ 5-7; *id*., Exhibits 5-6.  At bottom, no legal basis exists for the work and communications of such third-party contractors, that seemingly worked directly for the project proponent, to be withheld by BLM.  Plaintiffs ask this Court to ensure any and all data, information, and communications with third-party contractors, and particularly those of Piteau, in BLM's possession at or before the publishing of the FEIS or execution of the Record of Decision ("ROD") be disclosed and made part of the AR.  As this work was, in part, directly targeted at evaluating impacts, and even possible mitigation, to Plaintiffs' water rights, it is essential that this Court ensure that such records are produced so that the Court can evaluate the accuracy and scientific integrity of the baseline and impacts reports that Piteau contributed to the FEIS and ROD and, ultimately, whether BLM considered the relevant factors when it relied on the FEIS in issuing the ROD.

## II.    BACKGROUND

On January 15, 2021 the Bureau of Land Management issued the ROD approving LNC's Thacker Pass Lithium Mine Project. TPEIS-0452. The ROD relied on a 2,721-page FEIS prepared by ICF International Inc., a third-party purportedly authorized to prepare the EIS under BLM's direction according to a MOU between BLM and LNC and a contract between LNC and ICF—agreements that BLM has refused to include the AR and are part of the subject of this motion. AR-052897; AR-052543; *see* Carollo Decl. at ¶ 4; *id.*, Exhibits 1-2.

BLM, LNC, and ICF coordinated with and/or used data and analysis from additional third-party consultants (essentially, fourth-party consultants) to examine certain aspects of the Thacker Pass Mine, and in particular impacts to water resources. The work of these third-parties was used in the EIS and set the foundation for BLM's finding that the Thacker Pass Mine was "not anticipated to affect any threatened or endangered species or significant scientific, cultural, or historic resources[.]" AR-052518. Front and center in this third-party participation was Piteau Associates, who is cited throughout the EIS and whose "Water Quality and Quantity Impacts Report" and "2019 Hydrology Baseline Report" take up over 1,300 pages of the FEIS, in addition to the comment responses Piteau prepared, including to comments submitted by Plaintiffs and Dr. Powell. *See generally* TPEIS 0384; *See* TPEIS 0306; AR-010602-010706.

Plaintiff Edward Bartell is a co-owner of Plaintiff Bartell Ranch, LLC. Through Bartell Ranch, Plaintiffs own and operate an active cattle-grazing and livestock production operation adjacent to the approved Thacker Pass Mine. ECF 28 at ¶ 14. This operation includes the 50,000-acre Crowley Creek BLM grazing lease adjacent to the proposed open pit and partially within the Mine's project area. *Id*. at ¶ 30. Plaintiffs also own a 320-acre parcel of private land approximately 1.5 miles from the project area, among other private property. *Id*. For Plaintiffs, the Thacker Pass Mine will literally be next door. While Plaintiffs' business is livestock

production, Plaintiff Edward Bartell also enjoys seeing and painting, and has gone to great effort to protect, species such as Sage Grouse and Lahontan Cutthroat Trout. *See id.* at ¶¶ 14, 27.

The vitality of ranching, and nearly everything in northern Nevada's high desert, depends on the availability of one singular natural resource—water. Plaintiffs hold several vested, certificated, and permitted water rights in and adjacent to the project area for purposes of irrigation and stockwatering. *Id.* at ¶ 28. These water rights exist in groundwater through wells, as well as in as springs, seeps, and streams. Additionally, naturally-occurring high-water-table areas provide exceptional growing conditions for native forbs and grasses utilized by a multitude of species, including but not limited to Plaintiffs' livestock. *See* AR-056322.

As the Thacker Pass Mine project underwent its environmental review under NEPA, Plaintiffs were very active in trying to engage BLM, providing the agency hundreds of pages of comments to ensure that Plaintiffs' water rights, and the habitat for local wildlife, were not affected by groundwater drawdowns from mining activities. *See* TPEIS 448; TPEIS 0516; TPEIS 0522; TPEIS 0523. Without water for cattle and irrigation, ranching near Thacker Pass would be a futile exercise. AR-056322. Plaintiffs carry the greatest risk should the *projected* environmental impacts and the *actual* environmental impacts differ. With this in mind, Plaintiffs retained their own expert, Dr. Powell, to analyze how the Mine would impact groundwater and surface water resources, and provided BLM with this expert analysis. *See* TPEIS 0516. Ultimately, this expert analysis generated significantly different baseline data[1] than the data used by Piteau Associates in their analysis, as well as expected impacts. *See* AR-056312.

---

[1] "[A] baseline is not an independent legal requirement, but rather, a practical requirement … often employed to identify the environmental consequences of a proposed agency action. *Oregon Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 568 (9th Cir. 2016) (quotation omitted).

