Exhibit 1:

Proposed First Amended Complaint

1  Julie Cavanaugh-Bill (State Bar No. 11533)
2  Cavanaugh-Bill Law Offices
3  Henderson Bank Building
4  401 Railroad Street, Suite 307
5  Elko, NV 89801
6  (775) 753-4357
7  julie@cblawoffices.org
8
9  William Falk (Utah Bar No. 16678)
10  2980 Russet Sky Trail
11  Castle Rock, CO
12  (319) 830-6086
13  falkwilt@gmail.com
14
15  Terry J. Lodge (Ohio Bar No. 29271)
16  316 N. Michigan St., Suite 520
17  Toledo, OH 43604-5627
18  (419) 205-7084
19  tjlodge50@yahoo.com
20
21  Attorneys for Reno-Sparks Indian Colony and Atsa koodakuh wyh Nuwu

22
23                 UNITED STATES DISTRICT COURT
24                     DISTRICT OF NEVADA
25

| | | |
|---|---|---|
| 26  BARTELL RANCH LLC, et al., | ) | Case No.: 3:21-cv-80-MMD-CLB |
| 27 | ) | (**LEAD CASE**) |
| 28           Plaintiffs, | ) | |
| 29 | ) | |
| 30  v. | ) | |
| 31 | ) | **INTERVENING PLAINTIFFS'** |
| 32  ESTER M. MCCULLOUGH, et al., | ) | **FIRST PROPOSED** |
| 33 | ) | **AMENDED COMPLAINT** |
| 34           Defendants, | ) | |
| 35  and | ) | |
| 36 | ) | |
| 37  LITHIUM NEVADA CORPORATION, | ) | |
| 38 | ) | |
| 39           Intervenor-Defendant. | ) | |
| 40 | | |
| 41 | | |
| 42  WESTERN WATERSHEDS PROJECT, et al., | ) | Case No.: 3:21-cv-103-MMD-CLB |
| 43 | ) | (**CONSOLIDATED CASE**) |
| 44           Plaintiffs, | ) | |
| 45 | ) | |
| 46  RENO SPARKS INDIAN COLONY, et al., | ) | |

|     |                                                  |     |
|-----|--------------------------------------------------|-----|
| 1   |                                                  | )   |
| 2   |           Intervenor-Plaintiffs,                 | )   |
| 3   |                                                  | )   |
| 4   | and                                              | )   |
| 5   |                                                  | )   |
| 6   | BURNS PAIUTE TRIBE,                              | )   |
| 7   |                                                  | )   |
| 8   |           Intervenor-Plaintiff.                  | )   |
| 9   |                                                  | )   |
| 10  | v.                                               | )   |
| 11  |                                                  | )   |
| 12  | UNITED STATES DEPARTMENT OF THE                  | )   |
| 13  | INTERIOR, et al.,                                | )   |
| 14  |                                                  | )   |
| 15  |           Defendants,                            | )   |
| 16  | and                                              | )   |
| 17  |                                                  | )   |
| 18  | LITHIUM NEVADA CORPORATION,                      | )   |
| 19  |                                                  | )   |
| 20  |           Intervenor-Defendant.                  | )   |
| 21  |                                                  |     |

**INTRODUCTION**

1.  The Reno-Sparks Indian Colony ("RSIC") and Atsa Koodakuh wyh Nuwu/People of Red Mountain ("People of Red Mountain") seek a judgment declaring that the Bureau of Land Management ("BLM"), while permitting Lithium Nevada Corp.'s ("Lithium Nevada") Thacker Pass Lithium Mine Project ("the Project"), failed to comply with the National Historic Preservation Act  NHPA), 54 USC §§ 300101 *et seq.*, and its implementing regulations, 36 CFR § 800, Protection of Historic Properties (2004) *et seq.*; the Archaeological Resources Protection Act (ARPA), 16 USC §§ 470 *et seq.*, and its implementing regulations, 43 CFR § 7 *et seq.*; the Native American Graves Protection and Repatriation Act (NAGPRA), 25 USC §§ 3001 *et seq.*, and its implementing regulations, 43 CFR § 10 *et seq.*; the National Environmental Policy Act

(NEPA), 42 USC §§ 4321 *et seq.*, and its implementing regulations 40 CFR § 1500 *et seq.*; and the Administrative Procedure Act, 5 USC §§ 701 *et seq.*

2.   The Intervening Plaintiffs filed their first Complaint on July 29, 2021. At that time, the Intervening Plaintiffs, despite having submitted a Freedom of Information Act (FOIA) request on June 10, 2021, could only rely on information BLM made publicly available in the draft and final environmental impact statements and through the BLM National Register to bring their claims.

3.   BLM mailed the parties those portions of the Administrative Record concerning the Intervening Plaintiffs' NHPA claims that the BLM was willing to share on October 1, 2021. The Intervening Plaintiffs' counsel received the Administrative Record a few days later. BLM did not fulfill the Intervening Plaintiffs' FOIA request until October 20, 2021. Now that the Intervening Plaintiffs have had a chance to review the Administrative Record and FOIA responses, it appears that there are more violations of federal law than were originally evident.

4.   The Intervening Plaintiffs have discovered new evidence showing that BLM's findings and conclusions about historic properties in Thacker Pass and the historical, cultural, and spiritual significance of Thacker Pass to Native Americans are incomplete and wrong. This evidence includes two contemporary newspaper accounts describing the September 12, 1865 massacre that happened in Thacker Pass and five other publicly available sources documenting the massacre. The Intervening Plaintiffs included the September 30, 1865 article that was published by the *Owyhee Avalanche* in their Motion for Reconsideration. (ECF 96-2). Since then, they have also discovered a September 23, 1865 article published in the *Humboldt Register*. (Exhibit 1).

5.  The new evidence and the Administrative Record support additional claims about the arbitrariness of BLM's findings and conclusions and tend to prove that BLM failed to follow the procedures required by law to identify, evaluate, and mitigate adverse effects to historic properties and traditional cultural properties.

6.  Finally, since the Intervening Plaintiffs' filed their original Complaint on July 29, 2021, the BLM has violated ARPA, NAGPRA, and NEPA. The Intervening Plaintiffs, in an effort to avoid more litigation, gave BLM ample opportunities to correct these violations.

7.  The Intervening Plaintiffs seek a judgment and order setting aside the illegally issued Record of Decision ("ROD") and ARPA permit, and enjoining BLM from authorizing any physical disturbance in the Project area until BLM cures the violations of the aforementioned laws.

8.  Under BLM's own definition of consultation, BLM never engaged in, or even initiated, consultation with local Indian Tribes whose ancestors traveled through, hunted and gathered in, camped in, and were twice massacred in Thacker Pass before issuing the Thacker Pass Record of Decision. Five Indian Tribes have told BLM that they were never consulted with, including the three Tribes BLM originally identified as having religious, cultural, economic, and historical connections to Thacker Pass. (Exhibits 2, 3, and 4, Letters from Winnemucca Indian Colony, Fort McDermitt Paiute Shoshone Tribe, and Summit Lake Paiute Tribe, respectively). Despite this, BLM continues to refuse to engage in meaningful consultation with these Tribes and continues to refuse to revise the errors and misrepresentations in documents BLM has prepared including the ROD,

1   Final Environmental Impact Statement (FEIS), and Historic Properties Treatment Plan

2   (HPTP).

3       9.   BLM also failed to identify at least four historic properties, all of which are

4   eligible for inclusion on the National Register of Historic Places, that local Indian Tribes

5   consider sacred and culturally significant. BLM possessed records of three of those four

6   properties for many years prior to this lawsuit. These records describe a brutal

7   September 12, 1865 massacre in Thacker Pass, during which federal soldiers murdered

8   at least 31 Paiute men, women, and children, and as many as 70. These records also

9   describe extensive remains of Paiute camp sites in the Thacker Pass Project Area of

10   Potential Effects.  BLM either failed to review those records, which is by itself a violation

11   of the law or BLM, as part of the federal government, recognized the controversy that

12   would accompany the federal government destroying a site where the federal

13   government murdered between 30 and 70 Paiutes for another massive mine in Nevada

14   and hoped no one else would find proof of the massacre before mine construction

15   began.

16       10. BLM was obligated to consult with local Indian Tribes about the Thacker Pass

17   Project, and BLM was obligated to identify the historic properties that it missed before

18   issuing the ROD. These failures are enough to set aside the ROD and enjoin physical

19   disturbance in Thacker Pass until BLM engages in consultation and corrects the errors

20   in the ROD, FEIS, and HPTP.

21       11. After the ROD was issued, BLM was still obligated to engage in consultation

22   under both ARPA and NAGPRA with Indian Tribes before issuing an archaeological

23   resources permit for activities that Indian Tribes insist will affect human remains and

sacred cultural objects. Federal law recognizes affected Tribes as possessing special expertise about lands those Tribes consider sacred or culturally significant. Despite five Tribes' demands for such consultation before BLM issued the ARPA permit on September 29, 2021, BLM refused to engage in consultation.

