# EXHIBIT 1

# Proposed Complaint

# By Intervenor the Winnemucca Indian Colony

Norberto J. Cisneros, Esq. NV Bar No. 8782
Barbara M. McDonald, Esq., NV Bar No. 11651
**MADDOX & CISNEROS, LLP**
3230 S. Buffalo Drive, Suite 108
Las Vegas, Nevada 89117
Telephone: (702) 366-1900
Facsimile: (702) 366-1999

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| BARTELL RANCH LLC, *et al.*, <br><br> Plaintiffs, <br><br> vs. <br><br> ESTER M. MCCULLOUGH, *et al.*, <br><br> Defendants. <br>_____ <br> WESTERN WATERSHEDS PROJECT, *et al.*, <br><br> Plaintiffs, <br><br> vs. <br><br> UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*, <br><br> Defendants. | **Lead Case:** <br> Case No.:  3:21-cv-00080-MMD-CLB <br><br> **Consolidated with:** <br> Case No.: 3:21-cv-00103-MMD-CLB <br><br> **[PROPOSED] COMPLAINT BY INTERVENOR THE WINNEMUCCA INDIAN COLONY** |

MADDOX & CISNEROS, LLP
An Association of Professional Corporations
3230 S. Buffalo Drive, Suite 108
Las Vegas, Nevada 89117

The WINNEMUCCA INDIAN COLONY ("The Colony"), represented by its duly elected and recognized Council, and, by and through its counsel, Maddox & Cisneros, LLP, alleges as follows:

## INTRODUCTION

1. The Colony seeks a judgment declaring that the Bureau of Land Management ("BLM"), while permitting Lithium Nevada Corp.'s ("Lithium Nevada") Thacker Pass Lithium Mine Project ("the Project"), failed to comply with the National Historic Preservation Act (NHPA), 54 USC §§ 300101 *et seq.*, and its implementing regulations, 36 CFR § 800, Protection of Historic Properties (2004) *et seq.*; the Native American Graves Protection and Repatriation Act (NAGPRA), 25 USC §§ 3001 *et seq.*, and its implementing regulations, 43 CFR § 10 *et seq.*; the National Environmental Policy Act (NEPA), 42 USC §§ 4321 *et seq.*, and its implementing regulations 40 CFR § 1500 *et seq.*; and the Administrative Procedure Act, 5 USC §§ 701 *et seq.*

2. Because of these violations, the Colony seeks a judgment and order setting aside the illegally issued Record of Decision ("ROD") and enjoining BLM from authorizing any physical disturbance in the Project area, until BLM cures the violations of the aforementioned laws.

3. Under BLM's own definition of consultation, BLM never engaged in, or even initiated, consultation with the Colony, whose ancestors traveled through, hunted and gathered in, camped in, and were massacred in Thacker Pass before issuing the Thacker Pass Record of Decision. The Colony has told BLM that it was never consulted with, though originally identified as having religious, cultural, economic, and historical connections to Thacker Pass. Despite this, BLM continues to refuse to engage in meaningful consultation with the Colony and continues to refuse to revise the errors and misrepresentations in documents BLM has prepared including the ROD, Final Environmental Impact Statement (FEIS), and Historic Properties Treatment Plan (HPTP).

MADDOX & CISNEROS, LLP
An Association of Professional Corporations
3230 S. Buffalo Drive, Suite 108
Las Vegas, Nevada 89117

4.     BLM also failed to identify at least four historic properties, all of which are eligible for inclusion on the National Register of Historic Properties, that the Colony and Indian Tribes consider sacred and culturally significant. BLM possessed records of three of those four properties. These records describe a brutal September 12, 1865, massacre in Thacker Pass during which federal soldiers murdered at least 31 Paiute men, women, and children and as many as 70. These records also describe extensive remains of Paiute camp sites in the Thacker Pass Project Area of Potential Effects. BLM either failed to review those records, which is by itself a violation of the law, or hoped no one else would find proof of the massacre before mine construction began.

5.     BLM was obligated to consult with the Colony about the Thacker Pass Project, and BLM was obligated to identify the historic properties that it missed before issuing the ROD. These failures are enough to set aside the ROD and enjoin physical disturbance in Thacker Pass until BLM engages in consultation and corrects the errors in the ROD, FEIS, and HPTP.

6.     After the ROD was issued, BLM was still obligated to engage in consultation under NAGPRA with Indian Tribes before issuing an archaeological resources permit for activities that the Colony and other Tribes insist will affect human remains and sacred cultural objects. Despite the Colony's demands for such consultation, BLM failed to engage in consultation.

7.     The Colony, who, upon learning about the Thacker Pass Project, demanded consultation, has also presented BLM with information about Native American religious concerns with the Project, about the religious and cultural significance of land within the Area of Potential Effects, about massacres that happened within the Area of Potential Effects, and about historic properties eligible for inclusion on the National Register of Historic Places. BLM is obligated to

MADDOX & CISNEROS, LLP
An Association of Professional Corporations
3230 S. Buffalo Drive, Suite 108
Las Vegas, Nevada 89117

supplement and revise the ROD, the FEIS, and the HPTP, but persists in its refusal to do so.

8.    BLM was also obligated to consult in good faith with the Nevada State Historic Preservation Officer (SHPO) about historic properties in Thacker Pass but withheld the information. Further, BLM has misrepresented the extent of its consultation efforts with the Colony.

## JURISDICTION

9.    This Court has jurisdiction pursuant to 28 USC § 1331, as this action arises under the laws of the United States.

10.    An actual controversy exists between the parties within the meaning of 28 USC § 2201(a). This Court may grant declaratory relief and additional relief, including an injunction, pursuant to 28 USC §§ 2201, 2202 and 5 USC §§ 705, 706.

11.    BLM's failure to comply with the requirements of the NHPA, 54 U.S.C. §§ 300101 *et seq.*, is arbitrary, capricious, and not in accordance with the procedures required by law pursuant to the APA and is thus subject to judicial review. 5 USC §§ 701-706.

12.    BLM's failure to comply with the requirements of NHPA §§ 300101 *et seq.*, also constitutes agency action that is unreasonably delayed and/or unlawfully withheld as provided by Section 706(1) of the APA and is thus subject to judicial review. 5 USC §§ 701-706.

## VENUE

13.    Venue is proper in the District of Nevada pursuant to 28 U.S.C. §§ 1391(b) and (e). The BLM Winnemucca District Office and named Defendant Ester M. McCullough, who issued and signed the FEIS and ROD, are located in Winnemucca, Nevada. The Thacker Pass Lithium Mine project is located in Humboldt County, Nevada. The Thacker Pass Lithium Mine Project is located in Humboldt County, Nevada. The County is located in Winnemucca, Nevada.

MADDOX & CISNEROS, LLP
An Association of Professional Corporations
3230 S. Buffalo Drive, Suite 108
Las Vegas, Nevada 89117

**PARTIES**

14.    The Colony is a federally-recognized Tribe located in Winnemucca, Nevada. The Colony consists of 28 members. Ancestors of the Colony's tribal members traditionally hunted and gathered in Thacker Pass, also known to the Colony as Peehee mu'huh. The Colony has residents, members, and employees who have direct cultural connections to Peehee mu'huh, who practice ceremony in Peehee mu'huh, who hunt and gather in Peehee mu'huh, and who plan on doing so in the future.  The Colony attaches cultural and religious significance to Peehee mu'huh. Colony members include traditional elders and spiritual leaders. The Colony seeks to preserve its ancestral teachings, maintain oral histories, and practice the traditions its people have practiced for generations. Colony members regularly meet in Peehee mu'huh to perform ceremony; to gather traditional foods and medicines; to teach their members and the public about the traditional uses of plants, animals, and minerals found in Peehee mu'huh; to share oral histories involving the site, including the history of the massacre of their ancestors that gave Peehee mu'huh its name; to observe artifacts created by their ancestors; and to educate the public about the religious, cultural, and historic importance of Peehee mu'huh to their people. The Colony plans on continuing to visit Peehee mu'huh to engage in similar activities in the future.

15.    Defendant Bureau of Land Management is the agency responsible for preparation, approval and delivery of the Thacker Pass Lithium Mine Project Record of Decision, the Memorandum of Agreement with the Nevada State Historic Preservation Officer, and compliance with the NHPA.

16.    Defendant Deb Haaland is the Secretary of the Interior and is sued in her official capacity.

17.    Defendant-Intervenor Lithium Nevada Corp. ("Lithium Nevada") proposes to construct, operate, reclaim, and close the Thacker Pass Lithium Mine Project. Lithium Nevada has successfully intervened as a defendant in this case.

MADDOX & CISNEROS, LLP
An Association of Professional Corporations
3230 S. Buffalo Drive, Suite 108
Las Vegas, Nevada 89117

## Peehee mu'huh

18.     The original name for Thacker Pass in the local Numic dialect spoken by members of the Colony is "Peehee mu'huh," which will be used instead of "Thacker Pass." Peehee mu'huh is located within the traditional territories of the Nuwu (Northern Paiute) people.

19.     The Colony has residents, members, and employees who possess direct religious and cultural connections to Thacker Pass, also sometimes known to the members as Peehee mu'huh, as the members practice ceremony there, hunt and gather there, and plan on doing so in the future. Rojo Declaration at ¶ 3.

20.     Colony members practice the Sundance ceremony at or near Peehee mu'huh every year. *Id.* at ¶ 4.

21.     The Colony's practice of the Sundance originates from the time when Wovoka, a Paiute spiritual leader, shared the Paiute Ghost Dance to leaders in South Dakota and returned with the Sundance, which incorporated the Colony's traditions. *Id.* at ¶ 5.

22.     The Sundance ceremony is a sacred prayer dance and rigorous ceremony lasting ten days and requiring sacrifice and commitment. *Id.* at ¶ 6.

23.     On February 22, 2000, Chairman Rojo's close relative, Glen Wasson, was murdered at the Winnemucca Indian Colony, and since then, she has personally committed to perform the Sundance every year with the other members, as the ceremony carries the promise of healing through a demanding process of purification, sacrifice and prayer. *Id.* at ¶ 7.

24.     The Sundance is a way of life for Colony members, a way of reaching through seven generations back and forward for betterment. *Id.* at ¶ 8.

25.     To build the Thacker Pass Lithium Mine on lands held sacred to Colony members would be like raping the earth and their culture. *Id.* at ¶ 9.

