O. KENT MAHER (Nev. Bar No. 316)
kent@winnemuccalaw.com
PO Box 130
33 W Fourth Street
Winnemucca, Nevada 89446
Ph: (775) 623-5277
Fax: (775) 623-2468

*Local Counsel for Plaintiffs*

DOMINIC M. CAROLLO (Or. Bar. No. 093057)
*Pro Hac Vice*
dcarollo@carollolegal.com
Carollo Law Group LLC
Mail:   P.O. Box 2456
         Roseburg, OR 97470
Office: 2315 Old Highway 99 South
         Roseburg, OR 97471
Ph: (541) 957-5900
Fax: (541) 957-5923

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| **BARTELL RANCH, LLC,** a Nevada limited liability company and **EDWARD BARTELL**, | Case No.: 3:21-cv-00080-MMD-CLB |
| Plaintiffs | |
| vs. | **MOTION FOR SUMMARY JUDGMENT** |
| **ESTER M. MCCULLOUGH**, Winnemucca District Manager, Bureau of Land Management, **BUREAU OF LAND MANAGEMENT**, | |
| Defendants, | |
| and | |
| **LITHIUM NEVADA CORP.**, Defendant-Intervenor. | |

Table of Contents

Motion..................................................................................................................................1

Memorandum of Points and Authorities.........................................................................1

I.   Introduction.........................................................................................................1

II.  Plaintiffs Have Standing.....................................................................................3

         A. Article III Standing......................................................................................4

         B. Prudential Standing.......................................................................................6

III.    Factual Background..........................................................................................8

IV.    Legal Standard...................................................................................................9

         A. Administrative Procedure Act.......................................................................9

         B. National Environmental Policy Act.............................................................10

         C. Federal Land Policy and Management Act....................................................12

V.       Argument..........................................................................................................12

         A. BLM Violated NEPA by Failing to Independently Verify LNC's Data..........14

         B. BLM Failed to Make Relevant Environmental Information Publicly

             Available....................................................................................................18

         C. BLM's Water Resource Baseline is Erroneous and Lacked Scientific

         Integrity...........................................................................................................22

                 1. Legal Standard...................................................................................23

                 2. Springs and Seeps Baselines..............................................................24

                         i. LNC's Spring Surveys were Insufficient....................................25

                         ii. LNC's Spring Surveys did not follow Stevens Protocols..........26

                         iii. Springs were Unmeasured or Erroneously Measured.............30

3. Groundwater Baseline..............................................................33

4. Pole Creek Baseline..............................................................34

D. BLM Failed to Demonstrate Effectiveness of Mitigation for Water Resources.................................................................................36

E. BLM Violated FLPMA by Approving the Thacker Pass Mine Despite Inconsistencies with the RMP's............................................................38

VI.   Conclusion.........................................................................................40

## TABLE OF AUTHORITIES

## CASES

*Alameda Health Sys. v. Centers for Medicare & Medicaid Servs.*,
287 F. Supp. 3d 896 (N.D. Cal. 2017) ............................................................................ 9

*All. for the Wild Rockies v. U.S. Forest Serv.*,
907 F.3d 1105 (9th Cir. 2018) ...................................................................................... 10

*Associations Working for Aurora's Residential Env't v. Colorado Dep't of Transp.*,
153 F.3d 1122 (10th Cir. 1998) .............................................................................. 15, 17

*Barrows v. Hickel*,
447 F.2d 80 (9th Cir. 1971) .......................................................................................... 39

*Bohmker v. Oregon*,
903 F.3d 1029 (9th Cir. 2018) ...................................................................................... 39

*Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. Zinke*,
889 F.3d 584 (9th Cir. 2018) ........................................................................................ 15

*Cantrell v. City of Long Beach*,
241 F.3d 674 (9th Cir. 2001) .......................................................................................... 5

*Cascadia Wildlands v. Bureau of Indian Affairs*,
801 F.3d 1105 (9th Cir. 2015) ...................................................................................... 23

*Cascadia Wildlands v. U.S. Forest Serv.*,
 937 F. Supp. 2d 1271 (D. Or. 2013) ...................................................................... 20, 21

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986).......................................................................................................... 9

*Chilkat Indian Vill. of Klukwan v. Bureau of Land Mgmt.*,
399 F. Supp. 3d 888 (D. Alaska 2019), aff'd, 825 F. App'x 425 (9th Cir. 2020).......................... 4

i

*City of Sausalito v. O'Neill,*
386 F.3d 1186 (9th Cir. 2004) ................................................................................. 11

*Clarke v. Sec. Indus. Ass'n,*
479 U.S. 388 (1987) .................................................................................................. 6

*Communities Against Runway Expansion, Inc. v. F.A.A.,*
355 F.3d 678 (D.C. Cir. 2004) ................................................................................. 11

*Conservation Nw. v. Rey,*
674 F. Supp. 2d 1232 (W.D. Wash. 2009) ....................................................... 11, 25-26

*Ctr. for Biological Diversity v. Fed. Highway Admin.,*
290 F.Supp.2d 1175 (S.D.Cal.2003) ........................................................................ 11

*Ctr. for Biological Diversity v. Fed. Highway Admin., No. CIV. 01-1876-JM(POR),*
2002 WL 32307826 (S.D. Cal. Nov. 19, 2002), adopted, 290 F. Supp. 2d 1175 (S.D. Cal. 2003)
.................................................................................................................................. 17

*Ctr. for Biological Diversity v. U.S. Dep't of Interior,*
581 F.3d 1063 (9th Cir. 2009) ................................................................................. 12

*Ctr. for Biological Diversity v. U.S. Dep't of Interior,*
623 F.3d 633 (9th Cir. 2010) ..................................................................................... 9

*Ctr. for Biological Diversity v. U.S. Forest Svc.,*
349 F.3d 1157 (9th Cir.2003) ................................................................................. 11

*Ctr. for Biological Diversity v. United States Bureau of Land Mgmt.,*
No. 214CV00226APGVCF, 2017 WL 3667700 (D. Nev. Aug. 23, 2017) ................. 39

*Ctr. for Food Safety v. Vilsack,*
844 F. Supp. 2d 1006 (N.D. Cal. 2012), aff'd, 718 F.3d 829 (9th Cir. 2013) ............. 15

*Davis v. Mineta,*
302 F.3d 1104, 1113 (10th Cir. 2002) ...................................................................... 15

*Dep't of Transp. v. Pub. Citizen,*
541 U.S. 752 (2004) ................................................................................................ 10

*Duval Ranching Co. v. Glickman,*
965 F. Supp. 1427 (D. Nev. 1997) ........................................................................... 7

*Earth Island Institute v. U.S. Forest Serv.,*
442 F.3d 1147 (9th Cir. 2006) ................................................................................ 32

*Ecological Rts. Found. v. Pac. Lumber Co.,*
230 F.3d 1141 (9th Cir. 2000) .................................................................................. 5

*ForestKeeper v. Elliott,*
50 F. Supp. 3d 1371 (E.D. Cal. 2014) .................................................................... 19

*Friends of Clearwater v. Petrick,*
No. 2:20-CV-00243-BLW, 2022 WL 622460 (D. Idaho Mar. 2, 2022) ............... 20, 21

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,*
528 U.S. 167 (2000) .................................................................................................. 5

*Gardner v. U.S. Bureau of Land Mgmt.,*
638 F.3d 1217 (9th Cir. 2011) ............................................................................ 38, 40

*Great Basin Res. Watch v. Bureau of Land Mgmt.,*
 844 F.3d 1095 (9th Cir. 2016) ............................................................................... 35

*Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci,*
857 F.2d 505 (9th Cir. 1988) .............................................................................. 23, 32

*Idaho Farm Bureau Fed'n v. Babbitt,*
900 F. Supp. 1349 (D. Idaho 1995). ........................................................................ 7

*Kern v. U.S. Bureau of Land Mgmt.,*
284 F.3d 1062 (9th Cir. 2002) ................................................................................ 10

*Klamath-Siskiyou Wildlands Ctr. v. Gerritsma,*
638 F. App'x 648 (9th Cir. 2016) ................................................................. 39

*Lands Council v. McNair,*
537 F.3d 981 (9th Cir. 2008) ................................................................. 9, 10

*Laub v. U.S. Dep't of Interior*,
342 F.3d 1080 (9th Cir. 2003) ................................................................. 6

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton,*
No. 3:12-CV-02271-HZ, 2014 WL 6977611 (D. Or. Dec. 9, 2014) ...................................... 28, 32

*Lujan v. Def's of Wildlife*,
504 U.S. 555 (1992) ................................................................. 4

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
567 U.S. 209 (2012) ................................................................. 6

*N. Plains Res. Council v. Surface Transp. Bd.*,
668 F.3d 1067 (9th Cir. 2011) ................................................................. 23, 32

*Nat'l Credit Union v. First Nat. Bank & Tr. Co.,*
522 U.S. 479 (1998) ................................................................. 6

*Nevada Land Action Ass'n v. U.S. Forest Serv.,*
8 F.3d 713 (9th Cir. 1993) ................................................................. 7-8

*Nuclear Info. & Res. Serv. v. Nuclear Regul. Comm'n.,*
457 F.3d 941 (9th Cir. 2006) ................................................................. 6

*Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.,*
18 F.3d 1468 (9th Cir. 1994) ................................................................. 9

*Occidental Eng'g Co. v. INS,*
753 F.2d 766 (9th Cir. 1985). ................................................................. 9

*Ocean Advocs. v. U.S. Army Corps of Engineers*,

402 F.3d 846 (9th Cir. 2005) ..................................................................................... 6

*Oregon Nat. Desert Ass'n v. Jewell*,
840 F.3d 562 (9th Cir. 2016) ...............................................10-11, 16, 24, 32, 35, 37-38

*Oregon Nat. Desert Ass'n v. Rose*,
921 F.3d 1185 (9th Cir. 2019) .....................................................................24, 29-30

*People ex rel. Van de Kamp v. Marsh*,
687 F. Supp. 495 (N.D. Cal. 1988) ............................................................................. 17

*Protect Lake Pleasant, LLC v. Connor*,
No. CIV 07-0454-PHX-RCB, 2010 WL 5638735 (D. Ariz. July 30, 2010) .............................. 17

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989)...............................................................................11-12, 19, 22, 24

*S. Fork Band Council Of W. Shoshone Of Nevada v. U.S. Dep't of Interior*,
588 F.3d 718 (9th Cir. 2009) ..................................................................................... 37

*S. Fork Band v. U.S. Dep't of Interior*,
No. 3:08-CV-00616-LRH, 2010 WL 3419181 (D. Nev. Aug. 25, 2010).............................. 11, 15

*San Francisco Baykeeper v. U.S. Army Corps of Engineers*,
219 F. Supp. 2d 1001 (N.D. Cal. 2002) ...................................................................... 15

*San Luis & Delta-Mendota Water Auth. v. Locke*,
776 F.3d 971 (9th Cir. 2014) ....................................................................................... 10

*Sierra Nevada Forest Prot. Campaign v. Weingardt*,
376 F. Supp. 2d 984 (E.D. Cal. 2005)..........................................................12, 19, 22

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016).................................................................................................... 4

*Theodore Roosevelt Conservation P'ship v. Salazar*,
605 F. Supp. 2d 263 (D.D.C. 2009), aff'd, 616 F.3d 497 (D.C. Cir. 2010) ................................ 12

v

*United States v. Rice*,
886 F.2d 334 (9th Cir. 1989) .................................................................................... 39

*W. Lands Project v. United States Bureau of Land Mgmt.*,
No. 306CV00475BESVPC, 2007 WL 9734511 (D. Nev. Sept. 25, 2007) ............................................... 5

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .................................................................................. 9-10, 32

*Yount v. Salazar*,
No. CV11-8171-PCT DGC, 2013 WL 93372 (D. Ariz. Jan. 8, 2013) .................................... 7

