Laura K. Granier (SBN 7357)
Erica K. Nannini (SBN 13922)
HOLLAND & HART LLP
5441 Kietzke Lane, Suite 200
Reno, NV 89511-2094
(775) 327-3000
(775) 786-6179 fax
lkgranier@hollandhart.com
eknannini@hollandhart.com

Hadassah M. Reimer, Esq (Wyo. Bar No. 6-3825)
*Admitted Pro Hac Vice*
Holland & Hart LLP
P.O. Box 68
Jackson, WY 83001
Tel: 307-734-4517
hmreimer@hollandhart.com

*Attorneys for Defendant-Intervenor*
*Lithium Nevada Corp.*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| BARTELL RANCH, LLC, et al., <br><br> Plaintiffs, <br><br> v. <br><br> ESTER M. McCULLOUGH, et al., <br><br> Defendants, <br><br> and <br><br> LITHIUM NEVADA CORP., <br><br> Defendant-Intervenor. | **Lead Case:** <br> **Case No. 3:21-cv-00080-MMD-CLB** <br><br> **LITHIUM NEVADA CORP.'S OPPOSITION TO BARTELL RANCH LLC AND EDWARD BARTELL'S MOTION FOR EXTRA-RECORD EVIDENCE** |

Defendant-Intervenor Lithium Nevada Corp. ("Lithium Nevada") files this opposition to the Bartell Ranch LLC and Edward Bartell's (collectively, "BRL") motion seeking a court order admitting into the Administrative Record ("AR") excerpts of testimony from a State Engineer hearing on December 1–8, 2021, nearly a year after the Record of Decision ("ROD") being reviewed by this Court was signed.  ECF 207.

1

# I. INTRODUCTION

BRL disagrees with the BLM's decision to approve the Thacker Pass mine, and the underlying premise of its legal challenge is that the BLM should have relied on BRL's proffered expert instead of the agency's experts, a decade's worth of baseline data, and volumes of extensive analyses of the relevant hydrology. Because this premise fails as a matter of law to overcome the judicial deference to BLM's scientific decision-making, BRL has repeatedly tried to overcome that deficiency with unsubstantiated allegations of "conspiracy" and now "bad faith," or lack of oversight by BLM. This latest effort to mischaracterize new evidence and have the Court expand the record to include hearing testimony from nearly a year after the ROD was signed should be rejected.

Where, as here, "there is no dispute that [a document] post-dates the ROD," this Court previously ruled that such a document cannot fall under "exceptions to the normal rule regarding consideration of extra record materials." ECF 155 at 10. Despite a clear decision from this Court on this issue, BRL now argues that the first *Lands Council v. Powell*, 395 F.3d 1019 (9th Cir. 2005) exception should permit inclusion in the AR of certain post-ROD testimony from Lithium Nevada's hydrologist. Tellingly, BRL does not distinguish this Court's prior ruling on this issue and simply ignores the rule this Court adopted that, regardless of the potential applicability of a particular *Lands Council* exception, *none* apply when the document at issue post-dates the ROD. ECF 155 at 10 (noting that extra record evidence is not admissible "to determine the correctness … of the agency's decision" (*citing Asarco, Inc. v. U.S. EPA*, 616 F.2d 1153, 1160 (9th Cir. 1980)).

This motion is also untimely. The testimony BRL requests this Court add to the AR concluded December 8, over four months ago. BRL's attorney met and conferred with counsel on December 29th regarding this testimony, immediately after the Court decided motions to

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

supplement the record on December 27th and concluded that post-ROD evidence would be inadmissible.  *See* Carollo Decl. at ¶ 17; *see* ECF 155.  Although BRL's counsel raised the same points on December 29th that are now brought in this motion, *see* Ex. 1 (Carollo Email), BRL waited three and a half *more months* to file this motion concurrent with summary judgment briefing.[1]  BRL's counsel does not explain that delay, which ensured that opposing parties lost time to address BRL's summary judgment motion by responding to this last-minute motion.  *Cf.* ECF 197 at 17–18 ("the Court does not find good cause to give … infinite opportunities to continue litigating the completeness of the administrative record").  This is reason enough for the Court to deny the motion as untimely and order all references in BRL's brief to this extra-record evidence stricken.  *Native Ecosystems Council v. Erickson,* 330 F. Supp. 3d 1218, 1233 (D. Mont. 2018) (concluding that where "[t]he Case Management Order required Plaintiffs to raise 'any and all issues relating to the sufficiency of the agencies' administrative records' by July 28, 2017," and set the deadline for motions to supplement as "August 28, 2017," when the plaintiffs "filed their motion to supplement on October 27, 2017, two months past the deadline" and provided "no argument to excuse the late-filing …. the motion [was] untimely").  And the Ninth Circuit was clear in *Lands Council* that federal courts must not routinely or liberally admit new evidence when reviewing agency decisions because

---

[1] Counsel points to delay in receiving the hearing transcript as his main reason for filing so late in the case.  Carollo Decl. at ¶¶ 14–15.  But counsel had all his arguments prepared by December 29th.  *See* Ex. 1.  And his declaration does not explain why, when he received a watermarked transcript on January 25th, he did not immediately email Capitol Reporters requesting a shareable transcript.  Instead, counsel waited *over three weeks* to send an email and receive the non-watermarked transcript.  Carollo Decl. at ¶ 15.  Then, *seven weeks* after receiving the transcript on February 17th, counsel filed this motion.  *See* ECF 207 (dated April 5, 2022).

doing so would lead to review "de novo rather than with the proper deference to agency processes, expertise, and decision-making." *Lands Council*, 395 F.3d at 1030.

Moreover, BRL mischaracterizes the proffered testimony in an effort to squeeze within a *Lands Council* exception when, in fact, neither of BRL's two exhibits present the facts that BRL claims. *First*, Piteau's workplan as confirmed by BLM explicitly stated it would follow certain *elements* of the Stevens Protocols, not that the Protocols would be adopted wholesale as BRL suggests. *See* TPEIS-0054 at AR-005702–03. *Second*, BRL's claim that Lithium Nevada's hydrology contractor "revealed that Piteau did not follow the Stevens Protocols" in his testimony (Mot. at 4) is false. BRL ignores that Piteau clearly fulfilled the Protocols cited, including using hard copy "field data sheets," measuring flow in an acceptable manner, and adhering to the definition of "sketch maps" per the Protocols. *Third*, BRL's complaint that Piteau failed to follow the Protocol "requiring outreach to landowners" (a) ignores that the recommendation is not a portion of the Protocols adopted in the workplan, *see* TPEIS-0054 at AR-005702–03, (b) omits that such outreach "should," not "must" occur under the Protocols, *see* TPEIS-0642 at AR-060685, and ultimately (c) ignores the record information on the two instances of alleged "trespass." The Windmill Well is not on Bartell's property and Lithium Nevada received permission to access the Windmill Well from another private landowner who uses the well and believed the well was on their property. And, Piteau maintains that it accessed springs SP-034 and SP-042 from a road mapped as a public road and "never observed a 'no trespassing sign'" before Piteau began taking measurements from those springs in 2018. TPEIS-0406 at AR-048356; *see also* Carollo Decl. Ex. 2 at 315–16. None of BRL's allegations demonstrate errors or reason for the Court to consider post-ROD testimony.

