1

2  TODD KIM
   Assistant Attorney General
3  Environment and Natural Resources Division
   United States Department of Justice
4
   ARWYN CARROLL (MA Bar 675926)
5  LEILANI DOKTOR (HI Bar 11201)
   MICHAEL ROBERTSON (VA Bar 80866)
6  Natural Resources Section
   P.O. Box 7611
7  Washington, D.C. 20044-7611
   Phone: (202) 305-0465
8  Fax: (202) 305-0506
   arwyn.carroll@usdoj.gov
9  leilani.doktor@usdoj.gov

10 *Attorneys for Federal Defendants*

11              **UNITED STATES DISTRICT COURT**
                  **DISTRICT OF NEVADA**
12

13 BARTELL RANCH LLC, *et al*.,           Case No. 3:21-cv-80-MMD-CLB
                                          Related Case No. 3:21-cv-103-MMD-
14          Plaintiffs,                   CLB
                                          (Consolidated)
15     v.

16 ESTER M. MCCULLOUGH, *et al.,*

17          Defendants.

18
   ─────────────────────────────────
19 WESTERN WATERSHEDS                     **FEDERAL DEFENDANTS'**
   PROJECT,   *et al.,*                   **COMBINED MEMORANDUM IN**
20                                        **OPPOSITION TO RSIC'S AND**
            Plaintiffs,                   **BPT'S MOTIONS FOR**
21                                        **SUMMARY JUDGMENT AND IN**
       v.                                 **SUPPORT OF FEDERAL**
22                                        **DEFENDANTS' CROSS MOTION**
   UNITED STATES DEPARTMENT               **FOR SUMMARY JUDGMENT**
23 OF THE INTERIOR, *et al.,*             **[ORAL ARGUMENT**
                                          **REQUESTED]**
24          Defendants.

25

26

27

28

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................1

BACKGROUND..................................................................................................2

    I.    Factual background ..........................................................................3

        A.    Recent BLM projects, consultations, and communications regarding the Thacker Pass area ...................................................3

        B.    BLM's identification and consultation efforts on the Thacker Pass Project .................................................................6

    II.    Procedural background ........................................................................9

    III.    Statutory background................................................................11

        A.    National Historic Preservation Act ..........................................11

        B.    National Environmental Policy Act .........................................14

STANDARD OF REVIEW ................................................................................14

ARGUMENT ......................................................................................................16

    IV.    BLM complied with the NHPA by reasonably identifying and consulting with Indian tribes .............................................................16

        A.    BLM reasonably and in good faith did not identify RSIC or BPT for consultation................................................................16

                1.    RSIC informed BLM that its area of cultural interest did not include the Thacker Pass Project area................18

                2.    RSIC and BPT either affirmatively disclaimed an interest or did not assert an interest in the Thacker Pass Project area during the Winnemucca RMP ...................19

                3.    BLM's consultation efforts during intervening projects did not produce any information that would have reasonably indicated either RSIC or BPT asserted an interest in the Thacker Pass Project area........................23

                4.    The reasonableness of BLM's consultation decision is supported by BLM's consultation with the Nevada SHPO.........................................................................26

Fed. Defs.' Combined Mem. in Opp. to Tribes Ms. for Summ. J. and in Supp. of Cr. M.     .

i

5. Neither RSIC nor BPT asserted an interest in the Thacker Pass Project area when afforded the opportunity for public comment ...................................... 27

B. Plaintiff-Intervenors' arguments do not support a finding of unreasonableness or bad faith on the part of BLM ................... 27

1. RSIC cannot demonstrate BLM acted unreasonably or in bad faith in violation of the NHPA .......................... 28

2. BPT cannot demonstrate BLM acted unreasonably or in bad faith in violation of the NHPA .......................... 32

V. BLM complied with NEPA ................................................ 36

CONCLUSION ...................................................................... 42

**Fed. Defs.' Combined Mem. in Opp. to Tribes Ms. for Summ. J. and in Supp. of Cr. M.**

ii

# TABLE OF AUTHORITIES

**Cases**

*Califano v. Sanders*,
    430 U.S. 99 (1977)..................................................................15

*Citizens to Pres. Overton Park v. Volpe*,
    401 U.S. 402 (1971)............................................................ 14, 15

*Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs*,
    No. CV 14-1667 PSG (CWX), 2015 WL 12659937 (C.D. Cal. June 30, 2015).....26

*Ctr. for Cmty. Action & Env't Just. v. Fed. Aviation Admin.*,
    18 F.4th 592, 600 (9th Cir. 2021) .........................................34

*Friends of Sierra R.R., Inc. v. ICC*,
    881 F.2d 663 (9th Cir. 1989) ..............................................26

*Frizelle v. Slater*,
    111 F.3d 172 (D.C. Cir. 1997) .............................................32

*Goffney v. Becerra*,
    995 F.3d 737 (9th Cir. 2021) ..............................................30

*Gov't of Guam v. United States*,
    744 F.2d 699 (9th Cir. 1984) ..............................................26

*Kurshumi v. Ashcroft*,
    102 F. App'x 172 (1st Cir. 2004) ..........................................32

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990) .......................................................15

*McFarlane v. Kempthorne*,
    545 F.3d 1106 (9th Cir. 2008) .............................................14

*McMaster v. United States*,
    731 F.3d 881 (9th Cir. 2013) ..............................................34

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*,
    177 F.3d 800 (9th Cir. 1999) ...........................................11, 36

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.*,
    137 F.3d 1372 (9th Cir. 1998) .............................................36

*Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*,
    475 F.3d 1136 (9th Cir. 2007) .............................................14

*Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*,
    18 F.3d 1468 (9th Cir. 1994) ..............................................15

Fed. Defs.' Combined Mem. in Opp. to Tribes Ms. for Summ. J. and in Supp. of Cr. M.

*Occidental Eng'g Co. v. Immigration and Naturalization Serv.*,
   753 F.2d 766 (9th Cir.1985) ........................................................................15

*Occidental Petroleum Corp. v. SEC*,
   873 F.2d 325 (D.C. Cir. 1989) .....................................................................32

*ONRC Action v. Bureau of Land Mgmt.*,
   150 F.3d 1132 (9th Cir. 1998) .....................................................................14

*Pac. Choice Seafood Co. v. Ross*,
   976 F.3d 932 (9th Cir. 2020) ................................................................30, 39

*Paralyzed Veterans of Am. v. Sec'y of Veterans Affs.*,
   345 F.3d 1334 (Fed. Cir. 2003) ...................................................................32

*River Runners for Wilderness v. Martin*,
   593 F.3d 1064 (9th Cir. 2010) .....................................................................15

*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332 (1989) .....................................................................................13

*Rowland v. Cal. Men's Colony*,
   506 U.S. 194 (1993) .......................................................................................3

*San Juan Citizens All. v. Norton*,
   586 F. Supp. 2d 1270 (D.N.M. 2008) ..........................................................29

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
   747 F.3d 581 (9th Cir. 2014) .......................................................................15

*Shiny Rock Mining Corp. v. United States*,
   906 F.2d 1362 (9th Cir. 1990) .....................................................................26

*Summit Lake Paiute Tribe of Nev. v. Bureau of Land Mgmt.*,
   496 F. App'x 712 (9th Cir. 2012) ................................................................13

*Te-Moak Tribe of W. Shoshone v. U.S. Dep't of Interior*,
   608 F.3d 592 (9th Cir. 2010) .......................................................................16

*W. Radio Servs. Co., Inc. v. Espy*,
   79 F.3d 896 (9th Cir. 1996) ...................................................................34, 35

**Statutes**

42 U.S.C. § 4322(2)(C) ........................................................................................7

42 U.S.C. §§ 4321-4370h ....................................................................................1

5 U.S.C. § 706(2)(A) .........................................................................................14

5 U.S.C. §§ 500-706 ............................................................................................1

**Fed. Defs.' Combined Mem. in Opp. to Tribes Ms. for Summ. J. and in Supp. of Cr. M.**

5 U.S.C. §§ 701-06 ...................................................................................14

54 U.S.C. § 306108 ...................................................................................11

54 U.S.C. § 306112 ...................................................................................11

54 U.S.C. §§ 300101-307108 ......................................................................1

**Rules**

Fed. R. Civ. P. 56(a) ..................................................................................15

**Regulations**

36 C.F.R § 800.2(d)(1)-(2) .........................................................................28

36 C.F.R. §  800.6 ....................................................................................12

36 C.F.R. § 800.16(1)(1) ...........................................................................11

36 C.F.R. § 800.16(y) ...............................................................................11

36 C.F.R. § 800.2(c)(2)(ii) ................................................................... 13, 16

36 C.F.R. § 800.2(c)(2)(ii)(A) ......................................................... 12, 13, 35

36 C.F.R. § 800.2(c)(ii) ....................................................................... 16, 19

36 C.F.R. § 800.2(c)(ii)(A) ........................................................................16

36 C.F.R. § 800.2(d)(3) .............................................................................29

36 C.F.R. § 800.3 .....................................................................................11

36 C.F.R. § 800.4 .....................................................................................11

36 C.F.R. § 800.4(a)(1) .............................................................................12

36 C.F.R. § 800.4(b)(1) .............................................................................12

36 C.F.R. § 800.5 .....................................................................................12

36 C.F.R. § 800.5(d)(2) .............................................................................13

36 C.F.R. § 800.8(a)(1) .............................................................................14

36 C.F.R. Part 800 ...................................................................................11

40 C.F.R. § 1500.4(m) ..............................................................................14

40 C.F.R. § 1501.2(a) ...............................................................................37

40 C.F.R. § 1508.1(g)(1) ...........................................................................13

42 C.F.R. § 800.2(d)(3) ...............................................................................6

Fed. Defs.' Combined Mem. in Opp. to Tribes Ms. for Summ. J. and in Supp. of Cr. M.

43 C.F.R. § 10.5(a) ................................................................................. 33

43 C.F.R. § 7.7(a)(1) ............................................................................... 38

43 C.F.R. § 7.7(a)(2) ............................................................................... 38

43 C.F.R. § 7.7(a)(3) ............................................................................... 38

**Other Authorities**

70 Fed. Reg. 15,348 (Mar. 25, 2005) ....................................................... 4

78 Fed. Reg. 59,958-59 (Sept. 30, 2013) ............................................... 33

85 Fed. Reg. 3,413-02 (Jan. 21, 2020) .............................................. 6, 28

85 Fed. Reg. 4,5651-01 (July 29, 2020) ................................................. 28

85 Fed. Reg. 78,349-01 (Dec. 4, 2020) ................................................... 9

Fed. Defs.' Combined Mem. in Opp. to Tribes Ms. for Summ. J. and in Supp. of Cr. M.

vi

**TABLE OF ACRONYMS**

| ACHP | Advisory Council on Historic Preservation |
| APA | Administrative Procedure Act |
| ARPA | Archaeological Resources Protection Act |
| BLM | Bureau of Land Management |
| BPT | Burns Paiute Tribe (Plaintiff-Intervenor) |
| CRINA | Cultural Resource Inventory Needs Assessment |
| DEIS | Draft Environmental Impact Statement |
| FEIS | Final Environmental Impact Statement |
| HPTP | Historic Properties Treatment Plan |
| LNC | Lithium Nevada Corporation (Defendant-Intervenor) |
| MOA | Memorandum of Agreement |
| NAGPRA | Native American Graves Protection and Repatriation Act |
| NEPA | National Environmental Policy Act |
| NHPA | National Historic Preservation Act |
| RMP | Resource Management Plan |
| ROD | Record of Decision |
| RSIC | Reno-Sparks Indian Colony (Plaintiff-Intervenor) |
| SHPO | State Historic Preservation Office |

**Fed. Defs.' Combined Mem. in Opp. to Tribes Ms. for Summ. J. and in Supp. of Cr. M.**

### NOTICE OF CROSS MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, Federal Defendants Ester M. McCullough, the Bureau of Land Management, and the United States Department of the Interior (collectively "BLM") move for summary judgment on, and respond in opposition to, Plaintiff-Intervenors Reno Sparks Indian Colony's ("RSIC") and Burns Paiute Tribe's ("BPT") respective motions for summary judgment. As set forth in the following memorandum, Defendants are entitled to judgment as a matter of law because BLM complied with the National Historic Preservation Act ("NHPA"), 54 U.S.C. §§ 300101-307108, National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370h, and Administrative Procedure Act ("APA"), 5 U.S.C. §§ 500-706. Federal Defendants request oral argument.

