TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

ARWYN CARROLL (MA Bar 675926)
LEILANI DOKTOR (HI Bar 11201)
MICHAEL ROBERTSON (VA Bar 80866)
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Phone: (202) 305-0465
Fax: (202) 305-0506
arwyn.carroll@usdoj.gov
leilani.doktor@usdoj.gov
michael.robertson@usdoj.gov

*Attorneys for Federal Defendants*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| BARTELL RANCH LLC, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>ESTER M. MCCULLOUGH, *et al.*,<br><br>        Defendants.<br><br>―――――――――――――<br>WESTERN WATERSHEDS PROJECT, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*,<br><br>        Defendants. | Case No. 3:21-cv-80-MMD-CLB<br>Related Case No. 3:21-cv-103-MMD-CLB<br>(Consolidated)<br><br><br><br><br><br><br>**FEDERAL DEFENDANTS' COMBINED MEMORANDUM IN OPPOSITION TO ENVIRONMENTAL PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF FEDERAL DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT**<br>**[ORAL ARGUMENT REQUESTED]** |

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................... 1

BACKGROUND ..................................................................................................... 2

LEGAL STANDARDS .......................................................................................... 3

   I.     Administrative Procedure Act review of agency action ................................ 3

   II.    The Mining Law of 1872 ............................................................................ 4

   III.   Federal Land Policy and Management Act .................................................. 5

   IV.   National Environmental Policy Act ............................................................ 7

ARGUMENT .......................................................................................................... 7

   I.     BLM's approval of the Project complied with FLPMA ............................... 8

        A.     BLM's approval of the Project complied with FLPMA and BLM's regulations vis-à-vis the RMPs ............................................ 8

               1.     FLPMA does not require mining operations to comply with the RMPs ................................................................. 9

               2.     The RMP provisions themselves exempt the Project approval ................................................................................ 12

        B.     BLM did not assume that Lithium Nevada had "valid rights" because it was not required by FLPMA, BLM's subpart 3809 regulations, or polic ....................................................... 16

        C.     BLM's approval does not violate water- and air-quality standards or protections for listed species ........................................ 22

               1.     Water Quality ................................................................. 22

               2.     Air Quality ..................................................................... 25

               3.     Sensitive Species ............................................................ 25

   II.    BLM's environmental analysis complied with NEPA ................................ 26

        A.     BLM adequately described baseline conditions .............................. 27

                1.     Sage-grouse baseline conditions ..................................... 27

                2.     Pronghorn baseline conditions ....................................... 28

3.  Springsnails baseline conditions ........................................... 30

B.  BLM analyzed impacts to wildlife .................................................... 30

C.  BLM analyzed cumulative impacts .................................................. 33

D.  BLM considered mitigation measures ............................................. 35

III.  The Court should not vacate the ROD and FEIS ...................................... 40

CONCLUSION ......................................................................................... 40

# TABLE OF AUTHORITIES

**Cases**

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
  988 F.2d 146 (D.C. Cir. 1993) ........................................ 40

*Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin.*,
  126 F.3d 1158 (9th Cir. 1997) ........................................ 7

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
  462 U.S. 87 (1983) ................................................ 4, 27

*Belk v. Meagher*,
  104 U.S. 279 (1881) .................................................. 20

*Best v. Humboldt Placer Mining Co.*,
  371 U.S. 334 (1963) .................................................... 4

*Cal. Cmtys. Against Toxics v. U.S. E.P.A.*,
  688 F.3d 989 (9th Cir. 2012) ........................................ 40

*California v. Block*,
  690 F.2d 753 (9th Cir. 1982) ......................................... 7

*City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*,
  123 F.3d 1142 (9th Cir. 1997) ....................................... 36

*City of Sausalito v. O'Neill*,
  386 F.3d 1186 (9th Cir. 2004) ........................................ 3

*Cole v. Ralph*,
  252 U.S. 286 (1920) .................................................. 20

*Collord v. U.S. Dep't of Interior*,
  154 F.3d 933 (9th Cir. 1998) ...................................... 5, 17

*Ctr. for Biological Diversity v. Bureau of Land Mgmt.*,
  833 F.3d 1136 (9th Cir. 2016) ....................................... 40

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
  409 F. Supp. 3d 738 (D. Ariz. 2019) ................................. 21

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
  Nos. 19-17585, 19-17586, 2022 WL 1495007 (9th Cir. May 12, 2022) ......... 5, 22

*Ctr. for Biological Diversity v. Zinke*,
  900 F.3d 1053 (9th Cir. 2018) ........................................ 7

*Davis v. Nelson*,
  329 F.2d 840 (9th Cir. 1964) ...................................... 4, 20

*Dep't of Transp. v. Pub. Citizen*,
  541 U.S. 752 (2004) .................................................. 34

*Edwardsen v. U.S. Dep't of Interior,*
   268 F.3d 781 (9th Cir. 2001) ................................................................... 25, 38

*Freeman v. U.S. Dep't of Interior,*
   37 F. Supp. 3d 313 (D.D.C. 2014) ............................................................ 20

*Freeman v. U.S. Dep't of Interior,*
   83 F. Supp. 3d 173 (D.D.C. 2015) ............................................................ 5

*Grand Canyon Tr. v. F.A.A.,*
   290 F.3d 339 (D.C. Cir. 2002) ................................................................. 35

*Great Basin Res. Watch & W. Shoshone Def. Proj.,*
   182 IBLA 55 (2012) ................................................................................. 19

*Great Basin Res. Watch v. Bureau of Land Mgmt.,*
   844 F.3d 1095 (9th Cir. 2016) ......................................................... 34, 36, 38

*Great Basin Res. Watch v. U.S. Dep't of Interior,*
   No. 3:13–cv–00078–RCJ–VPC, 2014 WL 3696661 (D. Nev. July 23, 2014) ................ 19

*Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci,*
   857 F.2d 505 (9th Cir. 1988) ......................................................... 2, 27, 31

*Havasupai Tribe v. Provencio,*
   906 F.3d 1155 (9th Cir. 2018) ................................................................. 17

*Japanese Vill., LLC v. Fed. Transit Admin.,*
   843 F.3d 445 (9th Cir. 2016) ................................................................. 38, 40

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.,*
   387 F.3d 989 (9th Cir. 2004) ................................................................. 32

*Lands Council v. McNair,*
   537 F.3d 981 (9th Cir. 2008) ................................................................. 3

*Lands Council v. Powell,*
   379 F.3d 738 (9th Cir. 2004) ................................................................. 34

*Lara v. Sec'y of the Interior,*
   820 F.2d 1535 (9th Cir. 1987) ................................................................. 20

*Mineral Policy Center v. Norton,*
   292 F. Supp. 2d 30 (D.D.C. 2003) ............................................................ 11

*Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) ................................................................................. 4

*N. Alaska Env't Ctr. v. Kempthorne,*
   457 F.3d 969 (9th Cir. 2006) ................................................................. 35, 36

*Native Ecosystems Council v. Dombeck,*
   304 F.3d 886 (9th Cir. 2002) ................................................................. 3

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.*,
    137 F.3d 1372 (9th Cir. 1998) ................................................................................. 34

*Prairie Band Pottawatomie Nation v. Fed. Highway Admin.*,
    684 F.3d 1002 (10th Cir. 2012) ............................................................................... 34

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989) ........................................................................................... 7, 35

*S. Fork Band v. U.S. Dep't of Interior*,
    588 F.3d 718 (9th Cir. 2009) ................................................................................... 36

*S. Fork Band v. U.S. Dep't of Interior*,
    643 F. Supp. 2d 1192 (D. Nev. 2009) ...................................................................... 12

*Taxpayers of Mich. Against Casinos v. Norton*,
    433 F.3d 852 (D.C. Cir. 2006) ................................................................................. 35

*Te–Moak Tribe of W. Shoshone v. U.S. Dep't of Interior*,
    608 F.3d 592 (9th Cir. 2010) ................................................................................... 34

*Theodore Roosevelt Conservation P'ship v. Salazar*,
    661 F.3d 66 (D.C. Cir. 2011) ................................................................................... 26

*Union Oil of Cal. v. Smith*,
    249 U.S. 337 (1919) ................................................................................................. 20

*United States v. Coleman*,
    390 U.S. 599 (1968) ................................................................................................. 20

*United States v. Locke*,
    471 U.S. 84 (1985) ........................................................................................... 4, 5, 20

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*,
    435 U.S. 519 (1978) ................................................................................................. 34

*W. Expl., LLC v. U.S. Dep't of Interior*,
    250 F. Supp. 3d 718 (D. Nev. 2017) ........................................................................ 11

*W. Watersheds Project v. Kraayenbrink*,
    632 F.3d 472 (9th Cir. 2011) ............................................................................. 39, 40

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ....................................................................................................... 3

**Statutes**

30 U.S.C. § 22 ..................................................................................................... 4, 19

30 U.S.C. § 23 ........................................................................................................... 4

30 U.S.C. § 26 ........................................................................................................... 4

30 U.S.C. § 29 ........................................................................................................... 4

30 U.S.C. § 35 ........................................................................................................... 4

30 U.S.C. § 36 ........................................................................................................... 4

30 U.S.C. § 42 ........................................................................................................... 4

42 U.S.C. § 4332(2)(C) ............................................................................................. 7

43 U.S.C. § 1701 ....................................................................................................... 6

43 U.S.C. § 1701(a)(1)-(8) ....................................................................................... 6

43 U.S.C. § 1701(j) ................................................................................................... 6

43 U.S.C. § 1702(h) .................................................................................................. 6

43 U.S.C. § 1712 .................................................................................................... 6, 9

43 U.S.C. § 1712(e)(1) ............................................................................................. 6

43 U.S.C. § 1712(e)(3) .................................................................................... 6, 9, 13

43 U.S.C. § 1714 ....................................................................................................... 6

43 U.S.C. § 1732(a) .................................................................................................. 6

43 U.S.C. § 1732(b) ....................................................................................... 5, 9, 18

5 U.S.C. § 706(2) .............................................................................................. 3, 7, 8

**Rules**

Fed. R. Civ. P. 56 ..................................................................................................... 1

**Regulations**

36 C.F.R. Part 228 .................................................................................................. 21

40 C.F.R. § 1501.4 (2019) ........................................................................................ 7

40 C.F.R. § 1502.14(f) ............................................................................................ 35

40 C.F.R. § 1502.15 ................................................................................................ 27

40 C.F.R. § 1502.16(h) ........................................................................................... 35

40 C.F.R. § 1502.9(b) ............................................................................................. 39

40 C.F.R. § 1506.13 (2020) ...................................................................................... 7

40 C.F.R. § 1508.7 .................................................................................... 33, 34

40 C.F.R. Part 1500 (2019) ................................................................................ 7

43 C.F.R. § 1610.5-3(a) ................................................................................... 10

43 C.F.R. § 3809.0 ............................................................................................ 6

43 C.F.R. § 3809.100 ................................................................................... 4, 19

43 C.F.R. § 3809.101(a) ................................................................................... 21

43 C.F.R. § 3809.11(a) ....................................................................................... 6

43 C.F.R. § 3809.2(a) (2022) .............................................................................. 6

43 C.F.R. § 3809.411(d)(3) ..................................................................... 10, 13, 22

43 C.F.R. § 3809.420 ....................................................................................... 10

43 C.F.R. § 3809.420(a)(3) ............................................................................... 10

43 C.F.R. § 3809.420(b) ................................................................................... 23

43 C.F.R. § 3809.420(b)(4) ............................................................................... 25

43 C.F.R. § 3809.420(b)(5) ............................................................................... 23

43 C.F.R. § 3809.420(b)(7) ............................................................................... 26

43 C.F.R. § 3809.5 ........................................................................................... 23

43 C.F.R. §§ 4.451–4.452-9 ................................................................................ 5

Nev. Admin. Code § 445A.429(3) (2020) ......................................................... 23

**Other Authorities**

41 Fed. Reg. 53,428 (Dec. 6, 1976) ................................................................ 6, 19

45 Fed. Reg. 78,902 (Nov. 26, 1980) ................................................................ 19

65 Fed. Reg. 69,998 (Nov. 21, 2000) ........................................................... 19, 21

85 Fed. Reg. 3413-02 (Jan. 21, 2020) ............................................................ 2, 11

85 Fed. Reg. 43,304 (July 16, 2020) .................................................................. 7

85 Fed. Reg. 45,651 (July 29, 2020) ............................................................... 3, 12

85 Fed. Reg. 78,349 (Dec. 4, 2020) .................................................................... 3

**TABLE OF ABBREVIATIONS**

| APA | Administrative Procedure Act |
|---|---|
| ARMPA | Approved Resource Management Plan Amendment |
| BLM | United States Bureau of Land Management |
| DEIS | Draft Environmental Impact Statement |
| EIS | Environmental Impact Statement |
| EPA | United States Environmental Protection Agency |
| FEIS | Final Environmental Impact Statement |
| FLPMA | Federal Land Policy and Management Act of 1976 |
| NAAQS | National Ambient Air Quality Standards |
| NDEP | Nevada Department of Environmental Protection |
| NDOW | Nevada Department of Wildlife |
| NEPA | National Environmental Policy Act |
| NOI | Notice of Intent |
| RDF | Required Design Features |
| RMP | Resource Management Plan |
| ROD | Record of Decision |
| VRM | Visual Resource Management |

## NOTICE OF CROSS MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, Federal Defendants Ester M. McCullough, the Bureau of Land Management (BLM), and the United States Department of the Interior (collectively "BLM" or "Federal Defendants") move for summary judgment on, and respond in opposition to, Environmental Plaintiffs' motion for summary judgment. As set forth in the following memorandum, Federal Defendants are entitled to judgment as a matter of law because BLM complied with the Federal Land Policy and Management Act of 1976 (FLPMA), 43 U.S.C. §§ 1701 *et seq.*, National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq.*, and Administrative Procedure Act (APA), 5 U.S.C. §§ 500-706. Federal Defendants request oral argument.

