Vicky Oldenburg (Nevada Bar No. 4770)
Oldenburg Law Office
P.O. Box 17422
Reno, NV 89511
(775) 971-4245
vicky@oldenburglawoffice.com

William Falk (Utah Bar No. 16678)
2980 Russet Sky Trail
Castle Rock, CO
(319) 830-6086
falkwilt@gmail.com

Terry J. Lodge (Ohio Bar No. 29271)
316 N. Michigan St., Suite 520
Toledo, OH 43604-5627
(419) 205-7084
tjlodge50@yahoo.com

Attorneys for Reno-Sparks Indian Colony

Louis M. Bubala III (Nevada Bar No. 8974)
KAEMPFER CROWELL
50 West Liberty Street, Suite 700
Reno, Nevada   89501
Telephone:     (775) 852-3900
Facsimile:     (775) 327-2011
Email:  lbubala@kcnlaw.com

Rick Eichstaedt (Washington Bar No. 36487 *Admitted Pro Hac Vice*)
EICHSTAEDT LAW OFFICE, PLLC
25 West Main Avenue, Suite 320
Spokane, Washington 99201
Telephone:     (509) 251-1424
Email:  rick@eichstaedtlaw.net

Attorneys for the Burns Paiute Tribe

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | | |
|---|---|---|
| BARTELL RANCH LLC, et al., | ) | Case No.: 3:21-cv-80-MMD-CLB |
| | ) | (**LEAD CASE**) |
| Plaintiffs, | ) | |

|   |   |
|---|---|
| v. | ) |
|  | ) |
| ESTER M. MCCULLOUGH, et al., | ) |
|  | ) |
| Defendants, | ) |
| and | ) |
|  | ) |
| LITHIUM NEVADA CORPORATION, | ) |
|  | ) |
| Intervenor-Defendant. | ) |

**TRIBAL INTERVENORS'
JOINT REPLY ON SUMMARY
JUDGMENT**

|   |   |
|---|---|
| WESTERN WATERSHEDS PROJECT, et al., | ) |
|  | ) |
| Plaintiffs, | ) |
|  | ) |
| RENO SPARKS INDIAN COLONY, et al., | ) |
|  | ) |
| Intervenor-Plaintiffs, | ) |
|  | ) |
| and | ) |
|  | ) |
| BURNS PAIUTE TRIBE, | ) |
|  | ) |
| Intervenor-Plaintiff. | ) |
|  | ) |
| v. | ) |
|  | ) |
| UNITED STATES DEPARTMENT OF THE | ) |
| INTERIOR, et al., | ) |
|  | ) |
| Defendants, | ) |
| and | ) |
|  | ) |
| LITHIUM NEVADA CORPORATION, | ) |
|  | ) |
| Intervenor-Defendant. | ) |

Case No.: 3:21-cv-103-MMD-CLB
(**CONSOLIDATED CASE**)

Intervenor-Plaintiffs Reno Sparks Indians Colony ("RSIC") and Burns Paiute Tribe

("BPT") (collectively, "Tribal Intervenors") reply in support of their motions for summary

judgment, ECF 203, 205, and in opposition to the cross motions for summary judgment

1  separately filed by the Federal Defendants ("BLM") and Lithium Nevada Corporation ("LNC").

2  ECF 227, 229.

3       For the reasons set forth below and in the motions for summary judgment, the BLM

4  violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, the

5  National Historic Preservation Act ("NHPA"), 54 U.S.C. 300101 *et seq.,* applicable agency

6  polices and guidance, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 500 *et seq*. To

7  remedy these violations of law, Tribal Intervenors request an order vacating and remanding the

8  Record of Decision ("ROD"), the Final Environmental Impact Statement ("FEIS"), along with

9  the underlying decision documents. Tribal Intervenors also request an order enjoining the BLM

10  from proceeding with the Thacker Pass Lithium Mine Project ("Project").

11  **I.     INTRODUCTION**

12       In its Motion for Summary Judgment, RSIC argues[1] that BLM failed to seek and consider

13  the views of the public in a manner that reflects the nature and complexity of the Project.[2] This

14  failure was arbitrary and capricious or otherwise not in accordance with the law because BLM

15  forced the public commenting period to fit within SO 3355's unreasonably expedited timelines

16  despite substantial evidence that the public was unable to adequately engage in commenting due

17  to the COVID-19 pandemic.[3]

18       RSIC also argues that BLM's decision not to consult with RSIC about the Project was

19  arbitrary and capricious because: evidence before BLM showed that RSIC is comprised of

20  Northern Paiute and Western Shoshone descendants who traditionally occupied the region where

---

[1] ECF 205.
[2] ECF 205 at 16.
[3] *Id.*

Thacker Pass is located;[4] evidence before BLM showed that Thacker Pass contains many natural features and wildlife that Northern Paiute and Western Shoshone peoples consider sacred;[5] BLM decision-makers knew the Project was unusually complex and destructive of the land and Native American cultural resources;[6] BLM entirely failed to consider important aspects of the problem including the September 12, 1865 massacre which occurred in the Project's Area of Potential Effects and which, under the BLM-Nevada SHPO 2014 State Protocol Agreement is within the "Project Area" for purposes of NHPA;[7] BLM misrepresented the extent of Tribal consultation in securing the Nevada SHPO's concurrence under NHPA, which by definition, is bad faith;[8] and BLM offered no contemporaneous explanation for its decision upon which a reviewing court could sustain BLM's decision.[9]

In its Motion for Summary Judgment, BPT argues that BLM's failure to consult with BPT was arbitrary, capricious, or otherwise not in accordance with the law and especially NHPA, NEPA, and BLM's own policies.[10] BLM's failure to consult with BPT was arbitrary, capricious, or otherwise not in accordance with the law because: evidence before the agency showed the Project lies within BPT's traditional territory and BLM's sole reason for not consulting with BPT is a 17-year-old statement from a Tribal staff member (not Tribal Council member) made to BLM contractor preparing an ethnographic assessment for a completely different project, a resource management plan ("RMP"), where the staff member indicated that

---

[4] *Id.* at. 22.
[5] *Id.* at 22-24.
[6] *Id.* at  6, 22-23.
[7] *Id.* at 12-14.
[8] *Id.* at 10-12.
[9] *Id.* at 19-20.
[10] ECF 203 at 22.

