O. KENT MAHER (Nev. Bar No. 316)
kent@winnemuccalaw.com
PO Box 130
33 W Fourth Street
Winnemucca, Nevada 89446
Ph: (775) 623-5277
Fax: (775) 623-2468

*Local Counsel for Plaintiffs*

DOMINIC M. CAROLLO (Or. Bar. No. 093057)
*Pro Hac Vice*
dcarollo@carollolegal.com
Carollo Law Group LLC
Mail:   P.O. Box 2456
        Roseburg, OR 97470
Office: 2315 Old Highway 99 South
        Roseburg, OR 97471
Ph: (541) 957-5900
Fax: (541) 957-5923

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| **BARTELL RANCH, LLC,** a Nevada limited liability company and **EDWARD BARTELL**, <br><br> Plaintiffs <br><br> vs. <br><br><br> **ESTER M. MCCULLOUGH**, Winnemucca District Manager, **BUREAU OF LAND MANAGEMENT**, <br><br> Defendants, <br><br> and <br> **LITHIUM NEVADA CORP.**, <br> Defendant-Intervenor. | Case No.: 3:21-cv-00080-MMD-CLB <br><br><br> **BARTELL PLAINTIFFS' REPLY/RESPONSE BRIEF RE MOTIONS FOR SUMMARY JUDGMENT** |

## TABLE OF CONTENTS

I.   INTRODUCTION ...............................................................................1

II.   MATERIAL FACTS............................................................................2

    A.   BLM Permitted LNC to Prepare and Provide Environmental Documents.......2

    B.   Piteau Used Surveys to Generate Baselines and a Model to Analyze Effects..3

    C.   Piteau's Surveys Were Supposed to Follow Their Workplan, Including
        Stevens Protocols for Surveying Springs…......................................3

    D.   Piteau Surveyed Springs on Plaintiffs' Property Without Authorization.........4

    E.   Piteau's Surveys Failed to Follow the Workplan..............................6

    F.   Piteau's Survey Generated Inaccurate Measurements.....................8

    G.   BLM Did Not Evaluate Baseline Data........................................8

    H.   The Spring and Seep Baseline is Unreliable.................................9

    I.   BLM Did Not Make Records Available to the Public......................13

    J.   BLM Failed to Ensure the Accuracy of Other Aspects of Piteau's Work.......13

III.   LEGAL STANDARDS.......................................................................14

    A.   NEPA—"Flyspeck."...........................................................14

    B.   Methodologies..................................................................16

    C.   Scientific Integrity.............................................................17

    D.   Baseline Accuracy and Mitigation...........................................18

    E.   Independent Evaluation.......................................................19

    F.   Provide Environmental Information to the Public...........................20

    G.   FLPMA—RMP Applicability to Mining Claims...........................21

    H.   The Rosemont Case, *Ctr. for Biological Diversity v. United States Fish &*
        *Wildlife Serv*...................................................................22

i

IV.    ARGUMENT.................................................................................................22

         A. BLM Violated NEPA in Multiple Respects........................................22

              1.  The NEPA Process Lacked Professional and Scientific
                  Integrity.........................................................................................22

              2.  BLM Relied on an Erroneous Baseline....................................26

              3.  Mitigation is Impossible without an Accurate Baseline..........28

              4.  BLM Failed to Independently Evaluate Data...........................30

              5.  BLM Failed to Make Information Publicly Available.............32

         B. BLM Violated FLPMA in Multiple Respects………….....................34

              1.  BLM Failed to Comply with the Governing RMPs.................34

              2.  Permanent Occupancy of Invalid Mining Claims Causes Undue
                  Degradation……………………………..………….......................36

         C. Bartell Plaintiffs Have Standing……………….......................................38

V.     CONCLUSION............................................................................................40

## <u>TABLE OF AUTHORITIES</u>

### <u>CASES:</u>

*Airport Impact Relief, Inc. v. Wykle*,
192 F.3d 197 (1st Cir. 1999)....................................................................................20, 31

*Alaska Survival v. Surface Transp. Bd.*,
705 F.3d 1073 (9th Cir. 2013) (simplified) ...............................................................16

*All. for the Wild Rockies v. Pena*,
No. 2:16-CV-294-RMP, 2018 WL 4760503 (E.D. Wash. Oct. 2, 2018)....................19

*All. for the Wild Rockies v. Savage*,
375 F. Supp. 3d 1152 (D. Mont. 2019).....................................................................19

*Am. Rivers v. FERC*,
895 F.3d 32 (D.C. Cir. 2018)....................................................................................15

*Ashley Creek Phosphate Co. v. Norton*,
420 F.3d 934 (9th Cir. 2005)....................................................................................39

*Associations Working for Aurora's Residential Env't v. Colorado Dep't of Transp.*,
153 F.3d 1122 (10th Cir. 1998)......................................................................17, 26, 32

*Bohmker v. Oregon*,
903 F.3d 1029 (9th Cir. 2018).............................................................................21, 34, 35

*California Coastal Comm'n v. Granite Rock Co.*,
480 U.S. 572 (1987)............................................................................................21, 35

*Carvalho v. Wolfe*,
207 Or. App. 175 (2006)...........................................................................................25

*Chase v. Chase*,
15 Nev. 259 (1880)...................................................................................................25

*Citizens for a Better Env't v. Deukmejian*,
No. C89-2044 TEH, 1991 WL 424981 (N.D. Cal. Mar. 11, 1991)............................16

*Citizens for Better Forestry v. U.S. Dep't of Agric.*,
341 F.3d 961 (9th Cir. 2003).....................................................................................20

*City of Fernley v. Conant*,
No. 321CV00119MMDCLB, 2021 WL 5889529 (D. Nev. Dec. 13, 2021)
   (D.C.Cir.2003).....................................................................................................39

*City of Roseville v. Norton*,
219 F. Supp. 2d 130 (D.D.C. 2002), *aff'd*, 348 F.3d 1020
   (D.C.Cir.2003)................................................................................................20, 31

*Cloud Found. v. U.S. Bureau of Land Mgmt.*,
No. 3:11-CV-00459-HDM, 2013 WL 1249814 (D. Nev. Mar. 26, 2013)....................36

*Cockerham v. Atl. Richfield Co.*,
615 So. 2d 547 (La. Ct. App.)..............................................................................25

*Confederated Tribes of Grand Ronde Cmty. of Oregon v. Jewell*,
75 F. Supp. 3d 387 (D.D.C. 2014), *aff'd*, 830 F.3d 552 (D.C. Cir. 2016)..................19

*Conservation Nw. v. Rey*,
674 F. Supp. 2d 1232...............................................................................17, 18, 24

*Ctr. for Biological Diversity v. United States Bureau of Land Mgmt.*,
No. 214CV00226APGVCF, 2017 WL 3667700 (D. Nev. Aug. 23, 2017)...................16

*Ctr. for Biological Diversity v. U.S. Forest Serv.*,
349 F.3d 1157 (9th Cir.2003)...........................................................................17, 33

*Ctr. for Biological Diversity v. United States Fish & Wildlife Serv.*,
33 F.4th 1202 (9th Cir. 2022)..........................................................................22, 37, 38

*Duval Ranching Co. v. Glickman*,
965 F. Supp. 1427 (D. Nev. 1997).......................................................................38

*Earth Island Inst. v. Morse*,
No. 208CV-01897-JAM-JFM, 2009 WL 2423478 (E.D. Cal. Aug.5 2009)..................18

*Earth Island Inst. v. U.S. Forest Serv.*,
351 F.3d 1291 (9th Cir. 2003)...........................................................................18

*Earthworks v. U.S. Dep't of the Interior*,
 496 F. Supp. 3d 472 (D.D.C. 2020)..................................................................37, 38

*Env't Def. v. U.S. Army Corps of Engineers*,
515 F. Supp. 2d 69 (D.D.C. 2007) .......................................................................18

*Found. on Econ. Trends v. Lyng*,
680 F. Supp. 10 (D.D.C. 1988)..................................................................................20

*Gardner v. U.S. Bureau of Land Mgmt.*,
  633 F. Supp. 2d 1212 (D. Or. 2009), *aff'd*, 638 F.3d 1217 (9th Cir. 2011)...............21

*Ground Zero Ctr. for Non-Violent Action v. United States Dep't of Navy*,
  860 F.3d 1244 (9th Cir. 2017)................................................................................20

*Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*,,
857 F.2d 505 (9th Cir. 1988)......................................................................18, 19, 28

*In re Application of Kapel*,
1999-Ohio-304, 87 Ohio St. 3d 122.........................................................................25

*In re Application of Wylie*,
2000-Ohio-222, 89 Ohio St. 3d 471.........................................................................25

*Int'l Snowmobile Mfrs. Ass'n v. Norton*,
340 F. Supp. 2d 1249 (D. Wyo. 2004).............................................................. 33, 34

*LaFlamme v. FERC*,
852 F.2d 389 (9th Cir. 1988)...................................................................................15

*Landwatch v. Connaughton*,
905 F. Supp. 2d 1192 (D. Or. 2012).........................................................................19

*Lange v. Brinegar*,
625 F.2d 812 (9th Cir.1980)........................................................................19, 20, 31

*Lathan v. Brinegar*,
506 F.2d 677 (9th Cir. 1974)............................................................................15, 16

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Forsgren*,
163 F. Supp. 2d 1222 (D. Or. 2001), rev'd, 309 F.3d 1181 (9th Cir. 2002)...............16

*League of Wilderness Defs.-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*,
No. CIV. 04-488-HA, 2004 WL 2642705 (D. Or. Nov. 19, 2004).......................17, 26

*Lemon v. McHugh*,
668 F. Supp. 2d 133 (D.D.C. 2009).................................................................17, 23, 26

v

*Lingle v. Chevron U.S.A. Inc.*,
544 U.S. 528 (2005)..................................................................................................25

*Maddalena v. U.S. Fish & Wildlife Serv.*,
No. 08-CV-02292-H AJB, 2010 WL 9915002 (S.D. Cal. Aug. 5, 2010)....................................19
.
*Methow Valley Citizens Council v. Reg'l Forester*,
No. 85-2124-DA, 1986 WL 8595 (D. Or. Apr. 30, 1986), *rev'd*, 833 F.2d
810 (9th Cir. 1987), *rev'd sub nom. Robertson v. Methow Valley Citizens Council*, 490 U.S. 332
(1989)..................................................................................................................16

*Michael Hohl Carson Valley v. Hellwinkel Fam. Ltd. P'ship*,
442 P.3d 151 (Nev. 2019)...........................................................................................25

*Min. Pol'y Ctr. v. Norton*,
292 F. Supp. 2d 30 (D.D.C. 2003)......................................................................21, 22, 34

*N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*,
545 F.3d 1147 (9th Cir. 2008)....................................................................................15

*Nat. Res. Def. Council, Inc. v. Jamison*,
815 F. Supp. 454 (D.D.C. 1992)............................................................................21, 34

*Ni v. U.S. Citizenship & Immigr. Servs.*,
No. CV 08-3883CASAJWX, 2009 WL 649156 (C.D. Cal. Mar. 9, 2009)...............................25

*Norton v. Southern Utah Wilderness Alliance*,
542 U.S. 55 (2004)..................................................................................................21

*Nw. Env't Def. Ctr. v. Bonneville Power Admin.*,
117 F.3d 1520 (9th Cir. 1997)....................................................................................39

*Oregon Nat. Desert Ass'n v. Bureau of Land Mgmt.*,
625 F.3d 1092 (9th Cir. 2010).........................................................................16, 17, 26

*Oregon Nat. Desert Ass'n v. Bureau of Land Mgmt.*,
No. 2:10-CV-01331-SU, 2014 WL 4832218 (D. Or. Sept. 29, 2014)...................................36

*Oregon Nat. Desert Ass'n v. Jewell*,
840 F.3d 562 (9th Cir. 2016)...............................................................................passim

*Oregon Nat. Desert Ass'n v. Shuford*,
No. CIV. 06-242-AA, 2007 WL 1695162 (D. Or. June 8, 2007) ), *aff'd sub nom. Oregon Nat.
   Desert Ass'n v. McDaniel*, 405 F. App'x 197 (9th Cir. 2010)...................................................19

*Oregon Nat. Desert Ass'n v. Taylor*,
No. 04-334-KI, 2005 WL 106599 (D. Or. Jan. 18, 2005)...........................................................37

*Pub. Emps. for Env't Resp. v. Hopper*,
827 F.3d 1077 (D.C. Cir. 2016)...................................................................................................15

*Rags Over the Arkansas River, Inc. v. Bureau of Land Mgmt.*,
77 F. Supp. 3d 1038 (D. Colo. 2015...........................................................................................21
.

