Christopher Mixson (NV Bar#10685)
KEMP JONES, LLP
3800 Howard Hughes Parkway, Suite 1700
Las Vegas, Nevada 89169
702-385-6000
c.mixson@kempjones.com

Attorney for Plaintiffs

Roger Flynn, (CO Bar#21078) *Pro Hac Vice*
Jeffrey C. Parsons (CO Bar#30210), *Pro Hac Vice*
WESTERN MINING ACTION PROJECT
P.O. Box 349, 440 Main St., #2
Lyons, CO 80540
(303) 823-5738
wmap@igc.org

Attorneys for Great Basin Resource Watch, Basin and Range Watch, and Wildlands Defense

Talasi B. Brooks (ISB#9712), *Pro Hac Vice*
Western Watersheds Project
P.O. Box 2863
Boise ID 83714
(208) 336-9077
tbrooks@westernwatersheds.org

Attorney for Western Watersheds Project

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | | |
|---|---|---|
| BARTELL RANCH LLC, et al., | ) | Case No.: 3:21-cv-80-MMD-CLB (LEAD CASE) |
| Plaintiffs, | ) ) | |
| v. | ) ) | **ENVIRONMENTAL PLAINTIFFS' RESPONSE/REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |
| ESTER M. MCCULLOUGH, et al., | ) ) ) | |
| Defendants, | ) | |
| and | ) | |
| LITHIUM NEVADA CORPORATION, | ) ) | |
| Intervenor-Defendant. | ) ) | |

i

WESTERN WATERSHEDS PROJECT, et al.,      )      Case No.: 3:21-cv-103-MMD-CLB
                                         )      (CONSOLIDATED CASE)
                Plaintiffs,              )
                                         )
and                                      )
                                         )
RENO SPARKS INDIAN COLONY, et al.,       )
                                         )
                Intervenor-Plaintiff,    )
                                         )
and                                      )
                                         )
BURNS PAIUTE TRIBE                       )
                                         )
                Intervenor-Plaintiff,    )
                                         )
v.                                       )
                                         )
UNITED STATES DEPARTMENT OF THE          )
INTERIOR, et al.,                        )
                                         )
                Defendants,              )
and                                      )
                                         )
LITHIUM NEVADA CORPORATION,              )
                                         )
                Intervenor-Defendant.    )

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................v

LIST OF EXHIBITS ....................................................................ix

I.   **LNC Has No Statutory "Right" Under the Mining Law to Use and Occupy Mining Claims for the Waste Rock and Tailings Dumps**...........................1

    A.   **The Ninth Circuit's Ruling on the 1872 Mining Law Rejects the Same Arguments Put Forth by BLM and LNC in this Case** ........................1

        1.   *The Ninth Circuit Rejected the Federal Government's Assertion That Mining Claimants Have an Unquestioned Valid Right to Use and Occupy Public Lands for Waste Dumps*...........................2

        2.   *LNC's Permanent Waste and Tailings Dumps are "Occupation" Under the Mining Law* ...........................6

        3.   *The Mining Law and the Surface Resources Act Do Not Create Any Rights to "Reasonably Incident" Uses and Occupation of Public Land for the Waste Dumps* ...........................7

    B.   **Defendants' Attempts to Distinguish the Ninth Circuit's Decision Are Unavailing** ...........................8

        1.   *The Ninth Circuit's Ruling Is Immediately Applicable and Binding in this Case* ...........................8

        2.   *That the Ninth Circuit's Decision Dealt with a Mine on Forest Service Land Does Not Diminish Its Controlling Ruling on the Mining Law and the Surface Resources Act* ...........................9

        3.   *LNC Has Failed to Show That It Has Discovered a Valuable Mineral Deposit On the Lands To Be Permanently Buried by the Waste and Tailings Dumps* ...........................12

II.   **BLM Failed to Comply with the Controlling RMP Under FLPMA** ........................13

    A.   **BLM Cannot Rely on Unsupported and Unverified "Rights" Under the Mining Law to Avoid Compliance with its RMP** ...........................13

    B.   **BLM's Duty to "Prevent Unnecessary or Undue Degradation" Under FLPMA Requires Compliance with the Mitigation Measures and Standards in the RMP**...........................16

C.    BLM Failed to Apply the Sage-grouse RMP Habitat Protection
        and Design Standards ........................................................................20

III.    <u>Failure to Prevent "Unnecessary or Undue Degradation" Under FLPMA</u> ............23

A.    Failure to Prevent UUD to Sensitive Species ....................................23

B.    The Predicted Violation of Groundwater Standards Constitutes UUD .......24

C.    BLM Failed to Support Its Conclusion Regarding Compliance
        with Air Quality Standards ..............................................................28

IV.    <u>The FEIS Fails to Meet the Strict Analysis Standards Under NEPA</u> ......................28

A.    The FEIS Failed To Take a "Hard Look" At Wildlife Conditions
        and Impacts ....................................................................................28

B.    The FEIS Failed To Provide the Detailed "Quantified Assessment"
        of the Cumulative Impacts from the Other Activities in the Area ...............33

C.    Failure to Adequately Analyze Mitigation Measures and
        Their Effectiveness .........................................................................35

D.    BLM/LNC's Assurances of Compliance with Air Quality Standards
        Are Based on "Undetermined" Methods That Were Not Subject
        to Public Review .............................................................................38

V.    <u>Defendants Have Not Overcome the Presumption That Illegal Agency
    Actions Should Be Vacated</u> .........................................................................40

<span style="font-variant:small-caps">Conclusion</span> ..............................................................................................40

1

## TABLE OF AUTHORITIES

2

***Federal Caselaw***

3

4   Amer. Textile Manf. Inst. v. Donovan,
452 U.S. 490 (1981) ........................................................................................13

5

6   Barnes v. U.S. Dept. of Transp.,
655 F.3d 1124 (9th Cir. 2011) ......................................................................38

7

8   Cal. Cmtys. Against Toxics v. EPA,
688 F.3d 989 (9th Cir. 2012) ........................................................................40

9   Center for Biological Diversity v. U.S. Dept. of the Interior,
623 F.3d 633 (9th Cir. 2010) ........................................................................19

10

11   Center for Biological Diversity v. U.S. Fish and Wildlife Service,
33 F.4th 1202 (9th Cir. 2022) ................................................................ *passim*

12

13   Center for Biological Diversity v. U.S. Fish and Wildlife Service,
409 F.Supp.3d 738 (D. Ariz. 2019) .....................................................1, 6, 7, 13

14

15   Chevron v. NRDC,
467 U.S. 837 (1984).........................................................................................3

16

17   Chrisman v. Miller,
197 U.S. 313 (1905) ......................................................................................12

18   City of Carmel-By-The-Sea v. U.S. Dept. of Transp.,
123 F.3d 1142 (9th Cir. 1997) ......................................................................37

19

20   City of Davis v. Coleman,
521 F.2d 661 (9th Cir. 1975) ........................................................................22

21

22   Davis v. Mineta,
302 F.3d 1104 (10th Cir. 2002) ....................................................................27

23

24   Davis v. Nelson,
329 F.2d 840 (9th Cir. 1964) ..........................................................................3

25

26   Env'l Defense Ctr. v. Bureau of Ocean Energy Mgt.,
36 F.4th 850 (9th Cir. 2022) ...................................................................34, 39

27   Great Basin Mine Watch v. Hankins,
456 F.3d 955 (9th Cir. 2006) ...................................................................33, 34

28

Great Basin Resource Watch v. BLM,
844 F.3d 1095 (9th Cir. 2016) ............................................25, 28, 33, 34, 36, 39

Havasupai Tribe v. Provencio,
906 F.3d 1155 (9th Cir. 2018) ...................................................................16

Humane Soc'y of the U.S. v. Locke,
626 F.3d 1040 (9th Cir. 2010) ...................................................................40

In re Zermeno-Gomez,
868 F.3d 1048 (9th Cir. 2017) .....................................................................8

Japanese Vill. v. Fed. Transit Admin.,
843 F.3d 445 (9th Cir. 2016) .....................................................................37

Kern v. BLM,
284 F.3d 1062 (9th Cir. 2002) ...................................................................34

Klamath-Siskiyou Wildlands Ctr. v. BLM,
387 F.3d 989 (9th Cir. 2004) .....................................................................28

Lands Council v. Powell,
395 F.3d 1019 (9th Cir. 2005) .....................................................................3

Mineral Policy Center v. Norton,
292 F.Supp.2d 30 (D.D.C. 2003) ....................................................18, 19, 23

Motor Vehicles Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co.,
463 U.S. 29 (1983) .......................................................................................6

Nat. Wildlife Fed. v. NMFS,
184 F.Supp.3d 861 (D. Or. 2016) ..............................................................27

Nat'l Fam. Farm Coal. v. EPA,
960 F.3d 1120 (9th Cir. 2020) ...................................................................40

Native Village of Point Hope v. Jewell,
740 F.3d 489 (9th Cir. 2014) .....................................................................34

N. Spotted Owl v. Hodel,
716 F.Supp. 479 (W.D. Wash. 1988) .........................................................27

Or. Nat. Desert Ass'n v. BLM,
531 F.3d 1114 (9th Cir. 2008) ...................................................................13

Or. Nat. Desert Ass'n v. Jewell,
840 F.3d 562 (9th Cir. 2016) ...............................................................32, 40

Or. Nat. Desert Ass'n v. Rose,
921 F.3d 1185 (9th Cir. 2019) ................................................................36, 39

Protect Our Communities Fnd. v. Jewell,
825 F.3d 571 (9th Cir. 2016) ..........................................................................36

Sierra Club v. U.S. Army Corps of Engineers,
701 F.2d 1011 (2d Cir. 1983) ..........................................................................27

Silva v. Lynn,
482, F.2d 1282 (1st Cir. 1973) ........................................................................27

South Fork Band Council v. Dept. of Interior,
588 F.3d 718 (9th Cir. 2009) ................................................................37, 38, 39

Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dep't of Interior,
608 F.3d 592 (9th Cir. 2010) ..........................................................................33

U.S. v. Allen,
578 F.2d 236 (9th Cir. 1978) ...........................................................................3

U.S. v. Coleman,
390 U.S. 599 (1968) .....................................................................................12

U.S. v. Dulus,
2021 WL 230045 (D. Nev. 2021) .......................................................................8

Utility Air Regulatory Group v. E.P.A.,
573 U.S. 302 (2014) ......................................................................................3

Western Exploration v. U.S. Dept. of the Interior,
250 F.Supp.3d 718 (D. Nev. 2017) .......................................18, 19, 23, 36, 39, 40

***Federal Statutes***

Federal Land Policy and Management Act ("FLPMA"),
43 U.S.C. §§ 1701 *et seq.* .............................................................................9

Federal Land Policy and Management Act ("FLPMA"),
43 U.S.C. §§ 1701(a) ..........................................................................6, 20, 36

Federal Land Policy and Management Act ("FLPMA"),
43 U.S.C. §§ 1702(c) .....................................................................................20

Federal Land Policy and Management Act ("FLPMA"),
43 U.S.C. §§ 1732 (a) ....................................................................................13

Federal Land Policy and Management Act ("FLPMA"),
43 U.S.C. §§ 1732 (b) ..........................................................................9, 13, 16

Forest Service Organic Act of 1897,
16 U.S.C. §§ 478, 482, 551 ...........................................................................9

Mining Law of 1872
30 U.S.C. §22 .........................................................................2, 3, 7, 10, 15

Mining Law of 1872
30 U.S.C. §26 .................................................................................2, 3, 10

National Environmental Policy Act ("NEPA"),
42 U.S.C. §§ 4321 *et seq.* ................................................... *passim*

Surface Resources and Multiple Use Act of 1955,
30 U.S.C. §612 ...................................................2, 7, 8, 9, 15, 20

***Federal Regulations***

36 C.F.R. § 228.1 .........................................................................11

40 C.F.R. Part 1500 (2019) ........................................................34

40 C.F.R. § 1500.1 (2019) ..........................................................39

40 C.F.R. § 1502.22 (2019) ........................................................34

40 C.F.R. § 1506.5 (2019) ..........................................................38

43 C.F.R. § 3809.1 ......................................................................11

43 C.F.R. § 3809.420 ...................................4, 16, 17, 19, 20, 24, 28

***State Regulations***

NAC (Nevada Admin. Code) 445A.424.(1)(b)(1) .....................24

***Additional Authority***

65 Fed. Reg. 69998, 70052 (Nov. 21, 2000)............................17

66 Fed. Reg. 54835, 54840 (Oct. 30, 2001)............................17

BLM, Special Status Species Management Manual 6840 ........23, 24

Island Mountain Protectors,
144 IBLA 168; 1998 WL 344223 (1998) .............................25

Interior Department Solicitor Opinion, M-37039, <u>The Bureau of Land Management's Authority to Address Impacts of its Land Use Authorizations through Mitigation</u>, (Dec. 21, 2016) ...................................................................................................17, 18, 23

Interior Department Solicitor Opinion, M-370075, <u>Withdrawal of M-37046 and Reinstatement of M-37039</u> (April 15, 2022) ....................................................................17

**<u>Exhibit List for Environmental Plaintiffs' Response/Reply in Support of Their Motion for Summary Judgment</u>**

1. Interior Department Solicitor Opinion, M-37039, <u>The Bureau of Land Management's Authority to Address Impacts of its Land Use Authorizations through Mitigation</u>, (Dec. 21, 2016).