1  Plaintiffs also requested access to test wells on BLM land as well as data and models from

2  Piteau Associates, LNC, and BLM to evaluate whether Piteau's data and modeling of impacts

3  to water resources was accurate. AR-052485; AR-052486. Plaintiffs also raised concerns with

4  errors in Piteau's publicly available data collection and modeling, as well as the trespassing of

5  LNC contractors on Plaintiffs' private property, including by Piteau, to gather data. AR-052470;

6  AR-052486. Ultimately, Plaintiffs requests were largely denied, ignored, or interfered with, and

7  Plaintiffs' concerns about Piteau's methods of data collection and modeling were not

8  meaningfully addressed in the FEIS or ROD. AR-052487.

9      The importance of water in Thacker Pass, both to Plaintiffs and wildlife species and the

10  Mine, cannot be overstated. The Mine expects to use an estimated 2,600 acre-foot per annum

11  ("AFA") during its "Phase 1" and an estimated 5,200 AFA during Phase 2 as a necessary part

12  of the mining process. AR-045531[2]; AR-045519-045535. Therefore, the impacts of the Mine's

13  water use was a focal point in the environmental review process. This leads to the crux of this

14  motion. The *entirety* of the water resources analysis appears to have been entrusted to Piteau

15  Associates, who appears to have worked mostly, if not exclusively, at the direction of LNC—

16  creating apparent conflicts.  Moreover, BLM has acknowledged that the agency did not seek to

17  verify Piteau's field work or data and simply assumed it was reliable. *See* Carollo Decl., Exhibit

18  1. While that may be true, and would serve as a basis for vacating the ROD, Plaintiffs seek to

_____

[2] Because the Orovada Subarea Hydrographic Basin is overallocated, LNC plans to obtain this water through purchasing water rights from another party and transferring the point of diversion to wells near the project area. AR-045531. This requires an application to transfer with the Nevada State Engineer. *See* Carollo Decl. at ¶ 9; *id.*, Exhibit 7. Under Nevada water law, Plaintiffs have protested this transfer, arguing that diverting this water from a new location near Plaintiffs' existing water rights will conflict with Plaintiffs' rights. *Id.*

ensure that all records in BLM's possession prior to the execution of the ROD bearing on third-party contractors' work are appropriately included in the AR.

The law requires that the AR provide enough information to permit the Court to determine whether BLM considered the relevant factors, including baseline data, when it approved the Thacker Pass Mine project. *See Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971); *Oregon Nat. Desert Ass'n*, 840 F.3d at 568. Unfortunately, the AR misses the mark by a wide margin. By failing to include records that explain Piteau's involvement, disclose Piteau's field work, shed light on LNC's influence on Piteau, and BLM or LCF's oversight, or lack thereof, of Piteau's analysis and work product (as well as other contractors), BLM has left this Court with an impossible task of evaluating whether BLM considered the relevant factors when approving the ROD. Therefore, the Court should grant Plaintiffs' motion.

## III.   ARGUMENT

### A.  BLM Should be Required to Complete the Record.

Plaintiffs' claims challenge BLM's actions under NEPA and are reviewed under the Administrative Procedure Act ("APA") 5 U.S.C. §§ 706 et seq. Under the APA, judicial review is limited to "the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). The administrative record is the whole record, including "everything that was before the agency pertaining to the merits of its decision." *Portland Audubon Soc'y v. Endangered Species Comm.*, 984 F.2d 1534, 1548 (9th Cir. 1993) (citation omitted). This encompasses "all documents and materials directly or indirectly considered by agency decision-makers and includes evidence contrary to the agency's position." *Thompson v. U.S. Dept. of Labor*, 885 F.2d 551, 555 (9th Cir. 1989) (citation omitted); *see also People of State of Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*, 2006 WL

708914, at *2 (N.D. Cal. Mar. 16, 2006); *Cty. of San Miguel v. Kempthorne*, 587 F. Supp. 2d 64, 71 (D.D.C. 2008) (stating the record includes "all materials that might have influenced the agency's decision, and not merely those on which the agency relied in its final decision" (quotations omitted)); *WildEarth Guardians v. Bernhardt*, 507 F. Supp. 3d 1219, 1223 (C.D. Cal. 2020). A document does not have to pass before the eyes of the final agency decision maker to be considered part of the AR. *Lockyer*, 2006 WL 708914, at *2. Instead, those records that are the "work and recommendations of subordinates" must also be included. *Kempthorne*, 587 F. Supp. 2d at 71 (internal quotation marks omitted); *see also Amfac Resorts, L.L.C. v. U.S. Dep't of the Interior*, 143 F. Supp. 2d 7, 12 (D.D.C. 2001) ("[I]f the agency decisionmaker based his decision on the work and recommendations of subordinates, those materials should be included as well."). Documents that are "constructively considered" also must be produced. *Safari Club Int'l v. Jewell*, 2016 WL 7785452, at *2 (D. Ariz. July 7, 2016) (quoting *W. Watersheds Project v. Bureau of Land Mgmt.*, 2012 WL 13937, at *1 (D. Nev. Jan. 4, 2012)); *see also Oceana, Inc. v. Pritzker*, 2017 WL 2670733, at *4 (N.D. Cal. June 21, 2017); *Animal Legal Def. Fund v. Vilsack*, 110 F. Supp. 3d 157, 160 (D.D.C. 2015).