12. The five Tribes who, upon learning about the Thacker Pass Project, demanded consultation, have also presented BLM with significant new information about Native American religious concerns with the Project, about the religious and cultural significance of land within the Area of Potential Effects, about massacres that happened within the Area of Potential Effects, and about historic properties eligible for inclusion on the National Register of Historic Places. BLM is obligated to supplement and revise the ROD, the FEIS, and the HPTP, but persists in its refusal to do so.

13. BLM was also obligated to consult in good faith with the Nevada State Historic Preservation Officer (SHPO) about historic properties in Thacker Pass. BLM withheld information about historic properties in Thacker Pass – including evidence from a former Fort McDermitt Paiute and Shoshone Tribal Chairman about the significance of Thacker Pass – from the SHPO. And, BLM has misrepresented or exaggerated the extent of its consultation efforts with the Tribes.

**JURISDICTION**

14. This Court has jurisdiction pursuant to 28 USC § 1331, as this action arises under the laws of the United States.

15. An actual controversy exists between the parties within the meaning of 28 USC § 2201(a). This Court may grant declaratory relief and additional relief, including an injunction, pursuant to 28 USC §§ 2201, 2202 and 5 USC §§ 705, 706.

16. BLM's failure to comply with the requirements of the NHPA, 54 U.S.C. §§ 300101 *et seq.*, is arbitrary, capricious, and not in accordance with the procedures required by law pursuant to the APA and is thus subject to judicial review. 5 USC §§ 701-706.

17. BLM's failure to comply with the requirements of NHPA §§ 300101 *et seq.*, also constitutes agency action that is unreasonably delayed and/or unlawfully withheld as provided by Section 706(1) of the APA and is thus subject to judicial review. 5 USC §§ 701-706.

**VENUE**

18. Venue is proper in the District of Nevada pursuant to 28 U.S.C. §§ 1391(b) and (e). The BLM Winnemucca District Office and named Defendant Ester M. McCullough, who issued and signed the FEIS and ROD, are located in Winnemucca, Nevada. The Thacker Pass Lithium Mine Project is located in Humboldt County, Nevada. The Reno-Sparks Indian Colony is located in Reno and Sparks, Nevada. And, all of the members of Atsa koodakuh wyh Nuwu/People of Red Mountain are located and reside in Nevada.

**PARTIES**

19. Plaintiff Reno-Sparks Indian Colony ("RSIC") is a federally-recognized Tribe located in Reno and Sparks, NV. RSIC consists of 1,157 members from the Paiute, Shoshone, and Washoe Nations. Ancestors of RSIC tribal members traditionally hunted and gathered in Peehee mu'huh (Thacker Pass). RSIC has several residents, members, and employees that have direct cultural connections to Peehee mu'huh, who practice ceremony in Peehee mu'huh, who hunt and gather in Peehee mu'huh, and who plan on

1   doing so in the future.  RSIC attaches cultural and religious significance to Peehee

2   mu'huh.

3          20. Plaintiff Atsa koodakuh wyh Nuwu (translates to People of Red Mountain) is

4   an unincorporated association of members of the Fort McDermitt Paiute and Shoshone

5   Tribe. Atsa koodakuh wyh Nuwu members include traditional elders and spiritual

6   leaders. Atsa koodakuh wyh Nuwu formed to preserve their ancestral teachings,

7   maintain oral histories, and practice the traditions their people have practiced for

8   generations. Atsa koodakuh wyh Nuwu regularly meets in Peehee mu'huh to perform

9   ceremony; to gather traditional foods and medicines; to teach their members and the

10   public about the traditional uses of plants, animals, and minerals found in Peehee

11   mu'huh; to share oral histories involving the site – especially the history of the massacre

12   of their ancestors that gave Peehee mu'huh its name and the history of how their

13   ancestors hid in Peehee mu'huh to avoid American soldiers; to observe artifacts created

14   by their ancestors; and to educate the public about the religious, cultural, and historic

15   importance of Peehee mu'huh to their people. Atsa koodakuh wyh Nuwu plans on

16   continuing to visit Peehee mu'huh to engage in similar activities in the future.

17          21. Members of Atsa Koodakuh wyh Nuwu/People of Red Mountain lineally

18   descend from the survivors of the September 12, 1865. These members of Atsa

19   Koodakuh wyh Nuwu/People of Red Mountain and lineal descendants include Dorece

20   Antonio, Inelda Sam, Arnold Sam, Reva Northrup, Justine Barr, Josephine Dick, Elvida

21   Crutcher, Alva Brown; Deland Hinkey; Daranda Hinkey, Gary McKinney, and Alveeta

22   Brown. (Exhibit 5, Declaration of Dorece Antonio).

23          22. Defendant Bureau of Land Management is the agency responsible for

preparation, approval and delivery of the Thacker Pass Lithium Mine Project Record of

Decision, the Memorandum of Agreement with the Nevada State Historic Preservation

Officer, and compliance with the NHPA.

23. Defendant Deb Haaland is the Secretary of the Interior and is sued in her

official capacity.

24. Defendant-Intervenor Lithium Nevada Corp. ("Lithium Nevada") proposes to

construct, operate, reclaim, and close the Thacker Pass Lithium Mine Project. Lithium

Nevada has successfully intervened as a defendant in this case.

**PEEHEE MU'HUH**

25. The original name for Thacker Pass in the local Numic dialect spoken by

members of Atsa koodakuh wyh Nuwu/People of Red Mountain is "Peehee mu'huh,"

which will be used instead of "Thacker Pass." Peehee mu'huh is located within the

traditional territories of the Nuwu (Northern Paiute) people.

26. The Plaintiffs' oral histories teach them that the Creator placed them in their

traditional territories "with the stones." This means the Plaintiffs believe their ancestors

have lived in their traditional territories from time immemorial. (Exhibit 6, First Eben

Declaration, ¶ 21).

27. Peehee mu'huh is historically significant both to the Nuwu and to other

Americans, in general. When American soldiers were rounding the Nuwu up to violently

force them on to reservations, many of the Plaintiffs' ancestors hid in Peehee mu'huh.

The many caves and stone outcroppings in Peehee mu'huh offered a good vantage

point for the Nuwu to watch for the dust kicked up by the horses of approaching soldiers

from either the Quinn River Valley to the east or the Kings River Valley from the west.

The Fort McDermitt Tribe descends from essentially two families who, hiding in Peehee mu'huh, managed to avoid being sent to reservations farther away from their ancestral lands. (Exhibit 7, Hinkey Declaration, ¶ 9; Exhibit 8, Second Eben Declaration ¶ 2).

28. At least two massacres of the Intervening Plaintiffs' ancestors happened in Thacker Pass. The first massacre was perpetrated by Pitt River Indians and is how Pee hee mu'huh got its name. Peehee mu'huh means "rotten moon." (Exhibit 7, ¶ 7) Peehee mu'huh is named so because the Plaintiffs' ancestors were massacred there while the hunters were away. When the hunters returned, they found their loved ones, murdered, unburied, rotting, and with their entrails spread across the sage brush in a part of the Pass shaped like a moon. The second massacre is the September 12, 1865 Thacker Pass massacre perpetrated by federal cavalrymen.

29. The Intervening Plaintiffs believe that to build a lithium mine over Peehee mu'huh, where their ancestors were massacred, would be like building a lithium mine over Pearl Harbor, Arlington National Cemetery, or the Gettysburg Battlefield. (Exhibit 7, ¶ 8.)

30. Peehee mu'huh is spiritually sacred to the Nuwu, including the Plaintiffs, and other Native peoples across Nevada, western Idaho, southern Oregon and northeastern California. (Exhibit 7, ¶ 13; Exhibit 8 ¶¶ 2-5).

31. The Plaintiffs believe that Peehee mu'huh is a singularly powerful spiritual place blessed by the presence of their ancestors, other spirits, and golden eagles – whom they consider to be directly connected to the Creator. (Exhibit 7, ¶ 6).

32. Peehee mu'huh is essential to the survival of the Plaintiffs' traditions. Their

traditions are tied to the land. When the land is destroyed, the Plaintiffs' traditions are destroyed. (Exhibit 7, ¶ 14; Exhibit 8, ¶ ¶ 9-10).

33. Peehee mu'huh is home to many of the Plaintiffs' traditional foods. Some of the last choke cherry orchards traditionally used by the Intervening Plaintiffs are found in Peehee mu'huh. The Plaintiffs gather choke cherries in Peehee mu'huh to make choke cherry pudding, one of the Plaintiffs' oldest breakfast foods. (Exhibit 7, ¶ 14).

34. Peehee mu'huh is also a rich source of two of the Nuwu's traditional staple foods: yampa (wild potatoes) and biscuit root. There are significant patches of biscuit root throughout Peehee mu'huh and the Plaintiffs' ancestors wild-tended these patches and grew biscuit root gardens. (Exhibit 7, ¶ 14; Exhibit 8, ¶ 11).