MADDOX & CISNEROS, LLP
An Association of Professional Corporations
3230 S. Buffalo Drive, Suite 108
Las Vegas, Nevada 89117

26.     In addition to the Sundance, Tribal members engage in vision quests at or near Peehee mu'huh. A vision quest entails isolation and deep contemplation in the natural environment. Such vision quests are of important religious significance to Tribal members. *Id.* at ¶ 10.

27.     Tribal members also hunt deer, rabbit, and ground hogs at Peehee mu'huh. *Id.* at ¶ 11.

28.     Tribal members also gather medicinal plants at Peehee mu'huh. *Id.* at ¶ 12.

29.     Peehee mu'huh is further sacred to Colony members, as they believe their ancestors were murdered there during an 1865 massacre. *Id.* at ¶ 13.

### The Thacker Pass Lithium Project

30.     The Thacker Pass Lithium Mine Project is massive and complex. The Project area covers 17,933 acres of public land administered by the BLM, Winnemucca District. 10,468 of those acres are associated with the Mine Plan and 7,465 of them are associated with the Exploration Plan. Project facilities include the development of an open pit mine; waste rock storage facilities; a coarse gangue stockpile; a clay tailings filter stack; growth media stockpiles; haul and secondary roads; and additional mine facilities to support mining and lithium production operations. Thacker Pass Lithium Mine Project Record of Decision and Plan of Operations Approval (ROD), pg. 3.

31.     The Final Environmental Impact Statement reports that "inventories identified over one thousand (n=1020) cultural resource sites and a component of a large cultural district: the Thacker Pass component of the Double H/Whitehorse Obsidian Procurement District (DHWOPD)." This Thacker Pass Component became its own National Register of Historic Places (NRHP)-eligible district in 2009. Thacker Pass Lithium Mine Project Final Environmental Impact Statement (FEIS) pg. 4-82

32.     The Mining and Exploration Plans' direct effects area intersect 923 archaeological and architectural resources. 56 of these are eligible for listing on the

MADDOX & CISNEROS, LLP
An Association of Professional Corporations
3230 S. Buffalo Drive, Suite 108
Las Vegas, Nevada 89117

NRHP. FEIS, 4-82. The indirect effects area intersects 134 archaeological and architectural resources. 35 of these are eligible for listing on the NRHP. FEIS, 4-83.

33.   Ground disturbing activities and project infrastructure development could directly, indirectly, and cumulatively affect one or more of the NRHP integrity aspects of 85 historic properties and one district. FEIS, 4-83. BLM and Nevada SHPO have concurred that the Project would adversely affect 56 historic properties eligible for the NRHP. FEIS, 4-83.

34.   Even with the development of a HPTP, the FEIS explains that:

> there may still be permanent loss of cultural resources and a limited fragmentation of the Thacker Pass component of the DHWOPD. The use of routes and utility corridors surrounding the Project area would also increase and change access to areas leading to potential effects through new surface disturbances, unauthorized artifact collection, and vandalism at cultural resources.

FEIS, 4-85.

### The National Historic Preservation Act

35.   The NHPA obligates the Bureau of Land Management ("BLM"), in cooperation with Indian tribes, private organizations, and individuals "to administer federally owned, administered, or controlled historic property in a spirit of stewardship for the inspiration and benefit of present and future generations…" 54 U.S.C. § 300101(3). When Congress enacted NHPA, it declared that "the spirit and direction of the Nation are founded upon and reflected in its historic heritage," that "historic properties significant to the Nation's heritage are being lost or substantially altered often inadvertently, with increasing frequency," and that "the preservation of this irreplaceable heritage is in the public interest so that its vital legacy of cultural, educational, aesthetic, inspirational, economic, and energy benefits will be maintained and enriched for future generations of Americans." Section 1 of the NHPA, Pub. L. No. 89-665, as amended by Pub. L. No. 96-515.

MADDOX & CISNEROS, LLP
An Association of Professional Corporations
3230 S. Buffalo Drive, Suite 108
Las Vegas, Nevada 89117

36.   The Ninth Circuit has ruled that:

Congress enacted NHPA based on its findings that 'historical and cultural foundations of the Nation should be preserved as a living part of our community life and development in order to give a sense of orientation to the American people.' NHPA was enacted to 'encourage the public and private preservation of all usable elements of the Nation's historic built environment.'

*Presidio Golf Club v. National Park Service,* 155 F.3d 1153, 1158 (9th Cir. 1998) (internal citations to the NHPA omitted).

37.   36 Code of Federal Regulations § 800 *et seq* was promulgated to govern implementation of NHPA's Section 106 consultation process. 36 CFR § 800.1(a) states the purposes of the section 106 process, in pertinent part:

The section 106 process seeks to accommodate historic preservation concerns with the needs of Federal undertakings through consultation among the agency official and other parties with an interest in the effects of the undertaking on historic properties, commencing at the early stages of project planning. **The goal of consultation is to identify historic properties potentially affected by the undertaking, assess its effects and seek ways to avoid, minimize or mitigate any adverse effects on historic properties** (emphasis added).

38.   § 800.1(c) adds: "The agency official shall ensure that the section 106 process is initiated early in the undertaking's planning, so that a broad range of alternatives may be considered during the planning process for the undertaking."

39.   § 800.2(a)(4) obligates BLM to engage in more thorough consultation for larger projects: "The agency official should plan consultations appropriate to the scale of the undertaking and the scope of Federal involvement…"

40.   § 800.2(d)(1) describes the important role the public plays in helping federal agencies steward historic properties for the inspiration and benefit of present

MADDOX & CISNEROS, LLP
An Association of Professional Corporations
3230 S. Buffalo Drive, Suite 108
Las Vegas, Nevada 89117

MADDOX & CISNEROS, LLP
An Association of Professional Corporations
3230 S. Buffalo Drive, Suite 108
Las Vegas, Nevada 89117

and future generations: "The views of the public are essential to informed Federal decision-making in the section 106 process."

41. Also, § 800.2(d)(1) requires that "[t]he agency official shall seek and consider the views of the public in a manner that reflects the nature and complexity of the undertaking and its effects on historic properties [and] the likely interest of the public in the effects on historic properties…"

42. 36 CFR § 800.2(c)(2)(B)(ii) states that NHPA, Section 101(d)(6)(B) "requires the agency official to consult with **any** Indian tribe or Native Hawaiian organization that attaches religious and cultural significance to historic properties that may be affected by an undertaking. The requirement applies regardless of the location of the historic property." (emphasis added).

43. The Colony attaches religious and cultural significance to Pehee mu'huh. *See, generally,* Rojo Declaration.

44. Under § 800.2(c)(2)(B)(ii)(A):

[t]he agency official shall ensure that consultation in the section 106 process provides the Indian tribe…**a reasonable opportunity to identify its concerns about historic properties, advise on the identification and evaluation of historic properties, including those of traditional religious and cultural importance, articulate its views on the undertaking's effects on such properties, and participate in the resolution of adverse effects**. It is the responsibility of the agency official **to make a reasonable and good faith effort** to identify Indian tribes…that shall be consulted in the section 106 process.

45. § 800.2(c)(2)(B)(ii)(A) reminds agency officials, once again, that section 106 consultation should commence early in the planning process.

46. The Colony has not had a reasonable opportunity to identify its concerns about historic properties, advise on the identification and evaluation of historic

properties, articulate their views on the undertaking's effects on such properties, and participate in the resolution of adverse effects. *See, generally,* Rojo Declaration.

47.     § 800.2(c)(2)(B)(ii)(C) advises that "[c]onsultation with Indian tribes should be conducted in a manner sensitive to the concerns and needs of the Indian tribe…"

48.     Consultation conducted in a manner sensitive to the concerns and needs of Indian tribes would have accounted for the fact that the worst pandemic in at least 100 years was raging around the world, especially when those Indian tribes were disproportionately affected by the COVID-19 pandemic.

49.     Originally, all of 36 CFR § 800 governed implementation of NHPA's § 106 consultation process, but the BLM Nevada State Office, under a National Programmatic Agreement (NPA, 1997, as amended 2012) among BLM, the Advisory Council of Historic Preservation (ACHP), and the National Conference of State Historic Preservation Officers, replaced the procedures set forth in 36 CFR § 800.3 through § 800.7 with the 2014 BLM-State Historic Preservation Officer (SHPO) State Protocol Agreement ("State Protocol Agreement"). "The Protocol defines how BLM and SHPO will interact under the NPA for implementing the NHPA, including Section 106 (§ 800.3 through 800.7), Section 110 and Section 112." State Protocol Agreement, Purpose, pg. 1.

50.     The State Protocol Agreement therefore represents part of the procedures BLM was required to follow before issuing the Thacker Pass ROD. The State Protocol, in certain places, requires BLM to act in accordance with BLM Manuals and Handbooks. When a document, such as the State Protocol Agreement, which carries the weight of law, incorporates standards, definitions, and procedures described in the BLM Manuals and Handbooks, those standards, definitions, and procedures become part of the procedures BLM was required to follow before issuing the Thacker Pass ROD.

51.     The Protocol's Preamble declares that the State Protocol Agreement is "...designed to enhance the participation of consulting parties, the general public and Native American tribes in the section 106 process…"

52.     According to the State Protocol Agreement, "Native American participation will be guided by 36 CFR § 800.2(c)(2)(ii)(A-F), the provisions of BLM Manual 8120 (Manual) and the latest edition of any associated Handbook, as well as any policy guidance issued by BLM that supplements the Manual." State Protocol Agreement, Purpose, Section B, pg. 2.

53.     On December 15, 2016, Handbook (H) 1780-1, *Improving and Sustaining BLM-Tribal Relations* replaced H-8120-1, *Guidelines for Conducting Tribal Consultation.* H-1780-1,Chapter III, titled "Tribal Consultation General Considerations" distinguishes between the terms "notification," "coordination," and "consultation." In doing so, it provides a very specific definition of "consultation." H-1780-1's definition of "consultation" is substantially different than the way the word "consultation" is used in the Thacker Pass Project federal register notices, environmental impact statements, and ROD.