**STATUTES**

5 U.S.C. § 706(2)(A) ...................................................................................9

42 U.S.C. § 4321 ........................................................................................10

42 U.S.C. § 4332(C) ....................................................................................10

43 U.S.C. § 1701(a)(8) ................................................................................ 12

43 U.S.C. § 1712(a) ................................................................................... 12

43 U.S.C. § 1732(a) ............................................................................... 12, 38

30 U.S.C. § 22 ........................................................................................ 39

**REGULATIONS**

40 C.F.R. § 1500.1(b) ............................................................................. 11, 17

40 C.F.R. § 1502.15 ................................................................................. 11, 17

40 C.F.R. § 1502.23 ................................................................................. 11

40 C.F.R. § 1502.24 ................................................................................................ 26

40 C.F.R. § 1506.5 .................................................................................................. 15

40 C.F.R. § 1506.5(a) ............................................................................................. 11

40 C.F.R. § 1506.5(b)(2) ....................................................................................15, 18

43 C.F.R. § 1610.5-3 .............................................................................................. 12

## **OTHER AUTHORITIES**

Fed. R. Civ. P. 56(a) ............................................................................................ 1, 9

Council on Environmental Quality, *Considering Cumulative Effects under the National Environmental Policy Act* (Jan. 1997)
https://www.energy.gov/sites/default/files/nepapub/nepa_documents/RedDont/G-CEQ-
ConsidCumulEffects.pdf (last visited March 25, 2022) ......................................... 24

## MOTION

Pursuant to Federal Rule of Civil Procedure 56, Plaintiffs Bartell Ranch and Edward Bartell ("Plaintiffs") move the Court for summary judgment in Plaintiffs' favor on the grounds that Federal Defendant the Bureau of Land Management ("BLM") failed to comply with the National Environmental Policy Act ("NEPA") and Federal Land Policy and Management Act ("FLPMA"), in violation of the Administrative Procedure Act ("APA"). This motion is supported by the following memorandum of law, the Declaration of Edward Bartell submitted herewith, Plaintiffs' contemporaneously-filed Motion for Admission of Extra-Record Evidence and Declaration of Dominic M. Carollo and exhibits, and the existing Court record, including all previously filed exhibits. Plaintiffs conferred with Federal Defendants and LNC and both oppose this motion. Plaintiffs request oral argument.

## MEMORANDUM

### I.   INTRODUCTION

20,000 years ago, Lake Lahontan covered much of northwest Nevada in hundreds of feet of water. Over time, a warming climate caused Lake Lahontan to recede, stranding the fish which once resided in the lake in stream systems cutting through the Nevada desert. In time, people settled the historic lakebed. In the Quinn River Valley adjoining Thacker Pass, Native Americans first utilized the high desert and its abundant resources. Lahontan cutthroat trout ("LCT"), which once swam in Lake Lahontan, now populated small spring-fed streams while herds of ungulates browsed plentiful grasses supported by a high-water table and sage grouse flourished in the desert ecosystem. In time, ranching became the economic driver of the Quinn River Valley, as cattle and horses used the same springs, seeps, and wetlands alongside the area's wildlife. Today, those agricultural traditions continue in the Quinn River Valley and Thacker Pass.

The Bartell family is the latest in a long line of ranchers to call the Quinn River Valley and Thacker Pass home. Here, Bartell Ranch's cattle roam Thacker Pass, grazing down invasive cheatgrass, protecting the sensitive sage brush and streams, foraging on naturally subirrigated wetlands, and drinking from these few water resources. Deer and antelope move throughout the area, feeding and watering alongside the cattle. LCT persist in the small streams of Crowley and Pole Creek, which flow from the Montana Mountains down towards the Quinn River Valley.

People and wildlife have coexisted on this land since Lake Lahontan receded, and springs and streams in the higher-elevation Thacker Pass region continue to flow as they always have. Now, the region's history and wildlife is being threatened by a plan to mine lithium, left behind millions of years ago by the volcanic activity creating Thacker Pass and the Montana Mountains. However, to do so under the current mining plans will destroy the region's natural, native, and ranching traditions and history. As a result of this mine, the LCT left behind by ancient Lake Lahontan may be extirpated from Pole and Crowley Creeks, two of LCT's last remaining refuges in the region. The sage grouse which have flourished in the desert ecosystem will have their habitat destroyed. The deer and antelope which browse the area will have their water sources depleted. And the cattle raised on Thacker Pass will lose the grassy meadows and plentiful streams and springs where they graze and water.

This case presents a direct conflict between Thacker Pass as we know it and the desire for Lithium Nevada Corporation ("LNC") to transform Thacker Pass into a massive lithium mine and processing facility. To mine and process the lithium, using imported sulfur to create sulfuric acid, will require substantial daily groundwater withdrawals while mining crews strip away at layers of the earth below the ground water aquifer, destroying the sensitive sagebrush environment essential to sage grouse, and depleting the springs and streams which house the few remaining LCT in the

area and provide water, and support feed, for cattle and wildlife. Trucks will constantly be traveling to and from the mine, bringing sulfur for sulfuric acid. Lights installed to permit 24-hour operations will shine like a beacon against the natural landscape, destroying views of the night. In this quiet corner of the American West, a small industrialized city will soon be set onto the earth.

In today's age, where we recognize the importance of preserving the public's wildlife, ecosystems, and history, this mining project—as hastily planned by LNC and more hastily approved by BLM—threatens to destroy all of it in the interest of maximizing mining profits. On Thacker Pass where ranchers, livestock, fish, and wildlife have all grown to coexist and become mutually beneficial, the proposed lithium mining project will forever change the region for the worse. At a minimum, approval of such a project required well-reasoned scrutiny by the BLM, which manages much of Thacker Pass. Unfortunately, despite the tremendous impacts the Mine will have, the BLM abdicated its responsibility to analyze the Mine's effects on the environment in order to hastily approve the project while sweeping many of the Mine's most serious impacts under the rug, preventing the public from knowingly analyzing the environmental impacts. As explained below, in approving the project, BLM violated multiple bright-line principles and doctrines firmly established under Ninth Circuit NEPA jurisprudence, as well as FLPMA, which are precedents binding on this Court.  Consequently, the Court must vacate and set aside the BLM's Record of Decision ("ROD") and Environmental Impact Statement ("EIS").

## II.    PLAINTIFFS HAVE STANDING

In 2008, Bartell Ranch moved to the Quinn River Valley. Declaration of Edward Bartell ("Bartell Decl.") ¶¶ 1-3. Appurtenant to their private lands and grazing allotment, Bartell Ranch holds vested irrigation proofs used to provide livestock forage. *Id*. ¶ 4. Additional water rights in springs, streams, and stockwater wells are used to provide water to Bartell Ranch's cattle which

graze on the 50,000-acre Crowley Creek grazing allotment on BLM land at Thacker Pass, as well as their private lands. *Id*. ¶¶ 3-4. For the Bartell family, ranching is, and has long been, a labor driven not by wealth, but by the beauty and solidarity one feels between themselves, their livestock, and the natural world on which they live. This involves a focus and appreciation for the wildlife which call Thacker Pass home, and an active effort to protect the imperiled species which live alongside the Ranch's cattle. *Id*. ¶¶ 5-8. Hence, Bartell Ranch has spent their own time and money to protect streams and the LCT residing in them, graze invasive grasses which deplete sage grouse habitat in an effort to stop the invasive species' spread, and using grazing and mechanized means to limit the threat of wildfire, which can eliminate vast swaths of sage grouse habitat. *Id*. Bartell Ranch's appreciation for the natural world can also be seen in Mr. Bartell's artwork, which depicts the beauty that comes with ranching in the vast inter-mountain west. *Id*. ¶¶ 5, 9-12. It is for all of these reasons that the Bartell Plaintiffs have brought this lawsuit, to once again protect the wildness of Thacker Pass and the Bartell family's interests in the natural world and their ranching operation.

Whether a party has standing is a threshold question in every federal case. Standing determinations require two inquiries. First, it must be determined whether Plaintiffs' allegations meet Article III standing requirements. If they do, Plaintiffs must also show that they have "prudential standing" and that their claims are within the "zone of interest" of the statute(s) at issue. *See Chilkat Indian Vill. of Klukwan v. Bureau of Land Mgmt.*, 399 F. Supp. 3d 888, 905 (D. Alaska 2019), aff'd, 825 F. App'x 425 (9th Cir. 2020).

**A. Article III Standing**

Article III contains three elements: "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 136 (2016), as

revised (May 24, 2016) (citing *Lujan v. Def's of Wildlife*, 504 U.S. 555, 560-61 (1992). "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000) (quotation omitted). Thus, "[t]he 'injury in fact' requirement in environmental cases is satisfied if an individual adequately shows that she has an aesthetic or recreational interest in a particular place, or animal, or plant species and that that interest is impaired by a defendant's conduct." *Ecological Rts. Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000). "Once a plaintiff has established an injury in fact under NEPA, the causation and redressability requirements are relaxed."[1] *Cantrell v. City of Long Beach*, 241 F.3d 674, 682 (9th Cir. 2001). To meet the causation and redressability elements Plaintiffs need not show that following proper NEPA procedures would benefit them, they need only show that they are "seeking to enforce a procedural right under NEPA to protect their concrete interests." *Id*.

The Bartell Plaintiffs have aesthetic and recreational interests in the Thacker Pass area, which the proposed mining project is certain to injure. *See generally* Bartell Decl. Plaintiffs and their family reside in the local community, own land near the proposed action area, and graze cattle on these lands and a grazing allotment within the Thacker Pass project boundary. *Id*. ¶¶ 1-5, 27. The Bartell family has a great appreciation for the precious springs, streams, and seeps which appear as small oases within the Nevada desert, giving life to the wildlife and livestock. *Id*. ¶¶ 4, 7-12. For the Bartells, the beauty of Thacker Pass is enjoyed every time they are present. *See generally* Bartell Decl. This goes beyond just viewing the landscape—one of the greatest benefits of ranching in northern Nevada. Plaintiffs also enjoy watching and painting wildlife, including

---

[1] The same standard applies under FLPMA. *See W. Lands Project v. United States Bureau of Land Mgmt.*, No. 306CV00475BESVPC, 2007 WL 9734511, at *11 (D. Nev. Sept. 25, 2007).

sage grouse, which Mr. Edward Bartell had never seen before he and his family began ranching in northern Nevada. *Id*. ¶¶ 5-8. Plaintiffs have even gone to great lengths to protect imperiled species such as sage grouse and LCT[2] through targeted grazing efforts and fencing projects, consistent with the family's desire to manage their ranch in a way which promotes a mutually-beneficial relationship between the land, wildlife, and the livestock. *Id*. ¶ 8. Unfortunately, the Thacker Pass Mine will shatter the Bartell Plaintiffs' ability to enjoy their interests, unless the ROD is vacated by this litigation and the BLM is forced to take the "hard look" required by NEPA and otherwise comply with FLMPA and other federal laws. *See generally* Bartell Decl.

**B. Prudential Standing**

The Supreme Court "has long held that a person suing under the APA must satisfy not only Article III's standing requirements, but an additional test: The interest he asserts must be arguably within the zone of interests to be protected or regulated by the statute that he says was violated." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (quotation omitted). The prudential standing requirement applies to claims reviewed under the APA. *See Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1087 (9th Cir. 2003).

The "zone of interests" inquiry involves two steps. First, the Court must "discern the interests arguably to be protected by the statutory provision at issue" and "then inquire whether the plaintiff's interests affected by the agency action in question are among them." *Nat'l Credit Union v. First Nat. Bank & Tr. Co.*, 522 U.S. 479, 492 (1998). "The zone of interests test is 'not meant to be especially demanding.'" *Ocean Advocs. v. U.S. Army Corps of Engineers*, 402 F.3d 846, 861 (9th Cir. 2005) (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987)). "It is well settled that the zone of interests protected by NEPA is environmental." *Nuclear Info. & Res.*

---

[2] LCT occupy streams in the Thacker Pass region. TPEIS-0673 AR-064151. The Thacker Pass Mine will cause significant groundwater drawdowns and decreasing stream flows, affecting LCT. TPEIS-0384 at 216, 1094.