Finally, the caselaw that BRL cites supports admission of information demonstrating *gaps* in the baseline data, but does not authorize BRL's effort here to use new evidence to

assert "improper critiques of [the agency's] scientific analyses" where the allegation is that the agency did not "adhere[] to a particular analytic protocol." *Bundorf v. Jewell*, 142 F. Supp. 3d 1138, 1146 (D. Nev. 2015) (citation omitted).  As to BRL's final erroneous claim that the excerpts of testimony demonstrate that BLM did not exercise oversight over Piteau's work product, they do nothing of the sort and the AR citations in BRL's brief alone demonstrate extensive agency oversight.  *See* Mot. at 4 (citing TPEIS-1013; TPEIS-1022; TPEIS-1072; TPEIS-1092).  Those cited emails reflect that BLM's hydrogeologist, among many other agency reviewers, carefully reviewed the Piteau report and specifically analyzed the hydrologic model data set.  *See* TPEIS-1022 at AR-094719–20.  The fact that Mr. Cluff stated that he did not speak directly with the reviewers from BLM, ICF, and other cooperating agencies says nothing about the level of BLM's review.  Rather, as the AR reflects, Mr. Cluff submitted his work to Lithium Nevada, who properly provided it to BLM and transmitted comments back to Piteau.  *See, e.g.*, *id.* at AR-094720.  BRL's unfamiliarity with the contractor process does not mean nefarious intent lurks behind each element that BRL may not understand, and this Court should deny inclusion of the post-ROD testimony excerpts.  The evidence in the AR shows BLM's robust review of Piteau's work product.

BRL provides no justification to include these post-ROD testimony excerpts in the record, and makes incorrect claims regarding the substance of the excerpts.  There is no analogous caselaw to justify inclusion of the testimony under any of the *Lands Council* exceptions in any event.  BRL's motion for extra record evidence should be denied.

## II. ARGUMENT

This Court definitively concluded that "exceptions … [do not] apply to … post-decisional information."  ECF 155 at 10 (citation omitted).  This Court's prior conclusion prohibits BRL's introduction of transcript excerpts from a 6-day hearing that began December

1, 2021, long after the ROD was published.  *See Agostini v. Felton*, 521 U.S. 203, 236 (1997)

("Under [the law of the case] doctrine, a court should not reopen issues decided in earlier stages

of the same litigation.").  In addition, the testimony at issue does not establish the facts BRL

claims and is not admissible under the first or fourth *Lands Council* exceptions.  Quibbles with

an agency's methods and conclusions do not demonstrate "gaps" in the baseline and instead

attempt to create a battle of the experts that is inappropriate in a National Environmental

Protection Act ("NEPA") case.  Lastly, Mr. Cluff's unfamiliarity with the identity of each

BLM employee that reviewed and commented on his work product says nothing about BLM's

oversight, and fulsome agency oversight is demonstrated by the AR.  BRL presents no viable

reason for the Court to rescind its prior order and allow the inclusion of post-ROD information

into the AR.[2]

> ### A.   Piteau Followed the Stevens Protocol Elements Adopted in the BLM-Approved Workplan.

BRL attempts to paint an inaccurate picture of the EIS process, erroneously suggesting

that BLM used a third-party contractor to prepare the EIS because of Secretarial Order 3355,

Mot. at 3–4, when, in fact, such practice has long been standard and is expressly authorized by

Federal regulation.[3]  And, BRL ignores documents in the AR that unequivocally demonstrate

the reliability of Piteau's work and BLM's extensive oversight.

Piteau properly conducted its various hydrologic surveys pursuant to a workplan

developed with BLM and its contractor ICF.  *See* TPEIS-0054 at AR-005748 (documenting

---

[2] And, BRL provides only certain excerpts of Mr. Cluff's testimony be included in the AR, omitting much of the testimony provided over the seven-day hearing.  If the Court admits these testimony excerpts, then both the full transcript of the hearing, the forthcoming decision of the State Engineer, and other evidence should be admitted for context.  Lithium Nevada expects to receive the permit that BRL contested and the testimony Mr. Cluff gave went on for hours, explaining various measurements in detail.  While this level of granularity may be appropriate before the State Engineer, it is far afield from any issues before this Court given the legal scope of the record and the level of deference the Court provides to federal agencies' scientific analysis in NEPA cases.  *See San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 993 (9th Cir. 2014) ("the district court erred when it used the extra-record declarations as a basis for judging the wisdom of the agency's scientific analysis").

[3] An agency's use of a contractor to prepare an EIS is authorized in regulation and did not arise in connection with new timelines under Secretarial Order 3355.  *See* Mot. at 3; *Cachil Dehe Band of Wintun Indians of the Colusa Indian Cmty. v. Zinke*, 889 F.3d 584, 607 (9th Cir. 2018)

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

1    BLM's approval).  The BLM approved workplan specifically directed that Piteau would not

2    need to conduct Level 2 analyses of the springs and incorporated only the most salient elements

3    of the Stevens' Protocol Level 1 analysis into the workplan for this Project.  *See id.* at AR-

4    005702 (citing only Level 1 Protocols).  The workplan specifies that Piteau would follow

5    "BLM guidelines set forth for Level 1 inventory," *id.*, which set out further data requirements

6    that the Piteau reports fulfilled.  *Compare* TPEIS-0602 at AR-059090 (BLM guidance listing

7    spring inventory requirements including location, flow, quality, temperature) *with* TPEIS-0076

8    at AR-008491 (Piteau's spring survey form from Q1 2018 including location, flow, quality

9    information, and temperature).