### INTRODUCTION

RSIC and BPT (collectively "Plaintiff-Intervenors") allege BLM acted arbitrarily and capriciously in approving mining and exploration plans for the Thacker Pass Project (or "Project")—a proposed lithium mine in northwest Nevada.[1] They have brought claims challenging BLM's compliance with the NHPA, NEPA, and APA. In particular, Plaintiff-Intervenors allege BLM acted unlawfully by failing to identify and consult with each of them on the Project, and by otherwise conducting an allegedly flawed consultation process with other Indian tribes regarding the Project.

The Administrative Record demonstrates BLM acted reasonably and in good faith in identifying and consulting with Indian tribes in accordance with the NHPA and NEPA. BLM relied on historical studies conducted over the last dozen years in and around the Project area to identify Indian tribes that may attach religious and

---

[1] For additional background on the Thacker Pass Project, *see* Federal Defendants' forthcoming memoranda in support of their cross-motions for summary judgment and in opposition to Environmental Plaintiffs' Motion for Summary Judgment (ECF No. 202) and Bartell Plaintiffs' Motion for Summary Judgment (ECF No. 204).

Fed. Defs.' Combined Mem. in Opp. to Tribes Ms. for Summ. J. and in Supp. of Cr. M.          .

cultural significance to historic properties that may be affected by the Project.  BLM also acted in conjunction with the Nevada State Historic Preservation Office ("SHPO"), pursuant to an agreed upon protocol, to ensure compliance with NHPA regulations.  Despite BLM's reasonable inquiry, the record showed no indication Plaintiff-Intervenors would have an interest in the Project area—quite the opposite.  RSIC put BLM on notice of another area over which it *did* claim an interest, but that area excluded the Thacker pass area. BLM had also previously contacted Plaintiff-Intervenors regarding a Resource Management Plan that covered the current Project area, and in response, BPT disclaimed an interest in the area and RSIC never indicated an interest in the area during the consultation process for that plan.  During subsequent projects, BLM's analyses did not produce information to suggest Plaintiff-Intervenors would assert an interest in the Project area.  Based on the information at its disposal, BLM reasonably identified three Indian tribes for consultation regarding the Project and sought to engage those three tribes in accordance with the NHPA and NEPA.  To the extent Plaintiff-Intervenors complain BLM failed to consult with them, BLM's decision not to consult was reasonable and made in good faith.  And to the extent they complain that BLM inadequately consulted with other tribes, this Court has repeatedly concluded that Plaintiff-Intervenors cannot challenge BLM's consultation efforts on behalf of non-party tribes.

Accordingly and for the reasons set forth below, the Court should grant summary judgment in favor of BLM on all of Plaintiff-Intervenors' claims and deny Plaintiff-Intervenors' motions for summary judgment.

## BACKGROUND

Over much of the past two decades, BLM has regulated the development of mining projects in northwest Nevada, including the Thacker Pass area of Humboldt County, Nevada.  Most recently, in July 2019, Lithium Nevada Corporation

**Fed. Defs.' Combined Mem. in Opp. to Tribes Ms. for Summ. J. and in Supp. of Cr. M.**

("LNC") proposed plans to mine and explore for lithium resources on public lands.[2]
On January 15, 2021, BLM issued a Record of Decision approving the Project.[3]  In
considering LNC's proposal, BLM performed a robust analysis and consultation
process pursuant to NEPA and the NHPA.  Those efforts were informed by years of
similar analyses and consultation processes performed regarding Thacker Pass and
the greater northwestern Nevada region.  With that knowledge as a foundation—all
found in the administrative record—BLM satisfied its statutory and regulatory
obligations under NEPA and the NHPA.

## I.    Factual background

### A. Recent BLM projects, consultations, and communications regarding the Thacker Pass area

Plaintiff-Intervenors are two federally recognized Indian tribes that allege BLM
should have engaged them in consultation regarding the Thacker Pass Project.[4]  They
contend that exploration and excavation in Thacker Pass will disturb an area to which
they attach cultural and religious significance.  For example, Plaintiff-Intervenors
have alleged that Thacker Pass is the site of a massacre, a place of refuge, an ancient

---

[2] TPEIS-0687, Thacker Pass Project Proposed Plan of Operations and Reclamation Plan Permit Application (AR-64476).

[3] TPEIS-0452, Thacker Pass Lithium Mine Project Record of Decision ("ROD") (AR-052519).

[4] A third Plaintiff-Intervenor, Atsa Koodahuk Wyh Nuwu or the People of the Red Mountain ("The People"), is an "unincorporated association" of members of the Fort McDermitt Paiute-Shoshone Tribe.  On January 26, 2022, the Court granted counsel for the People's motion to withdraw.  ECF No. 175.  The Court ordered the People to file a substitution of counsel on or before May 2, 2022.  ECF No. 195.  After the People failed to file a timely substitution of counsel, *see* ECF No. 195, Magistrate Judge Carla Baldwin issued a Report and Recommendation recommending that the People be dismissed from this action, without prejudice on May 5, 2022 (ECF No. 222).  As the Court previously found, the People are not a proper party to this litigation, (ECF No. 92), a conclusion the People have not challenged, and summary judgment should be entered in favor of BLM against the People on this basis.  In the alternative, as an entity that must be represented by counsel, *Rowland v. Cal. Men's Colony*, 506 U.S. 194, 202 (1993), but has failed to obtain counsel, the Court may dismiss their claims without prejudice.

**Fed. Defs.' Combined Mem. in Opp. to Tribes Ms. for Summ. J. and in Supp. of Cr. M.**

obsidian quarry, and a traditional hunting, gathering, and burial location.  *E.g.*, ECF No. 46, ¶ 1; ECF No. 83, ¶¶ 32-26.  BLM, however, has previously engaged in several analyses of and consultations and communications with local tribes—including RSIC and BPT—in connection with multiple decisions going back almost twenty years.  In fact, Plaintiff-Intervenors affirmatively disclaimed interest in the area at issue in this case, and at no point in the intervening years did a tribe assert a cultural, religious, or historical interest in the Thacker Pass area in connection with a massacre or any other cultural site.

Understanding the information BLM had available when making its decision regarding the Project requires tracing BLM's numerous prior studies, analyses, and consultations concerning Thacker Pass and surrounding areas, beginning with BLM's development of the Winnemucca Resource Management Plan ("Winnemucca RMP").  In 2005, BLM began developing the Winnemucca RMP and corresponding Environmental Impact Statement to aid BLM's management of BLM-managed lands in northwest Nevada—the boundaries of which encompassed the present-day Thacker Pass Project area.[5] 70 Fed. Reg. 15,348, (Mar. 25, 2005).  An express goal of the Winnemucca RMP was to identify, preserve, and protect "significant cultural resources" under the NHPA through "consultation with the Nevada SHPO and local Native American Groups."[6] To meet this goal, BLM conducted an Ethnographic Assessment and sought consultation with numerous tribes—including RSIC and BPT.  Several tribes provided input for the Ethnographic Assessment, including the identification of massacre sites found within the Winnemucca RMP project area.[7] No

---

[5] TPNHPA-0003, Bureau of Land Management Winnemucca Field Office Resource Management Plan/Environmental Impact Statement Final Ethnographic Assessment ("Ethnographic Assessment"), at 1.

[6] TPEIS-0226, Winnemucca RMP at 2-35 (AR-033659).

[7] TPNHPA-0003, Ethnographic Assessment, at 60.

**Fed. Defs.' Combined Mem. in Opp. to Tribes Ms. for Summ. J. and in Supp. of Cr. M.**

tribe, however, identified and asserted a religious or cultural interest in any site in the Thacker Pass Project area.  In fact, BPT did the opposite: BPT disclaimed an interest in the Thacker Pass Project area, stating it "would defer consultation to the tribes that had reservations closer to the study area."[8]  And while a representative for RSIC attended an in-person meeting, that representative never indicated RSIC attached any religious or cultural significance to the Thacker Pass area.[9]

When BLM sought additional consultation from Indian tribes with regard to the Winnemucca RMP in 2010, neither RSIC nor BPT elected to engage in consultation.[10]  As for the tribes who did, none of them identified places of religious, cultural, or historic sites of importance in the Thacker Pass Project area.[11]

In the intervening years between the Winnemucca RMP and the current Project, BLM conducted at least four additional projects that encompassed the Thacker Pass Project area.[12]  BLM's efforts, however, did not yield any information that indicated Thacker Pass was an area to which RSIC or BPT attached cultural or religious significance.

In 2015, RSIC sent a letter to BLM providing "formal notice to all federal agencies of the RSIC official areas of cultural interests."[13]  The letter included a resolution by the RSIC Tribal Council and a map of their self-identified areas of

---

[8] *Id.* at 92.

[9] *Id.* at Appendix H.

[10] TPEIS-0226, Winnemucca RMP, at 1-34 (AR-033622).

[11] *Id.*

[12] The Thacker Pass Project is located within Township 44 N, Ranges 34-36 E.  TPEIS-0384, FEIS, § 1.1.  The four other projects preceding the Thacker Pass Project and their locations are discussed *infra*, pp. 23-25 and notes 72, 82, 85, 89.

[13] TPNHPA-0034, at 1 (AR-000521).

**Fed. Defs.' Combined Mem. in Opp. to Tribes Ms. for Summ. J. and in Supp. of Cr. M.**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

cultural interest.[14]   The map describing RSIC's areas of cultural interest excluded the Thacker Pass area.[15]

### B. BLM's identification and consultation efforts on the Thacker Pass Project

BLM began its formal NHPA outreach process for the Thacker Pass Project in 2019 when it sent letters to the Fort McDermitt Paiute-Shoshone Tribe ("Fort McDermitt Tribe"), Summit Lake Paiute Tribe, and the Winnemucca Indian Colony initiating formal consultation.[16]   On January 21, 2020, BLM published a Federal Register notice initiating "public consultation . . . under the [NHPA]."  85 Fed. Reg. 3,413-02, 3,414 (Jan. 21, 2020).  The notice informed the public that BLM would:

> use and coordinate the NEPA scoping process to help fulfill the public involvement process under the NHPA as provided in 42 C.F.R. § 800.2(d)(3).  The information about historic and cultural resources within the area potentially affected by the proposed project will assist the BLM in identifying and evaluating impacts to such resources in the context of both NEPA and the NHPA.

*Id*.  The Notice also invited "tribes and other stakeholders that may be interested in or affected by the proposed project . . . to participate in the scoping process," and "to participate in the development of the EIS as a cooperating agency."  *Id*.  The Notice requested that tribes and other stakeholders submit comments by February 20, 2020.  *Id*.

---

[14] *Id*. at 2-3 (AR-000522-23).

[15] *Id*.