## INTRODUCTION

A set of four environmental organizations (collectively "Plaintiffs" or "WWP") challenge BLM's approval of mining and exploration plans for a lithium mine for alleged violations of FLPMA and NEPA. BLM's decisions complied with applicable federal law and regulations. First, BLM's decision complied with FLPMA. BLM was not obligated to apply certain provisions of Resource Management Plans (RMPs) for the area prepared under FLPMA—as Plaintiffs argue. Because these RMP provisions by their own terms apply "subject to . . . applicable law," BLM reasonably did not apply these provisions in light of "applicable law" preventing such application—including FLPMA and BLM's surface management regulations. BLM also did not, and did not need to, make a "valid rights" determination, as Plaintiffs argue. Finally, BLM's decisions did not violate FLPMA's mandate to prevent "unnecessary or undue degradation." BLM reasonably determined that approving the exploration and mining plans would not violate relevant air- and water-quality standards or harm threatened or endangered species or their critical habitat.

BLM's decision also complied with NEPA. In analyzing the impacts on the quality of the human environment, BLM adequately described baseline conditions, analyzed impacts to wildlife and its cumulative impacts when combined with other projects, and

appropriately considered mitigation measures. Plaintiffs' arguments to the contrary invite the Court to improperly "flyspeck" BLM's scientific analysis, which is entitled to deference. *See Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 508 (9th Cir. 1988).

Because BLM's decisions complied with applicable law and regulations, and Plaintiffs have not carried their burden of demonstrating otherwise, the Court should deny their motion for summary judgment and grant Federal Defendants' cross-motion.

## BACKGROUND

In July 2019, Lithium Nevada submitted, under BLM's surface management regulations, 43 C.F.R. subpart 3809, proposed plans of operations to develop a lithium mine in the Thacker Pass area of Humboldt County, Nevada, and to explore for additional lithium resources in the vicinity of the proposed mine. On January 15, 2021, BLM issued a Record of Decision approving both plans. The mining and exploration plans of operations collectively comprise Lithium Nevada's Thacker Pass Lithium Mine Project ("the Project"). The Project area encompasses approximately 18,000 acres of public lands, though actual disturbance is anticipated on approximately 5,700 acres.[1] The Project contemplates construction and operation of an open pit mine and processing facility, and disposal of byproducts of the mining process by backfilling the mining pit with waste rock and coarse gangue, as well as by constructing two facilities to store excavated waste rock materials, a course gangue stockpile, and a clay tailings filter stack.[2] None of the lands within the Project area have been withdrawn from the public land laws, including the mining laws.

Before approving the Project, BLM conducted a robust NEPA analysis. It issued its Notice of Intent (NOI) to prepare an Environmental Impact Statement (EIS) on January 21, 2020.[3] It then engaged in a scoping period, during which it held public scoping meetings in

---

[1] TPEIS-0452, Thacker Pass Lithium Mine Project Record of Decision (ROD) at 3 (AR-052519).

[2] TPEIS-0452, ROD at 3 (AR-052519); TPEIS-0409, Plan of Operations at ii, 33–34, 45–46, 51–52 (AR-051381, AR-051425–26, AR-051437–38, AR-051446–47).

[3] TPEIS-0126, 85 Fed. Reg. 3413-02 (Jan. 21, 2020).

Winnemucca and Orovada, Nevada, on February 5 and 6, 2020, and received 26 comment letters. It provided a preliminary Draft EIS (DEIS) and underlying data and analyses to relevant stakeholders, including the Nevada Department of Wildlife (NDOW), early in the process and received and addressed or incorporated a variety of comments. It then made the DEIS available to the public for comment on July 29, 2020.[4] It held two additional public meetings in August 2020 and received 63 letters commenting on the DEIS.

BLM made the Final EIS (FEIS) available on December 4, 2020[5] and considered comments submitted during the ensuing 30-day review period. During that period, BLM received several comments from Plaintiffs, NDOW, and the United States Environmental Protection Agency (EPA), which BLM duly evaluated. BLM issued its ROD approving the Project on January 15, 2021.[6] Though Plaintiffs characterize this one-year approval process as "rushed" or "fast-tracked," no law or regulation sets a *minimum* timeframe for conducting a NEPA analysis or approving a project under BLM's surface management regulations. BLM complied with relevant law and regulations in doing so.

## LEGAL STANDARDS

### I.  Administrative Procedure Act review of agency action

The APA, 5 U.S.C. §§ 701–706, governs review of Plaintiffs' claims. *See City of Sausalito v. O'Neill*, 386 F.3d 1186, 1205–06 (9th Cir. 2004). Final agency action is reviewed under 5 U.S.C. § 706(2). Such review is highly deferential. *Lands Council v. McNair*, 537 F.3d 981, 992–94 (9th Cir. 2008), *overruled in part on other grounds*, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008). Agency decisions may be overturned only if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002) (citation omitted). An agency action will be upheld if the agency has considered the relevant factors and articulated a rational connection

---

[4] TPEIS-0458, 85 Fed. Reg. 45,651 (July 29, 2020).

[5] TPEIS-0395, 85 Fed. Reg. 78,349 (Dec. 4, 2020).

[6] TPEIS-0452, ROD at AR-052515.

between the facts found and the choice made. *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983). The court may not "substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## II.     The Mining Law of 1872

Under the Mining Law, "all valuable mineral deposits in lands belonging to the United States . . . shall be free and open to exploration and purchase, and the lands in which they are found to occupation and purchase[.]" 30 U.S.C. § 22. The Mining Law authorizes qualified persons to "go onto unappropriated, unreserved public land to prospect for and develop certain minerals," *United States v. Locke*, 471 U.S. 84, 86 (1985), provided they comply with "regulations prescribed by law" and "the local customs or rules of miners," so far as "not inconsistent with the laws of the United States." 30 U.S.C. § 22.

The Mining Law codified miners' longstanding customs with respect to establishing and protecting their rights to explore, occupy, and develop the minerals in certain lands by staking or "locating" so-called "mining claims." *See id.* §§ 23, 26, 35, 36, 42. In addition to the priority of possession customarily afforded to holders of such mining claims as against rival claimants, *see Davis v. Nelson*, 329 F.2d 840, 845 (9th Cir. 1964) (explaining the doctrine of *pedis possessio*), the Mining Law gave holders of valid mining claims a compensable property right that the United States would recognize upon the claimant's "discovery" of a valuable mineral deposit and compliance with all other applicable laws and regulations. *Id.* § 23; *Best v. Humboldt Placer Mining Co.*, 371 U.S. 334, 335–36 (1963). No property rights have been asserted against rival claimants or the United States in this case.

BLM may evaluate the validity of mining claims at any time, but generally does so only in a narrow set of circumstances. Mandatory validity investigations occur when a mining claimant is seeking to confirm or obtain a property right from the United States, such as when a mining claimant has applied for a mineral patent, *see* 30 U.S.C. § 29; seeks to continue to assert its rights on lands withdrawn from operation of the mining laws, *see* 43 C.F.R. § 3809.100; or has alleged a "taking" under the Fifth Amendment of rights

associated with their mining claim,[7] *see Freeman v. U.S. Dep't of Interior*, 83 F. Supp. 3d 173 (D.D.C. 2015), *aff'd*, 650 F. App'x 6 (D.C. Cir. 2016). Interior must conduct a formal administrative hearing known as a mining claim contest proceeding, *see* 43 C.F.R. §§ 4.451–4.452-9, before it may declare a mining claim invalid. *See Collord v. U.S. Dep't of Interior*, 154 F.3d 933, 937 (9th Cir. 1998) ("The Constitution requires a hearing before the government may cancel the Collords' mining and milling site claims."); *see also Locke*, 471 U.S. at 87 ("[I]f an outstanding mining claim was found, no matter how stale or apparently abandoned, formal administrative adjudication was required to determine the validity of the claim."). Before initiating such a hearing, BLM conducts an on-the-ground mineral examination and prepares a detailed report of its findings.[8]

### III.   Federal Land Policy and Management Act

FLPMA requires that, in managing the public lands, the Secretary of the Interior "shall, by regulation or otherwise, take . . . action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b). Congress specifically provided that the "unnecessary or undue degradation" mandate amended the Mining Law. *See id.* ("Except as provided in . . . the last sentence of this paragraph, no provision of this section or any other section of this Act shall in any way amend the Mining Law of 1872 . . . ."). This standard gave BLM the authority, for the first time, to manage surface disturbance connected with

---

[7] The Ninth Circuit Court of Appeals recently concluded that "validity of a mining claim is a necessary prerequisite to post-exploration occupancy of a claim" in a case involving the Forest Service's approval of a mining plan of operations under Forest Service regulations. *Ctr. for Biol. Diversity v. U.S. Fish & Wildlife Serv.*, 2022 WL 1495007, at *11 (9th Cir. May 12, 2022). The mandate has not yet issued in the Ninth Circuit. The federal government is reviewing the *Center for Biological Diversity* decision and considering whether to seek further review. The government preserves the argument that the Mining Law does not require a valid mining claim before conducting mining operations on open lands as also set forth in Federal Defendants' opposition to WWP's preliminary injunction motion. *See* Fed. Defs.' PI Opp. at 4–5, 20–24, WWP v. Dep' of Interior, No. 21-cv-103, (D. Nev. Feb. 26, 2021), ECF No. 30.

[8] See BLM Manual H-3060-1, Mineral Reports--Preparation and Review § .06 (Apr. 7, 1994) (requiring a mineral report to be prepared and stating that "[f]ield examinations are mandatory for mining claim validity").

---

**Fed. Defs.' Combined Mem. in Opp. to WWP's Mot. for Summ. J. and in Supp. of Cr. Mot.**   5

mining operations under the Mining Law on the public lands. *See* 41 Fed. Reg. 53,428 (Dec. 6, 1976) ("The rules would add a new subpart (3809) to the regulations to provide for surface management."). Accordingly, BLM promulgated its regulations at 43 C.F.R. subpart 3809 to institute, also for the first time, operational standards for mining use. 43 C.F.R. § 3809.0-1 (1982) ("The purpose of this subpart is to establish procedures to prevent unnecessary or undue degradation of Federal lands which may result from operations authorized by the mining laws."). Those regulations, which apply (with exceptions not relevant here) to "all operations authorized by the mining laws on public lands," 43 C.F.R. § 3809.2(a) (2022), require BLM to approve a "plan of operations" before mining operations or exploration causing more than five acres of surface disturbance can begin, *id.* § 3809.11(a) .