1  BPT "would defer consultation to the tribes that had reservations closer to the study area" for the

2  RMP (not disclaiming consultation on other projects).[11]

3        BPT demonstrates that BLM's failure to consult with BPT was arbitrary and capricious

4  for five reasons: the administrative record ("AR") is devoid of BLM's reasoning for its failure to

5  consult; BLM's decisions about consultation cannot be based on statements made by staff-

6  members who have not been granted decision-making authority by BPT; substantial evidence in

7  the AR showed that BPT had a strong interest in the project area; substantial evidence in the AR

8  shows that BLM's consultation decisions regarding BPT about the Thacker Pass Project are

9  inconsistent with consultation efforts for other projects; and just because BPT may not be able or

10  willing to consult at every opportunity does not relieve BLM of its obligation under NHPA and

11  NEPA to give BPT an opportunity to consult about every project that may harm BPT's

12  interests.[12]

13  **II.**    **RSIC's ARGUMENT**

14      **A. BLM failed to seek the views of the public in a manner reflecting the nature and**
15         **complexity of the Thacker Pass Project.**
16
17        BLM offers little response to RSIC's claim that BLM failed to seek and consider the

18  views of the public in a manner reflecting the nature and complexity of the Thacker Pass Project.

19  BLM simply recites that it published Federal Register notices about public consultation,[13] held

20  two public scoping meetings in February 2020,[14] and held two virtual public meetings in August

---

[11] *Id.*
[12] *Id.* at 22-26.
[13] ECF No. 227 at 14-15
[14] *Id.* at 15.

1  2020.[15] LNC similarly offers little response to RSIC's public consultation claim and instead tries

2  to recast this claim as one involving BLM's decision not to consult with RSIC.[16]

3       BLM's decision not to slow the public commenting period coupled with BLM's failure to

4  notify RSIC about the Project certainly made it more difficult for RSIC to request consultation.

5  But that's not the pertinent argument here. NHPA's implementing regulations state that "the

6  agency official should plan consultation appropriate to the scale of the undertaking and the scope

7  of Federal involvement…" 36 C.F.R. § 800.2(a)(4). They also require that "[t]he agency official

8  shall seek and consider the views of the public in a manner that reflects the nature and

9  complexity of the undertaking and its effects on historic properties…" 36 C.F.R. § 800.2(d)(1).

10       BLM acknowledged that the Project is an unusually complex undertaking involving

11  destruction of cultural resources on a massive scale.[17] If "[t]he views of the public are essential

12  to informed Federal decision making in the section 106 process" (36 C.F.R. § 800.2(d)(1)), then

13  the public must be afforded adequate time to understand the Project and provide its views. This

14  is what the ACHP, two US Senators, and members of the public told BLM while the COVID-19

15  pandemic raged on. It appears that BLM's primary rationale for disregarding this advice was, as

16  BLM's Robin Michel stated in an email discussion about following ACHP guidance, that "the

17  3355 clock keeps ticking…"[18] The AR shows BLM did not provide the public with adequate

18  time to understand and comment on the Project because BLM arbitrarily abused its discretion in

19  rushing the Project's timelines under SO 3355.

20     **B.  The State Protocol Agreement expressly elevates BLM manuals and handbooks to**
21         **procedures that BLM is required, by law, to follow.**
22

---

[15] *Id.* at 16.
[16] ECF 229 at 20.
[17] TPNHPA-0233, AR-004676.
[18] TPNHPA-0015, AR-000393.

1    LNC claims that RSIC makes a contradictory argument that BLM "must comply with

2  every detail of its cited handbooks" while declaring that BLM made a clear error in judgment "in

3  complying with the validly issued DOI SO 3355."[19] That claim overlooks the key point that in

4  certain situations, the 2014 BLM-Nevada SHPO State Protocol Agreement ("Protocol") requires

5  BLM to follow BLM Manuals and Handbooks. RSIC has already demonstrated,[20] and BLM

6  admitted,[21] that the Protocol replaced the procedures set forth in 36 C.F.R. § 800.3 through §

7  800.7. The Protocol incorporates standards, definitions, and procedures described in BLM

8  Manuals and Handbooks. These standards, definitions, and procedures, then, are part of the

9  procedures BLM was required to follow.

10    Corporations and government agencies are well-trained to use the blanket defense that

11  BLM does not have to follow its own manuals and handbooks.[22] That may be the case in many

12  situations. But not in the specific situations RSIC has pointed out. The Protocol states, for

13  example, that "Resources of religious and cultural significance to Native American tribes must

14  be included in determining inventory needs, based on appropriate notification and consultation,

15  *as required per BLM Manual 8120 and any associated Handbook*…"(emphasis added).[23]

16    Handbook (H) 1780-1, *Improving and Sustaining BLM-Tribal Relations* clearly declares

17  to the American public, to Tribes, and to the Nevada SHPO that, for BLM, "sending a letter to a

18  Tribe and receiving no response does not constitute a sufficient effort to initiate tribal

19  consultation." H-1780-1, Chapter 3.A.3. This statement is rooted in case law, too. "Contact, of

20  course, is not consultation, and consultation with one tribe doesn't relieve the agency of its

---

[19] ECF 229 at 22.
[20] ECF 205 at 25-26.
[21] ECF. 227 at 19.
[22] ECF 229 at 26.
[23] TPEIS-0261, AR-082642.

obligation to consult with any other tribe." *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 205 F.Supp.3d 4, 32 (D.D.C 2016). Consultation must "recognize the government-to-government relationship between the Federal Government and Indian tribes" and is to be "conducted in a manner sensitive to the concerns and needs of the Indian tribe." *Quechan Tribe of Fort Yuma Indian Reservation v. U.S. Department of Interior,* 755 F. Supp. 2d 1104, 1108-09 (S.D. Cal. 2010) (quoting 36 C.F.R. § 800.2(c)(2)(ii)(C).