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989).....................................................................................................................16

*Save Our Wetlands, Inc. v. Sands*,
711 F.2d 634 (5th Cir. 1983)..................................................................................................20, 31

*Sierra Club v. Marsh*,
714 F. Supp. 539 (D. Me.), *amended*, 744 F. Supp. 352 (D. Me. 1989),
*aff'd*, 976 F.2d 763 (1st Cir. 1992).......................................................................................19, 31

*Sierra Club v. Van Antwerp*,
709 F. Supp. 2d 1254 (S.D. Fla. 2009), *aff'd*, 362 F. App'x 100 (11th Cir. 2010)...............20, 31

*S. Fork Band Council Of W. Shoshone Of Nevada v. U.S. Dep't of Interior*,
588 F.3d 718 (9th Cir. 2009)........................................................................................................28

*Sharks Sports & Ent. LLC v. Fed. Transit Admin.*,
No. 18-CV-04060-LHK, 2020 WL 4569467 (N.D. Cal. Aug. 8, 2020)......................................37

*Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation*,
531 F.2d 637 (2d Cir.1976)..........................................................................................................19

*Theodore Roosevelt Conservation P'ship v. Salazar*,
605 F. Supp. 2d 263 (D.D.C. 2009), *aff'd*, 616 F.3d 497 (D.C. Cir. 2010)..........................21, 34

*Thompson v. U.S. Dep't of Lab.*,
885 F.2d 551 (9th Cir. 1989)......................................................................................................8, 9.

*Utahns for Better Transportation vs. U.S. Dep't of Transportation*,
305 F.3d 1152 (10th Cir. 2002)....................................................................................................20

*W. Radio Servs. Co. v. Espy*,
79 F.3d 896 (9th Cir. 1996)..................................................................38

*Westlands Water Dist. v. U.S. Dep't of Interior, Bureau of Reclamation*,
850 F. Supp. 1388 (E.D. Cal. 1994)....................................................39

*Yount v. Salazar*,
No. CV11-8171-PCT DGC, 2013 WL 93372 (D. Ariz. Jan. 8, 2013)............................38, 39, 40

## **ADMINISTRATIVE RULES:**

40 C.F.R. § 1500.1(b)..........................................................................17

40 C.F.R. § 1506.6..............................................................................20

43 U.S.C. § 1732(b)........................................................................21, 22

43 U.S.C. § 1712(a)............................................................................21

43 U.S.C. § 1712................................................................................35

43 U.S.C. § 1712(e)(3) ......................................................................35

43 U.S.C. § 1714................................................................................35

43 U.S.C. § 1702..........................................................................35, 37

## **OTHER AUTHORITIES:**

*Humboldt Zone 4 2021 Update*,
Nevada Department of Transportation  (2021)
   https://www.dot.nv.gov/Home/ShowDocument?id=7835
..............................................................................................................6
:
Eleanor R. Schwartz, *A Capsule Examination of the Legislative History of the Federal Land Policy and Management Act of 1976*,
*21 Ariz.L.Rev. 285 (1979)* https://solareis.anl.gov/documents/docs/FLPMA.pdf
..............................................................................................................35

Denise A. Dragoo, *Federal Land Use Planning Primer Under FLPMA and NEPA*
https://www.swlaw.com/assets/pdf/publications/2003/06/12/DDragooFLPMApresent.pdf
..............................................................................................................35

viii

INTEGRITY,
Black's Law Dictionary (11th ed. 2019)
.............................................................................................................................17, 24

Holly Doremus, *Scientific and Political Integrity in Environmental Policy*,
86 Tex. L. Rev. 1601 (2008)
.......................................................................................................................17, 18, 24

Dep't of the Interior, *GPRA Strategic Plan Fiscal Year 2007-2012*
......................................................................................................................................18

**TABLE OF ACRONYMS**

| AR | Administrative Record |
|---|---|
| ARMPA | Approved Resource Management Plan Amendment |
| AWARE | Associations Working for Aurora's Residential Env't |
| BA | Biological Assessment |
| BGS | Below Ground Surface |
| BLM | Bureau of Land Management |
| CEQ | Center for Environmental Quality |
| CFS | Cubic Feet Per Second |
| CTFS | Clay Tailings Filter Stack |
| DEIS | Draft Environmental Impact Statement |
| DOI | Department of the Interior |
| ET | Evapotranspiration |
| FEIS | Final Environmental Impact Statement |
| FLPMA | Federal Land Policy and Management Act |
| GPM | Gallons Per Minute |
| ICF | ICF International Inc. |
| LCT | Lahontan Cutthroat Trout |
| LNC | Lithium Nevada Corporation |
| MSJ | Motion for Summary Judgement |
| NDOT | Nevada Department of Transportation |
| NDOW | Nevada Department of Wildlife |
| NDWR | Nevada Division of Water Resources |
| NEPA | National Environmental Policy Act |
| Piteau | Piteau Associates |
| Plaintiffs | Bartell Ranch, LLC and Edward Bartell |
| RMP | Resource Management Plan |
| ROD | Record of Decision |
| VRM | Visual Resource Management |

x

# I.    INTRODUCTION

Beneath northern Nevada's desert sky lies Thacker Pass, a sagebrush steppe ecosystem teaming with biodiversity where sage grouse, deer, pronghorn antelope, springsnails, trout, and many more creatures emblematic of the American west thrive. This is where the Bartell Plaintiffs call home, raising their cattle among the other wildlife on BLM land on Thacker Pass and enjoying the freedoms, solitude, views, and mystique that comes with ranching under the Nevada desert sun. Unfortunately, this is all about to change as the Thacker Pass Mine proposes to destroy the sagebrush steppe and the few water resources which support the area's biodiversity.

Bartell Plaintiffs will have to live with the effect of this Mine like no other. During BLM's NEPA process Plaintiffs fought hard to get BLM to recognize the importance of the Thacker Pass ecosystem and fix shortcomings in the NEPA analysis. But BLM refused, often misrepresenting aspects of the NEPA process. Many of the same misrepresentations are now being repeated in briefing before this Court.

A fundamental problem throughout the NEPA process, and further exposed in this litigation, has been the role LNC's consultants played in the preparation of the FEIS. LNC's consultant Piteau collected baseline data for water resources, developed a groundwater drawdown model, analyzed Mine impacts, and more. BLM's contractors, meanwhile, took Piteau's information and inserted it into the FEIS. Yet, LNC has made blatantly false assertions that *BLM* collected water data (ECF 239 at 25), *BLM* modeled groundwater drawdown (ECF 239 n.29), and *BLM* surveyed Pole Creek (ECF 239 at 41), when in reality it was Piteau that did so. *See* ECF 238 at 16; TPEIS-0374. LNC even asserts "BLM conducted a sensitivity analysis'" when, in fact, the

"sensitivity analysis" was Piteau's work product.[1] ECF 239 at 26; TPEIS-0713 AR-067654; TPEIS-0711. The Court must cut through the misdirection and misrepresentations forming the foundation of Defendants' case and hold BLM to its duty to honor the requirements of NEPA and FLPMA.[2] To do anything else would be to work a disservice on environmental laws and judicial integrity. It is essential this Court establish a precedent that will ensure future projects meet legal requirements.

## II.    MATERIAL FACTS

Because there are so many misrepresentations and distortions in Defendants' briefs, Plaintiffs first wish to summarize material facts that support their claims, particularly their NEPA claims, and which controvert Defendants' cross motions.  While some of the facts set forth below are foundational background facts, in other instances the individual facts set forth below, standing alone, constitute a NEPA violation and warrant vacatur of the ROD.  Taken together and in combination, they paint a damning picture of multiple NEPA violations.

### A.  BLM Permitted LNC to Prepare and Provide Environmental Documents.

The FEIS contains well over 1,000 pages directly prepared by project proponent LNC and Piteau. *See generally* TPEIS-0384. BLM explains "Lithium Nevada hired [Piteau] to complete several water quality and quantity impact assessment reports…These reports…established

---

[1] Other misrepresentations abound. In ECF 256 LNC *twice* stated that Plaintiffs never cited paragraphs 13-42 of the Bartell Decl. (ECF 206) in the "Standing" section of their MSJ. *Id.* at 3, 8. However, Plaintiffs cited the *entire* Bartell Decl. in the "standing" section of their MSJ, and *specifically* cited paragraphs 27 and 18-30 in the same section. ECF 204 at 15, 17.

[2] LNC also accuses Plaintiffs of making false statements while routinely misstating Plaintiffs' arguments and contorting the record.  For instance, LNC falsely accuses Plaintiffs of "spuriously" claiming that total sulfur use was hidden from the public in the DEIS.  ECF 239 at 11 n. 2.  In fact, Plaintiffs are correct, Phase 2 sulfur use was *excluded* from the DEIS (TPEIS-0312 AR-039622) and only first disclosed much later, in the FEIS (TPEIS-0384 at 159), long after the formal public comment period had ended.

baselines … in the Project area and modeled the potential impact of the Project to those resources." ECF 238 at 16. Piteau's reports and baseline data form the water resources analysis.

### B. Piteau Used Surveys to Generate Baselines and a Model to Analyze Effects.

The water resources baseline for springs, seeps, and streams was created by Piteau. As BLM explains: "Piteau Associates surveyed the Project area to collect baseline data of ground water, seeps, and springs. This recently collected data, in conjunction with existing information provided by [NDWR] formed the baseline for the Project analysis."[3] ECF 238 at 19. Once the baselines were established Piteau used the same data to create a model which analyzed the Mine's impacts on water resources. *See* ECF 238 at 16; TPEIS-0384 at 58-61, 1057-2478.

The baselines for springs and seeps are located in TPEIS-0076, where Piteau summarized the baselines in a spreadsheet. The spring and seep baselines are comprised of different data sets. For the springs Piteau surveyed pursuant to the Workplan (*see* Fact C, *infra*), the results of Piteau's surveys, when averaged over four quarters, form the baseline for each spring. However, Piteau did not survey all springs. Prior surveys completed many years ago on behalf of Western Lithium formed the baseline for other springs. TPEIS-0027. Piteau's spreadsheet at TPEIS-0076 compiles the baselines for springs relevant to the Thacker Pass Mine, whether surveyed by them or the past consultants of Western Lithium.

### C. Piteau's Surveys Were Supposed to Follow Their Workplan, Including Stevens Protocols for Surveying Springs.

Piteau and BLM developed a Workplan to guide Piteau's spring surveys to ensure that baseline data for the NEPA process was collected in accordance with "BLM's Data Adequacy

---

[3] BLM's statement is incorrect in part. Piteau's surveys at TPEIS-0076 generated some baseline data. However, other baseline data was generated by prior surveys completed by surveyors for Western Lithium—a prior project proponent. TPEIS-0027. Piteau utilized these surveys to develop a "comprehensive" baseline.

Standards and other BLM guidelines." ECF 238 at 19-20. *Id*. The Workplan, TPEIS-0054, states: "this document outlines the workplan for baseline data collection for the water quantity and quality impacts analysis. This workplan was designed to meet the Data Adequacy Standards for the BLM[.]" The Workplan describes the methodology Piteau agreed to use when conducting the spring survey, describing eight particular surveying guidelines as follows:[4]

> The seep/spring inventory will comprise of the following elements for Level 1 inventory protocols (Stevens, 2016):
> • Description of location and spring type,
> • Location coordinates,
> • Photographs of locations, taken at the same location and vector between visits,
> • Flow measurement using pipe, meter, or portable parshall flume/weir (where surface flow is occurring),
> • Field parameters (pH, conductivity, ORP, temperature),
> • A filtered water quality sample will be collected at the first visit to springs.
> • Inventory of fauna and area of phreatophytes,
> • General observations and comments

*Id*. at AR-005702-03. The FEIS then clearly and unambiguously represented to the public that "[s]urveys … followed Level I Stevens protocol guidelines" (TPEIS-0384 at 285), "[s]pring surveying followed Level I protocols guidelines … for over a period of four consecutive quarters" (*id*. at 2317), and "Hydrologic baseline data was collected according to the '…Baseline and Model Workplan[.]'" *Id*. at 2299.[5]

**D. Piteau Surveyed Springs on Plaintiffs' Property Without Authorization.**

Plaintiffs own real property near the Thacker Pass Mine. This property contains three

---

[4] The Workplan also identifies four "priority monitoring locations." Those springs are Big Bend Spring (SP-007), Calavera Spring (SP-055), Lone Willow Spring, and Indian Springs (SP-035).

[5] Defendants try to raise a distinction about the level of the Stevens Protocols Piteau agreed to follow, arguing that Piteau was only required to follow "Level 1" protocols. Ultimately, any possible distinction between "Level 1," "Level 2," or "Level 3" protocols is irrelevant here because Piteau agreed, in the Workplan, to follow eight aspects of the Stevens Protocols, which bridge across both "Level 1" and "Level 2," and asserted that these aspects had been followed. That the Workplan called these "Level 1" protocols was, thus, either a mistake or imprecise.

springs which Piteau identified: SP-035, SP-042, and SP-023. TPEIS-0384 at 2386. Piteau surveyed two of these springs (SP-035 and SP-042) four times in 2018. *See* TPEIS-0076 AR-008643, AR-008657. Piteau did not conduct outreach, much less seek or obtain Plaintiffs' permission, prior to surveying these springs. TPEIS-1499 AR-112888.[6] BLM admits "Piteau explained … that it 'did access Bartell's property on four occasions in 2018' to collect baseline data[.]" ECF 238 at 24. BLM argues that Piteau's trespass was excusable because Piteau "never observed a 'no trespassing sign' … and believed the road used to access the [springs] in question 'to be public based on the [Nevada] Department of Transportation Roadmap.'" *Id.* at 24-25. The Record demonstrates Mr. Cluff and Piteau knew that SP-035 and SP-042 were located on Plaintiffs' private lands prior to the spring survey. Two 2013 documents authored by Mr. Cluff (TPEIS-0028 AR-002739; TPEIS-0031 AR-003622) and Piteau's 2018 Workplan (TPEIS-0054 AR-005683) state "[s]pring sites SP-023 and SP-035 … are located on private land."[7]

The road Piteau used to access SP-035 and SP-042 drove through a fence line and over Plaintiffs' cattle guard—each depicting Plaintiffs' property line. TPEIS-1499 AR-112888. Piteau also drove past a "Private Property" sign posted on Plaintiffs' fence line which stated "For Access Call" with Mr. Bartell's phone number. *Id.*; TPEIS-1489 AR-106727.