2. Interior Department Solicitor Opinion, M-37075, <u>Withdrawal of M-37046 and Reinstatement of M-37039</u> (April 15, 2022).

Environmental Plaintiffs (collectively WWP) submit this Consolidated Response to the Federal Defendants' (BLM) Cross-Motion for Summary Judgment (and Response to WWP's Motion for Summary Judgment)(BLM. Resp.)(ECF No. 237), and to Lithium Nevada Corporation's (LNC) Cross-Motion Summary Judgment (and Response to WWP's Motion)(LNC Resp.)(ECF No. 242).

## I.  LNC Has No Statutory "Right" Under the Mining Law to Use and Occupy Mining Claims for the Waste Rock and Tailings Dumps.

BLM and LNC assert, as BLM did throughout the permitting process, that LNC has a statutory right to use and occupy its mining claims underlying its planned waste and tailings dumps. These purported "rights" under the 1872 Mining Law, covering over a thousand acres of public land for the massive facilities, form the basis for their argument that BLM complied with FLPMA when it approved the Project and that BLM Resource Management Plan (RMP) requirements to protect the environment and sage-grouse do not apply to the Project. But this position was squarely rejected in Center for Biological Diversity v. U.S. Fish and Wildlife Service, a controlling new decision from the Ninth Circuit, which faced essentially the same "rights" argument from the federal government and mining intervenor as in this case. 33 F.4th 1202 (9th Cir. May 12, 2022). The circuit court affirmed the District of Arizona's decision in Center for Biological Diversity v. U.S. Fish and Wildlife Service, 409 F. Supp. 3d 738 (D. Ariz. 2019), on which Plaintiffs relied in their opening Motion.

Although BLM/LNC try to distinguish this ruling, they cannot refute the Ninth Circuit's express holding that, absent a finding that the mining claims approved for the waste and tailings dumps satisfy the test for the "discovery of a valuable mineral deposit," there are no "rights" under the Mining Law, and certainly no "valid and existing rights" that provide the blanket exclusion from RMP compliance asserted by BLM/LNC. Because the record lacks support for LNC's asserted "rights" to those lands, BLM's determination that the Project is exempt from otherwise-applicable requirements of FLPMA and the RMP is arbitrary and capricious and violates FLPMA.

## A.  The Ninth Circuit's Ruling on the 1872 Mining Law Rejects the Same Arguments Put Forth by BLM and LNC in this Case.

The Ninth Circuit's decision in Center for Biological Diversity fully supports WWP's arguments on federal mining and public land law and rejects BLM/LNC's positions. One of WWP's

fundamental arguments challenging BLM's review and approval of the Thacker Pass Project is that BLM improperly approved the use and occupation of public lands for the massive waste dumps based on the unwarranted presumption that LNC had statutory rights under the 1872 Mining Law for such use and occupancy, 30 U.S.C. §§ 22 et seq. *See, e.g.*, WWP SJ Mot. 9-14 (ECF No. 202). WWP asserts, as plaintiffs did in the Ninth Circuit case, that although the Mining Law gives miners some license to initially explore public lands for minerals, it restricts the right of occupancy of mining claims for permanent waste dumps to lands containing the discovery of a "valuable mineral deposit." 30 U.S.C. §§ 22, 26.

In response, BLM and LNC make three principal arguments, all of which the Ninth Circuit rejected in Center for Biological Diversity. First, they argue that BLM did not determine, and did not need to determine, whether LNC held any valid right to use and occupy the public lands to be buried by the waste dumps. Second, they argue that the permanent waste dumps are not "occupation" under the Mining Law. Third, they argue that occupation of these waste dump lands is a use "reasonably incident to" mining and is therefore authorized by the Surface Use Act of 1955, 30 U.S.C. § 612. Each argument fails under Center for Biological Diversity.

*1.    The Ninth Circuit Rejected the Federal Government's Assertion That Mining Claimants Have an Unquestioned Valid Right to Use and Occupy Public Lands for Waste Dumps.*

In Center for Biological Diversity, the Ninth Circuit rejected the government's position that a mining claimant has a "right" to use and occupy its mining claims absent a showing that a valuable mineral deposit had been discovered on those claims (i.e., the claims were valid under the Mining Law). That case dealt with the federal government's approval of the "Rosemont" mine, a large open pit copper mine on mostly federal land.[1] The Ninth Circuit rejected the same position taken by BLM/LNC here, that the mere filing of a mining claim, and the Mining Law in general, conveys a right to occupy federal lands with the waste dumps: "In the absence of a discovery of a valuable mineral deposit, Section 22 [of the Mining Law] gives a miner no right to occupy the claim beyond

---

[1] Although the defendant in the named case is the U.S. Fish and Wildlife Service, that first-filed case focused on FWS' actions under the Endangered Species Act; the Ninth Circuit's decision involves two later-filed and consolidated cases, brought by Indian Tribes and conservation groups, challenging the Forest Service's review and approval of the mine as misinterpreting federal mining laws. *See* Center for Biological Diversity, 33 F.4th at 1213-14 (discussing the cases).

2

the temporary occupancy necessary for exploration." <u>Center for Biological Diversity</u>, 33 F.4th at 1209. Section 22 states that: "All valuable mineral deposits in lands belonging to the United States … shall be free and open to exploration and purchase, and the lands in which they are found to occupation and purchase." 30 U.S.C. § 22. Ruling on that language, the court held:

> [T]he right of "occupation" depends on valuable minerals having been "found" on the land in question. *See* 30 U.S.C. §§ 23, 26. If no valuable minerals have been found on the land, Section 22 gives no right of occupation beyond the temporary occupation inherent in exploration.

<u>Center for Biological Diversity</u>, 33 F.4th at 1219. "[V]alidity of a mining claim is a necessary prerequisite to post-exploration occupancy of a claim." <u>Id</u>. at 1217-18. *See* WWP SJ Mot. 9-14.

Agreeing with plaintiffs in Rosemont and relying on the same precedent quoted by WWP here, the Ninth Circuit stated that "[o]ur court has also explained the distinction drawn in Section 22 between the right of temporary occupation for exploration purposes and the right of occupation for mining purposes after discovery of valuable minerals." 33 F.4th at 1220 (then quoting <u>Davis v. Nelson</u>, 329 F.2d 840, 844-45 (9th Cir. 1964)). *See* WWP SJ Mot. 11. The court further noted its precedent that "mere exploration, without discovery, does not confer a privilege to obstruct surface use." 33 F.4th at 1220, quoting <u>United States v. Allen</u>, 578 F.2d 236, 238 (9th Cir. 1978).

The court also held that the agency's failure to inquire into whether the waste dump claims were valid under the Mining Law was essentially the same as assuming the claimant had a right to use and occupy the waste dump lands – and that such an assumption illegally created statutory rights where none exist.

> In the FEIS, the Service either assumed that Rosemont's mining claims on that land were valid or (**what amounted to the same thing**) did not inquire into the validity of the claims. Based on its assumption that the mining claims were valid, the Service concluded that Rosemont's permanent occupation of the claims with its waste rock was permitted under the Mining Law.

<u>Center for Biological Diversity</u>, 33 F.4th at 1212 (emph. added). "The Government's argument is not only foreclosed by the text of Section 22. It is also foreclosed by a century of precedent." <u>Id</u>. at 1219.[2]

---

[2] LNC urges this Court to defer to BLM's view of the Mining Law under <u>Chevron v. NRDC</u>, 467 U.S. 837 (1984). But BLM's interpretations that contradict the plain language and intent of the statute and "a century of precedent" deserve no deference. "[A]n agency interpretation that is 'inconsisten[t] with the design and structure of the statute as a whole,' does not merit deference." <u>Utility Air Regulatory Group v. E.P.A.</u>, 573 U.S. 302, 321 (2014)(citation omitted). *See* <u>Lands Council v. Powell</u>, 395 F.3d

BLM did the same thing here, asserting that it "did not, and did not need to, make a 'valid rights' determination." BLM Resp. 1. BLM's failure to inquire into whether the claims to be used for the waste dumps meet the strict valid rights requirements of the Mining Law "amounted to the same thing" as illegally assuming those rights existed. Center for Biological Diversity, 33 F.4th at 1212.

BLM asserts that it did not assume LNC held valid rights, while arguing in the same breath that LNC has "rights to explore, occupy and develop minerals" on its mining claims. BLM Resp. 4. In briefing, BLM repeatedly argues that LNC does not have to comply with binding RMP requirements because "[t]he land use plan can be used to establish the objectives for post-mining land uses" but **"must recognize the rights granted by the Mining Law** . . . ."). BLM Resp. 10, n. 15 (emph. added). BLM also believed that LNC's "statutory rights" precluded application of the RMP standards and requirements:

> while the performance standards with which operators must comply require consistency with land-use plans, such **compliance is not required where a planning provision would prohibit exercise of statutory rights under the Mining Law**. *See* 43 C.F.R. § 3809.420(a)(3) ("Consistent with the mining laws, your operations and post-mining land use must comply with the applicable BLM land-use plans").

BLM PI Opp. 17 (ECF. No. 30)(emph. added).

The FEIS was based on the same flawed assumption that LNC held purported "rights" to use and occupy the entire Project area. "Proposed locatable minerals resource projects are not subject to lek buffer distances identified in Appendix B of the GRSG Amendment." FEIS N-6, AR046476.[3] According to BLM, the ARMPA lek buffers apply only if "consistent with valid and existing rights and applicable law." Id. BLM further exempted the Project from the ARMPA seasonal restrictions, as "Proposed locatable minerals resource projects are not subject to the application of seasonal

---

1019, 1026 (9th Cir. 2005)(agency action is "arbitrary and capricious" under the APA "if the agency's decision is contrary to the governing law.").

[3] The applicable RMPs include the Winnemucca RMP, AR033585-033741 (TPEIS-0226); amended by the Record of Decision and Approved Resource Management Plan Amendments for the Great Basin Region (Great Basin ROD) to include binding protective standards for sage-grouse. AR080419-080508 (file within TPEIS-0849); Attachment 2 to the Great Basin ROD established standards for the Greater sage-grouse. AR037727-830 (TPEIS-0298); and the Nevada and Northeastern California Greater Sage-Grouse Approved 2015 RMP Amendment (ARMPA), AR080913-081016 (file within TPEIS-0849).

4

restrictions identified in the 2015 GRSG Amendment." FEIS N-9, AR046479. BLM also waived the 3% habitat disturbance cap, based on LNC's "valid rights": "[A]ny exceedances of the cap (at both the BSU and project levels scales) do not preclude a locatable mineral resources project with existing valid rights from BLM approval." FEIS 4-45, AR045593.[4] *See also* FEIS N-5, AR046475 (waiving 3% cap due to "applicable laws and regulations such as the 1872 Mining Law, as amended, and valid existing rights").

Like the Forest Service at Rosemont, BLM "did not investigate mining claim validity prior to issuing the decision challenged here." BLM PI Opp. 23 (ECF No. 30). "No law, regulation, or Departmental policy obligates BLM to establish the existence of valid mining claims or sites – or, in Plaintiffs' terms, 'valid existing rights' – before approving the Thacker Pass Project." Id. 21. Instead, BLM simply claims it did not have to, since the lands were open to mining. BLM Resp. 5, n. 7 (noting the Rosemont decision and stating "[t]he government preserves the argument that the Mining Law does not require a valid mining claim before conducting mining operations on open lands….").

That was the same argument used by the federal government, and rejected by the Ninth Circuit in the Rosemont case: "The Government writes: 'because the lands that Rosemont proposes to use for its waste rock and tailings are open, *Rosemont has a statutory right to occupy those lands*, and the Service had no reason to evaluate whether Rosemont *also* possessed valid mining claims.'" Center for Biological Diversity, 33 F.4th at 1219 (emph. in original). Thus, BLM's "rights of occupancy" and "valid existing rights" arguments do not survive the Ninth Circuit's controlling ruling in the Rosemont case. The Court squarely rebuffed the attempt to create a statutory right to occupy mining claims for waste dumps, absent evidence that the lands (covered by LNC's mining claims, like at Rosemont) were found to contain the requisite discovery of a valuable mineral deposit.

The Ninth Circuit also affirmed the District Court's ruling rejecting the agency's argument that the claims automatically confer rights under the Mining Law unless the Interior Department conducts a formal claim validity adjudication. Center for Biological Diversity, 33 F.4th at 1221-22. The district court had held that "a validity determination differs significantly from establishing a

---

[4] For some reason, BLM's initial production of the AR had bates-pages for the FEIS (TPEIS 384), but when BLM submitted the supplemented AR, the bates-pages disappeared from TPEIS 384.

factual basis upon which the Forest Service can determine rights. … the [agency] merely needed a factual basis to support Rosemont's assertion of rights." 409 F. Supp. 3d at 761-62. Although the Interior Department may conduct its validity review in the future, that does not mean that the permitting agency, whether BLM or the Forest Service, can assume "rights" exist without meeting the statutory prerequisites for such rights. "Any decision made without first establishing the factual basis upon which the Forest Service could form an opinion on surface rights would entirely ignore an important aspect of this problem." Id. at 757-58 (citing Motor Veh. Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983)).

Thus, BLM cannot decide that the RMP requirements do not apply because LNC supposedly has "existing valid rights" under the Mining Law, but at the same time argue that it is under no obligation to inquire into whether those rights actually exist under that Law.