An incomplete record precludes the Court from determining whether an agency considered the relevant factors and has provided an explanation that rationally connects the data with the choice made. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983). While the AR enjoys a presumption of regularity and completeness, this may be rebutted with "clear evidence to the contrary." *In re United States*, 875 F.3d 1200, 1206 (9th Cir. 2017) (citations omitted). This is not a demanding standard. *See, e.g., Portland Audubon Soc'y,* 984 F.2d at 1548; *see also Gill v. U.S. Dep't of Justice*, 2015 WL 9258075, at *6 (N.D. Cal. Dec. 18, 2015). Clear evidence to the contrary exists "if the plaintiff can identify

the allegedly omitted material with sufficient specificity and provide reasonable, non-speculative grounds for the belief that the alleged documents were considered by the agency and not included in the record."[3] *Indigenous Env't Network v. United States Dep't of State*, 2018 WL 1796217, at *2 (D. Mont. Apr. 16, 2018). This does not require a showing of "bad faith or improper motive." *Lockyer*, 2006 WL 708914, at *2. In fact, "[d]efendants' admission that deliberative materials were omitted is sufficient to overcome the presumption that the administrative record is complete." *Ksanka Kupaqa Xa'lcin v. United States Fish & Wildlife Serv.*, 2020 WL 4193110, at *2 (D. Mont. Mar. 9, 2020) (citing *Inst. for Fisheries Res. v. Burwell*, 2017 WL 89003, at *1 (N.D. Cal. Jan. 10, 2017)).

The presumption of completeness can be rebutted by pointing to categories of records. In *Indigenous Env't Network* the plaintiffs took issue with the AR because it contained "few emails and other intra-agency or inter-agency communications." *Id*. The presumption of completeness was rebutted by pointing to the fact that review of the Keystone XL Pipeline at issue involved over 15 federal agencies, and likely included lots of intra-agency or inter-agency communications. *Id*. In *Ctr. for Biological Diversity v. Zinke*, plaintiff's motion to compel completion of the record was granted for "all email exchanges and other communications … with other agencies and other organizations outside of FWS" after showing that the record contained "only two emails" whereas other Endangered Species Act listing decisions contained a "large swath of emails and internal communications." 2018 WL 8805325, at *8 (D. Alaska

---

[3] Plaintiffs acknowledge that other circuits have different standards for identifying records missing from an AR. *See Wildearth Guardians v. U.S. Forest Serv.*, 713 F. Supp. 2d 1243, 1254 (D. Colo. 2010) (requiring the movants to set forth when the documents were presented to the agency, among other elements). Such a standard is not required in the Ninth Circuit and is not appropriate where Plaintiffs cannot know which specific documents are missing due to the BLM's woefully inadequate initial proposed AR.

Nov. 16, 2018). Finally, in *Regents of Univ. of California v. United States Dep't of Homeland Sec,* plaintiffs sought, and the court granted, plaintiffs' motion to complete the record with "emails, departmental memoranda, policy directives, meeting minutes, materials considered by Secretary Duke's subordinates" and more. 2017 WL 4642324, at *3 (N.D. Cal. Oct. 17, 2017).[4] Here, the omissions in the AR BLM has provided to the parties are even more glaring. Accordingly, the presumption of completeness can be rebutted for each category of records with clear evidence that omitted records or categories of records were considered during the administrative review process.

> **Category 1**: **Contracts, memorandums of understanding, and conflict of interest disclaimers between BLM, Lithium Nevada Corporation, the third-party contractor ICF, and any other third party consultants regarding the completion of the EIS.**

Plaintiffs have shown that the NEPA process for the Thacker Pass Mine involved multiple third and, essentially, fourth-party contractors and consultants, including ICF, Piteau Associates, and more. BLM admitted ICF executed a memorandum of understanding ("MOU"), agreeing to contract with LNC for the creation of the EIS. This MOU, as well as any other MOU, contract, conflict of interest disclaimer, and more are missing from ICF, Piteau Associates, and the multitude of other parties involved in the NEPA process despite such documents being required under Nevada BLM's contracting procedures. *See* Carollo Decl., Exhibit 3.   In addition, Plaintiffs request that BLM third-party contracting policies, attached in Exhibit 3, be included in the AR.  All such records in BLM's possession prior to adoption of the ROD should be included in the AR.