35. The Plaintiffs hunt groundhogs, rabbits, and mule deer in Peehee mu'huh. Mule deer are especially important to the Plaintiffs as a source of meat, but the Plaintiffs also use every part of a mule deer for things like clothing and for drum skins in the Plaintiffs' most sacred ceremonies. (Exhibit 7, ¶ 14).

36. Peehee mu'huh is one of the last places where the Plaintiffs can find their traditional medicines. CoVID-19 made Peehee mu'huh even more important for gathering their medicines than before. Last summer and fall, when the pandemic was at its worst on the Fort McDermitt Reservation, the Plaintiffs went to Peehee mu'huh to gather toza root, which is known as one of the world's best anti-viral medicines. In Peehee mu'huh, the Plaintiffs also gather ibi, a chalky rock, for ulcers and both internal and external bleeding and old-growth sage brush for a strong tea used to treat respiratory illnesses. (Exhibit 7, ¶ 15).

**THE THACKER PASS LITHIUM MINE PROJECT**

37. The Thacker Pass Lithium Mine Project is massive and complex. The Project area covers 17,933 acres of public land administered by the BLM, Winnemucca District. 10,468 of those acres are associated with the Mine Plan and 7,465 of them are associated with the Exploration Plan. Project facilities include the development of an open pit mine; waste rock storage facilities; a coarse gangue stockpile; a clay tailings filter stack; growth media stockpiles; haul and secondary roads; and additional mine facilities to support mining and lithium production operations. Thacker Pass Lithium Mine Project Record of Decision and Plan of Operations Approval (ROD), pg. 3.

38. The Final Environmental Impact Statement reports that "inventories identified over one thousand (n=1020) cultural resource sites and a component of a large cultural district: the Thacker Pass component of the Double H/Whitehorse Obsidian Procurement District (DHWOPD)." This Thacker Pass Component became its own National Register of Historic Places (NRHP)-eligible district in 2009. Thacker Pass Lithium Mine Project Final Environmental Impact Statement (FEIS) pg. 4-82

39. The Mining and Exploration Plans' direct effects area intersect 923 archaeological and architectural resources. 56 of these are eligible for listing on the NRHP. FEIS, 4-82. The indirect effects area intersects 134 archaeological and architectural resources. 35 of these are eligible for listing on the NRHP. FEIS, 4-83.

40. Ground disturbing activities and project infrastructure development could directly, indirectly, and cumulatively affect one or more of the NRHP integrity aspects of 85 historic properties and one district. FEIS, 4-83. BLM and Nevada SHPO have concurred that the Project would adversely affect 56 historic properties eligible for the NRHP. FEIS, 4-83.

41. Even with the development of a HPTP, the FEIS explains that:

"there may still be permanent loss of cultural resources and a limited fragmentation of the Thacker Pass component of the DHWOPD. The use of routes and utility corridors surrounding the Project area would also increase and change access to areas leading to potential effects through new surface disturbances, unauthorized artifact collection, and vandalism at cultural resources." FEIS, 4-85.

## THE NATIONAL HISTORIC PRESERVATION ACT

42. The NHPA obligates the Bureau of Land Management ("BLM"), in cooperation with Indian tribes, private organizations, and individuals "to administer federally owned, administered, or controlled historic property in a spirit of stewardship for the inspiration and benefit of present and future generations…" (54 U.S.C. § 300101(3)). When Congress enacted NHPA, it declared that "the spirit and direction of the Nation are founded upon and reflected in its historic heritage," that "historic properties significant to the Nation's heritage are being lost or substantially altered often inadvertently, with increasing frequency," and that "the preservation of this irreplaceable heritage is in the public interest so that its vital legacy of cultural, educational, aesthetic, inspirational, economic, and energy benefits will be maintained and enriched for future generations of Americans." Section 1 of the NHPA, Pub. L. No. 89-665, as amended by Pub. L. No. 96-515.

43. 36 Code of Federal Regulations § 800 *et seq* was promulgated to govern implementation of NHPA's Section 106 consultation process. 36 CFR § 800.1(a) states the purposes of the section 106 process, in pertinent part: "The goal of consultation is to identify historic properties potentially affected by the undertaking, assess its effects and seek ways to avoid, minimize or mitigate any adverse effects on historic properties."

44. Section 800.1(c) adds: "The agency official shall ensure that the section 106

13

process is initiated early in the undertaking's planning, so that a broad range of alternatives may be considered during the planning process for the undertaking."

45. Section 800.2(a)(4) obligates BLM to engage in more thorough consultation for larger projects: "The agency official should plan consultations appropriate to the scale of the undertaking and the scope of Federal involvement…"

46. Section 800.2(d)(1) describes the important role the public plays in helping federal agencies steward historic properties for the inspiration and benefit of present and future generations: "The views of the public are essential to informed Federal decision-making in the section 106 process."

47. Also, § 800.2(d)(1) requires that "[t]he agency official shall seek and consider the views of the public in a manner that reflects the nature and complexity of the undertaking and its effects on historic properties [and] the likely interest of the public in the effects on historic properties…"

48. 36 CFR § 800.2(c)(2)(B)(ii) states that NHPA, Section 101(d)(6)(B) "requires the agency official to consult with **any** Indian tribe or Native Hawaiian organization that attaches religious and cultural significance to historic properties that may be affected by an undertaking. The requirement applies regardless of the location of the historic property." (emphasis added)

49. Under § 800.2(c)(2)(B)(ii)(A),

"[t]he agency official shall ensure that consultation in the section 106 process provides the Indian tribe...**a reasonable opportunity to identify its concerns about historic properties, advise on the identification and evaluation of historic properties, including those of traditional religious and cultural importance, articulate its views on the undertaking's effects on such properties, and participate in the resolution of adverse effects**. It is the responsibility of the agency official **to make a reasonable and good faith effort** to identify Indian tribes...that shall be consulted in the section 106 process."

50. The Reno-Sparks Indian Colony, Fort McDermitt Paiute and Shoshone Tribe, Summit Lake Paiute Tribe, Burns Paiute Tribe of Oregon, Duck Valley Shoshone-Paiute Tribe, Lovelock Paiute Tribe, Battle Mountain Band Colony of the Te-Moak Tribe of Western Shoshone, Winnemucca Indian Colony, Cedarville Rancheria, Ft. Bidwell Indian Community, Fallon Paiute-Shoshone Tribe, and the Pyramid Lake Paiute Tribe attach religious and cultural significance to Pehee mu'huh. (Exhibit 6, ¶ 13).

51. The Reno-Sparks Indian Colony and all the tribes who attach religious and cultural significance to Peehee mu'huh have not had a reasonable opportunity to identify their concerns about historic properties, advise on the identification and evaluation of historic properties, articulate their views on the undertaking's effects on such properties, and participate in the resolution of adverse effects. (Exhibit 6, ¶¶ 7-8).

52. Section 800.2(c)(2)(B)(ii)(C) advises that "[c]onsultation with Indian tribes should be conducted in a manner sensitive to the concerns and needs of the Indian tribe…"

53. Consultation conducted in a manner sensitive to the concerns and needs of Indian tribes would have accounted for the fact that the worst pandemic in at least 100 years was raging around the world, especially when those Indian Tribes were disproportionately affected by the COVID-19 pandemic. Many tribal offices, including those of Tribes that should have been consulted about the Thacker Pass project, were closed for most of 2020. And, in April 2020, the Advisory Council on Historic Preservation recommended that NHPA, § 106 consultation be paused while tribes were struggling with the effects of COVID-19. (TPNHPA-0015, BLM Emails About ACHP Recommendations).

15

**UNDER BLM'S OWN DEFINITION OF "CONSULTATION," BLM WINNEMUCCA HAS NOT ENGAGED IN CONSULTATION WITH INDIAN TRIBES**

54. Originally, all of 36 CFR § 800 governed implementation of NHPA's § 106 consultation process, but the BLM Nevada State Office, under a National Programmatic Agreement (NPA, 1997, as amended 2012) among BLM, the Advisory Council on Historic Preservation (ACHP), and the National Conference of State Historic Preservation Officers, replaced the procedures set forth in 36 CFR § 800.3 through § 800.7 with the 2014 BLM-State Historic Preservation Officer (SHPO) State Protocol Agreement ("State Protocol Agreement"). "The Protocol defines how BLM and SHPO will interact under the NPA for implementing the NHPA, including Section 106 (§ 800.3 through 800.7), Section 110 and Section 112." State Protocol Agreement, Purpose, p. 1.

55. The State Protocol Agreement, therefore, represents part of the procedures BLM was required to follow before issuing the Thacker Pass ROD. The State Protocol, in certain places, requires BLM to act in accordance with BLM Manuals and Handbooks.

56. According to the State Protocol Agreement, "Native American participation will be guided by 36 CFR § 800.2(c)(2)(ii)(A-F), the provisions of BLM Manual 8120 (Manual) and the latest edition of any associated Handbook, as well as any policy guidance issued by BLM that supplements the Manual." State Protocol Agreement, Purpose, Section B, pg. 2.