54.     H-1780-1 states:

The BLM considers consultation to mean direct two-way communication between the agency and an American Indian or Alaska Native tribal government regarding the proposed BLM actions. The purpose of consulting is to obtain substantive tribal input and involvement during the decisionmaking process. Sometimes the consultation process itself, though sharing and discussing cultural and natural resource information, can enrich and reinvigorate tribal knowledge and appreciation for historic properties, resources, and sites located on public lands.

55.     H-1780-1 specifically says: "The Department Tribal Consultation Policy notes that **sending a letter to a Tribe and receiving no response does not constitute a sufficient effort to initiate tribal consultation.** (See MS-1780, Tribal

MADDOX & CISNEROS, LLP
An Association of Professional Corporations
3230 S. Buffalo Drive, Suite 108
Las Vegas, Nevada 89117

Relations, Appendix 2, Judging the Adequacy of Tribal Consultation, for a detailed discussion.)" H-1780-1, Chapter 3.A.3.

56.   BLM's definition of "consultation" is "direct two-way communication between the agency and an American Indian tribal government." BLM specifically warns its employees that "The Department Tribal Consultation Policy notes that **sending a letter to a Tribe and receiving no response does not constitute a sufficient effort to initiate tribal consultation.**"

57.   Handbook (H) 1780-1, *Improving and Sustaining BLM-Tribal Relations* replaced H-8120-1, *Guidelines for Conducting Tribal Consultation.* H-1780-1, Chapter III, titled "Tribal Consultation General Considerations" very clearly states that: "The Department Tribal Consultation Policy notes that **sending a letter to a Tribe and receiving no response does not constitute a sufficient effort to initiate tribal consultation.**" H-1780-1, Chapter 3.A.3.

58.   Courts have held that agencies must do more than just follow the requirements of the NHPA; they must also follow their own consultation policies. *See, e.g., Oglala Sioux Tribe*, 603 F.2d at 721 (meaningful opportunity must be afforded where the federal government has established an expectation through policy). "[W]here the Bureau has established a policy requiring prior consultation with a tribe, and has thereby created a justified expectation on the part of the Indian people that they will be given a meaningful opportunity to express their views before Bureau policy is made, that opportunity must be afforded." *Id.* at 718.

59.   Failure by BLM to comply with its own policy is not only a violation of "general principles of administrative law," but is also a violation of the government's trust duty. *Id.*

60.   "Meaningful consultation means tribal consultation in advance with the decision maker or with intermediaries with clear authority to present tribal views to the BIA decision maker. The decision maker is to comply with BIA and administration

MADDOX & CISNEROS, LLP
An Association of Professional Corporations
3230 S. Buffalo Drive, Suite 108
Las Vegas, Nevada 89117

policies." *Lower Brule Sioux v. Deer*, 911 F.Supp. 395, 401 (D.S.D. 1995) (assessing the adequacy of a Bureau of Indian Affairs consultation effort).

61.    "Fair notice of agency intentions requires telling the truth and keeping promises." *Id.* at 399.

62.    Courts have further provided guidance on what counts as NHPA consultation. For example, in *Quechan Tribe of Fort Yuma Indian Reservation v. US Dept. of Interior*, 755 F.Supp. 2d 1104, 1111-1112 (S.D. Cal. 2010), the federal district court confronted a similar Administrative Record. That court found:

> Defendants provide string citations to materials in the record which they say document 'extensive consultation with tribes, including Plaintiff. This description of the documents is general and cursory, and sheds little light on the degree to which BLM consulted with the Tribe, or whether the consultation was intended to comply with NEPA or NHPA. First, the documentation includes consultations with other tribes, agencies, and with the public. While this other consultation appears to be required and serves other important purposes, it doesn't substitute for the mandatory consultation with the Quechan Tribe. **In other words, that BLM did a lot of consulting in general doesn't show that its consultation with the Tribe was adequate under the regulations. Indeed, Defendants' grouping tribes together (referring to consultation with "tribes") is unhelpful: Indian tribes aren't interchangeable, and consultation with one tribe doesn't relieve the BLM of its obligation to consult with any other tribe that may be a consulting party under NHPA."**

63.    In a case similar to this one, the 10th Circuit ruled: "The record reveals that the Forest Service did request information from the Sandia Pueblo and other local Indian tribes, **but a mere request for information is not necessarily sufficient to constitute the 'reasonable effort' section 106 requires."** *Pueblo of Sandia v. United States*, 50 F.3d 856, 860 (10th Cir.1995)

64.    Furthermore, federal courts have ruled "[c]ontact, of course, is not consultation, and 'consultation with one tribe doesn't relieve the [agency] of its obligation to consult with any other tribe." *Standing Rock Sioux Tribe v. U.S. Army Corps*

MADDOX & CISNEROS, LLP
An Association of Professional Corporations
3230 S. Buffalo Drive, Suite 108
Las Vegas, Nevada 89117

MADDOX & CISNEROS, LLP
An Association of Professional Corporations
3230 S. Buffalo Drive, Suite 108
Las Vegas, Nevada 89117

*of Engineers*, 205 F.Supp.3d 4, 32 (D. DC 2016) (citing *Quechan Tribe of Fort Yuma Indian Reservation v. U.S. Dep't of Interior*, 755 F.Supp.2d 1104, 1112, 1118 (S.D.Cal. 2010)).

65.     Here, the Colony disputes the assertion by the BLM in its Record of Decision approving the project that it began consultation with the Colony in 2018 or 2019.

66.     The Colony further disputes the assertion by the BLM in its Record of Decision approving the project that it began the formal consultation with the Colony in 2019.

67.     The Colony further disputes the assertion by the BLM in its Record of Decision approving the project that it mailed copies of various documents associated with the NEPA process to the Colony in partial compliance with its Section 106 obligations.

68.     The Colony further disputes the assertion by the BLM in its Record of Decision approving the project that no comments or concerns have been raised during formal government-to-government consultation for the Project by the Tribes.

69.     The Colony further disputes the assertion in the BLM's Historic Properties Treatment Plan that:

> Per the BLM, Tribal consultation with the Fort McDermitt Paiute and Shoshone Tribe, Summit Lake Paiute Tribe, and the Winnemucca Indian Colony began in 2017 and continues to date. Consultation has not identified any sacred sites, places of cultural and religious importance, or traditional cultural properties within the TPP area. Further, none of the consulted Native American groups have raised any questions or comments or presented issues with the Project. As part of this HPTP, we aim to involve interested Native Americans in treatment fieldwork and monitoring.

70.     When notifying the State Historic Preservation Officer, the State Protocol Agreement, Section I.B states:

> In the earliest feasible planning stage for any undertaking, BLM will determine the information needed to identify and evaluate historic

properties within the Area(s) of Potential Effect (APE). BLM will base such determinations on a file search of the BLM/SHPO cultural resource records, aerial photographs, **Government Land Office (GLO) records, BLM land records**, resource management plans, project-specific NEPA documents of the proposed project area, available cultural resource planning models, and on information sought and obtained from SHPO and consulting parties. As needed BLM will gather the necessary information through appropriate levels of inventory or interviews with members of the public, professionals, and tribal experts. Resources of religious and cultural significance to Native American tribes must be included in determining inventory needs, **based on appropriate notification and consultation, as required per BLM Manual 8120 and any associated Handbook**, as well as any additional relevant instruction or guidance.

71.     When identifying, evaluating, and treating historic properties, the State Protocol Agreement requires that:

BLM will ensure that historic properties that may be affected by any undertaking are identified and evaluated in accordance with the procedures established below. BLM will ensure that project-specific surveys and other efforts to identify and evaluate historic properties are conducted in accordance with appropriate professional standards. These standards are defined in BLM Manual 8110, *Identifying and Evaluating Cultural Resources,* BLM Manual 8140, *Protecting Cultural Resources,* Nevada BLM supplements to this agreement including the *Guidelines* and *Architectural Guidelines,* the *Secretary of the Interior's Standards and Guidelines for Archaeology and Historic Preservation* (48 FR 44716), and relevant written SHPO guidance.

State Protocol Agreement, Section V, pg. 16.

72.     Pertinent "procedures established below" in Section v of the State Protocol Agreement include:

Section V.A.4: "When Indian tribes identify properties of religious and cultural importance, consultation with tribes to comply with the NHPA will be guided by the latest BLM manual and associated Handbook, appropriate Information Memoranda and Information

MADDOX & CISNEROS, LLP
An Association of Professional Corporations
3230 S. Buffalo Drive, Suite 108
Las Vegas, Nevada 89117

MADDOX & CISNEROS, LLP
An Association of Professional Corporations
3230 S. Buffalo Drive, Suite 108
Las Vegas, Nevada 89117

Bulletins relaying guidance on tribal consultation protocols from the Washington Office or NSO, or by consultation procedures agreed to by BLM and a tribe through a signed Memorandum of Understanding (MOU)."

Section V.B.5: "Provisions for evaluation extend to properties of religious and cultural significance to Indian tribes. The BLM Manager makes eligibility determinations based on consultation with affected Indian tribes and on recommendations made by CRSs. BLM also acknowledges that Indian tribes possess special expertise in assessing the eligibility of historic properties that may possess religious and cultural significance. BLM's consultation process should follow the latest Manual and associated Handbook, as well as appropriate Information Memoranda and Information Bulletins relaying guidance on tribal consultation protocols from the Washington Office or NSO."

Section V.C.3: "An undertaking's potential effects to properties or religious and cultural significance, as defined in BLM Manual 8120, and reasonable treatments for those effects can only be determined in consultation with the people who value the property. For Indian tribes and for Native American individuals, consultation will be guided by the latest BLM Manual and associated Handbook. BLM will also employ this consultation as a basis for determining and treating adverse effects to historic properties of religious and cultural significance."

73.     The State Protocol Agreement includes a brightline, procedural rule at Section V.F.4.a-b, which reads:

4.      BLM will negotiate a [Memorandum of Agreement] addressing adverse effects when BLM and SHPO agree that the adverse effects are known prior to the approval of the undertaking.

a.      The MOA establishes BLM-SHPO concurrence regarding the resolution of project-related adverse effects according to a [Historic Properties Treatment Plan], as well as other stipulations and measures that may be

MADDOX & CISNEROS, LLP
An Association of Professional Corporations
3230 S. Buffalo Drive, Suite 108
Las Vegas, Nevada 89117

specified in the MOA. BLM must initiate consultation with SHPO regarding eligibility, effects, and resolution of adverse effects with sufficient lead time to allow for development of an MOA on a schedule meeting the undertaking's anticipated DR or ROD. BLM will also consult with Indian tribes and other consulting parties, as appropriate. The MOA must be signed by the appropriate parties <u>prior</u> to BLM's issuance of a DR or ROD for the undertaking.

    b.    Draft PAs and MOAs should be made available for public comment." (emphasis with original.)