*Serv. v. Nuclear Regul. Comm'n.*, 457 F.3d 941, 950 (9th Cir. 2006). In the past, this has stymied NEPA suits brought on behalf of ranching interests *when the relief sought in those suits would arguably harm the environment. See Nevada Land Action Ass'n v. U.S. Forest Serv.*, 8 F.3d 713, 716 (9th Cir. 1993); *Duval Ranching Co. v. Glickman*, 965 F. Supp. 1427, 1441 (D. Nev. 1997); *see also Idaho Farm Bureau Fed'n v. Babbitt*, 900 F. Supp. 1349, 1356 (D. Idaho 1995).

Plaintiffs' interests are protected by NEPA and FLPMA.[3] Plaintiffs bring this suit to protect their aesthetic and recreational interests in Thacker Pass. Plaintiffs have shown they have significant interests in protecting wildlife and have taken steps to benefit wildlife through targeted grazing to protect sage grouse habitat and fencing projects to protect LCT habitat, creating a mutually beneficial relationship bringing great pride to the Bartell family. Bartell Decl. ¶¶ 1-8. Furthermore, ranching near Thacker Pass brings extraordinary views and a feeling of connectivity with the region's vast traditions and history. The destruction of this landscape and viewshed by the mining project would destroy Plaintiffs' enjoyment of the region. *Id.* ¶¶ 9-12, 18-30.

Plaintiffs have an economic interest in their ranch. However, the Thacker Pass Mine will not reduce the area available for Plaintiffs to graze, and Plaintiffs have no direct economic interest in the preservation of sage grouse or LCT. While Plaintiffs have an economic interest in protecting their water rights, Plaintiffs *cannot* use more water than they hold a right to. Likewise, denial of the project would not create more water than currently exists. Further, Plaintiffs' interest in their water rights are not purely economic as these rights are essential for Plaintiffs to enjoy the environmental, recreational, and aesthetic benefits of their private land and grazing allotment. Thus, Plaintiffs' economic interests do not impair their ability to meet the zone of interest test.

The 9th Circuit has not recognized prudential standing for ranching interests asserting

---

[3] The prudential standing standard for FLPMA is largely the same as for NEPA. However, standing for FLPMA is not *purely* environmental. *Yount v. Salazar*, No. CV11-8171-PCT DGC, 2013 WL 93372, at *14 (D. Ariz. Jan. 8, 2013).

NEPA claims when the relief sought would harm the environment. *See Nevada Land Action*, 8 F.3d at 716 (Plaintiffs could "not allege that the increased grazing levels it seeks would benefit the natural environment, and there seems to be substantial evidence to the contrary."). Here, the relief sought will benefit the environment. The Thacker Pass Mine will destroy wildlife habitat, extirpate wildlife, damage meadows and wetlands, and eliminate scenic views, all directly contrary to Plaintiffs' concrete interests. However, if Plaintiffs are granted their requested relief, these environmental harms would not occur. Thus, Plaintiffs, without question, have standing.

## III.   BACKGROUND

On August 31, 2017 Secretary of the Interior David Bernhardt issued Secretarial Order 3355 ("SO 3355"), ordering EISs under NEPA to be completed within one year of the date the Notice of Intent ("NOI") was issued.[4] On January 21, 2020 BLM published a NOI to initiate the NEPA process for the Thacker Pass Mine. TPEIS-0126. Ten and a half months later, BLM released its final EIS ("FEIS").[5] TPEIS-0384. January 15, 2021, during President Trump's last week in office, the ROD approving the Mine was signed. TPEIS-0452.

The short timeline for approving the mine required BLM to rely on outside contractors and the project proponent for the NEPA process. ICF was hired by BLM to complete the NEPA review. ICF then subcontracted with Plumley Associates to review impacts to water resources. TPEIS-1121. Meanwhile, LNC's consultant Piteau Associates ("Piteau") collected baseline data from

---

[4] This was driven by then-President Trump Executive Order 13807 ("EO 13807").

[5] The Thacker Pass Mine was the first project this BLM office tackled under SO 3355. TPEIS-0887. The one-year timeline BLM brought immense challenges, so much so that BLM's project lead Ken Loda stated "[w]e are following this course of action with the hope of having a solid, defensible document going out to the public at the DEIS stage. That seemed to be at risk with the latest version which… was rather *hastily pulled together* into the document in an attempt to maintain the existing schedule." TPEIS-1295 (emphasis added); *see also* TPEIS-1114 ("We appreciate BLM's 1-week extension for our review and comment of the Thacker Pass Wildlife Impact Assessments … we still did not have sufficient time to review the revised Wildlife Baseline Report, the BBCS, or the DraftECP, so we prioritized our efforts on the Impact Assessments."); TPEIS-1218 ("the document timing doesn't allow for a particular preview for them prior to DEIS publication[.]"); TPEIS-0880 ("As the project lead it is your responsibility to make these deadlines... You must make sure we do not slip again.").

Thacker Pass and used it to create an analysis of the Mine's impacts on water resources. Once the NEPA process began, Piteau's analysis was forwarded for its inclusion in the FEIS. As a result, the entire NEPA analysis was tainted by the hasty approval and LNC's direct participation in the NEPA process, in a manner which resulted in BLM's use of inaccurate scientific data and wholesale reliance on the work of LNC's contractors.

## IV.   LEGAL STANDARD

NEPA and FLPMA claims are reviewed under the APA's "arbitrary and capricious" standard. *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 623 F.3d 633, 641 (9th Cir. 2010). A motion for summary judgment is the appropriate mechanism for review of administrative decisions under the APA. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471–72 (9th Cir. 1994). Summary judgment may be granted where "there is no genuine dispute as to any material fact" of a party's prima facie case, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). However, because "the role of the court under the APA is not to 'find facts' but is limited to reviewing the administrative record, there can be no genuine issue of material fact." *Alameda Health Sys. v. Centers for Medicare & Medicaid Servs.*, 287 F. Supp. 3d 896, 910 (N.D. Cal. 2017) (citing *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985)). Thus, "summary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did." *Id.*

### A.   Administrative Procedure Act

A court will set aside agency action if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This standard imposed by the APA is "narrow," and the court must not substitute its judgment for that of the agency. *Lands*

*Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008), *overruled on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008). A court may reverse an agency decision "if the agency relied on factors that Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, … offered an explanation that runs counter to the evidence . . . or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* Review is deferential, and the agency's action carries a "presumption of regularity." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014).

### B. National Environmental Policy Act

"NEPA is a procedural statute that requires the federal government to carefully consider the impacts of and alternatives to major environmental decisions." *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1110 (9th Cir. 2018). NEPA's procedural requirements serve two "twin aims": (1) "it places upon [a federal] agency the obligation to consider every significant aspect of the environmental impact of a proposed action" and (2) "it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Id.* (quoting *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1066 (9th Cir. 2002)).

NEPA encourages "'harmony between man and his environment,' and was intended to reduce or eliminate environmental damage and to promote 'the understanding of the ecological systems and natural resources important to' the United States." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756 (2004) (quoting 42 U.S.C. § 4321). NEPA requires that agencies prepare a detailed EIS in connection with proposals for "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). This requires recording the environmental baseline. "The establishment of a baseline is not an independent legal requirement, but rather, a practical requirement in environmental analysis often employed to identify the

environmental consequences of a proposed agency action." *Oregon Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 568 (9th Cir. 2016) (quotation omitted). "An EIS must succinctly describe the environment of the area(s) to be affected by the alternatives under consideration and insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken[.]" *Id.* (simplified) (citing 40 C.F.R. § 1502.15, § 1500.1(b)).

Agencies must "[e]nsure the professional integrity, including scientific integrity, of the discussions and analyses in an EIS." *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1213 (9th Cir. 2004) (citing 40 C.F.R. § 1502.23) (simplified). To do so requires an EIS to contain "high quality" information and "accurate scientific analysis." *Conservation Nw. v. Rey*, 674 F. Supp. 2d 1232, 1249 (W.D. Wash. 2009) (citing *Ctr. for Biological Diversity v. U.S. Forest Svc.*, 349 F.3d 1157, 1167 (9th Cir.2003). Under NEPA, project proponents are required to provide environmental information to the agency. *S. Fork Band v. U.S. Dep't of Interior*, No. 3:08-CV-00616-LRH, 2010 WL 3419181, at *4 (D. Nev. Aug. 25, 2010) (citing 40 C.F.R. § 1506.5(a)). This information may be used, but the agency must first independently evaluate the information that is provided. *Id.* "The ultimate question ... is whether the financial interest of [the interested party] compromised the objectivity and integrity of the NEPA process." *Id.* (citing *Ctr. for Biological Diversity v. Fed. Highway Admin.*, 290 F.Supp.2d 1175, 1186 (S.D.Cal.2003) (simplified). Similarly, to prove a NEPA integrity claim, one must show that there are "flaws in the FEIS itself." *See Communities Against Runway Expansion, Inc. v. F.A.A.*, 355 F.3d 678, 687 (D.C. Cir. 2004).

The requirement that an agency prepare an environmental impact statement ensures that the agency, "in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the

decision-making process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). NEPA regulations require the agency to involve the public in preparing environmental documents, give notice of the availability of documents, and provide an opportunity for *informed* comments to the agency. *See Sierra Nevada Forest Prot. Campaign v. Weingardt*, 376 F. Supp. 2d 984, 990 (E.D. Cal. 2005).

## C. Federal Land Policy and Management Act

When FLPMA was enacted "Congress declared that it is the policy of the United States to manage the public lands 'in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values.'" *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 581 F.3d 1063, 1075 (9th Cir. 2009) (quoting 43 U.S.C. § 1701(a)(8)). For lands managed by the BLM, the purposes of FLPMA are achieved through the creation of RMPs that govern the management of those lands. *See* 43 U.S.C. § 1712(a). FLPMA provides that "[t]he Secretary shall manage the public lands . . . in accordance with the land use plans developed by him under section 1712 of this title." 43 U.S.C. § 1732(a). "All future resource management authorizations and actions . . . shall conform to the approved plan," and "[i]f a proposed action is not in conformance, and warrants further consideration before a plan revision is scheduled, such consideration shall be through a plan amendment[.]" 43 C.F.R. § 1610.5-3. Mining actions are subject to the applicable RMPs and must comply with the RMP or amend the plan where compliance would otherwise not be possible. *See Theodore Roosevelt Conservation P'ship v. Salazar*, 605 F. Supp. 2d 263, 284 (D.D.C. 2009), aff'd, 616 F.3d 497 (D.C. Cir. 2010).

## V.    ARGUMENT

Ranching on Thacker Pass provides a glimpse into the history of the American west. Herds of cattle, antelope, and mule deer graze and forage across the sage brush flats and high into the

Montana Mountains. Sage grouse hold tight as you walk near, waiting until the last second to flush from the safety of the brushy cover. Pristine streams flow from bubbling springs through rocky scenic canyons. Cutthroat trout, which once thrived in a prehistoric lake, now take shelter in small delicate streams and pools, migrating to isolated stream segments as stream flows change with the seasons. Springs and seeps bubble up at various locations around the region, occurring as small marshy oases within the desert. After the sun fades, the night sky views are unaffected by light pollution allowing one a glimpse into the heavens which few may ever experience. The dusty roads, old wooden corrals, rusty windmills, and faltering fences provide some of the few reminders of civilization's grasp on the region. That is, until the proposed Thacker Pass Mine gained momentum. In the past years, mining companies hired consultants to drill exploration boreholes, survey springs and streams, and measure existing wells. These consultants proceeded to repeatedly trespass on Plaintiffs' private land, tamper with Plaintiffs' wells, drain perched aquifers, and block Plaintiffs from accessing data collected on public land and their own land, all to collect an environmental "baseline" used to purportedly assess the Mine's impacts. *See* Bartell Decl. ¶ 30. Consequently, the impacts of the substantial groundwater withdrawals, open pit mine, creation of sulfuric acid, processing of lithium, 24-hour trucking and excavation, and explorational drilling have been premised on a baseline collected by the mining companies involved in Thacker Pass.