10        This workplan was incorporated into the quarterly springs reports and demonstrated

11    that Piteau was obligated to include certain "elements for Level 1 inventory protocols (Stevens,

12    2016)" in its analyses.  TPEIS-0054 at AR-005702 (Baseline and Model Workplan); TPEIS-

13    0870 at AR-081850 (Q2 2019 Seep and Spring report attached to an email from Mr. Bartell

14    listing the same Level 1 elements as its methodology, demonstrating that Mr. Bartell was aware

15    that the report was limited to "elements" of the Stevens Level 1 protocols).  Those "elements"

16    for a Level 1 analysis included a "[d]escription" and "[p]hotographs of [the] locations," and

17    "[f]low measurement … where surface flow is occurring."  *Id.*  The workplan did not require

18    many aspects of the Stevens Protocols, such as a cultural survey, socioeconomic analysis, a

19    wildlife survey, or (as relevant to BRL's arguments) the "Field Work Planning" process

20    regarding contact with private landowners.  *See* TPEIS-0642 at AR-060685 (Stevens Protocols

21

22

23    ("40 C.F.R. § 1506.5(c) states that an EIS 'prepared pursuant to the requirements of NEPA shall
be prepared directly by or by a contractor selected by the lead agency ….'").  Furthermore,

24    although Bartell attempts to insinuate that BLM's use of Lithium Nevada's contractor to gather
baseline data is barely legal (or not "*per se* illegal," Mot. at 13), it is obviously standard practice.

25    *See Desert Protective Council v. U.S. DOI*, No. 12cv1281-GPC(PCL), 2012 U.S. Dist. LEXIS
181344, at *6, 9 (S.D. Cal. Dec. 21, 2012) (noting nothing untoward about the use of

26    "comparative raptor use analysis performed by the Project Proponent's consultant," and
concluding that plaintiffs could not include in the AR a "declaration disagree[ing with] and

27    challeng[ing] the BLM's interpretation and conclusions as to the [contractor-provided] raptor
use data" because it would be "post-decision information as a new rationalization for

28    … attacking the Agency's decision" (citation omitted)).

regarding stakeholder involvement); AR-060688 (sociocultural-economic conditions); AR-060702 (fauna overview).

BRL ignores that in the "elements" incorporated into the workplan, BLM did not require Piteau to follow the Stevens Protocols for field data sheets, sketch maps, stakeholder outreach, or the specific flow measurements required in the Level 2 inventory cited by BRL's attorney during the State Engineer hearing. *Compare* Mot. at 8 (citing Carollo Decl, Ex. 2 at 18, quoting the Stevens Protocol as requiring "[s]prings flow should be measured at the point of maximum surface discharge"); *with* TPEIS-0642 at AR-060688, AR-060709 (demonstrating that the Stevens Protocols section that BRL quotes appearing at AR-060709 appears under the "Level 2 Inventory" sequence of activities starting on AR-060688). BRL cannot demonstrate that Piteau "recorded [baseline data] in violation of the [Stevens] [P]rotocols," Mot. at 8, when BLM accepted a more limited application of the Protocols that omitted the specific protocols that BRL highlights (and BRL provides no authority that limits BLM's discretion to do so). Piteau furthermore fully complied with the Level 1 elements that BLM instructed Piteau follow and even went beyond those requirements—Piteau took flow measurements and collected water quality samples, despite there being no requirement to do so in a Level 1 inventory visit. TPEIS-0642 at AR-060688 (describing a Level 1 survey as involving a description and photographs of the spring accompanied by an analysis of what flow method would be best suited to measure the particular spring). A careful review of BRL's attempt to nit-pick discrete aspects of Piteau's analyses emphasizes the level of detail and depth that Piteau went to in creating the reports used by BLM for this Project. *See* TPEIS-0711 (EIS Appendix P consisting of 1452 pages; 1326 of which constitute the Baseline Hydrologic Data Collection Report); TPEIS-0076 (six volumes of baseline water data reports from 2018–2020); TPEIS-0643 (2013 baseline water report).

### 1.  Mr. Cluff's Testimony Does Not Demonstrate Deviations from the Stevens Protocol.

But even assuming *arguendo* that Piteau was obligated to follow the elements of the Stevens Protocols that BRL points to, Piteau complied with those Protocols. BRL erroneously

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

8

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

1  argues that Mr. Cluff exposed a violation of the Stevens Protocols when he "agreed that field

2  data sheets were not used," Mot. at 4 n.3, but Mr. Cluff explained that "we wrote the notes that

3  would fill into a template in field notebooks."  Carollo Decl. Ex. 1 at 311.  The purpose of

4  using field data sheets in the Stevens Protocol is that "hard copy sheets" allow for "detection

5  of data entry errors" that an "electronic data entry system[]" could not demonstrate.  TPEIS-

6  0642 at AR-060687.  The point of this protocol requirement is that electronic data entry should

7  not be used in the field because errors in such data entry may not be detected.  *Id.*  Handwriting

8  in field notebooks provides the same benefit as field data sheets, which is why the Stevens

9  Protocols only "recommend[s] field data entry on hard copy sheets," and does not require a

10  specific field data sheet format.  *Id.*  Piteau used "hard copy sheets" of paper in their physical

11  field notebooks and complied with the Stevens Protocols for data entry.  *Id.*

12         Notably, BRL does not contend that Piteau's use of field notebooks resulted in

13  capturing less or less accurate data than the Stevens Protocols field data sheets would provide.

14  Piteau input the data written in the field notebooks into "Spring Survey Forms."  *See,e.g.*,

15  TPEIS-0076 at AR-008491–516 (Seep and Spring Survey Report Q1 2018, App. A).  These

16  Spring Survey Forms contain incredibly specific detail on each site surveyed, including the

17  surveyor's name, the survey's date, time, the spring name, elevation, and GPS coordinates.  *Id.*

18  at AR-008516.  The Forms further note the Flow, the Field Parameters (including the spring's

19  pH, conductivity, temperature, and oxidation reduction potential), provide a detailed

20  description of the site with accompanying photographs, the spring class, and a description of

21  the surrounding vegetation and riparian area.  *Id.*  This fully complies with the Level 1 survey

22  recommended by the Stevens Protocols.  TPEIS-0642 at AR-060688 (recommending geo-

23  referencing, directions to the site, the observer and date, a description and photos of the spring,

24  the spring type, and "the method best suited to measure flow").  Although the Piteau reports

25  are not required to conduct Level 2 surveys and do not reference Level 2 requirements, *see*

26  TPEIS-0054 (workplan), the Forms also incorporated elements of Level 2 analyses, including

27  the "source elevation," TPEIS-0642 at AR-060691; the spring name and type, *id.* at AR-

28  060692; the pH, conductivity, temperature, and oxidation reduction potential, *id.* at AR-

9

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

1    060715; and flow measurements, *see id.* at AR-060708–13.  Piteau's surveys thus met and far

2    exceeded the Stevens Protocol Level 1 requirements.

3            Similarly, BRL contends Mr. Cluff "admitted" that Piteau did not "prepar[e] a sketch

4    map" for every spring as recommended by the Stevens Protocols.  Mot. at 5 n.3.  But the

5    Stevens Protocols define a "sketch map" broadly, encompassing either a "[h]and-drawn map,

6    aerial photograph, or digitized map with scale, orientation, date, observers, landmarks,

7    georeferencing points, photo points."  TPEIS-0642 at AR-060696.  The absence of *hand drawn*

8    maps at every stream does not mean that Piteau ignored the "sketch map" recommendation.