[16] TPNHPA-0010 (AR-000375); TPHNHPA-0011 (AR-000378); TPHNHPA-0012 (AR-000381).  BLM began informal outreach on the Project much earlier.  For example, BLM's Tanner Whetstone reached out to the Fort McDermitt Tribe's chairperson on May 10, 2018 to schedule a visit to the Project site.  TPNHPA-0046 (AR-000609).  The site visit was conducted on October 3, 2018.  *See* TPNHPA-0043 (AR-000591).

**Fed. Defs.' Combined Mem. in Opp. to Tribes Ms. for Summ. J. and in Supp. of Cr. M.**

BLM then held two public scoping meetings, *see id.*, and two Fort McDermitt tribal members, including the tribal chairperson at the time, attended the February 5, 2020 meeting in Orovada.[17]   BLM did not receive any letters or comments from any tribe or tribal member during the scoping process regarding historical properties in the Thacker Pass area.

Following the public scoping meetings, on April 10, 2020, the Office of the Secretary of the United States Department of the Interior issued guidance concerning the COVID-19 pandemic and public participation.   The Office of the Secretary instructed that, in light of the availability of virtual public involvement, "[i]n most cases COVID-19 should not delay NEPA compliance for bureau proposed actions."[18]

Taking information gathered during the scoping process, BLM moved forward with the drafting of a Draft Environmental Impact Statement ("DEIS").[19]   In July 2020, BLM published notice of the availability of its DEIS for the Thacker Pass Project in the Federal Register and again invited "tribes and other stakeholders . . . to participate in the comment process."  85 Fed. Reg.  45,651-01 (July 29, 2020).[20]   The DEIS noted that "[d]epending upon the current conditions related to the national COVID-19 outbreak, public meetings . . . may be held in a virtual online format."[21]   BLM also listed in the DEIS the cultural resources identified through the scoping process, archival background research, and pedestrian inventories.[22]   BLM sent a

---

[17] TPEIS-0124 (AR-017864).

[18] TPNHPA-0015, at 2 (AR-000389).

[19] TPEIS-0312, Draft Environmental Impact Statement for the Thacker Pass Lithium Mine Project ("DEIS") (AR-039476).

[20] NEPA directs federal agencies to prepare an EIS for any major federal action significantly affecting the quality of the human environment.  *See* 42 U.S.C. § 4322(2)(C).

[21] TPEIS-0312, DEIS, at 6-2 (AR-039654).

[22] TPEIS-0312, DEIS, at 4-75 – 4-76, Appendix J (AR-039597-98, AR-040260).

**Fed. Defs.' Combined Mem. in Opp. to Tribes Ms. for Summ. J. and in Supp. of Cr. M.**

physical copy of the DEIS and an invitation to consult to the Fort McDermitt Tribe, Summit Lake Paiute Tribe, and Winnemucca Indian Colony.[23]  BLM also held virtual public meetings on August 19 and 20, 2020.[24]  No concerns were raised about cultural properties in the Thacker Pass area during these virtual public meetings.[25]

BLM, in consultation with the Nevada SHPO, concluded that the Project would have adverse effects on multiple historic properties.[26]  Thereafter, BLM and the Nevada SHPO developed a draft Memorandum of Agreement ("MOA") and Historic Properties Treatment Plan ("HPTP"), the latter of which describes mitigation methods—primarily data recovery and mitigation for visual effects.[27]  By letter dated August 28, 2020, BLM shared the draft MOA and redacted HPTP with the Fort McDermitt Tribe, Summit Lake Paiute Tribe, and Winnemucca Indian Colony and invited the tribes to submit comments.[28]  BLM did not receive comments from these tribes.  Accordingly, in November 2020, BLM and the Nevada SHPO signed the MOA which approved the HPTP.[29]  The HPTP invites tribal representatives to participate in all stages of the HPTP process.[30]  At the time of issuing the HPTP,

---

[23] TPNHPA-0002 (AR-000027).

[24] TPEIS-0384, Thacker Pass Lithium Mine Project Final Environmental Impact Statement ("FEIS"), at R-1; TPNHPA-0146 (AR-001656).

[25] TPEIS-0384, FEIS at 4-85.

[26] *See* TPNHPA-0035, Memorandum of Agreement Between the United States Department of the Interior and the Nevada State Historic Preservation Office ("MOA") (AR-000524).

[27] TPHNPA-0217, A Historic Properties Treatment Plan for the Thacker Pass Project, Humboldt County, Nevada, July 2020 Draft (AR-004509).

[28] TPNHPA-0004 (AR-000369-74).

[29] *See* TPNHPA-0035, MOA, (AR-000524); *see also* ECF No. 65-14.

[30] *Id*. at 45 (AR-004558).

**Fed. Defs.' Combined Mem. in Opp. to Tribes Ms. for Summ. J. and in Supp. of Cr. M.**

"none of the consulted Native American groups [had] raised any questions or comments or presented issues with the Project."[31]

BLM also prepared a final EIS ("FEIS").  BLM sent a physical copy of the FEIS to the three tribes identified for consultation on or about November 30, 2020 with a cover letter requesting further assistance in identifying cultural resources.[32] BLM also published the Notice of Availability for the FEIS in the Federal Register and made the FEIS available for review on BLM's ePlanning website.  85 Fed. Reg. 78,349-01 (Dec. 4, 2020).  The Notice indicated that BLM would not make a final decision on the Project for a minimum of 30 days.  *Id.*  The Record of Decision was then signed on January 15, 2021.[33]

## II.   Procedural background

On July 29, 2021, Plaintiff-Intervenor RSIC filed its Complaint seeking, *inter alia*, a declaratory judgment that BLM violated the NHPA.  Specifically, RSIC alleged BLM violated the NHPA by (1) failing to identify RSIC as a tribe that attached religious and cultural significance to the Thacker Pass area (ECF No. 46, ¶ 62); (2) failing to consult with RSIC (*Id.* at ¶ 63); (3) failing to consider public input in a manner commensurate with the nature of the Thacker Pass Project (*Id.* at ¶ 64); and (4) failing to provide a draft Memorandum of Agreement for public comment prior to issuing a Record of Decision for the Thacker Pass Project  (*Id.* at ¶ 65).

On August 25, 2021, Plaintiff-Intervenor BPT filed its Complaint for declaratory and injunctive relief.  BPT alleged BLM violated the NHPA and NEPA by failing to consult with BPT.  ECF No. 83, ¶¶ 55-58.  BPT also alleged BLM violated NEPA by failing to take a "hard look" at impacts to archaeological and cultural resources, potential alternatives, and possibilities for mitigation.  *Id.* at ¶¶ 49-61.

---

[31] *Id.*

[32] *See* TPEIS-0393 (AR-048247).

[33] TPEIS-0452 (AR-052515).

**Fed. Defs.' Combined Mem. in Opp. to Tribes Ms. for Summ. J. and in Supp. of Cr. M.**

Finally, BPT alleged BLM violated the APA by failing to comply with agency policy allegedly requiring consultation with BPT.  *Id.* at ¶¶ 62-66.

In conjunction with their Complaint, RSIC moved for a preliminary injunction, (ECF No. 45), joined by BPT, (ECF No. 62), to enjoin physical disturbance of the Thacker Pass area.  Following briefing and oral argument by the parties, the Court denied the motion.  ECF No. 92.  The Court concluded that Plaintiff-Intervenor Atsa Koodakuh Wyh Nuwu People of Red Mountain ("the People") was not a proper party, (*id.* at 6-7), and that RSIC cannot assert claims on behalf of non-party tribes with whom BLM engaged in consultation.  *Id.* at 7.  The Court then found that Plaintiff-Intervenors failed to present a sufficient showing on either the first or second *Winter* prong necessary to obtain injunctive relief, concluding they are "unlikely to prevail on the merits of their claim that BLM's decision not to consult them on the Project was unreasonable or made in bad faith," (*id.* at 18), and had "not shown sufficiently specific irreparable harm."  *Id.* at 22.

RSIC, joined by BPT, moved for reconsideration.  ECF No. 96; ECF No. 99.  The Court again concluded that the People were not a proper party, (ECF No. 117, 4), reiterated that RSIC cannot "assert violations of the rights of the nonparty tribes that BLM did consult," (*id.* at 5), and otherwise declined to reconsider its prior decision concluding that RSIC's purported newly discovered evidence was previously available, cumulative, and speculative.  *Id.* at 9-10.

Given the Court's repeated rulings on the matter, the law of the case is clear: Plaintiff-Intervenors cannot bring claims alleging inadequate consultation on behalf of other tribes with whom BLM did consult; nor can Plaintiff-Intervenors bring claims alleging BLM should have engaged in consultation on behalf of other tribes with

**Fed. Defs.' Combined Mem. in Opp. to Tribes Ms. for Summ. J. and in Supp. of Cr. M.**

whom BLM did not consult.  *See* ECF No. 92, 6-7; ECF No. 117, 4-5.[34]  Rather, RSIC's and BPT's claims are limited to contending that BLM should have consulted with them and that BLM's failure to do so was in violation of the NHPA, NEPA, and the APA.

### III.   Statutory background

#### A. National Historic Preservation Act

The NHPA sets forth procedural requirements for federal agencies to "take into account the effect of [an] undertaking on any historic property."  54 U.S.C. § 306108. The NHPA, like NEPA, "is a stop, look, and listen provision that requires each federal agency to consider the effects of its programs."  *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 805 (9th Cir. 1999).  The Advisory Council on Historic Preservation ("ACHP") administers the NHPA, *see* 54 U.S.C. § 306112, and has promulgated regulations to govern federal agency compliance with the NHPA consultation process, codified at 36 C.F.R. Part 800.

Pursuant to a National Programmatic Agreement, the BLM Nevada State Office, the ACHP, and the National Conference of State Historic Preservation Officers replaced the procedures set forth in 36 C.F.R. § 800.3 through § 800.7 with the 2014 BLM-State Historic Preservation Officer State Protocol Agreement ("Protocol").[35]  The Protocol establishes the ensuing process once BLM identifies a

---

[34] For example, RSIC and BPT cannot assert on behalf of the Fort McDermitt Tribe, Summit Lake Paiute Tribe, or Winnemucca Indian Colony, that BLM's consultation efforts with those tribes were insufficient.  Nor can RSIC and BPT assert on behalf of other Northern Paiute and Shoshone tribes that BLM was obligated to initiate consultation with those tribes as well.

[35] TPEIS-0261, 2014 BLM Nevada State Protocol Agreement (Revised December 22, 2014) ("Protocol") (AR-082634).

**Fed. Defs.' Combined Mem. in Opp. to Tribes Ms. for Summ. J. and in Supp. of Cr. M.**

project as an "undertaking" in Nevada that "has the potential to cause effects on historic properties."[36]

Broadly speaking, to comply with the NHPA, the Protocol and the regulations prescribe a four-step process with consultation requirements.   First, the agency determines whether the agency action is an "undertaking."[37]   Second, the agency identifies the "historic properties" within the area potentially affected by the undertaking that are listed or eligible for listing on the National Register.[38]   Third, the agency evaluates the proposed undertaking's effects on those properties.[39]   Fourth, if an adverse effect is found, the agency considers measures to avoid, mitigate, or minimize those effects.[40]   At various steps of this process, the agency, after making "a reasonable and good faith effort to identify Indian tribes and Native Hawaiian organizations," 36 C.F.R. § 800.2(c)(2)(ii)(A), that attach religious and cultural significance to historic properties that may be affected by the undertaking, must consult with the tribes, organizations, and other parties.