BLM also more generally manages the public lands within its jurisdiction under FLPMA's broad "multiple use and sustained yield" mandate. *See* 43 U.S.C. §§ 1701(a)(1)–(8), 1732(a) . This mandate gives BLM broad discretion to determine the land uses that will best meet the needs of the American people, and to use some lands for less than all of the resources. *Id.* § 1702(h) . To achieve these ends, BLM develops land-use plans, which set forth management goals and objectives for a particular area. *See id.* § 1712. In land-use plans, BLM may make "decisions, including but not limited to exclusions (that is, total elimination) of one or more of the principal or major uses." *Id.* § 1712(e)(1) .

BLM may withdraw lands from operation of the Mining Law—that is, withhold an area from the public land laws "for the purpose of limiting activities under those laws in order to maintain other public values in the area," *id.* § 1702(j) (defining "withdrawal"), § 1714 (process for making withdrawals)—and thus limit any new mining to lands with preexisting valid mining claims, *id.* § 1701 note (stating that the Secretary's actions under FLPMA "shall be subject to valid existing rights"). FLPMA specifically prohibits BLM from using the land-use-planning process to achieve the same result, however. *Id.* § 1712(e)(3) .

IV.    **National Environmental Policy Act**

NEPA serves the dual purpose of informing agency decision-makers of the significant environmental effects of proposed major federal actions and ensuring that relevant information is made available to the public so that they "may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). To meet these dual purposes, NEPA requires that an agency prepare a comprehensive EIS for "major Federal actions significantly affecting the quality of the human environment[.]" 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4 (2019).[9] The requirements of NEPA are procedural. *See Robertson*, 490 U.S. at 350. In reviewing the sufficiency of an EIS, a court should evaluate whether the agency has presented a "'reasonably thorough discussion of the significant aspects of the probable environmental consequences.'" *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982). A court should not "substitute its judgment for that of the agency," *id.*, or "'fly speck' an EIS and hold it insufficient on the basis of inconsequential, technical deficiencies," *Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin.*, 126 F.3d 1158, 1183–84 (9th Cir. 1997). Once the Court is satisfied that the agency "has taken a 'hard look' at a decision's environmental consequences, the review is at an end." *Block*, 690 F.2d at 761.

## ARGUMENT

In challenging the Project's approval, Plaintiffs invoke the Court's authority to review agency actions under 5 U.S.C. § 706(2). They argue that the approval was "arbitrary and capricious" because BLM failed to fully consider all "relevant factors," *Ctr. for Biol. Diversity v. Zinke*, 900 F.3d 1053, 1067 (9th Cir. 2018) (citation omitted), and that the decision issued

---

[9] The Council on Environmental Quality issued new NEPA-implementing regulations in 2020. *See* 85 Fed. Reg. 43,304 (July 16, 2020). Because the administrative actions challenged in this case were subject to the previous regulations, *see* 40 C.F.R. § 1506.13 (2020), all citations herein are to the version of the regulations in effect at the time the relevant decisions were made, 40 C.F.R. Part 1500 (2019).

"without observance of procedures required by law."[10] But, as thoroughly explained below, the Project's approval fully complied with FLPMA and NEPA and Plaintiffs have not identified any relevant factor that BLM failed to consider.

## I.     BLM's approval of the Project complied with FLPMA

The Project's approval complied with FLPMA. Plaintiffs first contend that BLM should have imposed certain limitations found in the Winnemucca RMP[11] and Nevada and Northeastern California Greater Sage-Grouse Approved 2015 RMP Amendment (the "2015 ARMPA").[12] But neither FLPMA, BLM's implementing regulations, nor the RMPs themselves require BLM's authorizations under 43 C.F.R. subpart 3809 to comply with the specific provisions that Plaintiffs invoke, so BLM did not violate FLPMA by not including those requirements as conditions of approval. Plaintiffs' argument that BLM improperly "exempted" the Project from those provisions based on a determination or "assumption" of Lithium Nevada's "valid rights" also fails because nothing in the record indicates that BLM made such a determination or assumption, let alone based its decision on it. In any event, neither FLPMA, BLM's regulations, nor agency policy required the BLM to conduct a determination of validity prior to a decision under 43 C.F.R. subpart 3809. Finally, BLM's approval of the Project did not permit "unnecessary or undue degradation," as Plaintiffs also contend, because the Project would not violate the performance standards in BLM's subpart 3809 regulations with respect to air, water, or wildlife.

### A.     BLM's approval of the Project complied with FLPMA and BLM's regulations vis-à-vis the RMPs

WWP contends that BLM erred by failing to comply with certain provisions of the Winnemucca RMP and 2015 ARMPA. But the fundamental precondition of that argument—that FLPMA and BLM's regulations required BLM to apply those provisions to

---

[10] Env't Pls.' Mot. for Summ. J. and Mem. in Support (WWP's Mem.) at 6, ECF No. 202 (quoting 5 U.S.C. § 706(2)).

[11] TPEIS-0226, Winnemucca RMP.

[12] TPEIS-0298, 2015 ARMPA.

the Project—is flawed. BLM was not obligated to ensure that its decision under 43 C.F.R. subpart 3809 complied with the management objectives in the Winnemucca RMP and 2015 ARMPA because no statute, regulation, or provision of the RMPs themselves required it.

### 1.    FLPMA does not require mining operations to comply with the RMPs

Congress first gave Interior the authority to promulgate regulations that would give BLM a role in determining how mining under the Mining Law was conducted on public lands through FLPMA. *See* 43 C.F.R. subpart 3809. FLPMA was not a complete change in the status quo, however. Though Congress amended the Mining Law through FLPMA, it did so only in four explicit ways and expressly disclaimed amending the Mining Law *but for* those four explicit amendments. 43 U.S.C. § 1732(b) ("Except as provided in" the four listed sections, "no provision of this section or any other section of this Act shall in any way amend the Mining Law of 1872").

Relevant to plaintiffs' arguments here, none of those four express amendments to the Mining Law includes land-use planning under section 202 of FLPMA, 43 U.S.C. § 1712. Indeed, the only reference to the Mining Law in section 202 is in its final subsection, in which Congress expressly prohibited BLM from using land-use-planning provisions of FLPMA to remove lands from or restore lands to the operation of the Mining Law. *Id.* § 1712(e)(3). Section 202 thus cannot be read to amend the Mining Law to allow BLM to impose obligations on mining operations though the land-use planning process that could have the effect of withdrawing lands from operation of the Mining Law. The Winnemucca RMP itself acknowledges these limitations.[13]

Furthermore, on their face, the provisions of the Winnemucca RMP and the 2015 ARMPA are mandatory only for discretionary actions—*i.e.*, actions that BLM has decided to allow on open lands and that BLM may refuse to authorize even if not required to prevent

---

[13] TPEIS-0226, Winnemucca RMP at 2-52 (AR-033676) (acknowledging that, with respect to mineral resources, "[p]ublic lands will remain open and available for mineral exploration and development subject to the provisions of FLPMA Section 204.").

"unnecessary or undue degradation" and also to refuse authorization even if the applicant otherwise complies with the permitting requirements.[14] For the sort of action challenged in this case, however—approval of plans of operations under 43 C.F.R. subpart 3809—Congress has decided that the agency may not impose conditions on or deny an otherwise approvable plan where such conditions or denial would be tantamount to a withdrawal. BLM's regulations further make clear that after reviewing a proposed plan and conducting a NEPA analysis, BLM may take only one of three actions: (1) approve the plan as submitted; (2) approve the plan subject to changes or conditions necessary to meet the performance standards specified in 43 C.F.R. § 3809.420 and to prevent unnecessary or undue degradation; and (3) disapprove or withhold approval because the plan does not meet regulatory requirements in subpart 3809. 43 C.F.R. § 3809.411(d)(3). And while the performance standards with which operators must comply do require compliance with land-use plans, the plain language of the regulation exempts such compliance where a planning provision—such as a visual-resource-management (VRM) restriction or surface-disturbance cap—would effectively bar such operations.[15] *See* 43 C.F.R. § 3809.420(a)(3) ("Consistent with the mining laws, your operations and post-mining land use must comply with the applicable BLM land-use plans . . . ."). BLM thus lacks authority to deny approval of an otherwise-approvable plan of operations solely on lack of compliance with land-use-planning provisions or impose conditions based on such plans that would effectively bar operations.

---

[14] *See, e.g.*, *id.* at 2-101 (AR-033725) (defining "Discretionary Actions" to "include livestock grazing, mineral leasing, and some lands actions."); TPEIS-0298, 2015 ARMPA at 2-30 (AR-037782) (clarifying that with respect to actions involving locatable minerals, certain management objectives apply "to the extent allowed by law").

[15] TPEIS-0714, BLM Surface Management Handbook, H-3809-1 (2012) at 8-14 (AR-068008) ("The land use plan can be used to establish the objectives for post-mining land uses" but "must recognize the rights granted by the Mining Law . . . ."). As explained above, section 202 of FLPMA does not permit BLM to withdraw lands from operation of the Mining Law through land-use plans. Plaintiffs' argument that BLM's resource-management-planning regulations, 43 C.F.R. § 1610.5-3(a), as well as its 43 C.F.R. subpart 3809 obligation to "prevent unnecessary or undue degradation" of the lands, required compliance with the RMPs, WWP's Mem. at 6–7, is undercut by these limitations on withdrawal through land-use planning.

The authority on which Plaintiffs rely does not support any finding that BLM violated FLPMA or its regulations. This Court's discussion of the 2015 ARMPA in *Western Exploration, LLC v. U.S. Department of the Interior*, 250 F. Supp. 3d 718, 747 (D. Nev. 2017), addressed the lawfulness of BLM's adoption of a "net conservation gain" standard in those RMPs under FLPMA itself, and did not concern approval of any site-specific action. *Id.* That decision therefore has no bearing on whether any of the provisions in the RMPs bind BLM's approval of mining plans of operations which, for the reason set forth above, fall outside the relevant FLPMA requirements. And the court's discussion of the application of land-use plans to plans of operations in the facial challenge to BLM's 43 C.F.R. subpart 3809 regulations, *Mineral Policy Center v. Norton*, 292 F. Supp. 2d 30, 49 (D.D.C. 2003), likewise did not consider whether provisions in land-use plans could be used to reject a plan of operations that otherwise complied with BLM's regulations.

WWP similarly cannot succeed on its argument that BLM was required to amend the Winnemucca RMP before approving the Project or ensure its compliance with that RMP's VRM requirements because, as explained above, decisions under 43 C.F.R. subpart 3809 are not required by FLPMA or BLM's regulations to comply with the management provisions of RMPs.[16] WWP identifies no statute, regulation, or policy requiring such compliance. Furthermore, BLM did not "admit," as Plaintiffs argue, that it was required to amend that RMP before it could approve the plans of operations. The NOI published on January 21, 2020, which informed the public of BLM's intent, at the time, to prepare an RMP amendment "to conform with the visual resource management class-2 designation in the current RMP" never stated that an RMP amendment was required, as Plaintiffs suggest.[17] But Plaintiffs' invocation of BLM's predecisional, deliberative discussions about whether an amendment was necessary[18] is irrelevant because neither FLPMA nor BLM's regulations

---

[16] *See* WWP's Mem. at 19–22.

[17] TPEIS-0126, 85 Fed. Reg. 3413-02, 3414 (AR-017868).

[18] *See* WWP's Mem. at 20–21 (citing TPEIS-0956, TPEIS-0305, TPEIS-1267).

obligated BLM to ensure consistency of the Project with the Winnemucca RMP VRM objectives. BLM ultimately and correctly concluded in its Notice of Availability for the DEIS that "[u]pon further review the BLM has determined than an amendment to the Winnemucca District [RMP] is not necessary."[19] BLM's approval of the Project without amending the Winnemucca RMP is not inconsistent with FLPMA or BLM's regulations. *See S. Fork Band v. U.S. Dep't of Interior*, 643 F. Supp. 2d 1192, 1211 (D. Nev. 2009) (no FLPMA violation when agency "made reasonable attempts to meet the VRM objectives and minimize the visual impacts of the" mining project despite the approved project not fully meeting the relevant visual impact standards), *rev'd on other grounds*, 588 F.3d 718 (9th Cir. 2009); *see also id.* at 725 (declining to "second-guess the agency's weighing of the compliant and noncompliant visual resource areas in light of its experience and expertise").