BLM told the Nevada SHPO that it had initiated Tribal consultation in a December 16, 2019 letter to acquire one round of the Nevada SHPO's required concurrence.[24] In truth, all BLM had done was send a letter to Fort McDermitt, Summit Lake, and the Winnemucca Indian Colony on December 12, 2019, without receiving a response. RSIC is not asserting the rights of other Tribes in making this argument. BLM was obligated to engage in a reasonable and good faith effort to identify Tribes with which to consult. BLM argues that the "reasonableness of BLM's consultation decision is supported by BLM's consultation with the Nevada SHPO" and states that the "SHPO noted that there will be tribal consultation…but did not identify or recommend any additional tribes for consultation."[25] The problem is BLM told the Nevada SHPO that Tribal consultation had begun when it hadn't, thereby securing Nevada SHPO's concurrence with false representations.

H-1780-1 cites *Pueblo of Sandia v. US*, 50 F. 3d 856 (10th Cir.) as "an example of how the courts define reasonable and good faith effort…" H-1780-1, III-6. In *Sandia,* the Tenth Circuit invalidated a Forest Service decision after finding that "the Forest Service withheld relevant information from the SHPO during the required consultation process." 50 F. 3d 856, 862. And, consultation with SHPO "would be meaningless unless the SHPO has access to

---

[24] TPNHPA-0020, AR-000416.
[25] ECF 227 at 26.

1   available, relevant information." *Id.* The Nevada SHPO clearly indicated that BLM's

2   representation that it began Tribal consultation and would conduct Tribal consultation in

3   accordance with the Protocol was a reason for its concurrence.[26] In fact, the Nevada SHPO even

4   asked BLM to "please continue to forward summaries of consultation efforts for the SHPO

5   administrative record."[27]

6         BLM's AR is devoid of any accurate summaries of BLM's consultation efforts. BLM

7   represented that it had initiated consultation, which is a term that has a very specific meaning

8   that BLM and the Nevada SHPO agreed to under the Protocol, when it had not in fact initiated

9   consultation. BLM never explained that the extent of its Tribal consultation efforts was sending

10   letters and receiving no response. This was relevant information withheld from the SHPO

11   meaning that BLM's SHPO consultation, a key part of BLM's decision not to consult with RSIC,

12   was conducted in bad faith.

13   **C. "Consultation" does not mean what LNC and BLM think it does.**

14         LNC and BLM twist the definition of "consultation" under NHPA in order to

15   characterize LNC's interactions with members of the Fort McDermitt tribe as "tribal

16   consultation" to defend BLM's false representations that Tribal consultation was initiated in

17   2017 or 2018.[28] These tactics resemble BLM's tactics in *Quechan*. There, BLM provided

18   citations to materials in the record which they said documented "extensive consultation with

19   Tribes." 755 F. Supp. 2d 1104, 1111. The Court, however, closely analyzed those materials and

20   found BLM's consultation efforts inadequate despite BLM documenting fourteen contacts with

21   the Quechan Tribe's president and 31 contacts with the Tribe's historic preservation officer

---

[26] TPNHPA-0187, AR-002209.

[27] *Id.*

[28] ECF 229 at 18 ("Tribal consultation regarding this Project…did begin in 2017…").

1   about the project in a two and a half year period. *Id.* at 1112-1113. These contacts not only

2   included letters but follow-up phone calls and emails.[29] Nowhere near 14 or 31 contacts with any

3   Tribe, much less the three BLM identified as needing to be consulted with, happened here.

4          LNC tries to pass off a "Community Picnic," project updates with unspecified Fort

5   McDermitt Tribal members, and public meetings with unspecified Tribal members as

6   consultation. But "[P]ublic informational meetings, consultations with individual tribal members,

7   meetings with government staff or contracted investigators, and written updates… don't amount

8   to the type of government-to-government consultation contemplated by the regulations." 755 F.

9   Supp. 2d at 1119.

10          NHPA requires consultation between *agency officials* and any Tribe that attaches

11   religious and cultural significance to historic properties that may be affected by an undertaking.

12   36 C.F.R. § 800.2(c)(2)(ii). LNC is not an agency official, a government, or capable of

13   implementing NHPA. Therefore, LNC's proffered list of communication[30] conducted with Fort

14   McDermitt Tribal members beginning in June 2017 cannot be relied upon to prove that *BLM*

15   complied with NHPA. Similarly, the Fort McDermitt Tribe is the Fort McDermitt Tribe, not "the

16   tribes." It is not the Summit Lake Tribe. It is not the Winnemucca Indian Colony. It is not the

17   Burns Paiute Tribe. And, it is not RSIC. "Tribal consultation" is not initiated with "the Tribes"

18   when LNC, and not BLM, interacts with a few Fort McDermitt Tribal members.

19       **D.  BLM's decision not to consult with RSIC cannot be sustained on a ground**
20   **appearing in the record to which the agency made no reference.**
21

---

[29] In 2022, when each BLM employee likely has an email account, landline telephone in his or her office, a work cell phone, a personal cell phone, and the knowledge that emails and phone calls are how most people communicate today, it is suspicious that BLM documented no efforts to email or call any Tribe about the Thacker Pass Project. Indeed, BLM documented phone calls with the Fort McDermitt chairman in 2009. When BLM truly wants to get ahold of a Tribal representative, BLM knows how to do it.
[30] TPNHPA-0032, AR-000516.

1    BLM cannot rely on the 2015 letter RSIC sent to the BLM Winnemucca District Office

2    because the AR that shows the letter did not inform BLM's rationale for deciding which Tribes

3    to consult.[31] Reliance on this letter is an improper *post hoc* rationale.[32] LNC counters that "There

4    is no evidence to support RSIC's argument, solely based on the timing of the initial production to

5    this Court…that the 2015 letter is a '*post hoc*' rationalization."[33] BLM similarly contends "What

6    matters is the fact that the document was before BLM when it rendered its decision…" and

7    repeats the uncontroverted proposition that "In assessing [an agency's decision, [this Court]

8    review[s] the whole record, which includes everything that was before the agency pertaining to

9    the merits of its decision."[34]

10    These arguments overlook an essential aspect of APA review. Reviewing courts are

11    required to review the whole record, but the mere existence in the AR of a document supporting

12    an agency's decision is only half the battle. "An administrative agency's decisions…cannot be

13    sustained on a ground appearing in the record to which the agency made no reference; to the

14    contrary [an agency's] decision stands or falls on its express findings and reasoning." *NLRB v.*

15    *Indianapolis Mack Sales & Serv., Inc.* 802 F.2d, 280, 285 (7th Cir. 1986).