---

[6] Tyler Cluff, Piteau's lead hydrogeologist for the Thacker Pass Mine, admitted in sworn testimony that Piteau did not contact Mr. Bartell prior to surveying SP-035 or SP-042. ECF 208-02 at 16.
[7] SP-042 is located adjacent to SP-035 and SP-023. TPEIS-0384 at 2386.



This photograph, included in the Plaintiffs' DEIS comments at TPEIS-1489 AR-106727, depicts the sign, fence, and cattleguard located at the entrance to Plaintiffs' private land.

BLM asserts that Piteau reasonably relied on the NDOT Roadmap for access to Plaintiffs' property. This map states that it is a draft and "NDOT makes no determination with regard to legal status of any road not maintained by NDOT." *See* Humboldt Zone 4 2021 Update, NDOT https://www.dot.nv.gov/Home/ShowDocument?id=7835 (2021 revision of map Piteau used (TPEIS-0406 AR-048356)). Furthermore, even assuming *arguendo* that Piteau had a legal right to access the road, the record is clear that Piteau went beyond any potential right of way when surveying SP-035 and SP-042. Piteau surveyed the entire perimeter of SP-035 and surveyed SP-042, which was on the other side of Crowley Creek from the road Piteau used for access. TPEIS-0076 (2018 Q4) AR-008624, 008694, 008700.

**E. Piteau's Surveys Failed to Follow the Workplan.**

The protocols described in the Workplan (Fact C, *supra*) contain their own individual

elements.[8] Use of field data sheets is an element of each of the protocols Piteau agreed to follow because Stevens explains that "[f]ield data sheets are the most efficient and reliable information documentation for Level 1 and 2 springs inventories." TPEIS-0642 AR-060687. Therefore, the Stevens Protocol recommends "field data entry on hard copy sheets, with data entry in the laboratory soon afterwards[.]" *Id*. Sketchmaps are an element of the Stevens Protocols for flow measurements, as well as descriptions of the spring, photograph locations, and inventory of fauna and phreatophyte area. *See* TPEIS-0642 AR-060700-09 ("The point of flow measurement should be recorded on the sketchmap"); AR-060695 ("indicate photo sites on the sketchmap"). Measuring spring flow at the point of maximum discharge is an element of the "flow measurement" protocol. TPEIS-0642 AR-060709 ("Springs flow should be measured at the point of maximum surface discharge"). Landowner outreach is an element of all Stevens Protocols to ensure spring data is collected lawfully and with integrity. *See* TPEIS-0642 AR-060682, 0685 ("Prior to conducting field work, the survey team should contact private landowners … to arrange access to springs …. Because information collected on the sites is the intellectual property of the springs owner, the team needs to ensure the security and ownership of the inventory data with the steward.").[9]

Ultimately, Piteau did not follow any of these protocol elements. Piteau did not use field sheets or prepare sketchmaps for all springs. ECF 208-2 at 12, 20. Similarly, Piteau did not take

---

[8] Nearly every element of the Stevens Protocols is prefaced with the term "should" or "recommend." Despite this, it is plain and obvious that, when Piteau agreed to follow the eight Stevens Protocols described in the Workplan, Piteau agreed to follow the Protocols' recommendations. Piteau could not both agree to follow the protocols and simultaneously decide *not* to follow the protocols *because* they are recommendations. Piteau's inability, or decision, not to follow these protocols amounts to a "failure" to follow the protocols.

[9] The Stevens Protocols for landowner outreach, like the protocols for data sheets and sketchmaps, span across level 1 and level 2 inventories. *See generally* TPEIS-0642. Obviously, trespass is not permissible under a level 1 inventory but impermissible under level 2. Rather, it is a general requirement.

Page **7**– BARTELL PLAINTIFFS' REPLY/RESPONSE BRIEF RE MOTIONS FOR SUMMARY JUDGMENT

flow measurements at springs' point of maximum discharge. *See Id*. at 3, 18. With respect to landowner outreach and authorization, Piteau admitted that, in the case of Bartell Ranch, Piteau "did not" follow the Stevens Protocols. *Id*. at 14. The administrative record also demonstrates that Piteau failed to measure springs at the point of maximum discharge. *See* Fact F, *infra*. Thus, Piteau did not follow multiple elements of the protocols described in the Workplan.

### F.  Piteau's Survey Generated Inaccurate Measurements.

Piteau failed to follow the Stevens Protocols and the Workplan for SP-047 by measuring the spring at the orifice as opposed to the point of maximum discharge. Mr. Cluff stated that taking SP-047's flow measurement at the orifice explained why a different hydrogeologist had recorded higher flow, stating that "[i]f [SP-047] was a gaining reach, which it very well may be, there would be additional flow upwelling further down the reach."[10] ECF 208-2 at 3.

Similarly, Piteau's baseline survey for SP-048 was incorrect because Piteau did not record SP-048 at the point of maximum surface discharge. Piteau recorded 23.9 gpm of flow from SP-048 for baseline purposes. TPEIS-0076 at AR-008510. Piteau's records state that SP-048 had greater flow—38.6 gpm—downstream from where the Q1 baseline measurement was taken. *Id*. Thus, it is admitted or well established that Piteau's failure to follow the Stevens Protocols for flow measurements resulted in a decreased spring survey measurement.[11]

### G.  BLM Did Not Evaluate Baseline Data.

An administrative record "consists of all documents and materials directly or *indirectly* considered by agency decision-makers." *Thompson v. U.S. Dep't of Lab.*, 885 F.2d

---

[10] This is not a "battle of the experts" issue. Rather, Mr. Cluff admits that Piteau's measurement was not a reflection of SP-047's maximum discharge.

[11] In the case of SP-035, the baseline is "zero flow" despite it being a perennial spring feeding 12 acres of water rights. This too is an inaccurate measurement caused by Piteau measuring the spring at the "orifice" as opposed to the point of maximum discharge. ECF-208-2 at 18.

551, 555 (9th Cir. 1989) (citation omitted). If BLM independently evaluated Piteau's spring surveys and data, the record would contain evidence of such evaluation. The record does contain evidence that BLM evaluated reports and analysis prepared by Piteau. The record also contains a general statement that "Dan Erbes … and Patrick Plumlee … have been working with Piteau and LNC with regard to these baselines[.]" TPEIS-1131 AR-097595–96. However, the record *does not* contain any examples or comments where BLM specifically evaluated baseline data. The record *does not* contain any instances where BLM independently measured springs, spring sites, or otherwise evaluated Piteau's measurements or field work. The record *does* contain an admission that BLM did not have time to visit springs to evaluate whether Piteau took spring measurements at the correct location. TPEIS-1411. BLM has admitted that it did not independently evaluate Piteau's baseline data but instead evaluated Piteau's Workplan (but not compliance with the Workplan) and Piteau's reports. *See* ECF 224 at 16 ("that BLM evaluated and approved the proposed work plan, as well as the reports and models prepared from the data collected under it, suffices."). In sum, it is beyond reasonable dispute that BLM evaluated Piteau's Workplan, *but not Piteau's compliance with the Workplan*, BLM evaluated Piteau's reports and analysis generated from baseline data *but not the accuracy or reliability of the data itself*, and, further, *BLM did not visit springs* despite recognizing spring surveys may have been taken at incorrect locations.[12]

## H. The Spring and Seep Baseline is Unreliable.

Table 4.2 of the FEIS identifies 22 perennial springs which will be monitored and possibly mitigated. TPEIS-0384 at 61. These are 22 of the springs Piteau and earlier surveyors identified as

---

[12] In point of fact, direct communication between BLM or BLM's NEPA contractors and Piteau was purposefully curbed. *See* TPEIS-0125 AR-109324 ("Ken requested that agencies directly contact LNC with questions and data requests, and copy Ken on all conversations. However, comments and data requests regarding the Piteau hydrology report need to go through Ken, and Ken will provide an official request to LNC.").

perennial.[13] Errors or insufficiencies exist in the baseline for 12 of these 22 springs: BLM-02, SP-006, SP-008, SP-010, SP-029, SP-030, SP-031, SP-032, SP-035[14], SP-042, SP-047, and SP-048.[15]

Seven (BLM-02, SP-008, SP-029, SP-030, SP-032, SP-035, and SP-042)[16] of the 22 perennial springs have baseline flow of zero despite being characterized as "perennial" and having observed flow. *See* TPEIS-0384 at 61; TPEIS-0076 at Table 5.1. For five of these springs, the surveys document flow at all quarters of the year, but the surveyors never actually measured the quantity of the flow. *See generally* TPEIS-0027. The record therefore shows that the baseline for these springs is flow of 0 gpm.[17] Two of these springs (SP-035 and SP-042, also located on Plaintiffs' property) were surveyed but, like the above-described springs, the baseline is misrepresented as 0 gpm as a result of surveyor error. Meanwhile, three (SP-006, SP-010, and SP-

---

[13] LNC falsely asserts Piteau measured "over fifty springs." ECF 239 at 29. In fact, Piteau visited roughly 29 springs, some of which were not measured because Piteau failed to definitively locate springs, as was the case with SP-007. TPEIS-0076 AR-008470, AR-008492. Furthermore, many springs have been converted to underground pipelines yet by Piteau's own admission "Piteau did not locate overflow pipes or buried pipes" although Plaintiffs requested this be considered during the NEPA process. TPEIS-406 AR-048361; TPEIS-1489 AR-106716.

[14] With respect to SP-035, Defendants pointed to Piteau's representations about water being "characterized separately," and captured in the Crowley Creek stream gauge. The record is clear SP-035 is a large perennial spring that naturally irrigates approximately 12 acres without flowing into Crowley Creek. TPEIS-1489 AR-106707-8. Piteau and another LNC consultant mapped this spring, and these maps confirm it does not flow into Crowley Creek. TPEIS-0076 AR-008525; TPEIS-0062 AR-006667.

[15] Evaluating the accuracy of Plaintiffs' claims here will require a fact-intensive inquiry. A spreadsheet (Spring Survey Datasheet 20190117) is available within TPEIS-0076 ("2019 GPS Shape Files" folder). Table 5.1 of this spreadsheet contains the "average" flow for all springs surveyed by either Piteau or earlier parties (in 2011-2013). This "average" is the baseline for the springs. Piteau calculated this average based on the spring surveys conducted by them and earlier parties. Surveys are found at TPEIS-0027 and TPEIS-0076. Comparisons between the FEIS, Piteau's spreadsheet, and the survey forms reveals the inaccuracies discussed in this section.

[16] The baseline data report states that SP-030 and SP-032 have baselines of "<1" gpm while SP-010 has a baseline of 0 gpm. *Compare* TPEIS-0076 Datasheet 20190117, Table 5.1 *with* TPEIS-0384 at 2318. Neither is correct, as these values are not based on actual spring measurements. Inconsistencies exist throughout Piteau's documents. *Id.* see also TPEIS-0384 at 1063.

[17] By definition a perennial spring cannot have *zero* average flow. It is incomprehensible a spring with *perennial* flow likewise has *zero* baseline flow. The two concepts are mutually exclusive.

031) of the 22 perennial springs have baselines of "<1" gpm. *See* TPEIS-0384 at 61; TPEIS-0076 at Table 5.1. Yet, the record reveals that flow from SP-006 and SP-010 was never actually measured (TPEIS-0027 AR-002620-23), and when SP-031 was measured the flows recorded were always *greater than* 1 gpm (TPEIS-0027 AR-002088, AR-002159).[18] Thus, 10 of the 22 perennial springs have an insufficient baseline.[19]

Three of the 22 perennial springs (SP-047, SP-048, and SP-035) were admittedly surveyed outside the point of maximum discharge, also creating a baseline error. *See* Facts E, F, *supra*. Therefore, a total of 12, or approximately 55 percent, of the perennial springs identified in Table 4.2 of the FEIS have baseline errors or insufficiencies, with 10 of these springs having a meaningless "zero flow" (or undocumented "<1 gpm") baseline.

In addition to these errors, there are some springs which the record demonstrates are perennial (not ephemeral) but were excluded from Table 4.2. SP-023, located on Plaintiffs' land adjacent to SP-035 and SP-042, had documented (but unmeasured) flow for four straight quarters but is not identified as perennial. TPEIS-0027 AR-002485, AR-002064, AR-002383, AR-002152. Similarly, BLM-03 is not identified as perennial but has four quarters of documented flow. TPEIS-

---

[18] Additionally, the record shows that SP-006 has pipes capturing spring flow. TPEIS-0027 AR-002553.This captured flow was never measured. For SP-010, some surveys describe extensive flow through multiple channels. TPEIS-0027 AR-002373. Rather than measuring this flow one surveyor simply recorded "<1" gpm of flow—a figure which made its way into the baseline. TPEIS-0027 AR-002623.