In addition, the Ninth Circuit highlighted the fact that the Forest Service in the Rosemont case – just like BLM and LNC here – relied on the Interior Department's Solicitor's Opinions, issued in 2005 and 2020, to support the agency's argument that it need not inquire into whether the waste dump lands contained the discovery of a valuable mineral and thus in effect assume the claims were valid. Like it did with the rest of the government's arguments under the Mining Law, the Ninth Circuit rejected the agency's erroneous position, and further noted that the Interior Department "had taken a different position four years earlier [in 2001]." Center for Biological Diversity, 33 F.4th at 1217. "[W]e give limited weight to the 2020 Opinion letter, because on the issue as to which the Government asks for deference, the Solicitor has taken inconsistent positions." Id. BLM/LNC relied on the 2005 and 2020 Solicitor's Opinions here also, and indeed, BLM attached these two Opinions to its Opposition to WWP's PI Motion. BLM PI Opp. 23, n. 66 (ECF. No. 30)(quoting  Opinions).

2.    *LNC's Permanent Waste and Tailings Dumps Are "Occupation" Under the Mining Law.*

The Ninth Circuit also specifically rejected BLM's and LNC's argument, similarly asserted by the federal government and Rosemont, that LNC's massive waste and tailings dumps, which LNC has no plans to remove, are not "occupation" under the Mining Law, or somehow not "permanent." Indeed, in rejecting that position, the Court quoted the Department of Justice's brief, which had argued that "after mining ends and reclamation is completed, Rosemont will no longer have the

Service's authorization to occupy the surface of those lands." 33 F.4th at 1220, quoting Federal brief. That is essentially the same language and position argued by BLM here:

> First, the challenged decision does not authorize 'permanent occupation.' A miner's occupation under the Mining law can only be characterized as 'permanent' if a patent is issued. … Once the project is reclaimed and the financial guarantee is released, the plans of operations will be closed and Lithium Nevada will no longer be authorized to engage in the approved mining operations on these public lands.

BLM PI Opp. 22 (ECF No. 30)(citations omitted).

As the Ninth Circuit held, "[t]he Government is wrong on two counts. First, discovery of valuable minerals is essential to the right to any occupancy—temporary or permanent—beyond the occupancy necessary for exploration. As soon as exploration on a claim is finished, the right to continue to occupy that claim is contingent on the discovery of valuable minerals, whether or not the occupation will be permanent." Center for Biological Diversity, 33 F.4th at 1220. "Second, Rosemont's occupancy with its waste rock would, in effect, be permanent." Id. The Court could not have been more clear in rejecting the government's position: "The argument that the proposed occupation would not be permanent does violence to the English language." Id.

3.  *The Mining Law and the Surface Resources Act Do Not Create Any Rights to "Reasonably Incident" Uses and Occupation of Public Land for the Waste Dumps.*

LNC and BLM also argue that LNC has a statutory right to use and permanently occupy the waste/tailings dump lands because such ancillary uses are "'reasonably incident' to mining" in the pit. LNC Resp. 8, relying on the Surface Resources Act of 1955, 30 U.S.C. § 612, as well as the Mining Law, 30 U.S.C. § 22. *See also* BLM PI Opp. 23, n. 66 (ECF. No. 30)(quoting the 2005 and 2020 Solicitor's Opinions for the view that the agency need not inquire into claim validity "where the claimant is proposing to use mining claims solely for purposes ancillary to mining….").

That was also the federal government's position in the Rosemont case. As the Ninth Circuit noted, the agency had believed "that Section 612 of the Multiple Use Act [Surface Resources Act, 30 U.S.C. §612] gives Rosemont the right to dump waste rock on its mining claims as a 'use reasonably incident' to its mining operations, irrespective of any rights Rosemont may or may not have under the Mining Law." Center for Biological Diversity, 33 F.4th at 1217.

In language directly applicable to this case, the Ninth Circuit squarely rebuffed that argument,

7

holding that **"neither Section 612 nor the Mining Law provides Rosemont with the right to dump its waste rock on thousands of acres of National Forest land on which it has no valid mining claims."** Id. at 1218 (emph. added). The court then concluded that "Section 612 of the Multiple Use Act does not authorize uses of mining claims beyond those authorized by the Mining Law." Id. "Section 612 'did not change the lands to which the Mining Law applied or specify where mining operations may or may not occur.'" Id. (quoting government's brief, after it abandoned its position that "reasonably incident" operations qualified for occupancy and use rights under Section 612). Thus, because the agency's decisions were based on the unsupported position that Rosemont had a right under the Mining Law and Section 612 to dump its waste, the Court held "that the Service improperly relied on Section 612 to support its decision." Id.

In sum, the Ninth Circuit held that "the [Forest] Service *de facto* amended the Multiple Use Act and the Mining Law to give Rosemont what it wants." Id. at 1224 (emph. in original). "But amendment of the Mining Law is a task for Congress, not the Service, and certainly not for us." Id.

**B.    Defendants' Attempts to Distinguish the Ninth Circuit's Decision Are Unavailing.**

*1.    The Ninth Circuit's Ruling Is Immediately Applicable and Binding in this Case.*

BLM attempts to avoid the Ninth Circuit's decision because "the mandate has not yet issued in the Ninth Circuit." BLM Resp. 5, n.7. BLM says that it is still reviewing the decision and "preserves the argument that the Mining Law does not require a valid mining claim before conducting mining operations on open lands." Id. But that is not a valid reason to disregard the controlling circuit decision. "Under our 'law of the circuit doctrine,' a published decision of this court constitutes binding authority "which 'must be followed unless and until overruled by a body competent to do so.'" In re Zermeno-Gomez, 868 F.3d 1048, 1052 (9th Cir. 2017)(internal citations omitted). "[O]nce a federal circuit court issues a decision, the district courts within that circuit are bound to follow it and have no authority to await a ruling by the Supreme Court before applying the circuit court's decision as binding authority." Id. Similarly, that BLM "preserves" its now-repudiated arguments under the Mining Law does not diminish the controlling nature of the Ninth Circuit's decision. This District has rejected a party's attempt to avoid the appellate decision by "preserv[ing] his claim for further appellate review." United States v. Dulus, 2021 WL 230045, *3 (D. Nev. 2021).

2.   *That the Ninth Circuit's Decision Dealt with a Mine on Forest Service Land Does Not Diminish Its Controlling Rulings on the Mining Law and the Surface Resources Act.*

BLM and LNC assert that because the Rosemont case dealt with the Forest Service's approval of waste dumping under asserted rights under the Mining Law and Section 612, rather than BLM's similar approval of such dumps, it is entirely irrelevant and inapplicable to this Court's review. This is because, according to them, the Rosemont case did not involve BLM's authority under the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. §§ 1701 *et seq.*, but rather the Forest Service Organic Act of 1897 (Organic Act), 16 U.S.C. §§ 478, 482, 551. BLM Resp. 5, n.7, and 21-22; LNC Resp. 8. While these public land laws do differ between the agencies, it is a distinction without a difference here when it comes to the overarching applicability of the Mining Law and Section 612.

BLM/LNC attempt to distract this Court from the plain fact that the Mining Law and Section 612 apply to both agencies equally. Except for a general introductory discussion about the Organic Act, the Ninth Circuit's ruling contains little analysis of that statute. Center for Biological Diversity, 33 F.4th at 1210. It is primarily focused on the Mining Law and Section 612. The fact that BLM's permit review and environmental standards under FLPMA (such as the prohibition against "unnecessary or undue degradation" to public lands, 43 U.S.C. § 1732(b)), differ from the Forest Service's duty under the Organic Act to protect against "depredations upon the public forests," 16 U.S.C. § 551, does not affect the Ninth Circuit's rulings on the Mining Law and Section 612.

Because the Mining Law and Section 612 indisputably apply to both agencies, BLM and LNC cannot evade the Ninth Circuit's clear interpretations of both statutes. A mining claim on BLM land is treated the same under the Mining Law as a claim on Forest Service land. The same "valuable mineral deposit" requirements apply to both. The prohibition against approving waste dumping and related operations under improperly-assumed rights under the Mining Law and Section 612, as ruled by the Ninth Circuit, thus applies equally to the Forest Service and BLM.

Indeed, a review of the Department of Justice's brief to the Ninth Circuit shows that it made the same arguments, with the same language, regarding the assertions of "rights" to use and occupy the waste dumps claims under the Mining Law, that the agency need not inquire into whether claims

approved for waste dumps before assuming such rights exist, and that such operations were

authorized by the Mining Law. As the government summarized to the circuit court:

> The district court erred in holding that the Service should have ensured that Rosemont's unpatented mining claims, specifically those claims that Rosemont planned to use for its waste rock and tailings facilities, were valid before approving its proposed mining plan. The court misunderstood the distinction drawn by the Mining Law between the statutory right to enter, explore, and occupy open federal lands for mining purposes, 30 U.S.C. § 22, and the entirely separate right to secure property interests in federal lands, id. §§ 23, 26, 29, 35, 36, 42. A miner need not obtain a property right to exercise his statutory right to occupy lands open to mining. Because the lands that Rosemont proposes to use for its waste rock and tailings facilities are open, Rosemont has a statutory right to occupy those lands, and the Service had no reason to evaluate whether Rosemont also possessed valid mining claims.

Federal Appellants' Brief, 2020 WL 3455289, **17-18. *See also*, <u>Id.</u> at 19-35 (main argument). As

quoted above, the Ninth Circuit ruled against the government on each of these positions.

The government further urged the Ninth Circuit to reject the argument, raised by plaintiffs in

Rosemont and by WWP in this case, that Section 22 of the Mining Law mandates that rights to

"occupation" for the waste dumps requires the discovery of a valuable mineral deposit on those

claims. As the government argued: "Nor should the Court join Plaintiffs in reading such a restriction

into the phrase 'the lands in which [valuable mineral deposits] are found.' 30 U.S.C. § 22. Plaintiffs

claim that this language limits a miner's right of occupation under § 22 to only lands containing

actual, validated valuable mineral deposits." 2020 WL 6833548, *3 (Reply Br.).

But that is precisely what the circuit court did, agreeing with plaintiffs on that very issue.

"[T]he right of 'occupation' depends on valuable minerals having been 'found' on the land in

question. *See* 30 U.S.C. §§ 23, 26. If no valuable minerals have been found on the land, Section 22

gives no right of occupation beyond the temporary occupation inherent in exploration." <u>Center for

Biological Diversity</u>, 33 F.4th at 1219. *See* WWP SJ Mot. 10-12.

The Ninth Circuit's ruling regarding Section 612, rejecting the government's position that

claimants such as LNC or Rosemont have a statutory right to conduct "reasonably incident" uses on

their claims, also applies to both the Forest Service and BLM. Indeed, as discussed above, the Forest

Service relied on the Interior Department's Solicitor's Opinions which had stated that BLM need not

inquire into claim validity, and that a claimant had a right under Section 612 to all "reasonably

incident uses" the same exact way BLM does here. *See* <u>Center for Biological Diversity</u>, 33 F.4th at 1216 (refusing to defer to the Opinions). The fact that BLM's legal positions in this case also rely heavily on the same erroneous Opinions further supports WWP's argument.

BLM and LNC also ignore the fact that both BLM and Forest Service mining regulations interpret the same language regarding "operations authorized by the mining laws." The focus of BLM's mining regulations is to "Prevent unnecessary or undue degradation of public lands **authorized by the mining laws**." 43 C.F.R. § 3809.1 (emph. added). Although the underlying environmental standard is different from BLM's, Forest Service regulations say the same thing: "It is the purpose of these regulations to set forth rules and procedures through which use of the surface of National Forest System lands in connection with operations **authorized by the United States mining laws** … shall be considered." 36 C.F.R. § 228.1 (emph. added).

Thus, the primary focus of the Ninth Circuit's decision, determining what is "authorized by the mining laws," applies to both agencies. The Ninth Circuit recognized that, only **if** the claims slated for the waste dumps were valid, then the use and occupancy was "authorized by the Mining Law." <u>Center for Biological Diversity</u>, 33 F.4th at 1221. "If Rosemont's dumping of its waste rock is authorized by the Mining Law because its mining claims are valid," the dumping would be covered by the agency's mining regulations. <u>Id.</u> There is no credible reason why the same rule does not apply to the BLM, albeit under its 43 C.F.R. Part 3809 mining regulations.

Any assertion that the legal issues between the two cases are unrelated is also contradicted by the agency's own arguments to this Court. For example, as discussed above, BLM's arguments here, that the waste dumps are not "occupancy" under the Mining Law, or that the dumps are not permanent, are essentially the same arguments the Ninth Circuit rejected. <u>Id.</u> at 1220-21.

Lastly, in upholding the district's court's vacatur of the Record of Decision and FEIS, and as part of its remand instructions to the agency, the Ninth Circuit ordered the agency to reconsider its permitting authority based on the rule that claimants have no right to occupancy for waste dumps unless a valuable mineral deposit had been discovered on each claim. <u>Id.</u> at 1223-24. Although the agency permitting regimes differ, BLM must also regulate these facilities without any unsupported

11

assumption of valid rights under the Mining Law and Section 612.