---

[4] While on review the Supreme Court required the court to narrow the scope of its ruling, the Court took no issue with the broad categories of records identified. *Regents of the Univ. of California*, 2018 WL 1210551, at *4.

**Category 2: Agency communications with the third-party contractors and consultants, and communications among these third parties, including but not limited to communications by or with consultants of Piteau Associates, who was responsible for the baseline report and estimates for impacts to water resources, including Plaintiffs' water rights.**

Like in *Indigenous Env't Network* where multiple agencies were involved, here multiple different agencies, contractors, and consultants took part in the NEPA process. Yet, the AR is substantively devoid of communications between many of these parties. It is inconceivable that there was not more communication between contractors, consultants, and the agency, as well as internally within these parties, for a project of this scope. Courts in the Ninth Circuit have stated that internal agency communications and drafts "are part of the universe of materials directly or indirectly considered by agency decision-makers." *Ctr. for Food Safety v. Vilsack*, 2017 WL 1709318, at *4 (N.D. Cal. May 3, 2017); *see also Institute for Fisheries Resources*, 2017 WL 89003 at *1; *Lockyer*, 2006 WL 708914 at *3. Even if these records constitute internal deliberations, that does not automatically mean they should be excluded from the record. *See Inst. for Fisheries Res.*, 2017 WL 89003, at *1 (stating "It is obvious that in many cases internal comments, draft reports, inter- or intra-agency emails, revisions, memoranda, or meeting notes will inform an agency's final decision. Therefore, the government is wrong to assert that these types of materials, as a categorical matter, should be excluded[.]"). In fact, several courts in the Ninth Circuit have held that deliberative communications are part of the AR. *See, e.g., id.*; *Ctr. for Food Safety*, 2017 WL 1709318, at *4; *Lockyer*, 2006 WL 708914, at *3; *United Farm Workers v. Adm'r, EPA,* 2008 WL 3929140, at *2 (N.D. Cal. Aug. 26, 2008); *Regents of Univ. of Cal.*, 2017 WL 4642324, at *8.

Communications and drafts in BLM's possession from third parties taking the environmental review role should be treated the same as these inter and intra-agency

communications. There also should be communications relating to a "datum shift" made by Piteau Associates to correct a purportedly erroneous data reading for groundwater levels. AR-048358. Because these belong in the AR, the Court should order BLM to complete the record.

**Category 3: Intra-agency communications, inter-agency communications, and communications by or with higher levels at the Department of the Interior regarding the project or the NEPA process.**

For the same reason that the records indicated in Category 2 must be submitted to the record, the records in Category 3 should be added to the AR. The Thacker Pass Mine Project involved five cooperating agencies and counties in addition to BLM. Furthermore, according to LNC, domestic energy production and the promotion of electric vehicles have been top priorities for the current and past presidential administrations. If true, it seems likely there are communications missing from the AR from higher-level officials regarding this project.

**Category 4: Field data reports from consultants and contractors relied on in preparation of all reports, memorandums, and analysis, including by outside contractors Piteau Associates and Tamzen Stringham/Range and Riparian Services LLC, who evaluate impacts to water resources and rangeland resources, respectively.**

The EIS reports that hydrological data was gathered by inventorying and measuring seeps, springs, and other water resources. In Stevens, et al. at TPEIS-0642, it is explained that "[f]ield data sheets are the most efficient and reliable information documentation for Level 1 and 2 springs inventories ... detection of data entry errors is impossible without hard copy field sheets[.]" These field data sheets are not included for a lot of the baseline data. BLM has stated that they do not have this data because they did not require it from the third-party contractor. *See* Carollo Decl., Exhibit 1. If so, that admission needs to be made officially part of the court record.  If not, and such data is in BLM's possession, it should be included in the AR.

**Category 5: Communications by or among BLM or Interior officials, third-party contractors, and consultants to the NEPA process involving the Stringham report, file TPEIS 0343 in the AR.**

File TPEIS 0343 in the AR is a report by Tamzen Stringham assessing the impacts to livestock forage due to Piteau Associates' projected groundwater drawdown from the Mine. Because Piteau data was used in this report it can be assumed that there were communications between at least those parties in addition to the emails included in the report itself. Furthermore, some party, whether it be BLM, another agency, or ICF must have requested the report be created and considered. These communications were considered by agency and third-party decisionmakers and thus should be produced by BLM.