57. On December 15, 2016, Handbook (H) 1780-1, *Improving and Sustaining BLM-Tribal Relations* replaced H-8120-1, *Guidelines for Conducting Tribal Consultation.* H-1780-1, Chapter III, titled "Tribal Consultation General Considerations" distinguishes

between the terms "notification," "coordination," and "consultation." In doing so, it provides a very specific definition of "consultation." H-1780-1's definition of "consultation" is substantially different from the way the word "consultation" is used in the Thacker Pass Project Federal Register notices, environmental impact statements, and ROD.

58. The *Guidelines* (H-1780-1) state:

"The BLM considers consultation to mean direct two-way communication between the agency and an American Indian or Alaska Native tribal government regarding the proposed BLM actions. The purpose of consulting is to obtain substantive tribal input and involvement during the decision making process. Sometimes the consultation process itself, though sharing and discussing cultural and natural resource information, can enrich and reinvigorate tribal knowledge and appreciation for historic properties, resources, and sites located on public lands."

59. It is important to note that H-1780-1 specifically says: "The Department Tribal Consultation Policy notes that **sending a letter to a Tribe and receiving no response does not constitute a sufficient effort to initiate tribal consultation.** (See MS-1780, Tribal Relations, Appendix 2, Judging the Adequacy of Tribal Consultation, for a detailed discussion.)" H-1780-1, Chapter 3.A.3

60. All BLM did to "initiate tribal consultation" was send a letter to the Fort McDermitt Paiute and Shoshone Tribe, the Summit Lake Paiute Tribe, and the Winnemucca Indian Colony on December 12, 2019. BLM received no response, and the Administrative Record is devoid of any attempt to follow up by telephone, email, or in-person. This is clearly not in accordance with law or procedure.

61. At the earliest feasible stage of any undertaking, the State Protocol

1    Agreement, Section I.B requires BLM to search General Land Office Records (GLO)

2    and to determine inventory needs based on appropriate notification and consultation, as

3    defined in BLM Manual 8120, with Indian Tribes.

4        62. When identifying, evaluating, and treating historic properties, the State

5    Protocol Agreement requires that BLM follow the standards defined in BLM Manual

6    8110, *Identifying and Evaluating Cultural Resources,* BLM Manual 8140, *Protecting*

7    *Cultural Resources,* Nevada BLM supplements to this agreement including the

8    *Guidelines* and *Architectural Guidelines,* the *Secretary of the Interior's Standards and*

9    *Guidelines for Archaeology and Historic Preservation* (48 FR 44716), and relevant

10   written SHPO guidance.

11       63. The State Protocol Agreement includes a brightline, procedural rule at

12   Section V.F.4.a-b, which reads:

13   "4. BLM will negotiate a [Memorandum of Agreement] addressing adverse effects when
14   BLM and SHPO agree that the adverse effects are known prior to the approval of the
15   undertaking.
16

17       a.      The MOA establishes BLM-SHPO concurrence regarding the resolution of
18   project-related adverse effects according to a [Historic Properties Treatment
19   Plan], as well as other stipulations and measures that may be specified in the
20   MOA. BLM must initiate consultation with SHPO regarding eligibility, effects, and
21   resolution of adverse effects with sufficient lead time to allow for development of
22   an MOA on a schedule meeting the undertaking's anticipated DR or ROD. BLM
23   will also consult with Indian tribes and other consulting parties, as appropriate.
24   The MOA must be signed by the appropriate parties <u>prior</u> to BLM's issuance of a
25   DR or ROD for the undertaking.
26

27       b.      Draft PAs and MOAs should be made available for public comment."
28   (emphasis with original.)
29

30       64. Despite BLM's and SHPO's agreeing that adverse effects to historic

properties in Peehee mu'huh were known prior to approval of the undertaking, the MOA was not signed by the appropriate parties prior to BLM's issuance of the ROD. Nor were draft Programmatic Agreements or Memorandums of Agreement made available for public comment.

65. BLM chose to coordinate "NEPA and NHPA § 106 compliance by using the NEPA scoping process to partially fulfill NHPA public notification requirements to seek input from the public and other consulting parties on the Project and its effects on historic properties." FEIS, p. 6-22.

66. 36 CFR § 800.8(a)(1) states: "...an environmental impact statement (EIS) under NEPA, should include consideration of the undertaking's likely effects on historic properties." 36 CFR § 800.8(a)(3) directs agency officials to "ensure the preparation...of an EIS and record of decision (ROD) includes appropriate scoping, identification of historic properties, assessment of effects upon them, and consultation leading to resolution of any adverse effects."

**BLM DID NOT REVIEW EXISTING INFORMATION ON HISTORIC PROPERTIES WITHIN THE AREA OF POTENTIAL EFFECTS**

67. On March 23, 2009, a BLM archaeologist called and spoke with Fort McDermitt Tribal Chairman Dale Barr about a project BLM was in the process of permitting in Thacker Pass and the Kings River Valley (Thacker Pass connects the Quinn River Valley in the east to the Kings River Valley in the west). The archeologist, McGuckian, wrote: "Chairman Barr called back. **He has concerns about this project.** They have an oral history which talks about a Paiute Pitt River conflict in Kings River Valley. The Paiute were attacked by the Pitt River Indians. I asked him if the oral history was confidential. He said parts." (TPNHPA-0140).

68. However, in the Kings Valley Lithium Exploration Project Environmental Assessment, on which BLM relies to argue Native Americans have never raised any concerns about Thacker Pass, BLM wrote: "The BLM contacted the Fort McDermitt Paiute and Shoshone Tribe by letter on November 13, 2008, and follow-up telephone calls. In a telephone conversation with BLM archaeologist Peggy McGuckian on March 23, 2009, **Fort McDermitt Tribal Chairman Dale Barr stated that the Tribe had no concerns about the Project**." (TPNHPA-0151, Kings Valley Lithium Exploration Project EA, pg. 3-6)

69. So, BLM's finding and conclusion that the Fort McDermitt Tribe had no concerns about the Kings Valley Lithium Exploration Project in the 2009 EA was false and directly contradicted by BLM's own records. The misinformation has falsely become authoritative as a result of repetition in subsequent NEPA documents and may be part of BLM's justification for not genuinely engaging in consultation with the Fort McDermitt Tribe.

70. BLM also reported on the cultural and spiritual significance of the region in 2012. In July 2012, BLM, Winnemucca published an Environmental Assessment for the Montana Mountains Cooperative Fuels Treatment Project. The Montana Mountains form the northern boundary of Thacker Pass. In Section 3.1.5 of that EA, titled "Native American Religious Concerns," BLM thoroughly explained the cultural and spiritual significance of greater sage-grouse, and their leks, in Northern Paiute oral traditions. There are several well-known leks near the Thacker Pass project area. (TPNHPA-00143, Montana Mountains EA, pg. 21)

71. BLM also noted that the proposed action occurred on the traditional territories of the Summit Lake Paiute Tribe and Fort McDermitt Paiute and Shoshone Tribe and that the Shoshone and Paiute Tribes of Duck Valley also claim the Montana Mountains. But  BLM never contacted the Shoshone and Paiute Tribes of Duck Valley about the Thacker Pass Project.

72. In a July 11, 2019 email from consulting archaeologist Erik Martin to BLM, Martin noted that the BLM Thacker Pass Project Manager was aware of possible "traditional use or religious significance to Sentinel Rock and possibly some of the obsidian quarry sites in the south portion of the project area." (TPNHPA 0092, July 11, 2019 Email from Erik Martin to Tanner Whetstone). Sentinel Rock is in the project area and does have traditional use and religious significance to the Intervening Plaintiffs, specifically, and to regional Tribes, generally.

73. On November 20, 2019, BLM hosted a "Thacker Pass Project Environmental Impact Statement Alternatives Development Meeting" at which the working group was clearly  aware that Sentinel Peak (also known as Sentinel Rock) might be important to local tribes. Because of "the large number of artifacts in the plan area and several would be impacted by development of the project. Sentinel Peak may be important to local tribes." (TPNHPA-0086, Thacker Pass EIS Alternatives Development Meeting Notes, pg. 2). Nonetheless, BLM never consulted local tribes about the importance of Sentinel Rock.

**BLM WITHHELD INFORMATION FROM AND MISREPRESENTED INFORMATION TO THE NEVADA STATE HISTORIC PRESERVATION OFFICER**

74. BLM withheld relevant information from the Nevada SHPO during the required Thacker Pass consultation process about the 2009 Barr-McGuckian

1   communication, BLM's knowledge of Sentinel Rock's importance, and the fact that

2   BLM consultation with Indian Tribes never actually happened. Thus BLM failed to "make

3   a reasonable and good faith effort to identify historic properties" in concert with the

4   SHPO, violating 36 CFR § 800.4(b).  "[C]onsultation with the SHPO is an integral part of

5   the section 106 process." *Pueblo of Sandia v. US*, 50 F.3d 856, 862 (10th Cir. 1995).