74.    Pertinent standards defined by BLM Manual 8110, *Identifying and Evaluating Cultural Resources*, include:

M-8110.22D2: "Specific properties, or categories of properties, of traditional cultural or religious importance should be known to the group that ascribes traditional value to them. Accordingly, such properties are not identified using survey methods analogous to archaeological survey. Instead, they are identified by consulting with the cultural groups known to have traditional interests in the target area. Consultation gives interested persons an opportunity to reveal to the BLM the specific locations of traditional cultural places that are known to them and that they want the BLM to consider during decision making. Consultation with Native Americans to locate properties of traditional importance is carried out in conformance with Handbook H-8120-1. Consultation to identify these types of properties should always precede field survey."

75.    Despite BLM's and SHPO's agreeing that adverse effects to historic properties in Peehee mu'huh were known prior to approval of the undertaking, the MOA **was not signed by the Colony** prior to BLM's issuance of the ROD. Nor were draft Programmatic Agreements or Memorandums of Agreement made available for public comment.

MADDOX & CISNEROS, LLP
An Association of Professional Corporations
3230 S. Buffalo Drive, Suite 108
Las Vegas, Nevada 89117

76.     Inexplicably, the Notice of Availability of the Final Environmental Impact Statement for the Intervening Thacker Pass Project, published December 4, 2020, stated that "[t]he BLM and Nevada SHPO recently executed a Memorandum of Agreement to resolve adverse effects to the 57 historic properties." But the January 15, 2021 Record of Decision contradicted the Notice of Availability and stated:

> In accordance with the requirements of Section 106 of the National Historic Preservation Act, the BLM coordinated and consulted with the State Historic Preservation Office (SHPO). The BLM received a letter dated Wednesday, October 7, 2020, providing the SHPO's concurrence on the cultural resource report and finding of adverse effect. A Memorandum of Agreement and treatment plan are being prepared, and the BLM will continue to consult with the SHPO on the Project and treatment plan in accordance with programmatic protocols.

77.     BLM chose to coordinate "NEPA and NHPA § 106 compliance by using the NEPA scoping process to partially fulfill NHPA public notification requirements to seek input from the public and other consulting parties on the Project and its effects on historic properties." FEIS, p. 6-22.

78.     36 CFR § 800.8(a)(1) states: "...an environmental impact statement (EIS) under NEPA, should include consideration of the undertaking's likely effects on historic properties." 36 CFR § 800.8(a)(3) directs agency officials to "ensure the preparation...of an EIS and record of decision (ROD) includes appropriate scoping, identification of historic properties, assessment of effects upon them, and consultation leading to resolution of any adverse effects."

79.     When BLM uses the NEPA process for § 106 purposes, 36 CFR § 800.8(c) allows for an agency official:

> to use the process and documentation required for the preparation of an...EIS/ROD to comply with section 106 . . . .if the agency official has notified in advance the SHPO/THPO and the Council that it intends to do so and the following standards are met:

*(1) Standards for developing environmental documents to comply with Section 106.*

During preparation of the EA or draft EIS (DEIS) the agency official shall:

…

(ii)    Identify historic properties and assess the effects of the undertaking on such properties in a manner consistent with the standards and criteria of §§ 800.4 through 800.5 …

(iii)    Consult regarding the effects of the undertaking on historic properties with the SHPO/THPO, Indian tribes and Native Hawaiian organizations that might attach religious and cultural significance to affected historic properties, other consulting parties, and the Council, where appropriate, during NEPA scoping, environmental analysis, and the preparation of NEPA documents;

….

(v)    Develop in consultation with identified consulting parties alternatives and proposed measures that might avoid, minimize or mitigate any adverse effects of the undertaking on historic properties and describe them in the EA or DEIS.

## BLM's Violations of the National Historic Preservation Act

80.    36 CFR § 800.1(c) directs BLM that it "shall ensure that the section 106 process is initiated early in the undertaking's planning, so that a broad range of alternatives may be considered during the planning process for the undertaking." Similarly, 36 CFR § 800.2(c)(2)(ii)(A) warns BLM that Tribal "[c]onsultation should

MADDOX & CISNEROS, LLP
An Association of Professional Corporations
3230 S. Buffalo Drive, Suite 108
Las Vegas, Nevada 89117

commence early in the planning process, in order to identify and discuss relevant preservation issues…"

81.     BLM did not ensure that the § 106 process involved the Colony early in the undertaking's planning process.

82.     Under BLM's own definition of consultation, BLM did not conduct *any* consultation with the Colony before issuing the Record of Decision on January 21, 2021.

83.     In the Final EIS, BLM represented that "Consultation regarding historic properties and locations of Native American Religious Concern were conducted by the BLM via mail and personal correspondence in 2018 and 2019 pursuant to the National Historic Preservation Act (NHPA) and implementing regulations at 36 CFR 800 in compliance with the BLM-SHPO 2014 State Protocol Agreement." FEIS, p. 4-120.

84.     The Colony disputes this statement, as consultation with the Colony did not occur in 2018 or 2019.

85.     Without using the word "consultation," the Record of Decision states that "The BLM has been in contact with tribal governments regarding this Project from its early stages (October 2018) and throughout the ensuring National Environmental Policy Act (NEPA) process." ROD, pg. 5. The word "contact" here is much more accurate than "consultation." But BLM was not in contact with the Colony's government. Further, mere contact is not sufficient to fulfill the obligations of NHPA, Section 106; the APRA consultation process; and definitely not the extensive NAGPRA process.

86.     BLM withheld relevant information from the Nevada SHPO during the required consultation process. 36 CFR § 800.4(b) requires that "in consultation with the [SHPO], the Agency Official shall make a reasonable and good faith effort to identify historic properties." Indeed, "consultation with the SHPO is an integral part

MADDOX & CISNEROS, LLP
An Association of Professional Corporations
3230 S. Buffalo Drive, Suite 108
Las Vegas, Nevada 89117

of the section 106 process." *Pueblo of Sandia v. US*, 50 F.3d 856, 862 (10th Cir. 1995). "Affording the SHPO an opportunity to offer input on potential historic properties would be meaningless unless the SHPO has access to available, relevant information. Thus, 'consultation' with the SHPO mandates an informed consultation." *Id.*

87.     In addition to withholding pertinent information, BLM has misrepresented, and continues to misrepresent, the so-called "tribal consultation" it engaged in in multiple communications with the Nevada State Historic Preservation Officer. NHPA obligates BLM to engage in good faith consultation with the Nevada SHPO, too.

88.     The BLM conclusion that "as of the date of this letter no questions, comments, or issues have been raised and no sacred sites, places of cultural and religious importance, or traditional cultural properties have been identified within the project area by any tribes" is incorrect.

89.     As explained above, Section B of the Protocol Agreement states that "Native American participation will be guided by 36 CFR § 800.2(c)(2)(ii)(A-F), the provisions of BLM Manual 8120 (Manual) and the latest edition of any associated Handbook, as well as any policy guidance issued by BLM that supplements the Manual." Section V.A.4 of the State Protocol Agreement echoes Section B and states: "When Indian tribes identify properties of religious and cultural importance, consultation with tribes to comply with the NHPA will be guided by the latest BLM manual and associated Handbook…"

90.     Under the definitions specified in the State Protocol Agreement and agreed to by BLM and the Nevada SHPO, BLM indicated that tribal consultation had been initiated when it had not.

91.     The assertion that no tribal consultation happened with the Colony is confirmed by letters the Colony has written to BLM since being sent the finalized HPTP in early April 2021.

MADDOX & CISNEROS, LLP
An Association of Professional Corporations
3230 S. Buffalo Drive, Suite 108
Las Vegas, Nevada 89117

MADDOX & CISNEROS, LLP
An Association of Professional Corporations
3230 S. Buffalo Drive, Suite 108
Las Vegas, Nevada 89117

92.     On April 19, 2021, Colony Council wrote to BLM, Humboldt River Field Office Field Manager Kathleen Rehberg. The WIC Council stated, in pertinent part:

> This is the first communication that our Colony has received, to the best of our knowledge, from BLM or others in regard to this proposed project. Our Colony Council hereby expresses our opposition to this project, at least until the Winnemucca Indian Colony has the opportunity to review and assess for ourselves the sufficiency of the data collected and operational plans of the project.
>
> The Winnemucca Indian Colony is very concerned about the protection and conservation of our aboriginal lands that are under the jurisdiction and influence of the BLM. We believe there may be archaeological sites, religious and traditional sites, and areas of cultural importance to our Colony that may be desecrated or destroyed. We are concerned that BLM has not adequately complied with its own Tribal Consultation Policy and Handbook, 1780-1…
>
> We are surprised and concerned that both, the BLM and the Nevada State Historic Preservation Office, have approved the Historic Properties Treatment Plan (HPTP) to mitigate impacts to archaeological sites in the mine's Plan of Operations (PoO) boundary without any talks or discussion with the Winnemucca Indian Colony. We are concerned that you [sic] document "Final Formatted LNC Thacker HPTP" on page 47, states that consultation was held with the Winnemucca Indian Colony beginning in 2017 and continues to date. We believe that it is not true, and that BLM or others have NOT consulted with the Winnemucca Indian Colony regarding the proposed project. Please provide dates and individual names of anyone in the Winnemucca Indian Colony or documents, positions taken, who may have discussed this project with BLM or its representatives.

*See* also Rojo Declaration at ¶¶ 16-25.

93.     The WIC Council concluded the letter with a list of 10 specific requests including that no collections, testing, or curation be conducted "until tribal elders can

participate in the determination of significance prior to the intrusion and removal of such properties"; "Mitigation agreements should be sought before collection, testing, desecration of potentially sacred objects and properties"; "No curation of historic properties associated with our Colony members and our ancestors should be made prior to consultation and agreement is reached with the Colony"; and "Avoidance of any disturbance or impacts to historic resources prior to discussions with the Colony or its representatives should be assured by BLM to prevent desecration of sacred trust assets."