Plaintiffs' hope that the BLM's NEPA review of the Thacker Pass Mine would reveal the Mine's true impacts have been dashed by the hasty, shortsighted, ignorant, and wanting "environmental review" which actually occurred. *Id*. ¶¶ 22-42. The same mining company who hired consultants that trespassed, mixed aquifers, and tampered with wells sent the very data these consultants collected to the BLM, who accepted it whole cloth. *See generally*, *id.* The company's consultants, not BLM, responded to Plaintiffs' concerns regarding the mine, often through lies and

deceit. And when Plaintiffs were able to review the baseline data which rests as the foundation for BLM's environmental review of the mine, Plaintiffs recognized that these same trespassing consultants vastly undermeasured springs, streams, and seeps—particularly those most important and essential to Plaintiffs' livelihoods and environmental interests. *See generally* Bartell Decl.

BLM completed its NEPA process for the Thacker Pass Mine using the wrong and illegally-obtained data of the project proponent, as well as the analysis provided by the project proponent. Now, the duty to ensure that the impacts of the Thacker Pass Mine are adequately assessed shifts to the Court.  As explained below, the Court should find that: BLM failed to independently verify data and analysis provided by LNC; BLM failed to ensure the integrity of the NEPA process; BLM failed to prepare an accurate environmental baseline; BLM failed to ensure the protection of the LCT, and; BLM failed to ensure the protection of sage grouse. As a result of BLM's failures, only one remedy is adequate. The Court must find that BLM failed to comply with NEPA and FLPMA and vacate and set aside the ROD.

### A.  BLM Violated NEPA by Failing to Independently Evaluate LNC's Data

BLM had one year to complete the Thacker Pass Mine NEPA analysis pursuant to SO 3355. Collecting sufficient baseline data for springs, streams, and seeps cannot be done within a year's time. *See* TPEIS-1489 AR-107911; TPEIS-1411 ("It does appear that the spring data was potentially collected from the wrong locations with limited documentation on how it was collected…. I think that the timelines required by [SO] 3355 also played a role. More time to review the baselines and to see the sites in the field would have been helpful."). Therefore, only LNC, through their consultant Piteau, collected baseline data. This data was provided to BLM, ICF, and Plumley and was used by Piteau for the entirety of their water resources analysis, which they also provided for adoption in the EIS. *Portions* of Piteau's *analysis* were reviewed by BLM,

ICF, Plumley, and cooperating agencies.[6] However, all parties failed to independently evaluate the very *foundation* of the analysis—i.e., the *baseline* spring and seep data used to determine the Mine's impacts. Because BLM did not independently evaluate the data and information provided by LNC, BLM's decision is patently arbitrary and capricious. *See* 40 C.F.R. § 1506.5.

Reliance on environmental data provided by proponents of a project is not in and of itself improper. *S. Fork Band*, 2010 WL 3419181, at *4. However, where the agency relies on the environmental data and analysis of a project proponent or an independent contractor, the agency must independently evaluate the information submitted. 40 C.F.R. § 1506.5(b)(2); *Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. Zinke*, 889 F.3d 584, 608 (9th Cir. 2018); *Ctr. for Food Safety v. Vilsack*, 844 F. Supp. 2d 1006, 1023 (N.D. Cal. 2012), aff'd, 718 F.3d 829 (9th Cir. 2013); *San Francisco Baykeeper v. U.S. Army Corps of Engineers*, 219 F. Supp. 2d 1001, 1012 (N.D. Cal. 2002). "Independent evaluation" involves the independent and extensive review of the contractor and proponent's analysis, commenting on the field data and written product, giving the contractor or proponent direction or noting deficiencies, and more. *Associations Working for Aurora's Residential Env't v. Colorado Dep't of Transp.*, 153 F.3d 1122, 1129 (10th Cir. 1998) (Hereafter, "*AWARE*"); *see also Davis v. Mineta*, 302 F.3d 1104, 1113 (10th Cir. 2002) (stating *AWARE* discusses "the kind of independent review that might insulate the reviewing agency from the biases of the preparer of the underlying EA."); *Cachil Dehe Band*, 889 F.3d at 607 (9th Circuit relying on *AWARE* to evaluate agency's required level of oversight).

As a result of the time limit set by SO 3355, the use of third-party contractors and the project proponent for the Thacker Pass Mine NEPA process was extensive. *See* TPEIS-0318 AR-042522; TPEIS-1121 AR-097211; TPEIS-0384 (FEIS totaling 2,721 pages, approximately half of

---

[6] Often, analysis from Fish and Wildlife Service ("FWS") and Nevada Department of Wildlife ("NDOW") resulted in them voicing grave concerns with the EISs. *See* TPEIS-1095; TPEIS-1339; TPEIS-0527; TPEIS-1396; TPEIS-1491.

which was prepared by Piteau); TPEIS-0950 AR-093663 (stating LNC has completed the baseline report for a portion of the seep and spring survey). For portions of Piteau's analysis, agency input was provided. *See* TPEIS-1205; TPEIS-1180; TPEIS-1164; TPEIS-1146; TPEIS-1399 (discussing FWS's concerns over the Thacker Pass hydrology baseline). However, conspicuously missing from this agency input is any independent evaluation of the sufficiency of the water resources baseline. The record indicates that *the closest BLM came to independently reviewing the water resources baseline came in the form of an email between BLM staff, in the record at TPEIS-1411.* Here, a BLM staff member stated: "[i]t does appear that the spring data was potentially collected from the <u>wrong locations</u> with <u>limited documentation</u> on how it was collected" and "[*m*]*ore time to review the baselines and to see the sites in the field would have been helpful*."[7] *Id.* (emphasis added). This admits that BLM never even visited the springs and seeps forming the basis for the water resources analysis. Instead, only LNC's consultants (and Plaintiffs) collected baseline data. Not one spring survey or data report came from BLM, ICF, or Plumley. In TPEIS-1146, Piteau's responses to the comments from BLM and cooperating agencies, there were no challenges to Piteau's baseline *data* for spring resources.[8]

"The establishment of a baseline is not an independent legal requirement, but rather, a practical requirement in environmental analysis often employed to identify the environmental consequences of a proposed agency action." *Oregon Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 568 (9th Cir. 2016) ("*ONDA*") (quotation omitted). "An EIS must succinctly describe the environment of the area(s) to be affected … before decisions are made and before actions are

---

[7] BLM attempts to explain that the data is still useful for purposes of Piteau's model. However, even if true, *BLM cannot evaluate the impacts of the Thacker Pass Mine if the baseline is inaccurate.* The model presents a system for analyzing the Mine's effects. However, the *impact* of the mine is those *effects* measured against the water resources baseline. If the baseline is inaccurate, the fact that the data may collected may still be useful in the model is irrelevant.
[8] NDOW did provide comments disputing the "ephemeral" label for Pole Creek.

taken[.]" *Id.* (simplified) (citing 40 C.F.R. § 1502.15, § 1500.1(b)).  The "independent evaluation" requirement extends to baseline data. *See AWARE*, 153 F.3d at 1129; *Protect Lake Pleasant, LLC v. Connor*, No. CIV 07-0454-PHX-RCB, 2010 WL 5638735, at *36 (D. Ariz. July 30, 2010) (agency satisfied its "hard look" requirement by independently analyzing the data it received and revising calculations); *Ctr. for Biological Diversity v. Fed. Highway Admin.*, No. CIV. 01-1876-JM(POR), 2002 WL 32307826, at *3 (S.D. Cal. Nov. 19, 2002), adopted, 290 F. Supp. 2d 1175 (S.D. Cal. 2003) (agency admitting that independent evaluation of data is necessary before it can be used in an EIS). When data provided to the agency is merely taken at face value, the agency fails to satisfy its requirement to independently verify the data. *See People ex rel. Van de Kamp v. Marsh*, 687 F. Supp. 495, 499 (N.D. Cal. 1988) ("Corps did not see the study it relied upon and instead accepted it at face value. The Corps neither independently verified the data it relied upon, nor did they take a hard look at the noise impacts …. Thus, the Corps violated NEPA[.]").

Like in *People ex rel. Van de Kamp*, Defendants simply accepted LNC/Piteau's baseline data at face value. Defendants (and cooperating agencies) never measured the springs the Thacker Pass Mine will impact. *See* TPEIS-1411. BLM and cooperating agencies did not look critically at the spring flow *data* LNC provided. *See* TPEIS-1146. LNC did not revise baseline data or the Baseline Data Report as a result of agency input.[9] *See AWARE*, 153 F.3d at 1129. For spring data on Thacker Pass, BLM and all participating agencies outright failed to do anything other than blindly accept the data LNC provided. Mr. Cluff, the Piteau hydrogeologist charged with analyzing the water resources on behalf of LNC, even *admitted* that he never communicated directly with ICF and was unaware if the data they provided was independently reviewed. Declaration of

---

[9] A thorough search of the record reveals that the spring and stream baseline data never changed during the NEPA process, despite errors within it. TPEIS-1122.  Piteau did collect limited additional data on Pole Creek. TPEIS-0374. However, Piteau did not make revisions based on this data; instead, the groundwater model was still calibrated with *zero* flow for all Pole Creek reaches even though Piteau knew this to be false. TPEIS-0384 at 1063.

Dominic Carollo ("Carollo Decl.") Exhibit 1 at 2, 8. Therefore, BLM failed to independently evaluate the data provided by LNC during the NEPA process.

BLM did not just fail to independently evaluate LNC's data, but that failure compromised the objectivity and integrity of the NEPA process. At every stage of the NEPA process Plaintiffs raised significant concerns regarding the accuracy of the baseline data and the manner in which this data was collected. *See* Bartell Decl. ¶¶ 15-18, 30-42. NDOW historical data also disagreed with LNC's baseline.[10] TPEIS-0148 AR-019356. *Still* the Record shows that BLM did not independently evaluate the baseline water resources data. BLM did not visit the seeps, springs, and streams to take measurements or observe field conditions despite recognizing the data may be in error, nor did BLM take a hard look at the data that was provided to determine its accuracy. *See* TPEIS-1411. Therefore, BLM failed to consider an important aspect of the Thacker Pass Mine, rendering BLM's decision arbitrary and capricious. 40 C.F.R. § 1506.5(b)(2).

**B. BLM Failed to Make Relevant Environmental Information Publicly Available**

Plaintiffs provided Defendants with extensive comments throughout their consideration of the Thacker Pass Mine, hoping these comments would be duly considered, leading to an accurate assessment of the water resources on Thacker Pass and the Mine's impacts. *See generally* Bartell Decl. However, Plaintiffs could not adequately comment on the Mine's impacts because BLM failed to provide documents in a timely manner and, at times, failed to provide material documents and information at all.[11] TPEIS-1423; TPEIS-0875; Bartell Decl. ¶¶ 35, 39. Specifically, BLM failed to provide the mitigation plan affecting Plaintiffs' private lands and grazing permit, despite

---

[10] BLM's failure to independently evaluate LNC's data is distinct from the question of whether the baseline is accurate. However, Section V(C) below conclusively shows that BLM's failure to independently verify LNC's data compromised the integrity and objectivity of the NEPA process by allowing LNC, who in 2019 had spent $84 million on developing the Mine, to provide all baseline data without agency evaluation. TPEIS-0991 AR-093853.

[11] LNC plans to import massive quantities of sulfur waste from oil refineries, burn it and then dump the waste at Thacker Pass, but the quantity of imported sulfur was kept hidden from the Plaintiffs and the public during the DEIS process because the DEIS provided only "Phase 1" sulfur use estimates.  TPEIS-0429; Bartell Decl. ¶ 39.