9    Instead, Piteau chose a more accurate and technologically advanced option, and included maps

10   of each spring using aerial photography and GPS coordinates.  *See, e.g.*, TPEIS-0076 at AR-

11   008517–43 (Seep and Spring Survey Report Q1 2018, App. B).  Furthermore, a digital map

12   including all monitored streams and reference points is clearly included in Piteau's 2020 Water

13   Quantity and Quality Impacts Report.  *See, e.g.*, TPEIS-0711 at AR-066321.  Piteau complied

14   with the "more efficient and accurate" sketchmap option (expressly included in the Stevens

15   Protocol) by incorporating the stream location data into a digital map.  *Compare* TPEIS-0642

16   at AR-060701 *with* TPEIS-0711 at AR-066321.

17           BRL next erroneously asserts that Piteau trespassed on his land to obtain certain

18   measurements, and in so doing violated the Stevens Protocols' admonition that "the survey

19   team should contact private landowners … to arrange access to springs."  TPEIS-0642 at AR-

20   060685.  Although BRL does not make it clear, there are two separate instances of alleged

21   "trespass."  One allegation centered around a transducer that Piteau placed in 2020 on a well

22   on BLM land called the Windmill Well—a well in which Mr. Bartell had recently placed water

23   rights in 2019.  *See* TPEIS-0914 at AR-089059.  This well "is … fenced inside of … Home

24   Ranch," a private landowner neighbor of Mr. Bartell's.  TPEIS-0914 at AR-089059.  As such,

25   as Lithium Nevada explained in an email to Mr. Bartell, Lithium Nevada "had understood from

26   the Home Ranch that this well was located on Home Ranch property, and we had received

27   permission from Home Ranch to place the transducer in the well."  TPEIS-0918 at AR-112183.

28   It later became clear that the well was actually on BLM land and that Bartell had sought to use

10

1   water rights at that well.  *See* TPEIS-0914 at AR-089059.  Thus, the record evidence is that it

2   is Lithium Nevada used the well on BLM's land as a guest—not through any trespass against

3   Bartell.  And, it appears Bartell may not have notified his neighbors at the Home Ranch that

4   he had acquired water rights to use this well, as Home Ranch is apparently now also

5   contemplating applying for water rights due to Home Ranch's use of the well and belief that it

6   was on their property.  *Id.*  Although Piteau employees did not personally reach out to Bartell,

7   Piteau had confirmation from Lithium Nevada that it received permission before taking

8   measurements from the Windmill Well.  This conforms with Mr. Cluff's testimony that "before

9   any monitoring could be done on private lands … we needed to get permission."  Carollo Decl.

10  Ex. 2 at 305.

11      The second set of measurements BRL claims were taken during a "trespass" on his

12  lands were at springs SP-035 and -042, where Piteau took measurements beginning in 2018.

13  TPEIS-1499 at AR-112888.  It is at these springs that BRL contends that Piteau took faulty

14  measurements, *id.* at AR-112889, a claim that BLM responded to in detail in the FEIS.  *See*

15  TPEIS-0713 at AR-067619–20.  Notably, even if there had been an alleged trespass, that does

16  not bear on the accuracy of the data collected.[4]  And Piteau maintains that even if the

17  measurements from SP-035 and SP-042 were altogether omitted from the analysis it would

18  "not affect the groundwater model" because those measurements "comprise a very minor

19  component of the overall hydrogeologic dataset" and the model itself was "calibrated to

20  baseflow in Crowley Creek," not any of the contested spring measurements.  TPEIS-0406 at

21  AR-048356.  In addition, Mr. Cluff's testimony was that in March 2018 he was "not aware

22  [those springs were on] … private property at the time."  Carollo Decl. Ex. 2 at 315.  Given

23  that Mr. Cluff testified he was unaware it was private property, there could not have been any

24  trespass which requires knowledge and intent.  Carollo Decl. Ex. 2 at 315–16 (Mr. Cluff stating

25

26  [4] But as discussed in detail below, BLM did not ignore Mr. Bartell's allegations of trespass.  The
    BLM's short response stating that it had "no evidence supporting the idea that hydrological data
    was collected incorrectly," TPEIS-0713 at AR-067618, was based on the detailed information
27  provided by Piteau to BLM explaining that Piteau "never observed a 'no trespassing sign'" and
    accessed the springs from what was indicated on the DOT's roadmap as a public road.  *See*
28  TPEIS-0406 at AR-048356.

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

that in taking measurements in 2018 "[w]e were not aware it was private property at the time" and in 2013 he did not "recall knowing" that certain spring sites were "on private land"); NRS 207.200(1) (defining trespassing under Nevada law as going "upon the land … with intent to vex or annoy the owner or occupant thereof, or to commit any unlawful act; or" to "[w]illfully go[] or remain[] upon any land or in any building after having been warned by the owner or occupant thereof not to trespass").  Although BRL alleges that Piteau surveyors must have seen his "Private Property" signs, TPEIS-1489 at AR-106727, Piteau explained to BLM in a response to Mr. Bartell's comments that Piteau "believed the … road to be public based on the [DOT] roadmap" and further "never observed a 'no trespassing sign' at the private property boundary."  TPEIS-0406 at AR-048356.  The single photo Bartell provided in his comments is insufficient to prove that the entire territory was fenced/signposted during the period Piteau performed measurements on the springs such that the sign could not be missed. *Cf. United States v. Chambers*, No. 2:11-cr-00456-KJD-CWH, 2012 U.S. Dist. LEXIS 187893, at *13 (D. Nev. Nov. 21, 2012) (concluding that even though there was a fence and an adjacent "no trespassing" sign, "[w]alking through an existing break in the fence … is not illegal" such that there was not sufficient reasonable suspicion of criminal activity).  Thus, BLM's responses to Mr. Bartell's comments that decline to take his claims of trespass as fact were not made in bad faith, the response was based off of Piteau's detailed explanation to BLM.  *See* Mot. at 11 n.7; TPEIS-0406 at AR-048356.  Piteau's responses to Mr. Bartell's comments reflect that Lithium Nevada and Piteau were unaware permission was necessary in the case of SP-035 and -042, and emails in the record demonstrate Lithium Nevada had permission from the perceived property owner whose fence encircled the Windmill Well.[5] Therefore, BRL fails to make any showing that BLM acted in bad faith.

Lastly, BRL argues that ***his expert's measurements*** differ from Piteau's in a stream in the outer reaches of the Project area called Sheep Creek, and erroneously advocates that Mr.