When identifying "historic properties," the agency must consult with the SHPO to "[d]etermine and document the area of potential effects."   36 C.F.R. § 800.4(a)(1).[41]   Generally, the agency must "make a reasonable and good faith effort"

---

[36] *Id*. § I.A2 (AR-082641); 36 C.F.R. § 800.16(y). The regulations define historic properties as "any prehistoric district, site, building, structure, or object included in, or eligible for inclusion in, the National Register of Historic Places maintained by the Secretary of the Interior."   36 C.F.R. § 800.16(1)(1).

[37] Protocol § I (AR-082641); 36 C.F.R. § 800.3.

[38] Protocol § V.A. (AR-082653); 36 C.F.R. §§ 800.4, 800.16(l)(1)   (defining "historic property").

[39] Protocol § V.C. (AR-082658); 36 C.F.R. § 800.5.

[40] Protocol § V.F (AR-082665); 36 C.F.R. § 800.6.

[41] *See also* Protocol § IV (AR-082652) ("[Area of potential effects] shall be identified in the [Cultural Resource Inventory Needs Assessment] that is sent to SHPO for review . . . .").A Cultural Resource Inventory Needs Assessment ("CRINA") is a document prepared by the BLM and submitted to the SHPO which, among other things, notifies the SHPO of a federal

**Fed. Defs.' Combined Mem. in Opp. to Tribes Ms. for Summ. J. and in Supp. of Cr. M.**

to identify historic properties within the undertaking's area of potential effects. 36 C.F.R. § 800.4(b)(1). The Protocol directs BLM to undertake "project-specific surveys and other efforts" to reasonably identify historic properties, including the documentation of previous adequate inventories of the area of potential effects.[42] Other efforts can of course include methods prescribed by the regulations, including the directives that the agency's efforts "may include background research, consultation, oral history interviews, sample field investigation, and field survey" and "shall take into account past planning, research and studies." 36 C.F.R. § 800.4(b)(1). The NHPA regulations' good-faith standard, however, does not require the agency to use all of those techniques. *Summit Lake Paiute Tribe of Nev. v. U.S. Bureau of Land Mgmt.*, 496 F. App'x 712, 715 (9th Cir. 2012). If the agency finds the undertaking will adversely affect historic properties, it must engage in further consultation regarding the resolution of any such adverse effects with various parties.[43]

For engagement with Native American tribes, the Protocol defers to 36 C.F.R. § 800.2(c)(2)(ii).[44] Accordingly, the agency must "consult with any Indian tribe or Native Hawaiian organization that attaches religious and cultural significance to historic properties that may be affected by an undertaking." 36 C.F.R. § 800.2(c)(2)(ii). The agency must "make a reasonable and good faith effort to identify" such tribes or organizations. *Id.* § 800.2(c)(2)(ii)(A) . The agency must then "provide[] the Indian tribe or Native Hawaiian organization a reasonable opportunity to identify its concerns about historic properties, advise on the identification and

---

action and the level of effort the BLM is conducting to identify historic properties in the project area. Identification may require new Class III surveys, or may incorporate previously performed surveys; additionally, archival documents, historical records, and other information may be incorporated. The document serves to notify the SHPO as to which other parties BLM is attempting to consult. *See* Protocol §§ I.B.1, V (AR-082642, AR-082653).

[42] *Id.* at § V (AR-082653); *id.* at § V.A.3.b (AR-082654).

[43] Protocol § V.F. (AR-082665); 36 C.F.R. § 800.5(d)(2).

[44] Protocol 2 (AR-082639).

**Fed. Defs.' Combined Mem. in Opp. to Tribes Ms. for Summ. J. and in Supp. of Cr. M.**

evaluation of historic properties, including those of traditional religious and cultural importance, articulate its views on the undertaking's effects on such properties, and participate in the resolution of adverse effects." *Id*. § 800.2(c)(2)(ii)(A).

## B.  National Environmental Policy Act

NEPA similarly prescribes a process agencies must follow to ensure their decision-making is informed by the environmental effects of proposed agency action.[45]  *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). Under NEPA, when considering a proposed action's environmental effects, the agency must take into account not only ecological effects, but also historic and cultural effects.  40 C.F.R. § 1508.1(g)(1).

Given the significant overlap and similarities between NEPA's and the NHPA's review processes for evaluating an action's effects on the environment and historic properties, agencies are expressly encouraged to coordinate and integrate their review processes.  36 C.F.R. § 800.8(a)(1) ("Federal agencies are encouraged to coordinate compliance with [NHPA] and the procedures in this part with any steps taken to meet the requirements of the National Environmental Policy Act (NEPA)."); 40 C.F.R. § 1500.4(m) (directing agencies to "[i]ntegrat[e] NEPA requirements with other environmental review and consultation requirements").  This synthesis of the NEPA and NHPA review processes promotes greater efficiencies, increased public involvement, and more well-informed decision-making.

## STANDARD OF REVIEW

The Court's review of Plaintiff-Intervenors' NEPA and NHPA claims is governed by the judicial review provisions of the APA, 5 U.S.C. §§ 701-06. *See ONRC*

---

[45] For additional discussion of NEPA, *see* Federal Defendants' forthcoming memoranda in support of their cross-motions for summary judgment and in opposition to Environmental Plaintiffs' Motion for Summary Judgment (ECF No. 202) and Bartell Plaintiffs' Motion for Summary Judgment (ECF No. 204).

**Fed. Defs.' Combined Mem. in Opp. to Tribes Ms. for Summ. J. and in Supp. of Cr. M.**

*Action v. Bureau of Land Mgmt.*, 150 F.3d 1132, 1135 (9th Cir. 1998). Under the APA, agency actions may be set aside only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Review under this standard is "'highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision.'" *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.,* 475 F.3d 1136, 1140 (9th Cir. 2007) (citation omitted). An agency's decision will be overturned

> only if the agency relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*McFarlane v. Kempthorne*, 545 F.3d 1106, 1110 (9th Cir. 2008) (citation and quotation marks omitted); *see also Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 416 (1971) (The role of the reviewing court is to determine whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."), *abrogated by Califano v. Sanders*, 430 U.S. 99, 97 (1977). "[T]he agency's decision is 'entitled to a presumption of regularity,' and [the Court] may not substitute [its] judgment for that of the agency." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014) (quoting *Citizens to Pres. Overton Park*, 401 U.S. at 415-16). In other words, the APA "does not allow the court to overturn an agency decision because it disagrees with the decision or with the agency's conclusions about environmental impacts." *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010).

Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In APA actions, however, the Court's review is based on the agency's administrative

**Fed. Defs.' Combined Mem. in Opp. to Tribes Ms. for Summ. J. and in Supp. of Cr. M.**

record. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883-84 (1990). Thus, the Court's role is not to resolve factual issues, but rather to determine whether the agency's record supports the agency's decision as a matter of law under the APA's arbitrary and capricious standard of review. *See Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994) ("[T]his case involves review of a final agency determination under the [APA]; therefore, resolution of this matter does not require fact finding on behalf of this court. Rather, the court's review is limited to the administrative record."); *see also Occidental Eng'g Co. v. Immigration and Naturalization Serv.*, 753 F.2d 766, 769 (9th Cir.1985) (In an APA case, "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision that it did.").

## ARGUMENT

### IV.   BLM complied with the NHPA by reasonably identifying and consulting with Indian tribes

To comply with the NHPA, BLM was required to "make a reasonable and good faith effort to identify Indian tribes . . . that shall be consulted in the [NHPA] process." 36 C.F.R. § 800.2(c)(ii)(A).  BLM did so here, as evidenced by BLM's reliance on past studies of the area and communications from Indian tribes—including Plaintiff-Intervenors' own communications disclaiming an interest in the Thacker Pass area.  BLM's decision is further supported by BLM's engagement with the Nevada SHPO and Plaintiff-Intervenors' silence following multiple public notices concerning projects in the Thacker Pass area.

#### A. BLM reasonably and in good faith did not identify RSIC or BPT for consultation

Acting in accordance with the Protocol and 36 C.F.R. § 800.2(c)(ii), in identifying tribes for consultation, BLM relied on its decades-long history and practice of consulting with tribes regarding other projects in the area.  *Cf. Te-Moak Tribe of W.*

Fed. Defs.' Combined Mem. in Opp. to Tribes Ms. for Summ. J. and in Supp. of Cr. M.

16

*Shoshone v. U.S. Dep't of Interior*, 608 F.3d 592, 609 (9th Cir. 2010) (finding consultation reasonable in light of previous consultation).  BLM identified the Fort McDermitt Tribe, Summit Lake Paiute Tribe, and Winnemucca Indian Colony for consultation as tribes that may attach "religious and cultural significance to historic properties that may be affected by" the Project.  36 C.F.R. § 800.2(c)(2)(ii).[46]  BLM's identification of these tribes was reasonable and made in good faith based on the information BLM reviewed and considered, including but not limited to (1) the Ethnographic Assessment, (2) correspondence from tribes; and (3) the Project's cultural survey inventory.[47]  For instance, Figure 3.1 and Table 3.1 in the Ethnographic Assessment identify the Northern Paiute territory,[48] and the location of bands within that territory.[49]  The map of the Northern Paiute territory does not list any Northern Paiute band as being associated with RSIC, and the bands associated with BPT (nos. 1 and 3 in Fig. 3.1) are shown as being located in Oregon and not near the Project area.[50]  The Red-Butte Dwellers (no. 9 in Fig. 3.1) are the Northern Paiute band closest to the Thacker Pass Project area, which is in the proximity of the Kinds and Quinn rivers.  The next closest Northern Paiute bands are the Cold Dwellers (no. 7 in Fig. 3.1) and the Half-Moon Valley Dwellers (no. 10 in Fig. 3.1).  All three of these Northern Paiute bands are affiliated with the Fort McDermitt Tribe.[51]  Next, in a 2010 letter and accompanying map sent to the BLM, the Summit Lake Paiute Tribe

---

[46] TPNHPA-0001, at 11 (AR-000012).

[47] TPEIS-0269, Volume I: Technical Report Class III Inventory of 12,963 Acres for Lithium Nevada's Thacker Pass Project, Humboldt County, Nevada (AR-035330); *See* TPEIS-0384, at Appendix J – Cultural Resource Inventory Tables.

[48] TPNHPA-0003, at 15.

[49] *Id.* at 15, 17.

[50] *Id.*

[51] *Id.* at 17.

**Fed. Defs.' Combined Mem. in Opp. to Tribes Ms. for Summ. J. and in Supp. of Cr. M.**

identified the majority of the Winnemucca District as an area of interest.[52]   Finally, the "Ethnographic Background" section of the Projects' cultural survey report, which draws on anthropological research from the 1940s, notes that the Red-Butte Dwellers and Sagebrush-Mountain Dwellers were the two Northern Paiute bands using the Thacker Pass Project area.[53]   The Sagebrush-Mountain Dwellers are associated with the Winnemucca Indian Colony, and the Red-Butte Dwellers band are associated with the Fort McDermitt Tribe.[54]   BLM appropriately considered this and other information to determine which tribes to identify for consultations.[55]

Plaintiff-Intervenors have not presented any evidence sufficient to overcome the presumption that BLM's determination was reasonable and made in good faith. Plaintiff-Intervenors' past communications disclaimed an interest in the area or, at best, suggested a lack of interest in the area.   There was no evidence in BLM's past planning, research, or studies of the Thacker Pass area that reasonably indicated Plaintiff-Intervenors attached significance to historic properties in the Thacker Pass area.