### 2.     The RMP provisions themselves exempt the Project approval

Plaintiffs further argue that BLM's approval of the Thacker Pass Project was required to comply with specific "binding" sage-grouse protections found in the 2015 ARMPA.[20] Specifically, Plaintiffs invoke a series of management decisions and objectives set out for the protection of sage-grouse and their habitat in the 2015 ARMPA, including Objective SSS 4, MD SSS 1,[21] MD SSS 2, and MD SSS 9a. But even if the Winnemucca RMP and 2015

---

[19] TPEIS-0458, 85 Fed. Reg. 45,651, 45,652 (July 29, 2020) (AR-052896). This is not a "switch" of position because, contrary to Plaintiffs' characterization, BLM never stated that that an RMP amendment was *necessary*—it merely included the possibility in the NOI. And ultimately, such an amendment was not necessary. In any event, Plaintiffs do not develop an argument that any such predecisional "switch" amounts to error—nor could they because, as explained *supra*, FLPMA does not require mining plans to comply with the management provisions of the RMPs.

[20] *See* WWP's Mem. at 7–9.

[21] Though WWP invokes this management decision—which addresses the location of proposed activities—it makes no specific argument about BLM's compliance with it. As BLM explained, however, the Project complied with this provision in light of the fact that "[o]re bodies are in place and not flexible in terms of location" because "LNC has consolidated its proposed facilities at the mine site and limited surface disturbance to the greatest extent possible." TPEIS-0709, FEIS App'x N at N-5 (AR-066088).

ARMPA addressed plans of operations under 43 C.F.R. subpart 3809 *generally*, BLM reasonably concluded, based on their plain language, that these *specific* provisions did not control approval of the plans of operations here. The 2015 ARMPA provides, explicitly, that these specific provisions should be applied "to the extent allowed by law"[22] for locatable mineral operations. As explained above, section 202 of FLPMA does not allow BLM to withdraw lands from operation of the Mining Law through the land-use planning process, 43 U.S.C. § 1712(e)(3), and BLM lacks discretion to impose additional conditions or reject an otherwise approvable plan that does not comply with these RMP provisions, 43 C.F.R. § 3809.411(d)(3). So BLM was not required to apply these provisions where doing so would conflict with this applicable law. As demonstrated below, each individual decision or objective contains a similar carve-out.

First, Plaintiffs contend that BLM improperly "waived" the 2015 ARMPA's 3-percent disturbance cap, set forth in MD SSS 2 because BLM believed that Lithium Nevada had "valid rights" from this restriction.[23] Yet WWP points to nothing in the record where BLM made such a waiver or such a determination. The 2015 ARMPA expressly makes application of the 3 percent disturbance cap "subject to applicable laws and regulations, such as the 1872 Mining Law, as amended"[24] and indicates that BLM would apply the disturbance cap (MD SSS 2.A.2) "to the extent allowed by law," which includes section 202 of FLPMA and BLM's surface-management regulations.[25] BLM thus could not permissibly deny an otherwise-approvable plan solely because the 3 percent disturbance cap had been reached by other land uses because, were it to do so, BLM would effectively withdraw the Project area

---

[22] TPEIS-0298, 2015 ARMPA at 2-30 (AR-037782) (Objective SSS 4 and MDs SSS 1 through 4); *id.* at 2-31 (AR-037783) (mitigation and management best practices).

[23] WWP's Mem. at 9-10, 14.

[24] TPEIS-0298, 2015 ARMPA at 2-7 (AR-037759) (MD SSS 2.A.2).

[25] *Id.* at 2-30 (AR-037782) (MD MR 15) (stating that BLM would, "to the extent allowed by law, apply MDs SSS 1 through SSS 4 when reviewing and analyzing projects and activities proposed in GRSG habitat").

from operation of the Mining Law through the land-use planning process. The 2015 ARMPA also applies noise restrictions only to "discretionary activities" which, as discussed above, does not include authorizations under 43 C.F.R. subpart 3809.[26] The same holds true for Plaintiffs' argument that BLM should have convened a technical team to determine whether the Project could be modified to a "net conservation gain."[27] BLM did not convene such a team because it reasonably concluded that "exceedances of the [disturbance] cap . . . do not preclude a locatable mineral resources project from BLM approval."[28]

Plaintiffs similarly contend that the Project was obligated to comply with 2015 ARMPA's "Required Design Features" found in MD SSS 2, such as "lek buffer distances," "seasonal restrictions to manage surface-disturbing activities," noise limits during the breeding season, and other "management or mitigation actions" based on habitat and population triggers.[29] But as the 2015 ARMPA expressly acknowledged, these restrictions also could only be applied "consistent with applicable law."[30] And BLM acknowledged these limitations, explaining in the FEIS for the Project that "proposed locatable minerals resource

---

[26] TPEIS-0849, 2015 ARMPA App'x E at AR-080692; TPEIS-0298, 2015 ARMPA at 2-9 (AR-037761) (MD SSS 2.F).

[27] TPEIS-0298, 2015 ARMPA at 2-7 (AR-037759) (allowing for convocation of a technical team to determine that the project can be modified to result in a net conservation gain with respect to discretionary activities).

[28] TPEIS-0709, FEIS App'x N at N-5 (AR-066088).

[29] WWP's Mem. at 14–15 (citing MD SSS 2B (mitigation), MD SSS 2D (lek buffer distances), MD SSS 2E (seasonal restrictions), and MD SSS 2F (noise limits). Plaintiffs also cite the 2015 ARMPA's Appendix C, *see* WWP's Mem. at 14, but do not identify any specific RDF from that appendix that they argue BLM should have applied and did not. In any event, those RDFs likewise apply "consistent with applicable law." TPEIS-0849, 2015 ARMPA ROD at C-1, C-3 (AR-080533, AR-080535).

[30] TPEIS-0298, 2015 ARMPA at 2-8 (AR-037760) (MD SSS 2B (mitigation), MD SSS 2C (RDFs), MD SSS 2D (lek buffer-distances), and MD SSS 2E (seasonal restrictions); *see also* TPEIS-0849, 2015 ARMPA ROD at 1-25 (AR-080453) (requiring mitigation and net conservation gain "consistent with applicable law" when "authorizing third-party actions that result in GRSG habitat loss and degradation").

projects" are not subject to or precluded by those provisions of the 2015 ARMPA.[31]

WWP's argument that BLM was required to apply all "RDFs for locatable mineral projects" found in Tables N.3 and N.4 of the 2015 ARMPA[32] meets with the same fate. As with the other RMP provisions WWP has invoked, these RDFs explicitly applied only "consistent with applicable law."[33] As BLM clearly explained in response to a comment from NDOW, it "may not impose timing or operational restrictions directed under the 2015 GRSG ARMPA" on the Thacker Pass Project.[34]

Next, WWP argues—though does not develop its argument—that BLM "was required to, but did not, take additional management and mitigation actions set forth in MD SSS 17 through 24."[35] Those management and mitigation actions come into play when a "trigger" based on vegetation or sage-grouse population is reached. WWP has not demonstrated that BLM was obligated to incorporate these actions into a specific project, such as the Thacker Pass Project approvals.

Finally, WWP argues that BLM was required to ensure net conservation gain of sage-grouse habitat under MD SSS 9a and Objective SSS 4 of the 2015 ARMPA.[36] MD SSS 9a provides that "BLM will consult with the Sagebrush Ecosystem Technical Team (SETT) for application of the 'avoid, minimize, and compensate' mitigation strategy and the Conservation Credit System" to "ensure that a net conservation gain of GRSG habitat is

---

[31] *See* TPEIS-0384, FEIS at 4-45 (AR-045593); TPEIS-0709, FEIS Appendix N at N-5 (AR-066088) (BSU disturbance caps), N-6–N-7 (AR-066089–90) (seasonal restrictions), N-8, N-10 (AR-066091, AR-066093) (noise limits), N-17 (AR-046487) (disturbance).

[32] *Id.* at 15–16.

[33] TPEIS-0849, 2015 ARMPA App'x C at C-3 (AR-80535).

[34] TPEIS-0384, FEIS at R-184 (AR-048171). RDF LOC 1 addresses noise shields and restrictions during the breeding, nesting, brood-rearing, and/or wintering seasons. TPEIS-0709, 2015 ARMPA App'x N at N-15 (AR-066098).

[35] WWP's Mem. at 15.

[36] WWP's Mem. at 14, 16–17 (invoking MD SSS 9a, ARMPA at 2-11 (AR-080949) and Objective SSS 4, ARMPA at 2-6 (AR-080944)).

achieved . . . on all agency-authorized activities."[37] As explained above, BLM's approval of the Project did not require compliance with these management objectives. BLM's approval did, however, require Lithium Nevada to comply with all state laws, including those related to the conservation credit system, as BLM outlined in response to a comment from NDOW, explaining that final approval required Lithium Nevada to "obtain sufficient credits through the Conservation Credit System."[38] BLM further explained that Lithium Nevada was working with the SETT to obtain those credits, but that mitigation under that system "is administered solely by the SETT," and "BLM does not administer the development of credits or debits under" that program "and is not responsible for enforcement of program requirements."[39] And the ROD provided that Lithium Nevada would continue consultation on that front and development of a mitigation plan "consistent with the Nevada Conservation Credit System or other applicable state requirements."[40] Thus while BLM was not obligated to require the Project to comply with these management objectives, its approval does require Lithium Nevada to work with SETT to ensure appropriate mitigation.

**B.    BLM did not assume that Lithium Nevada had "valid rights" because it was not required by FLPMA, BLM's subpart 3809 regulations, or policy**

WWP also contends that BLM erred by allegedly "exempt[ing] the Project from the [2015] ARMPA standards" based on an "assumption" that Lithium Nevada held "valid

---

[37] TPEIS-0298, 2015 ARMPA at 2-11 (AR-037763).

[38] TPEIS-0384, FEIS at R-213 (AR-048200).

[39] TPEIS-0384, FEIS at 4-44–4-45 (AR-045592–93). A statement in one employee's presentation on the conservation credit process, *see* WWP's Mem. at 16 (quoting TPEIS-1073 at AR-095430), does not impose on BLM obligations under a program it does not administer when BLM required Lithium Nevada's compliance with the program.

[40] TPEIS-0452, ROD at 11 (AR-052527). WWP invokes NDOW's comments on the preliminary draft EIS to argue that the compensatory mitigation was also insufficient. *See* WWP's Mem. at 17–19 (citing TPEIS-0307, TPEIS-1114, and TPEIS-1493). But as NDOW acknowledged, "specific mitigation plans are not required to be included within this EIS," and BLM incorporated the suggestion that it note "reference to the policy and State requirements . . . ." TPEIS-0307 at AR-083003. *See also* TPEIS-0384, FEIS at 4-45 (AR-045593) (incorporating suggestion).

rights" under the Mining Law. BLM made no such assumption. And no provision of FLPMA, BLM's surface-management regulations, or BLM policy guidance required it to make a validity determination before approving the Project without application of the RMP provisions that WWP invokes.[41]

First and foremost, nothing in the FEIS or ROD—not even the pages specifically cited by WWP—supports the proposition that BLM assumed that "valid rights" existed, let alone that it based the approval decision on any such assumption.[42] BLM's lone, indirect reference to "existing valid rights" in the FEIS[43] was not repeated in the ROD and, in any event, this assertion alone cannot be construed as an assumption that such rights exist or as a validity determination itself. And while BLM acknowledged that the 2015 ARMPA's "Required Design Features" and other "management or mitigation actions" based on sage-grouse habitat and population triggers may apply to approvals "consistent with valid and existing rights and applicable law in authorizing third-party actions,"[44] the applicable law— section 202 of FLPMA and BLM's regulations—did not authorize BLM to apply such requirements and supports the agency's ultimate conclusion that "locatable minerals

---

[41] WWP's Mem. at 9–14. To the extent that WWP seeks a finding from the Court regarding the validity of the mining claims, such a finding would circumvent constitutional due process protections. *See Collord*, 154 F.3d at 936–37 (due process required agency hearing before invalidity determination). Such a request would also constitute an impermissible collateral attack on the validity of the mining claims, which WWP lacks standing to assert because it falls outside the Mining Law's zone of interests. *See Havasupai Tribe v. Provencio*, 906 F.3d 1155, 1166 (9th Cir. 2018).