16    BLM failed to set forth any reasons for its decision about which Tribes to consult with at

17    the time the decision was made. BLM's failure to do so, by itself, renders this decision arbitrary

18    and capricious. "It is a foundational principle of administrative law that judicial review of agency

19    action is limited to the grounds that *the agency invoked when it took the action.*" *Dept. of*

20    *Homeland Sec. v. Regents of Univ. of Cal.,* 140 S. Ct. 1891, 1907, 591 U.S., 207 L. Ed. 2d 353

21    (2020)(emphasis added). "A fundamental requirement of administrative law is that an agency set

---

[31] ECF 205 at 19.
[32] ECF 205 at 20.
[33] ECF 229 at 9.
[34] ECF 227 at 38-39.

1  forth its reasons for decision; an agency's failure to do so constitutes arbitrary and capricious

2  agency action." *Tourus Records v. DEA*, 259 F.3d 731, 737 (D.C. Cir. 2001)(internal citations

3  omitted). "The agency must examine the relevant data and articulate a satisfactory explanation

4  for its action including a rational connection between the facts found and the choice made."

5  *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.,* 463

6  U.S. 29, 43 (1983).

7        BLM claims "Here, the letter, the first page of the resolution, and the map were all

8  considered by BLM as part of its consultation process…"[35] But BLM does not cite any part of

9  the AR where the letter was actually considered. BLM *cannot* cite any part of the AR because no

10  such documentation exists there. With no example of BLM considering the letter in the AR,

11  BLM's claim that the letter was considered by the agency is a rationale provided by BLM's

12  counsel years after the agency's decision was made. In addition, the portion of the RSIC letter

13  BLM seeks to rely on, the second page of the Tribal resolution, which provides important details

14  about the limits of RSIC's decision to forego some consultations, does not even appear in the

15  AR.

16      **E. The rationale BLM offered when it made its decision is insufficient to support a**
17         **ruling sustaining BLM's decision.**
18
19        BLM decided which Tribes to consult with on or sometime before October 21, 2019

20  when BLM's Tanner Whetstone approved the Thacker Pass Project's Cultural Resources

21  Inventory Needs Assessment ("CRINA") Form.[36] The form includes an explicit section for the

22  form's preparer to fill in the agency's rationale (the form even uses the word "rationale" in bold

23  typeface) for which Tribes to consult. BLM described this rationale in one sentence: "This

---

[35] ECF 227 at 39.
[36] TPNHPA-0001.

1    project will likely have adverse effects to cultural resources that may be of interest or importance

2    to tribes."[37] That is it.

3          When this Court asks: "Why did BLM decide to consult with the tribes it identified as

4    needing to be consulted with?" And, conversely, "Why did BLM decide not to consult with the

5    tribes it did not consult with?" The only express reason (and the only rationale BLM can rely on

6    or this court can look to) in the AR is "This project will likely have adverse effects to cultural

7    resources that may be of interest or importance to tribes." This is not a rationale for which Tribes

8    BLM decided to consult. At best, it is simply a general acknowledgement that "Tribes" needed to

9    be consulted. The APA requires more. In order for BLM's decision to only consult with the three

10   Tribes it listed to be sustained, BLM must have articulated a satisfactory explanation for this

11   decision. It did not. Therefore, under *State Farm*, BLM's decision was arbitrary and capricious.

12   463 U.S. at 43.

13         The only document in the AR that BLM cites as an example where any actual rationale

14   for Tribal consultation appears is a May 7, 2020 email from Whetstone to ICF's Andrew

15   Newman and Project Lead Kenton Loda.[38] This email came in response to a meeting about

16   describing environmental justice concerns in the EIS where BLM employees wondered if the

17   Pyramid Lake Paiute Tribe should be contacted about potential impacts of the project to that

18   Tribe.[39] Environmental justice considerations are different from NHPA considerations.

19   Environmental justice considerations focus on effects upon low-income and minority populations

20   and ensuring that they do not bear a disproportionate burden of a project's adverse effects.[40] By

21   contrast, NHPA focuses on adverse effects to cultural resources, traditional cultural properties,

---

[37] TPHPA-0001, AR-000012.
[38] TPNHPA-0047, AR-000610.
[39] TPNHPA-0169, AR-002153-54.
[40] TPEIS-0384 at 4-91.

1   and historic properties and whether there have been adequate attempts at government-to-

2   government consultation.

3         Whetstone's email, written almost seven months after the decision about which Tribes to

4   consult was made, only re-states the fact that BLM identified three Tribes to consult. He

5   provides no rationale for why these Tribes were chosen.[41] Whetstone does provide rationale for

6   why Pyramid Lake was originally not identified to be consulted with. *Id.* But this is not the

7   rationale for why RSIC was not consulted. Regardless, after concerns were raised about

8   considering potential impacts to Pyramid Lake, BLM did begin mailing letters to Pyramid

9   Lake.[42] The fact that Pyramid Lake was included in subsequent mailings, despite Whetstone's

10  conclusion that they did not need to be, along with the lack of any mention of RSIC's 2015 letter

11  anywhere in the AR (other than the incomplete portion of the letter that appears in the AR),

12  supports RSIC's contention that BLM simply failed to consider consulting with RSIC

13  whatsoever.

14      **F.   BLM admitted to not finding the 2015 letter until months after the ROD was issued
15           and never referenced the letter in the AR.**
16

17        BLM cannot rely on RSIC's 2015 letter to excuse BLM's failure to consult with RSIC

18  because there is no indication in the AR that BLM actually relied on the letter when deciding not

19  to consult with RSIC. "The focal point for judicial review should be the administrative record

20  already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*,

21  411 US 138, 142 (1972). Reviewing courts must look to a "contemporaneous explanation of the

22  agency decision" to review. *Id.* at 143.