[19] To summarize this important concept, these baselines are insufficient because, in many instances, surveyors observed significant spring flow (often through multiple channels) or significant groundwater upwelling over a broad area. However, rather than actually measure the quantity of water produced by these springs surveyors simply did not measure the springs at all. When the baseline was then prepared there was no flow data to utilize. As a result, the baseline for these springs became either "zero" or "<1 gpm," even though these springs produce water well in excess of that amount. Ultimately, then, there is not a sufficient baseline for these springs.

0027 at AR-002461, AR-002041, AR-002360, AR-002131.[20] SP-055 is also not considered perennial although it feeds 10 miles of pipelines during all months of the year, never going dry. TPEIS-01489 AR-106706, AR-106731-32.[21]

The spring and seep baseline even contains instances of blatant misrepresentation. For instance, SP-036 has an "average" flow of 1.1 gpm. However, Piteau reached this calculation by mischaracterizing the spring's highest quarterly flow value as "zero" flow because the spring *flowed too much to measure*. TPEIS-1489 at AR-106730-31.  LNC and BLM try to pass this off as a fly speck.  However, the AR shockingly reveals Piteau routinely reported documented but unmeasured flow as *zero* flow. These fictitious inputs skew baselines downward.[22] Given the extensive errors noted herein, and the failure to follow data gathering protocols, it is likely most or all the springs have baseline errors or insufficiencies, but the record is lacking to fully evaluate the accuracy of all springs. Ultimately, the spring and seep baseline is unreliable.

---

[20] Erroneously documented BLM-002, BLM-003, SP-029, SP-030, SP-031, SP-032, SP-035, SP-047, and SP-048 are inhabited by springsnails, which cannot survive in ephemeral springs (or springs with zero flow). TPEIS-0062 AR-006650; TPEIS-0826 AR-072100.

[21]  SP-055 was a "priority monitoring location." TPEIS-0054 AR-005702. Unfortunately, substantial problems exist for the "priority monitoring locations." For theses springs Piteau's surveys: (1) concluded SP-007 did not flow as Piteau did not identify the spring source (TPEIS-0076 AR-008492); (2) did not measure SP-055's perennial flow into outlet pipes feeding Plaintiffs' stockwater (TPEIS-01489 AR-106706, AR-106731-32); (3) did not survey Lone Willow Springs at all, and; (4) trespassed to collect data on SP-035 and reported a false "0 gpm" baseline flow.

[22] Piteau's spreadsheet used to calculate baselines reveals how the baselines are not an accurate depiction of the actual spring conditions. For instance, the spreadsheet utilizes data from a June, 2012 spring survey to calculate average spring flows. However, this particular survey revealed observed *but unmeasured* flow in 12 springs: BLM-02, BLM-03, SP-010, SP-023, SP-029, SP-030, SP-032, SP-033, SP-034, SP-035, SP-037, and SP-040. TPEIS-0076 "Spring Survey Datasheet 20190117" at Table 5.1 row 51. Rather than consider these baselines insufficient, Piteau instead assigned these 12 springs a "zero" flow value for June of 2012. *Id*. In turn, this arbitrarily reduced the average flow for these springs because the baselines were averaged using a "zero" flow value when, in fact, there was actual *but unmeasured* flow in these springs. TPEIS-0027 AR-002129-2172. Similarly, had the SP-036 baseline utilized the Q2 measurement of 63 gpm documented by another hydrologist rather than exclude any measurement because of "too much flow," the baseline would have been 15-fold higher. TPEIS-1489 at AR106690.

## I. BLM Did Not Make Records Available to the Public.

BLM admits that the BA prepared to analyze the impacts of the Mine on the threatened LCT was not publicly available. ECF 238 at 38. The FEIS does not even reference the BA. *See generally* TPEIS-0384. Similarly, BLM does not dispute that the Mitigation Plan was not publicly available until after the ROD was signed. *See* ECF 238 at 39. Plaintiffs also requested LNC's consultants' responses to public comments, utilized for decision-making in the FEIS. Rather than providing these documents BLM erroneously and falsely represented that only BLM staff and NEPA contractors were relied upon for comment responses.[23] TPEIS-1439; TPEIS-0355; TPEIS-0406. BLM did not make LNC's consultants' comment responses available to the public.

## J. BLM Failed to Ensure the Accuracy of Other Aspects of Piteau's Work.

Piteau monitored three wells while conducting a 72-hour pump test from the proposed water supply well to generate drawdown data which was extrapolated into the model to determine pumping impacts over the next 40-plus years. TPEIS-0711 AR-066184, AR-066433. During the pump test one of the transducers measuring drawdown was off by several feet from the conditions Piteau reported. ECF 238 at 31. Piteau inexplicably adjusted the data produced by the transducer in the production well downward to meet the level of the "erroneous" transducer.  TPEIS-0448 AR-052488; *compare* TPEIS-1489 AR-108465 *with* TPEIS-0384 at 2450.   This raises discrepancies in two of the three wells monitored for the pump test.  Most importantly, however, BLM did not evaluate the monitoring well or transducer to determine the accuracy of Piteau's manual data adjustments; instead, BLM relied on Piteau to self-investigate.[24]  ECF 238 at 31.

---

[23] BLM even discussed how to avoid responding to Plaintiffs' requests.  *Id.*; TPEIS-1437.

[24] LNC tries to justify Piteau's errors by implying in excess of 100 wells were monitored. ECF 239 at 34-35. In fact, Piteau themselves only monitored a handful of wells.  Piteau had roughly 39 sensors in 23 groundwater wells. TPEIS-0711 AR-066170-75.

Another groundwater discrepancy exists within certain wetlands in Sections 33 and 34 near the production well. A report prepared by Dr. Stringham, a consultant hired by LNC, concluded that water levels within a wetland area in Section 33 ranged from 14-30 feet. TPEIS-0384 at 124. This conclusion was included in the FEIS. *Id.* 14 years of groundwater monitoring by NDWR within the same wetland area in Section 33 reveals groundwater levels below that wetland never dropped lower than 6.92 feet bgs.[25] *Compare* TPEIS-0343 AR-044870 *with* AR-044858, AR-044855; *see also* TPNHPA-0209; TPEIS-0647 AR-061293 (Dr. Stringham's groundwater level estimate was taken in the same NW1/4 of Section 33 where the NDWR monitoring wells recorded groundwater levels 6.92 feet bgs or less).[26]

Finally, Piteau's Baseline Data Report, incorporated into the FEIS, also falsely assumed Pole Creek to be ephemeral at all reaches.[27] TPEIS-0384 at 2305, 2386. The groundwater model was calibrated to zero-flow for all reaches of Pole Creek. *Id.* at 1063.[28] Piteau attempted to rectify this issue by later surveying Pole Creek without revising the model. On three occasions Piteau took single-day measurements from Pole Creek locations to compare to the groundwater model's

---

[25] Plaintiffs' MSJ notes that Dr. Stringham incorrectly concluded that wetlands in sections 33 and 34 were caused by irrigation. BLM's response brief confusingly attempts to refute this by relying on Dr. Stringham's statements about a different upland area in section 22. ECF 238 at 31. Meanwhile, Piteau recognized that water levels in section 33 were 6.7 feet below ground surface in the same ¼ section Dr. Stringham monitored, directly contradicting Stringham and the FEIS. TPEIS-0343 AR-044870. Ultimately, Dr. Stringham's assertions that section 33 wetlands were caused by irrigation, therefore negating the possibility of impacts from the Mine, were false and directly contradicted by well-developed facts. *Id*; TPEIS-0448 AR-052493-96.

[26] LNC falsely asserts that Piteau's data supports Stringham's conclusions, and that the NDWR monitoring well is in a different location. ECF 239 at 37.

[27] Even Lower Pole Creek has late season flows. TPEIS-1489 AR-106674. Lower Pole Creek flows are critical for LCT migration between metapopulations. TPEIS-1114 AR-097073

[28] The pre-mining flux targets used to calibrate the model also suffered from the same errors and insufficiencies plaguing the baseline. *See* Fact H, *supra*; TPEIS-0384 at 1063.

outputted flow value for Pole Creek.[29] *See* TPEIS-0374 at AR-045396. These after-the-fact measurements of Pole Creek are the only baseline for Pole Creek in the FEIS and differ substantially from NDOW's historic Pole Creek surveys.[30]  *See* TPEIS-0865 AR-081123, 081136, 081148 (NDOW measuring *average* flow of 4,084, 763, and 897 gpm in June 1998, 2003, and 2009); TPEIS-1489 AR-108040 (NDOW measuring September *maximum* flow of 1,045 gpm); *compare with* TPEIS-0374 at AR-045396 (showing a maximum baseflow of 95 gpm).[31]

## III.   LEGAL STANDARDS

NEPA is the nation's basic charter for the protection of the environment. *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1153 (9th Cir. 2008). It makes no excuses for the types of projects being analyzed. *See Pub. Emps. for Env't Resp. v. Hopper*, 827 F.3d 1077, 1090 (D.C. Cir. 2016) (wind energy project vacated due to inadequate surveys); *Am. Rivers v. FERC*, 895 F.3d 32, 37 (D.C. Cir. 2018) (hydroelectric project vacated for baseline error); *ONDA v. Jewell*, 840 F.3d 562, 564 (9th Cir. 2016) (wind energy project vacated because agency misrepresented status of sage grouse); *LaFlamme v. FERC*, 852 F.2d 389 (9th Cir. 1988). Thus, the Thacker Pass Mine, like anything, must be scrupulously evaluated. Meanwhile, the "mission" of FLPMA is "to achieve, by comprehensive land use planning and management coordinated within State and local planning, the multiple use of the various national resources in the public lands on a sustained yield basis." *Petro Leasco, Inc.*, GFS(O&G) 128(1979) (Aug. 31, 1979).

### A.   NEPA—"Flyspeck."

Courts may not 'fly speck,' "[b]ut the courts can, and should, require full, fair, bona fide

---

[29] Piteau's June measurements recording significant flows were disregarded and measurements used for the baseflow were not taken at the point of greatest flow. TPEIS-0448 AR-052476-7.
[30] While Piteau's methodology considered ET in the Crowley Creek baseline to the tune of 492 gpm, Piteau did not account for ET on Pole Creek. TPEIS-1489 AR-106675; TPEIS-0384 at 59.
[31] Flow values have been converted from CFS to gpm.

Page **15– BARTELL PLAINTIFFS' REPLY/RESPONSE BRIEF RE MOTIONS FOR SUMMARY JUDGMENT**

compliance with NEPA." *Lathan v. Brinegar*, 506 F.2d 677, 693 (9th Cir. 1974). "That result can be achieved only if the prescribed procedures are faithfully followed; grudging, pro forma compliance will not do." *Id*. As this Court has found:

> This "hard look" must be taken objectively and in good faith—not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made. … I must then consider whether any error materially impeded NEPA's goals—that is, whether the error caused the agency not to be fully aware of the environmental consequences of the proposed action[.]

*Ctr. for Biological Diversity v. United States Bureau of Land Mgmt.*, No. 214CV00226APGVCF, 2017 WL 3667700, at *5–6 (D. Nev. Aug. 23, 2017). "Fly specking" occurs when plaintiffs assert inconsequential issues with the EIS. *See Methow Valley Citizens Council v. Reg'l Forester*, No. 85-2124-DA, 1986 WL 8595, at *19 (D. Or. Apr. 30, 1986), *rev'd*, 833 F.2d 810 (9th Cir. 1987), *rev'd sub nom. Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989); *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Forsgren*, 163 F. Supp. 2d 1222, 1252 (D. Or. 2001), rev'd, 309 F.3d 1181 (9th Cir. 2002).

## B. Methodologies.

NEPA's "hard look" requirement "does not require adherence to a particular analytic protocol." *ONDA v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1121 (9th Cir. 2010). BLM is often conferred deference to questions of methodology and planning strategy. *Id*. "It is not the role of [the] court to decide whether an EIS is based on the best scientific methodology available." *Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1088 (9th Cir. 2013) (simplified); *cf. Citizens for a Better Env't v. Deukmejian*, No. C89-2044 TEH, 1991 WL 424981, at *12 (N.D. Cal. Mar. 11, 1991) ("the court is obligated to examine the choice of methodology … to determine whether the model is a reasonable analytic tool that takes account of the pertinent data"). However, the general rule of deference to an agency's choice of methodology necessitates that the agency actually

followed the methodology described. If an agency fails to follow the methodology described, *then the court owes no deference to the agency's conclusions*. *Lemon v. McHugh*, 668 F. Supp. 2d 133, 140 (D.D.C. 2009) (army was not owed deference because the army did not actually follow the methodology); *see also ONDA v. BLM*, 625 F.3d at 1121 ("Here, the BLM used no [methodology] …. We cannot defer to a void."); *League of Wilderness Defs.-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, No. CIV. 04-488-HA, 2004 WL 2642705, at *9 (D. Or. Nov. 19, 2004).