3.   *LNC Has Failed to Show That It Has Discovered a Valuable Mineral Deposit On the Lands To Be Permanently Buried By the Waste and Tailings Dumps.*

LNC, and to some extent BLM, also attempt to distinguish the Rosemont decision by asserting that LNC has indeed discovered a valuable mineral deposit on each of its mining claims covering the approved waste and tailings dumps. LNC says that there is "widespread mineralization throughout the Project area," LNC Resp. 6, and that the caldera contains lithium. Id. 6-8. BLM says that "lithium exists in the pit itself and the record suggests its appearance throughout the Thacker Pass basin." BLM Resp. 22.[5]

But an assertion that "the record suggests" that lithium may "appear throughout the basin" does not mean that LNC has made the requisite "discovery of a valuable mineral deposit" on each of the claims slated for the waste dumps. Under the Mining Law, the mere presence of a mineral in the general area does not support the "discovery of a valuable mineral deposit" on each claim. In the seminal decision defining what a "valuable mineral deposit" is under the Mining Law, the Supreme Court stated: "The mere indication or presence of gold or silver is not sufficient to establish the existence of a lode. The mineral must exist in such quantities as to justify expenditure of money for the development of the mine and extraction of the mineral." Chrisman v. Miller, 197 U.S. 313, 322 (1905). "To hold otherwise would tend to make of little avail, if not entirely nugatory, the provision of the law whereby 'all valuable mineral deposits'" are subject to the Mining Law. Id. To qualify as a valuable mineral deposit, "it must be shown that the mineral can be extracted, removed and marketed at a profit." U.S. v. Coleman, 390 U.S. 599, 602 (1968).

As BLM acknowledges, it never inquired into whether LNC's claims contain the requisite discovery of a valuable mineral, and thus the agency has no idea if these lands contain such a discovery. Outside of vague assertions that the lands in the area contain some lithium, there is no evidence that lands under the approved dumps satisfy the test to qualify as containing a "valuable mineral deposit." As the Ninth Circuit held, the mere potential for minerals on these claims does not

---

[5] BLM and LNC do not refute WWP's evidence from LNC's Technical Report, which shows that the "known zone of Li [lithium] mineralization" is in the pit and does not extend to the waste dump lands. WWP SJ. Mot. 13, AR033908 (TPEIS-0234).

establish any rights under the Mining Law. "The question is whether valuable minerals have been 'found' on the claims, not whether valuable minerals might be found." <u>Center for Biological Diversity</u>, 33 F.4th at 1222. Indeed, the district court in Rosemont relied on the mining company's plans to bury the waste dump lands – the same plan as LNC's – as evidence that they did not contain valuable minerals: "As a threshold matter, Rosemont's proposal to bury its 2,477 acres of unpatented mining claims under 1.9 billion tons of its own waste was a powerful indication that there was not a valuable mineral deposit underneath that land." <u>Center for Biological Diversity v. U.S. Fish and Wildlife Service</u>, 409 F. Supp. 3d 738, 748 (D. Ariz. 2019).

As such, an assertion that each of these claims contain the needed discovery to assert rights under the Mining Law is speculation, unsupported by the record, and post-hoc rationalization by BLM and LNC counsel. "[T]he post hoc rationalizations of the agency or the parties to this litigation cannot serve as a sufficient predicate for agency action." <u>Amer. Textile Manf. Inst. v. Donovan</u>, 452 U.S. 490, 539 (1981). *See* <u>Or. Natural Desert Ass'n v. BLM</u>, 531 F.3d 1114, 1141 (9th Cir. 2008)(rejecting counsel's rationalizations that were not advanced by the agency when making its decision). BLM and LNC cannot rely on a new-found and unsupported assertion that these claims contain the requisite discovery of a valuable mineral deposit when BLM admitted that it never inquired into whether that was the case, and indeed argues that it did not have to.

**II.    <u>BLM Failed to Comply with the Controlling RMP Under FLPMA.</u>**

**A.    BLM Cannot Rely on Unsupported and Unverified "Rights" Under the Mining Law to Avoid Compliance with its RMP.**

FLPMA requires that all activities approved by BLM comply with the requirements of binding RMPs: "The Secretary shall manage the public lands under principles of multiple use and sustained yield, in accordance with the land use plans developed by him under section 1712 of this title when they are available." 43 U.S.C. § 1732(a). BLM and LNC urge this Court to make a blanket rule that this FLPMA requirement cannot be applied to any "locatable mineral operation." BLM Resp. 9-12, LNC Resp. 2-5. But they continue to ignore the plain language of FLPMA, which limits the application of § 1732(a) only when compliance would "amend the Mining Law of 1872 or impair the **rights** of any locators or claims under that [1872] Act." 43 U.S.C. § 1732(b) (emph. added).

13

Thus, if there is no "right" to be impaired, the RMP requirements apply. Even if there is a right, to the extent RMP requirements do not impair it, they still apply.

BLM and LNC ignore the Ninth Circuit's decision, which held that there are no "rights" of locators under the Mining Law to occupation of mining claims unless the claims contain the requisite discovery of a valuable mineral deposit. Compliance with the RMP does not improperly "amend" the Mining Law, or "withdraw" all the lands at the site from the Mining Law. WWP also does not argue that the sage-grouse and visual resource RMP requirements apply to all the lands at the site. Rather, WWP asserts that for those lands for which the record does not support valid existing rights under the Mining Law – e.g., the waste and tailings dumps sites at Thacker Pass – there are no "rights of the locator." Thus, FLPMA's RMP consistency mandate applies to those lands and BLM erred when it made the blanket determination that the RMP did not apply to the Project.

LNC argues that "Operators are required to comply with RMPA provisions only to the extent they are consistent with the Mining Law." LNC Resp. 2. BLM asserts that it complied with the RMP requirements, because "these specific provisions should be applied 'to the extent allowed by law.'" BLM Resp. 13 (citing ARMPA). But in arguing that compliance with the RMP would not be "allowed by law," they rely on the now-debunked argument that LNC has a statutory right to occupy the waste dump lands and that all mining-related operations "are nondiscretionary actions allowed under the General Mining Law of 1872 on all BLM-administered … lands, unless they are withdrawn from mineral entry." LNC Resp. 2 (quoting RMPA).[6] LNC asserts that WWP's position, that the RMPs apply to operations not covered by valid claims, "is inconsistent with the RMPA and BLM's longstanding interpretation of the Mining Law." Id. n. 1. Yet as the Ninth Circuit held, it is BLM's and LNC's interpretation of "rights" under the Mining Law – which is the same as the Forest Service's – that is wrong under the Mining Law, not WWP's.

LNC and BLM base their argument against RMP compliance for the waste dump lands on the view that the Mining Law and BLM regulations "do not require a validity determination before recognizing Mining Law rights to use public lands." LNC Resp. 3, BLM Resp. 9-12. But the Ninth

_____

[6] Like at Thacker Pass, none of the public lands at the Rosemont site were withdrawn, and thus the Ninth Circuit's ruling applies to all "open" lands under the Mining Law in both cases.

14

Circuit rejected the interpretation that any such "rights" can exist without discovery of valuable minerals: "If no valuable minerals have been found on the land, Section 22 gives no right of occupation beyond the temporary occupation inherent in exploration." Center for Biological Diversity, 33 F.4th at 1219.

The same is true for LNC's argument that it has a valid right under Section 612 of the Surface Resources Act "if the occupancy is reasonably incident" to mining the pit. LNC Resp. 4. The Ninth Circuit also rejected this position: "neither Section 612 nor the Mining Law provides Rosemont with the right to dump its waste rock on thousands of acres of National Forest land on which it has no valid mining claims." Id. at 1218.

In their efforts to avoid compliance with FLPMA and the RMPs, BLM and LNC repeatedly rely on statements in the RMPs that none of the sage-grouse ARMPA, or Visual/VRM standards, apply at Thacker Pass because, "'locatable minerals resource projects are not subject to such requirements." BLM PI Opp. 21 (Doc. 30)(quoting FEIS Appx. N-6). This is highly misleading, as the statement that all "locatable mineral resource projects are not subject" to the ARMPA is **not** found in the ARMPA, or in FLPMA. Thus, BLM's and LNC's fundamental legal error, asserting that LNC has "rights of the locator" so as to avoid RMP compliance – rejected by the Ninth Circuit – applies to both the sage-grouse and the VRM standards.

The ARMPA's 3% disturbance cap for Priority Habitat Management Areas (PHMA) (which BLM admits will be exceeded) is only constrained "subject to applicable laws and regulations, such as the 1872 Mining Law, as amended, **and valid existing rights**." FEIS N-5, AR046475 (3% disturbance cap Standard MD SSS 2A)(emph. added). "[A]ny exceedances of the cap (at both the BSU and project levels scales) do not preclude a locatable mineral resources project **with existing valid rights** from BLM approval." FEIS 4-45, AR045593 (emph. added). Similarly, the "'Required Design Features' and other 'management or litigation actions' based on sage-grouse habitat and population triggers may apply to approvals '**consistent with valid and existing rights** and applicable law in authorizing third-party actions.'" BLM PI Resp. 21 (ECF. No. 30)(quoting ARMPA)(emph. added). These provisions do not create the blanket exemption for all locatable mineral projects asserted by BLM and LNC.

15

Lastly, and only in a footnote, BLM attempts to portray this case as WWP's "collateral attack on the validity of the mining claims, which WWP lacks standing to assert because it falls outside the Mining Law's zone of interests. *See Havasupai Tribe v. Provencio*, 906 F.3d 1155, 116 (9th Cir. 2018)." BLM Resp. 17, n. 41. But that is not what this case is about. Rather, WWP challenges BLM's violations of FLPMA, based on the agency's erroneous and unsupported assumption that LNC had rights under the Mining Law to permanently occupy the waste dump lands, and thus, that compliance with the RMPs was not required. BLM's assertion is also misleading, as the Ninth Circuit in Havasupai held that conservation group plaintiffs **did have standing** to challenge the agency's determination of claim validity, because that determination was part of the agency's determination that the mining claimant had a "valid existing right" under FLPMA and the Mining Law that exempted the mining from the withdrawal of the area. 906 F.3d at 1166-67.

**B.    BLM's Duty to "Prevent Unnecessary or Undue Degradation" Under FLPMA Requires Compliance with the Mitigation Measures and Standards in the RMP.**

In addition to FLPMA's land use compliance requirements under 43 U.S.C. § 1732(a), FLPMA imposes an additional duty on BLM to "take any action necessary to prevent unnecessary or undue degradation" (UUD) of the public lands. 43 U.S.C. § 1732(b). BLM/LNC agree that BLM cannot approve a mine plan that would cause UUD. This includes the duty to comply with the "performance standards" under 43 C.F.R. § 3809.420. One of those standards is that mining "must comply with the applicable BLM land-use plans." 43 C.F.R. § 3809.420(a)(3).

BLM and LNC argue that this mandate does not apply because application of the RMP must be "consistent with the mining laws." Id. Yet, under the Ninth Circuit's ruling, it is not "consistent with the mining laws" for BLM to assume that LNC has any "right" under the Mining Law to use and occupy the waste dump lands absent a showing that its mining claims are valid.

As it does in arguing against compliance with the RMP under FLPMA's land use planning consistency requirement, BLM asserts that it does not have to comply with the performance standards and the UUD requirement to comply with the RMP because LNC has "rights" under the Mining Law, as BLM: "must recognize the rights granted by the Mining Law." BLM Resp. 10, n. 15.

But BLM's duty to ensure compliance with the RMP standards is part of its mandatory duty to "prevent [UUD]" under FLPMA and BLM's mining regulations. For example, those rules:

> retain[ed] the general performance standards (paragraphs (a)(1) through (a)(5) from the 2000 rule because they provide an overview of how an operator should conduct operations under an approved plan of operations and clarify certain basic responsibilities, **including the operator's responsibility to comply with applicable land use plans and BLM's responsibility to specify necessary mitigation measures.**

66 Fed. Reg. 54835, 54840 (Oct. 30, 2001)(emph. added). One of these standards is BLM's duty to impose "mitigation measures to protect public lands." 43 C.F.R. § 3809.420(a)(4). While BLM does not have to impose every conceivable mitigation measure, "Mitigation measures fall squarely within the actions the Secretary can direct to prevent unnecessary or undue degradation of the public lands. An impact that can be mitigated, but is not, is clearly unnecessary." 65 Fed. Reg. 69998, 70052 (Nov. 21, 2000)(preamble to rule section that remains in force).

BLM's mitigation policy, as detailed by the Interior Solicitor, acknowledges the need to ensure compliance with an RMP as part of its mitigation duties under the FLPMA UUD standard. In discussing the previous rulemaking (quoted above) with approval, the Solicitor reiterated "'the operator's responsibility *to comply with applicable land use plans and BLM's responsibility to specify necessary mitigation measures*.' *Id*. at 54,840 (emphasis supplied)." M-37039, The Bureau of Land Management's Authority to Address Impacts of its Land Use Authorizations through Mitigation, 20, n. 115 (Dec. 21, 2016)(Mitigation Opinion)(attached as Exhibit 1)).[7]

The Solicitor noted that "in the hardrock mining context, the BLM has long recognized that the UUD requirement creates a 'responsibility [for the BLM] to specify necessary mitigation measures' when approving mining plans of operations." M-37039, at 19 (citations omitted). "The BLM regulations addressing surface management of hardrock mining operations on public lands have consistently included mitigation as a requirement for preventing UUD, including as part of the general performance standards in the current regulations." Id.

---

[7] The 2016 Mitigation Opinion was temporarily revoked in 2017, but was recently reinstated by the Solicitor. M-37075, Withdrawal of M-37046 and Reinstatement of M-37039 (April 15, 2022) (Exhibit 2). This new Opinion noted that the 2017 Opinion (M-37046) "expresses no views regarding the merits of the legal analysis or conclusions contained in the [2016 Opinion]." M-37075 at 2.