**Category 6: Communications regarding TPEIS 0403 and TPEIS 0400.**

TPEIS 0403 and TPEIS 0400 in the AR contain assumptions, conclusions, and recommendations from Piteau for groundwater monitoring and mitigation on the Bartell Ranch during the life of the mine. Because these communications were considered by agency and third-party decisionmakers BLM should include them in the AR.

**Category 7: All versions of the "Piteau 2020c" report (current version included as TPEIS-0374), which evaluated impacts to water resources, including drafts and markups.**

In TPEIS 0443, Plaintiffs raised concerns over a citation to a particular figure, a map of investigation locations for water monitoring, in a document cited in the EIS as "Piteau 2020c." The map and document were cited in responses to public comments. The concern raised by Plaintiffs was that this figure was not actually located in the final report included in the AR. In response, it was stated that the figure was dropped from the final report, resulting in the error in the citation. AR-052410. This indicates that there were drafts for the "Piteau 2020c"

document – included in the AR as TPEIS 0374. Because these drafts were considered they should be in the record.

**Category 8**: **Transmittal emails and emails discussing the documents referenced in TPEIS 0406, 443, and 545, and copies of the documents referenced.**

TPEIS 0406, 443, and 545 are comprised of an email from Edward Bartell concerning the omitted Piteau 2020c drafts discussed, a technical memorandum from Piteau Associates responding to comments regarding water quantity and quality effects, and a letter from the Nevada Department of Wildlife providing comments and recommendations to be addressed in the final EIS. These records each reference documents and drafts not included in the record. BLM must include these documents, as well as emails discussing these documents. Furthermore, transmittal emails concerning the records at TPEIS 0406, 443, and 545 should be included.

**Category 9**: **Comments to and from Plaintiffs to BLM officials and officials at Lithium Nevada Corporation, in BLM's possession.**

As already noted, Plaintiffs attempted to be extensively involved in the NEPA process and frequently communicated with BLM and ICF officials. Many of these communications were excluded from the record, even though the agency purports to have considered them. Notably the CD hand delivered by Mr. Bartell on 12/31/2020 containing FEIS comments from Dr. Powell and numerous attachments have been omitted from the record. Likewise, most of Mr. Bartell's attachments to his draft EIS comments are missing. A list of these records is being provided with this motion. *See* Carollo Decl. at ¶ 2; *id.*, Exhibit 2. Although BLM has committed to supplementing the record with these submissions and communications, Plaintiffs raise this issue here as a precaution because BLM has not yet confirmed that all listed submissions and communications have been located by BLM for inclusion in the AR.

**B.  The Court Should Permit Limited Discovery and Supplementation of the Record.**

While a motion to complete the record is concerned with ensuring the whole record has been submitted, a motion to supplement is concerned with bringing additional record evidence necessary to decide the case. Thus, alternatively, Plaintiffs request that the Court allow limited discovery and supplementation of the record by ordering BLM to produce and supplement the record with the requested materials.

Supplementation is appropriate (1) if the admission is necessary to determine whether the agency has considered all relevant factors and has explained its decision, (2) if the agency has relied on documents not in the record, (3) when supplementing the record is necessary to explain technical terms or complex subject matter, or (4) when plaintiffs make a showing of agency bad faith. *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005). Supplementation can take many forms and is distinct from a motion to complete the record. *See Sharks Sports & Ent. LLC v. Fed. Transit Admin.*, 2020 WL 511998, at *1 (N.D. Cal. Jan. 31, 2020). Through supplementation the Court may compel the agency to produce extra-record evidence, permit a limited discovery, remand to the agency, or compel additional explanation through agency affidavits and testimony. *See Animal Def. Council v. Hodel*, 840 F.2d 1432, 1436 (9th Cir. 1988), amended, 867 F.2d 1244 (9th Cir. 1989); *Idaho State Snowmobile Ass'n v. U.S. Forest Serv.*, 2014 WL 971151, at *1–2 (D. Idaho Mar. 12, 2014); *Hestia Educ. Grp., LLC v. King*, 2016 WL 362226, at *2 (N.D. Cal. Jan. 29, 2016); *Lower San Pedro Watershed All. v. Barta*, 2020 WL 8020085, at *3 (D. Ariz. Nov. 30, 2020); *Hunters v. Marten*, 470 F. Supp. 3d 1151, 1169 (D. Mont. 2020), appeal dismissed sub nom. *Helena Hunters & Anglers Ass'n v. Marten*, No. 20-35771, 2020 WL 8678109 (9th Cir. Dec. 28, 2020). Limited discovery/compelled production of records may be appropriate where, as here, plaintiffs are not

in possession of the documents sought to be supplemented. *See Pinnacle Armor, Inc. v. United States*, 923 F. Supp. 2d 1226, 1241–42 (E.D. Cal. 2013). Furthermore, supplementation through compelled production/limited discovery is appropriate where, again as here, an environmental baseline is so insufficient that actual baseline conditions are hidden. *See Hunters*, 470 F. Supp. 3d at 1169 (citing *Motor Vehicle Mfrs. Ass'n of the U.S.,* 463 U.S. at 43 (1983)).