6   "Affording the SHPO an opportunity to offer input on potential historic properties would

7   be meaningless unless the SHPO has access to available, relevant information. Thus,

8   'consultation' with the SHPO mandates an informed consultation." *Id.*

9       75. Since BLM's signing of the ROD in January 2021, several Tribes have

10   identified properties of religious and/or cultural significance that could be affected by the

11   Thacker Pass Project. To date, BLM has not consulted with the Nevada SHPO about

12   these properties despite the legal requirement to do so.

13   **BLM DID NOT PROVIDE INDIAN TRIBES A REASONABLE OPPORTUNITY TO**
14   **IDENTIFY, EVALUATE, AND RESOLVE ADVERSE EFFECTS TO HISTORIC**
15   **PROPERTIES**
16
17       76. The Intervening Plaintiffs' contentions that no tribal consultation happened

18   with Fort McDermitt, Summit Lake, and Winnemucca Indian Colony is confirmed by

19   letters those tribes have written to BLM since being sent the finalized HPTP in early

20   April 2021. (Exhibits 2-4).

21       77. Each of the 3 Tribes BLM originally identified as consulting Tribes for the

22   Thacker Pass Project wrote letters early in 2021 stating that they had not yet been

23   consulted about the Project despite the ROD being issued, MOA signed, and the HPTP

24   finalized. BLM thus denied each Tribe "a reasonable opportunity to identify its concerns

25   about historic properties, advise on the identification and evaluation of historic

properties, including those of traditional religious and cultural importance, articulate its views on the undertaking's effects on such properties, and participate in the resolution of adverse effects," as specifically required by 36 CFR § 800.2(c)(2)(ii)(A).

**BLM IGNORED THE ADVISORY COUNCIL ON HISTORIC PROPERTIES' RECOMMENDATIONS TO PAUSE SECTION 106 CONSULTATION WHILE THE TRIBES WERE STRUGGLING WITH THE PANDEMIC**

78. On April 13, 2020, BLM Winnemucca learned of the Advisory Council on Historic Preservation's recommended practices for NHPA § 106 compliance during the COVID-19 pandemic. The ACHP advised that state and tribal historic preservation officers and tribes which attach religious and cultural significance to affected properties during the pandemic "will be considered paused while, due to the COVID-19 outbreak, an office is closed or work conditions are such that the States/Tribes/NHOs are unable to carry out their Section 106 duties or statutory rights to consultation in a timely fashion (e.g., staff unavailability due to health reasons; restricted access to records; state or tribal laws requiring hard copy records; lack of Internet access or telework capabilities. The clock will resume once the conditions are no longer in effect." (TPNHPA-0015, pgs. 5-6)

79. By fast-tracking the § 106 consultation process with the Tribes while COVID-19 shut down tribal offices across Indian Country, precisely when COVID-19 was disproportionately affecting the Tribes, BLM denied the Tribes a reasonable opportunity to identify their concerns about historic properties, help identify and evaluate them, articulate their views on the mine's likely adverse effects on such properties, and participate in the resolution of those adverse effects. BLM's dismissal of the ACHP

1    recommendations denied consultation "in a manner sensitive to the concerns and needs

2    of Indian tribes," as required by 36 CFR § 800.2(c)(2)(ii)(C).

3
4    **BLM FAILED TO MAKE A REASONABLE AND GOOD FAITH EFFORT TO IDENTIFY HISTORIC PROPERTIES WITHIN THE AREA OF POTENTIAL EFFECTS**
5

6    80. BLM failed to identify at least four historic properties eligible for inclusion in

7    the National Register of Historic Places within the Area of Potential Effects before

8    issuing the Record of Decision. These properties are the September 12, 1865 Thacker

9    Pass Massacre site, two areas of Indian Lodgings identified by US Deputy Surveyor

10    Abed Alley Palmer's United States General Land Office's 1868 Field Notes Journal, and

11    Sentinel Rock.

12    81. All of these historic properties are eligible for inclusion on the National

13    Register of Historic Places under Criteria A and D because they "are associated with

14    events that have made a significant contribution to the broad patterns of our history" and

15    "they have yielded, or may be likely to yield, information important in prehistory or

16    history." 36 CFR § 60.4.

17    82. To date, the Intervening Plaintiffs have discovered and provided to BLM

18    seven publicly available sources describing the September 12, 1865 Thacker Pass

19    Massacre. These include US Deputy Surveyor's 1868 General Land Office Field Notes

20    Journal (Exhibit 9, 1868 GLO Field Notes), a September 23, 1865 *Humboldt Register*

21    article (Exhibit 1), a September 30, 1865 *Owyhee Avalanche* article (Exhibit 10), and

22    eye-witness accounts of the massacre in the *Autobiography of Big Bill Haywood* (Exhibit

23    11)[1]. The massacre began within the Indirect Area of Potential Effect that BLM originally

---

[1] In addition to 1868 Field Notes, *Owyhee Avalanche* article, *Humboldt Register* article, and *The Autobiography of Big Bill Haywood*, descriptions of the Thacker Pass Massacre in: Angel, Myron (editor). *History of Nevada*, Thompson and West, 1881, pg. 174; Michno, Gregory. *The Deadliest Indian War in*

1   identified for the Thacker Pass Project. Evidence shows that the massacre extended

2   into both the Exploration Direct Area of Potential Effect and the Mining Direct Area of

3   Potential Effect.

4       83. BLM did not adequately search Government Land Office archives. Because

5   of this, BLM has never considered the eligibility of the September 12, 1865 massacre

6   site for the National Register, has not identified adverse effects to the massacre site,

7   and has not mitigated those adverse effects, which would be partial or total destruction

8   of the large swathes of acreage where it took place.

9       84. The 1865 massacre was described in a US Deputy Surveyor's 1868 General

10  Land Office Field Notes Journal, which is available on BLM Nevada's own website. The

11  BLM's own 1868 official survey records reference "the remains of an extensive Indian

12  Camp. It was at these camps that Captain RC Payne with Co. E, 1st Nevada Cavalry,

13  attacked, and whipped a body of Indians on Sept. 12 1865. There are many Indian

14  skulls and other remains to be found scattered over this portion of the Township. I found

15  some also opposite here on the east side of the River."

16      85. The massacre site is a property eligible for inclusion on the National Register

17  of Historic Properties. BLM was required to adequately review its own GLO records for

18  possible historic properties in the Areas of Potential Effect. The massacre site is at least

19  partially located in the Areas of Potential Effect. Native American concerns about

20  disturbances to the massacre site, and plans to mitigate adverse effects to the

21  massacre site are completely missing from BLM's communications with the NV SHPO,

---

the West: The Snake Conflict, 1864- 1868. Caxton Press, 2007, pgs. 131-32; and Smith, Philip D. The Sagebrush Soldiers: Nevada's Volunteers in the Civil War. PD Smith, 1962, pgs. 79-80.

1   communications with the Tribes, the Final EIS, the ROD, and the Historic Properties

2   Treatment Plan.

3          86. BLM has unlawfully withheld and delayed alerting the Nevada SHPO about

4   the massacre site, has not formally advised the Tribes, and has not supplemented the

5   Final EIS, amended the ROD, or revised the HPTP. Also, the fact that between 31 and

6   70 Paiutes were murdered in Thacker Pass and federal soldiers made no effort to

7   gather their bodies suggests a strong likelihood that there are human remains and

8   sacred objects in the Thacker Pass project area. And when human remains may be in a

9   project area, BLM is obligated to engage in the extensive NAGPRA consultation

10  process.

11         87. BLM's GLO records also contain an 1868 map that identifies two areas with

12  "Remains of Indian Lodgings." RSIC's GIS Specialist Maureen Vazquez, using Lithium

13  Nevada's proffered map showing the locations of the Paiute camps and GIS information

14  about the Area of Potential Effects portrayed in a map titled "Lithium NV Thacker Pass -

15  Areas of Potential Effect" included in the Thacker Pass Cultural Resources Inventory

16  Needs Assessment (CRINA) (TPNHPA-0001, pg 12), mapped the "Indian Lodgings"

17  (Exhibit 12, Map of Paiute Camps in the Thacker Pass Area of Potential Effects). The

18  northernmost area is located within the Thacker Pass Project Area of Potential Effects,

19  and the southernmost area is just outside the Area.

20         88. Irrespective of the September 12, 1865 massacre, BLM did not identify,

21  inventory, or evaluate the northernmost area despite it being within the APE as required

22  by NHPA. The southernmost area should have properly been included within the

23  Indirect Effects APE. BLM, then, should have identified it, inventoried it, and evaluated it

1    for inclusion on the National Register because it was close enough to the undertaking

2    that it would potentially suffer seismic events, erosion, and traffic effects. It would also

3    potentially suffer indirect visual, audible, or atmospheric effects that diminish the

4    integrity of the location, setting, feeling and/or association that contribute to the

5    property's historical significance.