94.    BLM never responded to this letter.

95.    On April 13, 2020, BLM Winnemucca became aware of the Advisory Council on Historic Properties' recommendations for NHPA § 106 compliance during the COVID-19 pandemic. Those recommendations stated:

> The Section 106 deadlines for the response of State and Tribal Historic Preservation Officers, and Indian tribes and Native Hawaiian organizations that attach religious and cultural significance to historic properties affected the undertaking, regardless of its location (collectively, States/Tribes/NHOs), will be considered paused while, due to the COVID-19 outbreak, an office is closed or work conditions are such that the States/Tribes/NHOs are unable to carry out their Section 106 duties or statutory rights to consultation in a timely fashion (e.g., staff unavailability due to health reasons; restricted access to records; state or tribal laws requiring hard copy records; lack of Internet access or telework capabilities. The clock will resume once the conditions are no longer in effect.

96.    These recommendations support the Colony's contentions that by fast-tracking the NHPA § 106 consultation process with the Tribes while COVID-19 shut down tribal offices across Indian Country and while COVID-19 was disproportionately affecting the Tribes, BLM did not ensure that consultation in the section 106 process provided Indian tribes a reasonable opportunity to identify its concerns about historic properties, advise on the identification and evaluation of

MADDOX & CISNEROS, LLP
An Association of Professional Corporations
3230 S. Buffalo Drive, Suite 108
Las Vegas, Nevada 89117

historic properties, including those of traditional religious and cultural importance, articulate its views on the undertaking's effects on such properties, and participate in the resolution of adverse effects. BLM's dismissal of these recommendations are evidence that BLM did not make a reasonable and good faith effort to identify Indian tribes that shall be consulted in the § 106 process.

97.     In *Quechan Tribe of Fort Yuma Indian Reservation v. US Dept. of Interior*, 755 F.Supp. 2d 1104, 1111-1112 (S.D. Cal. 2010), the federal district court found:

> Defendants provide string citations to materials in the record which they say document 'extensive consultation with tribes, including Plaintiff. This description of the documents is general and cursory, and sheds little light on the degree to which BLM consulted with the Tribe, or whether the consultation was intended to comply with NEPA or NHPA. First, the documentation includes consultations with other tribes, agencies, and with the public. While this other consultation appears to be required and serves other important purposes, it doesn't substitute for the mandatory consultation with the Quechan Tribe. In other words, that BLM did a lot of consulting in general doesn't show that its consultation with the Tribe was adequate under the regulations. Indeed, Defendants' grouping tribes together (referring to consultation with "tribes") is unhelpful: Indian tribes aren't interchangeable, and consultation with one tribe doesn't relieve the BLM of its obligation to consult with any other tribe that may be a consulting party under NHPA.

98.     The State Protocol Agreement obligated BLM to prepare a Cultural Resources Inventory Needs Assessment (CRINA) with the Nevada State Historic Preservation Officer (SHPO). The State Protocol Agreement explains at Section I.B.1:

> "The intent of the CRINA is to establish the Direct and Indirect Effect APEs, provide a summary of known resources present within the APEs, evaluate inventory needs, describe the methods (other than standard inventory) that will be used to analyze effects (e.g., visual and auditory simulation modelling), and list the tribes, consulting parties and members of the public who will be consulted for individual undertakings. Problems that arise late in the processing of land use applications often stem from one or more of these critical pieces of Section 106 compliance missing from the

MADDOX & CISNEROS, LLP
An Association of Professional Corporations
3230 S. Buffalo Drive, Suite 108
Las Vegas, Nevada 89117

MADDOX & CISNEROS, LLP
An Association of Professional Corporations
3230 S. Buffalo Drive, Suite 108
Las Vegas, Nevada 89117

process. The CRINA can help alleviate (but not eliminate) Section 106 compliance issues by ensuring these steps are established early in the planning process, and that both BLM and SHPO have the opportunity to communicate with one another on the planned Section 106 compliance process for individual undertakings…

99.   The Thacker Pass CRINA, in turn, states: "The following inventory actions are needed for the project…review aerial imagery, and historic reference material including topographic maps and GLO maps to identify any potential unrecorded historic properties within the Indirect APE that may be indirectly affected by the project."

100.   BLM's own land records and GLO maps contain references to the September 12, 1865 massacre site, which is "within the Indirect APE that may be indirectly affected by the project." However, BLM did not review these materials as required by the State Protocol Agreement and the CRINA. Because of this, BLM has never considered the eligibility of the September 12, 1865 massacre site for the National Register of Historic Places, has not identified adverse effects to the massacre site, and has not mitigated those adverse effects (partial to complete destruction of the large swathes of acreage where it took place).

101.   According to the ROD, the following is the extent of BLM's "Native American Consultation" prior to issuing the ROD:

The BLM has been in contact with tribal governments regarding this Project from its early stages (October 2018) and through the ensuing National Environmental Policy Act (NEPA) process.

In December 2019, BLM sent certified letters to Fort McDermitt, Pyramid Lake, Summit Lake, and Winnemucca Indian Colony "initiating formal consultation." These tribes are also on the Project EIS mailing list to receive updates, and the BLM notified the tribes of the availability of the draft EIS in July 2020. The tribes also received notification and copies of the final EIS by certified mail in December 2020. No comments or concerns have been raised

during formal government to government consultation for the Project by the tribes.

102.   In a case similar to this one, the 10th Circuit ruled: "The record reveals that the Forest Service did request information from the Sandia Pueblo and other local Indian tribes, but a mere request for information is not necessarily sufficient to constitute the 'reasonable effort' section 106 requires." *Pueblo of Sandia v. United States,* 50 F.3d 856, 860 (10th Cir.1995)

103.   In another case similar to this one, the BLM offered documentation of consultations with tribes different from the plaintiffs, with other agencies, and with the public. However, the federal district court noted:

> While this other consultation appears to be required and serves other important purposes, it doesn't substitute for mandatory consultation with the Quechan Tribe. In other words, that BLM did a lot of consulting in general doesn't show that its consultation with the Tribe was adequate under the regulations. Indeed, [the BLM] grouping tribes together (referring to consultation with 'tribes') is unhelpful: Indian tribes aren't interchangeable, and consultation with one tribe doesn't relieve the BLM of its obligation to consult with any other tribe that may be a consulting party under NHPA.

*Quechan Tribe of Fort Yuma Indian Reservation v. US Dept. of Interior,* 755 F.Supp.2d 1104, 1118 (SD Calif. 2010)

104.   *The Quechan Tribe* court also stated: "...the BLM's communications are replete with recitals of law (including Section 106), professions of good intent, and solicitation to consult with the Tribe. But mere pro forma recitals do not, by themselves, show BLM actually complied with the law." *Id.*

105.   Furthermore, federal courts have ruled "[c]ontact, of course, is not consultation, and 'consultation with one tribe doesn't relieve the [agency] of its obligation to consult with any other tribe." *Standing Rock Sioux Tribe v. U.S. Army Corps*

MADDOX & CISNEROS, LLP
An Association of Professional Corporations
3230 S. Buffalo Drive, Suite 108
Las Vegas, Nevada 89117

*of Engineers*, 205 F.Supp.3d 4, 32 (D. DC 2016) (citing *Quechan Tribe of Fort Yuma Indian Reservation v. U.S. Dep't of Interior*, 755 F.Supp.2d 1104, 1112, 1118 (S.D.Cal. 2010))

106.   The only so-called consultation the BLM can demonstrate for the Thacker Pass project are mere *pro forma* recitals, requests for information, and feeble attempts at contacting a fraction of the tribes who attach religious and cultural significance to Peehee mu'huh.

107.   On November 5, 2020, BLM and the SHPO entered into a Memorandum of Agreement approving the HPTP. Despite the FEIS (4-85) stating that the HPTP would be approved through consultation with local Native American tribes, no tribes participated in preparing this HPTP.

108.   On January 15, 2021, the Record of Decision was published.

109.   BLM failed to identify historic properties eligible for inclusion in the National Register of Historic Places in Peehee mu'huh before issuing this Record of Decision.

110.   NHPA authorizes the Secretary of the Interior to expand and maintain a National Register of districts, sites, buildings, structures, and objects significant in American history, architecture, archeology, engineering, and culture. 36 CFR § 60.1(a).

> The quality of significance in American history, archeology, and culture is present in districts, sites, buildings, structures, and objects that possess integrity of location, design, setting, materials, workmanship, feeling, and association and
>
> (a)    that are associated with events that have made a significant contribution to the broad patterns of our history; or
>
> (b)    that are associated with the lives of persons significant in our past; or
>
> (c)    that embody the distinctive characteristics of a type, period, or method of construction, or that represent the work of a master or that possess high artistic

MADDOX & CISNEROS, LLP
An Association of Professional Corporations
3230 S. Buffalo Drive, Suite 108
Las Vegas, Nevada 89117

values, or that represent a significant and distinguishable entity whose components may lack individual distinction; or

(d)    that have yielded, or may be likely to yield, information important in prehistory or history.

36 CFR § 60.4.

111.    According to BLM Manual 8110 *Identifying and Evaluating Cultural Resources*:

Properties of traditional cultural or religious importance to Native Americans (including "traditional cultural properties" as discussed in National Register Bulletin No. 38) can be found to meet National Register criteria and this should be located, described, and evaluated at the same stage in the Section 106 compliance process as the field inventory for historic properties. Properties of traditional cultural or religious importance must meet one or more National Register criteria (i.e., must be historically significant) in order to be determined eligible for the National Register.

BLM Manual 8110.22D

Properties of traditional cultural or religious importance are specific, definite places that figure directly and prominently in a particular group's cultural practices, beliefs, or values, when those practices, beliefs, or values (i) are widely shared within the group, (ii) have been passed down through the generations, and (iii) have served a recognized role in maintaining the group's cultural identity for at least 50 years…

BLM Manual 8110.22D(1)

112.    All of Peehee mu'huh is a traditional cultural property eligible for inclusion on the National Register of Historic Places. And, the September 12, 1865 massacre site is an historic property eligible for inclusion.

113.    The September 12, 1865 massacre site is a property eligible for inclusion on the National Register of Historic Properties.