Plaintiffs' requests. TPEIS-0443; TPEIS-0484; Bartell Decl. ¶¶ 35, 39. BLM failed to produce documents showing the rationale for key water resources conclusions. *See* TPEIS-1437. Finally, BLM failed to produce documents concerning the determination of impacts to LCT. These omissions were not accidental. BLM purposely sought to mislead Plaintiffs and provide nonresponsive answers to Plaintiffs' document requests. *See* TPEIS-1437 (suggesting staff respond "but not respond" to a request); TPEIS-1439 (falsely suggesting that BLM, not Piteau, prepared comment responses). Thus, BLM acted arbitrarily and capriciously.

BLM also quite brazenly failed to inform the public that consultation with FWS regarding the LCT was ongoing and the BLM's Biological Assessment ("BA") concerning the LCT was not made available to the public until after all comment opportunities had closed. As a result, Plaintiffs were unable to knowingly comment on the Mine's impacts to LCT, violating BLM's duties under NEPA. NEPA requires that the agency make available to the public relevant information that may play a role in the decision-making process. *Robertson*, 490 U.S. at 349. This involves providing the public with as much environmental information as is practicable so the public has a sufficient basis to address subject areas that may be considered. *ForestKeeper v. Elliott*, 50 F. Supp. 3d 1371, 1382 (E.D. Cal. 2014). Where the agency possesses relevant environmental information before or during a comment period, this information must be made available to the extent practicable. *See Weingardt*, 376 F. Supp. 2d 984, 992 (E.D. Cal. 2005). In *Weingardt*, the court determined that relevant information was not made publicly available where the agency failed to provide the public with information regarding the environmental impacts of the projects or a discussion of cumulative impacts. *Id*. Importantly, the court found that the agency's possession of already-prepared environmental documents during the comment period, but decision not to make these documents public, demonstrated a failure to make relevant information available to the public. *Id*.

BLM issued its Draft EIS on July 21, 2020, with a comment period ending October 29, 2020. TPEIS-0312. The DEIS did not mention any ongoing consultation between BLM and FWS regarding LCT.[12] On December 4, 2020 the FEIS was issued and made available for public comment. TPEIS-0384 at 1. Once again, no mention was made of BLM's consultation with FWS regarding LCT. The record reveals, however, that consultation with FWS had been ongoing *since February 3, 2020*—prior to the comment period for the DEIS—and a BA was prepared in *November of 2020*—prior to the comment period for the FEIS. TPEIS-0480 AR-053096.

The BA shows that on September 3, 2020 (during the DEIS comment period) BLM received a Species List from FWS showing that LCT have the potential for occurrence within the Mine's area of impact. *Id.* AR-053096. This Species List was not available to the public. Similarly, records from BLM's February, May, and September consultations with FWS were not available to the public. *See id.* Finally, despite the BA having been created prior to the publication of the FEIS, the FEIS made no mention of the BA, did not inform the public of its existence, and the BA itself was not made available to the public. *See generally* TPEIS-0384. As a result, Plaintiffs were unable to provide comments specific to the consultation between BLM and FWS.

Similar situations were addressed in *Cascadia Wildlands v. U.S. Forest Serv.*, 937 F. Supp. 2d 1271, 1277 (D. Or. 2013) and *Friends of Clearwater v. Petrick*, No. 2:20-CV-00243-BLW, 2022 WL 622460, at *16 (D. Idaho Mar. 2, 2022). In both cases, Plaintiffs argued that the agency failed to make environmental information available to the public. In *Cascadia Wildlands*, the Plaintiffs claimed that "the EA failed to discuss or disclose the Project's effect on interspecies competition … and that any discussion of this competition in the BA and BiOp did not satisfy NEPA's disclosure requirement and was not readily available to the public …." 937 F. Supp. 2d

---

[12] The only mention of consultation with FWS came at AR-040493, where the DEIS stated that the potential for occurrence of a "special status" species within the project area was determined through consultation with FWS.

at 1276. The court disagreed, holding "the Forest Service clearly referenced and identified the BA and the BiOp …[and] the Forest Service noted when more comprehensive information could be found in the BA or BiOp located in the project file." *Id*. at 1126-27. Because the BA was referenced in the NEPA document and available for inspection, the court determined the agency satisfied its duty to make the document publicly available. *Id*. Similarly, in *Friends of Clearwater* the court held the agency's reference to reports and BAs, as well as the availability of these documents for inspection, meant the agency satisfied its public disclosure obligation. 2022 WL 622460, at *16.

The glaring distinction, of course, between this case and both *Cascadia Wildlands* and *Friends of Clearwater* is that, here, BLM never once mentioned the existence of the BA, or even its consultation with FWS, in the DEIS, FEIS, or ROD. In fact, Plaintiffs only became aware of the BA months *after* the ROD was issued, approving the Thacker Pass Mine, and amended their complaint to reflect the newly-learned information. Without knowing the BA existed, Plaintiffs were unable to inspect the document and comment on it.

The record shows FWS had extensive concerns about Piteau's baselines and this project's effects on LCT in Pole Creek.[13] TPEIS-0890 (see imbedded comments).  Had Plaintiffs had full access to documents relied upon by BLM in the FEIS, and had Plaintiffs been able to comment on the LCT BA, *Plaintiffs would have informed FWS of additional critical information that could have altered the consultation process, including FWS requiring a biological opinion that would have required additional time that would have been presumably unacceptable to LNC and BLM*. For example, FWS was extremely concerned about the impacts of breaching the aquifer, but were persuaded that this would not occur for a substantial period of time. TPEIS-1396 AR-104097

---

[13] Given these concerns, BLM aggressively pushed FWS to sign off on the FEIS, threatening to go up the chain of command and attacking the comments of an FWS hydrologist who felt Piteau's hydrologic modeling was inaccurate. TPEIS-0890 AR-088848; TPEIS-1402 AR-104219; TPEIS-1395 AR-104041; TPEIS-1399 AR-104153.

("punching through an aquafer can result in immediate detrimental effect on water quantity, and take of LCT"). However, the aquifer has *already* been breached, by exploration, causing declines in the water table ranging from several feet to several *hundred* feet. TPEIS-0024 AR-001924. Likewise, it does not appear FWS was aware that production well pumping impacts would travel up Pole Creek causing impacts in the near very future. TPEIS-0384 at 1475, 1478, and 1482. Nor does it appear that FWS was informed that Piteau failed to model the impacts of a second production well that is a mile *closer* to Pole Creek. TPEIS-1489 AR-106677-78. Had FWS been made aware of these, and other, factors through public input, FWS may have required formal consultation and a biological opinion that would undoubtedly have made approval of the ROD prior to the expiration of the Trump administration impossible.

Without being aware of the consultation between FWS and BLM, Plaintiffs were unable to provide FWS with information concerning the Mine's impacts on LCT. As in *Weingardt*, here, the agency's failure to provide to the public information concerning the environmental impacts of the mine on LCT, *despite being in possession of said information*, plainly violated the agency's duty under NEPA. *See Robertson*, 490 U.S. at 349. Therefore, BLM's decision was arbitrary and capricious. *See Weingardt*, 376 F. Supp. 2d at 993.

### C. BLM's Water Resources Baseline is Erroneous and Lacked Scientific Integrity

At the heart of Plaintiffs' baseline claims are the sensitive streams, springs, and seeps on Thacker Pass. These unique water sources play a vital role in the ecosystem and Plaintiffs' use and enjoyment of the region. Streams and springs provide habitat for sage grouse and threatened LCT—species Plaintiffs greatly enjoy seeing and protecting, and which Plaintiffs have invested significant time and resources for their health and survival. Many of these same streams and springs also provide irrigation, forage, and water for livestock through Plaintiffs' water rights and

are essential for Plaintiffs' aesthetic use and enjoyment of their property and grazing allotment.

Defendant's reliance on Piteau's unverified data puts these resources at risk of significant unpredicted environmental impacts. *See* Bartell Decl. ¶ 30. Piteau deliberately and consistently mismeasured streams and springs which strike at the heart of Plaintiffs' use and enjoyment of Thacker Pass. *Id.* ¶¶ 1-30. During the collection of baseline stream and spring data Piteau's employees repeatedly trespassed on Plaintiffs' private land *to take measurements of water sources on Plaintiffs' own property*, misrepresented monitoring locations, incorrectly calculated flow targets, mischaracterized important stream reaches and springs, and violated the protocols they sought to follow. *Id.* ¶ 30. Each of these individual failures results in a baseline which cannot support BLM's decision to approve the Thacker Pass Mine and lacks scientific and professional integrity. When viewed in combination, these repeated failures and bad-faith actions paint a disturbing picture of an agency and mining proponent willing to ignore, misappropriate, and outright manipulate baseline water resource conditions for the purpose of reaching their desired result—a ROD approving the Thacker Pass Mine in less than twelve-months' time, before the expiration of the Trump administration.[14] The record compels a finding that BLM acted arbitrarily and capriciously in approving the ROD.

1. Legal Standard

An agency's duty to establish the environmental baseline under NEPA is critical. *See Cascadia Wildlands v. Bureau of Indian Affairs*, 801 F.3d 1105, 1111–12 (9th Cir. 2015); *Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988); *N. Plains Res. Council v. Surface Transp. Bd.*, 668 F.3d 1067, 1085 (9th Cir. 2011)("[W]ithout [baseline] data,

---

[14] The Stevens Protocols, which is standardized survey protocol accepted as the best science by BLM, states that spring data is the intellectual property of the spring's owner. TPEIS-0642 AR-060685. LNC refused to provide data from Plaintiffs' private springs, stealing this property. Bartell Decl. ¶ 30(l).

an agency cannot carefully consider information about significant environmental impacts."); Council on Environmental Quality, *Considering Cumulative Effects under the National Environmental Policy Act* (Jan. 1997), at 41, https://www.energy.gov/sites/default/files/nepapub/ nepa_documents/RedDont/G-CEQ-ConsidCumulEffects.pdf (last visited March 25, 2022) ("The concept of a baseline against which to compare predictions of the effects of the proposed action and reasonable alternatives is critical[.]"). It is a central tenet of NEPA that the effects of a proposed action "not be overlooked or underestimated only to be discovered after resources have been committed and the die otherwise cast." *Robertson*, 490 U.S. at 349. A failure to survey baseline conditions or a failure to properly record baseline conditions violates NEPA by neglecting to analyze the environmental baseline. *See ONDA V. Jewell*, 840 F.3d at 570 (failure to survey project area was arbitrary and capricious); *ONDA v. Rose*, 921 F.3d 1185, 1192 (9th Cir. 2019) (BLM's survey did not establish baseline conditions where BLM failed to follow survey prompts).

2. Springs and Seeps Baselines

Springs and seeps are vital for wildlife and livestock on Thacker Pass. *See* TPEIS-0384 at 104 ("risks to wildlife … include changes in surface water and ground water flow to seeps, springs, creeks, and surrounding wildlife habitat … Water is a critical resource for many species … and any impact to water quantity or quality could be a significant impact."). Plaintiffs' enjoyment of Thacker Pass is helplessly intertwined with these springs. As the springs go, so do the sage grouse, LCT, and Plaintiffs' water rights. *See* TPEIS-0384 at 104; TPEIS-0359 AR-045059 ("[w]e have extensively discussed the metapopulation concept between Pole Creek and Crowley Creek and how fish are likely to occupy the lower reaches of each stream as water conditions allow. The continued lack of understanding of these systems in the DEIS is very concerning and results in an inaccurate and misleading document."); *see generally* Bartell Decl.

BLM has not measured the springs and seeps on Thacker Pass. *See* Section V(a), *supra*. Only the private consultants of LNC surveyed these resources. *Id*. Their spring and seep measurements were insufficient, taken illegally, lacked scientific integrity, and entirely skewed the data in a way which would reduce the predicted impacts of the Mine. Thus, the baseline for these vital water resources of Thacker Pass is hopelessly erroneous and inadequate.