---

[5] Notably, when Bartell notified Lithium Nevada of his concerns and his water rights in the Windmill Well, in an abundance of caution, Lithium Nevada apologized, promptly removed the alleged offending transducer, and provided Bartell the data collected by the transducer. TPEIS-0918 at AR-112182–84.  Although Bartell initially claimed that installing the transducer

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

Cluff's suggestion for why the two measurements differ demonstrates that *all* of Piteau's measurements were incorrect. Mot. at 8; Carollo Decl. Ex. 2 at 265. Again, BRL makes this particular claim assuming that the Level 2 recommendations regarding flow measurements in the Stevens Protocols are binding on Piteau (they aren't) and that the statement in the Protocols that "[s]prings flow should be measured at the point of maximum surface discharge, which *is not likely* to be at the source" means that the source should *never* be measured. TPEIS-0642 at AR-060709. This is an incorrect interpretation of the Protocols on their face and, as Mr. Cluff explained in his testimony, "a more rigorous stream flow of monitoring wasn't done" at Sheep Creek because it was less hydrologically significant "on the other side of the divide" in nearby "Kings River Valley," and thus "wasn't one of the streams that we identified as being important." Carollo Decl. Ex. 2 at Tr. 266. While Mr. Cluff hypothesized that there could be "additional flow upwelling further down the reach," resulting in different measurements if BRL's expert measured a different part of the creek, this exchange does not establish the reason for the differences in measurement and further does not demonstrate a violation of the non-binding Level 2 survey recommendations in the Stevens Protocols.

Testimony related to the possible differences in flow measurements is the quintessential "battle of the experts" type of disagreement that courts do not referee. While Bartell tries to assert this is not a "battle of the experts" because the proffered testimony is from Piteau, the expert BLM relied upon, BRL is contesting minute aspects of Piteau's application of its scientific experience by comparison to his own expert's opinions. In Mr. Cluff's testimony he explained that the Sheep Creek (SP-047) spring was not identified as

---

constituted "trespass on private property," TPEIS-1500 at AR-112900, he knew that the well was actually on *BLM public land*, which is how he got his water rights to the well in the first place. *See id.* at AR-112899 (Bartell noting that he knew "the well was on BLM lands" but claiming that he "'owned' the pump in the well" such that Piteau's measurements constituted "tamper[ing]" instead of trespass). Bartell's initial claims of trespass as to this well appear frivolous. *Lied v. County of Clark*, 579 P.2d 171, 173–74 (Nev. 1978) ("to sustain a trespass action, a property right must be shown to have been invaded. Here, [plaintiff] has shown neither." (internal citation omitted)); *see Sierra v. Desert Palace, Inc.*, No. 2:12-cv-00230-GMN-CWH, 2013 U.S. Dist. LEXIS 35349, at *22 (D. Nev. Feb. 27, 2013) (concluding that without "any recognized property interest," the "Plaintiffs' claim for the intentional tort of trespass is futile").

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

1  important to the analysis of the Project's impacts by Piteau, but it apparently was considered

2  important by BRL's expert, Dr. Powell.  *See* Carollo Decl. Ex. 2 at 265–66.  And although

3  Piteau clearly measured certain springs by their "gaining flow," *see* TPEIS-0076 at AR-008510

4  (2018 Q1 report measuring SP-048 "downstream of orifice with good channel conditions"),

5  Piteau made the decision based on the conditions it observed at SP-047 to measure at the

6  "[s]pring orifice found along rangefront exposure in the hillside."  *Id.* at AR-008509

7  (describing measurements at SP-047).  Given that even the Protocols themselves allow that in

8  some situations "maximum surface discharge" may be at the orifice, the decision Piteau made

9  in interpreting the spring's conditions and choosing a particular flow measurement process is

10  explicitly delving into scientific details, reviewed and confirmed by the agency, to which the

11  Court gives great deference.  *Protect Our Cmtys. Found. v. Salazar*, No. 12cv2211-GPC(PCL),

12  2013 U.S. Dist. LEXIS 159281, at *25–26 (S.D. Cal. Nov. 6, 2013) ("Disagreeing with the

13  methodology conducted by the agency does not constitute a NEPA violation.").  BRL's expert

14  believed stream flow at Sheep Creek was hydrologically significant but Piteau did not, and

15  further interpreted the spring conditions as warranting measurement in a different spot—

16  explaining the rationale and difference from Piteau's measurements.  But one expert's

17  disagreement with the science BLM relied upon does not render the BLM's decision arbitrary

18  and capricious.  *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1075 (9th

19  Cir. 2011) ("The court is not to 'act as a panel of scientists that instructs the [agency] …,

20  chooses among scientific studies …, and orders the agency to explain every possible scientific

21  uncertainty.'" (citation omitted)).

22  And as the Stevens Protocol acknowledges "[f]low measurement techniques vary in

23  relation to site and season" and a more detailed analysis of the two measurements may provide

24  another answer as to why they differ.  *See* TPEIS-0642 at AR-060709–13 (listing eight ways

25  to calculate flow depending on the type of stream).  Nor does "one data point," even if it were

26  in error, constitute evidence that "the agency's decision hinged on this single figure" or

27  demonstrate any prejudicial errors.  *Neighbors of the Mogollon Rim Inc. v. U.S. Forest Serv.*,

28  No. CV-20-00328-PHX-DLR, 2022 U.S. Dist. LEXIS 14236, at *11–13 (D. Ariz. Jan. 26,

14

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

2022) (noting that where a plaintiff observed "one data point" was in error, there was "no evidence that the agency's decision hinged on this single figure" and because "[t]he opponent of the agency action bears the burden of demonstrating that errors in the agency's data … are prejudicial," the court determined the agency "reasonably assess[ed] the likely effects"). Similarly here, BRL provides no evidence that this single reading that he contests represents a pattern of mistakes or a definitively unreliable reading that could cause any measurable impact on the hydrologic model ultimately created by Piteau.  This is one reading from one spring "out of 56 total springs, … comprise[ing] a very minor component of the overall hydrogeologic dataset" that is calibrated based on Crowley Creek, not SP-035, SP-042 or Sheep Creek. TPEIS-0406 at AR-048356.  BRL fails to uphold his burden of demonstrating these alleged errors, even if true, had any impact on the resulting model.  Ultimately, it is not the province of the district court to make the determination on the best flow calculation method where multiple methods are permissible.  *U.S. Citrus Sci. Council v. U.S. Dep't of Agric.*, 312 F. Supp. 3d 884, 906–07 (E.D. Cal. 2018) ("The Court will not second-guess the agency's determination, as it was based on 'scientific judgments and technical analyses within the agency's expertise,' an area over which courts are to be 'at our most deferential.'" (citation omitted)).  The testimony proffered does not provide detailed information about the differences in expert measurements and this measurement for this specific spring does not call into question Piteau's other measurements at different spring locations, or demonstrate any impact to the hydrologic model or Piteau's other conclusions.