### 1.   RSIC informed BLM that its area of cultural interest did not include the Thacker Pass Project area

First and foremost, RSIC identified areas of cultural interest and did not include Thacker Pass in those areas.   On or about May 29, 2015, RSIC sent a letter, attached resolution, and highlighted map to the BLM Winnemucca District Office providing "formal notice to all federal agencies of the RSIC official areas of cultural

---

[52] TPNHPA-0044 (AR-000593, AR-000606).

[53] TPEIS-0269 (AR-035386).

[54] TPNHPA-003, at 17-18.

[55] *See, e.g.*, TPNHPA-0047 (AR-000610).

**Fed. Defs.' Combined Mem. in Opp. to Tribes Ms. for Summ. J. and in Supp. of Cr. M.**

interest."[56]  RSIC's areas of cultural interest did not include the Thacker Pass area.[57] The letter also provides that "there may be projects or circumstances that may occur outside of the official area," but does not identify these outside areas.[58]  Based on the information available to BLM, such outside areas would not have reasonably included Thacker Pass because according to the Ethnographic Assessment, the Northern Paiute bands nearest Thacker Pass are not affiliated with RSIC.[59] Furthermore, the letter makes clear that "[a]t the discretion of RSIC . . . there may be other projects [RSIC] may *request consultation with* the federal agencies outside these areas."[60]  RSIC did not timely request consultation here. It is difficult, if not impossible, to see how an agency's determination not to affirmatively consult with a tribe for a project in an area that was not included in the tribe's identified area of interest could run afoul of the "reasonable and good faith standard" in 36 C.F.R. § 800.2(c)(ii).

### 2. RSIC and BPT either affirmatively disclaimed an interest or did not assert an interest in the Thacker Pass Project area during the Winnemucca RMP

In March 2005, the Winnemucca BLM began developing a Resource Management Plan ("Winnemucca RMP") and corresponding Environmental Impact Statement "[t]o establish the guidance, objectives, policies, and management actions

---

[56] TPNHPA-0034, at 1 (AR-000521).

[57] Intervenor-Defendant Lithium Nevada Corporation provided a copy of RSIC's 2015 map with the location of the Thacker Pass Project as an exhibit to its Sur-Reply in opposition to RSIC's Motion for Preliminary Injunction.  ECF No. 87-1, Exhibit 1-E.  LNC's Exhibit 1-E clearly illustrates the Thacker Pass Project is outside RSIC's identified areas of cultural interest, and as the Court has recognized, RSIC has not challenged the accuracy of this exhibit.  ECF No. 92, 13.

[58] TPNHPA-0034, at 1 (AR-000521).

[59] TPNHPA-0003, at 15, 17.

[60] *Id.* (emphasis added).

**Fed. Defs.' Combined Mem. in Opp. to Tribes Ms. for Summ. J. and in Supp. of Cr. M.**

for its 7,256,174 acres of administered lands"[61] in northwest Nevada.    The Winnemucca RMP encompassed the roughly 18,000 acres that are part of the Thacker Pass Project at issue in this case.[62]    One of the goals of the Winnemucca RMP was to "identify, preserve, and protect significant cultural resources" in northwest Nevada—including within the Thacker Pass area—"by ensuring that all authorizations for land and resource use comply with the NHPA" and other applicable authorities. [63]    In so doing, the Winnemucca RMP sought to evaluate "[a]ll current and future sites . . . for eligibility for the National Register of Historic Places."[64]    The express means of achieving this objective included "consultation with the Nevada SHPO and local Native American groups . . . in compliance with the programmatic agreement between BLM and SHPO."[65]

In connection with the Winnemucca RMP and EIS, BLM prepared an Ethnographic Assessment to assist BLM "with its Native American consultation and to identify Native American concerns to be addressed."[66]    Among the express objectives of this ethnography were "to conduct a thorough archival and literature review to identify and document Native American traditional occupancy and use of lands and resources, as well as previously recorded native American places of cultural and religious importance" and "elicit contemporary concerns and recommendations for management of traditional resources and cultural and religious values from tribal

---

[61] TPNHPA-0003, Ethnographic Assessment, at 1.

[62] TPEIS-0384, FEIS, at 1-1.

[63] TPEIS-0226, Record of Decision and Resource Management Plan for the Winnemucca District Planning Area ("Winnemucca RMP") at 2-35 (AR-033659).

[64] *Id.*

[65] *Id.*

[66] TPNHPA-0003, Ethnographic Assessment, at 1.

**Fed. Defs.' Combined Mem. in Opp. to Tribes Ms. for Summ. J. and in Supp. of Cr. M.**

leaders, elders, or representatives" in accordance with the NHPA and other federal laws.[67]

BLM consulted with roughly twenty tribes—including Plaintiff-Intervenors RSIC and BPT—on the Ethnographic Assessment.[68]  Beginning in February 2005, BLM sent letters via certified mail to the tribes which "provided a brief description of the RMP/EIS project and requested tribal input concerning the identification of culturally significant places that should be considered in the RMP."[69]  BLM also contacted each of the tribes by telephone to identify "places of cultural and religious importance that need to be considered in the RMP/EIS process."[70]  Three in-person meetings were then held on May 24, May 26, and August 25, 2005, for tribal representatives to express their comments or concerns regarding the RMP.[71]

BLM sent RSIC and BPT no fewer than three letters each inviting their consultation and participation in the RMP process to help identify culturally significant places.[72]  On February 4, 2005, BLM sent via certified mail an initial consultation letter to RSIC's Chairperson and Planning Director, and to BPT's Chairperson and Cultural Resource Representative.[73]  On February 16, BLM sent RSIC's and BPT's respective Chairpersons a letter inviting the tribes to participate in

---

[67] *Id.*

[68] *Id.* at 4, 87-88, 92; *see also* TPEIS-0173, Winnemucca District Proposed Resource Management Plan and Final Environmental Impact Statement, at 3-110 ("Proposed Winnemucca RMP/FEIS") (AR-31632); TPEIS-0226, Winnemucca RMP, at 1-34 (AR-33622).

[69] TPNHPA-0003, Ethnographic Assessment, at 82.

[70] *Id.*

[71] *Id.*

[72] *Id.*, at 87-88, 92.

[73] *Id.* at 87, 92.

**Fed. Defs.' Combined Mem. in Opp. to Tribes Ms. for Summ. J. and in Supp. of Cr. M.**

the Winnemucca RMP process as a cooperating agency.[74]  On May 6, BLM sent letters to RSIC's Chairperson and Planning Director, and BPT's Chairperson and Cultural Resource Representative, inviting their participation at one of the in-person meetings to discuss the Winnemucca RMP.[75]  On June 16, BLM sent another letter to RSIC and BPT summarizing the two in-person planning meetings.[76]

During a subsequent telephone conversation on July 28, 2005, BPT's Cultural Resource Representative informed BLM that it "would defer consultation to the tribes that had reservations closer to the study area" and that "it would not be necessary to keep the tribe on the mailing list" for the Winnemucca RMP.[77]

RSIC's Cultural Resource Coordinator, Michon Eben, attended the August 25, 2005 meeting held at the Pyramid Lake Paiute Tribal Offices in Nixon, Nevada.[78] During that meeting, tribal representatives from the Pyramid Lake Paiute Tribe and RSIC provided their comments, concerns, and questions regarding the Winnemucca RMP but did not identify any sites of religious, cultural, or historic interest to the tribes within the Thacker Pass area.[79] In fact, though the Ethnographic Assessment ultimately collected a list of culturally significant areas (including ceremonial locations, traditional origin and mythological places, historical sites, ethnohistoric habitations, resource collection areas, trails, burial sites, and massacre sites found in archival research and provided by the tribes), *no* tribe identified Thacker Pass as a massacre site or other similar site of cultural interest.[80]

---

[74] *Id.*

[75] *Id.*

[76] *Id.*

[77] *Id.* at 92.

[78] *Id.* at 87.

[79] *Id.* at Appendix H.

[80] *See id.* at 60.

**Fed. Defs.' Combined Mem. in Opp. to Tribes Ms. for Summ. J. and in Supp. of Cr. M.**

BLM continued to consult with tribes during the remainder of the Winnemucca RMP planning process.  In 2010, BLM sent requests for consultation to approximately 20 tribes, including RSIC and BPT.[81]  Only the Fort McDermitt Tribe and Summit Lake Paiute Tribe elected to participate in the consultation meetings held in 2010.[82]  RSIC and BPT declined or did not respond to requests to engage in consultation.[83]

In sum, BLM spent years developing the Ethnographic Assessment and overarching Winnemucca RMP, and as a result, identified numerous culturally significant historic sites.  But no tribe—including RSIC and BPT—gave any indication that they attached religious or cultural significance to the Thacker Pass Project area such that BLM could have reasonably been expected to consult with RSIC or BPT on the Thacker Pass Project.

> **3.  BLM's consultation efforts during intervening projects did not produce any information that would have reasonably indicated either RSIC or BPT asserted an interest in the Thacker Pass Project area**

In the years that followed BLM's initial attempts at consultation during the Winnemucca RMP, BLM conducted four other projects concerning the Thacker Pass Project area.  None of the consultation efforts or public comments made during those projects yielded information that could have reasonably put BLM on notice that Plaintiff-Intervenors had an interest in the Thacker Pass Project area.

First, BLM prepared an Environmental Assessment for the Kings Valley Lithium Exploration Project, which issued in December 2009.[84]  This project

---

[81] TPEIS-0226, Winnemucca RMP, at 1-34 (AR-033622).

[82] *Id.*

[83] *Id.*

[84] TPNHPA-0151, Kings Valley Lithium Exploration Project, Environmental Assessment (AR-001670).

**Fed. Defs.' Combined Mem. in Opp. to Tribes Ms. for Summ. J. and in Supp. of Cr. M.**

overlapped with the Thacker Pass Project area.[85]  BLM contacted the Fort McDermitt Tribe which confirmed "that the Tribe had no concerns about the Project."[86]  BLM made the preliminary Environmental Assessment available for public comment and posted it on BLM's website.[87]

Second, in 2010 BLM began work on an Environmental Assessment for the Montana Mountains Cooperative Fuels Treatment Project, a project designed to "reduce the risk of unwanted destruction of habitat from wildland fire."[88]  The Montana Mountains Cooperative Fuels Treatment Project encompassed the Thacker Pass Project area.[89]  In accordance with the NHPA, BLM consulted with the Summit Lake Paiute Tribe, Fort McDermitt Tribe, Shoshone and Paiute Tribes of Duck Valley, and the Winnemucca Indian Colony.[90]  BLM also made the initial scoping letter and associated maps available to the public on its website.[91]

Third, in 2013 BLM again consulted with tribes and made information publicly available for comment in association with an Environmental Assessment developed for the Western Lithium Corporation Kings Valley Clay Mine, an open-pit clay mine within the same geographic footprint as the Thacker Pass Project.[92]  In April 2013,

---

[85] *Id.* at § 1.1 (AR-001676) (noting that the project "is located on the north side of Thacker Pass"); *id.* at § 2.1.1 (AR-001681) (describing the project as being located in Township 44 N, Range 35 E).

[86] *Id.* at § 3.6 (AR-001698).

[87] *Id.* at § 9 (AR-001731).

[88]  TPNHPA-0143, Montana Mountains Cooperative Fuels Treatment Project, Environmental Assessment, § 1.1 (AR-001544).

[89] *Id.* at § 3.0 (AR-001558) (noting that the project's "southern border is the Thacker Pass Road"); *id.* at § 2.1 (AR-001547) (describing the project as covering the area between Townships 44-48 N and Ranges 33-38 E).

[90] *Id.* at § 3.1.5 (AR-001563).

[91] *Id.* at §7 (AR-001639-40).