[42] *See* WWP's Mem. at 9–10, 14–16 (citing TPEIS-0384, FEIS at 4-45 (AR-045593); TPEIS-0709, FEIS App'x N at N-3–N-6, N-9, N-11, N-15 and Tables N.3 and N.4 (AR-066086–89, AR-066092, AR-066094–98)).

[43] TPEIS-0384, FEIS at 4-45 (AR-045593) ("any exceedances of the [disturbance] cap" set by the 2015 ARMPA "do not preclude a locatable mineral resources project with existing valid rights from BLM approval").

[44] TPEIS-0298, 2015 ARMPA at 2-8–2-9 (AR-037760–61).

resources project[s]" are not subject to such requirements.[45] Nothing in the record supports WWP's argument that BLM based this conclusion, instead, on any assumption about the existence of valid rights with respect to some of Lithium Nevada's mining claims.[46]

And there was no legal reason that BLM would *need* to make an assumption of "valid rights," let alone a formal determination here. Plaintiffs' argument that Interior was required to have determined "valid rights" before allegedly exempting the Project from the 2015 ARMPA provisions identifies nothing in FLPMA or BLM's regulations containing such a requirement.[47] And nothing in those authorities, or in the cases on which Plaintiffs rely in their summary judgment brief, support their bare contention that BLM should have made a determination of "valid rights" in the "lands underlying the permanent waste rock and tailings dump" before approving the mining plan of operations.[48]

First, nothing in FLPMA requires BLM to determine mining claim validity before authorizing surface use under 43 C.F.R. subpart 3809. At the time FLPMA was enacted, Congress was careful to respect the Mining Law, expressly amending the existing framework in four ways. *See* 43 U.S.C. § 1732(b). None of the four sections of FLPMA listed in § 1732(b)

---

[45] *See* TPEIS-0384, FEIS at 4-45 (AR-045593); TPEIS-0709, FEIS Appendix N at N-5 (AR-066088) (BSU disturbance caps), N-6–N-7 (AR-066089–90) (seasonal restrictions), N-8, N-10 (AR-066091, AR-066093) (noise limits), N-17 (AR-046487) (disturbance).

[46] *E.g.*, TPEIS-0709, FEIS App'x N at N-6 (AR-066089); *see also id.* at N-9 (AR-066092). BLM's explanations at Plaintiffs' other citations contain no reference at all to "valid existing rights." *Id.* at N-3–N-6, N-9, N-11, N-15, N-25 and Tables N.3 and N.4 (AR-066086–89, AR-066092, AR-066094–98, AR-066108). WWP also cites a form concerning proposed activities in sage-grouse habitat management areas, *see* WWP's Mem. at 10, but that form nowhere indicates a validity determination was made. Rather, the "valid existing rights" as defined on the form included other existing authorized uses—such as Lithium Nevada's Kings Valley Lithium Exploration Project, approved in 2009.

[47] WWP's Mem. at 10–13.

[48] Plaintiffs appear to appear to assert the necessity of some validity determination only with respect to the elements of the plan addressing the permanent waste rock and tailings dump. By contrast, they admit that Lithium Nevada has found "valuable lithium in the mine pit" itself. WWP's Mem. at 12. Plaintiffs also do not appear to challenge, on this basis, the *exploration* plan of operations, which the ROD also approved and which does not include a waste rock or tailings dump. *See* TPEIS-0410, Exploration Plan of Operations.

authorizes or requires BLM to verify mining claim validity before authorizing surface use related to mining operations on open lands, nor does WWP cite to anything in the text of FLPMA containing such requirement.

Second, BLM's surface-management regulations at 43 C.F.R. subpart 3809 similarly impose no requirement to determine mining claim validity before approving a plan of operations on open lands, such as the lands at issue here. *See Great Basin Res. Watch & W. Shoshone Def. Proj.*, 182 IBLA 55, 67–68 (2012) (BLM need not determine validity of claim before approving a plan of operations); *Great Basin Res. Watch v. U.S. Dep't of the Interior*, No. 3:13–cv–00078–RCJ–VPC, 2014 WL 3696661, at *8 (D. Nev. July 23, 2014) ("Because the land at issue was not withdrawn from entry under the Mining Law, BLM was not required to assess the validity of [the proponent's] mining claim before approving the Project."), *aff'd in part, rev'd in part and remanded sub nom. Great Basin Res. Watch v. BLM*, 844 F.3d 1095 (9th Cir. 2016). This is because, as BLM made clear in the preamble to its original subpart 3809 regulations, surface use authorization under those regulations does not depend on the existence of a mining claim, valid or otherwise, except on lands that are withdrawn from the operation of the Mining Law. 43 C.F.R. § 3809.100; 45 Fed. Reg. 78,902, 78,903 (Nov. 26, 1980) ("One does not need a mining claim to prospect for or even mine on unappropriated Federal lands."); *see also* 65 Fed. Reg. 69,998, 70,013 (Nov. 21, 2000) ("The inclusion of unclaimed land within an area of operations subject to these regulations is carried over from the original November 26, 1980 rulemaking."). The fact that BLM has repeatedly framed the authority for and scope of these regulations in terms of the provision of the Mining Law making the lands "free and open," rather than the later mining claim provisions, further supports the fact that application of BLM's subpart 3809 regulations do not depend on the existence of a mining claim. 43 C.F.R. subpart 3809 ("Authority" statement); 41 Fed. Reg. 53,428 (Dec. 6, 1976) (preamble to proposed rule stating that the regulations are issued under 30 U.S.C. § 22). An interpretation of BLM's current regulations requiring a validity examination before authorization of surface use thus finds no basis in their text.

Finally, BLM's policy guidance is consistent with this statutory and regulatory framework. For example, BLM's Surface Management Handbook, H-3809 provides that "a validity examination is not required to process a Plan of Operations and the NEPA analysis does not need to address mining claim status or validity" when the land at issue "is open to entry under the Mining Law . . . ." [49] In light of the applicable statutory and regulatory framework, and the agency's policy consistent therewith, BLM appropriately did not investigate mining claim validity prior to issuing the decision challenged here, let alone purport to base that decision on the existence of a valid mining claim.

Nearly all of the cases on which WWP relies in its summary judgment brief for the proposition that approval of a plan of operations requires a determination of validity predate FLPMA and BLM's promulgation of the subpart 3809 regulations, and none address the requirements for obtaining surface use authorization under part 3809—as even WWP acknowledges.[50] *See Locke*, 471 U.S. at 104–07 (interpreting FLPMA's mining claim recordation requirements); *United States v. Coleman,* 390 U.S. 599, 602–05 (1968) (addressing the standard for obtaining a patent under the Mining Law); *Cole v. Ralph*, 252 U.S. 286, 294–97 (1920) (resolving adverse claim proceedings in response to a patent application under the Mining Law); *Union Oil of Cal. v. Smith*, 249 U.S. 337, 349 (1919) (acknowledging *pedis possessio* rights in claims as between private locators); *Belk v. Meagher*, 104 U.S. 279, 283–85 (1881) (resolving rival mining claimant dispute); *Freeman v. U.S. Dep't of Interior*, 37 F. Supp. 3d 313, 319–21 (D.D.C. 2014) (reviewing Interior's validity determination made in the context of a takings claim); *Lara v. Sec'y of the Interior*, 820 F.2d 1535, 1537–39 (9th Cir. 1987) (reviewing Interior's validity determination of mining claim on withdrawn National Forest System lands); *Davis*, 329 F.2d at 845–46 (reviewing Interior's authority to determine mining claim validity).

---

[49] TPEIS-0714, BLM Surface Management Handbook, H-3809-1 at 4-40 (AR-067896).

[50] WWP's Mem. at 11 (acknowledging that cases apply to "any *enduring* occupancy rights to a mining claim") (emphasis added).

WWP's invocation of the Surface Resources Act is equally irrelevant.[51] To the extent WWP argues that BLM's decision was infirm because the agency must "determine whether the lands to be used[] . . . contain . . . common variety minerals" before approving a plan of operations, BLM's regulations impose no such requirement. The regulations require such an examination only where the minerals proposed to be removed are potentially "common varieties." 43 C.F.R. § 3809.101(a). Lithium Nevada was clearly not proposing to remove common variety minerals, so no such "common variety" determination was necessary. Moreover, WWP can cite nothing in the record showing that BLM's decision under subpart 3809 authorized Lithium Nevada to remove "common variety" minerals or otherwise use "common variety" minerals, except as in connection with its approved mining operations. *See* 65 Fed. Reg. at 70,027 ("[I]f use of the common variety mineral material is reasonably incident to an operation authorized under subpart 3809, the operator may use that material on the mining claim at no charge, if that removal is a part of the plan of operations that is approved by BLM.").

Crucially, Plaintiffs' sole cited case that addresses the relationship between mining claim validity and surface use authorization did not involve BLM's regulations, "public lands," or FLPMA. *See Ctr. for Biol. Diversity v. U.S. Fish & Wildlife Serv.*, 409 F. Supp. 3d 738, 758 (D. Ariz. 2019), *aff'd*, No. 19-17585, 2022 WL 1495007 (9th Cir. May 12, 2022)). That case instead involved a challenge to an agency decision under a different regulatory framework—the Forest Service's regulations at 36 C.F.R. Part 228 Subpart A—governing mining operations conducted on National Forest System lands reserved from the public domain and promulgated under the Organic Administration Act of 1897—not BLM's subpart 3809 regulations governing surface management on public lands and promulgated under FLPMA. *Id.* at 747.

That the Ninth Circuit Court of Appeals recently affirmed that decision does not alter the outcome here, either, because the cases are factually distinguishable. First, *Center for*

---

[51] WWP's Mem. at 12–14.

*Biological Diversity* addressed the Forest Service's approvals under its own regulations on National Forest lands. The Ninth Circuit ultimately remanded that action to the Forest Service to consider the application of its Part 228A regulations. *Ctr. for Biol. Diversity*, 2022 WL 1495007 at *11. Here, BLM applied its subpart 3809 regulations which, as discussed above, require no validity examination in this context and apply without regard to whether a mining claim exists. As also discussed above, they further limit BLM's discretion to impose additional conditions on or reject an otherwise approvable plan that does not comply with the RMP provisions that WWP invokes. 43 C.F.R. § 3809.411(d)(3). *Center for Biological Diversity* is also distinguishable because the court there determined that it was undisputed that no valuable minerals were under the storage locations. 2022 WL 1495007 at *5. Even assuming that the presence of such minerals was an appropriate consideration in this case, there is no such undisputed gap in the record here. WWP concedes that lithium exists in the pit itself and the record suggests its appearance throughout the Thacker Pass basin.[52] BLM simply made no assumption or determination of mining claim validity because, as explained above, it was not required to under FLPMA or the subpart 3809 regulations.

### C.   BLM's approval does not violate water- and air-quality standards or protections for listed species

Plaintiffs next claim that BLM violated FLPMA because the Project would violate relevant air- or water-quality standards, or harm sensitive species, and thus cause "unnecessary or undue degradation" as defined in BLM's regulations at 43 C.F.R. subpart 3809. But Plaintiffs cannot demonstrate that the Project would violate the cited standards—because it would not.

### 1.   Water Quality

Plaintiffs claim that release of antimony into the groundwater would exceed water quality standards and, therefore, that BLM's approval of the plans of operations violates FLPMA's mandate to prevent unnecessary or undue degradation as well as BLM's

---

[52] *E.g.*, TPEIS-0702, FEIS App'x G at AR-065693.

regulations at 43 C.F.R. § 3809.420(b)(5).[53] As discussed above, BLM defines "unnecessary or undue degradation," in part, as "conditions, activities, or practices" that fail to comply with the "performance standards in [43 C.F.R.] § 3809.420," or with "other Federal and state laws related to environmental protection." *Id.* § 3809.5. And 43 C.F.R. § 3809.420(b) requires "[a]ll operators" to "comply with applicable Federal and state water quality standards." *Id.* § 3809.420(b)(5). These regulations and FLPMA have not been violated because the Project approval simply does not authorize Lithium Nevada to violate relevant Nevada law or regulations.