---

[41] TPNHPA-0047, AR-000610
[42] TPNHPA-0002, AR-00036.

It was not until August 19, 2021, over seven months after the ROD was issued and over eight months after the FEIS was published, that BLM's litigation counsel offered RSIC's 2015 letter as rationale for BLM's decision not to consult with RSIC about the Project. No affidavit from a BLM employee stating that the letter informed BLM's decision accompanied BLM's motion to introduce the letter. It was not until the day RSIC's reply in support of its Motion for Preliminary Injunction was due, and after BLM had already filed its response to that motion, that the letter was produced. In BLM's motion, counsel admitted that the letter "was found after Federal Defendants' opposition was filed."[43]

BLM was challenged in court and needed an explanation for why RSIC – one of the largest Tribes in Nevada, comprised of Northern Paiutes and Western Shoshones who BLM knew traditionally occupied the region, with one of the most active Tribal Historic Preservation Offices in the State[44] – was not even considered as a Tribe to consult with about the Nation's largest open pit lithium mine that would destroy an unusually high number of Northern Paiute and Western Shoshone cultural resources. Then, BLM's counsel finally offered a rationale for not consulting with RSIC. This is precisely what the prohibition on *post hoc* rationales is designed to protect against.

LNC, albeit unwittingly, gives a compelling reason for why the 2015 letter should not be relied upon: "BLM would not compile documentation to prove a negative, meaning there was no reason or purpose for BLM to seek out prior communications with RSIC as part of BLM's initial record development to justify the ROD."[45] If it is true that BLM had no reason to seek out prior

---

[43] ECF 72 at 2.

[44] *See* TPHNPA-0186, AR-002205 (demonstrating how active RSIC's THPO is. Also note how BLM discussed delaying the Fish Springs Solar Project due to an inability to reach RSIC). The obvious question is: If BLM was willing to delay the Fish Springs Solar Project due to an inability to reach RSIC, why not delay the Thacker Pass Project due to an inability to reach *any Tribe*?

[45] ECF 229 at 9.

1    communications with RSIC, then it's no wonder that BLM did not seek out, much less consider,

2    the 2015 letter until RSIC challenged BLM's Tribal consultation failures. Whether or not

3    agencies are required to "prove a negative," agencies *are required* to provide "express findings

4    and reasonings" for a positive (*Indianapolis Mack Sales & Serv.,* at 285) or they are required to

5    provide a "contemporaneous explanation of the agency's decision" (*Camp*, at 143).

6         BLM's contemporaneous explanations or grounds invoked for decisions about Tribal

7    consultation do not provide any reasons for deciding which Tribes to consult, much less refer to

8    RSIC's 2015 letter. BLM did provide an internal email as rationale for why it originally chose

9    *not* to consult with Pyramid Lake. But, then BLM decided to send Pyramid Lake a letter anyway,

10   suggesting that BLM decided this rationale wasn't strong enough. Even if BLM employees knew

11   about the 2015 letter – and there is no evidence that they did – the simple inclusion of the letter

12   in the AR is not sufficient to sustain BLM's decision not to consult RSIC. To sustain BLM's

13   decision not to consult RSIC because of the 2015 letter is to read a rationale into the AR that

14   simply is not there.

15        Affirming a *post hoc* effort to salvage an agency's "decision would require us to overstep

16   our institutional role and usurp essential functions committed in the first instance to the

17   administrative process." *Allen v. Barnhart,* 357 F.3d 1140, 1142 (10th Cir. 2004). APA

18   practitioners often repeat the maxim that a reviewing court may not substitute its judgment for

19   that of the agency. *See Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415-16 (1971).

20   This maxim is oft-repeated in an effort to warn courts that the APA "does not allow the court to

21   overturn an agency decision because it disagrees with the decision or with the agency's

22   conclusions…"[46] However, this maxim also operates to limit a court's reliance on a rationale the

---

[46] ECF 227 at 24.

1    agency simply never invoked at the time of its decision. A court cannot overturn an agency

2    decision just because it disagrees with the decision. Neither can a court sustain an agency

3    decision it agrees with if the agency offered no contemporaneous explanation for that decision.

4    **G.   The September 12, 1865 massacre, described in BLM's own records that BLM was**
5    **required to review, occurred within the Area of Potential Effects.**
6

7        LNC's assertion that the 1865 massacre happened "outside the Project area"[47] needs to be

8    put to rest. While denying the Tribal Intervenors' preliminary injunction motion, this Court

9    stated "the 1868 field notes do not show a massacre happened within the Project area."[48] This

10   conclusion was based on an incomplete understanding of how "Project area" is defined under the

11   Protocol. At the time the Court stated this, only BLM possessed the AR. Despite RSIC

12   requesting this information with a June 10, 2021 FOIA request, ten weeks before the preliminary

13   injunction hearing, the Tribal Intervenors did not receive the first half of the NHPA AR until six

14   weeks after preliminary injunction briefing concluded (and the whole AR was not lodged until

15   April 20, 2022).

16        Because of this, neither the Tribal Intervenors nor the Court had access to the CRINA.

17   According to the Protocol (which carries the force of law as shown above), "the intent of the

18   CRINA is to establish the Direct and Indirect Effect APEs" and to "provide a summary of known

19   resources present within the APEs…"[49] The Protocol states, "In defining the APEs, boundaries

20   are not limited by the physical footprint of the undertaking. They should be large enough to

21   encompass all direct and indirect effects, such as, but not limited to, visual, audible, and

22   atmospheric effects."[50] BLM stated that it needed to, and promised the Nevada SHPO in the

---

[47] ECF 229 at  2.
[48] ECF 92 at 21.
[49] TPEIS-0261, AR-082642.
[50] *Id.* at AR-082652

CRINA that it would, "review aerial imagery and historic reference material including topographic maps and GLO maps to identify any potential unrecorded historic properties within the Indirect APE that may be indirectly affected by the project."[51] BLM's GLO maps identified the "Remains of Indian Lodgings"[52] and BLM admitted that these properties "fall within the broader, indirect areas of potential effects that BLM determined for the Project."[53] Irrespective of the massacre, these "Indian Lodgings" were unrecorded properties within the Indirect APE that BLM failed to identify.