## C. Scientific Integrity.

"An EIS must contain high quality information and accurate scientific analysis. This requires the Agencies to ensure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements." *Conservation Nw. v. Rey*, 674 F. Supp. 2d 1232, 1249 (W.D. Wash. 2009) (simplified) (citing 40 C.F.R. § 1500.1(b); *Ctr. for Biological Diversity v. U.S. Forest Svc.*, 349 F.3d 1157, 1167 (9th Cir.2003)).  It is vital to NEPA that the public have "faith in the integrity of the NEPA process." *AWARE v. Colorado Dep't of Transp.*, 153 F.3d 1122, 1129 (10th Cir. 1998). The term "integrity" is not well defined in NEPA cases. However, "integrity" commonly means "1. Freedom from corruption or impurity; soundness; purity. 2. Moral soundness; the quality, state, or condition of being honest and upright." INTEGRITY, Black's Law Dictionary (11th ed. 2019); *see also* Holly Doremus, Scientific and Political Integrity in Environmental Policy, 86 Tex. L. Rev. 1601, 1623 (2008) ("integrity embodies above all the individual's commitment to intellectual honesty and personal responsibility. It is an aspect of moral character and experience . . . ."). Ultimately, scientific integrity demands:

> a kind of fierce honesty, and an accompanying constant self-consciousness and vigilant skepticism about one's own (and others') motives, biases, and shortcomings. It is motivated not by the fear of regulatory sanctions but by an ethic or sense of duty which impels scientists to do their best to interrogate nature without

> distorting it, and to articulate the data with which nature responds with minimal interference from their own prejudices.

Doremus at 1624 (citation omitted). The NEPA regulations were one of the earliest formal recognitions of the importance of integrity. *Id*. at 1625. Likewise, DOI has attempted to explain what integrity means, stating it is: "impartiality, honesty in all aspects of scientific enterprise, and a commitment to making that information available to the public as a whole."[32] *Id*. at 1626 (quoting Dep't of the Interior, *GPRA Strategic Plan Fiscal Year 2007-2012* 32).

A NEPA integrity claim premised on "factual accuracy differs from an attack on the methodology itself." *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1302 (9th Cir. 2003). Moreover, "deference does not excuse the BLM from ensuring the accuracy and scientific integrity of its analysis, a NEPA requirement." *ONDA v. Jewell*, 840 F.3d at 570; *Earth Island Inst. v. Morse*, No. 208CV-01897-JAM-JFM, 2009 WL 2423478, at *8 (E.D. Cal. Aug. 5, 2009) (lack of integrity and no deference owed where agency "arbitrarily and capriciously alter[ed] a scientifically set value[.]"); *Env't Def. v. U.S. Army Corps of Engineers*, 515 F. Supp. 2d 69, 78 (D.D.C. 2007); *Conservation Nw.*, 674 F. Supp. 2d at 1253 ("If two-thirds of the sites are unreliable, the Court must find that the agencies abrogated their duties … to ensure 'the professional integrity, including scientific integrity, of the [EISs]'").

**D. Baseline Accuracy and Mitigation.**

"The establishment of a baseline is … a practical requirement in environmental analysis often employed to identify the environmental consequences of a proposed agency action." *ONDA v. Jewell*, 840 F.3d at 568. "Without establishing the baseline conditions [before the project]

---

[32] DOI states: "[DOI] has also created bureau-specific guidelines for information quality. … [G]overnment data and information must meet certain basic standards of quality, objectivity, utility, and integrity. We implement the data quality guidelines throughout [DOI]."

begins, there is simply no way to determine what effect the [project] will have on the environment and, consequently, no way to comply with NEPA." *Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci,*, 857 F.2d 505, 510 (9th Cir. 1988). Furthermore, mitigation is inadequate without knowledge of baseline conditions. *ONDA v. Jewell*, 840 F.3d at 570. The creation of a baseline can differ from the creation of an analytical model. While a model may be used to determine the effect of a project, the baseline is the environmental condition against which that effect is measured. *See Landwatch v. Connaughton*, 905 F. Supp. 2d 1192, 1197 (D. Or. 2012); *ONDA v. Shuford*, No. CIV. 06-242-AA, 2007 WL 1695162, at *4 (D. Or. June 8, 2007), *aff'd sub nom. Oregon Nat. Desert Ass'n v. McDaniel*, 405 F. App'x 197 (9th Cir. 2010); *All. for the Wild Rockies v. Savage*, 375 F. Supp. 3d 1152, 1156 (D. Mont. 2019); *Maddalena v. U.S. Fish & Wildlife Serv.*, No. 08-CV-02292-H AJB, 2010 WL 9915002, at *8 (S.D. Cal. Aug. 5, 2010).

### E.  Independent Evaluation.

"If an agency permits an applicant to prepare an EIS, the agency shall make its own evaluation of the environmental issues and take responsibility for the scope and content of the [EIS]." *All. for the Wild Rockies v. Pena*, No. 2:16-CV-294-RMP, 2018 WL 4760503, at *6 (E.D. Wash. Oct. 2, 2018) (simplified). A claim for failure to independently evaluate environmental information can survive separate from a NEPA conflict of interest claim. *See Confederated Tribes of Grand Ronde Cmty. of Oregon v. Jewell*, 75 F. Supp. 3d 387, 419 (D.D.C. 2014), *aff'd,* 830 F.3d 552 (D.C. Cir. 2016); *Sierra Club v. Marsh*, 714 F. Supp. 539, 555 (D. Me.), *amended*, 744 F. Supp. 352 (D. Me. 1989), *aff'd*, 976 F.2d 763 (1st Cir. 1992). "Whether an agency has independently evaluated an EIS is a question of fact, to be determined on a case-by-case basis." *Sierra Club v. Marsh*, 714 F. Supp. at 557 (quotations omitted) (citing *Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation*, 531 F.2d 637 (2d Cir.1976); *Lange v.*

*Brinegar*, 625 F.2d 812 (9th Cir.1980)). Whether the agency evaluated the data or made site visits can be integral to the court's analysis. *See Save Our Wetlands, Inc. v. Sands*, 711 F.2d 634, 643 (5th Cir. 1983) (agency met its burden where it independently evaluated data); *Lange*, 625 F.2d at 819 (burden met where agency made four or five field trips over route being analyzed); *Airport Impact Relief, Inc. v. Wykle*, 192 F.3d 197, 208 (1st Cir. 1999) (agency visited area to examine the affected locations); *City of Roseville v. Norton*, 219 F. Supp. 2d 130, 166 (D.D.C. 2002), *aff'd*, 348 F.3d 1020 (D.C. Cir. 2003) (agency participated in site reviews). Where an agency uncritically adopts data and/or reports from the applicant, NEPA has been violated. *See Sierra Club v. Van Antwerp*, 709 F. Supp. 2d 1254, 1265 (S.D. Fla. 2009), *aff'd*, 362 F. App'x 100 (11th Cir. 2010) (violation of NEPA in mining case where record lacked evidence that agency independently evaluated applicant's claims); *see also Utahns for Better Transportation vs. U.S. Dep't of Transportation*, 305 F.3d 1152, 1165 (10th Cir. 2002).[33] The evaluation of data is a critical part of the independent evaluation inquiry. *Save Our Wetlands, Inc*, 711 F.2d at 643; *Found. on Econ. Trends v. Lyng*, 680 F. Supp. 10, 16 (D.D.C. 1988); *Airport Impact Relief, Inc*, 192 F.3d at 208.

**F.  Provide Environmental Information to the Public.**

A fundamental purpose of NEPA is to "ensure…information is available to the public." *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 971 (9th Cir. 2003). The agency must "[p]rovide public notice of … the availability of environmental documents so as to inform those persons and agencies who may be interested or affected." 40 C.F.R. § 1506.6; *Ground Zero Ctr. for Non-Violent Action v. United States Dep't of Navy*, 860 F.3d 1244, 1256 (9th Cir. 2017).

**G.  FLPMA—RMP Applicability to Mining Claims.**

---

[33] In *Sierra Club v. Van Antwerp* the court took the *absence* of evidence in the record *as substantive evidence* that the agency did not meet its burden to independently evaluate information.

"The heart of FLPMA amends and supersedes the Mining Law to provide: 'In managing the public lands the Secretary shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands.'" *Min. Pol'y Ctr.*, 292 F. Supp. 2d at 33 (quoting 43 U.S.C. § 1732(b)). "To assist in the management of public lands, FLPMA requires that the BLM 'develop, maintain, and, when appropriate, revise land use plans.'" *Gardner v. U.S. Bureau of Land Mgmt.*, 633 F. Supp. 2d 1212, 1215 (D. Or. 2009), *aff'd*, 638 F.3d 1217 (9th Cir. 2011) (quoting 43 U.S.C. § 1712(a)). "These land use plans, which the BLM regulations denote '[RMPs]… project both the present and future use of the land.'" *Id.* (citations omitted). "FLPMA prohibits the BLM from taking actions inconsistent with the … RMPs." *Id.* (citing *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 69 (2004)); *see also Rags Over the Arkansas River, Inc. v. Bureau of Land Mgmt.*, 77 F. Supp. 3d 1038, 1053 (D. Colo. 2015) ("Specific projects … must conform to the relevant [plan].'… 'Conformity or conformance means that a resource management action shall be specifically provided for in the plan, or if not specifically mentioned, shall be clearly consistent with … the approved plan or plan amendment.'" (citation omitted)). This continues to be true for mining cases, including those where mining is permitted pursuant to the Mining Law. *See Nat. Res. Def. Council, Inc. v. Jamison*, 815 F. Supp. 454, 462 (D.D.C. 1992); *Theodore Roosevelt Conservation P'ship v. Salazar*, 605 F. Supp. 2d 263, 283 (D.D.C. 2009), *aff'd*, 616 F.3d 497 (D.C. Cir. 2010); *Min. Pol'y Ctr.*, 292 F. Supp. 2d at 49 ("when BLM receives a proposed plan of operations … it assures [sic] that the proposed mining use conforms to the terms, conditions, and decisions of the applicable [RMP], in full compliance with FLPMA[]"); *see also California Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 587 (1987); *Bohmker v. Oregon*, 903 F.3d 1029, 1038 (9th Cir. 2018) ("holders of unpatented mining claims do not have an 'unfettered' right … unencumbered by federal and state environmental regulation.").

**H.  The Rosemont Case, *Ctr. for Biological Diversity v. United States Fish & Wildlife Serv.***

The Ninth Circuit recently decided the extremely-pertinent case of *Ctr. for Biological Diversity v. United States Fish & Wildlife Serv.*, 33 F.4th 1202 (9th Cir. 2022), where the Rosemont Copper Company sought to establish a mine on Forest Service land and dump its waste rock on mining claims where there was no basis for the assumption the claims were valid. There, the court held that, in the absence of a discovery of a valuable mineral deposit, a miner has no right to "occupy the claim beyond the temporary occupancy necessary for exploration." *Id.* at 1209. "If a mining claim is invalid, a miner has no right, possessory or otherwise, in connection with the land." *Id.* at 1210. The record in the Rosemont case showed "that no valuable minerals have been found" where Rosemont was proposing to dump its waste rock. *Id.* at 1221. "Because the discovery of valuable minerals is essential to the validity of a claim, Rosemont's claims are necessarily invalid." *Id.* The lack of valuable minerals, or at least discovered valuable minerals, within Rosemont's claims was fatal to the approval of the Rosemont Mine.[34]

**IV.    ARGUMENT**

**A.  BLM Violated NEPA in Multiple Respects.**

**1.   The NEPA Process Lacked Professional and Scientific Integrity.**

Piteau's failures to comply with the Workplan, as well as Piteau's repeated unlawful

---

[34] Although the decision to approve the Rosemont Mine was made under the Multiple Use Act, not FLPMA, the same principles which dictated the court's opinion in the Rosemont case are before the Court here. "The heart of FLPMA amends and supersedes the Mining Law to provide: 'In managing the public lands the Secretary shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands.' 43 U.S.C. § 1732(b)." *Min. Pol'y Ctr. v. Norton*, 292 F. Supp. 2d 30, 33 (D.D.C. 2003). Therefore, this Court should issue a ruling consistent with the Rosemont case.

trespass[35] and BLM's incorporation of Piteau's data and studies into the FEIS, caused the NEPA process to lack scientific and professional integrity, in violation of NEPA. BLM has repeatedly asserted that the Court should simply defer to its decision to approve Piteau's Workplan (which was intended to ensure BLM's data adequacy standards were met) and acceptance of Piteau's data. However, "deference does not excuse the BLM from ensuring the accuracy and scientific integrity of its analysis, a NEPA requirement" (*ONDA*, 840 F.3d at 570), nor can BLM receive deference for its choice in survey methodologies which were not actually followed (*Lemon*, 668 F. Supp. 2d at 140). Evidence reveals Piteau did not follow the eight survey protocols described in the Workplan—protocols meant to ensure NEPA integrity. *See* Facts D, E, F, *supra*. Yet, BLM still incorporated Piteau's data into the FEIS, violating BLM's own data adequacy standards and causing the NEPA process to lack integrity. Additionally, since Piteau did not actually follow the survey methodologies in the Workplan, the Court owes BLM no deference. *Id.*

The lack of integrity plagues a substantial portion of the FEIS, causing the baseline data to suffer from real and significant errors as a result of Piteau's failure to follow the Workplan and BLM's failure to evaluate baseline data. Table 4.2 of The FEIS identifies 22 perennial springs.[36] TPEIS-0384 at 61. A significant portion of these 22 springs have survey errors, and even more have baseline errors or insufficiencies. *See* Facts D, E, F, H, *supra*. Of these 22 perennial springs, SP-035 and SP-042 are located on Plaintiffs' land where Piteau repeatedly trespassed to survey them (Fact D, *supra*), SP-035, SP-047, and SP-048 were not surveyed at the point of maximum discharge, resulting in a decreased baseline (Fact F, *supra*), 10 perennial springs have baselines of

---

[35] LNC argues that Plaintiffs' integrity claim concerns Piteau's trespass onto BLM land. ECF 239 at 28. LNC is simply mistaken. Plaintiffs' integrity claim concerns, in part, Piteau's repeated, and well-evidenced, trespass on Plaintiffs' private lands.