Of particular relevance to this case is the Solicitor's ruling that failure to require mitigation to protect important habitat constitutes UUD. "Although mitigation may contribute in some instances to the avoidance of UUD, in other cases, the impacts to resources may be of a nature or magnitude such that they cannot be mitigated sufficiently to prevent UUD." M-37039 at 20. This applies to the BLM's failure to require sufficient mitigation to protect the sage-grouse's designated "Priority Habitat" here, as detailed in WWP's SJ Mot. (at 8-9) (and *infra*). According to the Solicitor:

> **the destruction of unique habitat in a particular place might not be adequately compensated by post-use restoration or protection of lesser habitat elsewhere**. In such a case, **where mitigation cannot prevent UUD, the BLM has authority to reject the application for approval of the public land use based on the proponent's inability to prevent UUD.** The obligation to avoid UUD is a complementary but distinct source of authority for requiring mitigation under FLPMA.

M-37039 at 20 (emph. added). Thus, BLM's position that it "lacks authority to deny approval of an otherwise-approvable plan of operations solely on lack of compliance with land-use-planning provisions or impose conditions based on such plans that would effectively bar operations," BLM Resp. 10, contradicts its own controlling policy and FLPMA.

The Solicitor recognized that, without adequate mitigation, "the destruction of unique habitat in a particular place" would constitute UUD. M-37039 at 20. Importantly, this is not just limited to species listed under the Endangered Species Act, as BLM maintains. BLM Resp. 26 (arguing that mitigation to prevent UUD to Sensitive Species such as the sage-grouse is not required). As BLM stated to this Court in Western Exploration v. U.S. Dept. of the Interior, 250 F. Supp. 3d 718 (D. Nev. 2017), BLM's Sensitive Species Policy requires practices that "improve the condition of the species' [Sage-grouse] habitat on BLM-administered lands." WWP SJ Mot. 36.

Lastly, BLM tries to avoid the ruling in Mineral Policy Center v. Norton, 292 F. Supp. 2d 30 (D.D.C. 2003), arguing it does not apply because it involved a facial challenge to BLM's regulations, rather than a site-specific challenge. BLM Resp. 11. Yet the court was responding to BLM's defense of its 43 C.F.R. Part 3809 mining regulations, where BLM argued that it would meet its UUD mandate in future mine reviews (such as at Thacker Pass) by ensuring compliance with the RMPs. "[W]hen BLM receives a proposed plan of operations under the 2001 [and still current] rules,

pursuant to Section 3809.420(a)(3), it assures that the proposed mining use conforms to the terms, conditions, and decisions of the applicable land use plan, in full compliance with FLPMA's land use planning and multiple use policies." Id. at 49. BLM cannot on one hand argue to the D.C. district court that it will ensure compliance with RMPs to prevent UUD, but then years later assert to this Court that it has no authority to do so.

This is not the first time BLM has tried to backtrack from its commitments to prevent UUD made in Mineral Policy Center. In a decision overturning BLM's approval of a land exchange with a mining company, the Ninth Circuit highlighted the Interior Department's statement in Mineral Policy Center that "it will protect the public lands from any UUD by exercising case-by-case discretion to protect the environment through the process of: (1) approving or rejecting individual mining plans of operation…." Center for Biological Diversity v. U.S. Dept. of the Interior, 623 F.3d 633, 645 (9th Cir. 2010)(quoting Mineral Policy Center, 292 F.Supp.2d at 44). When BLM/Interior argued that it had little to no discretion over mining operations, the Ninth Circuit refused to countenance such litigation tactics. "It ill becomes Interior and the BLM to take the position in this litigation that the MPO [Mine Plan of Operation] would not alter the manner of mining, and its environmental consequences, when Interior took precisely the opposite position in *Mineral Policy Center*." Id.

Similarly, BLM tries to distinguish this Court's ruling in Western Exploration, since that case, too, involved a facial challenge to the sage-grouse RMPs, rather than a site-specific mine approval. BLM Resp. 11. But, like in Mineral Policy Center, BLM had defended its regulations and RMPs based on a commitment to this Court that compliance with the RMPs – including in the hardrock mining context – was part of the agency's UUD and FLPMA responsibilities. As this Court held: "if actions by third parties result in habitat loss and degradation, even after applying avoidance and minimization measures, then compensatory mitigation projects will be used to provide a net conservation gain to the sage-grouse." 250 F. Supp. 3d at 747. The ARMPA's "goals to enhance, conserve, and restore sage-grouse habitat and to increase the abundance and distribution of the species, … is best met by the net conservation gain strategy because it permits disturbances so long as habitat loss is both mitigated and counteracted through restorative projects." Id.

**C.     BLM Failed to Apply the Sage-grouse RMP Habitat Protection and Design Standards.**

In defending the Project's violation of the sage-grouse RMP standards, BLM/LNC largely rely on BLM's erroneous presumption of LNC's "rights" to occupy the tailings and waste dump lands. But as shown above, that assumption, and BLM's refusal to inquire into whether LNC had valid claims covering these lands, which "amounted to the same thing," was based on an erroneous interpretation of the Mining Law and Section 612 of the 1955 Surface Resources Act. Center for Biological Diversity, 33 F.4th at 1212.

WWP's opening brief detailed the various provisions of the ARMPA and related sage-grouse RMP standards that would be violated by the Project. Because BLM's and LNC's case is based on the erroneous assumption of LNC's rights under the Mining Law, for brevity's sake, these violations need not be repeated. *See* WWP SJ Mot. 14-19. However, rebuttal is needed to highlight BLM and LNC's erroneous and misleading statements in trying to defend these violations. BLM claims that because the ARMPA provisions apply only "to the extent allowed by law," they could *never* apply to a locatable mineral operation because requiring compliance would be tantamount to a mineral withdrawal. BLM Resp. 13. But this interpretation is contrary to the Ninth Circuit's Rosemont ruling and BLM's own regulation, which provides that a plan of operations "must comply with the applicable BLM land-use plans" or risk UUD, 43 C.F.R. § 3809.420(a)(3), and to the ARMPA itself.

For instance, BLM points to the 2015 ARMPA's Appendix E to support its blanket assertion that the 3% disturbance cap and noise restrictions do not apply to locatable minerals projects. But Appendix E itself contradicts that, stating only that "mining activities under the 1872 mining law **may not be subject** to the 3% disturbance cap." 2015 ARMPA Appx. E-2, AR-80692 (emph. added). But this does not categorically exempt locatable minerals projects from the disturbance cap, as would be the case if BLM's claim that it could never disapprove a mine plan based upon noncompliance with the disturbance cap was legally accurate. Indeed, the ARMPA contains specific provisions that apply to locatable minerals projects:

MD MR 15: Review Objective SSS 4, and to the extent allowed by law, **apply MDs SSS 1 through SSS 4** when reviewing and analyzing projects and activities proposed in GRSG habitat.
MD MR 18: Subject to valid existing rights and applicable law, authorize locatable mineral development activity, by approving plans of operation and apply mitigation and best

management practices that minimize the loss of PHMAs and GHMAs or that enhance GRSG habitat by applying the "avoid, minimize and compensatory mitigation" process through an applicable mitigation system, such as the Nevada Conservation Credit System and exemplified in the Barrick Nevada Sage-Grouse Bank Enabling Agreement (March 2015).

2015 ARMPA 2-30 to 2-31, AR080968–AR080969 (emph. added). Yet, BLM claims that MD SSS 2, which contains Required Design Features including lek buffers, noise limits, and others, can *never* be applied to locatable mineral projects "consistent with applicable law." BLM Resp. 14–15. BLM also argues that it does not have to comply with MD MR 18. *See* id. at 16. LNC argues that the ARMPA's "net conservation mitigation requirement" in MD SSS 2B and others do not apply for the same reason. LNC Resp. 9-11. BLM/LNC's argument would render superfluous the ARMPA provisions applicable to locatable minerals projects if those provisions could *never* apply. Thus, the ARMPA contains no categorical prohibition on applying any RMP standards to a mining plan.

LNC bases its defense of the Project's violation of these RMP provisions on its fundamental position that: "ENGOs [WWP] rely on the false premise that Lithium Nevada does not hold valid existing rights; as shown above, those arguments lack merit." LNC Resp. 9. First, this contradicts BLM's position that it never determined whether LNC had valid existing rights to occupy the waste dump lands, BLM Resp. 1 ("BLM also did not, and did not need to, make a 'valid rights' determination"). More critically, LNC's assertions of "valid existing rights" to occupy the waste dump lands under the Mining Law, without any evidence in the record or finding that these lands actually contain the requisite discovery of a valuable mineral deposit on these claims, was squarely rejected by the Ninth Circuit in Center for Biological Diversity, as detailed above.

For other RMP requirements, both BLM and LNC argue that BLM was not required to apply MD SSS 17 through 24, which come into play when a "trigger" is tripped, even though it is undisputed that the Lone Willow PMU tripped two different triggers. FEIS 4-43, AR045591. LNC claims that because the population trigger is based on the State's sage-grouse conservation plan, it is a separate standard from the ARMPA. LNC Resp. 10. That is wrong. The ARMPA trigger is tripped based upon population decline or habitat loss in a Biologically Significant Unit (BSU). *See* ARMPA 4-3, AR80983; AR80862. The Lone Willow PMU is a BSU. AR80863. The FEIS indicates that the Lone Willow PMU tripped a "population trigger" and a "habitat trigger." FEIS 4-43, AR045591.

21

According to the ARMPA "[h]ard triggers represent a threshold indicating that immediate action is necessary to stop a severe deviation from GRSG conservation goals" and "[i]f soft triggers are hit for both GRSG populations and its habitat, this would result in a hard trigger response for the BSU." 2015 ARMPA Appx. J-4, AR80864. Thus, MD SSS 17 through 24 apply.

BLM also argues that it fully protected the sage-grouse because the ROD "require[d] Lithium Nevada to comply with state laws, including those related to the conservation credit system [CCS]…." BLM Resp. 16. LNC claims that the ROD "requires Lithium Nevada to purchase those credits." LNC Resp. 12. But the ROD states only that "LNC will continue to coordinate with the SETT [Nevada Sagebrush Ecosystem Technical Team] to develop or obtain the appropriate number of CCS credits" and will "continue to consult with the BLM and the [SETT] on a mitigation plan…." ROD 6, 11, AR52522, 52527 (TPEIS-0452). The FEIS outlines two potential mitigation plans for sage-grouse but does not commit LNC to either one. Thus, the ROD does not specifically require LNC to purchase conservation credits.

Further, the apparent planned CCS credits, do not include any permanent credits to offset permanent changes to water quantity in wet meadows vital to sage-grouse caused by the Project's dewatering. FEIS N-25, AR46495; *see also* FEIS 4-54, AR045602. As the SETT experts stated, there are no credits to account for and mitigate the significant impacts from the Project's dewatering:

> Dewatering may impact these systems that are outside the scope of the CCS HQT analysis. Additional mitigation measures should be considered due to the potential long term impacts of dewatering and the consequential impacts to sage-grouse, fisheries, and other wildlife. … In consideration that the likely impacts from dewatering will be significant, the SETT strongly suggests additional mitigation to offset and adequately account for all impacts to sage-grouse, affected fisheries, and other wildlife within this sagebrush ecosystem.

AR095760 (TPEIS-1088). This is also a violation of the ARMPA, which requires BLM to avoid and mitigate impacts "whether in accordance with a valid existing right or not." AR080944 (ARMPA 2-6, MD SSS 1).[8]

Lastly, BLM cites the Winnemucca RMP's definition of "discretionary" to claim that it has no discretion when reviewing a mining plan. BLM Resp. 10, n. 14. That definition states that

---

[8] LNC contends that BLM complied with the command in MD SSS 1 to "avoid" impacts, LNC Resp. 9, but BLM makes no such claim. Instead, BLM contends that none of the ARMPA requirements apply. BLM Resp. 12-16. BLM did not apply the requirements of MD SSS 1.

discretionary actions "include livestock grazing, mineral leasing, and some lands actions," a list that does not exclude locatable mineral projects. Id. But again, BLM bases its view that it has no discretion over any aspect of a mining operation on the premise that such regulation is only allowed "to the extent allowed by law." Id. As detailed above, this reprises BLM's argument that it does not have discretion due to LNC's purported rights under the Mining Law – which the Ninth Circuit squarely rejected for the waste dump lands lacking the discovery of valuable minerals. BLM's assumed lack of discretion over mining is also contradicted by its previous positions. See Center for Biological Diversity, 623 F.3d 633 at 645 (quoting BLM/Interior's commitment in Mineral Policy Center, 292 F.Supp.2d at 44, that "it will protect the public lands from any UUD by exercising case-by-case **discretion** to protect the environment through the process of: (1) approving or rejecting individual mining plans of operation….")(emph. added).

**III.   Failure to Prevent "Unnecessary or Undue Degradation" Under FLPMA.**

In addition to BLM's duties to ensure compliance with the RMP, BLM's separate duty to "prevent UUD" applies across-the-board to all proposed mining operations, regardless of whether the operations are on valid mining claims. This duty is "the heart of FLPMA [that] amends and supersedes the Mining Law." Mineral Policy Center, 292 F. Supp. 2d at 42.