Here, Plaintiffs are not in possession of most of the records sought to be supplemented. Plaintiffs only have possession of the letters and emails sent to and from Plaintiffs and can provide these to the Court for supplementation. However, for the remainder of the requested records, only BLM has possession of the records. Therefore, a proper remedy, like in *Pinnacle* and *Hunters*, is for this Court to compel disclosure of the requested records.

### 1. Supplementation is necessary to determine if BLM has considered all relevant factors.

The records requested by Plaintiffs relate to the creation of the environmental baseline and impacts reports, in particular the expected impacts to water and rangeland resources. This baseline was created by Piteau Associates. Unfortunately, a shroud of secrecy has remained over Piteau's baseline, as Plaintiffs and their hydrogeologist were precluded from collecting data at Piteau's test wells and monitoring locations, Piteau has refused to turn over key field data, and the AR merely contains Piteau's final reports and analysis but excludes nearly all drafts and communications from Piteau. Furthermore, no contracts, MOUs, or conflict of interest disclaimers executed with or by Piteau according to BLM's NEPA contracting procedures are included.

Plaintiffs, having owned and worked on land adjacent to the project area for 13 years and having retained an expert hydrogeologist to evaluate Piteau's work, strongly dispute the baseline water quantity and quality conditions, and forage conditions incorporated in the FEIS.

However, because of the BLM's approach to this NEPA process Plaintiffs have been precluded from fully investigating Piteau's work. If this were to stand Piteau could have imputed faulty data into the models to generate a particular baseline and model outcomes to benefit their employer LNC and would be concealed under the guise of a "complete" administrative record.

The lack of communications from Piteau is clear evidence that records have been excluded from the AR. It seems unlikely Piteau could not have drafted half of the FEIS and answered public comments without substantial communication with BLM, ICF, and/or LNC. Further, Piteau's extensive involvement is clear evidence that Piteau must have contracted with some relevant party to authorize participation in the NEPA process in this manner. Together, the evidence clearly shows that the AR excludes records relevant to determining whether BLM considered all relevant factors. Thus, supplementation by BLM is warranted.

### 2. BLM has acted in bad faith and supplementation is warranted.

BLM's decision to trust the NEPA process to parties like Piteau who may have a financial stake in the approval of the Thacker Pass Mine raises the specter of bad faith. Supplementation is warranted through "an extra-record investigation by the reviewing court [which] may be appropriate when there has been a strong showing in support of a claim of bad faith or improper behavior[.]" *Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997). This is "logical because once there is a showing of bad faith by the agency, the reviewing court has lost its reason to trust the agency. There is no reason, then, to presume that the record is complete, and justice is served only by going beyond the record…" *New York v. United States Dep't of Com.*, 345 F. Supp. 3d 444, 452 (S.D.N.Y. 2018) (citation omitted). "[T]here must be a strong showing of bad faith or improper behavior." *Hodel*, 840 F.2d at 1437.

In *Hunters*, agency concealment of baseline conditions, and the bare baseline data provided, amounted to bad faith. 470 F. Supp. 3d at 1167. Here, BLM's failure to oversee the NEPA process and blind reliance on the work of third parties with unknown conflicts, and refusing to produce documents that would bear on questions about potential conflicts, warrants a finding of bad faith. The record indicates Piteau was first hired by LNC to analyze baseline conditions before NEPA review had begun. *See* TPEIS 0054, showing Piteau was creating a baseline for water resources in August 2018 – before LNC submitted plan proposals to BLM. Yet, BLM appears to have accepted this baseline data without even verifying field data sheets. *See* Carollo Decl., Exhibit 1. In addition, the lack of field work and data and communications with third-party contractors seems intentionally designed to preclude meaningful judicial review of the accuracy of the environmental baseline. *See* Carollo Decl. at ¶ 7. Thus, limited discovery and supplementation is warranted.