6        89. BLM consistently insists that the sites of the Indian Lodgings and massacre

7    are on private land. Close scrutiny of maps reveals that the massacre was perpetrated,

8    at least partially, on federal land. But the obligations imposed by the State Protocol

9    Agreement apply regardless of land ownership.

10       90. Nothing in Part II of the State Protocol Agreement limits the application of the

11   Protocol to the Indian Lodgings. And, BLM did not determine otherwise, in formal

12   consultation with SHPO because it never told the Nevada SHPO about these Indian

13   Lodgings.

14       91. As alleged above, BLM was well aware that Sentinel Peak (also known as

15   Sentinel Rock), in the southeast portion of the project area, might be important to local

16   tribes throughout the NHPA process. But, BLM never asked local tribes about the

17   importance of Sentinel Rock before finalizing the Historic Properties Treatment Plan and

18   issuing the ROD. And upon learning directly from the Tribes, post-ROD, that Sentinel

19   Rock is indeed sacred to regional Tribes, BLM never notified the NV SHPO about

20   Sentinel Rock, never initiated any edits to the HPTP, never initiated a supplement to the

21   FEIS, and never initiated formal consultation about Sentinel Rock with local Tribes.

22       **BLM'S CURRENT HISTORIC PROPERTIES TREATMENT PLAN FAILS TO**
23       **ADEQUATELY MITIGATE ADVERSE EFFECTS TO HISTORIC PROPERTIES**
24

92. With the new evidence that the September 12, 1865 massacre probably extended into the project area, leaving the remains of massacred Paiutes in the Area of Potential Effects, it is equally likely that the specific excavations planned for the project area will disturb these human remains and cause irreparable harm to the Intervening Plaintiffs. (Exhibit 8, paras. 6-10) The Historic Properties Treatment Plan provided to RSIC includes a confidential map of cultural resource sites that will be excavated and thus adversely affected by the mine (HPTP, Appendix B, pg. 1). It also includes a table listing the first sites to be trenched, dug, or otherwise excavated (Table 2. Pg. 19).

93. Under the State Protocol Agreement and BLM Manual 8110.41A, BLM must allocate to appropriate use categories all cultural properties known and projected to occur in a plan area. Under BLM Manual 8110.41B, BLM must reevaluate and revise allocations to use categories when circumstances change or new data become available. BLM refuses to do this.

94. BLM concluded in the HPTP that: "The precontact archaeological record is the prevalent cultural resources element of the project area" because of its failure to identify the Indian Lodgings and the massacre site. The agency's bottom line historical conclusion has been thoroughly discredited. Of the 57 historic properties BLM originally identified in Thacker Pass, BLM determined in the HPTP that all but 1 property were only eligible for the National Register under Criterion D, assigned these to the Scientific Use category, and therefore concluded that adverse effects to these properties can be mitigated solely through archaeological data recovery. "Archaeological data recovery" – removing artifacts created by the Intervening Plaintiffs' ancestors to a consultant's

1    warehouse where the public has no access to them – is not a legally sustainable

2    disposition.

3                    **ARCHAEOLOGICAL RESOURCES PROTECTION ACT**

4         95. The Archaeological Resources Protection Act implementing regulations are

5    found at 43 CFR § 7 *et seq.* These implementing regulations were enacted to "enable

6    Federal land managers to protect archaeological resources, taking into consideration

7    provisions of the American Indian Religious Freedom Act, through permits authorizing

8    excavation and/or removal of archaeological resources…" 43 CFR § 7.1(a).

9         96. 43 CFR § 7.7 outlines the obligations BLM owes Indian tribes when possibly

10   harming or destroying sites on public lands that are religiously or culturally important to

11   Native Americans. BLM failed to meet these obligations. Section 7.7(a) requires that "If

12   the issuance of a permit under this part may result in harm to, or destruction of, any

13   Indian tribal religious or cultural site on public lands: "at least 30 days before issuing

14   such a permit the Federal land manager shall notify any Indian tribe which may consider

15   the site as having religious or cultural importance." If a Tribe makes a request within

16   the 30-day period, BLM "may meet with official representatives of any Indian tribe or

17   group to discuss their interests, including ways to avoid or mitigate potential harm or

18   destruction such as excluding sites from the permit area." 43 CFR § 7.7(a)(3).

19        **THE NATIVE AMERICAN GRAVES PROTECTION AND REPATRIATION ACT**

20        97. The Native American Graves Protection and Repatriation Act's implementing

21   regulations at 43 CFR § 10 *et seq.*, "develop a systematic process for determining the

22   rights of lineal descendants and Indian tribes...to certain Native American human

23   remains, funerary objects, sacred objects, or objects of cultural patrimony with which

they are affiliated." 43 CFR § 10.1(a). And, "these regulations pertain to identification and appropriate disposition of human remains, funerary objects, sacred objects, or objects of cultural patrimony that are in federal possession or control...or excavated intentionally or discovered inadvertently on Federal or tribal lands." 43 CFR § 10.1(b)(1)(i) and (iii).

98. NAGPRA imposes extensive consultation obligations with Indian tribes and Native American lineal descendants under 43 CFR § 10.3(b), § 10.3(c) and § 10.5(b) whenever a planned activity *may* result in excavation of human remains, funerary objects, sacred objects or objects of cultural patrimony.

99. Whenever an Indian tribe becomes aware that a planned activity *may* result in the excavation of human remains, funerary objects, sacred objects or objects of cultural patrimony, an Indian tribe is specifically empowered to ensure that BLM complies with § 10.3(b) under § 10.3(c)(4). 43 CFR § 10.3(b) lists "specific requirements" that BLM must comply with before the excavation of human remains or sacred objects. These requirements include consultation, and proof of consultation, with appropriate Indian Tribes. BLM has not fulfilled these requirements.

100. 43 CFR § 10.3(c)(1) imposes an extensive and specific set of steps for notice and consultation with Indian Tribes about human remains and sacred objects prior to issuing any approvals or permits. BLM has not fulfilled these requirements.

101. 43 CFR § 10.3(c)(2) requires that "[f]ollowing consultation, the Federal agency official must complete a written plan of action (described in § 10.5(e)) and execute the actions called for in it."

1       102. Because the Thacker Pass Project is also subject to review under section

2   106 of NHPA, "the Federal agency official should coordinate consultation and any

3   subsequent agreement for compliance conducted under that Act with the requirements

4   of § 10.3(c)(2) and § 10.5." 43 CFR § 10.3(c)(3).

5       103. The NAGPRA implementing regulations specifically empower Indian tribes

6   to ensure that BLM follows the NAGPRA procedures. 43 CFR § 10.3(c)(4).

7       104. 43 CFR § 10.5(b)(1). states:

8   Upon receiving notice of, or otherwise becoming aware of, an inadvertent discovery or
9   planned activity that has resulted or may result in the intentional excavation or inadvertent
10  discovery or human remains, funerary objects, sacred objects or objects of cultural
11  patrimony on Federal lands, the responsible Federal agency official must, as part of the
12  procedures described in §§ 10.3 and 10.4, take appropriate steps to identify the lineal
13  descendant, Indian tribe, or Native Hawaiian organization entitled to custody of the human
14  remains, funerary objects, sacred objects, or objects of cultural patrimony pursuant to §
15  10.6 and § 10.14."

16

17      105. The rest of 43 CFR § 10.5 details an extensive consultation process that

18  BLM has failed to begin much less complete. 43 CFR § 10.5(b)(1)(i-iv) describes the

19  parties that "the Federal agency official shall notify in writing" and includes lineal

20  descendants of deceased Native Americans likely to be excavated," "Indian tribes that

21  are likely to be culturally affiliated," "which aboriginally occupied the area, or "that have

22  a demonstrated cultural relationship" to human remains or objects likely to be

23  excavated.

24      **THE NATIONAL ENVIRONMENTAL PROTECTION ACT**

25      106. Impacts to traditional cultural and historic properties in Thacker Pass are

26  part of the environmental impacts and consequences of the Thacker Pass Project. BLM

1 | was required to adequately consider these consequences in both the Thacker Pass

2 | Draft and Final Environmental Impact Statements.

3 | NEPA, at 42 U.S.C. § 4332(C) provides that "a detailed statement" shall be prepared in
4 | "major federal actions significantly affecting the quality of the human environment. . . . "
5 |
6 | Environmental impacts, adverse environmental effects, alternatives to the proposed
7 | action, the relationship between local short-term uses of the environment and  long-term
8 | productivity must be explained, and irreversible and irretrievable commitments of
9 | resources all must be addressed. *Id.*
10 |
11 | 107. 40 CFR § 1502.9(d)(1)(ii) requires agencies to "prepare supplements to . .

12 | . final environmental impact statements if a major Federal action remains to occur, and

13 | there are significant new circumstances or information relevant to environmental

14 | concerns and bearing on the proposed action or its impacts."

15 | 108. NHPA cultural and historical properties are required to be addressed under

16 | NEPA. Intervening Plaintiffs have identified herein multiple cultural and historical

17 | properties which were neither identified nor addressed within the Final Environmental

18 | Impact Statement, as a consequence of which supplementation is required.