MADDOX & CISNEROS, LLP
An Association of Professional Corporations
3230 S. Buffalo Drive, Suite 108
Las Vegas, Nevada 89117

MADDOX & CISNEROS, LLP
An Association of Professional Corporations
3230 S. Buffalo Drive, Suite 108
Las Vegas, Nevada 89117

114.    Under the State Protocol Agreement and BLM Manual 8110.41A, "Field Office managers shall allocate to appropriate use categories all cultural properties known and projected to occur in a plan area." And, "A cultural property may be allocated to more than one use category or it may pass from one category to another (e.g., from Scientific Use to Public Use)..." Id.

115.    New data about these historic properties has become available and 8110.41B requires: "Allocations shall be reevaluated and revised, as appropriate, when circumstances change or new data become available. Conditions and/or criteria for revising allocations must be included in the RMP, or else revisions may require a plan amendment."

116.    BLM's "use categories" are defined at BLM Manual 8110.42. These use categories are "Scientific Use," "Conservation for Future Use," "Traditional Use," "Public Use," "Experimental Use," and "Discharged from Management."

117.    Because BLM failed to identify the Thacker Pass massacre site, it concluded in the HPTP that: "The precontact archaeological record is the prevalent cultural resources element of the project area." That is no longer true. Of the 57 historic properties BLM originally identified in Thacker Pass, BLM determined in the HPTP that all but 1 property were only eligible for the National Register under Criterion D, assigned these to the Scientific Use category, and therefore concluded that adverse effects to these properties can be mitigated solely through archaeological data recovery. "Archaeological data recovery" means removing artifacts created by the Intervening Plaintiffs' ancestors to Far Western Anthropological Research Group, Inc's warehouses and offices where the public cannot access them. Far Western will spend several years studying the artifacts before handing them over to a museum.

118.    Once the HPTP is implemented, if there are no revisions based on new data, then the Intervening Plaintiffs will not be able to see those artifacts until they are

handed over to a museum. And, then, only when they can afford to travel to the museum and to pay museum entrance fees.

### The Native American Graves Protection and Repatriation Act

119. The Native American Graves Protection and Repatriation Act's implementing regulations at 43 CFR § 10 *et seq.*, "develop a systematic process for determining the rights of lineal descendants and Indian tribes...to certain Native American human remains, funerary objects, sacred objects, or objects of cultural patrimony with which they are affiliated." 43 CFR § 10.1(a). "[t]hese regulations pertain to identification and appropriate disposition of human remains, funerary objects, sacred objects, or objects of cultural patrimony that are in federal possession or control...or excavated intentionally or discovered inadvertently on Federal or tribal lands." 43 CFR § 10.1(b)(1)(i) and (iii).

120. NAGPRA imposes extensive consultation obligations with Indian tribes and Native American lineal descendants under 43 CFR § 10.3(b), § 10.3(c) and § 10.5(b) whenever a planned activity *may* result in excavation of human remains, funerary objects, sacred objects or objects of cultural patrimony.

121. Whenever an Indian tribe becomes aware that a planned activity *may* result in the excavation of human remains, funerary objects, sacred objects or objects of cultural patrimony, an Indian tribe is specifically empowered to ensure that BLM complies with § 10.3(b) under § 10.3(c)(4).

122. 43 CFR § 10.3(b) lists "Specific Requirements":

"These regulations permit the intentional excavation of human remains, funerary objects, sacred objects, or objects of cultural patrimony from Federal or tribal lands only if:

(1)     The objects are excavated or removed following the requirements of [ARPA] and its implementing regulations...Procedures and requirements for issuing

MADDOX & CISNEROS, LLP
An Association of Professional Corporations
3230 S. Buffalo Drive, Suite 108
Las Vegas, Nevada 89117

permits will be consistent with those required by the ARPA and its implementing regulations;

(2)    The objects are excavated after consultation with or, in the case of tribal lands, consent of, the appropriate Indian tribe...pursuant to § 10.5;

(3)    The disposition of the objects is consistent with their custody as described in § 10.6; and

(4)    Proof of the consultation or consent is shown to the Federal agency official or other agency official responsible for the issuance of the required permit."

123.    To accord with 43 CFR § 10.3(c)(1),

[t]he Federal agency must take reasonable steps to determine whether a planned activity may result in the excavation of human remains, funerary objects, sacred objects or objects of cultural patrimony from Federal lands. **Prior to issuing any approvals or permits for activities,** the Federal agency official must notify in writing the Indian tribes or Native Hawaiian organizations that are likely to be culturally affiliated with any human remains, funerary objects, sacred objects, or objects of cultural patrimony that may be excavated. The Federal agency official must also notify any present-day Indian which aboriginally occupied the area of the planned activity and any other Indian tribes or Native Hawaiian organizations that the Federal agency official reasonably believes are likely to have a cultural relationship to the human remains, funerary objects, sacred objects, or objects of cultural patrimony that are expected to be found. The notice must be in writing and describe the planned activity, its general location, the basis upon which it was determined that human remains, funerary objects, sacred objects, or objects of cultural patrimony may be excavated, and the basis for determining likely custody pursuant to § 10.6. The notice must also propose a time and place for meetings or consultations to further consider the activity, the Federal agency's proposed treatment of any human remains, funerary objects, sacred objects, or objects of cultural patrimony that may be excavated, and the proposed disposition of any excavated human remains, funerary objects, sacred objects, or objects of cultural patrimony.

MADDOX & CISNEROS, LLP
An Association of Professional Corporations
3230 S. Buffalo Drive, Suite 108
Las Vegas, Nevada 89117

Written notification should be followed up by telephone contact if there is no response in 15 days. Consultation must be conducted pursuant to § 10.5.

124.   43 CFR § 10.3(c)(2) requires that "[f]ollowing consultation, the Federal agency official must complete a written plan of action (described in § 10.5(e)) and execute the actions called for in it."

125.   Because the Thacker Pass Project is also subject to review under section 106 of NHPA, "the Federal agency official should coordinate consultation and any subsequent agreement for compliance conducted under that Act with the requirements of § 10.3(c)(2) and § 10.5." 43 CFR § 10.3(c)(3).

126.   The NAGPRA implementing regulations specifically empower Indian tribes to ensure that BLM follows the NAGPRA procedures. 43 CFR § 10.3(c)(4) provides:

> If an Indian tribe or Native Hawaiian organization receives notice of a planned activity or otherwise becomes aware of a planned activity that may result in the excavation of human remains, funerary objects, sacred objects, or objects of cultural patrimony on tribal lands, the Indian tribe or Native Hawaiian organization may take appropriate steps to: (i). Ensure that the human remains, funerary objects, sacred objects, or objects of cultural patrimony are excavated or removed following 43 CFR § 10.3(b), and (ii) Make certain that the disposition of any human remains, funerary objects, sacred objects, or objects of cultural patrimony excavated intentionally or discovered inadvertently as a result of the planned activity are carried out following 43 CFR § 10.6.

127.   43 CFR § 10.5(b)(1) states:

> Upon receiving notice of, or otherwise becoming aware of, an inadvertent discovery or planned activity that has resulted or may result in the intentional excavation or inadvertent discovery or human remains, funerary objects, sacred objects or objects of cultural patrimony on Federal lands, the responsible Federal agency official must, as part of the procedures described in §§ 10.3 and

10.4, take appropriate steps to identify the lineal descendant, Indian tribe, or Native Hawaiian organization entitled to custody of the human remains, funerary objects, sacred objects, or objects of cultural patrimony pursuant to § 10.6 and § 10.14.”

128.   The rest of 43 CFR § 10.5 details an extensive consultation process that BLM has failed to begin much less complete. Instead of laying out the rest of 43 CFR § 10.5 (which the Intervening Plaintiffs incorporate here, by reference), the Intervening Plaintiffs highlight parts of this consultation process.

129.   43 CFR § 10.5(b)(1)(i-iv) describes the parties that “the Federal agency official shall notify in writing” and includes lineal descendants of deceased Native Americans likely to be excavated,” “Indian tribes that are likely to be culturally affiliated,” “which aboriginally occupied the area, or “that have a demonstrated cultural relationship” to human remains or objects likely to be excavated.

130.   43 CFR § 10.5(b)(2) requires that the notice must propose a time and place for meetings or consultation to consider the intentional excavation or inadvertent discovery, the Federal agency’s proposed treatment of the human remains or objects, and the planned disposition of the human remains or objects.

131.   43 CFR § 10.5(b)(3) requires that “the consultation must seek to identify traditional religious leaders who should also be consulted and seeking to identify, where applicable, lineal descendants and Indian tribes affiliated” with the human remains and objects.

132.   43 CFR § 10.5(c) describes information that BLM “must provide” to lineal descendants and officials of Indian tribes likely to be affiliated with human remains or objects. 43 CFR § 10.5(d) describes information that BLM “must request” during the consultation process. BLM did not provide or request the required information under 43 CFR § 10.5(c) or (d).

133.   43 CFR § 10.5(e) describes a written plan of action that BLM "must prepare, approve, and sign" and requires that this written plan of action be provided to the lineal descendants and Indian tribes involved. § 10.5(e) also includes a list of things that BLM must document with the written plan of action. BLM never prepared this written plan of action.

## The National Environmental Policy Act

134.   Impacts to traditional cultural and historic properties in Thacker Pass are part of the environmental impacts and consequences of the Thacker Pass Project. BLM was required to adequately consider these consequences in both the Thacker Pass Draft and Final Environmental Impact Statements.

135.   NEPA, at 42 U.S.C. § 4332, provides in pertinent part:

The Congress authorizes and directs that, to the fullest extent possible…(2)all agencies of the Federal Government shall –

....

(C)   include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on –

(i)    the environmental impact of the proposed action,

(ii)   any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii)  alternatives to the proposed action,

(iv)   the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

MADDOX & CISNEROS, LLP
An Association of Professional Corporations
3230 S. Buffalo Drive, Suite 108
Las Vegas, Nevada 89117

(v)   any irreversible and irretrievable commitments of resources which would be involved in the proposed action should be implemented.

136.   Environmental Impact Statements shall include discussions of

The environmental impacts of the proposed action and reasonable alternatives to the proposed action and the significance of those impacts. The comparison of the proposed action and reasonable alternatives shall be based on this discussion of the impacts.

40 CFR 1502.16(a)(1))

Any adverse environmental effects that cannot be avoided should the proposal be implemented.