### i.   LNC's Spring Surveys were Insufficient

Piteau's spring measurements were taken following Level 1 protocols under the "Stevens Protocols" (Stevens, 2016) for four consecutive quarters in 2018. *See* TPEIS-0384 at 2317. This type of spring surveying is insufficient for a project such as the Thacker Pass Mine. The Stevens Protocols is a standardized survey protocol developed to provide a comprehensive, repeatable data collection process. TPEIS-1489 AR-107874. Three levels of protocols are recommended, depending on the purpose for which the data is being collected. *Id*. "Level 1" inventories, which are what LNC's consultant completed (*See* TPEIS-0384 at 2317) are meant "for the purpose of georeferencing, clarifying access, and determining sampling equipment needs." TPEIS-1489 AR-107874. Level 2 inventories, meanwhile, are "a detailed inventory of a springs ecosystem to describe baseline physical, biological, human impacts, and administrative context variables." *Id*. A "Level 3" inventory is necessary "for long-term studies, and includes variables measured in multiple Level 2 inventories, as well as other variables relevant to monitoring programs." *Id*. By conducting a "Level 1" inventory, Piteau collected data meant for georeferencing, clarifying access, and determining equipment needs *and used it for the entire NEPA analysis.*

In *Conservation Nw. v. Rey*, 674 F. Supp. 2d 1232, 1252 (W.D. Wash. 2009), defendant's failure to conduct "extensive and general regional surveys" for species possibly affected by the agency action demonstrated that the agency failed to create an accurate baseline and ensure "the

professional integrity, including scientific integrity, of the … [EIS]." (Quoting 40 C.F.R. §

1502.24). Here, Piteau's failure to conduct an extensive survey using Level 2 or 3 protocols

impeded the scientific and professional integrity of the NEPA process. BLM's failure to require,

or at least take a "hard look" at considering to require, Level 2 or Level 3 protocol surveys was

arbitrary and capricious.

### ii.   LNC's Spring Surveys did not Follow Stevens Protocols

Piteau's decision to survey springs and streams using Level 1 Stevens Protocols is only the

tip of the iceberg when it comes to the egregious errors made while surveying these resources.

Although Piteau purportedly attempted to follow the Stevens Protocols when surveying springs,

the record demonstrates Piteau failed to follow the protocol's directives. *See* TPEIS-0384 at 2317.

The Stevens Protocols provide that the stream inventory team (here, Piteau staff):

> [S]hould compile and review a list of all stakeholders concerned with the landscape.
> Private landowners, non-governmental agencies, Tribes, researchers, and state and
> federal springs stewards may be familiar with springs locations and land use
> history. Consultation with those individuals will help identify management
> concerns that will focus monitoring and stewardship activities…. Compiling and
> understanding that information is required to plan logistics, and complete the
> administrative context of the ecosystem assessment. … Prior to conducting field
> work, the survey team should contact private landowners … or local entities
> involved with the springs to communicate goals and objectives about the project,
> acquire additional information, and to arrange access to springs included in the
> inventory. Because information collected on the sites is the intellectual property of
> the springs owner, the team needs to ensure the security and ownership of the
> inventory data with the steward.

TPEIS-0642 AR-060685. Despite long-knowing that springs existed on Plaintiffs' private lands

adjacent to Thacker Pass, Piteau never contacted Plaintiffs requesting access or to discuss

Plaintiffs' knowledge of the spring and seep resources in the area.[15] TPEIS-1489 AR-106686.

---

[15] Additionally, Plaintiffs' business requires them to be intimately familiar with the water resources on Thacker Pass.
Plaintiffs are almost constantly present on Thacker Pass, either on their own private lands or on their grazing lease
where their cattle roam. As a result, Plaintiffs have a deep understanding of how, and where, the region's springs flow.

Multiple springs exist on Plaintiffs' private property adjacent to Thacker Pass. *See* TPEIS-1489 AR-107877 ("LNC's own documents clearly show that they repeatedly accessed springs that exist entirely on our private lands (SP-035 and SP-042)."); TPEIS-0384 at 1300 (depicting location of SP-035 and SP-042 in relation to a portion of the mine project area); TPEIS-0028 (Memo from Piteau's lead hydrologist Tyler Cluff (then with Schlumberger Water Services) to LNC stating "Spring sites SP-023 and SP-035 … are located on private land."). Yet, when Piteau engaged in its spring surveys, SP-035 and SP-042 were surveyed for four straight quarters without Plaintiffs' knowledge or permission. *See* TPEIS-1489 at AR-107158; AR-107164; AR-107296; AR-107309; AR-107472; AR-107486; AR-107643; AR-107657. In fact, the first time these springs were surveyed by Piteau, Mr. Cluff, *who in 2013 recognized that SP-035 was on private lands* (TPEIS-0028 AR-002739), surveyed SP-035 *himself*. TPEIS-1489 AR-106686.

Such a blatant showing of disrespect for Plaintiffs' property rights, directly contrary to the directives of the Stevens Protocols, is inexcusable. That BLM simply adopted these surveys without bothering to determine whether they were conducted illegally or unethically is even more disturbing. *See* TPEIS-0384 at 2518 (FEIS comment responses to Mr. Bartell stating "The BLM has no information regarding potential trespass issues with the applicant's consultants and no evidence supporting the idea that hydrological data was collected incorrectly or inconsistent with industry accepted standards or current private property law."); TPEIS-1489 AR-106852 (Plaintiffs scoping comments, stating: "We are concerned that the company representatives trespassed on our private property in order to gather data …. This raises serious ethical concerns relative to the good faith, veracity, ethics and credibility of the company and its contractors."); Bartell Decl. ¶ 30. BLM cannot, in good faith, claim there is "no evidence" supporting the idea that spring flow data was collected by trespassing onto Plaintiffs' land when SP-035 is present on Plaintiffs' land, Mr. Cluff

admitted as much in 2013[16] (TPEIS-0028 AR-002739), and LNC clearly surveyed SP-035. *See* TPEIS-1489 at AR-107158; AR-107164; AR-107296; AR-107309; AR-107472; AR-107486; AR-107643; AR-107657; *See also League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, No. 3:12-CV-02271-HZ, 2014 WL 6977611, at *21 (D. Or. Dec. 9, 2014) ("an agency's misrepresentation of scientific information, whether intentional or not, is sufficient reason to find the NEPA analysis lacked scientific integrity."). Moreover, BLM cannot in good faith claim "no evidence" when it was repeatedly advised by Plaintiffs of the trespasses and BLM simply chose to *not investigate*—i.e., willful ignorance.  Trespassing, and BLM's failure to investigate allegation of the same, proves Piteau's entire baseline analysis lacked scientific integrity.

Continuing with Piteau's (and thereby BLM's) failure to follow protocols, the Stevens Protocols state springs "should be measured at the point of maximum surface discharge, which is not likely to be the source but rather some distance downstream." TPEIS-1489 AR-107901. If springs are not measured at their point of maximum surface discharge, data collected will not account for the true flow of that spring. Curiously, Piteau did just that. In at least two instances, Mr. Cluff admitted in sworn testimony before the Nevada State Engineer that spring flow data was collected using flows from the spring orifice, not the point of maximum surface discharge.[17] Carollo Decl. Exhibit 2 at 2-3, 17. This admission is damning. The water resources baseline simply cannot be accurate if Piteau failed to record springs at their point of maximum discharge. Thus, the water resources baseline is incorrect and lacked scientific integrity. *BLM even admitted this*

---

[16] Mr. Bartell even took BLM staff out and showed them Bartell Ranch's private property signs and memorialized this visit in his 7/1/2020 letter to the District Manager Ester McCullough, noting: "it is clear that Lithium Nevada's consultants knowingly and deliberately trespassed on [Bartell Ranch] property."  TPEIS-1499 AR-112888.

[17] SP-035, one of the springs Piteau failed to measure at the point of maximum discharge, is located on Plaintiffs' private land is the source for one of Plaintiffs' water rights, providing important forage and water for wildlife along Crowley Creek. SP-047, another spring Piteau admitted they did not measure at the point of maximum discharge, supplies Sheep Creek, the source for additional water rights in the Kings River Valley.  For SP-047, Mr. Cluff noted that measuring the spring at the orifice resulted in a lower flow measurement. Carollo Decl. Exhibit 2 at 2-3.

*much*. *See* TPEIS-1411 (stating spring data may have been collected at the wrong locations.).

The Stevens Protocols state that the "point of flow measurement should be recorded on the sketchmap[.]" TPEIS-1489 AR-107901. The record is devoid of sketchmaps for the springs Piteau measured.[18] Instead, Piteau used images to record measurement locations. *See generally* TPEIS-0076. However, these photos did not accurately record spring measurement locations. In fact, the pictures were not always taken at the location of the measurement. *See* TPEIS-1489 AR-106688 (showing that, for a spring tributary to Pole Creek providing flow necessary for the survival and movement of LCT, the location of the spring and the location of the pictures varied significantly). The Stevens Protocols also provide that "[f]ield data sheets are the most efficient and reliable information documentation for Level 1 and 2 springs inventories. Multi-staff team information compilation and detection of data entry errors is impossible without hard copy field sheets[.]" TPEIS-1489 AR-107879. Field data sheets are not in the record. Additionally, Mr. Cluff admitted in sworn testimony that Piteau did not record spring data in field data sheets, providing just another instance where Piteau failed to follow the Stevens Protocols. Carollo Decl. Exhibit 2 at 8-11.

In *ONDA v. Rose*, 921 F.3d at 1192, the 9th Circuit analyzed the BLM's NEPA analysis for a Travel Management Plan in the Steens Mountain Area. The BLM's analysis was challenged on the basis that the BLM did not accurately record baseline road conditions for the region. *Id*. at 1190. Critically, appellants argued that BLM failed to accurately assess the baseline because BLM did not follow prompts set forth in its "Route Analysis Forms." *Id*. at 1192. The court determined that BLM did not follow the directives in the Route Analysis Forms it sought to follow. *Id*. As a result, the BLM's decision was arbitrary and capricious because it relied on an inaccurate baseline

---

[18] Once again, *BLM admits* that they do not know how or where spring flow data was collected. *See* TPEIS-1411. Piteau has admitted that they did not create sketch maps for many springs, inhibiting their ability to measure springs at the same location. Carollo Decl. Exhibit 2 at 18-19.

collected in violation of the BLM's protocols for collecting and recording baseline data. *Id.*

The BLM's actions in *ONDA v. Rose* pale in comparison to Piteau's failure to follow spring survey protocols here. Despite falsely claiming to have followed the Stevens Protocols in a report incorporated into the FEIS, TPEIS-0384 at 2317, Piteau trespassed on Plaintiffs' land to collect spring data, failed to measure springs at their point of greatest discharge resulting in reduced flow measurements, did not properly record the location of spring measurements, and neglected to record spring data in field data sheets—each and all of which directly violate the Stevens Protocols. Then, on top of that, despite voicing its own concerns and uncertainties about Piteau's data collection methods—TPEIS-1411, TPEIS-0914—and being advised by Plaintiffs of Piteau's trespasses—BLM did nothing to check or verify Piteau's field work, the accuracy of its baseline data, nor consistency with the Stevens Protocols. The end result is a *massive fail* by BLM—adoption of an unreliable and untrustworthy set of baseline data that should have never been relied upon in a government report, much less an EIS and ROD for a first-of-its-kind-in-America lithium mine. Consistent with the 9th Circuit's holding in *ONDA v. Rose*, these egregious errors mandate a finding that BLM acted arbitrarily and capriciously and vacatur of the ROD.

### iii.    Springs were Unmeasured or Erroneously Measured

Many springs on Thacker Pass went unmeasured or were erroneously measured. *See* Bartell Decl. ¶ 30. SP-036 is a spring adjacent to Pole Creek which provides flow to the stream. *See* TPEIS-0384 at 1210. Pole Creek is inhabited by the threatened LCT. TPEIS-0359 AR-045057 ("Pole Creek is considered occupied by LCT."). Stream flows across *all* reaches of Pole Creek are vital for perennial fish habitat and connectivity with other streams to establish metapopulations capable of traveling between streams. *Id*. AR-045059 (LCT are likely to occupy the lower reaches of Pole and Crowley Creeks as conditions allow.). SP-036 plays a key role in providing habitat for

LCT and flows which permit movement of LCT between Pole and Crowley Creeks. Piteau surveyed this spring for four quarters. The first quarter, Piteau measured 4.6 gallons per minute ("gpm") of flow from SP-036. TPEIS-1489 AR 107159. The second quarter, the surveyor noted that there was too much flow to measure, and therefore recorded no flow. *Id*. at AR 107297. The third and fourth quarters, the spring was dry. *Id*. at AR 107474, 107645.