Piteau far exceed the Level 1 survey recommendations included in the BLM approved workplan with detail and specificity of its surveys.  But even were the Protocols that BRL

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

1  points to required, Piteau properly implemented the Protocols and BRL fails to allege any

2  demonstrable impact from the scientific decisions Piteau made during its surveys.[6]

3      **2.**    **BRL Fails to Satisfy the First *Lands Council* Exception.[7]**

4      Were the Court to determine that it would consider post-ROD information, BRL still

5  does not demonstrate that the testimony can supplement the AR under the first *Lands Council*

6  exception.  Under the first exception, extra-record evidence is only admissible if it "is

7  necessary to determine 'whether the agency has considered all relevant factors and has

8  explained its decision.'"  *Lands Council*, 395 F.3d at 1030 (citation omitted).  Although BRL

9  claims the Court should admit the proffered testimony because it allegedly demonstrates BLM

10  "relied on an inaccurate baseline," as explained above, BRL fails to demonstrate the baseline

11  is inaccurate and the cases BRL cited simply acknowledge that extra-record information that

12  identifies *gaps* in the baseline data qualify under the first exception.  BRL has failed to show

13  any such gaps here where there are "thousands of water level/surface flow data points,

14  hundreds of water quality measures, and hundreds of spring flow measurements."  TPEIS-

15  0713 at AR-067628.  Piteau's extensive and thorough data collection and analysis starkly

16  contrast the fact patterns in the caselaw BRL cites.  *See Or. Nat. Desert Ass'n v. Rose*, 921

17

18  [6] BLM analyzed any possible prejudicial effect of BRL's various complaints throughout the EIS
19  process and concluded that any errors he alleged in Piteau's observations "have been minor
errors bearing no meaningful effect to the analysis" due to the "***thousands of water level/surface***
20  ***flow data points***, ***hundreds of water quality measurements, and hundreds of spring flow***
***measurements.***  With such a large monitoring network minor corrections are anticipated, but
21  these minor corrections do not justify invalidating the overall program."  TPEIS-0713 at AR-
067628 (emphasis added).  Ultimately, "[i]n no way do the minor corrections made to the
22  baseline dataset substantially affect the outcome of the groundwater model and impacts analysis
23  prepared for the Thacker Pass Project."  *Id.*

24  [7] BRL, in a single sentence citing no caselaw, claims that BLM's use of Piteau's data "amounts
to bad faith" because the "the surveys … were not collected pursuant to the Stevens Protocols."
25  Mot. at 11 n.7.  As discussed above, BLM authorized the workplan that did not require the
surveys be conducted according to the Level 2 Stevens Protocols that BRL cites, and the surveys
26  more than fulfilled the recommendations under the Level 1 Stevens Protocols.  "[I]t would be
practically impossible for [BRL] to establish any causal connection between [the surveys] and
27  any purported bad faith by [the agency].  Merely incanting the phrase 'bad faith,' as plaintiffs
do, is not tantamount to a 'strong showing of bad faith or improper behavior ….'"  *Protect Lake*
28  *Pleasant, Ltd. Liab. Co. v. Connor*, No. CIV 07-0454-PHX-RCB, 2010 U.S. Dist. LEXIS 77991,
at *14 (D. Ariz. July 29, 2010).

F.3d 1185, 1192 (9th Cir. 2019) (admitting extra-record information where the forms reflecting the baseline data "fail to provide any details responsive to the prompt" to provide the condition of the Obscure Routes); *Or. Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 569 (9th Cir. 2016) (admitting extra-record information where "[t]he FEIS did not report on *any* observations of the Echanis site surveying winter sage grouse use of the area"); *Stop B2H Coal. v. BLM*, No. 2:19-cv-1822-SI, 2021 U.S. Dist. LEXIS 145939, at *19 (D. Or. Aug. 4, 2021) (admitting "newly created evidence submitted by Plaintiffs" not to challenge agency's data collection process, but instead because "not all the information contained in these exhibits can be found in evidence already in the record,"); *Helena Hunters & Anglers Ass'n v. Marten*, 470 F. Supp. 3d 1151, 1166 (D. Mont. 2020) (allowing supplementation of extra-record evidence where the agency completely "fail[ed] to conduct a technical analysis or offer any explanation to which the Court may defer," which is not the case here).

Where, as here, the agency provided extensive baseline data with which the plaintiff disagrees, courts do not admit the plaintiff's competing scientific information. *See W. Expl. LLC v. U.S. DOI*, No. 3:15-cv-00491-MMD-VPC, 2015 U.S. Dist. LEXIS 155195, at *7 (D. Nev. Nov. 16, 2015) (observing that Plaintiffs cannot "invit[e] the Court to use extra-record evidence … to question the 'correctness or wisdom of the agency's decision.'" (citation omitted)); *see also San Luis & Delta-Mendota Water Auth.*, 776 F.3d at 993 ("the district court erred when it used the extra-record declarations as a basis for judging the wisdom of the agency's scientific analysis"); *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 640 F.3d 979, 983 n.3 (9th Cir. 2011) ("It is usually inappropriate for a district court to consider extra-record evidence offered merely to rebut the merits of an agency's finding."); *Churchill County v. U.S. DOI*, No. 3:09-cv-00170-LDG (WGC), 2015 U.S. Dist. LEXIS 29335, at *6 (D. Nev. Mar. 6, 2015) ("The record cannot be supplemented with documents the plaintiffs believe will provide 'much needed context to evaluate Federal Defendants' decision.'"); *W. Watersheds Project v. BLM*, No. 3:11-cv-00053-HDM-VPC, 2011 U.S. Dist. LEXIS 50056, at *14–15 (D. Nev. Apr. 28, 2011) (determining plaintiffs could not use extra-record evidence "as a critique of the BLM's decision [or] to dispute the merits of that decision").