[92]  TPNHPA-0112, Western Lithium Corporation Kings Valley Clay Project, Final Environmental Assessment, § 1.1.2 (AR-001255) (noting the proposed mine "is located at

**Fed. Defs.' Combined Mem. in Opp. to Tribes Ms. for Summ. J. and in Supp. of Cr. M.**

BLM requested consultation with the Fort McDermitt Tribe and the Summit Lake Paiute Tribe.[93]   Later that year, "the Preliminary Environmental Assessment was made available for a 30-day public review period."[94]

Finally, BLM consulted with ten tribes, including RSIC, between 2011 and 2017 when preparing the Environmental Assessment for the Programmatic District-Wide Vegetation Management Plan.[95]  Like the Winnemucca RMP, the Vegetation Management Plan addressed the entirety of the lands managed by BLM's Winnemucca District Office, including the Thacker Pass Project area.[96]  On or about July 22, 2015, BLM sent a consultation letter and a copy of the Preliminary Environmental Assessment to RSIC, to which RSIC did not respond.[97]   The Preliminary Environmental Assessment was also "made available for a 31-day public comment period through the BLM ePlanning NEPA Register."[98]

At no time during any of these consultations or public administrative processes did BLM learn that RSIC or BPT claimed a cultural, religious, or historical interest in sites in the Thacker Pass area.

---

Thacker Pass between the Montana Mountains and the Double H Mountains in northern Humboldt County, Nevada"); *id.* (describing the project as located within Township 44 N, Range 35 E).

[93] *Id.* at § 3.5.3 (AR-001298).

[94] *Id.* at § 6.4 (AR-001378).

[95]   TPNHPA-0111, Programmatic District-Wide Vegetation Management Plan, Environmental Assessment (AR-001065).

[96] *Id.* at § 2.1 (AR-001077) (recognizing "[t]he Winnemucca PVMP provides analysis for vegetation management on public lands administered by the BLM throughout the Winnemucca District").

[97] *Id.* at § 6.0 (AR-001222).

[98] *Id.* at § 7.0 (AR-001224).

**Fed. Defs.' Combined Mem. in Opp. to Tribes Ms. for Summ. J. and in Supp. of Cr. M.**

### 4. The reasonableness of BLM's consultation decision is supported by BLM's consultation with the Nevada SHPO

The Protocol directed BLM to prepare a Cultural Resource Inventory Needs Assessment form ("CRINA").[99]   The goal of the CRINA was to further NHPA compliance by allowing BLM and the Nevada SHPO to communicate early on regarding various "critical pieces" of the NHPA process.[100]   This included providing a "list [of] the tribes, consulting parties and members of the public who will be consulted for individual undertakings."[101]   Once BLM delivered its CRINA to the SHPO, the SHPO was to notify BLM that either: "(1) SHPO has no questions or issues with the information contained in the CRINA;" or that "(2) SHPO may provide recommendations . . . regarding additional parties that might be consulted."[102]   On or about October 21, 2019, BLM transmitted its CRINA identifying the Fort McDermitt Tribe, Summit Lake Paiute Tribe, and Winnemucca Indian Colony for consultation.[103]   After reviewing the CRINA, the SHPO provided its response.   The SHPO noted that "there will be tribal consultation for this undertaking in keeping with the Purpose § B and Part 1 § V.A.4 of the Protocol," but did not identify or recommend any additional tribes for consultation.[104] The fact that the SHPO did not identify RSIC or BPT for consultation supports the reasonableness of BLM's decision. *See Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs*, No. CV 14-1667 PSG (CWX), 2015 WL 12659937, at *21 (C.D. Cal. June 30, 2015) (recognizing that agency's decision not to consult with tribe was reasonable and in good faith based in part on state historic preservation officer not advising agency of

---

[99] TPEIS-0261, State Protocol Agreement, § I.B.1 (AR-082642).

[100] *Id.*

[101] *Id.*

[102] *Id.* at § I.B.1.d.(1)-(2) (AR-082642-43).

[103] TPNHPA-0001 at 11 (AR-000012).

[104] TPNHPA-0036 (AR-000550).

**Fed. Defs.' Combined Mem. in Opp. to Tribes Ms. for Summ. J. and in Supp. of Cr. M.**

tribe), *aff'd sub nom.*, *Friends of Santa Clara River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906 (9th Cir. 2018).

### 5.  Neither RSIC nor BPT asserted an interest in the Thacker Pass Project area when afforded the opportunity for public comment

Finally, BLM also provided opportunities for public involvement in the NHPA process for the Thacker Pass Project. Specifically, BLM issued several public notices, including in the Federal Register, and so gave "notice to the world."  *See Shiny Rock Mining Corp. v. United States*, 906 F.2d 1362, 1364-65 (9th Cir. 1990) ("'Publication in the Federal Register is legally sufficient notice to all interested or affected persons regardless of actual knowledge or hardship resulting from ignorance.'" (quoting *Friends of Sierra R.R., Inc. v. ICC*, 881 F.2d 663, 667-68 (9th Cir. 1989))); *Gov't of Guam v. United States*, 744 F.2d 699, 701 (9th Cir. 1984) (holding that publication in the Federal Register "constituted formal notice to the world"). BLM received no written comments from Plaintiff-Intervenors before issuing the Record of Decision.  BLM also did not learn of any of the concerns now expressed by Plaintiff-Intervenors during the public meetings it held after providing advance notice.

In sum, BLM's identification of tribes for consultation was reasonable and in good faith. Plaintiff-Intervenors were not identified because they had affirmatively expressed an interest in an area that did not include the Project or had affirmatively expressed disinterest in the Project area, and no other information elicited during previous projects indicated they had a religious or cultural interest in the area. BLM's decision is supported by BLM's consultation with the SHPO, and public meetings and notices concerning the Project in which neither Plaintiff-Intervenors nor any other party claimed an interest in the Project area.

### B.  Plaintiff-Intervenors' arguments do not support a finding of unreasonableness or bad faith on the part of BLM

Fed. Defs.' Combined Mem. in Opp. to Tribes Ms. for Summ. J. and in Supp. of Cr. M.

In their respective motions for summary judgment, Plaintiff-Intervenors present several arguments concerning the NHPA process,[105] in effect, asserting that BLM's decision not to consult with them was unreasonable or in bad faith. Plaintiff-Intervenors' arguments do not, however, undermine the reasonableness of the challenged agency decision or in any way demonstrate that it was made in bad faith.

### 1. RSIC cannot demonstrate BLM acted unreasonably or in bad faith in violation of the NHPA

RSIC first states that BLM completed a "rushed" consultation process given the nature of the project and the Covid-19 pandemic, resulting in an allegedly flawed public comment and review process, ECF No. 205, 16-19, but does not identify any error in the agency's consultation process as a result of the project's timeline.

To the extent RSIC is challenging BLM's initial determination of which tribes to consult, the time necessary to make such a decision is not dispositive as to whether that decision was reasonable. RSIC cites no authority for the proposition that the time it takes to approve a project under regulations implementing the NHPA, NEPA, or for that matter, the Surface Mining Control and Reclamation Act regulations, is relevant to whether an agency's decision is arbitrary or capricious.[106] And as described above, BLM was not starting from scratch. It had previously conducted multiple studies and analyses covering the Thacker Pass Project area, including the ethnographic study that was part of the Winnemucca RMP. Plaintiff-Intervenors either did not raise any interest in the Project area or did not respond to BLM's request for consultation with respect to any of these previous projects, and BLM was entitled

---

[105] RSIC has only asserted claims under the NHPA and the Court has denied its motion to amend its Complaint. ECF No. 167.

[106] Insofar as RSIC is attempting to assert a facial challenge to the NHPA and NEPA's consultation regulations, the time to do so has long since passed.

**Fed. Defs.' Combined Mem. in Opp. to Tribes Ms. for Summ. J. and in Supp. of Cr. M.**

to rely on this experience in determining whether to consult with RSIC on the Thacker Pass Project.[107]

With regard to BLM's public comment and review process for the Project, BLM sought the views of the public consistent with 36 C.F.R § 800.2(d)(1)-(2).   As discussed *supra* p. 6, BLM published the January 21, 2020 Federal Register notice initiating public consultation under the NHPA.  85 Fed. Reg. 3,413-02, 3,414 (Jan. 21, 2020).  BLM then held two public scoping meetings in February 2020.[108]  On April 10, 2020, the Office of the Secretary of the United States Department of the Interior issued guidance concerning public participation, and in light of the availability of virtual public involvement, instructed that "[i]n most cases COVID-19 should not delay NEPA compliance for bureau proposed actions."   In July 2020, BLM published notice of the availability of the DEIS for public comment in the Federal Register. 85 Fed. Reg. 4,5651-01 (July 29, 2020).  BLM then held two virtual public meetings in August 2020 that were attended by dozens of participants.[109]  Plaintiff-Intervenors have not presented any evidence that BLM's practice of conducting virtual public meetings in compliance with Departmental guidance was unreasonable or in bad faith.

RSIC also cites no authority that combining the NHPA and NEPA processes for obtaining public involvement is relevant to whether an agency decision is arbitrary and capricious.   Indeed the regulations counsel in favor of such efficiency.  *E.g.* 36 C.F.R. § 800.2(d)(3) ("The agency official may use the agency's procedures for public involvement under the National Environmental Policy Act . . . if they provide adequate opportunities for public involvement consistent with this subpart.").

---

[107] TPEIS-0226, Winnemucca RMP at 1-34 (AR-0033622); TPNHPA-0003, Ethnographic Assessment at 92.

[108] TPEIS-0124 (AR-017837).

[109] TPNHPA-0146 (AR-01658-65); TPEIS-0384, FEIS, R-1.

**Fed. Defs.' Combined Mem. in Opp. to Tribes Ms. for Summ. J. and in Supp. of Cr. M.**

In any event, RSIC never timely sought to participate as a member of the public in the approval process, and so is not a proper party to challenge BLM's public outreach.   Similarly, RSIC lacks standing to challenge public outreach on behalf of tribes with whom BLM did consult.  *See San Juan Citizens All. v. Norton*, 586 F. Supp. 2d 1270, 1293 (D.N.M. 2008).

Second, RSIC maintains BLM should have consulted with RSIC based on its 2015 Official Areas of Cultural Interests letter.  ECF No. 205, 19-21.  Upon close inspection, however, RSIC's letter indicates just the opposite.  As discussed *supra* pp. 18-19, the encircled area of the 2015 map identifying RSIC's "official areas of cultural interest" does not include the Thacker Pass Project area.  Although RSIC stated it may assert an interest in other sites outside its official area of interest, BLM had no reasonable way of knowing where such sites may be located, and RSIC made clear that the onus would be on RSIC to request consultation regarding sites outside these official areas.[110]

RSIC criticizes BLM for allegedly having "found" its letter during the briefing on RSIC's Motion for Preliminary Injunction and for failing to include a missing page of the resolution with the aforementioned disclaimer for projects outside RSIC's areas of interest.  ECF No. 205, 19-20.  The letter as retained in BLM's files is appropriately part of the administrative record that was before the agency when it identified tribes for consultation.  *See Goffney v. Becerra*, 995 F.3d 737, 748 (9th Cir. 2021) ("An agency's statement of what is in the record is subject to a presumption of regularity.").  Plaintiff-Intervenors present no argument to overcome the presumption of regularity.  What matters is the fact that the document was before BLM when it rendered its decision; when the document was added to the administrative record for purposes of this litigation is irrelevant.  *See Pac. Choice Seafood Co. v. Ross*, 976 F.3d 932, 942 (9th

---

[110] TPNHPA-0034 (AR-000521).