Based on BLM's comment response to the effect that "pore water in [the mine pit] backfill will exceed MCLs [Maximum Contaminant Levels] for longer than 20 pore volumes," Plaintiffs charge that release of antimony into the groundwater would surpass water quality standards and, thus, approval of the Project violates BLM's obligation to prevent unnecessary or undue degradation under FLPMA.[54] But Plaintiffs identify no provision of Nevada law to the effect that a potential *future* exceedance of a water-quality standard is a per se violation of state law.[55] And, in any event, BLM reasonably concluded that proposed operations would not violate applicable water-quality standards.

Specifically, Plaintiffs' complaint that groundwater from the mine pit "would exceed standards" fails to disclose that, in fact, antimony is the *only* constituent that BLM might expect to find in the groundwater of the pit backfill at levels above any regulatory standard as a result of the Project, and then only above the *drinking water* standard for antimony—not the ambient water quality standard.[56] But the pit area (whether backfilled or a lake) is not

---

[53] WWP's Mem. at 36–38.

[54] WWP's Mem. at 36–37 (quoting TPEIS-0384, FEIS App'x R at R-121 (AR-048108)).

[55] Nevada's specific pit-lake regulations do not require pit lakes to meet Nevada water quality standards. Rather pit lakes in Nevada are regulated on a case-by-case basis to prevent degradation of surrounding groundwater or adverse effects on the health of human, terrestrial, or avian life. Nev. Admin. Code § 445A.429(3) (2020).

[56] TPEIS-0384, FEIS at 4-13 (AR-045561).

intended as a source of drinking water. And the hydrogeologic modeling demonstrated that, even after 300 years, groundwater from the pit area would not leave the mine footprint or reach any existing water wells (either human or stock water).[57] Because the antimony levels would not exceed applicable ambient water quality standards,[58] BLM reasonably concluded that approving the Project would not lead to unnecessary or undue degradation.

In an effort to undermine this analysis, WWP raises a comment from the Nevada Department of Environmental Protection (NDEP), acknowledging the models showing that "elevated antimony concentrations will occur outside the proposed final pit shell," but ignores the conclusion that such concentrations "are expected to remain within the approved Thacker Pass project boundary."[59] NDEP indicated that it would require Lithium Nevada to place a monitoring well and encourage source mitigation, but did not indicate that the *potential* for elevated antimony levels within the Project area is a per se violation of Nevada's regulations—only that it would need to be watched and mitigated.[60] And BLM contemplated that Lithium Nevada would, in fact, monitor the water quality "downgradient of the backfilled pit," as well as apply mitigation options described in Appendix P "in the event that antimony concentrations exceeded the Nevada Primary Drinking Water Standard" outside of the pit.[61] WWP also invokes a comment on the hydrological impacts report to argue that all of the three model scenarios "*could* be considered to cause unnecessary or undue degradation,"[62] but this document alone does not establish that they *do*.

---

[57] *Id.* at 4-14 (AR-045562).

[58] *Id.* at 4-14, 4-24–4-27 (AR-045562, AR-045572–75).

[59] TPEIS-1494, October 29, 2020 NDEP letter to LNC at AR108868. Through its NEPA analysis, BLM discloses a project's impacts and potential mitigation options. But it is NDEP, not BLM, that regulates water quality in Nevada, and BLM requires operators to comply with NDEP's regulations and permitting requirements.

[60] *Id.*

[61] TPEIS-0384, FEIS at 4-26 (AR-045574).

[62] TPEIS-1061, Email and Comments from Dan Erbes, January 31, 2020 at AR-095381 (emphasis added).

Finally, as explained *infra* Part II.D, Plaintiffs have not established any violation of FLPMA in connection with the evaluated mitigation measures[63] because the FEIS adequately considered mitigation measures.

### 2.   Air Quality

Finally, Plaintiffs claim that BLM violated FLPMA by failing to ensure the Project complied with air quality standards.[64] Operators must "comply with applicable Federal and state air quality standards." 43 C.F.R. § 3809.420(b)(4). The FEIS here concluded that "the project would not have a substantial effect on air quality," based on an analysis that demonstrates "that the estimated maximum ambient concentrations for all pollutants and averaging periods are less than the applicable NAAQS and Nevada Standards."[65] BLM is entitled to take into account the mitigating effect of Clean Air Act regulation by NDEP and its findings that the National Ambient Air Quality Standards (NAAQS) would not be exceeded. *See Edwardsen v. U.S. Dep't of the Interior*, 268 F.3d 781, 789 (9th Cir. 2001) (upholding agency's conclusion that no significant impacts to air quality would occur based on finding that NAAQS would not be exceeded). Plaintiffs have not identified any other air-quality standards with which they contend the Project fails to comply—they only challenge mitigation measures which, as explained *infra* Part II.D, were sufficiently considered. Absent an alleged violation of "Federal and state air quality standards" or "other Federal and state laws related to environmental protection," Plaintiffs cannot establish that the Project's emissions constitute "unnecessary or undue degradation" in violation of FLPMA.

### 3.   Sensitive Species

Finally, WWP argues that, because BLM did not comply with the RMPs' protections for the greater sage grouse, BLM also did not satisfy the standards for preventing degradation

---

[63] *See* WWP's Mem. at 38.

[64] *Id.* at 38–39.

[65] TPEIS-0384, FEIS at 4-80 (AR-045628); *see also* TPEIS-0706, FEIS App'x K at 24 (AR-065847) (Table 16).

to a sensitive species.[66] Under its surface-management regulations, when approving a mining plan, BLM may only require mitigation "to prevent adverse impacts to threatened or endangered species, and their habitat which may be affected by operations." 43 C.F.R. § 3809.420(b)(7). The greater sage grouse has not been listed as a "threatened or endangered species," and Plaintiffs have not identified any listed threatened or engaged species for which BLM failed to require mitigation.

The only authority Plaintiffs cite in support of their position is a brief from *Western Exploration v. U.S. Department of the Interior*. As Federal Defendants explained in that brief, the net conservation gain mitigation standard for sage grouse—a special status species—in the 2015 ARMPA complied with BLM's policy for special status species and exceeded FLPMA's unnecessary or undue degradation standard.[67] But FLPMA's standard does not require BLM to prevent *all* degradation, only *unnecessary* or *undue* degradation. *See Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 78 (D.C. Cir. 2011). And "by following FLPMA's multiple-use and sustained-yield mandates, the Bureau will often, if not always, fulfill FLPMA's requirement that it prevent environmental degradation because the former principles already require the Bureau to balance potentially degrading uses—e.g., mineral extraction, grazing, or timber harvesting—with conservation of the natural environment." *Id.* at 76. Here, BLM did balance the potentially degrading use—mineral extraction—with conservation of the natural environment. The fact that BLM did not also apply *additional* protections not required under the applicable performance standard in its subpart 3809 regulations does not render its action a violation of FLPMA.

## II.    BLM's environmental analysis complied with NEPA

Next, Plaintiffs contend that BLM's environmental analyses did not satisfy NEPA. Specifically, Plaintiffs argue that: (1) BLM's wildlife analysis failed to disclose baseline data

---

[66] WWP's Mem. at 35–36.

[67] *See* Pls.' Mot. for Prelim. Inj. Ex. 16 at 26-27, WWP v. Dep' of Interior, No. 21-cv-103, ECF No. 23-16.

about three species; (2) BLM failed to adequately analyze the impacts of the Project on wildlife; and (3) BLM's analysis of cumulative impacts was insufficiently detailed. But BLM's disclosure of baseline data, discussion of the Project's impacts on wildlife, and discussion of cumulative impacts satisfy requirements of NEPA and its regulations. Finally, Plaintiffs challenge the sufficiency of BLM's consideration of mitigation measures and its conclusions that the Project would comply with applicable air-quality standards. But BLM concluded that the Project would comply with applicable air-quality standards, such that mitigation measures were not required, and reasonably analyzed mitigation measures for uncertain water quantity and quality impacts that may occur decades in the future.

### A.    BLM adequately described baseline conditions

An EIS must "succinctly describe the environment of the area(s) to be affected or created by the alternatives under consideration" such that "[t]he descriptions shall be no longer than is necessary to understand the effects of the alternatives." 40 C.F.R. § 1502.15. Accordingly, in order to assess the impact of the Project on wildlife, BLM accounted for the baseline conditions of each species affected. *See Half Moon Bay*, 857 F.2d at 510 (effects determination requires baseline conditions). The Court's review of such technical determinations is "at its most deferential." *Balt. Gas & Elec.*, 462 U.S. at 103. BLM's analysis of wildlife impacts in the FEIS, including a discussion of the baseline conditions and the affected environment for greater sage-grouse, pronghorn, and springsnails, fully satisfies this standard and complies with NEPA.

### 1.    Sage-grouse baseline conditions

The FEIS includes substantial baseline information related to greater sage grouse and the potential effects of the Project thereon, including identification of an active lek in the vicinity of the Project, as well as acknowledged field surveys documenting greater sage grouse within the Project area.[68] Contrary to Plaintiffs' assertion that "there are no details

---

[68] TPEIS-0384, FEIS at 4-42 (AR-045590); TPEIS-0702, FEIS App'x G at G-18 (AR-065647).

about sage-grouse use of the area" to support BLM's determination that potential for occurrence for greater sage-grouse was "High/confirmed-observed in surveys,"[69] BLM's descriptions of the affected environment contain ample information to support the agency's conclusion. For example, Appendix G of the FEIS specifies that "sage-grouse activity has been documented within the Project area by NDOW, who reported 63 tracking locations generated by at least 30 radio-marked birds," though those tracking locations were scattered throughout the entire Nevada portion of the Montana Mountains, such that "[d]uring baseline surveys," only "one sage-grouse was observed in the Project area."[70] It also described other sampling efforts, including "surveying 113 transects in 15 sample units across approximately 49,165 acres," and discussed suitable habitat (although considerably modified by wildfire and invasive annual grasses), as well as signs of use by greater sage grouse.[71] The FEIS also included an appendix devoted entirely to reviewing, among other things, the existing conditions for greater sage grouse.[72] Plaintiffs have simply offered no authority to support their proposition that "BLM fails to provide sufficient information to assess impacts" on greater sage grouse.[73]

### 2.      Pronghorn baseline conditions

The FEIS likewise provided ample disclosure with respect to baseline conditions of pronghorn habitat and movement corridors in the Project area.[74] For example, the FEIS

---

[69] WWP's Mem. at 24–25 (citing TPEIS-0384, FEIS at H-9 (AR-046155).

[70] TPEIS-0702, FEIS App'x G at G-18 (AR-065647).

[71] *Id.*

[72] *See* TPEIS-0709, 2015 ARMPA App'x N at N-17 (AR-066100) ("Existing disturbance within [the project scale study] area include 172 acres of roads, 2,335 acres of mining disturbance, 109 acres of utility powerlines, and 726 acres of other disturbance for a total of 3,343 acres" of existing surface disturbance."); *id.* (observing that "[s]easonal GRSG habitat within the Project area has been identified by" NDOW).

[73] WWP's Mem. at 25.

[74] TPEIS-0384, FEIS at 4-38 (AR-045586); TPEIS-0696, FEIS App'x A Figure 4.5-7 (AR-065508).

---

noted that "[in] northern Nevada, salt desert shrub communities are often used as a winter range" for pronghorn, and that the population of pronghorn in NDOW's Hunt Unit 31 has "remained stable, though the rest of the hunt units [in the area] have experienced a slight decline in populations compared to previous years."[75] The FEIS also discussed pronghorn range and use of the Project area.[76] Though Plaintiffs raise concerns about the affected amount of pronghorn winter range,[77] the FEIS accounted for that, observing that that the "[m]apped pronghorn antelope winter range distribution within the Project area" constituted a mere 1.26% of the "total winter range mapped distribution within" the hunt unit at issue.[78]

The FEIS also clearly established baseline information about pronghorn movement corridors, identifying and mapping two movement corridors and discussing how both "facilitate access between limited use and winter range habitat to the south of the Project area and winter range, summer range, and year-round habitat range to the north of the Project area."[79] The FEIS also established a baseline for recreational hunting for pronghorn, stating that in 2018 there were 191 hunting tags with a 50 percent harvest rate.[80] Additionally, the baseline pronghorn evaluation used NDOW mapping of pronghorn habitat to establish that, under Alternatives A and B, the Project would impact 427 acres of summer habitat and

---

[75] TPEIS-0702, FEIS App'x G at G-14 (AR-065643).