However, BLM's GLO maps state that "it was at these camps that Captain RC Payne with Co. E, 1st Nevada Cavalry, attacked, and whipped a body of Indians on Sept. 12 1865."[54] So, the Indian Lodgings are within the "Project area" for purposes of identifying historic properties, analyzing adverse effects to those properties, and mitigating those adverse effects under NHPA. The presence of a massacre perpetrated by federal agents against Northern Paiute people within a project area is an important aspect of BLM's decision about which Tribes to consult. It is also an important aspect of BLM's decisions about how to conduct consultation with the public. BLM stated that it needed to review GLO maps for any unrecorded historic properties that would be affected by the project and represented to the NV SHPO that it would do so. BLM's GLO maps described a massacre at "Indian Lodgings" within the Project's Area of Potential Effects. Observance of the procedures specified by NHPA through the Protocol would have revealed the massacre site. The presence of the massacre site would have alerted BLM to the fact that it needed to do more than just send some letters to a few Tribes to satisfy its NHPA obligations. BLM's failure to observe these procedures violates the APA. U.S.C. § 706(2)(d).

---

[51] TPNHPA-0001, AR-000010.
[52] ECF 73-1.
[53] ECF 84 at 4.
[54] ECF 73-1 at 5-6.

**III. BPT's Argument**

    **A. The burden to consult was on the BLM not with the Burns Paiute Tribe.**

    BLM and LNC attempt to shift the burden of BLM's failure to consult onto BPT arguing that the Tribe did not provide notification of its interest until after the ROD was issued. ECF 227 at 27-34; ECF 229 at 28-34. This argument is simply without merit. Consultation is the agency's obligation not the Tribe's. NHPA regulations make clear that "it is the statutory obligation of the federal agency to fulfill the requirements of Section 106 and to ensure that an agency official with jurisdiction over an undertaking takes legal and financial responsibility for Section 106 compliance." 36 C.F.R. § 800.2(a). This is a key point: it is the BLM's obligation - not the Tribes' - to complete the Section 106 process and the BLM bears the responsibility to ensure that full consultation occurs.

    The BLM and LNC briefing begins from the opposite premise, that it was somehow the Tribe's burden to demand consultation. Clearly, this is not the case. Courts have been reluctant to excuse an insufficient consultation process even when an agency consulted with some Tribes. "[T]hat BLM did a lot of consulting in general doesn't show that its consultation with the Tribe was adequate under the regulations." *Quechan Tribe of Fort Yuma Indian Rsrv. v. U.S. Dep't of Interior*, 755 F. Supp. 2d 1104, 1112 (S.D. Cal. 2010).

    BLM and LNC ask this Court to penalize the Tribe for failing to consult on an action that was unrelated to the development of a lithium mine and involved no ground disturbing activities, which occurred more than a decade ago. As described above, the BLM Handbook also recognizes that a failure to respond is not an invitation to stop - "As the Secretary's policy on

1    Indian tribal consultation makes clear, even if the BLM has made an attempt to initiate

2    consultation and has not received a response, the BLM must still make additional reasonable

3    efforts periodically throughout the planning process to repeat invitations to consult." BLM

4    Handbook 1780-1 (Improving and Sustaining BLM-Tribal Relations) at III-4.[55]

5           Moreover, BLM and LNC are twisting what the Tribal employee told BLM in 2005 – that

6    the Tribe did not want to consult on the RMP.  TPNHPA-0003 at 92. The Tribe, at no time,

7    indicated that it did not want to consult on any other project within the boundaries of the

8    Winnemucca Field Office. It certainly is not unreasonable to defer consultation until specific

9    projects are proposed, as BLM's own guidance suggests may occur.  BLM Manual 1780 at IV-6.

10          The Ethnographic Report, which BLM  uses to justify its failure to consult, actually

11   demonstrates the historic and cultural ties of the BPT to the area. TPNHPA-0003 at 17 (Northern

12   Paiute Bands including the Burns Paiute Tribe);  *id.* at 15 (Northern Paiute aboriginal territory).

13   Unfortunately, BLM disregarded this.

14          BLM and LNC argue that Charisse Snapp was a designated cultural resource

15   representative of the BPT with authority to engage in consultation and otherwise bind the Tribe.

16   ECF 227 at 41; ECF 229 at 30.  However, there is nothing in the administrative record (or in the

17   Tribe's records) to indicate that Ms. Snapp (now Ms. Soucie) was designated by the Tribe as a

18   cultural resource representative and the attached declaration of Ms. Souchie indicates that she

19   was without authority to engage in consultation on behalf of the Tribe or otherwise bind BPT in

---

[55] Available at https://www.blm.gov/sites/blm.gov/files/uploads/H-1780-1__0.pdf (visited March 18, 2022)("BLM Handbook").

1    regards to government-to-government consultation.  *See* Declaration of Charisse Soucie ¶¶ 3-8.

2    As pointed out by LNC, the regulations provide that "the agency official shall consult with a

3    representative **designated** by such Indian tribe."  36 C.F.R. § 800.2(c)(2)(B)(emphasis added).

4    There is no evidence that Ms. Soucie was ever designated by the Tribe either in BLM's record or

5    in the Tribe's own records.  *Id.* ¶ 6.

6         Lastly, BLM argues that a Federal Register notice was published about the project and

7    that the Tribe could have notified BLM of its interest in consultation. ECF 227 at 35. There is no

8    evidence in the record to suggest that the Tribe knew about or had reason to know about the

9    project. There were no efforts to consult and a letter was not sent to the Tribe. In fact, the Tribe

10   indicated that it did not know about the project until May 2021 and then sent a letter expressing

11   concern. ECF 62-1 at 6. Moreover, there is no legal authority to suggest that anything but

12   individual consultation can meet the NHPA requirements. *See Pueblo of Sandia v. United States*,

13   50 F.3d 856 (10th Cir. 1995) (Forest Service failed to meet its consultation obligations where its

14   "efforts" to consult were limited to the distribution of "form letters").