[36] These are the 22 springs that will be monitored and possibly mitigated. TPEIS-0384 at 75.

"zero flow" or an unmeasured "<1 gpm" baseline (Fact H, *supra*), and at least three perennial springs were excluded from Table 4.2 in the FEIS (Fact H, *supra*). Like in *Conservation Nw. v. Rey*, 674 F. Supp. 2d at 1253, over half the perennial springs surveyed suffer from a survey error, baseline insufficiency, or are otherwise unreliable, leaving the FEIS lacking the "high quality information and accurate scientific analysis," "soundness," and "honesty" necessary to give the NEPA process professional and scientific integrity. *Id*. at 1249; INTEGRITY, Black's Law Dictionary; Doremus at 1626. This violates NEPA's integrity requirement. However, the issue of integrity goes beyond Piteau's failure to meet BLM's data adequacy standards and insufficient baselines. In point of fact, Piteau repeatedly accessed Plaintiffs' property to conduct their spring survey without ever obtaining, or even requesting, permission, yet Piteau knew all along that they were on Plaintiffs' land.[37]

Although "integrity" is not defined by the NEPA regulations, a common definition is: "1. Freedom from corruption or impurity; soundness; purity. 2. Moral soundness; the quality, state, or condition of being honest and upright." INTEGRITY, Black's Law Dictionary. Articles addressing the NEPA integrity requirement assert that integrity requires "a kind of fierce honesty, and an accompanying constant self-consciousness and vigilant skepticism about one's own (and others') motives, biases, and shortcomings." Doremus at 1624 (citation omitted). DOI has stated that integrity requires "impartiality [and] honesty in all aspects of scientific enterprise[.]" *Id*. at 1626. Here, despite knowing that SP-035 and SP-042 were on Plaintiffs' private lands, Piteau surveyed them anyway without ever contacting Plaintiffs. Despite a "private property" sign, fence,

---

[37] Piteau's trespass is not a mere flyspeck. Piteau's surveys of SP-035 and SP-042 were vital to BLM's conclusion that the Thacker Pass Mine would not impact water rights or perennial springs. If Piteau had not trespassed it is possible BLM would have been better informed of the Mine's impacts to SP-035 and SP-042. It is hardly a flyspeck that baseline issues plague *every* spring (SP-035, SP-042 and SP-023) surveyed on Plaintiffs' land. *See* Facts D, E, F, H.

and cattleguard being present, Piteau drove right through Plaintiffs' property to access these springs.[38] Despite SP-042 appearing *on the opposite side of Crowley Creek* from the road Piteau used for access and surveying the entire perimeter of SP-035, Piteau attempted to explain away their trespass by asserting that the springs were within a non-existent road right-of-way. TPEIS-0406 AR-048356; TPEIS-0448 AR052470. So, not only did Piteau commit a trespass, *Piteau lied to BLM about its knowledge and awareness of its unlawful activities*. Turning to the definition of integrity, it is clear that Piteau's actions were not free of "corruption or impurity"; rather, they lacked "moral soundness" and "honesty." *See In re Application of Kapel*, 1999-Ohio-304, 87 Ohio St. 3d 122, 122 (bar admission denied based, in part, on applicant's trespass); *Cockerham v. Atl. Richfield Co.*, 615 So. 2d 547, 557 (La. Ct. App.) ("a knowingly unauthorized entry … is legally and morally reprehensible conduct."); *Ni v. U.S. Citizenship & Immigr. Servs.*, No. CV 08-3883CASAJWX, 2009 WL 649156, at *4 (C.D. Cal. Mar. 9, 2009) (trespass conviction supported decision to deny naturalization application); *In re Application of Wylie*, 2000-Ohio-222, 89 Ohio St. 3d 471, 473 (bar application denied based, in part, on trespass).[39] Therefore, the NEPA process irrefutably lacked integrity.

---

[38] The sign at the entrance to Plaintiffs' property states: "For Access Call" and provides Mr. Bartell's phone number. *See* Fact D, *supra*. Plaintiffs need not meet a prosecutorial burden for trespass to show Piteau's survey lacked integrity. *See Chase v. Chase*, 15 Nev. 259, 260 (1880) ("Trespass [is] the unwarrantable entry upon the lands of another"); *Michael Hohl Carson Valley v. Hellwinkel Fam. Ltd. P'ship*, 442 P.3d 151 (Nev. 2019) (Nev. courts rely on Second Restatement of Torts); *Carvalho v. Wolfe*, 207 Or. App. 175, 182, 140 P.3d 1161, 1164 (2006) ("intentional … means the defendant[] [knew] a trespass would result from its acts"); *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539 (2005) (right to exclude "perhaps the most fundamental of all property interests").

[39] This is not a criminal case, nor does Piteau's due process hang in the balance. Instead, this is a case where the Court simply must determine whether or not water resource baseline data was collected with professional and scientific integrity. Such is clearly lacking here, where data was collected by trespass, particularly when the trespasser was clearly aware of Plaintiffs' private property and, further, where adherence to the Stevens Protocols for landowner outreach would have avoided these secret unauthorized surveys from taking place without Plaintiffs' knowledge.

BLM is owed no deference for this NEPA integrity claim, nor could deference be given where Piteau did not comply with the very protocols designed to promote data accuracy and integrity. Nor is this a mere flyspeck, as the lack of integrity corrupted baseline data and, moreover, corrupted public faith in the NEPA process. *See AWARE*, 153 F.3d at 1129. BLM's incorporation of Piteau's data into the FEIS caused the NEPA process to lack professional and scientific integrity. This renders BLM's approval of the ROD arbitrary and capricious.

### 2.  BLM Relied on an Erroneous Baseline.

BLM hardly disputes that the water resources baseline for the Thacker Pass NEPA process contains errors. Instead, BLM takes the approach of characterizing the errors as mere "flyspecks" and "insignificant," requesting "deference," and arguing that any possible errors were cured by the model.[40] ECF 238 at 28-33. BLM is mistaken. The magnitude, frequency, and compounding effect of the baseline errors render the baseline inaccurate. Therefore, the Court should find that BLM's decision to approve the ROD without first creating an accurate baseline is arbitrary and capricious.

Piteau's spring surveys were intended to create the environmental baseline for these resources as well as create "flux targets" to calibrate the model which, in turn, estimated the impact of the Thacker Pass Mine—impacts which were then measured against the baseline.[41] Piteau's Baseline and Model Workplan recognizes this dichotomy. The Workplan shows surveys were the method used to create the baseline, then Piteau used a "numerical groundwater model" to assess the impacts to those baselines. TPEIS-0054. Here, the errors in the baseline Plaintiffs identify in

---

[40] The baseline errors are not mere flyspecks. *See, e.g.*, Facts D, E, F, H, J, *supra*. No deference is owed to BLM in this respect because BLM cannot receive deference for its choices in survey methodology if the record shows that this methodology was not actually followed. *See Lemon*, 668 F. Supp. 2d at 140; *ONDA v. BLM*, 625 F.3d at 1121; *League of Wilderness Defs.*, 2004 WL 2642705, at *9.

[41] This is not just true for springs. Pole Creek was likewise used as a flux target in the model, but with a target of "zero flow," which is clearly incompatible with the actual flow in the stream.

Facts D, E, F, H, and J render the NEPA process arbitrary and capricious because, with these errors, there is not an accurate baseline against which to measure the effects of the Mine.[42] For instance, in Fact H Plaintiffs demonstrate that, of the 22 springs the FEIS identified for monitoring and mitigation, the actual spring flow is *entirely unknown* for over <u>40 percent of</u> the springs, while over *half* have some type of survey error or data insufficiency rending the baseline inaccurate.[43] Thus, the baseline *is in direct contradiction with the actual observed field conditions*. *See* Fact H, *supra*. BLM staff even acknowledged some of these baseline errors in TPEIS-1411.[44] The errors in the baseline render the NEPA analysis meaningless.

A baseline is the environmental information against which the effect of a project is

---

[42] Defendants assert that any errors are limited by the fact that mine impacts will not occur for years. This is irrelevant, because BLM still had a duty to analyze these effects prior to approving the ROD. Furthermore, Defendants downplay or ignore the immediate impacts which will be caused by the groundwater withdrawals necessary to run the lithium processing facilities, which will cause almost-immediate drawdowns in springs near lower Pole Creek (*see* TPEIS-0711 AR-066572, AR-066583-4, AR-066587) and will cause a 50-percent reduction in flow in lower Pole Creek. TPEIS-0711 AR-066402.

[43] Comparing this to *ONDA v. Jewell*, where the Ninth Circuit vacated a wind energy project due to an erroneous baseline, reveals similarities. There, the EIS baseline indicated a lack of sage grouse despite evidence in the record of sage grouse presence. Here, the record shows surveys for 10 of the "22" perennial springs identify that the springs have flow. *See* Fact H, *supra*. The reported EIS baselines for these springs, however, are either "zero flow" or "<1 gpm" of flow. *Id*. Thus, here, there is an egregious inconsistency between the reported baseline and the *actual observed conditions*. Where the observed conditions in the record are not consistent with the baseline reported to the public in the EIS, NEPA has been violated. *ONDA*, 840 F.3d at 564.

[44] BLM reasons that this is irrelevant, because the same staff member also asserted that the data was "still useful" for the model, citing *ONDA v. Ros*e for the proposition that "[a]n agency need not measure 'actual baseline conditions in every situation—it may estimate baseline conditions using data from a similar area, computer modeling, or some other reasonable method.'" ECF 238 at 28-29. BLM's argument here misses the crux of the issue. First, while a model may be used at times to establish baselines, here the model's purpose *was not* to establish the baseline. It was Piteau's surveys which purported to *actually measure* springs and streams which created the water resources baseline. *See* TPEIS-0054 AR-005696. The purpose of the model was then to estimate the Mine's *impacts* to these resources. *Id*. at AR-005705. Thus, the model's predicted impacts are meaningless if there is not a correct baseline to start with. So, in TPEIS-1411, while BLM staff opined that erroneous baseline data *could* still be useful for purposes of the <u>model</u>, BLM staff *did not* assert that the errors in the spring survey were still useful for purposes of the <u>baseline</u>.

measured. *See Half Moon Bay*, 857 F.2d at 510. However, Facts H and J reveal that BLM (and Piteau) did not have sufficient baseline information to actually measure the Mine's impacts against. For example, for the seven perennial springs identified in Table 4.2 of the FEIS with a zero-flow baseline, no matter how substantial the Mine's impacts the effect to the baseline of these springs was, and always is, going to be zero because the baseline incorrectly reflects that these springs do not flow. Thus, neither BLM nor Piteau could adequately assess the impacts of the Thacker Pass Mine against these springs because neither BLM nor Piteau know the actual flow rate of these springs. Similarly, BLM is unaware of the actual groundwater levels across parts of the Thacker Pass region, relying instead on false data. Fact J, *supra*. Additionally, the baseline for Pole Creek is grossly misrepresented, as are the flow rates of critical springs tributary to Pole Creek. *See* Facts H, J. Such errors make the baseline for the NEPA process insufficient. Therefore, BLM's decision to approve the Thacker Pass Mine was arbitrary and capricious.

### 3. Mitigation is Impossible without an Accurate Baseline.

Errors in baseline data also render BLM's mitigation and monitoring recommendations insufficient. Plaintiffs' motion explained:

> "An essential component of a reasonably complete mitigation discussion is an assessment of whether the proposed mitigation measures can be effective." *S. Fork Band Council Of W. Shoshone Of Nevada v. U.S. Dep't of Interior*, 588 F.3d 718, 727 (9th Cir. 2009). Mitigation effectiveness is directly intertwined with the accuracy of baseline conditions. *ONDA v. Jewell*, 840 F.3d at 571. Without an accurate baseline, BLM cannot "know what impacts to mitigate, or whether the mitigation proposed would be adequate to offset damage[s]…." *Id.*

ECF 204 at 47. The errors in the baseline data make BLM's mitigation discussion meaningless. BLM is already proposing that certain springs be monitored and mitigated *with a baseline of zero flow*. Of the 22 springs identified for mitigation, *a mind-boggling 32 percent do not have a baseline flow value at all to monitor or mitigate*. This creates an impossible proposition and is a huge problem in the baseline, because mitigating a spring with zero baseline flow *is presumably zero*

*mitigation.*[45] Thus, it is arbitrary and capricious for BLM to propose monitoring and mitigation for springs where the baseline is inaccurately characterized as zero flow.[46]

BLM has not contested that there are errors in the baseline data used for the Thacker Pass NEPA process. Yet, when addressing Plaintiffs' mitigation claims BLM merely asserted "[t]he monitoring and mitigation plan includes mitigation options to support surface water features in the Montana Mountains, including at spring locations for the benefit of wildlife, as well as Pole Creek and the nearest stockwater well that could be impacted[.]" ECF 238 at 18. This entirely ignores Plaintiffs' argument that mitigation is meaningless if the surface water features supposedly being mitigated do not have an accurate baseline, *which is true for over half of the springs identified for mitigation in the FEIS* as well as all reaches of Pole Creek. *See* Facts H, J, *supra*. Moreover, there are more perennial (not to mention ephemeral) springs where monitoring or mitigation would be appropriate but which are excluded from Table 4.2 due to Piteau's errors. *Id*.