**A.   Failure to Prevent UUD to Sensitive Species.**

BLM asserts that it does not have a duty to mitigate against impacts to the sage-grouse under FLPMA, since that duty only applies to species listed under the Endangered Species Act. BLM Resp. 26 (arguing that mitigation to prevent UUD to Sensitive Species is not required). But as the Interior Department's mitigation policy holds: "the destruction of unique habitat in a particular place" would constitute UUD. Solicitor's Opinion, M-37039 at 20. As BLM stated to this Court in Western Exploration, 250 F. Supp.3d 718 (D. Nev. 2017), BLM's Sensitive Species Policy requires practices that "improve the condition of the species' [Sage-grouse] habitat on BLM-administered lands." WWP SJ Mot. at 36. Here, there is no credible argument that sage-grouse habitat will be improved as a result of the Project. "The objectives of the BLM special status species policy are: … B. To initiate proactive conservation measures that reduce or eliminate threats to Bureau sensitive species to minimize the likelihood of and need for listing of these species under the ESA." Special Status

Species Mgmt. Manual 6840 at 3 (ECF No. 23-15 in WWP docket).

As detailed above and in WWP's Motion, and as found by NDOW and the Nevada Sagebrush Ecosystem Program (WWP SJ Mot. 18-19), BLM failed to adequately analyze and require mitigation to achieve a "net conservation gain," never instituted "practices that 'improve the conditions of the species habitat,'" and never "call[ed] for 'special management consideration to promote conservation'" for sage-grouse, or otherwise complied with BLM's Sensitive Species policies. Nor did BLM meet these mandates for other Sensitive Species, such as the springsnail, as discussed below. By failing to mitigate for impacts to these species, BLM illegally failed to prevent UUD.

**B.    The Predicted Violation of Groundwater Standards Constitutes UUD.**

BLM admits that the Project is predicted to violate Nevada groundwater standards, which constitutes UUD. 43 C.F.R. § 3809.420(b)(5)(requiring compliance with all water quality standards). "Geochemical modeling results indicate that pore water in [the mine pit] backfill will exceed MCLs [Maximum Contaminant Levels] for longer than 20 pore volumes." FEIS R-121, AR048108. BLM asserts that this predicted "*future* exceedance of a water-quality standard" does not run afoul of state law or FLPMA. BLM Resp. 23 (emph. in original). But the fact that environmental violations would occur in the future is not an excuse for approving the Project. That is nonsensical, as that is always the case, as operations and impacts could only occur in the future, as predicted by the FEIS.

BLM's argument also ignores Nevada groundwater protection laws, as well as the finding by the Nevada Division of Environmental Protection (NDEP) that the project **would** violate state drinking water standards. "A facility, may not degrade the waters of the State [which includes groundwater] to the extent that: … (b) For groundwater: (1) The quality is lowered below a state or federal regulation prescribing standards for drinking water." NAC 445A.424(1)(b)(1). BLM misleadingly states that Nevada regulations do not require that mine "pit lakes" meet water quality standards. BLM Resp. 23, n. 55. But the Project will not create a "pit lake," as the waste rock backfilled into the pit is designed to prevent the formation of a pit lake. ROD 3, AR045501.

NDEP informed LNC and BLM that, due to the predicted violation of the drinking water standard for antimony, the mine's excavation below the water table was not permitted. "Based on the most recent predictive groundwater modeling results, elevated antimony concentrations will occur

24

outside the proposed final pit shell …. The Division does not allow degradation of waters of the State and will therefore enforce Profile I or the demonstrated background water quality immediately outside the pit boundary." NDEP letter to LNC ¶50, AR108868 (TPEIS-1494). *See also* letter, ¶7 ("Figures 6.9 and 6.10 show antimony exceedances leaving the pit boundary. A method of source mitigation must be selected, described in the tentative plan for permanent closure, and appropriately bonded prior to Permit issuance."). AR108864.

Despite this, BLM approved the **entire** Project, including the excavation below the water table, the backfilling of waste rock into the mine pit, and the resulting polluted groundwater plume, all without requiring any "method of source mitigation" or prevention in the ROD, whereas the NDEP said such operations violate state law. As NDEP stated, any exceedance of state groundwater standards "beyond the pit boundary" violates state law. NDEP letter to LNC, AR108868.

BLM also argues that the plan to monitor for, but not prevent, the predicted violations nevertheless prevents UUD. BLM Resp. 24. Yet, as EPA stressed to BLM, even this plan was only submitted after the public comment period was over. WWP SJ Mot. 38. There is substantial overlap between BLM's substantive duty to "prevent UUD" and BLM's procedural duty under NEPA to take a "hard look" at baseline conditions, cumulative impacts, mitigation measures, and whether the Project complies with all state and federal environmental standards. If BLM has not sufficiently reviewed these impacts and conditions, then it cannot support its conclusion that the Project would not cause UUD. As the Interior Department has long held: "To the extent BLM failed to meet its obligations under NEPA, it also failed to protect public lands from unnecessary or undue degradation." Island Mountain Protectors, 144 IBLA 168, 202; 1998 WL344223, *22 (1998).

"[P]utting off an analysis of possible mitigation measures until after a project has been approved, and after adverse environmental impacts have started to occur, runs counter to NEPA's goal of ensuring informed agency decisionmaking." Great Basin Res. Watch v. BLM, 844 F.3d 1095, 1107 (9th Cir. 2016). While the court approved BLM's plan for the pit lake in that case, the facts were very different, as there was only a "low probability" of adverse impacts to water quality, the mine pit lake was not predicted to release its pollutants into groundwater (i.e., it was a ground water "sink") and, importantly, NDEP raised no concerns for that mine, as it does here. Id. Also, as BLM

states, Nevada water quality standards do not apply to mine pit lakes, which was the situation in that case, not here – and very different from the groundwater pollution plume emanating from the backfilled pit here.

The backfilled pit will directly release polluted waters into the groundwater. FEIS 4-14 ("pit backfill outflow with concentrations on antimony that exceed the 0.006 regulatory threshold would migrate up to approximately one mile east-southeast of the pit."). AR045562 (TPEIS-0384). The fact that there are no current groundwater users in the immediate vicinity ignores the likelihood that as surface waters continue to dry up due to the aridification of the region, water will be an ever-scarcer and increasingly valuable resource. And, regardless, Nevada groundwater standards for drinking water do not contain an exemption for pollution that will flow a mile beyond the pit, as they apply anywhere "beyond the pit boundary." NDEP letter to LNC, AR108868.

As discussed in WWP's Motion, the U.S. EPA severely criticized BLM's approval of the predicted violation of the groundwater standard. WWP SJ Mot. 38-39. "While the Final EIS includes three *conceptual* options that have the potential to mitigate antimony groundwater contamination … the plans are not developed with an adequate level of detail to assess whether or how groundwater quality downgradient from the pit would be effectively mitigated." Id. (emph. in original). "Without detailed information about mitigation and its efficacy, it is unclear how a Record of Decision could state that all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted." EPA comments at 1, TPEIS-0695 (PDF p. 3 of 5). BLM admitted that "options for blending/discharge and active treatment 'have not been evaluated, and therefore may not be feasible for consideration as mitigation for the Final EIS' (Appendix R p. R-180)." Id. But, without this analysis "conclusions in the Final EIS that groundwater quality management plans would 'effectively mitigate impacts to groundwater quality downgradient from the pit' (p. 4-25) are not adequately supported." Id.

Attempting to avoid EPA's numerous and serious concerns, BLM couches this argument as one where WWP asserts that BLM *must* adopt the recommendations of EPA, and that BLM has no obligation to respond to EPA's comments on the FEIS, which were submitted prior to the BLM's decision to approve the Project in the ROD. BLM Resp. 39-40.

Although BLM is not strictly bound by EPA's comments, where expert agencies, which BLM invited to participate in the review and approval process, level such stinging criticisms directly questioning BLM's approval of the Project due to the predicted groundwater pollution, "[t]here must be good faith, reasoned analysis in response." Silva v. Lynn, 482 F.2d 1282, 1285 (1st Cir. 1973). "[A] reviewing court 'may properly be skeptical as to whether an EIS's conclusions have a substantial basis in fact if the responsible agency has apparently ignored the conflicting views of other agencies having pertinent expertise.'" Davis v. Mineta, 302 F.3d 1104, 1123 (10th Cir. 2002) *quoting* Sierra Club v. U.S. Army Corps of Eng'rs, 701 F.2d 1011, 1030 (2d Cir.1983). "The Court will reject conclusory assertions of agency 'expertise' where the agency spurns unrebutted expert opinions without itself offering a credible alternative explanation." N. Spotted Owl v. Hodel, 716 F.Supp. 479, 483 (W.D. Wash. 1988). *See also* Nat. Wild. Fed. v. NMFS, 184 F.Supp.3d 861, 904 (D. Or. 2016)(same).

BLM never really counters EPA's (and NDOW's, on the wildlife issues) strong indictments against the rushed FEIS and ROD. Instead, for water quality, BLM bases its defense on the erroneous position that it could approve the entire Project despite the predicted violation of groundwater standards, which is not allowed under state law.

BLM tries to minimize its staff's admission that the Project's groundwater pollution would cause UUD. "[A]ll three model scenarios as proposed without a source control component could be considered to cause unnecessary or undue degradation pursuant to federal surface management regulations." Email and Comments from Dan Erbes, AR095381 (TPEIS-1061). But BLM never required any "source control" to prevent the generation of the contamination and its release into the groundwater. FEIS R-121, AR048108. Although agency staff are not the final decision-makers, the fact remains that there is no "source control" to prevent the violation of the groundwater standard – the reason why NDEP refused to approve LNC's excavation below the water table (which BLM's ROD nevertheless authorized).

BLM approved the pit to intercept groundwater and release contaminated water without requiring mitigation to prevent the groundwater pollution. BLM's proposed solution – to monitor the pollution and then require LNC to submit a "groundwater quality management plan for review and

approval," FEIS 4-26, AR045574, simply allows the prohibited degradation and violation to occur first, with potential mitigation to occur only later. Allowing LNC to "update the groundwater model" every five years and then "adopt mitigation strategies," ROD 11, AR052527, does nothing to prevent the predicted groundwater contamination, or allow the required public review under NEPA.

**C.    BLM Failed to Support Its Conclusion Regarding Compliance with Air Quality Standards.**

BLM based its statement that the Project will comply with air quality standards on a "black box" "scrubbing" process to remove sulfur dioxide ($SO_2$) and other toxic pollutants. Yet "the exact scrubbing system has not yet been determined." FEIS Appx. K, AR046215-16. "[T]he process plant is pretty much a black box." Email from project lead Ken Loda, AR093830 (TPEIS-0981).

Without knowing if and how this process will work, BLM cannot credibly find that the Project will comply with all air quality standards and thus prevent UUD. *See* 43 C.F.R. §3809.420 (b)(4)(requiring compliance with air quality standards). BLM's failure to fully ensure compliance with all air quality standards, based on an "undetermined" and "black box" technology that neither BLM nor the public has seen, is a violation of the UUD standard under FLPMA, as well as NEPA.

Because BLM's failure to adequately support its air quality compliance conclusion also violates NEPA, this issue is discussed more fully in the NEPA section below.

**IV.    The FEIS Fails to Meet the Strict Analysis Standards Under NEPA.**

**A.    The FEIS Failed To Take A "Hard Look" At Wildlife Conditions and Impacts.**

The FEIS fails to take the required "hard look" at wildlife impacts, in part because it did not establish an adequate baseline. "[W]ithout establishing the baseline conditions which exist before a project begins, there is simply no way to determine what effect the project will have on the environment, and consequently, no way to comply with NEPA." Great Basin Res. Watch, 844 F.3d at 1101. With little baseline to speak of, BLM then relied on broad generalizations about potential wildlife impacts, without specific information or analysis about how specific species would be affected by the Project's impacts, and therefore failed to take the required "hard look." *See* Klamath-Siskiyou Wildlands Ctr. v. BLM, 387 F.3d 989, 993 (9th Cir. 2004)("general statements about possible effects and some risk do not constitute a hard look absent a justification regarding

28

why more definitive information could not be provided.").

Defendants claim that BLM adequately considered impacts to sage-grouse, but they cannot identify a detailed analysis of baseline sage-grouse populations in the area or how they use seasonal habitats there, because there is none. Nor can they point to a thorough analysis of how impacts to the Montana-10 and Pole Creek leks will affect sage-grouse populations in the Project area or within the Lone Willow PMU. Instead, BLM just broadly states that sage-grouse and their habitats are present in the Project area. BLM Resp. 27-28.

Even if these vague statements could suffice to establish a baseline, they do not constitute an adequate effects analysis. Outside of generalized statements, the FEIS does not detail how sage-grouse habitat in the Project area will be affected by the Project, how the loss or degradation of that habitat will affect sage-grouse use of the area, or what those impacts mean to sage-grouse populations at any scale. The effects are likely to be serious and warrant careful examination. According to NDOW, "noise impacts to Montana 10 and to a lesser extent, Pole Creek 01, could dramatically impact or eliminate these leks and create significant impacts on this portion of the Lone Willow PMU sage grouse population." AR67778. In response, BLM said that this was a "worst-case scenario," but also claimed that the impacts would be factored into the CCS calculation and offset. Id.