**C. The Deliberative Process Privilege does not Apply to the Requested Documents.**

During conferral BLM expressed its view that some records are deliberative. *Id.*, Exhibits 1-2. The deliberative process privilege provides that *predecisional* and *deliberative* documents may be excluded from the record. *Nat'l Wildlife Fed'n v. U.S. Forest Serv.*, 861 F.2d 1114, 1117 (9th Cir. 1988) (emphasis added). This "permits the government to withhold documents that reflect advisory opinions, recommendations and deliberations comprising part of a process by which government decisions and policies are formulated." *F.T.C. v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984). The privilege was "developed to promote frank and independent discussion among those responsible for making governmental decisions[.]" *Id.*

The Supreme Court has recognized a distinction between materials reflecting deliberative or policy-making processes and purely factual investigative matters, with the purely factual matters generally outside the scope of the privilege. *See Nat'l Wildlife Fed'n v. U.S. Forest Serv.*, 861 F.2d 1114, 1118 (9th Cir. 1988) (citing *Environmental Protection Agency v. Mink*, 410 U.S. 73, 89 (1972)). Factual documents may be privileged if they would expose the decision-making process of the agency by revealing the agency's evaluation and analysis of the numerous facts. *Id.*, citing *Montrose Chemical Corp. of California v. Train*, 491 F.2d 63, 71 (D.C. Cir.1974). The Ninth Circuit has adopted a "process-oriented" or "functional" test such that "documents containing nonbinding recommendations on law or policy would continue to remain exempt from disclosure. Factual materials, however, would likewise be exempt from disclosure to the extent that they reveal the mental processes of decisionmakers." *Id*. Further, within this test the "[f]actual portions of documents covered by the deliberative process privilege must be segregated and disclosed unless they are 'so interwoven with the deliberative material that [they are] not[segregable]." *Pac. Fisheries, Inc. v. United States*, 539 F.3d 1143, 1148 (9th Cir. 2008) (quoting *United States v. Fernandez*, 231 F.3d 1240, 1247 (9th Cir. 2000)); *see also In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997) ("The deliberative process privilege does not . . . protect material that is purely factual . . . .").

The deliberative process privilege is a qualified privilege. An agency must disclose otherwise-privileged documents if the "need for the materials and the need for accurate fact-finding override the government's interest in non-disclosure." *Karnoski v. Trump*, 926 F.3d 1180, 1196 (9th Cir. 2019). Among the factors to be considered when determining whether to override the privilege are: 1) the relevance of the evidence; 2) the availability of other evidence; 3) the government's role in the litigation; and 4) the extent to which disclosure would hinder

frank and independent discussion regarding policies and decisions." *Id*. at 1206, (citations omitted). The availability of other evidence is considered the most important factor in determining whether the deliberative process privilege should be overcome. *Thomas v. Cate*, 715 F. Supp. 2d 1012, 1043 (E.D. Cal. 2010), order clarified, No. 1:05CV01198LJOJMDHC, 2010 WL 797019 (E.D. Cal. Mar. 5, 2010). When the government is the defendant the third factor generally weighs in favor of disclosure. *All. for the Wild Rockies v. Pena*, 2017 WL 8778579, at *7 (E.D. Wash. Dec. 12, 2017).

The records sought are either not subject to the deliberative process privilege or should be admitted to the record in light of the privilege. Plaintiffs' requests do not seek documents containing nonbinding recommendations on law or policy that would be excluded from disclosure under the Ninth Circuit's "process oriented" or "functional" test. Instead, what Plaintiffs seek are emphatically **factual records** bearing the baseline and modeled or estimated impacts to water resources and rangelands.

The field data sought by Plaintiffs is obviously factual and does not qualify as privileged. Furthermore, BLM appears to be making the unfounded assertion that nearly all internal and external communications are privileged, even if those communications were about *facts* or *factual inferences* to make from data. Additionally, BLM has appeared to assert that the deliberative process privilege bars the production of contracts and conflict of interest statements with third parties. The privilege does not apply to any of these categories.

Indeed, it is questionable that the deliberative process privilege would apply to *any* records from consultants or contractors that BLM did not directly hire or oversee. In *Alliance for the Wild Rockies v. Pena*, the court was tasked with determining whether communications between the agency and a third party were excludable under the deliberative process privilege.

2017 WL 8778579, at *5 (E.D. Wash. Dec. 12, 2017). The court recognized that the privilege does not apply to all communications with third party consultants, stating that it had found no case "where the United States Supreme Court or the Ninth Circuit addressed whether the deliberative process privilege also applies to an outside consultant that communicates with an agency but is selected, hired, and compensated by a third-party contractor." *Id*. Still, the court found that the privilege *did* apply to a third-party consultant where the consultant *worked with* the agency to prepare an Environmental Analysis and had stated that it would achieve tasks *in close coordination* with Forest Service counterparts. *Id*. The third-party consultant had also provided a disclosure statement declaring that they did not have a conflict of interest. *Id*.

ICF is the only party that BLM has stated is under contract pursuant to an MOU that would analogous to the consultant at issue in *Alliance for the Wild Rockies*. BLM has given no indication that any other contractor or consultant was under contract with BLM, under the supervision of the agency, reported to the agency, acted in coordination with agency counterparts, or even provided a conflict-of-interest disclosure. Thus, from the record provided there is nothing that would permit a finding that the communications of non-ICF contractors are covered by the deliberative process privilege.