19 |

20 | **BLM FAILED TO NOTIFY THE PROPER INDIAN TRIBES AT LEAST 30 DAYS**
21 | **BEFORE ISSUING AN ARPA PERMIT**
22 |
23 | 109. The Thacker Pass ARPA Permit was issued on September 29, 2021.

24 | (Exhibit 13, para. 6).

25 | 110. On June 3, 2021, Reno-Sparks Indian Colony sent a letter to BLM officially

26 | requesting that BLM "halt any plans for mechanical trenching operations and any other

27 | construction activities as part of the Thacker Pass Lithium Mine Project ("the Project")

28 | until meaningful government-to-government consultation with all of the tribes that are

connected to Thacker Pass has concluded." (Exhibit 14, June 3, 2021 RSIC Letter to BLM).

111. RSIC, through its Tribal Historic Preservation Officer notified BLM that, in addition to RSIC, the Fort McDermitt Paiute and Shoshone Tribe, Summit Lake Paiute Tribe, Burns Paiute Tribe of Oregon, Duck Valley Shoshone-Paiute Tribe, Lovelock Paiute Tribe, Battle Mountain Band Colony of the Te-Moak Tribe of Western Shoshone, Winnemucca Indian Colony, Cedarville Rancheria, Ft. Bidwell Indian Community, Fallon Paiute Shoshone Tribe, and Pyramid Lake Paiute Tribe all attach religious and cultural significance to Thacker Pass.

112. BLM did not notify any of these tribes at least 30 days before issuing the ARPA permit.

**BLM FAILED TO MEET WITH THE INDIAN TRIBES WHO STATED THEY WANTED TO CONSULT ABOUT WAYS TO AVOID OR MITIGATE POTENTIAL HARM OR DESTRUCTION TO CULTURAL RESOURCES BEFORE ISSUING THE ARPA PERMIT**

113. The Winnemucca Indian Colony on April 19, 2021, told BLM that there "may be archeological sites, religious and traditional sites, and areas of cultural importance to our Colony that may be desecrated or destroyed" by the mine project. The Winnemucca Colony also requested  "that collections, testing and curation not be conducted until tribal elders can participate in the determination of significance prior to the intrusion and removal of such properties". (Exhibit 2)

114. On May 4, 2021, the Fort McDermitt Paiute Shoshone Tribe expressed concern that it was not consulted by BLM prior to HPTP approval and that the HPTP "is not reflective of what the Tribes would consider acceptable 'treatments' of historic, cultural, and religious resources." (Exhibit 3)

115. On May 13, 2021, the Summit Lake Paiute Tribe chastised BLM for only making contact with Summit Lake "after decisions have already been made to move forward with the project. The Tribe requested formal consultation on the HPTP. (Exhibit 4).

116. On May 13, 2021, Lithium Nevada Corporation informed the Environmental Plaintiffs that it intended to begin ground disturbance as soon as June 23, 2021. Talasi Brooks Declaration, ¶ 7.

117. In the June 3, 2021 letter, RSIC informed BLM that, with over 1000 cultural resource sites, 56 historic properties, and the Thacker Pass Component of the Double H/Whitehorse Obsidian Procurement District in the Thacker Pass project area, "[t]he RSIC considers this entire area a Native American Historic District, as well as a Traditional Cultural Property and must be treated as such, which demands NOT removing our ancestral remains or their significant cultural items!" RSIC also notified BLM of "Native American cultural items, cultural sites, and possibly even Native American human remains in Thacker Pass."

118. On June 16, 2021, the Burns Paiute Tribal Chairwoman notified BLM of the historical, cultural, and spiritual significance of Thacker Pass to the Tribe and alerted BLM to the possible presence of Native American human remains in Thacker Pass. (Exhibit 15, Burns Paiute Tribe Letter to BLM)

119. On June 24, 2021, Atsa koodakuh wyh Nuwu/People of Red Mountain sent a letter to BLM requesting consultation, describing to BLM the religious, cultural, and historical significance of Peehee mu'huh, explaining why this religious, cultural, and historical significance qualifies Peehee mu'huh for classification in both the

"Conservation For Future Use" and "Traditional Use" categories described in BLM

Manual 8110 *Identifying and Evaluating Cultural Resources*, and asserting that BLM

"has so far failed to adequately consult with other tribes and must do so before any

physical disturbance happens in Peehee mu'huh." See: Atsa koodakuh wyh Nuwu June

24 Correspondence to BLM Winnemucca. (Exhibit 16, PRM Letter to BLM)

120. The People of Red Mountain also notified BLM about Native American

human remains in the Thacker Pass project area. The People of Red Mountain echoed

RSIC's assertion about all of the Tribes that attach religious and cultural significance to

historic properties in Thacker Pass. The People of Red Mountain concluded by putting

BLM on notice that if BLM failed to honor the People of Red Mountain's request, they

were "investigating initiating litigation against BLM."

**BLM FAILED TO INITIATE NAGPRA CONSULTATION DESPITE BEING NOTIFIED THAT THE THACKER PASS PROJECT MAY RESULT IN EXCAVATION OF HUMAN REMAINS, FUNERARY OBJECTS, SACRED OBJECTS OR OBJECTS OF CULTURAL PATRIMONY**

121. BLM has been notified that it is almost certain there are human remains in

the Thacker Pass Project Area of Potential Effects. At least 31 and as many as 70

Paiutes were murdered across a wide space throughout Thacker Pass on September

12, 1865. There were also two areas of extensive Native American camps in Thacker

Pass and the area was a regionally-significant obsidian procurement district for

hundreds of years. There are many stone outcroppings and caves in the Area of

Potential Effects. In addition to those Paiutes killed by American soldiers, it is almost

certain there are human remains in these stone outcroppings and caves. Where people

camped, they often brought their funerary objects, sacred objects, or objects of cultural

patrimony. So, it is also almost certain that there are funerary objects, sacred objects, or objects of cultural patrimony in Thacker Pass.

**BLM FAILED TO REVISE OR SUPPLEMENT THE FEIS DESPITE FINDING SIGNIFICANT NEW INFORMATION ABOUT THE EFFECTS OF THE THACKER PASS PROJECT**

122. There is significant new information about adverse effects to historic properties in Thacker Pass. This information includes the historical, cultural, and religious significance that regional Tribes attach to Thacker Pass; the existence of the Indian Lodgings in the Area of Potential Effects; the existence of the September 12, 1865 massacre site in the Area of Potential Effects; the fact that the precontact archaeological record is no longer the prevalent cultural resources element of the project area; the concerns regional Tribes have brought about the project; and the lack of consultation with regional Tribes. Major federal action remains to occur because mine construction has not begun, much less concluded, and the BLM still needs to sign a Field Work Authorization granting permission to Far Western and Lithium Nevada to begin archaeological digs in Thacker Pass.

**CLAIMS FOR RELIEF**

123. Intervening Plaintiffs incorporate by reference the allegations of all the foregoing paragraphs as if fully set forth herein.

124. BLM's failures to comply with the NHPA in issuing a ROD for the Thacker Pass Project:

Without planning consultations appropriate to the scale of the undertaking and the scope of Federal involvement, contravene 36 CFR § 800.2(a)(4);

Without making a reasonable and good faith effort to identify Indian tribes that should have been consulted with because they attach religious and cultural significance to Peehee mu'huh, contravene 36 CFR § 800.2(c)(2)(ii)(A);

Without providing to Indian tribes who attach religious and cultural significance to Peehee mu'huh a reasonable opportunity to identify their concerns about historic properties, advise on the identification and evaluation of historic properties, articulate their views on the undertaking's effects on such properties, and participate in the resolution of adverse effects, contravene 36 CFR § 800.2(c)(2)(ii)(A);

Without conducting consultation in a manner sensitive to concerns and needs of Indian tribes, contravene 36 CFR § 800.2(c)(2)(ii)(C);

Without seeking and considering the views of the public in a manner that reflects the nature and complexity of the undertaking, contravene 36 CFR § 800.2(d)(1);

Without reviewing existing information on historic properties within the area of potential effects, including data concerning possible historic properties not yet identified; contravene 36 CFR § 800.4(a)(2) and the State Protocol Agreement;

Without making a reasonable and good faith effort to identify historic properties within the area of potential effects, contravene 36 CFR § 800.4(b) and the State Protocol Agreement;

Without carrying out appropriate identification efforts, which may include background research, consultation, oral history interviews, sample field investigation, and field survey, contravene 36 CFR § 800.4(b)(1) and the State Protocol Agreement;

Without taking into account past planning, research and studies, the magnitude and nature of the undertaking and the degree of Federal involvement, the nature and extent of potential effects on historic properties, and the likely nature and location of historic properties within the area of potential effects, contravene 36 CFR § 800.4(b)(1) and the State Protocol Agreement;

Without reevaluating properties previously determined eligible or ineligible despite the passage of time, changing perceptions of significance, and incomplete prior evaluations requiring BLM reevaluate those properties, contravene 36 CFR § 800.4(c)(1) and the State Protocol Agreement;

Without ensuring that preparation of the EIS and ROD includes appropriate scoping, identification of historic properties, assessment of effects upon them, and consultation leading to resolution of any adverse effects, contravene 36 CFR § 800.8(a)(3);

Without identifying historic properties and assessing the effects of the undertaking on such properties in a manner consistent with the standards and criteria of §§ 800.4 through 800.5, contravene § 800.8(c)(1)(ii);

Without consulting regarding the effects of the undertaking on historic properties that might attach religious and cultural significance to affected historic properties, other consulting parties, and the Council, where appropriate, during NEPA scoping, environmental analysis, and the preparation of NEPA documents, contravene § 800.8(c)(1)(iii);

Without developing in consultation with identified consulting parties alternative and proposed measures that might avoid, minimize or mitigate any adverse effects of the undertaking on historic properties and describing them in the DEIS, contravene § 800.8(c)(1)(v);

Without making a draft Memorandum of Agreement available for public comment, contravene the State Protocol Agreement;

Without having the Memorandum of Agreement signed by the appropriate parties contravene the State Protocol Agreement, Section V.F.4a;

and, under the APA, are agency actions unlawfully withheld or unreasonably delayed;

are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law; and are without observance of procedure required by law.