40 CFR 1502.16(a)(2)

Possible conflicts between the proposed action and the objectives of Federal, regional, State, Tribal, and local land use plans, policies and controls for the area concerned,

40 CFR 1502.16(a)(5).

Urban quality, historic and cultural resources, and the design of the built environment, including the reuse and conservation potential of various alternatives and mitigation measures.

40 CFR 1502.16(a)(8)

137.   40 CFR § 1502.9(d)(1)(ii) declares:

Agencies shall prepare supplements to either draft or final environmental impact statements if a major Federal action remains to occur, and there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

138.   BLM has ignored significant information about adverse effects to historic properties in Thacker Pass. This information includes but is not limited to the historical, cultural, and religious significance that the Colony and other regional Tribes attach to Thacker Pass; the existence of the Indian Lodgings in the Area of Potential

Effects; the existence of the September 12, 1865 massacre site in the Area of Potential Effects; the concerns that the Colony and regional Tribes have brought about the project; and·the lack of consultation with the Colony and regional Tribes.

### BLM's NAGPRA, and NEPA Violations

139.   As discussed in the section on BLM's NHPA violations above, the Winnemucca Indian Colony on April 19, 2021, told BLM about the Thacker Pass project area: "We believe there may be archeological sites, religious and traditional sites, and areas of cultural importance to our Colony that may be desecrated or destroyed."

140.   In this letter, the Winnemucca Indian Colony also told BLM that "Our Colony requests that collections, testing and curation not be conducted until tribal elders can participate in the determination of significance prior to the intrusion and removal of such properties"; that "Mitigation agreements should be sought before collection, testing, desecration of potentially sacred objects and properties;" and that "No curation of historic properties associated with our Colony members and our ancestors should be made prior to consultation and agreement is reached with the Colony."

141.   On July 14, 2021, because BLM did not respond to Winnemucca Indian Colony's April 19 letter, WIC sent a letter, copying BLM, seeking help from Jean Prijatel, Manager in the Environmental Review Branch, United States Environmental Protection Agency. Pertinent parts of that letter include:

> The Area of Potential Impact [sic] (APE) states that adverse impacts to at least 57 historic properties will occur. Our colony requests that collections, testing and curation not be conducted until tribal elders can participate in the determination of significance prior to the intrusion and removal of such properties.
>
> Mitigation agreements should be sought before collection, testing, desecration of potentially sacred objects and properties.

No curation of historic properties associated with our Colony members and our ancestors should be made prior to consultation and agreement is reached with the Colony.

We are surprised and concerned that both, the BLM and the Nevada State Historic Preservation Office, have approved the Historic Properties Treatment Plan (HPTP) to mitigate impacts to archaeological sites in the mine's Plan of Operations (PoO) boundary without any talks or discussions with the Winnemucca Indian Colony. We are concerned that the document "Final Formatted LNC Thacker HPTP" on page 47, states that consultation was held with the Winnemucca Indian Colony beginning in 2017 and continues to date. We believe that it is not true, and that BLM or others have not consulted with the Winnemucca Indian Colony regarding this project.

*See also* Rojo Declaration at ¶¶26-28.

142.    The HPTP, according to BLM, was final and complete on November 5, 2020. The Colony was thus not being given an opportunity to suggest any mitigation measures that BLM would, or according to BLM, could actually incorporate.

## CLAIMS FOR RELIEF
### FIRST CLAIM FOR RELIEF
**Violations of NEPA, its Implementing Regulations, and the APA: Failure to Adequately Assess and Disclose Environmental Impacts, Mitigation, and Alternatives**

143.    Intervenor realleges and incorporates the allegations of all the preceding paragraphs of this Complaint.

144.    NEPA requires federal agencies to prepare an EIS in connection with all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

MADDOX & CISNEROS, LLP
An Association of Professional Corporations
3230 S. Buffalo Drive, Suite 108
Las Vegas, Nevada 89117

145.    NEPA requires federal agencies to take a "hard look" at the direct, indirect, and cumulative impacts of proposed major Federal actions, and at alternatives that could reduce or eliminate those environmental impacts. 42 U.S.C. § 4332(2)(C)(i)-(ii); 40 C.F.R. §§ 1502.16, 1508.7, 1508.8, 1508.25.

146.    The FEIS, HPTP, and ROD fail to comply with the requirements of NEPA, its implementing regulations, and the relevant case law for reasons including:

a)    Failing to take the requisite "hard look" at the archaeological and cultural resources impacts of the HPTP and the Project and available alternatives to mitigate impacts;

b)    Failing to adequately study, disclose, or mitigate archaeological and cultural resources impacts; and

c)    Relying on less than adequate information by failing to engage in meaningful consultation with Tribes.

147.    Defendants acted arbitrarily and capriciously in approving the FEIS, HPTP, and ROD based on a factual record that contains both questionable data and gaping omissions.

148.    By their actions and inactions as alleged above, Defendants are currently violating the NEPA and its implementing regulations. Defendants' actions and inactions are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the requirements of NEPA and its implementing regulations and are reviewable under the APA, 5 U.S.C. §§ 701–706.

## SECOND CLAIM FOR RELIEF

### Violations of NEPA, its Implementing Regulations, and the APA: Failure to Engage in Government-to-Government Consultation

149.    Intervenor realleges and incorporates the allegations of all the preceding paragraphs of this Complaint.

150.   NEPA regulations require that federal agencies consult early in the NEPA process with "Indian tribes." 40 C.F.R. § 1501.2(d)(2).

151.   The FEIS, HPTP, and ROD fails to comply with the requirements of NEPA regulations by failing to consult with the Colony to ensure that necessary information was received to assess impacts of the Project.

152.   By their actions and inactions as alleged above, Defendants are currently violating the NEPA and its implementing regulations. Defendants' actions and inactions are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the requirements of NEPA and its implementing regulations and are reviewable under the APA, 5 U.S.C. §§ 701–706.

## THIRD CLAIM FOR RELIEF

### Violations of NHPA and the APA: Failure to Consult

153.   Plaintiff realleges and incorporates the allegations of all the preceding paragraphs of this Complaint.

154.   Defendants failed to follow the consultation mandate of the NHPA and its regulations, including 36 C.F.R. §§ 800.1, 800.2, by failing to consult with the Colony regarding the Project.

155.   Defendants failed to comply with NHPA in issuing a ROD for the Thacker Pass Project:

a)   Without planning consultations appropriate to the scale of the undertaking and the scope of Federal involvement, in contravention of 36 CFR § 800.2(a)(4);

b)   Without making a reasonable and good faith effort to identify Indian tribes that should have been consulted with because they attach religious and cultural significance to Peehee mu'huh, in contravention of 36 CFR § 800.2(c)(2)(ii)(A);

MADDOX & CISNEROS, LLP
An Association of Professional Corporations
3230 S. Buffalo Drive, Suite 108
Las Vegas, Nevada 89117

MADDOX & CISNEROS, LLP
An Association of Professional Corporations
3230 S. Buffalo Drive, Suite 108
Las Vegas, Nevada 89117

c)  Without providing the Colony a reasonable opportunity to identify its concerns about historic properties, advise on the identification and evaluation of historic properties, articulate its views on the undertaking's effects on such properties, and participate in the resolution of adverse effects, in contravention of 36 CFR § 800.2(c)(2)(ii)(A);

d)  Without conducting consultation in a manner sensitive to concerns and needs of the Colony, in contravention of 36 CFR § 800.2(c)(2)(ii)(C);

e)  Without seeking and considering the views of the public in a manner that reflects the nature and complexity of the undertaking, in contravention of 36 CFR § 800.2(d)(1);

f)  Without reviewing existing information on historic properties within the area of potential effects, including data concerning possible historic properties not yet identified, in contravention of 36 CFR § 800.4(a)(2) and the State Protocol Agreement;

g)  Without making a reasonable and good faith effort to identify historic properties within the area of potential effects, in contravention of 36 CFR § 800.4(b) and the State Protocol Agreement;

h)  Without carrying out appropriate identification efforts, which may include background research, consultation, oral history interviews, sample field investigation, and field survey, in contravention of 36 CFR § 800.4(b)(1) and the State Protocol Agreement;

i)  Without taking into account past planning, research and studies, the magnitude and nature of the undertaking and the degree of Federal involvement, the nature and extent of potential effects on historic properties, and the likely nature and location of historic properties within the area of potential effects, in contravention of 36 CFR § 800.4(b)(1) and the State Protocol Agreement;

MADDOX & CISNEROS, LLP
An Association of Professional Corporations
3230 S. Buffalo Drive, Suite 108
Las Vegas, Nevada 89117

j) Without reevaluating properties previously determined eligible or ineligible despite the passage of time, changing perceptions of significance, and incomplete prior evaluations requiring BLM reevaluate those properties, in contravention of 36 CFR § 800.4(c)(1) and the State Protocol Agreement;

k) Without ensuring that preparation of the EIS and ROD includes appropriate scoping, identification of historic properties, assessment of effects upon them, and consultation leading to resolution of any adverse effects, in contravention of 36 CFR § 800.8(a)(3);

l) Without identifying historic properties and assessing the effects of the undertaking on such properties in a manner consistent with the standards and criteria of §§ 800.4 through 800.5, in contravention of § 800.8(c)(1)(ii);

m) Without consulting regarding the effects of the undertaking on historic properties that might attach religious and cultural significance to affected historic properties, other consulting parties, and the Council, where appropriate, during NEPA scoping, environmental analysis, and the preparation of NEPA documents, in contravention of § 800.8(c)(1)(iii);Without developing in consultation with identified consulting parties alternative and proposed measures that might avoid, minimize or mitigate any adverse effects of the undertaking on historic properties and describing them in the DEIS, in contravention of § 800.8(c)(1)(v);

n) Without making a draft Memorandum of Agreement available for public comment, in contravention of the Stat Protocol Agreement; and

o) Without having the Memorandum of Agreement signed by the appropriate parties, in contravention of the State Protocol Agreement,

Section V.F.4a. Defendants' failure to consult with the Colony is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the requirements of NHPA and its implementing regulations.