Plaintiffs' scoping comments took issue with Piteau's inability to measure flow from SP-036 during their second quarter survey. *See* TPEIS-1489 AR-106690. In the FEIS, BLM responded that "the measurement taken in Q2 2018 should be revised to say 'no measurement' as opposed to 'zero' gpm." TPEIS-0384 at 2523. BLM then calculated the spring's base flow by averaging the remaining three flow recordings, producing a "baseline" flow of 1.5 gpm (4.6 gpm divided by three). *Id*. This baseline is clearly erroneous. By failing to measure SP-036 during its highest discharge and calculating "base flow" using the three *lower* flow observations, the baseline for this vital spring was substantially mischaracterized. Simply ignoring the actual high flow conditions of SP-036 results in an erroneous baseline for a resource vital to the survival of LCT.[19]

SP-036 was far from the only spring to be mismeasured or unmeasured. SP-035 on Plaintiffs' private land was reported as having zero flow because Piteau believed flow would be captured in the downstream Crowley Creek gauging station, despite their own map showing a lack of connectivity between the two sources. TPEIS-1489 AR-107345. Meanwhile, SP-055 was erroneously reported as ephemeral despite Plaintiffs' hydrologist recording dry season flow from this spring and Mr. Bartell noting it does not go dry. TPEIS-1489 AR-106706; TPEIS-0516 AR-056313. Another spring, SP-001, was arbitrarily declared by LNC's consultants to not be a spring at all after it stopped flowing in wake of exploration activities, despite previously concluding it

---

[19] SP-036 is within the drawdown area for the Mine, and therefore will be impacted. *See* TPEIS-0384 at 60, 228. Without collecting an accurate baseline BLM cannot determine the Mine's impacts on this spring.

1    *was* a spring.[20] *Compare* TPEIS-0384 at 2317 *with* TPEIS-0031 AR-003622. Thus, by classifying

2    a spring that had been destroyed by exploration activities, LNC's consultants, and then BLM,

3    swept this impact under the rug of an inaccurate environmental baseline.

4         Inaccurately recording baseline conditions is a violation of NEPA. *See N. Plains Res.*

5    *Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1085 (9th Cir. 2011) (not taking baseline

6    measurements violates NEPA's "hard look" requirement); *League of Wilderness Defs./Blue*

7    *Mountains Biodiversity Project*, 2014 WL 6977611, at *21; *Earth Island Institute v. U.S. Forest*

8    *Serv.*, 442 F.3d 1147, 1160–67, abrogated on other grounds by *Winter*, 555 U.S. 7 (2008) (finding

9    that Forest Service's "highly misleading FEISs" based on the agency's mischaracterization of

10    scientific data was a NEPA violation); *ONDA v. Jewell*, 840 F.3d 562, 569 (9th Cir. 2016) (baseline

11    was in error where the reported baseline did not match the actual observed conditions). In *ONDA*

12    *v. Jewell*, the 9th Circuit found the BLM acted arbitrarily and capriciously where the project

13    baseline in the FEIS inferred a lack of sage grouse in the project area, yet a survey actually

14    documented the presence of sage grouse. 840 F.3d at 569. Here, the FEIS reports baseline

15    conditions which are different than those actually observed to exist. For instance, while Piteau

16    determined that SP-036 flowed too much to measure, BLM's baseline reports that this spring has

17    negligible flow by simply ignoring Piteau's high-flow observation. *See* TPEIS-0384 at 2523. Just

18    like in *ONDA v. Jewell*, here BLM utilized incorrect spring measurements resulting in an erroneous

19    baseline. As a result, BLM acted arbitrarily and capriciously in approving the Thacker Pass Mine.

---

[20] SP-001 stopped flowing following exploration activities, but once had documented flow. TPEIS-0027 AR-002541. Piteau's spring survey began in 2018. *See* generally TPEIS-0076. However, exploration drilling began long prior, leading to substantial declines in groundwater levels. TPEIS-0024 AR-001924. "Without establishing the baseline conditions which exist [in the project area before the project] begins, there is simply no way to determine what effect the [project] will have on the environment and, consequently, no way to comply with NEPA." *Half Moon Bay*, 857 F.2d at 510. Because measurements were not taken before explorational drilling began, the baseline is entirely in error.

3.   <u>Groundwater Baseline</u>

Pump testing of LNC's proposed production well formed a key basis of Piteau's groundwater modeling, using the pump test to project mine impacts for the 40+ years of use from this well.[21] Unfortunately, LNC and Piteau failed to ensure water level sensors were functioning properly prior to this pump test. Specifically, Piteau admitted the sensor (transducer) in the monitoring well PZ17-01 (adjacent to the production well) was logging inaccurate water levels during the pump test.[22] TPNHPA-0204; TPEIS-0406 AR-048358.  The FEIS asserts the data from PZ17-01 was valid. TPEIS-0384 at 2521. However, despite extensive requests by Plaintiffs, BLM has not produced any support for the assertion that this data is "valid." TPEIS-0484 AR-088686, 088691. Instead, BLM simply accepted Piteau's representations without question. *Compare* TPEIS-0406 AR-048358 *with* TPEIS-0384 at 2521.

Plaintiffs obtained data from this critically important pump test from Piteau. TPNHPA-0206; TPEIS-1489 AR-106704, AR-108465. Upon comparing the raw data with hydrographs in the FEIS, Plaintiffs discovered that the hydrograph did not reflect actual measurements. TPEIS-0448 AR-052488. Instead, the hydrograph of the Production well QRPW18-01 had unexplainably been moved downward to meet the water level data in PZ17-01.  *Id*.; *compare* TPEIS-1489 AR-108465 *with* TPEIS-0384 at 2450. This creates the impression that baseline water levels are deeper than they really are, masking impacts of future groundwater pumping.  TPEIS-0448 AR-052492.

In another instance, LNC consultant Dr. Stringham recorded incorrect groundwater levels below a wetland area essential for Plaintiffs' livestock and local wildlife.[23] TPEIS-0448 AR-

---

[21] BLM's hydrologist acquiesced to Piteau's erroneous work product due to the mistaken notion that impacts would not occur until 34+ years in the future.  However, groundwater pumping impacts begin immediately and include springs supplying Pole Creek such as SP-036, SP-039 and SP-043. TPEIS-0384 at 1475, 1478, and 1482.

[22] Ironically, LNC refused Plaintiffs access to PZ17-01. TPNHPA-0205. The transducer elevation was changed despite Plaintiffs request that this critical evidence not be tampered with. *Id*.; TPEIS-0406 AR-048358.

[23] Despite observing standing water in the wetlands and groundwater upwelling from springs, Dr. Stringham concluded that water levels were over 14.43 feet below the surface. TPEIS-0343 AR-044870, AR-044858.

052493-96; Bartell Decl. ¶ 32. BLM utilized Dr. Stringham's report to conclude these natural wetlands were caused by irrigation, and thus mitigation to Plaintiffs was unnecessary.[24] TPEIS-0384 at 124-125. This is directly contradicted by groundwater measurements from the Nevada Division of Water Resources ("NDWR") showing water levels near these wetlands range from 3.63-6.92 feet below the surface over 15 years of record. TPNHPA-0209; TPEIS-1489 AR-106679-80. BLM's failure to explain these discrepancies fails to adequately characterize and explain the groundwater baseline.

4.  Pole Creek Baseline

The baseline for Pole Creek has been subject to much dispute throughout this NEPA process. The entirety of Pole Creek provides vital LCT habitat. *See* TPEIS-0110 AR-109296; TPEIS-1491 AR-108825 (connected streams assist LCT by "increasing genetic diversity and potentially repopulating or augmenting the other stream."); TPEIS-0359 AR-045059 ("the lower section of Crowley Creek does support fish ... We have extensively discussed the metapopulation concept between Pole Creek and Crowley Creek and how fish are likely to occupy the lower reaches of each stream .... The continued lack of understanding of these systems in the DEIS is very concerning and results in an inaccurate and misleading document."). Despite its importance, baseline data was not collected for Pole Creek prior to Piteau analyzing the Mine's impact on the stream. *See* TPEIS-0384 at 59 ("A supplemental field investigation conducted on February 19, 2020 delineated three flowing reaches of Pole Creek"); TPEIS-1489 AR-106691-94. Only after Piteau's model predicted base flow in and impacts to Pole Creek was the stream surveyed and baseline data collected.[25] *See* TPEIS-0374 AR-045408- 045410.

---

[24] It was impossible for any irrigation water to reach this area when the Stringham report was prepared, as no water was diverted or applied on or near these wetlands. TPEIS-0448 AR-052493-96.

[25] Piteau's measurements were *significantly* lower than historical measurements. *See* TPEIS-0865 AR-081123, 081136, 081148 (NDOW measuring 4,084, 763, and 897 gpm in June 1998, 2003, and 2009); TPEIS-0374 AR 045409

Contrary to data and correspondence from NDOW stating that Pole Creek has perennial reaches occupied by LCT, the FEIS characterized the *entirety* of Pole Creek as ephemeral.[26] *See* TPEIS-0384 at 2305 ("Pole creek is an ephemeral stream"); TPEIS-0359 AR-045060 ("Pole Creek has perennial sections and is considered occupied with LCT"); TPEIS-1489 Exhibits 7-9 (NDOW records concerning LCT in Pole Creek). Piteau calibrated the groundwater model with *zero* flow for all reaches of Pole Creek, failed to establish any gauging stations on Pole Creek, and, after actually taking flow measurements, failed to correct their earlier model inputs or baseline data report based on their own observations. *Compare* TPEIS-0384 at 1063 *with* TPEIS-0374, AR-045408-10. Ultimately, the FEIS concluded that Pole Creek, and therefore LCT, were not likely to be impacted by the Thacker Pass Mine[27] because "there is no observed year-round baseflow … across the Thacker Pass Project [area of impact]."[28] TPEIS-0384 at 1038.

By failing to measure Pole Creek baseflow prior to modeling the impacts to Pole Creek, Piteau (and therefore BLM) did not establish an adequate baseline. Recording the baseline is a practical requirement under NEPA. *See ONDA v. Jewell*, 840 F.3d at 568. Although baselines may be estimated using computer modeling, such information must be based on accurate information. *See Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1101 (9th Cir. 2016). Piteau predicted *a* Pole Creek baseline using computer modeling. However, this baseline was reached

---

(Piteau measuring high flow of 412 gpm in June, 2020); TPEIS-0865 AR-081123, 108040 (NDOW measuring September flow of 219 gpm with high flow of 1,045 gpm); TPEIS-0374 AR 045410 (Piteau recording September high flow of 94 gpm, while considering pooled streambeds "dry.").

[26] Baseline data for Pole Creek is critical. "Any pit dewatering-induced drawdown that extends beyond the immediate area of the project site … can be expected to propagate north from the pits …in the general direction of Pole Creek, which includes habitat occupied by federally-listed endangered [LCT] …." TPEIS-0527 AR-056501. Uncertainty concerning when the mine would breach the water table made a "Not Likely to Adversely Affect" determination inappropriate. TPEIS-1396 AR-104097.

[27] When FWS felt a "Not Likely to Adversely Affect" determination for Pole Creek LCT was inappropriate, BLM noted that "if [FWS] [isn't] being reasonable, we will press the issue up the chain of command[.]" TPEIS-0890.