17

BRL contends that since the testimony he now asks the Court to consider is from Lithium Nevada's contractor it is not competing scientific evidence but rather evidence "demonstrat[ing] that survey protocols were not followed." Mot. at 10. As discussed *supra* in Section II.A.1, the Stevens Protocols were followed. But even if the testimony could demonstrate Piteau did not implement all aspects of the Stevens Protocols, such evidence would not be admissible under the first *Lands Council* exception. *Bundorf*, 142 F. Supp. 3d 1138 further establishes this point. In *Bundorf*, this Court did not consider evidence proffered in the plaintiffs' declarations that "critique[d] the agencies' selected [survey] methods," because "NEPA's requisite hard look does not require adherence to a particular analytic protocol." *Id.* at 1146 (citation omitted). Here, BRL is attempting to bind Piteau to every aspect of the Stevens Protocols, even where BLM reviewed and confirmed Piteau's workplan and decided only the Level 1 survey recommendations in the Stevens Protocols applied— which Piteau clearly exceeded. *See* TPEIS-0054 at AR-005702–03. In *Bundorf*, this Court "further [found] that some [extra-record] assertions constitute[d] improper critiques of Federal Defendants' scientific analyses, including how the agencies classified nests observed during golden eagle surveys." *Id.* (striking paragraphs 37, 42, 44, and 45 of the proffered declaration). The Court accordingly struck portions of the declaration that claimed that the agency misapplied its survey protocols by not surveying enough of the project area and failed to classify observed inactive nests as "associated with golden eagles." Cashen Decl. at ¶¶ 37, 45, *Bundorf v. Jewell*, 142 F. Supp. 3d 1138 (D. Nev. 2015) (No. 2:13-cv-00616-MMD-PAL). While the Court did allow admission of certain paragraphs that "point[ed] out factors that are *missing* from [the agency's] wildlife analyses"—BRL fails to demonstrate there are any factors missing from BLM's analyses. *Bundorf*, 142 F. Supp. 3d at 1146, 1147 (emphasis added) (retaining paragraphs 41 and 43); *see* Cashen Decl. at ¶ 41 (noting the consultant "did not conduct any surveys exclusively for eagles"); *id.* at ¶¶ 43–44 (observing that "at least two complete aerial surveys during a single breeding season are required to establish nesting territories" but the consultant "never attempted to map territories or occupancy"). BRL presents selected post-decisional testimony to try to improperly critique BLM's scientific

18

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

analyses, including which streams Piteau identified as significant, to challenge Piteau's data collection and spring classification methods. BRL does not identify gaps where Piteau failed to measure certain springs. BRL's extra-record testimony is thus exactly the type of information that this Court previously determined inadmissible as extra-record evidence under *Bundorf.*

Nor does BRL demonstrate that Piteau's extensive reports "misrepresent[] … scientific information." Mot. at 10. Piteau's measurements accurately recorded their observations, and BRL simply disagrees with those observations. *See* Carollo Decl. Ex. 2 at 318 (BRL Counsel accuses Mr. Cluff of failing to "follow the Stevens protocol" by not measuring SP-035 "at the point of maximum discharge," but Mr. Cluff explains that when he measured SP-035 "there wasn't a point of discharge. There was standing water"). And, as Mr. Cluff describes in the testimony BRL offers to this Court, the difference in the measuring point stems from the expert's decision of areas of significance and the proper flow measurement prompted by the particular spring's conditions. BRL's expert's disagreement with those determinations is the quintessential battle of the experts. "[T]his is not a situation where the [agency] 'understood but concealed and misrepresented the data.' Rather, this is a situation where experts differ in their testimony …. In such a situation, the Court defers to the agency …." *League of Wilderness Defs./Blue Mts. Biodiversity Project v. Connaughton*, No. 3:12-cv-02271-HZ, 2014 U.S. Dist. LEXIS 170072, at *63–64 (D. Or. Dec. 9, 2014) (internal citation omitted). BLM did not require Piteau follow the portions of the Stevens Protocols that BRL cites, and even if BLM had done so Piteau fulfilled its responsibilities to map the area, collect data in hard copy, obtain permission (or reasonably believed it had) to access known private lands, and measure flow depending on the spring's circumstances and in the areas the expert identified as significant in order to determine the appropriate point to measure. BRL "has not shown that these surveying and monitoring data were likely incorrect." *Wildearth Guardians v. Jeffries*, 370 F. Supp. 3d 1208, 1244 (D. Or. 2018). And where, as here, Plaintiffs seek admission of extra record evidence by attacking the science underlying BLM's decisions, the extra record evidence is not admissible under the first *Lands Council* exception. *See Native*

1    *Ecosystems Council*, 330 F. Supp. 3d at 1231 (denying admission of extra-record evidence

2    where "[a]ll three of the Johnson declarations go beyond the limitations on extra record

3    evidence by attacking the science underlying the [agency's] decisions" and, if admitted,

4    "[t]heir consideration would therefore lead to de novo review of the decisions at issue here by

5    inviting judicial weighing of the science").

6        **B.    BLM Exercised Extensive Oversight Over Piteau's Work Product.**

7            BRL's contention that "Mr. Cluff's own admission that he was never in direct contact

8    with [BLM's contractor] ICF" meant that there was no BLM oversight is a mischaracterization

9    of the testimony and factually incorrect.  Mot. at 13.  Mr. Cluff described the oversight process

10   in his testimony, stating that Lithum Nevada would "provide[] … a final version" of Piteau's

11   work product to BLM and its contractor ICF would "provide[] comments."  Carollo Decl. Ex.

12   1 at 302.  Mr. Cluff also explained that ICF hired "a third party reviewer" that reviewed the

13   model used to forecast the Project's hydrologic impacts.  *Id.* at 356.  In just the testimony

14   evidence BRL submitted, BLM clearly "edit[ed] NEPA documents[] and anlayz[ed] baseline

15   data submitted by the project proponent or consultant."  Mot. at 14.  This is further bolstered

16   by record evidence of BLM's oversight that BRL cites to while incomprehensibly claiming

17   that it does not exist.  *See* Mot. at 4 (citing TPEIS-1013; TPEIS-1022; TPEIS-1072; TPEIS-

18   1092).

19           Those referenced documents demonstrate BLM's multiple reviewers of the water data

20   and analysis, TPEIS-1092 at AR-096045; BLM's hydrogeologist reviewed Piteau's report and

21   "the model data set (i.e. MODFLOW)," TPEIS-1022 at AR-094719; BLM's contractor ICF

22   reviewed Piteau's report and transmitted its comments through BLM, TPEIS-1072 at AR-

23   095420; and BLM ensured the cooperating agencies also reviewed and commented on the

24   report, TPEIS-1013 at AR-094497.  There is thus no need to "look to records which originated

25   outside the bounds of the agency" to "determin[e] whether the agency independently evaluated

26   the work of" Piteau, Mot. at 15, where "the BLM's [hydrogeologist] reviewed all responses

27   concerning [hydrology] … issues.…   Thus, the record indicates that the BLM actively

28   participated in the comment review and response process and was ultimately responsible for

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

1    the content of the Final EIS." *S. Fork Band v. U.S. DOI*, No. 3:08-CV-00616-LRH-RAM,

2    2010 U.S. Dist. LEXIS 88510, at *14 (D. Nev. Aug. 25, 2010).  Mr. Cluff's "admitted lack of

3    [direct] contact" with BLM says nothing about BLM's oversight, which the AR demonstrates

4    in detail.  BRL once again exalts form over substance in an effort to try to overcome the legal

5    deference due to BLM's decision on arguably competing expert scientific information.