**Fed. Defs.' Combined Mem. in Opp. to Tribes Ms. for Summ. J. and in Supp. of Cr. M.**

Cir. 2020) ("In assessing [an agency's] decision, [this Court] review[s] the whole record, which includes everything that was before the agency pertaining to the merits of its decision." (citations and quotation marks omitted)).  Here, the letter, the first page of the resolution, and the map were all considered by BLM as part of its consultation process, and they support BLM's decision not to consult with RSIC. Even assuming the second page of the resolution relied on by RSIC were also considered by BLM, as explained above, the unbounded claim to other unknown areas of interest outside the map RSIC provided would not reasonably put BLM on notice that RSIC claimed an interest in the Thacker Pass area.

Third, RSIC takes issue with BLM's reliance on the 2006 Ethnographic Assessment prepared as part of the Winnemucca RMP.  ECF No. 205, 21-23.  In effect, RSIC argues that the Thacker Pass area contains several features of religious or cultural significance such as travel routes, (*id.* at 22); caves and stone outcroppings, (*id.*); obsidian deposits, (*id.* at 22-23); springs, wetlands, and riparian areas, (*id.* at 23); campsites, (*id.*); and sage grouse and golden eagle habitat, (*id.*).  RSIC then makes the leap that, because BLM knew that such features were significant to Northern Paiute tribes, generally, BLM was on notice that it was obligated to consult, specifically, with RSIC regarding Thacker Pass.

RSIC's logic is flawed for several reasons.  First, RSIC's references in the Ethnographic Assessment are all drawn from a section that merely provides a discussion of "general categories of places of cultural and religious importance."[111] That section refers to features that can be found generally across the Winnemucca RMP like caves, water resources, habitation sites, and sagehen strutting grounds— not specific locations within the Thacker Pass Project area.[112]  Second, the discussion

---

[111] TPNHPA-0003, Ethnographic Assessment, at 43.

[112] *Id.* at 43, 44, 45, and 51.

**Fed. Defs.' Combined Mem. in Opp. to Tribes Ms. for Summ. J. and in Supp. of Cr. M.**

refers to features of cultural or religious importance to Northern Paiute or Western Shoshone tribes, generally—not specifically RSIC.[113]   None of the references to the Ethnographic Assessment tie RSIC to a location within the Thacker Pass area such that BLM would have had reasonable notice that *RSIC* had a relationship with places of cultural or religious significance in the Thacker Pass area.

### 2. BPT cannot demonstrate BLM acted unreasonably or in bad faith in violation of the NHPA

BPT's arguments that BLM should have identified BPT for consultation likewise fall short.  First, BPT asserts that no document within the administrative record expressly outlines BLM's rationale for including or excluding certain tribes within the consultation process, (ECF No. 203, 16); but this is not the standard.  BPT cites no authority requiring BLM to explain its rationale for *not* consulting with a given tribe—such a requirement would be unduly onerous on an administrative agency, which may have to explain such a determination with respect to hundreds of federally recognized tribes. Furthermore, the basis for BLM's decision not to consult with BPT is reflected in the administrative record primarily through the *absence* of communications from BPT.

In assembling the administrative record—that is, the evidence considered by the agency in reaching its decision—BLM is entitled to a presumption of good faith and regularity.  *See Paralyzed Veterans of Am. V. Sec'y of Veterans Affs.*, 345 F.3d 1334, 1349 (Fed. Cir. 2003).  As such, BLM need not provide a specific document providing a detailed explanation of every decision within a decision *ad infinitum*.  *See, e.g., Frizelle v. Slater*, 111 F.3d 172, 176 (D.C. Cir. 1997) ("All that is required is that the [agency's] decision minimally contain a rational connection between the facts found and the choice made." (internal quotation marks and citations omitted)); *see also Kurshumi v.*

---

[113] *Id.* at 43 ("Additionally, some of these locations may be considered sacred to particular Native American individuals or tribes."); *id.* at 45 ("These places may or may not be of cultural importance to a particular tribe.").

**Fed. Defs.' Combined Mem. in Opp. to Tribes Ms. for Summ. J. and in Supp. of Cr. M.**

*Ashcroft*, 102 F. App'x 172, 175 (1st Cir. 2004) ("The [agency] is not required to discuss each and every piece of evidence or write an exegesis on every contention."). The administrative record "allow[s] for meaningful judicial review" if it "delineates the path by which [the agency] reached its decision," which the record does here, discussed *supra* pp. 16-18. *Occidental Petroleum Corp. v. SEC*, 873 F.2d 325, 338 (D.C. Cir. 1989).

Second, BPT criticizes BLM's reliance on BPT's disavowal of an interest in the Thacker Pass Project area during a July 28, 2005 telephone conversation.  ECF No. 203, 16-17.  As evidenced in the Winnemucca RMP Ethnographic Assessment, BPT's Cultural Resource Representative stated "the tribe would defer consultation to the tribes that had reservations closer to the study area" and that "it would not be necessary to keep the tribe on the mailing list for the RMP/EIS."[114]  BPT argues BLM could not have relied on this statement because its representative was not an "elected tribal official[] delegated by elected tribal officials to engage in such consultation." ECF No. 203, 16.   Even assuming BPT's Cultural Resource Representative lacked such authority, however, there is no indication BPT made BLM aware of this fact. Moreover, if BPT's Chairperson were the only individual with such authority, BPT's Chairperson never responded to BLM's multiple letters inviting BPT to participate in the process.  BPT's Cultural Resource Representative's disavowal is in accord with the Chairperson's silence; it was not unreasonable for BLM to rely on this information.

Third, like RSIC, BPT highlights the historical territory of the Northern Paiute people, generally; and the features and resources generally found in the Winnemucca RMP Project area.  *Id.* at 17-18.  But like RSIC, BPT fails to identify any specific features in the Thacker Pass Project area that were identified in the Ethnographic

---

[114] TPNHPA-0003, Ethnographic Assessment, at 92.

**Fed. Defs.' Combined Mem. in Opp. to Tribes Ms. for Summ. J. and in Supp. of Cr. M.**

Assessment that would have put BLM on notice that BPT, specifically, attached cultural or religious significance to those features. And neither BPT nor RSIC argue that these features required BLM to consult with every single Northern Paiute band or tribe.

Fourth, BPT argues that because BLM did consult with BPT in 2002 and 2013, it is unreasonable that BLM did not consult with it on the Thacker Pass Project. *Id.* at 18-19. But the 2013 consultation was for an area over 50 miles away from Thacker Pass and the consultation was pursuant to the Native American Graves Protection and Repatriation Act ("NAGPRA"), not the NHPA. *See* Notice of Inventory Completion, 78 Fed. Reg. 59,958-59,959 (Sept. 30, 2013). NAGPRA casts a broader consultation net than the NHPA. *See* 43 C.F.R. § 10.5(a) (requiring consultation "with known lineal descendants and Indian tribe officials" from, among others, Indian tribes "that are, or are likely to be, culturally affiliated with the human remains, funerary objects, sacred objects, or objects of cultural patrimony" or "that have a demonstrated cultural relationship with the human remains, funerary objects, sacred objects, or objects of cultural patrimony."). Because those objects evidenced a relationship to Northern Paiute tribes, NAGPRA obligated BLM to contact BPT, which has Northern Paiute members, even if the Northern Paiute bands affiliated with BPT were not associated with the area.[115] BPT was one of the tribes who "were invited to consult, but did not respond." 78 Fed. Reg. at 59,959.

The 2002 consultation is of little if any relevance. The Winnemucca RMP was conducted more recently than the 2002 consultation; identified Northern Paiute bands affiliated with BPT, none of which were associated with the Thacker Pass area; and during the Winnemucca RMP, BPT disclaimed an interest in the project area and deferred to other tribes who were in closer proximity to the project area.

---

[115] *See* TPNHPA-0003, at 15, 17 (noting that the two Northern Paiute bands affiliated with BPT are in Oregon).

**Fed. Defs.' Combined Mem. in Opp. to Tribes Ms. for Summ. J. and in Supp. of Cr. M.**

Finally, BPT contends that BLM's efforts were unreasonable given certain guidance found in the BLM's Improving and Sustaining BLM-Tribal Relations Handbook ("BLM Handbook"), H-1780-1.  ECF No. 203, 19-20.  The BLM Handbook, like other agency manuals, provides a practical guide to BLM's consultation with tribes, but does not create specific legal requirements.  It is not binding on BLM because it was not promulgated through notice and comment procedures, nor was it published in the Federal Register or the Code of Federal Regulations.  *See McMaster v. United States*, 731 F.3d 881, 888 (9th Cir. 2013) ("BLM manuals are not legally binding.").   Courts "do 'not review allegations of noncompliance with an agency statement that is not binding on the agency.'"  *Ctr. for Cmty. Action & Env't Just. v. Fed. Aviation Admin.*, 18 F.4th 592, 600 (9th Cir. 2021) (quoting *W. Radio Servs. Co., Inc. v. Espy*, 79 F.3d 896, 900 (9th Cir. 1996)).  Even if they could be considered, the sections of the BLM Handbook cited by BPT provide guidance for BLM's consultation efforts once BLM has reasonably identified the tribes with which it should consult.[116]  The guidance in no way restricts BLM's decision-making authority in the first instance in terms of making "a reasonable and good faith effort to identify Indian tribes . . . that shall be consulted."  36 C.F.R. § 800.2(c)(2)(ii)(A).  In fact, § III.C.1 of the BLM Handbook, "Identifying Tribes and other Indian parties for Consultation," expressly instructs that "[s]pecific consultation should focus on tribes known to have concerns about the geographic area under consideration and the particular resources and/or land uses involved,"[117] which is what BLM focused on here.

---

[116] BLM Handbook 1780-1 Improving and Sustaining BLM-Tribal Relations (P), United States Department of the Interior, Bureau of Land Management, at III-14, available at https://www.blm.gov/sites/blm.gov/files/uploads/H-1780-1__0.pdf (last accessed May 9, 2022).

[117] *Id.* at III-4.

**Fed. Defs.' Combined Mem. in Opp. to Tribes Ms. for Summ. J. and in Supp. of Cr. M.**

In short, both BPT and RSIC disclaimed an interest in the Thacker Pass Project area in communications with BLM: BPT as evidenced by the Winnemucca RMP process and RSIC as evidenced through its 2015 letter of official areas of cultural interests.   Moreover, despite several opportunities during other projects that encompassed the Thacker Pass Project area in whole or in part—including development of an ethnography of the area—BLM did not come into possession of any information indicating BPT or RSIC had a significant cultural interest in the Thacker Pass area.   The Nevada SHPO agreed with BLM's determination not to identify BPT or RSIC for consultation and neither BPT nor RSIC requested to be a consulting party to the Project.   Accordingly, BLM's decision not to identify BPT and RSIC for consultation on the Thacker Pass Project was reasonable and made in good faith.

## V.     BLM complied with NEPA

BLM took the requisite hard look at the potential impacts to cultural resources from the Thacker Pass Project.   As explored in more detail in Federal Defendants' forthcoming memoranda in support of their cross-motions for summary judgment and in opposition to Environmental Plaintiffs' Motion for Summary Judgment (ECF No. 202) and Bartell Plaintiffs' Motion for Summary Judgment (ECF No. 204), BLM conducted a thorough analysis of the Project in its final Environmental Impact Statement ("FEIS").

An agency satisfies its NEPA obligation if its environmental impact statement "contains 'a reasonably thorough discussion of the significant aspects of the probable environmental consequences.'"   *Muckleshoot Indian Tribe*, 177 F.3d at 809 (quoting *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1376 (9th Cir. 1998)).