[76] *Id.* (noting "limited use habitat mapped in the Project area, which may be used by pronghorn throughout the year depending on forage availability and conditions" and that "[w]inter range, summer range, limited use range, and year-round range are all found within a four-mile buffer.").

[77] WWP's Mem. at 25.

[78] TPEIS-0384, FEIS at 4-38 (AR-045586); *see also* TPEIS-0702, FEIS App'x G at G-13–G-14 (AR-06542–43).

[79] TPEIS-0702, FEIS App'x G at G-14 (AR-065643). And while NDOW's comment on the preliminary draft EIS did acknowledge that loss of this amount of acreage of winter habitat would "be a significant loss," as WWP observes, WWP's Mem. at 25 (quoting TPEIS-1493 at AR-108856), NDOW merely recommended that BLM "indicate the percent of winter range within the Project Area and disturbed in relation to winter range available" in the hunt unit. TPEIS-1493 at AR-108856. As explained above, BLM did just that.

[80] TPEIS-0702, FEIS App'x G at G-50 (AR-065679).

4,960 acres of winter habitat.[81] As with the greater sage grouse, Plaintiffs' assertions that BLM's discussion of the baseline conditions for pronghorn provided "[n]o data or analysis" for the Project's impacts on pronghorn are unfounded.

### 3.   Springsnails baseline conditions

Finally, Plaintiffs contend that the FEIS failed to provide "clear information" regarding baseline conditions within the Project area for two species of springsnails.[82] Most of Plaintiffs' assertions center on the Kings River pyrg and Plaintiffs' assertion that BLM's analysis overlooked "the Kings River pyrg's high risk of extinction."[83] But the record reflects otherwise. The FEIS discusses BLM's survey findings for 56 sites within the Project area and a 20-mile radius.[84] Although both the Kings River pyrg and turban pebble snail were detected during baseline surveys within the survey area, the FEIS makes clear that these springsnails were not detected within the direct footprint of the Project or in any area likely to be adversely affected by the Project.[85] BLM's disclosure of the baseline conditions for springsnails thus more than satisfied the applicable standard.

### B.   BLM analyzed impacts to wildlife

After establishing baseline conditions, BLM then conducted a robust analysis of the

---

[81] *See id.* at G-14 (AR-065643).

[82] WWP's Mem. at 25–26.

[83] *Id.* at 25.

[84] TPEIS-0702, FEIS App'x G at G-12 (AR-065641) (noting the collection of springsnails common to the region from some of the seeps, springs, and wetlands around the Project area); *id.* at G-17 (AR-065646) (noting that of the potentially suitable habitat at 29 springs in the project area, Kings River pyrg and turban pebblesnail were collected).

[85] *See* TPEIS-0702, FEIS App'x G at 129 of 133 (AR-065754); TPEIS-0384, FEIS at 4-10 and 4-48 (AR-045558, AR-045596) (noting that SP-001 and SP-003 were "determined to be ephemeral, or seasonal, and no springsnails occur in these springs"); *id.* at 4-49–4-50 (AR-045597–98) (analysis of noise impacts under Alternative C, noting that no springsnails were identified at the SP-059 survey location); *id.* at 4-55 (AR-0455603) (analysis of water quality under Alternative A, noting that the proposed action would directly affect SP-001 and that "no springsnails occur in these springs"); TPEIS-0696, FEIS App'x A at Figure 4.3-8 (AR-065488) (showing locations of described springs); TPEIS-0703, FEIS App'x H at H-27 (AR-065789) (stating that "[n]o springsnails were detected" at the four sites surveyed).

impacts of the Project on wildlife. The FEIS contains a discussion of the anticipated impacts of each alternative on wildlife, both terrestrial and aquatic, as well as special status wildlife species such as sage grouse.[86] Plaintiffs challenge only a narrow portion of that analysis, contending that BLM failed to disclose how the Project's impacts on water resources would impact wildlife and arguing that BLM's discussion of the Project's impacts on "big game," such as pronghorn, was insufficient.[87] BLM's disclosures and analyses on these fronts satisfied NEPA because the EIS "contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences" to these resources. *Half Moon Bay*, 857 F.2d at 508 (citation omitted) (cautioning courts not the "flyspeck" EISes).

**Water resources**. First, BLM did analyze the impacts of effects of the Project on aquatic habitat, as well as on wildlife species. It analyzed the effect of the Project on groundwater levels and the springs and streams of the area.[88] In doing so, it concluded that "mine related drawdown is not expected to result in a measurable effect to flows in the perennial stream reaches in the Project," and that that while ephemeral stock pond would be directly affected, the other two ephemeral springs would not.[89] It acknowledged those conclusions in discussing the impact of the Project on wildlife known to use those areas, including migratory birds, bats, the Lahontan Cutthroat Trout, amphibians, and springsnails.[90] WWP's reliance on NDOW's comments on the Wildlife Impact Assessment and preliminary draft EIS does not alter the sufficiency of this analysis.[91] In subsequently

---

[86] TPEIS-0384, FEIS at 4-33–4-66 (AR-045581–614). *See also* TPEIS-0702, FEIS App'x G at G-12–G-19 (AR-065641–49).

[87] WWP's Mem. at 26–29.

[88] *See* TPEIS-0384, FEIS at 4-7–4-11 (AR-045556–59)

[89] *Id.* at 4-9–4-10 (AR-045557–58).

[90] *Id.* at 4-36–4-37 (birds), 4-46 (bats), 4-47 (LCT), 4-48 (amphibians and springsnails) (AR-045584–85, AR-045595–96).

[91] WWP's Mem. at 26–27 (quoting TPEIS-1114 at AR097080 and AR097082–83, TPEIS-1493 at AR-108853).

commenting on the draft EIS, NDOW indicated that "many of [its] previous comments" concerning the impacts to wildlife, ground, and surface waters "have been addressed . . . ."[92] NDOW acknowledged that "impacts to groundwater and surface water resources . . . have limited effect on perennial streams and springs," and "appreciat[ed] [BLM's] "inclusion of [a] 1-mile buffer to account for" uncertainty in the hydrological models.[93] Ultimately, NDOW attributed a higher level of impact to wildlife from the results of the hydrological modeling than BLM's hydrologists and biologists believed was warranted. But that does not undercut the fact that BLM took a "hard look" under NEPA when it considered and addressed those concerns, and its determinations in this area of its expertise are entitled to deference. *See Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989, 993 (9th Cir. 2004).

The FEIS did not need to further address indirect impacts to springnails or the Kings River pyrg as WWP argues[94] because, as explained *supra*, these springnails were not detected in any area likely to be adversely affected by the Project. Similarly, BLM's analysis of impacts on wildlife need not have further addressed changes to vegetation from drawdown in light of BLM's conclusions that drawdown would not "result in measurable effects" and, as BLM further concluded, "[r]iparian vegetation . . . is extremely minimal or lacking within the Project area . . . ."[95] Finally, the hydrologic models did not predict substantive loss of springs or seeps in the uplands of the Montana Mountains,[96] so BLM did not err—as Plaintiffs contend[97]—by not further discussing the impacts of such loss on sage grouse.

**Big game.** BLM also analyzed the impacts of the Project on big game, including pronghorn. BLM's consideration of those impacts it not limited to the single, general

---

[92] *Id.* at AR-067770.

[93] *Id.* at AR-067771.

[94] WWP's Mem. at 28.

[95] TPEIS-0384, FEIS at 4-48 (AR-045596).

[96] TPEIS-0384, FEIS at 4-8–4-11 (AR-045556–59); TPEIS-0711, FEIS App'x P Piteau 2020a (AR-046156–7782).

[97] WWP's Mem. at 27.

statement that WWP cites.[98] Rather, after establishing baselines, BLM concluded that the Project would cause a loss of 4,960 acres of pronghorn winter range and would impact two pronghorn movement corridors in a way that may "prohibit[ ] or impede[ ] movement between seasonal habitats."[99] And as with the impacts on water resources, BLM considered NDOW's comments on the Wildlife Impact Assessment and preliminary draft EIS, which WWP invokes in this context as well.[100] In commenting on the Draft EIS, NDOW acknowledged that BLM "incorporate[ed] [its] previous comments regarding direct and indirect impacts to . . . pronghorn[ ] and their habitats within and adjacent to the project," such that it considered the draft's "disclosure of these effects" to be "a much more accurate representation" of those impacts.[101]

### C.   BLM analyzed cumulative impacts

Plaintiffs next challenge BLM's cumulative impacts analysis. Under the applicable regulations, BLM's analysis was required to account for "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7. Plaintiffs contend that BLM did not "adequately analyze the cumulative impacts from the other proposed activities" within the area, but they identify only a single "other proposed activities" that BLM allegedly did not address—the McDermitt lithium-drilling project—and otherwise contend that BLM "improperly truncates its analysis for affected wildlife" at the Oregon border.[102]

As an initial matter, Plaintiffs did not raise their concerns about effects of the McDermitt lithium-drilling project or about the boundary of the cumulative effects study

---

[98] *See id.* at 28.

[99] TPEIS-0384, FEIS at 4-38 (AR-045586).

[100] WWP's Mem. at 28–29 (quoting TPEIS-1114 at AR097066, TPEIS-1493 at AR- 108859).

[101] TPEIS-0713, FEIS App'x R at AR-067778.

[102] WWP's Mem. at 30–31.

areas for greater sage-grouse or "other wildlife"[103] during the comment process. Having failed to put BLM on notice during their participation in the administrative proceedings that they were concerned about these issues, Plaintiffs have waived their opportunity to raise them now. *See Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764 (2004) (objections not raised during the public comment process afforded by NEPA are "forfeited" on judicial review); *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 553–54 (1978).

Even were Plaintiffs' challenges not waived, BLM's cumulative-impacts analysis fully complied with the applicable requirements under NEPA. In analyzing cumulative effects, "an agency must take a hard look at all actions that may combine with the action under consideration to affect the environment." *Great Basin Res. Watch v. BLM*, 844 F.3d 1095, 1104 (9th Cir. 2016) (quoting *Te–Moak Tribe of W. Shoshone v. U.S. Dep't of Interior*, 608 F.3d 592, 603 (9th Cir. 2010) (internal quotations omitted)). A cumulative impact was defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1378 (9th Cir. 1998); 40 C.F.R. § 1508.7. A "reasonably foreseeable" action, for which cumulative impacts must be analyzed, included "proposed actions." *Lands Council v. Powell*, 379 F.3d 738, 746 (9th Cir. 2004) (citation omitted), *amended and superseded on other grounds*, 395 F.3d 1019 (9th Cir. 2005).

BLM took the requisite hard look here. Chapter Five of the FEIS contains a comprehensive analysis of the cumulative impacts of the Project.[104] Contrary to Plaintiff' assertion, in conducting this analysis, BLM did not "simply list[ ]" other relevant actions and

---

[103] Indeed, none of the comments raised these concerns. *See* TPEIS-0713, FEIS App'x R. Plaintiffs invoke NDOW's comment on the preliminary draft EIS indicating that it was "unclear why Hunt Unit 031 [was] used as the area to reference proportion of habitat loss," WWP's Mem. at 31 (quoting TPEIS-1114 at AR097079), but that comment did not raise the concerns that Plaintiffs now press. In any event, the geographic scope of an agency's analysis is committed to the agency's discretion and thus is entitled to deference. *See Prairie Band Pottawatomie Nation v. Fed. Highway Admin.*, 684 F.3d 1002, 1010–11 (10th Cir. 2012).

[104] TPEIS-0384, FEIS at 5-1–5-20 (AR-045671–90).

their acreage without any further analysis.[105] Rather, BLM followed three steps in considering cumulative effects. First, BLM identified, described, and mapped the cumulative effects study areas for each resource.[106] Next it identified past, present and reasonably foreseeable future actions, including commercial/public and mining operations with disturbed areas, and over 22,000 acres of disturbance from wildfires, along with acreage estimates.[107] BLM then described and quantified (where possible) the impacts of those other projects in its detailed analyses of the Project's cumulative impacts on at least 20 resources.[108] This satisfied BLM's obligations to conduct a cumulative-impact analysis. *See Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d 852, 864 (D.C. Cir. 2006) (quoting *Grand Canyon Tr. v. F.A.A.*, 290 F.3d 339, 345 (D.C. Cir. 2002)) (listing elements of a "meaningful cumulative impact analysis"). With the exception of the McDermitt project, which was both waived and outside the geographic scope of the cumulative impacts analysis, Plaintiffs fail to identify with specificity any aspect of BLM's cumulative impacts analysis that is allegedly infirm.[109] Plaintiffs have thus failed to demonstrate a likelihood of success on the merits of this claim.