15        **B. BLM had an obligation to comply with its agency policies regarding consultation.**

16        BLM and LNC assert that the BLM has no obligation to comply with its own

17   consultation procedures.  ECF 227 at 34; ECH 229 at 26. The BLM is not to be permitted to

18   disavow its own policies and directives. The Supreme Court held in *Morton v. Ruiz*, 415 U.S.

19   199, 235, 94 S. Ct. 1055, 39 L. Ed. 2d 270 (1974) that when the rights of individuals are

20   affected, it is incumbent upon agencies to follow their own procedures "... even where the

21   internal procedures are possibly more rigorous than otherwise would be required."  Where the

22   BLM has established a policy requiring prior consultation with a Tribe, and therefore created a

justified expectation that a Tribe will receive a meaningful opportunity to express its views

before policy is made, that opportunity must be given. *Lower Brule Sioux Tribe v. Deer*, 911

F.Supp. 395, 399 (D.S.D.1995) (*citing Oglala Sioux Tribe*, 603 F.2d at 721). "Fair notice of

agency intentions requires telling the truth and keeping promises." *Id*.

BLM's guidelines and policies clearly embody the policy of the BLM and must be

followed. Moreover, compliance is mandatory to meet the "overriding duty of [the] Federal

Government to deal fairly with Indians wherever located," *Morton,* 94 S. Ct. at 1075, pursuant to

"the most exacting fiduciary standards," *Seminole Nation v. United States*, 62 S. Ct. 1049, 1054

(1942); *see also Oglala Sioux Tribe of Indians*, 603 F.2d at 721. Interior's own Board of Land

Appeals has recognized the enforceability of these policies:

> BLM is "generally obligated to follow its own Manual," Handbook, and
> Departmental policies. BLM's disregard of those documents in its consultation with
> the Pueblo would support a claim that BLM had not engaged in consultation
> necessary to carry out its responsibility to consult with tribal governments.

*Pueblo of San Felipe*, 191 IBLA 53, 65 (Aug. 31, 2017); *see also Island Mountain Protectors,*

144 IBLA 168, 183-85 (1998) (holding that BLM violated its trust duty by failing to consult with

a Tribe regarding off-reservation mining project).

**C. BLM failed to comply with the substantive and procedural requirements of NEPA.**

**1. BLM failed to take a "hard look" at impacts to cultural uses of the Project area.**

BLM and LNC assert that BLM's analysis of cultural resource concerns was adequate:

(1) because it conducted an archeological assessment of the area; (2) concerns about impacts to

culturally significant areas identified in its 2007 ethnological report are too general; and (3)

22

1   Tribes did not raise specific concerns until after the ROD had been issued. ECF 227 at 37-42;

2   ECF 229 at 35-37. These arguments are incorrect.

3        First, it is undisputed that none of the surveys conducted for the Project assessed current

4   Tribal cultural use of the area, such as uses for gathering of cultural plants and hunting. *See, e.g.,*

5   TPNHPA-0258. These assessed only archaeological resources. The significance of this area to

6   Tribes extended much farther than prehistoric archaeological resources. *See* ECF 62-1 at 5 ("It is

7   an area that contains plants and wildlife that the Tribe hunted and gathered and continue to hunt

8   and gather.") Cultural resources often reflect resources and areas (traditional cultural properties)

9   that are currently used and held sacred by a Tribe. During litigation, counsel for BLM

10  acknowledges this, stating that the agency does "not dispute that the Tribes consider the entire

11  Thacker Pass area sacred." ECF 92 at 2.

12       BLM was aware of this. These issues were raised by the Tribes in 2006 in the BLM's

13  Ethnographic Assessment, which specifically identifies r current significance of the area to

14  Tribes, not simply concerns with prehistoric archaeological resources, including  "resource

15  collection areas (particularly pine nut gathering areas)," "culturally important plant species," and

16  " access to lands traditionally used for plant gathering and hunting." AR TPNHPA-0003 at 75-

17  76. Earlier comments submitted to the BLM on the RMP process reflect that Tribes use these

18  areas to this day. "[L]iving cultural resources found in the area covered by the RMP are

19  incredibly valuable to Tribal members, who actively use the area to gather traditional foods and

20  medicines and conduct ceremonies. The importance of this area to Tribal members attempting to

21  preserve what is left of their land, heritage, and culture, cannot be overstated." TPNHPA-0044,

22  AR 000599. These types of current uses were unaddressed in BLM's decision documents.

1    Both BLM and LNC failed to respond to the fact that the BLM's archaeologist called for

2    such an analysis, but it was not included.TPNHPA-0246, AR 004709 ("It'd be interesting to add

3    a tribal produced ethnographic background, or even a second synthesis/conclusion section from

4    an indigenous perspective."). Neither do they address the argument that BLM's own guidance,

5    "Traditional Cultural Places & Indian Sacred Sites," calls for this type of analysis. TPNHPA-

6    0114, AR 001511 ("If a place matters to a tribe, we need to factor that information into our

7    analysis and decisions on proposed actions.").

8    Cultural resources are not simply prehistoric materials, as were assessed by BLM

9    as part of this project. A hard look at environmental impacts required BLM to examine

10   the living use of this area by Tribes and it simply was not.

11   **2. BPT does not raise a claim of consultation on behalf of other Tribes.**

12   BLM and LNC assert that BPT raises claims regarding the adequacy of consultation on

13   behalf of other Tribes. This is simply not the case. BLM failed to take a "hard look" at impacts to

14   significant cultural impacts of concern to Tribes. NEPA requires agencies to analyze impacts to

15   cultural resources. 40 C.F.R. § 1502.16(a)(8); *see* 42 U.S.C. § 4331(b)(4) (declaring that

16   "preserv[ing] important historic, cultural, and natural aspects of our national heritage" is an

17   element of national environmental policy).