BLM tries to rationalize that immediate correction of the FEIS shortcomings is unnecessary "because surface and groundwater are not anticipated to be affected [until] the year 2055 (34+ years into the future)," when the mine pit will impact groundwater. ECF 238 at 28; TPEIS-1411. BLM is forgetting about the impacts caused by production well pumping, which are slated to begin

---

[45] Similarly, if BLM orders LNC to monitor the springs in Table 4.2, LNC will monitor the springs against the baseline. Because the baseline says many of these springs do not flow (despite surveys to the contrary), LNC's monitoring would reveal that these springs will not be impacted by the Mine even if they completely stop flowing.

[46] The Court must understand the consequences of Fact H, *supra*, for this claim and many of Plaintiffs' other claims. For instance, Plaintiffs have water rights on SP-035. SP-035 is identified as a perennial spring in Table 4.2 of the FEIS, therefore LNC is directed to monitor and mitigate SP-035 if flow decreases. However, the baseline for SP-035 is zero flow. Therefore, *it is impossible for SP-035 to decrease in flow* according to the baseline. As a result, no matter what happens to SP-035, LNC could never be responsible for mitigating this spring.

immediately, and potential immediate impacts from exploratory drilling.[47] Groundwater drawdowns as a result of extracting groundwater from the Production Well will promptly travel up Crowley Creek and Pole Creek, causing declines in Lower Pole Creek amounting to over 50% of the flow.[48]  TPEIS-0711 AR-066402. Likewise, near immediate drawdowns are projected to occur underneath all springs on or near Lower Pole Creek (SP-028 SP-039, SP-040, SP-043). TPEIS-0711 AR-066572, AR-066583-4, AR-066587. Further still, the only modeled spring on Middle Pole Creek (SP-036) is modeled to experience a lowered water table in the very near future. TPEIS-0711 AR-066580.

Because BLM does not address Plaintiffs' mitigation argument, and because the errors in baseline data prevent BLM from sufficiently addressing mitigation, the Court should find that BLM's decision to approve the ROD was arbitrary and capricious.

### 4.  BLM Failed to Independently Evaluate Data.

BLM's approval of the Thacker Pass Mine is arbitrary and capricious because BLM did not independently evaluate Piteau's data.[49] The record demonstrates that BLM only evaluated Piteau's analysis and, possibly, Piteau's Workplan. *See* Fact G, *supra*. However, the record is

---

[47] Accurate baselines are critical because exploration impacts can suddenly dry up springs or streams. "BLM expressed concern of exploration drilling in the vicinity of Pole Creek and how that activity might intercept perched water and spring sources that support streamflow and potentially and cause it to drain down the drill hole and permanently remove water from Pole Creek." TPEIS-0107 AR-109236.  BLM has stated: "one spring [near Thacker Pass] appeared to have been impacted by a drilling program from another operator. I don't know if it ever recovered since then."  TPEIS-1122 AR-097325

[48] The projected 50 percent decline in Lower Pole Creek will cause irreparable harm to LCT as Pole Creek is inhabited by LCT. TPEIS-0359 AR-045057 Stream flows across *all* reaches of Pole Creek are vital for perennial fish habitat and seasonal connectivity with other streams to establish metapopulations capable of traveling between streams. *Id*. AR-045059.

[49] Plaintiffs' complaint alleges BLM blindly incorporated Piteau's data, challenging BLM's approval of the ROD "based on the faulty, incomplete, and inadequate FEIS." *See generally* ECF 28. Plaintiffs asserted BLM violated NEPA because of "fundamentally flawed modeling and analysis" and "inadequate or false" baseline data. *Id*. This put BLM on clear notice of this claim.

devoid of evidence that BLM evaluated Piteau's baseline data and BLM staff admitted BLM did not have time to visit spring locations. *See* TPEIS-1411. The duty to independently evaluate the information provided by the applicant is fact-intensive and evaluated on a case-by-case basis. *Sierra Club v. Marsh*, 714 F. Supp. at 557. Moreover, it is a claim that can be proven based on a lack of evidence in the record. *See Sierra Club v. Van Antwerp*, 709 F. Supp. 2d at 1265.

This particular claim is about BLM's failure to independently evaluate Piteau's baseline spring and stream data. *See* Fact G, *supra*. There is an absence of evidence in the record demonstrating that BLM independently evaluated this data. In TPEIS-1131 AR-097595–96 it is generally stated that BLM and ICF worked with Piteau on the baselines, but no other record evidence indicates that BLM actually evaluated baseline data. No records exist showing independent site visits of any springs or seeps, or even discussions between BLM and Piteau regarding how Piteau actually conducted spring surveys. *See* n. 12, *supra* (quoting TPEIS-0125 AR-109324). Ultimately, the lack of evidence showing any independent site visits, actual data evaluation, or mere conversations between BLM and Piteau detailing Piteau's baseline surveys is more than enough for the Court to find that BLM did not independently evaluate Piteau's data. *See Sierra Club v. Van Antwerp*, 709 F. Supp. 2d at 1265. Further still, TPEIS-1411 is an affirmative admission that BLM did not visit spring locations. The facts of this case show that conducting actual site visits was critical where BLM lacked another way to independently evaluate the accuracy or reliability of Piteau's data. Because BLM did not conduct site visits and lacked information necessary to otherwise evaluate Piteau's data, BLM failed to independently evaluate baseline data. *See Save Our Wetlands, Inc.*, 711 F.2d at 643; *Lange*, 625 F.2d at 819; *Airport Impact Relief, Inc.*, 192 F.3d at 208; *City of Roseville*, 219 F. Supp. 2d at 166.

BLM's failure to independently evaluate Piteau's field work and data let Piteau's failure to

comply with BLM's data adequacy standards go unnoticed.[50] *See* Facts C, D, E, F, H, J, *supra*. The only indication in the record that Piteau failed to measure springs at their point of maximum discharge appeared in Piteau's summary of its measurement of SP-048. The only indication in the record of Piteau's other failures appears in Plaintiffs' own comments. BLM simply did not evaluate whether Piteau repeatedly mismeasured springs because BLM never visited the springs themselves or had sufficient information to evaluate Piteau's measurements. BLM never found that the criticisms in Plaintiffs' comments contained, or lacked, merit because BLM did not actually evaluate the baseline errors.

BLM has ultimately conceded that it did not evaluate Piteau's data, stating it "evaluated and approved the proposed work plan, as well as the reports and models prepared from the data collected under it." ECF 224 at 16. Yet, BLM did not evaluate Piteau's compliance with the Workplan (*see* Facts E, F, *supra*) and evaluation of the reports and models prepared using Piteau's baseline data is meaningless without evaluating the baseline data itself. Because the adequacy of the FEIS hinges on the accuracy of the underlying baseline data (*see* Fact H, *supra*), BLM's failure to verify baseline data and field work is a serious and substantial NEPA violation, rendering BLM's approval of the ROD arbitrary and capricious.[51]

### 5.  BLM Failed to Make Information Publicly Available.

BLM's failure to make information publicly available violated NEPA. BLM did not make the BA, or any other evaluation of LCT impacts, nor the mitigation plan available to the public

---

[50] This occurred despite Plaintiffs' repeated comments to BLM asserting that Piteau made errors in the spring surveys and trespassed repeatedly. Yet, the record is devoid of evidence wherein BLM investigated the merit of Plaintiffs' comments. Instead, allegations of wrongdoing were turned over to LNC's offending consultants to respond on behalf of BLM. TPEIS-406.

[51] This is also relevant to Plaintiffs' NEPA integrity claims. "When agencies take … an active role, public perception concerning the integrity of the process is necessarily strengthened." *AWARE*, 153 F.3d at 1129.

until after the FEIS was published and the ROD signed, and refused to provide Plaintiffs with environmental information available to BLM and requested by Plaintiffs. *See* Fact I, *supra*. This violates a foundational purpose of NEPA, that "information [be] available to the public." *Ocean Mammal Inst.*, 546 F. Supp. 2d at 972.

BLM admits that the BA and mitigation plan were not publicly available. In fact, the public was not even made aware that BLM consulted with FWS concerning possible impacts to LCT— or that BLM was even considering that, or how, LCT could be impacted. The mitigation plan, meanwhile, specifies how mitigation is to occur on Bartell Ranch's private lands—something not reflected by the FEIS.[52] TPEIS-1408 AR-104284. Although the mitigation plan affects Plaintiffs' private lands, Plaintiffs were unaware of its existence until well after the FEIS was published, requiring Plaintiffs to request the document (which was not provided), foreclosing any comment opportunity. TPEIS-0454 AR-052553; TPEIS-0484. It was impossible for the public to knowingly comment with environmental information withheld from the public.[53] *See Int'l Snowmobile Mfrs. Ass'n v. Norton*, 340 F. Supp. 2d 1249, 1265 (D. Wyo. 2004) (no comment opportunity where little

---

[52] LNC asserts: "BRL falsely claims that 'BLM failed to provide the mitigation plan affecting [his] private lands and grazing permit.' Mot. at 18. But BRL commented on the mitigation plan, rebutting his own claim that he never viewed it. TPEIS-1489 at AR106706 (Bartell comments on the mitigation plan).'" LNC is incorrect. Plaintiffs FEIS comments make it abundantly clear Plaintiff was commenting on the FEIS in general (citing to page numbers in the FEIS) not the *Applicant Committed Thacker Pass Project Monitoring and Mitigation Plan for Water Resources Technical Memorandum 20-05 October 2020*, relevant here.

[53] "NEPA emphasizes the importance of coherent and comprehensive up-front environmental analysis to ensure informed decision-making to the end that the agency will not act on incomplete information, only to regret its decision after is it too late to correct." *Center for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1166 (9th Cir.2003). Plaintiffs had zero days to comment on the BA and the mitigation plan before the ROD was signed. Other key documents fundamental to the FEIS, including the Stringham Report and Sensitivity Analysis (the document showing Piteau's Pole Creek measurements), were hidden from the public until after the FEIS was published. TPEIS-1421 AR-104472. While LNC ironically faults Plaintiffs for making post-FEIS comments, due to BLM's failure to make environmental information publicly available, the only opportunity Plaintiffs had to provide meaningful comments on these records was after the FEIS was published.

time between FEIS becoming available and comment deadline ending). But that is exactly what occurred. Therefore, the BLM's failure to make environmental information publicly available in this case was arbitrary and capricious.

**B. BLM Violated FLPMA in Multiple Respects.**

BLM was required to comply with the statutory mandates of FLPMA to approve the Thacker Pass Mine. Not only has BLM failed to do that here, but BLM has made no attempt to comply with FLPMA for aspects of the Thacker Pass Mine, reasoning instead that the agency simply was not required to address requirements within the governing RMP. Furthermore, BLM has approved the creation of permanent infrastructure pursuant to the Mining Law of 1872 ("Mining Law") on land which does not contain valuable minerals, violating FLPMA. For these reasons, BLM's decision to approve the ROD is arbitrary and capricious.

**1. BLM Failed to Comply with the Governing RMPs.**

BLM's decision to approve the Thacker Pass Mine despite admitted inconsistencies with the governing RMP is arbitrary and capricious. Controlling case law has found that mining claims are subject to RMPs. *See Min. Pol'y Ctr.*, 292 F. Supp. 2d at 49; *Bohmker*, 903 F.3d at 1038; *Nat. Res. Def. Council, Inc.*, 815 F. Supp. at 462; *Theodore Roosevelt Conservation P'ship*, 605 F. Supp. 2d at 283. Yet, the FEIS states: "[t]he Proposed Action and Project alternatives conform with the BLM's WD Record of Decision and Resource Management Plan (RMP) (ROD/RMP) (with the exception of existing Visual Resource Management (VRM) designations BLM 2015a)." TPEIS-0384 at 17. BLM does not dispute that the Mine would violate the RMP. Instead, BLM's position is simply that the agency did not have to comply with the RMP, arguing that FLPMA had to amend the Mining Law to subject mining claimants to the RMPs. ECF 237 at 18-21.