But that promise is contrary to BLM's admission that any future potential credits would not compensate for impacts to other critical habitat resources: "[m]itigation pursued by the applicant through the CCS program…is not intended to offset effects to other resources, such as impacts to riparian and water resources, or impacts from noise." FEIS Appx. N-25, AR66108 (TPEIS-0709). BLM further stated that it did not have authority to "impose timing or operational restrictions directed under the 2015 GRSG ARMPA." AR67778. *See* above discussion refuting BLM's erroneous assumption of LNC's "rights" under the Mining Law that governed its RMP decisions.

The FEIS' analysis of impacts to pronghorn is similarly infirm. The FEIS does not provide baseline population information other than that the population is purportedly "stable," and that the Project area contains 4,960 acres of winter range, 427 acres of summer range, and two migration corridors. FEIS 4-38, AR045586 (TPEIS-0384). There is no information about pronghorn numbers or

how pronghorn use the Project area seasonally—information that is required to determine what the Project's effects will be.

The FEIS' entire analysis of effects to pronghorn is limited to a single sentence: "The construction of Project facilities and the associate loss of habitat is likely to prohibit or impede pronghorn movement between seasonal habitats." Id. There is no discussion of the actual effects to the local pronghorn population from destroying roughly 5,000 acres of winter range and cutting off two migration corridors in the Project area. Instead, BLM relies on generalizations for "big game," with no specifics regarding pronghorn. FEIS 4-30, AR045578. These generalizations do not adequately describe effects to pronghorn, which, as found by NDOW, may be "significant," AR108865 (TPEIS-1493). Indeed, BLM's brief contains more discussion of pronghorn than the entire FEIS. *See* BLM Resp. 28-30, 32-33.

Defendants are also wrong that the FEIS adequately considered impacts to the rare Kings River pyrg. Their argument that springsnails will not be affected within the direct impact of the Project footprint simply parrots the FEIS, which dismisses impacts to springsnails in a paragraph. FEIS 4-48, AR045596. However, Kings River pyrg are known to exist in only 13 springs in the entire world. LNC's Springsnail Report 7, AR006647. Four of those springs, SP-035, SP-047, SP-048, and SP-049, are likely to experience drawdown of up to a foot by the end of the groundwater recovery period and two more, BLM-02 and BLM-03, "may exhibit some impact." AR066207 (FEIS Appx. P 64). Since some of the springs known to support Kings River pyrg have depths of as little as 0.1 cm—any reduction to water quantity would thus be significant. Springsnail Report 9, AR006649.

NDOW raised significant concerns with BLM's conclusions, stating that "Many more springs categorized by the [LNC] Report as ephemeral also indicate flow reductions are possible and these should be included as well [in enhanced monitoring] due to existing discrepancies on perennial vs ephemeral categorizations." NDOW letter to BLM on FEIS, AR052421. Thus, groundwater drawdown may affect at least 6 of 13 total springs known to support Kings River pyrg, and effects to this imperiled species deserve more than a scant mention in the FEIS, and should have been carefully analyzed and mitigated.

BLM also claims it adequately considered effects to wildlife habitat from the Project's

significant impacts to water resources. Yet, reference to any wildlife is conspicuously absent from the pages of the FEIS BLM cites. *See* BLM Resp. 31 n. 88 (referring to the FEIS 4-7 to 4-11). The analysis there dismisses potential impacts to streams in the Project area because it concludes "[t]here are no perennial stream reaches within or near the maximum extent of the projected drawdown areas (defined by the 10-foot drawdown contour) associated with the Proposed Action." FEIS 4-9, AR045557. It acknowledges significant uncertainty about whether springs and seeps in the area would be affected, but "conservatively assumes that there is a potential risk that drawdown associated with the mine could reduce baseflow to perennial springs located within (or within one mile of) the maximum extent of the 10-foot drawdown contour" that could, potentially, result in springs drying up forever. FEIS 4-10, AR045558.

Although BLM discounts these effects as insignificant, NDOW disagreed. In comments on the DEIS, NDOW stated: "The Preferred Alternative results in likely and potential impacts to wildlife, ground and surface waters, and riparian vegetation within and outside the project area. Many of these impacts will likely result in adverse consequences to wildlife resources." AR67770. BLM refused to change the Project, or conduct the required additional analysis, forcing NDOW, in its comments on the FEIS to reiterate: "We continue to find that the Preferred Alternative will likely result in adverse impacts to wildlife, ground and surface waters, and riparian vegetation within and outside the project area. These impacts include effects to an array of species and will likely have permanent ramifications on the area's wildlife and habitat resources." AR052420 (TPEIS-0446).

BLM claims that NDOW concurred with the FEIS' analysis of these effects, but omits NDOW's continued criticisms. For example, NDOW wrote in 2021: "Groundwater dependent habitats in the Montana Mountains north of the Project area boundary are critical to greater sage-grouse, Lahontan cutthroat trout, mule deer, pronghorn, and many other wildlife species. Given the arid nature of this region, water sources, riparian vegetation, and wet-meadow habitats are essential to wildlife and the loss or degradation of these areas will have significant negative impacts on wildlife populations." AR052420. NDOW had raised the same concerns with the DEIS, AR67771, yet BLM's response was a terse "Comment noted." Id.

NDOW stressed that "the DEIS [should] clearly disclose that defining ephemeral vs

31

perennial [streams] is based on relatively limited field data collection and does not account for annual variation of these systems," another comment that BLM "noted." AR67775. While NDOW stated it "appreciated" BLM's inclusion of a 1-mile buffer to help account for impacts from groundwater drawdown, id., it also asked how the 1-mile buffer was selected and how that buffer had any relationship to modeling, AR67774. BLM simply directed NDOW to a map depicting the 1-mile buffer. Id. Further, in its comments on the FEIS, NDOW specifically faulted BLM hydrologic assumptions: "We continue to question the methods BLM used to determine the one-mile buffer and our specific comments (Attachment 1 [AR052424—33]) provides an example where **this approach appears to lack objectivity and creates potential for a significant flaw in BLM's analysis**." AR052421 (emph. added). BLM essentially ignored NDOW and approved the ROD later that month.

This brush-off of NDOW's concerns is echoed in BLM's brief, when it states: "[u]ltimately, NDOW attributed a higher level of impact to wildlife from the results of the hydrological modeling than BLM's hydrologists and biologists believed was warranted." BLM Resp. 32. But BLM never refuted NDOW's specific comments on the FEIS. And NDOW was not the only expert agency concerned about the hydrologic modeling. The U.S. Fish and Wildlife Service's hydrologist "disagree[d] with the hydrologic baselines and modeling." AR104041(TPEIS-1395). *See also* AR096050-54 (TPEIS-1095)(additional FWS emails raising serious concerns with the hydrologic modeling and Project impacts). BLM's own staff noted the problems with the lack of information about the groundwater system and connection to springs, AR101554. The very conclusion BLM now claims supports its decision not to consider the effects of loss of seeps and springs on wildlife—that the hydrologic models did not predict a loss of springs or seeps in the uplands of the Montana Mountains—is the same conclusion that NDOW and BLM's own employees criticized as being based on insufficient information.

NDOW also criticized the FEIS' classification of streams as perennial as unsupported, so BLM could not simply dismiss impacts to streams affected by the Project on that basis. BLM is wrong to claim that its unsupported conclusion is entitled to deference. Indeed, it is the mark of an arbitrary and capricious action. *See* Oregon Natural Desert Association v. Jewell, 840 F.3d 562, 570 (9th Cir. 2016)(agency violated NEPA when its conclusions regarding baseline levels and impacts to

sage-grouse relied on "inaccurate data and unsupported assumption [which] materially impeded informed decisionmaking and public participation.").

**B.     The FEIS Failed to Provide the Detailed "Quantified Assessment" of the Cumulative Impacts from the Other Activities in the Area.**

BLM/LNC assert that the FEIS fully complied with BLM's duty to include "mine-specific or cumulative data," a detailed "quantified assessment" of other projects' combined environmental impacts, and "identify and discuss the impacts that will be caused by each successive project, including how the combination of those various impacts is expected to affect the environment" within the area. Great Basin Res. Watch 844 F.3d at 1104-06, quoting Great Basin Mine Watch v. Hankins, 456 F.3d 955, 973-74 (9th Cir. 2006). But the FEIS contains no such detailed analysis.

First, the FEIS lacks any mention of the nearby McDermitt Lithium Project. WWP SJ Mot. 31. To defend this omission, BLM argues that WWP "waived" its ability to raise the issue. BLM Resp. 33-34. Yet a plaintiff is not required to list every single project in the area that has cumulative impacts to assert that a cumulative impacts analysis is inadequate – especially for projects such as McDermitt that operate on BLM land. That argument was rejected by the Ninth Circuit in another BLM mine case when it held that "plaintiffs met their burden in raising a cumulative impacts claim under NEPA, despite failing to specify a particular project that would cumulatively impact the environment along with the proposed project." Te-Moak Tribe v. U.S. Dept. of the Interior, 608 F.3d 592, 605 (9th Cir. 2010). "We conclude that Plaintiffs must show only the potential for cumulative impacts." Id.  WWP more than carried this minimal burden when it criticized BLM's failure to consider "the cumulative impacts from all other residential and commercial development, mining, grazing, recreation, energy development, roads, ORV use, etc., in the region. The DEIS's failure to include this analysis violates NEPA and FLPMA." WWP Comments on DEIS, AR056145 (TPEIS-0512).

Regarding the other activities in the area, BLM/LNC merely cite back to the FEIS which contains a general mention of potential impacts, with no quantified analysis, just listing acreages of other projects, which fails the Ninth Circuit test. See WWP SJ Mot. 29-30. BLM excuses these omissions, saying it "identified past, present, and reasonably foreseeable future actions." BLM Resp. 35. But, under the Ninth Circuit test, simple "identification," without the detailed and quantified

analysis of the impacts from these projects, falls far short of BLM's NEPA duties. *See* Great Basin Res. Watch, 844 F.3d at 1104-06; Great Basin Mine Watch, 456 F.3d at 973-74.

BLM says that it "described and quantified (where possible) the impacts of those other projects." BLM Resp. 35. But no details are provided, nor any justification for why it could not have conducted the required "quantified" analysis. This violates the NEPA regulations, which require BLM to provide all needed information: "If the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the environmental impact statement." 40 C.F.R. § 1502.22(a).[9] The "cumulative impact analysis must be timely. It is not appropriate to defer consideration of cumulative impacts to a future date when meaningful consideration can be given now." Kern v. BLM, 284 F.3d 1062, 1075 (9th Cir. 2002).

"The regulations implementing NEPA require agencies to obtain missing information when it is 'essential to a reasoned choice' and the costs of obtaining it are not 'exorbitant.' 40 C.F.R. § 1502.22(a). The agencies have not provided convincing reasons for why these data gaps are not essential or could not be mitigated through further study." Env'l Defense Ctr. v. Bureau of Ocean Energy Mgt., 36 F.4th 850, 881 (9th Cir. 2022). "If there is 'essential' information at the plan- or site-specific development and production stage, [the agency] will be required to perform the analysis under § 1502.22(b)." Native Vill. of Point Hope v. Jewell, 740 F.3d 489, 499 (9th Cir. 2014). Here, a review of the adverse impacts from the Project when added to other actions in the region are essential to BLM's analysis (under NEPA) and duty to ensure that the mine mitigates adverse environmental impacts (under FLPMA), especially to regional wildlife.

For example, the FEIS provides no quantified, detailed information about the status of sage-grouse populations or habitats within the Lone Willow PMU or the Western Great Basin PAC, or the anticipated cumulative effects to sage-grouse from the Project in combination with other actions at either scale. Even this cursory review was cut-off at the nearby Oregon border. But the ARMPA specifically recognizes the need for a broader analysis that the FEIS failed to do. 2015 ARMPA 2-13, AR80951 (noting that there are multiple BSU's "including those that cross state lines").

---

[9] Citations are to the NEPA regulations in effect during BLM's review, 40 C.F.R. Part 1500 (2019).

WWP is not suggesting that BLM analyze impacts in context of the entire species' 11-state range. But NEPA requires a cumulative impacts analysis adequate to place the impacts of habitat destruction at Thacker Pass, likely to cause, at a minimum, abandonment of one of the three largest leks in the Lone Willow PMU, in context. This is required to take the "hard look" at impacts to sage-grouse. As the U.S. Fish and Wildlife Service recognized: "[m]aintenance of the integrity of the PACs" is the "essential foundation for sage-grouse conservation." Great Basin ROD 1-9, AR82103 (quoting Conservation Objectives Team Report).

**C.    Failure to Adequately Analyze Mitigation Measures and Their Effectiveness.**

BLM tries to defend its decision not to analyze and disclose up front mitigation measures and their efficacy—as NEPA requires—by pointing to future mitigation and monitoring plans promised by LNC. For mitigating the predicted groundwater pollution, Plaintiffs specifically requested that BLM provide these plans during the NEPA process for public review, yet BLM refused. FEIS R-122, AR048109 (GBRW comment P572: requesting that BLM "Present a model for an alternative closure option for the backfilled pits that prevents the release of pollutants in a groundwater plume, such as a period of active pumping and treating of pore water until the discharge from the waste-rock backfill is below the groundwater MCLs."). Yet, in the FEIS, BLM claimed that "[i]mplementation of [LNC's proposed] monitoring and mitigation plan is expected to detect and minimize effects to perennial surface water resources." FEIS 4-10, AR045558. While BLM relies on Appendix P, that merely describes "mitigation options" and a "proposed monitoring plan"—not an actual plan to prevent the groundwater pollution. FEIS Appx. P 149, AR066292 (monitoring), 154, AR066297 (potential mitigation "options"). BLM also admitted that "options for blending/discharge and active treatment 'have not been evaluated, and therefore may not be feasible for consideration as mitigation for the Final EIS' (Appendix R-180)." EPA comments at 1, TPEIS-0695 (PDF p. 3 of 5).