For any requested documents where the deliberative process privilege may apply, the four factors mentioned in *Karnoski* still weigh towards inclusion of the evidence in the AR. Factor one from *Karnoski* speaks to the relevance of the evidence. Here, because the AR here is so exceedingly narrow in scope, there is undoubtedly very relevant and probative evidence that has been excluded. In *Thomas*, because the documents were probative to the main issue, this factor weighed in favor of waiving the privilege. 715 F. Supp. 2d at 1043. Here the main issue is whether BLM satisfied its statutory authority by satisfactorily reviewing the Mine's

environmental effects in compliance with NEPA. The requested documents are probative of that issue. Thus, this factor weighs in favor of inclusion.

Factor two speaks to the availability of other evidence. Much of the evidence requested by Plaintiffs is the only evidence of its kind. In *Karnoski*, the government's primary, if not exclusive control of the evidence was found to favor waiving the deliberative process privilege. 926 F.3d at 1207. Here too, Plaintiffs do not have access to other communications between any parties because BLM has primary if not exclusive control over the evidence. Similarly, Plaintiffs do not have access to significant portions of field data, only the reports and summarizations generated from this data. Plaintiffs also do not have access to prior drafts and markups of some documents because these are the only of their kind. Thus, factor two weighs in favor of including otherwise privileged evidence.

Factor three weighs in favor of inclusion because BLM is the defendant in this case, and, as noted in *Alliance for the Wild Rockies*, when the government is the defendant the third factor weighs in favor of disclosure. Finally, factor four weighs in favor of Plaintiffs because disclosure would not hinder frank and independent discussion regarding policy. Plaintiffs' requests regarding communications seek *factual* communications discussing, among other things, interpretation of data, the relationships between parties, the creation and use of reports and studies, and motivations for choices made in the modeling and impact reports. This would not hinder frank and independent discussion; rather, it would promote transparency. Thus, this factor weighs in favor of disclosure.

### D. A Privilege Log must be Produced.

There remains a question in this Circuit whether the deliberative process privilege can be claimed without the production of a privilege log. Because the APA requires a "thorough,

probing, in-depth review[,]" the Court must be able to access the *entire* administrative record. *Overton Park*, 401 U.S. at 420. To invoke the deliberative process privilege, a privilege log must identify the records. *See, e.g.*, *Regents of Univ. of Cal.*, 2017 WL 4642324, at *7. This is in order to give the court "an opportunity to intelligently judge the contest." *Wiener v. FBI*, 943 F.2d 972, 979 (9th Cir. 1991); *In re Nielsen*, No. 17-3345, slip op. at 3 (2nd Cir. Dec. 27, 2017) ("[W]ithout a privilege log, the District Court would be unable to evaluate the Government's assertions of privilege."). Some courts have held that privileged records are excludable from the AR without a privilege log because they were not considered by agency decision-makers and thus are not part of the AR in the first place. *See Save the Colorado v. United States Dep't of the Interior*, 517 F. Supp. 3d 890, 901 (D. Ariz. 2021). In the Ninth Circuit the test for the deliberative process privilege is broad enough to exclude records that *would be* part of the AR. Thus, because there may be privileged, excludable documents that would otherwise be part of the AR, a privilege log is needed.  Alternatively, the Court should conduct a review *in camera*.

## IV.   **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that this Court order BLM to complete the records with the herein identified documents. Alternatively, Plaintiffs request that this Court order limited discovery and supplementation of the record.

Respectfully submitted this 22nd day of October, 2021.

/s/ *Dominic M. Carollo*
DOMINIC M. CAROLLO (Or. Bar. No. 093057)
*Pro Hac Vice*
dcarollo@carollolegal.com
Carollo Law Group LLC
P.O. Box 2456
630 SE Jackson Street, Suite 1
Roseburg, Oregon 97470
Ph: (541) 957-5900
*Of Attorneys for Plaintiffs*

O. Kent MAHER (Nev. Bar No. 316)
kent@winnemuccalaw.com
PO Box 130
33 W Fourth Street
Winnemucca, Nevada 89446
Ph: (775) 623-527
*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 22nd, 2021, I filed the foregoing using the United States District Court CM/ECF, which caused all counsel of record to be served electronically.

<u>/s/ *Dominic M. Carollo*</u>
Dominic M. Carollo (Or. Bar. No. 093057)
*Admitted Pro Hac Vice*

**BARTELL PLAINTIFFS' MOTION TO COMPLETE AND SUPPLEMENT ADMINISTRATIVE RECORD**