125. BLM's failures to comply with ARPA in issuing an archaeological resources permit:

Without notifying all of the Indian tribes which may consider the Thacker Pass Project site as having religious or cultural importance, at least 30 days before issuing an Archaeological Resources Protection Act permit, contravene 43 CFR § 7.7(a);

Without meeting with official representatives of any Indian tribe or group to discuss their interests, including ways to avoid or mitigate potential harm or destruction such as excluding sites from the permit area, contravene 43 CFR § 7.7(a)(3);

Without seeking to determine, in consultation with official representatives of Indian tribes or other Native American groups, what circumstances should be the subject of special notification to the tribe or group after a permit has been issued, contravene 43 CFR § 7.7(b)(4);

Without referring to NAGPRA and its implementing regulations as required in cases involving Native American human remains and other "cultural items", as defined by NAGPRA, contravene 43 CFR § 7.7(b)(4);

and, under the APA, are agency actions unlawfully withheld or unreasonably delayed;

are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law; and are without observance of procedure required by law.

126. BLM's failures to comply with NAGPRA in issuing an archaeological

resources permit:

Without taking reasonable steps to determine whether the Thacker Pass project may result in the excavation of human remains, funerary objects, sacred objects, or objects of cultural patrimony from Federal lands, contravene 43 CFR § 10.3(c)(1);

Without notifying in writing the Indian tribes that are likely to be culturally affiliated with any human remains, funerary objects, sacred objects, or objects of cultural patrimony that may be excavated, prior to issuing any approvals or permits for the Thacker Pass Project, contravene 43 CFR § 10.3(c)(1);

Without notifying the present-day Indian tribes which aboriginally occupied the area of the Thacker Pass Project and any other Indian tribes that are likely to have a cultural relationship to the human remains, funerary objects, sacred objects, or objects of cultural patrimony that are expected to be found, contravene 43 CFR § 10.3(c)(1);

Without providing the requisite notice with all of the specific requirements described at 43 CFR § 10.3(c)(1);

Without following up written notification by telephone contact when there was no response within 15 days, contravene 43 CFR § 10.3(c)(1).

Without taking appropriate steps to identify the lineal descendant or Indian tribe entitled to custody of human remains, funerary objects, sacred objects, or objects of cultural patrimony, upon receiving notice of, or otherwise becoming aware of, an inadvertent discovery or planned activity that has resulted or may result in the intentional excavation or inadvertent discovery of human remains, funerary objects, sacred objects, or objects of cultural patrimony, contravene 43 CFR § 10.5(b);

Without notifying in writing any known lineal descendants of the deceased Native American individual whose human remains and associated funerary objects have been or are likely to be excavated intentionally or discovered inadvertently, in contravene 43 CFR § 10.5(b)(i);

39

Without notifying in writing the Indian tribes that are likely to be culturally affiliated with, the Indian tribes which aboriginally occupied the area in which, and the Indian tribes that have a demonstrated cultural relationship with the human remains, funerary objects, sacred objects, or objects of cultural patrimony that have been or are likely to be excavated inadvertently, contravene 43 CFR § 10.5(b)(ii-iv);

and, under the APA, are agency actions unlawfully withheld or unreasonably delayed;

are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law; and are without observance of procedure required by law.

127. BLM's failure to comply with NEPA in proceeding under the Final EIS:

Without preparing a supplement to the Final Environmental Impact statement despite a major Federal action remaining to occur and discovering significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts, contravenes 40 CFR § 1502.9(d)(1)(ii),

and, under the APA, is agency action unlawfully withheld or unreasonably delayed; is

arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

and is without observance of procedure required by law.

**RELIEF**

128. WHEREFORE, for all the foregoing reasons, Plaintiffs request that this

Court issue:

129. A judgment declaring that BLM's activities connected to plans for physical

disturbance of Peehee mu'huh, pursuant to an Historic Properties Treatment Plan or

otherwise, fail to comply with the NHPA, ARPA, NAGPRA, and NEPA.

130. A judgment declaring that BLM failed to comply with the requirements of the

NHPA, ARPA, NAGPRA, and NEPA and that such failure is arbitrary, capricious, and

not in accordance with the procedures required by law pursuant to the APA, 5 USC §§

701 through 706.

1   140. A judgment declaring that BLM failed to comply with the NHPA, ARPA,

2   NAGPRA, and NEPA and that such failure constitutes agency action that is

3   unreasonably delayed and/or unlawfully withheld as provided by Section 706(1) of the

4   APA.

5   141. A judgment and order setting aside the illegally issued ROD pending

6   compliance with the NHPA, including compliance with the 2014 BLM-SHPO Protocol

7   Agreement.

8   142. A judgment and order enjoining the BLM from authorizing any physical

9   disturbance in Peehee mu'huh pending compliance with the NHPA, including

10  compliance with the 2014 BLM-SHPO Protocol Agreement, ARPA, NAGPRA, and

11  NEPA.

12  143. A judgment and order setting aside the legally issued ARPA permit pending

13  compliance with ARPA and NAGPRA.

14  144. A judgment granting Intervening Plaintiffs their costs and reasonable

15  attorneys fees incurred in bringing this action, pursuant to the Equal Access to Justice

16  Act (EAJA), 28 U.S.C. § 2412 et. seq. and any other applicable statutory or equitable

17  principles; and

18  145. Such other and further relief as the Court may deem necessary and proper,

19  at law and in equity.

20  Respectfully submitted this 29th day of November, 2021.

21

22  By: /s/ William Falk
23  (Utah Bar No. 16678)
24  2980 Russet Sky Trail
25  Castle Rock, CO
26  (319) 830-6086

falkwilt@gmail.com

Terry J. Lodge, Esq.
(Ohio Bar No. 29271)
316 N. Michigan St., Suite 520
Toledo, OH 43604-5627
(419) 205-7084
tjlodge50@yahoo.com

Julie Cavanaugh-Bill
(State Bar No. 11533)
Cavanaugh-Bill Law Offices
Henderson Bank Building
401 Railroad Street, Suite 307
Elko, NV 89801
(775) 753-4357
julie@cblawoffices.org

Attorneys for Reno-Sparks Indian Colony and Atsa koodakuh wyh Nuwu

## CERTIFICATE OF SERVICE

I hereby certify that on Monday, November 29, 2021, I filed the foregoing using the

United States District Court CM/ECF, which caused all counsel of record to be served

electronically.

/s/William Falk
Utah Bar No. 16678

1
2
3
4                                 **EXHIBIT INDEX**
5
6    EXHIBIT                         DESCRIPTION              # OF PAGES
7
8    1
9                       Sep. 23, 1865 Humboldt Register      3
10                      Article
11
12   2
13                      April 19, 2021 WIC Letter to BLM     4
14   3
15                      May 4, 2021 Fort McDermitt Letter    3
16                      To BLM
17   4
18                      May 13, 2021 Summit Lake Letter to   3
19                      BLM
20   5
21                      Declaration of Dorece Antonio        6
22   6
23                      First Michon R. Eben Declaration     10
24   7
25                      Daranda Hinkey Declaration           9
26   8
27                      Second Michon R. Eben Declaration    10
28   9
29                      1868 General Land Office Field Notes 6
30   10
31                      Sept. 30, 1865 Owyhee Avalanche      3
32                      Article
33   11
34                      Autobiography of Bill Hayward Excerpts 8
35   12
36                      Map of Paiute Camps in APE           2
37   13
38                      Third Michon R. Eben Declaration     4
39   14
40                      June 3, 2021 RSIC Letter to BLM      4
41   15
42                      June 16, 2021 BPT Letter to BLM      4
43   16
44                      June 24, 2021 PRM Letter to BLM      6
45

43