## PRAYER FOR RELIEF

WHEREFORE, for all the foregoing reasons, Intervening Plaintiff requests that this Court issue:

1. Adjudge and declare that any ground disturbing activities planned by Defendants associated with the Project have violated NEPA, NHPA, their implementing regulations, and the APA;

2. Adjudge and declare that Defendants' FEIS, HPTP, and ROD violate the requirements of NEPA, NHPA, their implementing regulations, and the APA;

3. Vacate the FEIS, HPTP, and ROD and remand to the Defendants;

4. Enjoin any ground disturbing activities;

5. Award the Colony its reasonable fees, costs, expenses, and disbursements, including attorneys' fees, associated with this litigation; and

6. Grant the Colony such additional or different relief as it deems just and proper, or as the Colony may hereinafter request.

Dated this _____ day of February, 2022.

_____
Norberto J. Cisneros, Esq. NV Bar No. 8782
Barbara M. McDonald, Esq., NV Bar No. 11651
**MADDOX & CISNEROS, LLP**
3230 S. Buffalo Drive, Suite 108
Las Vegas, Nevada 89117
Telephone: (702) 366-1900
Facsimile: (702) 366-1999

*Attorneys for Plaintiff*

MADDOX & CISNEROS, LLP
An Association of Professional Corporations
3230 S. Buffalo Drive, Suite 108
Las Vegas, Nevada 89117

1  Norberto J. Cisneros, Esq. NV Bar No. 8782
2  Barbara M. McDonald, Esq., NV Bar No. 11651
   MADDOX & CISNEROS, LLP
3  3230 S. Buffalo Drive, Suite 108
4  Las Vegas, Nevada 89117
   Telephone: (702) 366-1900
5  Facsimile: (702) 366-1999
6  *Attorneys for Plaintiff*

7                    UNITED STATES DISTRICT COURT

8                        DISTRICT OF NEVADA

9

10

11  BARTELL RANCH LLC, *et al.*,          *Lead Case:*
12                                         Case No.:  3:21-cv-00080-MMD-CLB
                 Plaintiffs,
13
                                          *Consolidated with:*
14        vs.                              Case No.: 3:21-cv-00103-MMD-CLB
15  ESTER M. MCCULLOUGH, *et al.*,
16                                         **DECLARATION OF**
                                           **JUDY ROJO**
17               Defendants.
18  ────────────────────────────
19  WESTERN WATERSHEDS PROJECT, *et
20  al.*,
21               Plaintiffs,
22
23        vs.
24  UNITED STATES DEPARTMENT OF
25  THE INTERIOR, *et al.*,
26               Defendants.
27
28

MADDOX & CISNEROS, LLP
An Association of Professional Corporations
3230 S. Buffalo Drive, Suite 108
Las Vegas, Nevada 89117

I, JUDY ROJO, hereby declare as follows under penalty of perjury:

1.      I am an enrolled member and Chairwoman of the Winnemucca Indian Colony ("Colony" or "Tribe").

2.      The Colony is a federally recognized Tribe located in Winnemucca, Nevada. The Colony consists of 28 members whose ancestors derive from the Paiute and Shoshone Nations.

3.      The Colony has residents, members, and employees who possess direct religious and cultural connections to Thacker Pass, also sometimes known to us as Peehee mu'huh, as our members practice ceremony there, hunt and gather there, and plan on doing so in the future.

4.      Our Tribal members practice the Sundance ceremony at or near Thacker Pass/ Peehee mu'huh every year.

5.      Our practice of the Sundance originates from the time when Wovoka, a Paiute spiritual leader, shared the Paiute Ghost Dance to leaders in South Dakota and returned with the Sundance, which incorporated our traditions.

6.      The Sundance ceremony is a sacred prayer dance and rigorous ceremony lasting ten days and requiring sacrifice and commitment.

7.      On February 22, 2000, my close relative, Glen Wasson, was murdered at the Winnemucca Indian Colony, and since then, I have personally committed to perform the Sundance every year with our other members, as the ceremony carries the promise of healing through a demanding process of purification, sacrifice and prayer.

8.      The Sundance is a way of life for our members, a way of reaching through seven generations back and forward for betterment.

9.      To build the Thacker Pass Lithium Mine on lands held sacred to our members would be like raping the earth and our culture.

10.     In addition to the Sundance, Tribal members engage in vision quests at or near Thacker Pass/ Peehee mu'huh. A vision quest entails isolation and deep

contemplation in the natural environment. Such vision quests are of important religious significance to Tribal members.

11.     Tribal members also hunt deer, rabbit, and ground hogs at Thacker Pass/Peehee mu'huh.

12.     Tribal members also gather medicinal plants at Thacker Pass/Peehee mu'huh.

13.     Thacker Pass/Peehee mu'huh is further sacred to us, as we believe our ancestors were murdered there during an 1865 massacre.

14.     The Federal Bureau of Land Management ("BLM") did not provide the Colony a reasonable opportunity to identify concerns about historic properties in Thacker Pass/Peehee mu'huh, advise on the identification and evaluation of historic properties there, including those of traditional religious and   cultural importance, articulate views on the Thacker Pass Lithium Mine Project's ("the Project's") effects on such properties, or participate in the resolution of adverse effects as required by the National Historic Preservation Act (NHPA) before the Thacker Pass Record of Decision ("ROD") and Plan of Operations  ("POO") was issued.

15.     On April 14, 2021, Kathleen Rehberg, Humboldt River Field Office Field Manager for BLM, sent me a letter, asking if the Colony considered any of the archaeological sites contained in the POO as having religious or cultural importance.

16.     On April 19, 2021, I wrote a letter to Ms. Rehberg and expressed the Colony's opposition to the Project, at least until the Colony had the opportunity to review and assess for ourselves the sufficiency of the data collected and operational plans of the Project.

17.     I further explained that our Colony had been actively working to reclaim our trust lands, especially over the last three years, cleaning up massive amounts of solid and hazardous waste that had accumulated over the past few decades on our trust lands; that we were working to remove the three or more criminal drug enterprises

operating on the Colony; and that meanwhile, we were initiating an economic development plan in hopes of becoming financially self-sufficient.

18.     I further stated to Ms. Rehberg that we were concerned about the fact that surface water flowing through Water Canyon Creek over the past 40-50 years had diverted and nearly dried up the drainage except during snowmelt and active rain storms; that groundwater had been pumped and diverted from Colony trust lands to the City of Winnemucca, private irrigators, and other users; and that as the Project was located between the Quinn River and Kings River, each of which were in our aboriginal territory, we were concerned about potential adverse impact from diversion.

19.     My efforts to communicate with BLM occurred during a time that the Colony was embroiled in a twenty-year long litigation with the BIA regarding lack of services and funding to the Colony and our aforementioned efforts to remove criminal drug enterprises on our Colony land.

20.     As a result of lack of funding, the Colony does not have a Tribal Resources Officer.

21.     Today, I am further concerned about the effects of pollution of said waters and its adverse impact on water serving the Colony.

22.     I am also concerned about the effects of pollution on the sacred land where we hold the Sundance, and the land where we hunt and gather medicinal herbs.

23.     I further stated to Ms. Rehberg that the Colony was very concerned about the protection and conservation of our aboriginal lands that are under the jurisdiction and influence of the BLM. We believed there may be archaeological sites, religious and traditional sites, and areas of cultural importance to our Colony that may be desecrated or destroyed.

24.     I further stated the Colony was concerned that BLM had not adequately complied with its own Tribal Consultation Policy and Handbook, 1780-1, and more specifically with implementation of Environmental Protection Agency's Environmental

Justice Program to include tribes and tribal members to effectively provide for environmental and public health protection in Indian Country in areas of Environmental Justice.

25.    I further stated that the Colony was surprised and concerned that both the BLM and the Nevada State Historic Preservation Office had approved the Historic Properties Treatment Plan (HPTP) to mitigate impacts to archaeological sites in the mine's POO boundary without any talks or discussion with the Colony. We were concerned that Final Formatted LNC Thacker HPTP stated that consultation was held with the Winnemucca Indian Colony beginning in 2017 and continued to date, as we believed that it was not true, and that BLM or others had in fact not consulted with the Winnemucca Indian Colony regarding the Project. I asked for dates and individual names of anyone in the Colony or documents, positions taken, who may have discussed this Project with BLM or its representatives.

26.    On July 14, 2021, because BLM did not respond to the Colony's April 19 letter, I sent a letter, copying BLM, to Jean Prijatel, Manager in the Environmental Review Branch, United States Environmental Protection Agency.

27.    Therein I repeated the concerns set forth in my April 19, 2021, letter to the BLM.

28.    If the Colony is provided a reasonable opportunity to consult with the BLM about effects to Thacker Pass/Peehee mu'huh's historic properties, the Colony will advise BLM about its concerns, including those herein stated. The Colony will encourage BLM to allocate Thacker Pass/Peehee mu'huh to the "Conservation for Future Use" and "Traditional Use" categories and to provide Thacker Pass/Peehee mu'huh with long-term preservation as described in BLM Manual 8110. 12 21.

29.    If the Colony is provided a reasonable opportunity to participate in the resolution of adverse effects to historic properties in Thacker Pass/Peehee mu'huh, the Colony will help the BLM understand that gouging seven, 40-meter-long, several-

MADDOX & CISNEROS, LLP
An Association of Professional Corporations
3230 S. Buffalo Drive, Suite 108
Las Vegas, Nevada 89117

29.     If the Colony is provided a reasonable opportunity to participate in the resolution of adverse effects to historic properties in Thacker Pass/Peehee mu'huh, the Colony will help the BLM understand that gouging seven, 40-meter-long, several-meter-deep trenches and hand-digging as many as 525 holes into land hallowed by the massacre of our ancestors and where we observe religious ceremonies severely disrespects our culture and traditions, causes us extreme emotional and spiritual distress, and is a desecration of the worst kind.

30.     If BLM and Lithium Nevada still insist on disrespecting our traditional ways, distressing us emotionally and spiritually, and desecrating land we consider sacred, the Colony will advise BLM on how to perform this desecration in the most sensitive manner possible. Because the desecration of Thacker Pass/Peehee mu'huh is so imminent, the  Colony is forced to seek relief, including preliminary relief, in order to protect its  interests in protecting historic properties the Colony attaches religious and cultural significance to.

31.     I swear under penalty of perjury that the foregoing is true and correct to the the best of my knowledge.

Dated this _10th_ day of February, 2022.


Judy Rojo

MADDOX & CISNEROS, LLP
An Association of Professional Corporations
3230 S. Buffalo Drive, Suite 108
Las Vegas, Nevada 89117