[28] The FEIS states "[t]here are no perennial stream reaches within or *near* the maximum extent of the projected drawdown areas[.]" TPEIS-0384 at 67 (emphasis added). Figure 4.3-8 (TPEIS-0384 at 216) depicts that perennial reaches of Pole and Thacker creeks fall *within* the 10-foot drawdown buffer.

using a target of *zero flow* for the entirety of the stream—i.e., an inaccurate model input. TPEIS-0384 at 1063; TPEIS-0374, AR-045408-10 (depicting Piteau's Pole Creek measurements). This created an erroneous baseline across all of Pole Creek, with inadequate baseline data for LCT-occupied reaches of the stream.

The mischaracterization of Pole Creek may have grave impacts on LCT. Bartell Decl. ¶¶ 22-24. Within lower reaches of Pole Creek, LCT utilize stream flows to move between other LCT-occupied streams or populate new streams. *See* TPEIS-0359 AR-045059. Using their erroneous baseline, Piteau estimated that lower reaches of Pole Creek flow around 24 gpm.[29] TPEIS-0384 at 1070. As a result of the Thacker Pass Mine, this will be reduced to around 10 gpm. *Id*. at 1081, 1083. Piteau states this will likely shorten peak flows. *Id*. at 1084. BLM ignored the projected decline in Pole Creek by relying on the stream's purported "ephemeral" nature and assuming without support that LCT only occupy perennial reaches. *See* TPEIS-0480 AR-053129-053130. This is improper given the importance of seasonal connectivity to LCT. *See* TPEIS-0359 AR-045059. But this connectivity requires flow in Lower Pole Creek, which Piteau modeled at a paltry 24 gpm with an expected decline of 14 gpm as a result of the Thacker Pass Mine. TPEIS-0384 at 1070, 1081, 1083.  This could substantially reduce LCT movement between streams. *Id*. at 1084. BLM has simply chosen to ignore this impact, failing to analyze the declining flow of Pole Creek on the stream's seasonal connectivity with other streams. *See* generally TPEIS-0480. Thus, BLM has failed to adequately characterize the baseline for Pole Creek and has not assessed the impacts the Thacker Pass Mine will have on LCT. BLM's decision is therefore arbitrary and capricious.

**D.  BLM Failed to Demonstrate Effectiveness of Mitigation for Water Resources**

BLM's FEIS discusses mitigation and monitoring recommendations LNC may utilize to

---

[29] Dr. Powell documented flows on Lower Pole Creek of 1077 GPM (2.4 CFS) in May of 2020 and 85 GPM (.19 CFS) in August of 2020.  TPEIS-0516 AR-056387.

lessen impacts to water resources. *See* TPEIS-0384 at 74. As a result of the improper baseline BLM used throughout the FEIS, BLM failed to establish the effectiveness of the recommended mitigation. "An essential component of a reasonably complete mitigation discussion is an assessment of whether the proposed mitigation measures can be effective." *S. Fork Band Council Of W. Shoshone Of Nevada v. U.S. Dep't of Interior*, 588 F.3d 718, 727 (9th Cir. 2009). Mitigation effectiveness is directly intertwined with the accuracy of baseline conditions. *ONDA v. Jewell*, 840 F.3d at 571. Without an accurate baseline, BLM cannot "know what impacts to mitigate, or whether the mitigation proposed would be adequate to offset damage[s]…." *Id.*

The FEIS provides that mitigation will occur for mine-related impacts to perennial water resources, including all perennial springs identified at TPEIS-0384 at 61.[30] TPEIS-0384 at 75. Unfortunately, the erroneous baseline will prohibit effective mitigation. For instance, SP-047 is a perennial stream which will be monitored for any mine-induced impacts. *Id.* However, as this brief has already shown, BLM's baseline for SP-047 is in error because Piteau measured this spring at the orifice as opposed to the point of maximum flow, directly contradicting the Stevens Protocols. *See* Carollo Decl. Exhibit 2 at 2-3. Similarly, Piteau failed to properly measure the flow of SP-035—another perennial spring and a source for one of Plaintiffs' water rights. *See id.* at 13-18 (demonstrating Piteau's failure to measure spring flow and failure to contact Bartell Ranch prior to measuring SP-035, located on Bartell Ranch's private lands); TPEIS-1489 AR-106708. The

---

[30] The FEIS provides that groundwater levels within the maximum extent and 1-mile buffer of the anticipated drawdown areas will be monitored to determine if mitigation is needed. TPEIS-0384 at 77, 216. Plaintiffs have water rights within the 1-mile buffer. *Id.* at 216 (depicting Plaintiffs' rights as 140 and 141 on map). BLM's "baseline" for these rights was provided by LNC consultant Dr. Stringham, who concluded that the wetlands at the source of Plaintiffs' rights are caused by irrigation, and groundwater levels in the area are 14.43 feet below the surface. TPEIS-0343 AR-044870, AR-044858; TPEIS-0448 AR-052493-96. However, because BLM's reliance on Dr. Stringham created an erroneous baseline given the incorrect groundwater levels (NDWR shows water levels near these wetlands range from 3.63-6.92 feet below the surface over 15 years of record) and lack of irrigation (TPEIS-1489 AR-106709), BLM's mitigation for these water rights cannot be effective. Thus, in accordance with *ONDA v. Jewell*, BLM's discussion of mitigation is inadequate, rendering BLM's decision arbitrary and capricious. *See* 840 F.3d at 571. The

errors in the baseline prevent BLM from effectively mitigating the Mine's impacts. *See ONDA v. Jewell*, 840 F.3d at 571; *see generally* Bartell Decl. Thus, BLM's mitigation discussion is inadequate, and BLM's approval of the Thacker Pass Mine is arbitrary and capricious.

### E. BLM Violated FLPMA by Approving the Thacker Pass Mine Despite Inconsistencies with the RMPs

BLM's decision to approve the Thacker Pass Mine despite the Mine's noncompliance with FLPMA and the standards of the governing RMP is arbitrary and capricious. FLPMA requires BLM to "manage the public lands under principles of multiple use and sustained yield, in accordance with the land use plans" developed under FLPMA § 202. 43 U.S.C. § 1732(a). "In managing the public lands, the Secretary shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands." *Gardner v. U.S. Bureau of Land Mgmt.*, 638 F.3d 1217, 1222 (9th Cir. 2011) (quoting 43 U.S.C. § 1732(b)).

Pursuant to FLPMA and in response to the "warranted, but precluded" listing decision for sage grouse, BLM initiated a review of RMPs for regions containing sage grouse habitat. TPEIS-0384 at 973. This resulted in the 2015 Approved Resource Management Plan Amendment (ARMPA) and a 2019 ARMPA which was enjoined. The BLM was required to comply with the 2015 ARMPA for the Thacker Pass Mine. The 2015 ARMPA provides that, in priority sage grouse habitat (PHMA) and general sage grouse habitat (GHMA), BLM must, if possible, locate projects outside PHMA and GHPAs. *Id*. at 977. If that is not possible, surface-disturbing activities must first be located in non-habitat areas, then located in the least-suitable habitat. *Id*.

In the FEIS, BLM states that lithium ore bodies are not flexible in terms of location, therefore BLM was unable to modify the location of the Thacker Pass Mine to avoid PHMAs and GHMAs. *Id*. However, BLM failed to consider Plaintiffs' comments showing that LNC is not permitted to degrade sage grouse habitat pursuant to the Thacker Pass Mine on mineral claims

*where there has not been a discovery of valuable minerals.*[31] *See* Bartell Decl. ¶¶ 36-38. Moreover, BLM failed to show that mine infrastructure cannot be located outside the PHMA and GHMAs, as required by the 2015 and 2019 ARMPA. "BLM may not… take actions 'inconsistent with the provisions of a land use plan.'" *Ctr. for Biological Diversity v. United States Bureau of Land Mgmt.*, No. 214CV00226APGVCF, 2017 WL 3667700, at *15 (D. Nev. Aug. 23, 2017). By approving the destruction of sage grouse habitat without first determining whether certain mine infrastructure, such as the acid plants, buildings, waste dumps, and pipelines, can be located elsewhere, BLM has violated their responsibilities under FLPMA.

BLM has also violated FLPMA by failing to comply with the Visual Resource Management directive of the governing RMP. In fact, BLM has *admitted* as much. *See* TPEIS-0384 at 17 ("The Proposed Action and Project alternatives conform with the BLM's WD Record of Decision and Resource Management Plan (RMP) (ROD/RMP) *with the exception of existing Visual Resource Management (VRM) designations* (BLM 2015a)." (Emphasis added)). The mandates of FLPMA apply to mining claims. "[T]he holders of unpatented mining claims do not have an 'unfettered' right to explore and mine federal lands, unencumbered by federal and state environmental regulation." *Bohmker v. Oregon*, 903 F.3d 1029, 1038 (9th Cir. 2018). If BLM wishes to take an action which violates the governing RMP, BLM must amend the RMP. *Klamath-Siskiyou Wildlands Ctr. v. Gerritsma*, 638 F. App'x 648, 653 (9th Cir. 2016). BLM has not done this here. Instead, BLM has simply acknowledged its noncompliance with the RMP. Thus, BLM has violated FLPMA rendering their decision arbitrary and capricious.

---

[31] In comment responses BLM skipped Plaintiffs' comments. *Compare* TPEIS-0713 AR-067649 *with* TPEIS-0516 AR-056334-37. Had these comments been considered BLM would have been aware that LNC is using mining claims to construct infrastructure where there has not been a valid mineral discovery which is contrary to existing law. "In order for a mineral claim on public lands to be valid it is necessary that the discovered mineral deposits be 'valuable.'" *Barrows v. Hickel*, 447 F.2d 80, 82 (9th Cir. 1971) (citing 30 U.S.C. § 22); *United States v. Rice*, 886 F.2d 334 (9th Cir. 1989) (evidence that claim is not located where actual deposit exist demonstrates lack of valid claim).

FLPMA directs the BLM to achieve the objective of preventing unnecessary or undue degradation of public lands. *Gardner*, 638 F.3d at 1222. BLM has discretion to determine what is unnecessary or undue degradation. *Id*. Excavation of lithium ore, creation of a lithium processing facility, and dumping clay and sulfuric acid waste on public lands are certainly degradation of the land. The question is whether it is *unnecessary*. LNC's current mine process involves extracting lithium using sulfuric acid, then depositing the mix of clay and acid on public lands. TPEIS-0384 at 4, 2300. However, extracting lithium in this manner is unnecessary. Recently, Tesla developed a process to extract lithium from clay using salt. TPEIS-1489 AR-106684; Bartell Decl. ¶ 40. Under this process, there would be no need to transport truckloads of sulfur to generate thousands of tons of sulfuric acid each day, nor would there be a need to deposit sulfuric acid waste products on priority sage grouse habitat. TPEIS-0384 at 29. Instead, a cleaner process could be used. This alternative process demonstrates that the Thacker Pass Mine's degradation is unnecessary. Thus, BLM's approval of the Mine is arbitrary and capricious.

## VI.    CONCLUSION

Plaintiffs respectfully request that the Court find that BLM acted arbitrarily and capriciously by approving the Thacker Pass Mine and vacate BLM's ROD.

Respectfully submitted this 5th day of April, 2022.

/s/ *Dominic M. Carollo*
DOMINIC M. CAROLLO (Or. Bar. No. 093057)
*Pro Hac Vice*
dcarollo@carollolegal.com
Carollo Law Group LLC
Mail:  P.O. Box 2456
        Roseburg, OR 97470
Office: 2315 Old Highway 99 South
        Roseburg, OR 97471
Ph:    (541) 957-5900
  *Attorneys for Plaintiffs*

O. KENT MAHER (Nev. Bar No. 316)
kent@winnemuccalaw.com
PO Box 130
33 W Fourth Street
Winnemucca, Nevada 89446
 Ph: (775) 623-527
*Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 5, 2022 I filed the foregoing **MOTION FOR SUMMARY JUDGMENT**  using the United States District Court CM/ECF, which caused all counsel of record to be served electronically.

/s/Dominic Carollo
DOMINIC M. CAROLLO (Or. Bar No. 093057)
[*Pro Hac Vice*]

*Attorneys for Plaintiffs*