6         At the outset, BLM confirmed that "Dan Erbes (BLM geohydrologist) and Patrick

7    Plumlee (hydrology/geochemistry subcontractor to ICF) have been working with Piteau and

8    LNC with regard to these baselines."  TPEIS-1131 at AR-097595.  As observed by Mr. Cluff

9    in his testimony, BLM hired an additional contractor to oversee the hydrology analysis in the

10   EIS.  Carollo Decl. Ex. 1 at 356.  This subcontractor, Patrick Plumley, is noted throughout the

11   record providing oversight: reviewing Piteau's comment responses, TPEIS-1405, requesting

12   technical memoranda from Piteau, TPEIS-1406, and demonstrating such familiarity with

13   Piteau's data as to be able defend it from misinterpretation, TPEIS-1399.  The record further

14   demonstrates that Piteau, Lithium Nevada's subcontractor, transmitted its reports through

15   Lithium Nevada to the BLM, who then carefully reviewed the work product and transmitted

16   edits back through Lithium Nevada's point of contact, Ms. Clark.  This process facilitated

17   BLM's review and BLM's oversight is evident throughout the record.  *See* TPEIS-1406 at AR-

18   104225 (Ms. Clark transmitting Piteau's technical memorandum to BLM); TPEIS-1022 at AR-

19   094720 (Ms. Clark conveying Piteau's availability and requesting that "[a]ll agency comments

20   should be submitted to the BLM, and the BLM will direct comments to LNC / Piteau"); *id.* at

21   AR-094719–20 (emails from BLM's hydrogeologist demonstrating his review of Piteau's

22   hydrologic model's dataset).

23        BRL's two record citations do not present evidence to the contrary.  The Project lead

24   demurred that he did not "work with that [hydrologic] data personally," because that

25   information was reviewed by BLM's specialist—the hydrogeologist.  TPEIS-0386 at AR-

26   048228.  Rather than show lack of oversight, this comment demonstrates BLM properly using

27   its own subject matter experts (as well as a third-party expert under the ICF contract) to

28   consider hydrology information, rather than relying on the project lead who is a geology

specialist by trade.  The comments BRL cites from a BLM employee who observed that some "data *appears* to not have been collected from the correct location" does not override the specific BLM specialist's review and subsequent approval.  TPEIS-1411 at AR-104428 (emphasis added).  Furthermore, the alleged possible discrepancy did not perturb even the BLM employee that BRL references, who concluded "it is still useful data[] [a]nd its use in the model is not precluded."  *Id.*  And, BLM's hydrogeologist, who dug deeply into Piteau's reports, *see* TPEIS-1022, approved Piteau's approach in the FEIS to water resources.  TPEIS-1330 at AR-101586 ("The revised water resources section in the 6/19/2020 Thacker Pass ADEIS constitutes a vast improvement over the previous version and I only have a few comments ….").  Given these many examples of careful oversight and the large volumes of data collected to develop baseline water conditions since 2011, there remains insufficient "evidence of conflicts of interests that would suggest BLM was capricious in relying on the data and reports collected and prepared by these subcontractors."  ECF 155 at 6; *see* TPEIS-0713 at AR-067584 (observing that "[d]ata collection commenced in 2011" and the "[b]aseline data includes published information relating to the geology and hydrology of the region" in addition to "exploration drill logs and core, geophysical surveys, water levels, stream baseflows, spring discharge, and water quality analyses").

Even if the testimony that BRL seeks to include made an intelligible case to question BLM's oversight over the Project (which it does not), BRL provides no analogous case where a court admitted such evidence under the first *Lands Council* exception.  The majority of cases BRL relies on involve a court reviewing documentation at the preliminary injunction stage or considering a claim on the merits looking only at the record, without admitting extra-record evidence.  *See S. Fork Band*, 2010 U.S. Dist. LEXIS 88510 at *12–18 (evaluating an "MOU[ wherein] the contractor was responsible for responding to public comments" that was produced in the "Administrative Record"); *see also Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d 692, 713 (10th Cir. 2010) (citing a case that reviewed a contract in deciding a preliminary injunction motion); *Colorado Wild Inc. v. U.S. Forest Serv.*, 523 F. Supp. 2d 1213, 1230 n.18 (D. Colo. 2007) (analyzing various emails at the preliminary injunction stage, noting

the "unsettled status of the already voluminous administrative record for the challenged agency decision"); *Valley Cmty. Pres. Comm'n v. Mineta*, 246 F. Supp. 2d 1163, 1175 (D.N.M. 2002) ("Rather than rely on the [extra-record] Declaration, as already noted, I have carefully combed the records that were submitted in connection with the motion for preliminary injunction."); *Sierra Club v. Marsh*, 701 F. Supp. 886, 916 (D. Me. 1988) (referencing a declaration when considering a motion for a preliminary injunction).  The sole case where a court did admit extra-record evidence regarding the agency's independent evaluation admitted the evidence under the "bad faith" *Lands Council* exception, not under the first exception.  *See Nat'l Audubon Soc'y v. U.S. Army Corps of Eng'rs*, No. 7:17-CV-162-FL, 2018 U.S. Dist. LEXIS 168626, at *15 (E.D.N.C. Sep. 30, 2018) (concluding that the proffered emails "demonstrate[d] the requisite type of bad faith to warrant consideration of the pertinent e-mails as extra-record evidence").[8]  BRL provides no support for his claim that post-ROD testimony allegedly raising questions about BLM's oversight constitutes admissible evidence under the first *Lands Council* exception nor does BRL demonstrate "bad faith" by BLM.  BRL's unsubstantiated claims that BLM failed to oversee Piteau's work are rebutted by the record and his motion for extra record evidence should be denied.

### III. CONCLUSION

For all these reasons, BRL's motion for extra record evidence should be denied and all references to the extra record evidence in BRL's motion for summary judgment and arguments relying on those references should be stricken.

Dated: April 19, 2022.

/s/ *Laura K. Granier*
Laura K. Granier (SBN 7357)
Erica K. Nannini (SBN 13922)
HOLLAND & HART LLP
5441 Kietzke Lane, 2nd Floor
Reno, Nevada 89511
*Attorneys for Defendant-Intervenor*
*Lithium Nevada Corp.*

---

[8] BRL specifies that he is bringing his oversight argument as a "'relevant factor' the agency must consider" under only the first *Lands Council* exception, and does not argue that BLM's alleged lack of oversight constitutes bad faith.  *See* Mot. at 14, 17.

23

## CERTIFICATE OF SERVICE

I hereby certify that on April 19, 2022, I filed the foregoing using the United States District Court CM/ECF, which caused all counsel of record to be served electronically.

/s/ *Laura K. Granier*
Laura K. Granier (SBN 7357)

## TABLE OF EXHIBITS

| Exhibit No | Date | Document |
|---|---|---|
| 1 | 12/29/2021 | Email from Mr. Carollo |

17744492_v1

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094