Fed. Defs.' Combined Mem. in Opp. to Tribes Ms. for Summ. J. and in Supp. of Cr. M.

36

BLM took the requisite hard look at the Project's effects on cultural resources[118] and Native American religious concerns.[119] First, BLM reviewed 38 inventories conducted over the past 49 years, meaning that, taken together, the entirety of the Project area and "portions of the indirect effects area have been covered by pedestrian inventories meeting the standards of the Nevada BLM."[120]  One of these surveys, conducted in 2018, inventoried 12,963 acres for the Project, and included a recent ethnographic analysis.[121]  The inventories identified roughly one thousand cultural resource sites and the 16,030-acre Thacker Pass component of the 166,346-acre Double H/Whitehorse Obsidian Procurement District.[122]  The overwhelming majority (95 percent) of the cultural resources in the Project area were identified as prehistoric lithic scatters associated with obsidian toolstone assay and reduction. The FEIS then considered the effects on the identified cultural resources under the proposed action and alternative actions, notably concluding that the proposed action and several alternatives would adversely affect all fifty-six properties eligible under Criterion D for the National Register of Historic Places.[123]  Importantly, the FEIS also indicated that mitigation for adverse effects would involve implementation of a HPTP that "would involve a combination of avoidance, cultural resources monitoring, data recovery, and public outreach/interpretation for each historic property and the [obsidian procurement district]."[124]

---

[118] TPEIS-0384, FEIS, at §§ 4.10-4.10.3.

[119] *Id.* at § 4.18-4.18.3.

[120] *Id.* at § 4.10; *see also* TPEIS-0384, FEIS, at Appendix J – Cultural Resource Inventory Tables, (listing the 38 inventories); TPEIS-0705 (AR-065805-07).

[121] *Id.*; TPEIS-0269 (AR-035386).

[122] *Id.*

[123] *Id.* at §§ 4.10.1.1-4.10.1.3.

[124] *Id.* at § 4.10.2.

**Fed. Defs.' Combined Mem. in Opp. to Tribes Ms. for Summ. J. and in Supp. of Cr. M.**

The FEIS also considered the Project's effects on Native American religious concerns. BLM explained that its consultations were conducted pursuant to the NHPA and implementing regulations, as well as in accordance with the BLM-SHPO State Protocol Agreement, discussed *supra* pp. 11-13.[125] *See* 40 C.F.R. § 1501.2(a) ("Agencies should integrate the NEPA process with other planning and authorization processes at the earliest reasonable time to ensure that agencies consider environmental impacts in their planning and decisions, to avoid delays later in the process, and to head off potential conflicts."). The FEIS again noted its consultation efforts with the Fort McDermitt Tribe, Summit Lake Paiute Tribe, and Winnemucca Indian colony.[126] The results of the consultation efforts brought forth no resource issues for the three tribes, and the BLM concluded in the FEIS that the proposed action and alternatives did not have the potential to directly or indirectly affect any resources of Native American religious importance.

The above discussions and analyses of the FEIS are all that NEPA requires. In an attempt to show otherwise, BPT argues (1) that the FEIS errs in suggesting that consultation is ongoing (ECF No. 203, 21) (citing FEIS 2-21), and (2) that the FEIS fails to account for and therefore analyze potential impacts to culturally and religious serious areas that would have been uncovered if consultation had in fact been "ongoing." *Id.* at 22-23.

As to the former argument, opportunities for tribal consultation on the Project had not closed.[127] While consultation under the NHPA ended once the MOA was

---

[125] *Id.* at §§ 4.18-4.18.3.

[126] *Id.* at § 4.18.1.

[127] Additionally, BLM policy is that consultation "[d]oes not terminate with the decision or authorization itself," BLM Manual (MS) 1780 Tribal Relations at § 1.1.E.7 (Dep't of the Interior, Bureau of Land Mgmt. Dec. 15, 2016), https://www.blm.gov/sites/blm.gov/files/uploads/MS%201780.pdf, and that "project-specific consultation between the BLM and tribal technical staff . . . continues during project implementation and afterward during long-

**Fed. Defs.' Combined Mem. in Opp. to Tribes Ms. for Summ. J. and in Supp. of Cr. M.**

signed between the Nevada SHPO and BLM, because that agreement approved the HPTP and that plan requires certain excavation in the Project area, BLM was still required in accordance with the Archaeological Resources Protection Act ("ARPA") to provide the tribes an opportunity to consult. ARPA, which governs excavation of archaeological sites on public lands and removal of archaeological artifacts from those sites, obligated BLM to "notify any Indian tribe which may consider the site as having religious or cultural importance" by sending notice "to the chief executive officer or other designated official of the tribe," 43 C.F.R. § 7.7(a)(1), before excavation activities could begin under the appropriate permit. BLM could also notify any other Native America group, but such notice was not required. *Id*. § 7.7.(a)(2). The permit may not issue until 30 days after the required notice, during which time BLM "may meet with official representatives of any Indian tribe or group to discuss their interests, including ways to avoid or mitigate potential harm or destruction such as excluding sites from the permit area." *Id*. 7.7(a)(3).

In accordance with ARPA's consultation requirements, in April 2021, BLM sent letters to and sought consultation with the Fort McDermitt Tribe, Summit Lake Paiute Tribe, and Winnemucca Indian Colony. ECF No. 65, 17-18. By letter dated June 16, 2021, RSIC and BPT also raised concerns about the Thacker Pass Project. *Id*. at 18. Though the NHPA consultation period closed in 2020, after receiving RSIC and BPT's letter, on or about July 8-9 and August 12, 2021, BLM invited RSIC and BPT to consult on the ARPA permit and propose any appropriate mitigation measures. *Id*. Contrary to BPT's allegations, because the FEIS issued in 2020, the

---

term monitoring and reclamation." *Id*. at 1.6.A.7; *see also* 8140 – Protecting Cultural Resources at § .5.51 (Dep't of the Interior, Bureau of Land Mgmt. Dec. 3, 2004), https://www.blm.gov/sites/blm.gov/files/uploads/mediacenter_blmpolicymanual8140.pdf ("[T]he Field Office manager will determine how consultation with Native Americans should proceed when considering protection for cultural properties.").

**Fed. Defs.' Combined Mem. in Opp. to Tribes Ms. for Summ. J. and in Supp. of Cr. M.**

FEIS accurately noted that consultation and efforts to identify tribal concerns were ongoing.

As to BPT's latter argument, BPT also argues that BLM's efforts were unreasonable for failing to describe culturally and religiously significant areas, relying on one letter each from BPT, the Fort McDermitt Tribe, and the Summit Lake Paiute Tribe, all of which post-date the challenged January 15, 2021 Record of Decision. ECF No. 203, 22.  Therefore, these letters—dated June 16, 2021;[128] May 4, 2021;[129] and May 13, 2021[130] respectively—could not have been considered by BLM when rendering that decision or preparing the underlying FEIS.  BLM can only consider that evidence which is before it at the time of making its decision.  *See Pac. Choice Seafood Co.*, 976 F.3d at 942.  And none of this information was before the agency when the Record of Decision was signed.

Furthermore, none of the letters identify or refer to any specific cultural resources within the Project boundary that could be considered for analysis or mitigation.  BPT's own letter referenced a massacre site allegedly within the Thacker Pass Project area, which BPT contends should have been identified during the NEPA process.  ECF No. 203, 22.  But the evidence shows that site as being located outside of the Project area as the Court has acknowledged.  *Id.* at 21.  BPT similarly asserts a spiritual and cultural connection to Thacker Pass, generally.  *Id.* at 22.  But, the general information BPT puts forth regarding traditional foods and medicines does not provide specifics requisite for further analysis.  And again, BPT never raised these concerns during the Project's public comment period or any time before the Record of Decision was signed.

---

[128] TPNHPA-0117 (AR-004369).

[129] TPNHPA-0007 (AR-004339).

[130] TPNHPA-0009 (AR-004341).

**Fed. Defs.' Combined Mem. in Opp. to Tribes Ms. for Summ. J. and in Supp. of Cr. M.**

Moreover, to the extent BPT is attempting to assert an alleged NEPA violation on behalf of the Fort McDermitt Tribe or the Summit Lake Paiute Tribe or contend that BLM's consultation efforts with those tribes were insufficient, this Court has repeatedly rejected Plaintiff-Intervenors' attempts to assert such claims on behalf of non-party tribal governments.  ECF Nos. 92, 117.

BPT also invokes the Ethnographic Assessment that was part of the Winnemucca RMP.  ECF No. 203, 23.  But BPT's reliance on the Ethnographic Assessment in support of its NEPA claim suffers from the same shortcomings as BPT's attempts to use the Ethnographic Assessment in support of its NHPA claim. That is, BPT references generalized statements about the cultural interests of Northern Paiutes and Western Shoshones in the Ethnographic Assessment regarding areas within the Winnemucca RMP—not specific areas within the Thacker Pass Project Area.  BLM sought input from BPT during the Winnemucca RMP to help identify such culturally significant places to no avail.[131]  Nothing in the Ethnographic Assessment of the Winnemucca RMP indicates BLM did not take a hard look at the cultural resources specifically within the Thacker Pass area.[132]  Moreover, BPT's assertion that "[t]here is no discussion of current uses of the area by Tribes or its significance" is incorrect.  ECF No. 203, 24.  The record indicates that the cultural resources report for the Project contained an ethnographic analysis.[133]

None of BPT's arguments overcome the fact that BLM, based on the information and resources it had available at the time of conducting its EIS, took a

---

[131] TPNHPA-0003, Ethnographic Assessment, at 92.

[132] BPT suggests that it is "[r]emarkabl[e]," but does not develop an argument based on the fact that BLM did not cite the Ethnographic Assessment in the FEIS.  ECF No. 203, 23.  But it is not remarkable at all given no tribe identified the Thacker Pass area as an area of cultural or historical interest in the Ethnographic Assessment.

[133] TPEIS-0384, FEIS, at 4-82 (referencing the review of inventories at Appendix J; TPEIS-0705 (AR-65801) (providing the cultural survey); TPEIS-0269 (AR-035386) (providing the recent ethnographic analysis).

**Fed. Defs.' Combined Mem. in Opp. to Tribes Ms. for Summ. J. and in Supp. of Cr. M.**

hard look at the Project's effects on cultural resources within the Project area. BLM properly identified and analyzed cultural resources in the Project area, effects on those resources based on various alternative actions, and potential for mitigation. BLM continues to be willing to consult with tribes on mitigation efforts through the HPTP. Generalized statements, provided after the issuance of the FEIS, however, do not overcome the reasonableness of BLM's decision-making.

## CONCLUSION

For the foregoing reasons, Federal Defendants request that this Court find BLM acted in compliance with the NHPA, NEPA, and APA in approving the Thacker Pass Project, and that it grant summary judgment in Federal Defendants' favor on all of Plaintiff-Intervenors' claims and deny Plaintiff-Intervenors' claims with prejudice.

Respectfully submitted this 20th day of May, 2022.

TODD KIM
Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Div.

 /s/ Leilani Doktor
ARWYN CARROLL (MA Bar 675926)
LEILANI DOKTOR (HI Bar 11201)
MICHAEL ROBERTSON (VA BAR 80866)
Trial Attorney
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Phone: 202-305-0465
Fax: 202-305-0506
arwyn.carroll@usdoj.gov
leilani.doktor@usdoj.gov

*Attorneys for Federal Defendants*

Fed. Defs.' Combined Mem. in Opp. to Tribes Ms. for Summ. J. and in Supp. of Cr. M.