### D.   BLM considered mitigation measures

BLM fully complied with NEPA's requirement that BLM consider measures that may mitigate the adverse impacts of a proposed project. 40 C.F.R. §§ 1502.14(f), 1502.16(h) . NEPA "requires only that an EIS contain 'a reasonably complete discussion of possible mitigation measures.'" *N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 979 (9th Cir. 2006) (quoting *Robertson*, 490 U.S. at 352). While "[p]utting off an analysis of possible mitigation measures" entirely "until after a project has been approved, and after adverse environmental

---

[105] WWP's Mem. at 30–31.

[106] *See* TPEIS-0384, FEIS at 5-1–5-2, Table 5.1 (AR-045671–72).

[107] *See* TPEIS-0384, FEIS at 5-2–5-3 (AR-045672–73).

[108] *See* TPEIS-0384, FEIS at 5-1–5-20 (-045671–90).

[109] WWP's Mem. at 30–31. Plaintiffs also argue that "cut[ting] off its review of cumulative impacts at the nearby Oregon/Nevada border" was arbitrary and capricious, but do not identify any other projects in Oregon that should have been accounted for. *Id.*

impacts have started to occur, runs counter to NEPA's goal of ensuring informed agency decisionmaking," *Great Basin Res. Watch*, 844 F.3d at 1107, "NEPA does not require an agency to formulate and adopt a complete mitigation plan," *N. Alaska Env't Ctr.*, 457 F.3d at 979. Instead, the mitigation discussion need only contain "sufficient detail to ensure that environmental consequences have been fairly evaluated," *City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1154 (9th Cir. 1997) (citation omitted), and disclose the effectiveness of the identified mitigation, *S. Fork Band Council*, 588 F.3d at 727.

Throughout their memorandum, WWP contends that BLM failed to adequately analyze plans to monitor and mitigate the impact of mining operations on groundwater, air quality, and wildlife, including the greater sage grouse.[110] As explained below, BLM's evaluation of mitigation measures for each of these resources satisfied NEPA's standards.

**Groundwater monitoring and mitigation**. Lithium Nevada prepared a "monitoring and mitigation plan to address potential effects to surface and groundwater resources"[111] from the Project, which was included in the FEIS as Appendix P. As explained in the FEIS, BLM analyzed the impacts of the Project to groundwater levels and other water resources.[112] It did not anticipate a drawdown in groundwater until the end of mining—several decades hence—and concluded that mine-related drawdown was "not expected to result in a measurable effect to flows in the perennial stream reaches in the Project area," and identified uncertainty in the impacts on seeps and springs that were not either man-made or within the Projected groundwater drawdown contour.[113] Under the monitoring plan, Lithium Nevada

---

[110] *See* WWP's Mem. at 3–4 (wildlife and groundwater); 17–19 (groundwater); 22–24 (air quality), 31–34 (groundwater and wildlife); 36–38 (groundwater). To the extent that Plaintiffs argue that BLM's mitigation analysis did not satisfy NEPA or FLPMA because BLM did not apply sage-grouse mitigation elements of the RMP, as BLM has thoroughly explained above, BLM was not—and in fact, consistent with FLPMA and its regulations, could not—impose those requirements on the Project.

[111] TPEIS-0384, FEIS at 4-24 (AR-045572).

[112] TPEIS-0384, FEIS at 4-6–4-13 (AR-045555–61).

[113] TPEIS-0384, FEIS at 4-7–4-10 (AR-045556–58).

would extensively monitor groundwater levels between the Project and the Montana Mountains both during and after mining operations, which would trigger mitigation efforts.[114] The monitoring and mitigation plan includes mitigation options to support surface water features in the Montana Mountains, including at spring locations for the benefit of wildlife, as well as Pole Creek and the nearest stockwater well that could be impacted.[115]

Monitoring of groundwater *quality* down-gradient of the Project would also invoke mitigation measures if antimony concentrations exceeded Nevada's Drinking Water Standards.[116] BLM considered "three proposed mitigation options . . . designed to directly mitigate" groundwater potentially affected by antimony in the FEIS.[117] Each option was "expected to be an effective control to counter contaminant migration, if required."[118]

WWP's main complaint is that a mitigation plan addressing all *potential* impacts decades from now was not developed or analyzed before the ROD issued.[119] But additional monitoring and mitigation measures submitted by Lithium Nevada, which are also described in the FEIS, and which Plaintiffs now challenge,[120] contemplate an *additional* "comprehensive groundwater quality monitoring plan" provided to both BLM and the NDEP "for review and approval prior to commencement of mining."[121] Because the analysis of monitoring and mitigation measures included in the FEIS satisfies NEPA's hard-look requirement, development and implementation at a later time of *additional* monitoring and

---

[114] TPEIS-0384, FEIS at 4-24 (AR-045572).

[115] TPEIS-0711, FEIS App'x P, Part 1 at 154, 157–58 (AR-066297, AR-066300–01).

[116] TPEIS-0384, FEIS at 4-24 (AR-045572).

[117] *See* TPEIS-0384, FEIS at 4-24 (AR-045572); TPEIS-0711, FEIS App'x P, Part 1 at 154–59 (AR-066297–302).

[118] *Id.* These mitigation options, which include groundwater extraction and treatment, are those referred to by BLM's hydrogeologist, which WWP contends is not "in the ROD." WWP's Mem. at 32 (citing TPEIS-0893 at AR-088883).

[119] *See* WWP's Mem. at 32–33, 37–38.

[120] *See id.* at 32–33 (citing FEIS at 4-24 and R-122).

[121] TPEIS-0384, FEIS at 4-26 (AR-045574).

mitigation plans does not amount to a "pollute first, mitigate later" approach[122] and does not violate the statute. *See Japanese Vill., LLC v. Fed. Transit Admin.*, 843 F.3d 445, 459 (9th Cir. 2016). And some specific measures being determined on a case-by-case basis was appropriate given the low probability for their occurrence. *Great Basin Res. Watch*, 844 F.3d at 1107 (BLM's "wait and see" mitigation approach was reasonable "given the relatively low probability and temporal remoteness of adverse impacts to ground water").

**Air quality monitoring and mitigation**. With respect to air resources, BLM determined that mining under the proposed action did not require additional mitigation measures because air-quality standards would be met.[123] Plaintiffs principally complain that the FEIS does not contain sufficient information regarding the effectiveness of Lithium Nevada's system for mitigating emissions from the sulfuric acid plant—which allows the Project to be a net exporter of carbon-free electricity, but is not required for the Project to meet applicable air-quality standards.[124] But their argument is based on the false assumption that air-quality mitigation was needed to avoid significant impacts. Because BLM reasonably determined that the Project would not cause any exceedance of the NAAQS, and thus would not have significant air quality impacts, BLM was not required to thoroughly examine the effectiveness of Lithium Nevada's additional mitigation plans. *See Edwardsen*, 268 F.3d at 789 (upholding agency's conclusion that no significant impacts to air quality would occur based on agency's finding that NAAQS would not be exceeded). BLM thus "complied with NEPA by considering 'extensively the *potential* effects and mitigation processes.'" *Great Basin*

---

[122] *See* WWP's Mem. at 32.

[123] TPEIS-0384, FEIS at 4-82 (AR-045630) ("[A]ll pollutant concentrations within the project would be less than the NAAQS and Nevada standards, and that effects on AQRVs in Class I areas would be negligible. Therefore, no mitigation is required.").

[124] *See* WWP's Mem. at 23, 33. Plaintiffs take out of context an email from Ken Loda to contend that "BLM knew that it did not have enough information on the processing plant." *Id.* at 23. As that email makes clear, BLM did not *need* further information on the plant because, as Mr. Loda explained, it "do[es] not evaluate the details (engineering) of [the plant's] processing." TPEIS-0981 at AR-093830.

---

*Res. Watch*, 844 F.3d at 1107 (citation omitted).

**NDOW and EPA comments**. Finally, Plaintiffs invoke at length comments on the FEIS submitted by the EPA and NDOW.[125] BLM sufficiently considered those comments. Consistent with its policy guidance, BLM "review[s] any comments on the final EIS to determine if they have merit; for example, if they identify significant new circumstances or information relevant to environmental concerns and bear upon the proposed action."[126] If the comments do, the decisionmaker determines whether to supplement the EIS, or if minor changes can be made to the existing EIS.[127] Here, BLM's "interdisciplinary team specialists reviewed" the twelve comment letters received during this period "in full."[128] It "determined that the FEIS analysis was completed using standard protocols . . . including the best data and science available at the time," and that BLM had "applied all reasonable and feasible mitigation within its regulatory authority regarding water resources . . . and other resource topics" raised in the post-FEIS comments.[129] Although not required by statute or regulation, BLM considered these FEIS comments and determined supplementation was not necessary.

The fact that these comments were received after the FEIS was published distinguishes them from the comments—submitted during the comment period on draft regulations—that the Ninth Circuit addressed in *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 493 (9th Cir. 2011), on which Plaintiffs rely.[130] The regulation that Plaintiffs invoke likewise outlines an agency's obligation to respond *in the FEIS* to comments received during the comment period. *See* 40 C.F.R. § 1502.9(b). Though BLM must consider and respond to substantive comments received during the NEPA process, it is not obligated to accept or

---

[125] *E.g.*, WWP's Mem. at 32–34, 38 (citing TPEIS-0695 (EPA comments on FEIS) and TPEIS-446 (NDOW comments on FEIS)).

[126] TPEIS-0244, BLM NEPA Handbook, H-1790-1 at 102 (AR-034242) (2008).

[127] *Id.*

[128] TPEIS-0452, ROD at 7–8 (AR-052523).

[129] *Id.* at 8 (AR-052524).

[130] WWP's Mem. at 34.

adopt all recommendations or proposed measures by other agencies. *Ctr. for Biol. Diversity v. BLM*, 833 F.3d 1136, 1150 (9th Cir. 2016). Moreover, BLM is not even "required to accept public comments after publishing the FEIS." *Japanese Vill.*, 843 F.3d at 467 (citing 40 C.F.R. § 1503.1(b)). The record thus shows that BLM considered the other agencies' criticisms and concerns, as well those raised by the general public, thus more than satisfying the applicable legal standard. *See W. Watersheds Project,* 632 F.3d at 493.

### III.   The Court should not vacate the ROD and FEIS

As explained above, the record demonstrates that the Project's approval complied with applicable law and was not arbitrary or capricious, so no remedy is called for here. But should the Court grant Plaintiffs' motion for summary judgment and conclude that the approval was insufficient in some aspect, the ROD and FEIS should not be vacated without further briefing on remedy. "Whether agency action should be vacated depends on how serious the agency's errors are 'and the disruptive consequences of an interim change that may itself be changed.'" *Cal. Cmtys. Against Toxics v. U.S. E.P.A.*, 688 F.3d 989, 992 (9th Cir. 2012) (quoting *Allied–Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)). This is a fact-dependent analysis, which the parties should have an opportunity to fully brief—and the Court a full opportunity to consider—in light of any specific errors identified by the Court, their seriousness, the process to remedy them, and the disruptive consequences if the Project is remanded during the time it takes to do so.

### CONCLUSION

For the reasons set forth above, BLM's approval of the Thacker Pass project complied with applicable law and was not arbitrary or capricious. Plaintiffs have not carried their burden of demonstrating otherwise. The Court should therefore deny Plaintiffs' motion for summary judgment and grant Federal Defendants' motion.

Respectfully submitted this 3rd day of June, 2022.

TODD KIM
Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Div.

 */s/ Arwyn Carroll*
ARWYN CARROLL (MA Bar 675926)
LEILANI DOKTOR (HI Bar 11201)
MICHAEL ROBERTSON (VA Bar 80866)
Trial Attorney
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Phone:  202-305-0465
Fax:  202-305-0506
arwyn.carroll@usdoj.gov
leilani.doktor@usdoj.gov
michael.robertson@usdoj.gov


*Attorneys for Federal Defendants*