18   BLM guidance calls on the agency to assess impacts to traditional culture properties and

19   sacred sites. TPNHPA-0114, AR 001511 ("If a place matters to a tribe, we need to factor that

20   information into our analysis and decisions on proposed actions."); *id.* at 001512 ("If the site

21   does not meet the NRHP eligibility criteria, it would still need to be considered under EO 13007

22   and AIRFA through the NEPA analysis, but not under the NHPA."). Regardless of where the

1    information or concern originates, BLM must take a hard look, as required by the law, at the

2    impacts.

3        **D. Vacatur is the Appropriate Remedy to Address the Harm to the Tribal**
4        **Intervenors.**
5

6            In its conclusion, LNC suggests that vacatur is not the appropriate remedy to address the

7    harm suffered by the Tribal Intervenors by BLM's unlawful actions and that somehow the

8    request for such a remedy was waived.  ECF 229 at 39. When a court determines that an agency's

9    decision was unlawful under the APA, vacatur is the standard remedy. *See* 5 U.S.C. § 706(2)(A)

10   ("The reviewing court shall ... set aside agency action, findings, and conclusions found to be ...

11   arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"). The

12   Ninth Circuit has instructed that vacatur of unlawful agency action is to be declined only in rare

13   circumstances. *See Humane Soc'y v. Locke,* 626 F.3d 1040, 1053 n.7 (9th Cir. 2010) ("In rare

14   circumstances, when we deem it advisable that the agency action remain in force until the action

15   can be reconsidered or replaced, we will remand without vacating the agency's action.").

16           Contrary to LNC's argument, it has the burden, not the Tribal Intervenors, to demonstrate

17   that an exception to the usual remedy of vacatur would apply. To grant an exemption, the Court

18   considers two factors: (1) "how serious the agency's errors are," and (2) "the disruptive

19   consequences of an interim change that may itself be changed." *See Cal. Cmtys. Against Toxics*

20   *v. Envtl. Prot. Agency*, 688 F.3d 989, 992 (9th Cir. 2012) (*quoting Allied–Signal, Inc. v. U.S.*

21   *Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)). Neither factor applies

22   here. The BLM's errors are serious. NHPA Section 106 specifically requires that the BLM

23   "shall, ... take into account the effect of the undertaking...." 54 U.S.C. § 306108. Similarly,

1  NEPA requires that an agency "will have available, and will carefully consider, detailed

2  information concerning significant environmental impacts" before making a decision on the

3  proposed action. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349, 109 S.Ct.

4  1835, 104 L.Ed.2d 351 (1989).

5          The consequences to the Tribal Intervenors justify vacatur. BLM has infringed the Tribal

6  Intervenors' rights to consultation, *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 572 n.7, 112 S.

7  Ct. 2130, 119 L. Ed. 2d 351 (1992), which cannot be cured retroactively through additional

8  procedures, *Quechan Tribe of Fort Yuma Indian Reservation v. U.S. Dept. of the Interior*, 755

9  F.Supp.2d 1104, 1120 (S.D. Cal. 2010) ("Tribe attaches cultural and religious significance to

10  many if not most of the [sites]" and "if the tribe hasn't been adequately consulted and the project

11  goes ahead anyway, this legally-protected procedural interest would be effectively lost.")

12      **III.    CONCLUSION**

13          For the foregoing reasons and those set forth in the motions for summary judgment,

14  Tribal Intervenors respectfully request that the Court deny BLM and LNC's motions for

15  summary judgment; grant Tribal Intervenors' motions for summary judgment; order that the

16  ROD, EIS, and other decision documents are legally and factually inadequate; rule that the BLM

17  has violated the NHPA, NEPA, applicable BLM policies, and the APA; enjoin BLM/LNC from

18  proceeding with any element of the Project until the agencies comply with the law, and properly

19  consult with the Tribe; vacate the ROD, EIS, and any of the BLM's decisions to approve the

20  Project until the agencies demonstrate to this Court that they have adequately complied with the

21  law; and award Tribal Intervenors their costs, litigation expenses, and reasonable attorneys' fees

1   associated with this litigation pursuant to the Equal Access to Justice Act, and all other

2   applicable authorities.

3   Dated this 27th day of June 2022.

4

5

6   Respectfully submitted,

7

8   s/Will Falk
9   Utah Bar No.: 16678
10  2980 Russet Sky Trail
11  Castle Rock, CO 80108
12  (319) 830-6086

13

14  Vicky Oldenburg (Nevada Bar No. 4770)
15  Oldenburg Law Office
16  P.O. Box 17422
17  Reno, NV 89511
18  (775) 971-4245
19  vicky@oldenburglawoffice.com

20

21  Terry J. Lodge
22  Ohio Bar No.: 29271
23  316 N. Michigan St., Suite 520
24  Toledo, OH 43604-5627
25  (419) 205-7084

26

27  Attorneys for Reno-Sparks Indian Colony

28

29  s/Rick Eichstaedt (Washington Bar No. 36487 *Admitted Pro Hac Vice*)
30  EICHSTAEDT LAW OFFICE, PLLC
31  25 West Main Avenue, Suite 320
32  Spokane, Washington 99201
33  Telephone:    (509) 251-1424
34  Email:  rick@eichstaedtlaw.net

35

36  Louis M. Bubala III (Nevada Bar No. 8974)
37  KAEMPFER CROWELL
38  50 West Liberty Street, Suite 700
39  Reno, Nevada   89501
40  Telephone:    (775) 852-3900
41  Facsimile:    (775) 327-2011
42  Email:  lbubala@kcnvlaw.com

43

44  Attorneys for the Burns Paiute Tribe

**CERTIFICATE OF SERVICE**

I hereby certify that on Monday, June 27, 2022, I filed the foregoing using the United

States District Court CM/ECF, which caused all counsel of record to be served electronically.

/s/Will Falk
Utah Bar No. 16678

**EXHIBIT INDEX**

| EXHIBIT | DESCRIPTION | # OF PAGES |
|---|---|---|
| 1 | DECL. OF CHARISSE. SOUCIE | 3 |