BLM is incorrect. While FLPMA states that it expressly amended the mining law in four

ways, FLPMA also states "[l]and use plans shall be developed for the public lands regardless of whether such lands previously have been classified, withdrawn, set aside, or otherwise designated for one or more uses." 43 U.S.C. § 1712. The only natural reading of FLPMA is that RMPs do not act as an *amendment* of the mining law, but are nevertheless an environmental regulation which governs how mining may occur. *See Granite Rock Co.*, 480 U.S. at 587; *Bohmker*, 903 F.3d at 1038. This interpretation is bolstered by 43 U.S.C. § 1712(e)(3), which states that public lands may only be removed from the operation of the Mining Law pursuant to 43 U.S.C. § 1714. Thus, in drafting 43 U.S.C. § 1712 clearly Congress knew how to exempt mining operations from RMPs, determining that RMPs may not be used to remove lands from the application of the mining law. However, Congress made a clear decision *not* to except mining operations from environmental regulations promulgated under the RMPs.[54] Furthermore, 43 U.S.C. § 1712 provides that RMPs shall "observe the principles of multiple use and sustained yield." The term "multiple use" includes, among other things, mineral usage.  43 U.S.C. § 1702 (emphasis added).[55] Thus, the RMPs are not an "amendment" of the Mining Law but are an environmental regulation which

---

[54] FLPMA was described by Senator Henry M. Jackson, chairman of the Senate Committee on Energy and Natural Resources, as follows:

> For the first time in the long history of the public lands, one law provides comprehensive authority and guidelines for the administration and protection of the Federal lands and their resources under the jurisdiction of the Bureau of Land Management. This law enunciates a Federal policy of retention of these lands for multiple use management and repeals many obsolete public land laws which heretofore hindered effective land use planning for and management of public lands. The policies contained in the Federal Land Policy and Management Act will shape the future development and conservation of a valuable national asset[.]

Eleanor R. Schwartz, A Capsule Examination of the Legislative History of the Federal Land Policy and Management Act of 1976, 21 Ariz.L.Rev. 285 (1979) (online at: https://solareis.anl.gov/documents/docs/FLPMA.pdf).

[55] *See also* Denise A. Dragoo, Federal Land Use Planning Primer Under FLPMA and NEPA https://www.swlaw.com/assets/pdf/publications/2003/06/12/DDragooFLPMApresent.pdf   (last accessed June 21, 2022).

mining operations must comply with.

With respect to the VRM designations in the governing RMP, BLM argues that compliance with the VRM designations was impossible without withdrawing the lands from mining, which is why BLM did not comply with the RMP. ECF 237 at 19-21. Whether or not this is true is irrelevant because BLM did not even *attempt* to comply with the VRM designation, instead assuming it could not be met and simultaneously determining that amending the RMP is unnecessary. Tellingly, no statute, regulation, or case provides BLM the authority to ignore completely the mandates of the RMP. While the RMP may not itself work a withdrawal of lands from the application of the Mining Law, BLM nevertheless must still attempt to bring mining operations into compliance with the RMP, and where that is not possible must amend the RMP. *Cloud Found. v. U.S. Bureau of Land Mgmt.*, No. 3:11-CV-00459-HDM, 2013 WL 1249814, at *10 (D. Nev. Mar. 26, 2013) ("Any action inconsistent with the balance of resources as set forth in the RMPs requires amendment to the RMP"); *ONDA v. Bureau of Land Mgmt.*, No. 2:10-CV-01331-SU, 2014 WL 4832218, at *26 (D. Or. Sept. 29, 2014). Here, BLM has left the RMP and Mine incompatible with one another such that the mine will be in continual violation of the RMP,[56] making BLM's approval of the Thacker Pass Mine arbitrary and capricious.

### 2. Permanent Occupancy of Invalid Mining Claims Causes Undue Degradation.

The ROD permits LNC to permanently occupy portions of Thacker Pass where LNC does not hold valid mining claims. This will cause unnecessary and undue degradation of the public lands, violating FLPMA.

The Thacker Pass Mine and associated infrastructure would be located on mineral claims

---

[56] BLM violated the 2015 ARMPA for sage grouse in the same way, never attempting to locate the mine outside sage grouse priority or general habitat areas, and not amending the ARMPA to bring the mine and ARMPA into compliance with one another.

owned by LNC on BLM land. Presence of valuable minerals is a prerequisite to a valid mineral claim. *Ctr. for Biological Diversity*, 33 F.4th at 1218. LNC holds mining claims throughout Thacker Pass, and the plan of operations assumes that these claims give LNC the requisite surface estate necessary to construct the Thacker Pass Mine, lithium processing facilities, CTFS, and associated infrastructure, including water and power transmission lines. TPEIS-0384 at 273. However, the FEIS states "[l]ithium mineralization in the Thacker Pass Project is entirely contained within the lacustrine sediments of the McDermitt Caldera." TPEIS-0384 at 579. Parts of the Thacker Pass Mine are located outside the McDermitt Caldera, where lithium is not found.[57] *Compare* TPEIS-0384 at 203 *with* TPEIS-0384 at 208. Due to the lack of evidence of valuable minerals being present, these mining claims outside the caldera are not valid.[58]

BLM has nevertheless permitted LNC to permanently occupy Thacker Pass on claims outside of the caldera and lithium mineralization. The Ninth Circuit has recognized that, without discovery of a valuable mineral deposit, a miner has no right to "occupy the claim beyond the temporary occupancy necessary for exploration." *Ctr. for Biological Diversity*, 33 F.4th at 1209. Furthermore, "[i]f a mining claim is invalid, a miner has no right, possessory or otherwise[.]" *Id.* at 1210. FLPMA similarly prohibits "permanent impairment … of the land." 43 U.S.C. § 1702; *see also ONDA v. Taylor*, No. 04-334-KI, 2005 WL 106599, at *1 (D. Or. Jan. 18, 2005); *Earthworks v. U.S. Dep't of the Interior*, 496 F. Supp. 3d 472, 481 (D.D.C. 2020) ("FLPMA

---

[57] With respect to claims *within* the Caldera only the proposed location of the mine pit is within an area of known mineralization. *See* TPEIS-0457 AR-052868. The remainder of the project, even that within the confines of the McDermitt Caldera, does not contain currently known zones of lithium mineralization. *Id.*

[58] Mr. Bartell provided BLM with substantial DEIS comments showing these claims are invalid. BLM ignored these comments. *Compare* TPEIS-0713 AR-067649 *with* TPEIS-0516 AR-056334-37; *Sharks Sports & Ent. LLC v. Fed. Transit Admin.*, No. 18-CV-04060-LHK, 2020 WL 4569467, at *1 (N.D. Cal. Aug. 8, 2020) ("agency must respond to [DEIS] comments").

supersedes or supplements the Mining Law[.] For example, it requires the Secretary, '[i]n managing the public lands,' to 'take any action necessary to prevent unnecessary or undue degradation'").

The Thacker Pass Mine violates FLPMA because it permits LNC to permanently occupy BLM land in reliance on mining claims lacking any evidence of validity. This violates the Ninth Circuit's central holding in the Rosemont case and FLPMA because the unnecessary and undue degradation caused by the Mine will permanently degrade the productivity of the land, and such permanent occupancy cannot be permitted as part of an invalid mining claim. *Ctr. for Biological Diversity*, 33 F.4th at 1209-1210. BLM could have avoided violating FLPMA had BLM considered alternatives which did not require significant groundwater withdrawals for the extraction of lithium. Because BLM has unlawfully permitted LNC to permanently occupy invalid mining claims, BLM has arbitrarily and capriciously violated FLPMA.

**C. Bartell Plaintiffs Have Standing.**

Plaintiffs will suffer both environmental aesthetic/recreational injuries and economic injuries as a result of the Thacker Pass Mine. *See generally*, Declaration of Edward Bartell (Bartell Decl.), ECF 206. LNC asserts that Plaintiffs do not have standing because, as LNC puts it, Plaintiffs' "attempt to obscure its true interests are futile." ECF 241 at 10. LNC reasons that Plaintiffs' environmental interests "do not mask" Plaintiffs' economic interests, and that a focus on economic harms in scoping comments evidences their true interest. LNC is mistaken. Under Ninth Circuit caselaw, standing under NEPA is lacking where a plaintiff alleges *purely* economic injuries. *See W. Radio Servs. Co. v. Espy*, 79 F.3d 896, 903 (9th Cir. 1996); *Duval Ranching Co. v. Glickman*, 965 F. Supp. 1427, 1441 (D. Nev. 1997) ("Plaintiff Sandra Sharp's affidavit contains no indication that she is interested in the springs except as a water supply for her ranch; Plaintiff Kirk Dahl's affidavit is to the same effect"); *Yount v. Salazar*, No. CV11-8171-PCT DGC, 2013

WL 93372, at *18 (D. Ariz. Jan. 8, 2013) (standing existed where "economic interests cannot be divorced from their environmental interests"); *City of Fernley v. Conant*, No. 321CV00119MMD CLB, 2021 WL 5889529, at *4 (D. Nev. Dec. 13, 2021) (no standing where complaint alleged only economic injuries, not potential harms to the environment); *Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 940 (9th Cir. 2005) (standing insufficient where plaintiff "never claimed to be protecting an interest that is even remotely intertwined."). However, "the presence of economic injury, if the plaintiff also asserts environmental concerns, does not preclude standing." *Westlands Water Dist. v. U.S. Dep't of Interior, Bureau of Reclamation*, 850 F. Supp. 1388, 1411 (E.D. Cal. 1994).

Plaintiffs have been concerned with the environmental impacts of the Thacker Pass Mine since its inception. Plaintiffs' scoping comments specifically noted "[t]he EIS must thoroughly examine the impacts of air and other discharges on the local environment (i.e. plants, livestock Sage Grouse, and trout) …"[59] TPEIS-1489 AR-106855. These comments also explicitly noted present concerns about LNC's inadequate baseline data for Pole Creek and the impact of this shortcoming to LCT. TPEIS-1489 AR-106853.[60] Plaintiffs' complaint asserted that BLM violated NEPA because of BLM's shortcomings in the EIS related to LCT, sage grouse, water resources, and many other environmental issues. ECF 28 at 22. Thus, Plaintiffs have always had strong environmental interests—not merely "remotely intertwined" environmental interests—in the Thacker Pass Mine, repeatedly raised these interests during the NEPA process, and filed a

---

[59] LNC falsely asserts that Mr. Bartell "initially made no reference to his present concerns for sage grouse or trout." (ECF 239 at 11).

[60] It was not necessary that Plaintiffs raised these issues at the scoping comment stage to establish standing. "Because Article III's standing requirement does not apply to agency proceedings, petitioners had no reason to include facts sufficient to establish standing as a part of the administrative record." *Nw. Env't Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1527–28 (9th Cir. 1997). Thus, LNC's reliance on Plaintiffs' scoping comments is meaningless.

complaint focused on these interests to begin this lawsuit.[61] This sets this case apart from every case LNC's cites where the plaintiffs lacked standing. That Plaintiffs have some economic interests while also possessing environmental interests is in no way fatal to their standing. *See Yount*, 2013 WL 93372, at *18. To find otherwise would be reversible error.[62]

## V.   CONCLUSION

For the foregoing reasons, and those in Plaintiffs' motion for summary judgement, the Court should find BLM's approval of the Thacker Pass Mine arbitrary and capricious and vacate the ROD and FEIS.

Respectfully submitted this 12th day of July, 2022.

/s/ *Dominic M. Carollo*
DOMINIC M. CAROLLO (Or. Bar. No. 093057)
*Pro Hac Vice*
dcarollo@carollolegal.com
Carollo Law Group LLC
Mail: P.O. Box 2456
     Roseburg, OR 97470
Office: 2315 Old Highway 99 South
     Roseburg, OR 97471
Ph: (541) 957-5900
*Of Attorneys for Plaintiffs*

O. Kent MAHER (Nev. Bar No. 316)
kent@winnemuccalaw.com
PO Box 130
33 W Fourth Street
Winnemucca, Nevada 89446
Ph: (775) 623-527
*Of Attorneys for Plaintiffs*

---

[61] Plaintiffs' complaint references LCT over 70 times, wildlife 14 times, grouse 13 times, fish 7 times, and many other environmental interests. *See generally* ECF 28.

[62] It would be a stark deviation from standing jurisprudence to find that a party cannot have legitimate environmental interests simply because they have other economic interests in the natural world. That noted, in the unlikely event the Court were to find that Plaintiffs lack standing based on the mere existence of economic interests, Plaintiffs reserve the right to pursue any and all arguments on appeal, including challenging the "purely economic" interest bar from *Ashley Creek Phosphate*.  It makes little sense that, as part of BLM's NEPA analysis, BLM evaluated the potential impacts to Plaintiffs' water rights, and proposed mitigation, but Plaintiffs would have no recourse to challenge whether such NEPA analysis was arbitrary and capricious.  Put another way, given that NEPA required that BLM analyze impacts to Plaintiffs' water rights, Plaintiffs must also, then, possess interests within the zone of interests of NEPA.

## CERTIFICATE OF SERVICE

I hereby certify that on July 12, 2022 I filed the foregoing **BARTELL PLAINTIFFS' REPLY/RESPONSE BRIEF RE MOTIONS FOR SUMMARY JUDGMENT** using the United States District Court CM/ECF, which caused all counsel of record to be served electronically.

/s/Dominic Carollo
DOMINIC M. CAROLLO (Or. Bar No. 093057)
[*Pro Hac Vice*]

*Attorneys for Plaintiffs*