As an initial matter, this Court has found that BLM violated NEPA when it made decisions based on information added between the DEIS and FEIS without public review. Western Exploration, 250 F. Supp. 3d 718 (D. Nev. 2018). In that case, BLM changed sage-grouse habitat designations based upon new information provided to the agency by the federal FWS between the DEIS and FEIS. Id. at 749. "The public should have had an opportunity to review FWS's determinations and comment on the

decision to change or add new designations." Id. Without the opportunity to review and comment on the new information, the public was denied opportunity for "intelligent public participation in the EIS process." Id. at 750. *See also* ONDA v. Rose, 921 F.3d 1185, 1192 (9th Cir. 2019)(vacating BLM recreation plan for similar failures).

      BLM's violations here are even more concerning because it relies on LNC's water monitoring plans, that had not yet been developed or disclosed in the DEIS, to offset impacts to water resources. Although the Ninth Circuit has held that such an approach is not always contrary to NEPA, this is not a case like Great Basin Res. Watch, where BLM "reasonably determined to rely on a monitoring scheme to develop future mitigation measures," due to the "low probability" of "insignificant" impacts and the lack of any applicable pit lake standards (and no concerns raised by NDEP). 844 F.3d at 1107. Nor is it a case like Protect Our Communities Fnd. v. Jewell, 825 F.3d 571, 582 (9th Cir. 2016), where the agency decided "to incorporate an adaptive management plan as one component of a comprehensive set of mitigation measures," because here there are no actual approved mitigation measures that were subject to public review. The public never had the opportunity to comment on any actual mitigation plan and EPA and NDOW commented repeatedly that BLM's analyses of water impacts were unsupported and unreliable. By relying on monitoring and future mitigation plans to detect and offset potential impacts to poorly-understood water resources without public input, BLM did not allow for the "intelligent public participation" required by NEPA. *See* Western Exploration, 250 F. Supp. 3d at 750.

      BLM's failure to provide these plans up front is especially egregious given how "essential" water resources are to wildlife in the Project area's arid landscape. AR67771. NDOW repeatedly commented that "[g]roundwater dependent habitats in the Montana Mountains north of the Project area boundary are critical to greater sage-grouse, Lahontan cutthroat trout, mule deer, pronghorn, and many other wildlife species." AR67771, AR52420. NDOW urged BLM to analyze and commit to monitoring and mitigation plans in the FEIS and ensure that commitments by LNC be cemented in the FEIS and ROD. AR67771-72, 67775-78. But while the FEIS mentioned several mitigation options, it did not actually select any of them. FEIS Appx. P 154, AR066297. BLM promised that sometime in the future "a draft of the comprehensive water resources monitoring plan would be provided by LNC *to the BLM, NDWR, and NDOW* for review and approval *prior to project initiation*." FEIS Appx. R,

AR67587 (TPEIS-0713) (emph. added). According to LNC, this plan was provided in December 2020, and was no more than an updated version of the DEIS' Appendix P. LNC Resp. 31, n. 29. But Appendix P only refers to future plans outside the NEPA process, shielded from public review.

Regarding water quality, as detailed in Plaintiffs' Motion, and quoted above, EPA severely criticized BLM's approval of the predicted violation of the groundwater standard. WWP SJ Mot. 38-39. EPA specifically found that BLM lacked "detailed information about mitigation and its efficacy," that "the plans are not developed with an adequate level of detail to assess whether or how groundwater quality downgradient from the pit would be effectively mitigated," and that the FEIS's conclusions "are not adequately supported." EPA Comments at 1, TPEIS-0695 (PDF p. 3 of 5).

Thus, this case is also unlike Japanese Vill. v. Fed. Transit Admin., on which BLM and LNC rely, where the plan at issue contained detailed mitigation measures intended to deal with the subsidence issue plaintiffs were concerned about, and those measures were consistent with expert recommendations set forth in a study that was part of the administrative record. 843 F.3d 445, 460-61 (9th Cir. 2016). And it is unlike City of Carmel-By-The-Sea v. U.S. Dept. of Transp., where the conceptual framework was backed by a "contingent" plan to be used if the proposed mitigation fails. 123 F.3d 1142, 1154 (9th Cir. 1997). Here, there was no existing mitigation plan to comment upon.

The same is true regarding the sage-grouse mitigation options. Again, BLM approved the project with no concrete mitigation plan. Instead, the FEIS described two potential mitigation options, each discussed in a paragraph in Appendix N. FEIS Appx. N-25, AR66108. Such a brief glance does not "discuss mitigation measures, with sufficient detail to ensure that environmental consequences have been fairly evaluated." S. Fork Band Council v. Dept. of Interior, 588 F.3d 718, 727 (9th Cir. 2009). And both options appear to be completely inadequate since neither address impacts from noise or changes in water quality or quantity—critical issues for sage-grouse identified by NDOW and others. AR66108; see also WWP SJ Mot. 16-19 (describing inadequacy of mitigation). And, as detailed above, and overall, BLM's review was tainted by its belief that LNC had a right to use and occupy the waste dump lands.

The inadequate mitigation plans combined with the minimal analysis defeats the purpose of

the requirement that an EIS disclose and analyze mitigation, which is to "evaluat[e] whether anticipated environmental impacts can be avoided." <u>S. Fork Band</u>, 588 F.3d at 727. As BLM had already concluded that it could not require critical mitigation for sage-grouse impacts due to LNC's assumed "rights," its limited discussion of potential future plans falls short under NEPA.

**D.     BLM/LNC's Assurances of Compliance with Air Quality Standards Are Based on "Undetermined" Methods That Were Not Be Subject to Public Review.**

Regarding BLM's duties under FLPMA to ensure that the Project complies with all air quality standards, WWP SJ Mot. 22-24 (air quality), as discussed above in the FLPMA UUD section, BLM/LNC rely on purported mitigation measures that were not yet reviewed. They rely on LNC's "tail gas scrubber" technology to meet strict toxic air emission standards. LNC Resp. 15-17. Yet, they acknowledge that that this "scrubbing system has not yet been determined." FEIS Appx. K, AR046215-16. BLM asserts that the scrubber system is not actually needed, since BLM has already determined the Project would comply with all air standards. BLM Resp. 38. But as LNC acknowledges, the conclusion that standards would be met is based on the installation of the scrubber system. LNC Resp. 15.

Nor does LNC really respond to BLM staff's admission that: "[T]he process plant is pretty much a black box." Email from project lead Ken Loda, AR093830 (TPEIS-0981). BLM had admitted that it did not have the technical expertise to determine the plant technology: "Also, to my knowledge the BLM does not employ anyone with that kind of background, which would likely be a chemical or metallurgical engineer." <u>Id.</u>

BLM/LNC argue that all such "technical" issues deserve essentially blind deference from this Court. But BLM cannot simply rely on LNC's contractors to supply the requisite analysis when BLM admits that it does not have the technical knowledge to evaluate whether the company's information is accurate. "The agency shall independently evaluate the information submitted and shall be responsible for its accuracy." 40 C.F.R. § 1506.5(a). BLM "was required to independently evaluate the information in [its NEPA document] and was responsible for its accuracy." <u>Barnes v. U.S. Dept. of Transp.</u>, 655 F.3d 1124, 1131 (9th Cir. 2011) (citing 40 C.F.R. § 1506.5(a)). Here, there is no analysis of how, and whether, the "undetermined" scrubber system will work – let alone that BLM

38

conducted its required independent and technically-competent analysis, when it admits it was incapable of such analysis.

In addition to the lack of competent and independent review, any future review of this "undetermined" scrubber system would escape public review under NEPA. "Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." 40 C.F.R. § 1500.1(b). "This important information, which effects the air impacts analysis, was essentially immune from meaningful scrutiny by the public because BLM never provided any data or reasoning in support of it." Great Basin Res. Watch, 844 F.3d at 1103. BLM/LNC never explain why this "scrubber" technology could not have been developed and submitted for public review as required by NEPA. "Such late analysis, 'conducted without any input from the public,' impedes NEPA's goal of giving the public a role to play in the decisionmaking process and so 'cannot cure deficiencies' in a [NEPA document]." ONDA v. Rose, 921 F.3d 1185, 1192 (9th Cir. 2019)(quoting Great Basin Res. Watch, at 1104). See also Western Exploration, 250 F. Supp.3d at 748.

BLM/LNC also rely heavily on the fact that NDEP, which is not subject to NEPA, would issue an air quality permit. LNC Resp. 17-18. Yet the Ninth Circuit has repeatedly rejected BLM's reliance on Nevada state air permitting as a substitute for full public review of mining projects under NEPA: "'[a] non-NEPA document ... cannot satisfy a federal agency' obligations under NEPA'. … and the reference to the Project's Clean Air Act permit did nothing to fix that error." Great Basin Res. Watch, 844 F.3d at 1104 (quoting S. Fork Band, 588 F.3d at 726). "[N]or have we allowed federal agencies to rely on state permits to satisfy review under NEPA." Env'l Defense Ctr., 36 F.4th at 874, relying on S. Fork Band, 588 F.3d at 726.

Lastly, LNC disingenuously relies on NDEP's recent post-ROD air quality permitting in a belated attempt to backfill BLM's NEPA and FLPMA analysis. LNC 17, n. 14. LNC cites to the NDEP website and asks this Court to take judicial notice of the permit decision. Not only does a state permit decision issued long after the FEIS was completed have no bearing on whether the FEIS complied with NEPA, **LNC's tactic is the height of hypocrisy**, as LNC had previously urged this court to reject WWP's request to take judicial notice of NDEP documents. "NDEP's letters documenting its state permitting process are irrelevant to the NEPA process under review in this case

and it would be inappropriate to supplement the record, consider the documents as extra-record evidence, or take judicial notice of those letters." LNC Resp. to WWP Mot. on the Record, 5 (ECF No. 123). And LNC's tactic also flatly ignores this Court's ruling that it would not take judicial notice of NDEP documents. Order on Record Motions, 4 (ECF No. 155).

## V.  Defendants Have Not Overcome the Presumption That Illegal Agency Actions Should Be Vacated.

Although BLM and LNC correctly note that vacatur of an agency action found to violate federal law under the APA is not automatically applied in every case, they bypass the unbroken line of precedent holding that absent "rare" or "unusual" circumstances, vacatur of illegal agency action is the presumptive remedy in cases such as this. *See* Oregon Natural Desert Ass'n v. Jewell, 840 F.3d 562, 575 (9th Cir. 2016); Cal. Cmtys. Against Toxics v. EPA, 688 F.3d 989, 992, 994 (9th Cir. 2012)("we have only ordered remand without vacatur in limited circumstances"); Humane Soc'y v. Locke, 626 F.3d 1040, 1053 n.7 (9th Cir. 2010)(same). This Court has recognized this principle, declining to vacate the sage-grouse RMPs due to "possibility of undesirable consequences" to the sage-grouse as "the Court finds that protection of the greater-sage grouse weights against vacatur of the RODs." Western Exploration, 250 F.Supp.3d at 751. Here, in essentially the inverse, allowing the Project to proceed without vacatur of the ROD and FEIS would certainly not accomplish that goal.

Although LNC would obviously like to proceed with clearcutting of sage brush, ground clearance, construction, and blasting, there is no compelling public interest in allowing such operations to proceed based on an illegal agency approval. The extensive impacts to imperiled species, public uses of these lands, and to the environment in general warrants the prohibition of operations until the agency has complied with federal law. To the extent LNC alleges temporary economic harm or other disruptive consequences, those do not rise to the level contemplated by the Ninth Circuit to warrant remand without vacatur. Nat'l Fam. Farm Coal. v. EPA, 960 F.3d 1120, 1144-45 (9th Cir. 2020)(vacating despite substantial economic consequences).

### CONCLUSION

Plaintiffs ask this Court to grant their motion for summary judgment, deny the Defendants' motions, and set aside and vacate the ROD, FEIS, and BLM's actions authorizing the Project.

Respectfully submitted this 12th day of July, 2022.

*/s/ Christopher Mixson*
Christopher Mixson (NV Bar#10685)
KEMP JONES, LLP
3800 Howard Hughes Parkway, Suite 1700
Las Vegas, Nevada 89169
702-385-6000
c.mixson@kempjones.com

Attorney for Plaintiffs

*/s/ Roger Flynn*
Roger Flynn, (Colo. Bar #21078), *Pro Hac Vice*
Jeffrey C. Parsons, (Colo. Bar #30210), *Pro Hac Vice*
WESTERN MINING ACTION PROJECT
P.O. Box 349, 440 Main St., #2
Lyons, CO 80540
(303) 823-5738
wmap@igc.org

Attorneys for Plaintiffs GBRW, BRW, and WD

*/s/ Talasi Brooks*
Talasi B. Brooks (ISB #9712), *Pro Hac Vice*
WESTERN WATERSHEDS PROJECT
P.O. Box 2863
Boise ID 83701
(208)336-9077
tbrooks@westernwatersheds.org

Attorney for Plaintiff WWP

Certificate of Service

I, Roger Flynn, hereby attest that I served the foregoing and all attachments on all parties via this Court's ECF system, this 12th day of July, 2022.

*/s/ Roger Flynn*

41