TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

ARWYN CARROLL (MA Bar 675926)
LEILANI DOKTOR (HI Bar 11201)
MICHAEL ROBERTSON (VA Bar 80866)
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Phone: (202) 305-0465
Fax: (202) 305-0506
arwyn.carroll@usdoj.gov
leilani.doktor@usdoj.gov
michael.robertson@usdoj.gov

*Attorneys for Federal Defendants*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| BARTELL RANCH LLC, *et al*., | Case No. 3:21-cv-80-MMD-CLB |
| Plaintiffs, | Related Case No. 3:21-cv-103-MMD-CLB |
| v. | (Consolidated) |
| ESTER M. MCCULLOUGH, *et al.,* | |
| Defendants. | |
| WESTERN WATERSHEDS PROJECT, *et al.,* | **FEDERAL DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON ENVIRONMENTAL PLAINTIFFS' CLAIMS** |
| Plaintiffs, | |
| v. | |
| UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.,* | |
| Defendants. | |

# TABLE OF CONTENTS

ARGUMENT .................................................................................................................... 1

   I.      BLM's approval of the Project complied with FLPMA ............................... 1

         A.     BLM's approval of the Project complied with applicable RMP requirements ..................................................................................... 2

         B.     The *Rosemont* decision does not alter the outcome here ..................... 7

         C.     BLM's approval does not violate water- or air-quality standards or protections for sage-grouse ......................................................... 10

   II.     BLM's approval of the Project complied with NEPA ................................ 13

         A.     BLM adequately described baseline conditions and impacts to wildlife ............................................................................................ 14

         B.     BLM analyzed cumulative impacts ................................................. 18

         C.     BLM considered mitigation measures ............................................. 20

   III.    The Court should not vacate the ROD and EIS .......................................... 23

CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**

*Alaska Env't Ctr. v. Kempthorne*,
    457 F.3d 969 (9th Cir. 2006) ...........................................................20

*Allied–Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
    988 F.2d 146 (D.C. Cir. 1993) .........................................................24

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
    462 U.S. 87 (1983) ...........................................................................17

*Black Rock City LLC v. Haaland*,
    No. 19-CV-3729 (DLF), 2022 WL 834070 (D.D.C. Mar. 21, 2022) .....................24

*Cal. Cmtys. Against Toxics v. EPA*,
    688 F.3d 989 (9th Cir. 2012) ............................................................24

*Ctr. for Biological Diversity v. BLM*,
    833 F.3d 1136 (9th Cir. 2016) ..........................................................17

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
    623 F.3d 633 (9th Cir. 2010) ..............................................................3

*Ctr. for Biological Diversity v. U.S. Fish and Wildlife Serv. (Rosemont)*,
    33 F.4th 1202 (9th Cir. 2022) .............................................. 2, 4, 7, 9

*Davis v. Mineta*,
    302 F.3d 1104 (10th Cir. 2002) ........................................................21

*Edwardsen v. U.S. Dep't of the Interior*,
    268 F.3d 781 (9th Cir. 2001) ............................................................12

*Fox Television Stations, Inc. v. FCC*,
    280 F.3d 1027 (D.C. Cir. 2002) ........................................................24

*Great Basin Mine Watch v. Hankins*,
    456 F.3d 955 (9th Cir. 2006) ..................................................... 11, 19

*Great Basin Resource Watch v. Bureau of Land Management*,
    844 F.3d 1095 (9th Cir. 2016) ..................................... 14, 15, 19, 20

*Greenwood v. FAA*,
    28 F.3d 971 (9th Cir. 1994) ...............................................................19

*Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*,
    857 F.2d 505 (9th Cir. 1988) ............................................................17

*Idaho Farm Bureau Fed'n v. Babbitt*,
    58 F.3d 1392 (9th Cir. 1995) ............................................................24

*Japanese Vill. LLC, v. Fed. Transit Admin,*
    843 F.3d 445 (9th Cir. 2016) ..................................................................18

*Klamath-Siskiyou Wildlands Ctr. v. BLM,*
    387 F.3d 989 (9th Cir. 2004) ..................................................................14

*Kleppe v. Sierra Club,*
    427 U.S. 390 (1976) ..................................................................................1

*Min. Pol'y Ctr. v. Norton,*
    292 F. Supp. 2d 30 (D.D.C. 2003) ........................................ 3, 6, 9, 17

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,*
    184 F. Supp. 3d 861 (D. Or. 2016) .........................................................21

*Or. Nat. Res. Council v. Lowe,*
    109 F.3d 521 (9th Cir. 1997) ..................................................................14

*Plains Res. Council, Inc. v. Surface Transp. Bd.,*
    668 F.3d 1067 (9th Cir. 2011) .......................................................... 18, 19

*Robertson v. Methow Valley Citizens' Council,*
    490 U.S. 332 (1989) ................................................................................20

*Selkirk Conservation All. v. Forsgren,*
    336 F.3d 944 (9th Cir. 2003) ..................................................................19

*Silva v. Lynn,*
    482 F.2d 1282 (1st Cir. 1973) .................................................................21

*Spotted Owl v. Hodel,*
    716 F. Supp. 479 (W.D. Wash. 1988) ....................................................21

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
    282 F. Supp. 3d 91 (D.D.C. 2017) .........................................................24

*Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior,*
    608 F.3d 592 (9th Cir. 2010) ..................................................................18

*Theodore Roosevelt Conservation P'ship v. Salazar,*
    661 F.3d 66 (D.C. Cir. 2011) ..................................................................12

*Western Exploration LLC v. U.S. Dep't of Interior,*
    250 F. Supp. 3d 718 (D. Nev. 2017) .......................................................21

*WildEarth Guardians v. U.S. Office of Surface Mining, Reclamation,*
    *& Enf't,* 104 F. Supp. 3d 1208 (D. Colo. 2015) .....................................24

*WildEarth Guardians v. Zinke,*
    368 F. Supp. 3d 41 (D.D.C. 2019) .........................................................24

*Williston Basin Interstate Pipeline Co. v. FERC,*
    519 F.3d 497 (D.C. Cir. 2008) ..................................................................24

**Statutes**

30 U.S.C. § 22 ..................................................................................................8

43 U.S.C. § 1712(e)(3) ................................................................................4, 7

5 U.S.C. § 706(2)(A) ......................................................................................23

**Regulations**

40 C.F.R. § 1502.14(f).....................................................................................20

40 C.F.R. § 1502.15 ........................................................................................13

43 C.F.R. § 3809.411(d)(3).........................................................................3, 25

43 C.F.R. § 3809.420 ......................................................................................10

43 C.F.R. § 3809.420(a)(3)...............................................................................4

43 C.F.R. § 3809.420(a)(4)...............................................................................6

43 C.F.R. § 3809.420(b)(5).............................................................................11

43 C.F.R. § 3809.420(b)(7).............................................................................12

66 Fed. Reg. 54,834 (Oct. 30, 2001) .............................................................12

# TABLE OF ABBREVIATIONS

| APA | Administrative Procedure Act |
|---|---|
| ARMPA | Approved Resource Management Plan Amendment |
| BLM | United States Bureau of Land Management |
| DEIS | Draft Environmental Impact Statement |
| EIS | Environmental Impact Statement |
| FEIS | Final Environmental Impact Statement |
| FLPMA | Federal Land Policy and Management Act of 1976 |
| NAAQS | National Ambient Air Quality Standards |
| NDEP | Nevada Department of Environmental Protection |
| NDOW | Nevada Department of Wildlife |
| NEPA | National Environmental Policy Act |
| RMP | Resource Management Plan |
| ROD | Record of Decision |
| SETT | Nevada's Sagebrush Ecosystem Program |

## **ARGUMENT**

The Environmental Plaintiffs have not carried their burden of demonstrating that the United States Bureau of Land Management's (BLM) approval of the Thacker Pass Project was arbitrary or capricious. *See Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976) (establishing burden). They fail to respond substantively to BLM's explanations as to why the Federal Land Policy and Management Act (FLPMA), BLM's regulations, and resource management plans (RMPs) did not require BLM to impose the constraints on the Project that Plaintiffs seek to enforce. They disregard that BLM may apply each of the RMP provisions they invoke only to the extent the law allows, and the record clearly demonstrates why those statutes and regulations do not apply to the facts presented here. Instead, Plaintiffs continue to insist that BLM based its decision not to apply those RMP provisions on assumed "valid rights," but the record shows that it did not do so and that it need not have made such a determination here. Finally, through their NEPA arguments, Plaintiffs continue to ask the Court to improperly flyspeck BLM's scientific analysis, which is entitled to deference, or to require BLM to comply with standards Plaintiffs have created rather than those set by NEPA and the caselaw interpreting it. For all of these reasons, the Court should deny Plaintiffs' motion for summary judgment and grant Federal Defendants' cross-motion.

## **I.  BLM's approval of the Project complied with FLPMA**

Plaintiffs argue that FLPMA required BLM to ensure that the Project complied with sage-grouse-related provisions of the Nevada and Northeastern California Greater Sage-Grouse Approved 2015 RMP Amendment (the 2015 ARMPA) and the visual resource management (VRM) provisions of the Winnemucca RMP, and that BLM did not do so because it assumed that Lithium Nevada possessed "valid rights" under the Mining Law to place waste rock and tailing facilities on the public lands. Both of these premises are faulty. Nothing in the RMPs themselves, FLPMA, or

BLM's regulations required adherence to those aspects of the RMPs. And BLM did not—and did not need to—base its decision on any assumption of "valid rights" for the independent reasons that BLM lacked discretion to require compliance with those provisions and could not do so without effectively and impermissibly withdrawing the lands in question from operation of the Mining Law through the land-use planning process. The Ninth Circuit's recent decision in *Center for Biological Diversity v. U.S. Fish and Wildlife Service ("Rosemont")*, 33 F.4th 1202 (9th Cir. 2022), is distinguishable and does not alter the conclusion that BLM's approval of the Project complied with FLPMA.

### A.   BLM's approval of the Project complied with applicable RMP requirements

The challenged Record of Decision (ROD) approved two separate plans: a Mining Plan of Operations and an Exploration Plan of Operations.[1] Plaintiffs have now clarified that they do not challenge the Exploration Plan's compliance with the RMPs. Nor do they challenge BLM's approval of most of the Mining Plan for failure to comply with the RMPs. In fact, the only element of the Project that they now argue needed to comply with the invoked RMP provisions concerns the waste rock and tailings facilities described in the Mining Plan.[2] But Plaintiffs have not demonstrated that BLM's approval of the Mining Plan was required to comply with the RMP

---

[1] ROD, TPEIS-0452 at 1–2 (AR-052517–18).

[2] *See* Pls.' Resp. in Supp. of Mot. for Summ. J at 2–12, ECF No. 264 ("WWP Resp.") (addressing "valid rights" argument at waste rock and tailings facilities); *id.* at 13–16 (arguing, inaccurately, that BLM did not apply 2015 ARMPA provisions to that aspect of the Project based on a "valid rights" assumption); *id.* at 16 (clarifying that WWP alleges "violations of FLPMA, based on [BLM's allegedly] erroneous and unsupported assumption that LNC had rights under the Mining Law to permanently occupy the waste dump lands, and thus, that compliance with the RMPs was not required"); *id.* at 16, 20, 23 (founding other RMP-based arguments on "tailings and waste dump" occupation).

Unless otherwise indicated, all ECF numbers refer to the consolidated docket in this case, 3:21-cv-80 (D. Nev.). Citations to the docket in *Western Watersheds Project*, 3:21-cv-103 (D. Nev.), will be identified as "WWP ECF No."

provisions they invoke—*regardless* of whether Lithium Nevada had the "valid rights," as Plaintiffs persistently contest.

First, on their face, the provisions of the Winnemucca RMP and the 2015 ARMPA must be applied only to discretionary actions—*i.e.*, actions that BLM has decided through the land-use planning process to allow, and that BLM may refuse to authorize even if such refusal is not required to prevent "unnecessary or undue degradation."[3] Disapproval of a plan of operations is not such an action. To the contrary, BLM's regulations do not afford it discretion to disapprove a plan of operations for failure to comply with a land-use plan. *See* 43 C.F.R. § 3809.411(d)(3). In response to this argument, Plaintiffs merely invoke positions taken by Interior in previous, unrelated cases.[4] But neither of those cases addressed disapproval of a plan of operations for lack of compliance with a land-use plan or BLM's authority with respect to such disapprovals. *See Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 623 F.3d 633, 645 (9th Cir. 2010) (discussing NEPA compliance); *Min. Pol'y Ctr. v. Norton*, 292 F. Supp. 2d 30, 44 (D.D.C. 2003) (addressing facial challenge to regulations without considering whether land-use planning provisions could be used to reject an otherwise-compliant plan of operations).

Furthermore, BLM could not impose provisions of the RMPs on the Mining Plan where, as here, requiring compliance with those provisions would effectively bar operations entirely—thus having the effect of withdrawing the land from operation of

---

[3] *See* TPEIS-0298, 2015 ARMPA at 2-30 (AR-037782) (clarifying that, with respect to actions involving locatable minerals, certain management objectives apply "to the extent allowed by law"); TPEIS-0226, Winnemucca RMP at 2-52 (AR-033676) (defining "Discretionary Actions" to "include livestock grazing, mineral leasing, and some lands actions").

[4] WWP Resp. at 22–23. Plaintiffs' attempts to revisit Interior's arguments in *Ctr. for Biological Diversity* and *Mineral Policy Center*, *id.* at 19, are immaterial where, as here, the terms of the invoked RMPs themselves exclude application of the provisions Plaintiffs assert and where neither case addressed whether requiring compliance with the RMPs would effectively withdraw lands from operation of the Mining Law.

the Mining Law, which BLM is expressly prohibited from doing through the land-use-planning process. 43 U.S.C. § 1712(e)(3). Plaintiffs do not seriously counter this argument, stating generally—and without mentioning § 1712(e)(3)—that it is "contrary to the Ninth Circuit's Rosemont ruling" and "BLM's own regulations."[5] But *Rosemont* did not discuss FLPMA, RMPs, or withdrawal of lands at all. And BLM's regulations require compliance with land-use plans "[c]onsistent with the mining laws," 43 C.F.R. § 3809.420(a)(3), and cannot impose compliance with provisions of land-use plans when such compliance would effectively bar any operations.

In any event, as Federal Defendants have explained, application of the RMP provisions that Plaintiffs invoke is expressly limited such that they may be applied only "to the extent allowed by law," "consistent with applicable law," or "subject to applicable laws and regulations"—not only when "valid rights" are in play.[6] FLPMA's prohibition against withdrawing lands from operation of the Mining Law through land-use planning thus cabins these provisions' application. So, too, do BLM's regulations, which—as explained *supra*—do not authorize BLM to disapprove mining plans of operations for lack of compliance with an RMP. Plaintiffs ignore this language entirely, continuing to argue that BLM exempted the Project from the 2015 ARMPA provisions on grounds that Lithium Nevada possessed "valid existing rights." [7] In doing so, they ignore BLM's explanation that it did *not* exempt the Project from the 2015 ARMPA provisions on that basis.

Plaintiffs' remaining arguments have not overcome the plain language of the 2015 ARMPA provisions. First, Plaintiffs entirely ignore that the 2015 ARMPA

---

[5] *See* WWP Resp. at 20.

[6] Fed. Defs.' Opp'n to Pls.' Mot. for Summ. J. at 12–16, ECF No. 237 ("Fed. Defs.' Opp'n") (citations omitted).

[7] *See* WWP Resp. at 6, 13–16.

applies noise restrictions—such as the 3% disturbance cap—only to "discretionary activities," which does not include authorizations under 43 C.F.R. subpart 3809. Plaintiffs then mischaracterize Federal Defendants' argument with respect to the "Required Design Features" of MD SSS 2: it is not that those provisions can *never* be applied to locatable mineral projects;[8] rather, application of MD SSS 2 is, on its face, "subject to applicable laws and regulations."[9] Among the "applicable laws" that cabin those provisions' reach is FLPMA's prohibition from withdrawing lands from operation of the Mining Law in these circumstances, when applying the disturbance cap would effectively bar any operations and so act as a withdrawal.

Second, Plaintiffs newly argue that BLM should have required the Project to comply with MD SSS 17 through 24.[10] But the Final Environmental Impact Statement (FEIS) does not identify or conclude that the 2015 ARMPA's triggers have been met, as Plaintiffs suggest.[11] Even if it did, those provisions largely address actions that BLM will take in response to relevant triggers being met and do not address incorporation of specific requirements at the project level.[12] Plaintiffs thus fail to identify how those provisions would or should be incorporated into the Project, even if they applied here. And Plaintiffs have brought no claim alleging that BLM has failed to comply with the 2015 ARMPA separate from the Project's approval, and cannot do so now.

---

[8] WWP Resp. at 20–21.

[9] TPEIS-0298, 2015 ARMPA at 2-7 (AR-037759) (MD SSS 2.A.2).

[10] WWP Resp.at 21–22. Plaintiffs did not develop that argument in their opening brief. *See* Pls.' Mot. for Summ. J. and Mem. in Supp.at 15, ECF No. 202 ("WWP Mem.").

[11] *See* TPEIS-0384, FEIS at 4-43 (AR-045591) (discussing Lone Willow PMU meeting triggers under the Nevada Department of Wildlife (NDOW) 2014 Nevada Greater Sage-grouse Management Plan).

[12] *See* TPEIS-0298, 2015 ARMPA at 2-12–2-13 (AR-037764–65).

Third, with respect to conservation credits,[13] Plaintiffs ignore the fact that BLM required Lithium Nevada to comply with state laws, including those related to the conservation-credit system—but that BLM itself does not administer that program and is not responsible for enforcing its requirements.[14] BLM thus was not required under the 2015 ARMPA to administer that system by requiring development of specific credits or debits, or otherwise enforce the system in approving the Project.

Finally, invoking a recently reinstated opinion of the Department of the Interior's Solicitor,[15] Plaintiffs argue that BLM was required to impose the specific provisions from the 2015 ARMPAs because BLM *may* impose "mitigation measures to protect public lands."[16] As Plaintiffs admit, however, that opinion was not in force as of the date of the challenged decisions.[17] Moreover, that opinion's analysis of BLM's mitigation authority builds from the principle of multiple use and sustained yield, which the opinion expressly recognizes does not apply to operations under the Mining Law.[18] Thus, while the opinion recognized BLM's authority to "identify and require appropriate mitigation" under FLPMA[19] it nowhere states that BLM may impose mitigation provisions in a land-use plan that would function to withdraw the land in question from operation of the Mining Law. Nor did the opinion address

---

[13] WWP Resp. at 22.

[14] Fed. Defs.' Opp'n at 15–16.

[15] *The Bureau of Land Management's Authority to Address Impacts of its Land Use Authorizations through Mitigation*, M-37039 (Dec. 21, 2016), ECF No. 264-1.

[16] WWP Resp.at 17 (citing 43 C.F.R. § 3809.420(a)(4)); *see also id.* at 15–18.

[17] *Id.* at 17 n.7.

[18] M-37039 at 7 n.43 ("FLPMA provides that only certain of its provisions, including the BLM's obligation to 'take any action necessary to prevent unnecessary or undue degradation of the lands,' 'amend the Mining Law of 1872 or impair the rights of any locators or claims under that Act.' *Id.* § 1732(b).").

[19] *Id.* at 3.

whether BLM is obligated to impose specific mitigation measures in any particular project.

### B.   The *Rosemont* decision does not alter the outcome here

In repeating their argument that BLM could not exempt the Mining Plan's waste rock and tailings facilities from certain provisions of the 2015 ARMPA on the basis of "valid rights," Plaintiffs largely respond to arguments raised by Federal Defendants during the preliminary injunction motion phase of this case, where Federal Defendants focused on whether those provisions could be applied to the Project consistent with the Mining Law itself.[20] As explained above, however, even setting aside any consideration of rights to occupation under the Mining Law, BLM could not apply those provisions of the 2015 ARMPA consistent with other applicable law—including FLPMA and BLM's subpart 3809 regulations, which it was required to follow.

For that reason alone, Plaintiffs' repeated invocation of the Ninth Circuit's recent decision in *Rosemont* is irrelevant here: the Ninth Circuit did not address whether a mining plan of operations approved under BLM's subpart 3809 regulations[21] must comply with RMP provisions when application of those provisions would effectively withdraw the land in question from operation of the Mining Law in violation of FLPMA, 43 U.S.C. § 1712(e)(3). That is particularly important here, where Plaintiffs have *only* asserted a claim challenging the lack of a "valid rights" determination for compliance with FLPMA through the Administrative Procedure

---

[20] *See* WWP Resp. at 4–7, 15.

[21] The distinction between the applicable regulations in that case and this is also not immaterial, as Plaintiffs argue. *Id.* at 11. The Court of Appeals concluded that arguments based on the application of the Forest Service's Part 228 subpart A regulations were "premature" in that case, and did not rule on those arguments. *Rosemont*, 33 F.4th at 1223–24.

Act (APA)—and have not brought a claim challenging the agency's compliance with the Mining Law itself, as plaintiffs in *Rosemont* did.[22]

*Rosemont* is also distinguishable on the facts. The Ninth Circuit concluded that, "[i]f no valuable minerals have been found on the land," the Mining Law "gives no right of occupation beyond the temporary occupation inherent in exploration." 33 F.4th at 1219 (analyzing 30 U.S.C. § 22). It then characterized the mining company's placement of waste rock "during the period of active mining" as "occupancy . . . beyond [that] necessary for exploration." *Id.* at 1220. Because the Court of Appeals found, based on "[u]ndisputed evidence in the record," that "no valuable minerals have been found on [the] claims," and that "none are likely to be found," it concluded that the mining company's "claims are necessarily invalid" and the Forest Service may not "assume the validity of [the] mining claims . . . ." *Id.* at 1221.

No such uncontested evidence exists here. To the contrary, the record contains evidence supporting the potential for valuable minerals—lithium—throughout the Thacker Pass basin.[23] Even the feasibility study that Plaintiffs rely on indicates that "lithium mineralization is laterally extensive across the whole caldera . . . ."[24] In that regard, the same concerns that animated the validity discussion in *Rosemont* are not

---

[22] *See* Compl. ¶¶ 252–254 (Claim 3), WWP ECF No. 1; Complaint ¶¶ 218–19 (Claim 4), *Save the Scenic Santa Ritas v. U.S. Forest Service*, No. 4:17-cv-576-RCC (D. Ariz. Nov. 27, 2017), ECF No. 1.

[23] *E.g.*, TPEIS-0702, FEIS App'x G at AR-065693; *see also* Lithium Nevada's Opp'n at 6–8, ECF No. 240. Even if this record contained conflicting evidence about the viability of extraction, at most, that the Court should not make a determination—as the Ninth Circuit did—that Lithium Nevada's claims are *invalid*. Rather, if it finds any error on this basis, it should remand the decision to BLM to make the appropriate findings and determinations in the first instance.

[24] TPEIS-0234 at 3–4 (AR-033884–85). Further, the map on which Plaintiffs rely does not indicate that there is *no* mineralization outside of the mine pit; only that the mine pit, itself, as described in that report, *is* known to contain mineralization. *Id.* at 2 (AR-033883).

present here. *See* 33 F.4th at 1221 (Forest Service may not "assume the validity of [the] mining claims even where . . . that assumption is contradicted by the evidence").

Nor is this a project that, like the mine at issue in *Rosemont*, will blanket thousands of acres of public lands in billions of tons in a permanent layer of waste rock—a fact that the Ninth Circuit highlighted throughout its opinion and alongside its dispositive observation that "no valuable minerals have been found" underlying Rosemont's ancillary uses. 33 F.4th at 1212; *see also id.* at 1217 (describing as "counterintuitive" Rosemont's proposal "to permanently occupy land that supposedly contains valuable minerals with a 700-foot layer of waste rock"). This Project is small relative to that described in *Rosemont*: its entire footprint, for example, could fit within Rosemont's waste rock facility. At most, the Project will deposit a fraction of the two billion tons of waste rock and tailings at issue in *Rosemont*.[25] Finally, in *Rosemont*, waste rock and tailings were to be deposited to an *average* depth of 700 feet over thousands of acres—a design that would "obstruct[t] countless alternative uses." 33 F.4th at 1221. By contrast, here, the tailing facilities here would rise to a maximum height of 250 feet at *one point* and would generally "mimic the surrounding topography,"[26] thus not approaching the same level of impact on the landscape.

Finally, and importantly, Plaintiffs have not challenged the Exploration Plan at all under this theory. Nor could they. The Ninth Circuit's conclusions were limited to the facts before it: review of the Forest Service's approval of a *mining* plan of operations, not an *exploration* plan of operations. *Rosemont*, 33 F.4th at 1207. Indeed, the plain language of the Ninth Circuit's decision acknowledges this distinction,

---

[25] *See* TPEIS-0102, Mining Plan at 53 (AR-012578) (describing *capacity* of tailings facility as 317 million tons); *id.* at 33 (AR-012558) (predicting Project will generate 62 million tons (50 million CY) of waste rock, net of backfill).

[26] TPEIS-0102, Mining Plan at 53 (AR-012578); *see also id.* at AR-12782–83 (reclamation topography and tailings stack diagram).

concluding that, absent a discovery of a valuable mineral deposit, the Mining Law "gives a miner no right to occupy the claim *beyond* the temporary occupancy necessary for *exploration*." *Id.* at 1209 (emphasis added). No part of the Ninth Circuit's decision purports to require such a discovery or validity determination before approving surface use for *exploratory* purposes.

### C. BLM's approval does not violate water- or air-quality standards or protections for sage-grouse

Plaintiffs' argument that BLM's approval of the Project authorizes unnecessary or undue degradation remains disconnected from the law and relevant standards—and so Plaintiffs have not carried their burden on that claim.

### 1. Water quality

Plaintiffs still have not identified how the challenged decision would lead to any violation of a relevant performance standard or Federal or state law "related to environmental protection," and thus constitute unnecessary or undue degradation within the meaning of BLM's regulations. *See* 43 C.F.R. §§ 3809.420, 3809.5(a). There is no dispute that BLM recognized that water in the pit backfill *could* contain antimony—but only antimony—at a level above a water-quality standard—but only the standard for *drinking* water.[27] And hydrogeologic modeling shows that the water would not leave the mine footprint, even after 300 years, so will not reach any drinking water wells or watering holes. Plaintiffs do not identify an applicable ambient water-quality standard that this approval would violate. Though they point to Nevada's limitations on groundwater degradation at NEV. ADMIN. CODE § 445A.424(1)(b)(1) (2022), they ignore that the Nevada Department of Environmental Protection (NDEP) "may exempt a body of groundwater" from those standards in the permitting process, especially where the groundwater does not and is not likely to serve as a source for drinking water—which is the case here. *Id.*

---

[27] TPEIS-0384, FEIS at 4-13 (AR-045561).

§ 445A.424(2). They also ignore that Nevada's case-by-case application of these standards in the context of pit lakes apply generally to "[b]odies of water which are a result of mine pits penetrating the water table," *id.* § 445A.429(4)—which would include any water remaining in the mine pit, backfilled or otherwise.

Ultimately, whatever the FEIS's estimation about antimony levels over time, consistent with its regulations at 43 C.F.R. § 3809.420(b)(5), BLM's decision approving the Project expressly requires Lithium Nevada to comply with Nevada's water-quality standards, which NDEP—not BLM—enforces. Plaintiffs' selective characterizations of NDEP's communications notwithstanding, in exercising those responsibilities, NDEP did what BLM anticipated: given the future potential for increased antimony levels, it required Lithium Nevada to watch for and mitigate against any concentrations exceeding the drinking water standards outside the pit.[28] BLM's decision was thus fully consistent with its obligation to prevent unnecessary or undue degradation because it did require Lithium Nevada to comply with state water-quality standards. *See Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 966 (9th Cir. 2006) (rejecting plaintiffs' assertion that BLM's approval constituted unnecessary or undue degradation because the agency's decision was subject to compliance with requirement to obtain a permit from NDEP).

## 2. Air quality

BLM concluded that the Project "would not have a substantial effect on air quality" because pollutants from the Project, as presented in the Mining Plan, would not exceed "the applicable [National Ambient Air Quality Standards (NAAQS)] and

---

[28] TPEIS-1494, October 29, 2020 NDEP letter to Lithium Nevada at AR108868; TPEIS-0384, FEIS at 4-26 (AR-045574). NDEP issued a Water Pollution Control Permit to Lithium Nevada in February 2022, which the State Environmental Commission unanimously affirmed on June 28, 2022, despite challenges from at least one of the Plaintiffs in this case.

Nevada Standards"[29]—even without the engineering details of the sulfur dioxide scrubbing technology that Lithium Nevada proposed for mitigating emissions from its sulfuric acid plant. Plaintiffs, by contrast, have not identified *any* air-quality standard that the Project would fail to comply with.[30] Nor have Plaintiffs offered any authority supporting the proposition that BLM was required to evaluate the details of any *additional* mitigation system that was not required for the Project to meet those air-quality standards. Plaintiffs thus have not met their burden of demonstrating that BLM has authorized unnecessary or undue degradation in the air-quality context. *See Edwardsen v. U.S. Dep't of the Interior*, 268 F.3d 781, 789 (9th Cir. 2001).

### 3.    Sensitive species

Plaintiffs still have offered no binding authority requiring BLM's decision to require the mitigation provisions for sage-grouse and other "BLM sensitive species" specified only in the RMPs in order to satisfy the agency's obligation to prevent unnecessary or undue degradation.[31] As BLM has explained, FLPMA's standard does not require BLM to prevent *all* degradation; only that which is *unnecessary* or *undue. See Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 78 (D.C. Cir. 2011). BLM has defined what constitutes unnecessary or undue to fisheries, wildlife, and plants through notice-and-comment rulemaking, such that it will only *require* mitigation "to prevent adverse impacts to *threatened or endangered species*, and their habitat which may be affected by operations." 43 C.F.R. § 3809.420(b)(7) (emphasis added); *see also* 66 Fed. Reg. 54,834, 54,858 (2001) (noting that § 3809.420(b)(7) "on fisheries, wildlife, and plant habitat explicitly protects only *threatened and endangered*

---

[29] TPEIS-0384, FEIS at 4-80 (AR-045628); *see also* TPEIS-0706, FEIS App'x K at 24 (AR-065847) (Table 16).

[30] *See* WWP Resp. at 28.

[31] WWP Resp. at 23–24.

*species*" (emphasis added)). The greater sage-grouse is neither of these.[32] BLM thus complied with its obligations under FLPMA and its regulations.

Plaintiffs' appeal to a BLM handbook, out-of-context statements from prior cases, and a letter from NDOW[33]—none of which are binding on the agency—cannot impose obligations beyond those spelled out in BLM's regulations. Plaintiffs also invoke a statement, in the form of an example from the recently reinstated Solicitor's Opinion discussed above, that "destruction of unique habitat . . . *might* not be adequately compensated" by other actions such that mitigation would not prevent unnecessary or undue degradation.[34] But BLM has made no such finding as to sage-grouse habitat here. Rather, as explained above, Lithium Nevada's coordination of conservation credits through Nevada's Sagebrush Ecosystem Program (SETT) program is intended to ensure a net gain in sage-grouse habitat overall—but the State administers that program.

## II.     BLM's approval of the Project complied with NEPA

In arguing that the Project's approval did not satisfy NEPA, Plaintiffs attempt to impose a higher standard on BLM than does the law itself. Applicable regulations require an EIS to "*succinctly* describe the environment of the area(s) to be affected or created by the alternatives under consideration" such that the descriptions "shall be no longer than is necessary to understand the effects of the alternatives." 40 C.F.R. § 1502.15 (emphasis added).[35] The question before the Court is not whether the EIS explores every possible corner of every possible impact, but instead whether BLM has taken a "hard look" at environmental impacts under the "rule of reason"—that is,

---

[32] Nor is the springsnail, which WWP only mentions in passing. WWP Resp. at 24.

[33] WWP Resp. at 23–24.

[34] S*ee* WWP Resp. at 17–18 (emphasis added) (citing M-37039 at 20, which was not in force at the time of the decision).

[35] Citations herein are to the version of the NEPA-implementing regulations in effect at the time the relevant decisions were made, 40 C.F.R. Part 1500 (2019).

does the EIS "contain[ ] a *reasonably thorough* discussion of the *significant aspects* of the *probable* environmental consequences." *Or. Nat. Res. Council v. Lowe*, 109 F.3d 521, 526 (9th Cir. 1997) (per curiam) (emphasis added) (internal quotation marks and citations omitted). The FEIS underlying the Project's approval does so.

### A.   BLM adequately described baseline conditions and impacts to wildlife

Plaintiffs attempt to set their own standards for an FEIS's inclusion of baseline conditions and its analysis of impacts on wildlife. In support, they cite only two cases,[36] neither of which is relevant to the facts of this case. First, they rely on *Great Basin Resource Watch v. Bureau of Land Management* for the general proposition that an agency must establish "appropriate baseline conditions" in conducting a NEPA analysis. 844 F.3d 1095, 1101 (9th Cir. 2016). But the only baseline that the Ninth Circuit found insufficient in that case was a baseline of zero for certain air pollutants—an assumption the agency relied on without explanation. *Id.* at 1103. Even further afield, *Klamath-Siskiyou Wildlands Center v. Bureau of Land Management*, does not address either baseline conditions or impacts on wildlife at all. Instead, the court faulted the agency for merely listing elements that *could* be impacted by the project without conducting any analysis of *how* they would be impacted. 387 F.3d 989, 995 (9th Cir. 2004). BLM has more than satisfied the relevant legal requirements here.

### 1.   Sage-grouse

As Federal Defendants have explained,[37] the FEIS established a baseline of sage-grouse activity within the affected environment, including documentation of "63 tracking locations generated by at least 30 radio-marked birds" and other

---

[36] WWP Resp. at 28–29.

[37] Fed. Defs.' Opp'n at 27–28.

sampling efforts.[38] Unlike in *Great Basin Resource Watch*, 844 F.3d at 1103, here BLM set out a baseline, explained its source, and then analyzed the potential impacts of the Project against that baseline.[39] BLM also acknowledged NDOW's concerns about noise impacts on sage-grouse leks and explained how, under its analysis, "anticipated noise levels would likely not exceed the recommended 10 [decibels]."[40] That Lithium Nevada was also working with the SETT program to offset noise-related impacts through the conservation-credit system does not undermine this explanation.[41] Plaintiffs ignore these details, inaccurately characterizing sage-grouse baselines clearly set forth in the record as "vague statements" without an "adequate effects analysis," without offering any authority supporting any inadequacy here.[42]

### 2.   Pronghorn

The FEIS also established the baseline for its analysis of the Project's impacts on pronghorn.[43] Plaintiffs now fault the baseline for not including population numbers,[44] but offer no authority for the proposition that BLM must include such numbers when the population of the relevant Hunt Unit has "remained stable" and where BLM thoroughly analyzed the impact of the Project on pronghorns' habitat,

---

[38] TPEIS-0702, FEIS App'x G at G-18 (AR-065647).

[39] TPEIS-0384, FEIS at 4-42–4-45 (AR-045590–93).

[40] TPEIS-0384, FEIS at R-184 (AR-048171). BLM also explained that the Project was "a non-discretionary 43 CFR 3809 action" and that "BLM's discretion [was] limited to preventing unnecessary and undue degradation," such that it "may not impose timing or operational restrictions" from the 2015 ARMPA provisions, as Plaintiffs seek to require here. As explained *supra* Parts I.A and I.B, BLM's determination that it lacked such discretion derives from its Part 3809 regulations, not any assumption of "valid rights" under the Mining Law.

[41] *See* WWP Resp. at 29; TPEIS-0384, FEIS at R-184 (AR-048171).

[42] WWP Resp. at 29.

[43] *See* Fed. Defs.' Opp'n at 28–30, 32–33. As demonstrated by Federal Defendants' previous discussion, Plaintiffs' assertion that the FEIS's "entire analysis of effects to pronghorn is limited to a single sentence," WWP Resp. at 30, is patently false.

[44] WWP Resp. at 29.

range, and movement corridors.[45] Plaintiffs also now fault BLM for discussing impacts to pronghorn in the context of impacts to other "big game,"[46] but similarly offer no authority requiring BLM to completely separate those analyses when the latter analysis applies as much to pronghorn as to other big game.

### 3.    Kings River pyrg

The FEIS also adequately analyzed the Project's impacts on water resources—and thus on the Kings River pyrg, a variety of springsnail. Specifically, and as previously explained, BLM analyzed the impact of mine-related drawdown of water resources on springsnails and concluded that no further impacts analysis was necessary because springsnails were not detected in any streams likely to be adversely affected by the Project.[47] Plaintiffs now challenge these conclusions by citing NDOW's letter commenting on the FEIS as raising "significant concerns,"[48] but neglect to point out that NDOW raised these "concerns" in the context of recommending expansion of the seep/spring *monitoring* program.[49] In any event, BLM considered and responded to these post-FEIS comments to the extent required by law.[50]

### 4.    Impacts on other wildlife from impacts on water resources

Finally, Plaintiffs continue to ask the Court to flyspeck BLM's analysis of the Project's impact on water resources and thus on the wildlife that depend on them.[51] As previously explained, BLM concluded that the drawdown related to the Project

---

[45] *See* TPEIS-0384, FEIS at 4-38 (AR-045586); TPEIS-0696, FEIS App'x A Figure 4.5-7 (AR-065508); TPEIS-0702, FEIS App'x G at G-14 (AR-065643).

[46] WWP Resp. at 30.

[47] TPEIS-0384, FEIS at 4-48 (AR-045596); *id.* at 4-9–4-10 (AR-045557–58).

[48] WWP Resp. at 30.

[49] TPEIS-0446, NDOW Letter at 2 (AR-052421).

[50] *See* Fed. Defs.' Opp'n at 39–40.

[51] WWP Resp. at 32–34.

was "not expected to result in a measureable effect to flows in the perennial stream reaches" within the Project area, and that ephemeral springs would likewise not be directly affected, and it explained why.[52] This scientific analysis is entitled to deference. *See Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 508 (9th Cir. 1988). And BLM explained and discussed this conclusion in analyzing the Project's impacts on wildlife.[53]

Plaintiffs counter by arguing that NDOW disagreed with this assessment in its comments on the Draft EIS (DEIS) and FEIS.[54] But they offer no authority that BLM was obligated to *adopt* NDOW's analysis. Nor can they. BLM must consider and respond to comments on the DEIS. *Ctr. for Biological Diversity v. BLM*, 833 F.3d 1136, 1150 (9th Cir. 2016). It did so here, recognizing NDOW's concerns and addressing (as NDOW acknowledged) several of them in the FEIS, including by adding a 1-mile buffer to account for uncertainty in the hydrological models.[55] But ultimately, the Court defers to BLM's technical determinations—not NDOW's comments. *See Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983). And to the extent

---

[52] Fed. Defs.' Opp'n at 31–32 (citing TPEIS-0384, FEIS at 4-7–4-11 (AR-045556–59)).

[53] Fed. Defs.' Opp'n at 31–32 (citing 4-36–4-37 (birds), 4-46 (bats), 4-47 (LCT), 4-48 (amphibians and springsnails) (AR-045584–85, AR-045595–96)). Plaintiffs misconstrue BLM's argument, and ignore this citation entirely, in their misleading conclusion that BLM's FEIS citations on this subject lack "reference to any wildlife." WWP Resp. at 31.

[54] WWP Resp. at 31–33. Plaintiffs also assert that the U.S. Fish and Wildlife Service (FWS) also commented on the hydrologic baselines and modeling after reviewing the draft EIS and Biological Assessment. *Id.* at 32. But Plaintiffs point to nothing suggesting that BLM did not consider those comments in preparing the FEIS or any authority requiring BLM to adopt another agency's technical determinations.

[55] TPEIS-0384 at R-181–R-192 (AR-048168–79). BLM specifically also addressed NDOW's comment on the DEIS concerning classification of streams as perennial, *see* WWP's Response at 32, for which NDOW recommended "future monitoring" and continued evaluation, *see* TPEIS-0384, FEIS at R-186 (AR-048173).

that Plaintiffs continue to rely on NDOW's post-FEIS comments, BLM considered and responded to them to the extent required by law.[56]

### B.   BLM analyzed cumulative impacts

Plaintiffs also have not carried their burden of demonstrating any error in BLM's cumulative impacts analysis. They offer no excuse for their failure to raise the single project they believe BLM should have analyzed in its cumulative impacts analysis during the administrative process, and their other, generic challenges to the cumulative impacts analysis completely ignore the record.

### 1.   McDermitt Lithium Project

Plaintiffs waived any challenge to the cumulative impacts analysis based on the McDermitt lithium project.[57] *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 605 (9th Cir. 2010), on which Plaintiffs rely to counter that waiver,[58] does not dictate a different result. "Parties must alert an agency to their position[ and contentions" and, by failing to do so, "waive[ ] arguments that are not raised during the administrative process." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1081 (9th Cir. 2011). *Te-Moak Tribe* does not address a plaintiff's burden to raise issues before the agency, but rather the plaintiffs' burden at summary judgment. Even were those burdens the same, WWP's asserted broad criticism during the administrative process that BLM did not consider the impacts from "*all other*" of eight or more generic land uses "in the region"[59] is far too general to "alert [the] agency to [plaintiffs'] position" and carry Plaintiffs' burden of raising objections

---

[56] *See* Fed. Defs.' Opp'n at 39–40. The law does not require BLM to "refute[ ] . . . specific comments" on an FEIS, as Plaintiffs argue BLM should have done, WWP Resp. at 32; it does not even require BLM to *accept* them. *Japanese Vill. LLC, v. Fed. Transit Admin*, 843 F.3d 445, 467 (9th Cir. 2016) (citing 40 C.F.R. § 1503.1(b)).

[57] *See* Fed. Defs.' Opp'n at 24.

[58] WWP Resp. at 33.

[59] WWP Resp. at 33.

during the public comment period to avoid forfeiting them during judicial review. *Cf.* *N. Plains Res. Council*, 668 F.3d at 1081 (cumulative impacts argument not waived when petitioner specifically raised project to be addressed).

### 2.      Other cumulative impacts

Plaintiffs also have not carried their burden of demonstrating any deficiency in the remainder of BLM's cumulative impacts analysis. They repeat their argument that BLM's analysis "just list[s]," without quantified analysis, "acreages of other projects . . . ."[60] To be sure, the FEIS *does* include a list of other projects and the acreage of their projected ground disturbance.[61] But unlike *Great Basin Mine Watch*, 456 F.3d at 973 and *Great Basin Resource Watch*, 844 F.3d at 1105, on which Plaintiffs rely, BLM did not stop there: it presented more than 15 pages of analysis of those cumulative effects on at least 20 resources.[62] Until their responsive brief, Plaintiffs had not identified *any* of those specific analyses as being allegedly deficient, instead only generally challenging the geographic scope of the cumulative effects study areas[63]—the agency's determination of which is afforded deference, so long as it is explained. *See Selkirk Conservation All. v. Forsgren*, 336 F.3d 944, 958 (9th Cir. 2003). And Plaintiffs have pointed to no such lack of explanation here.

Plaintiffs now, for the first time, argue that BLM erred by not quantifying the cumulative impacts on sage-grouse populations—and *only* that.[64] Plaintiffs waived this argument by not raising it in their opening brief. *See Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994) (issues not "argued specifically and distinctly in a party's opening brief" are waived). Even were it not waived, Plaintiffs have not supported it

---

[60] WWP Resp. at 33–34.

[61] TPEIS-0384, FEIS at 5-2 (AR-045673).

[62] TPEIS-0384, FEIS at 5-3–5-20 (AR-045673–90).

[63] *See* WWP Mem. at 29–31.

[64] WWP Resp. at 34–35.

with any authority requiring quantification of sage-grouse or their habitat in a cumulative effects analysis, especially where—as here—impacts to sage-grouse habitat beyond the Project area will be addressed through the conservation-credit system.

### C.   BLM considered mitigation measures

Finally, Plaintiffs have not demonstrated any lack of compliance with NEPA's requirement that BLM consider measures that may mitigate the adverse impacts of a proposed project. 40 C.F.R. §§ 1502.14(f), 1502.16(h).

### 1.   Water resources

Plaintiffs continue to assert that BLM put off analysis of possible mitigation measures, and thus erred.[65] In doing so, they continue to ignore the relevant standards for consideration of mitigation measures in the FEIS. Here, BLM disclosed to the public and analyzed proposed monitoring and mitigation measures for addressing surface and groundwater resources—specifically, the measures discussed in Appendix P.[66] This satisfied NEPA, which "requires only that an EIS contain 'a reasonably complete discussion of *possible* mitigation measures'" and "does not require an agency to formulate and adopt a complete mitigation plan" before project approval. *N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 979 (9th Cir. 2006) (emphasis added) (quoting *Robertson v. Methow Valley Citizens' Council*, 490 U.S. 332, 352 (1989)). Plaintiffs have offered no contrary authority requiring BLM to do more before a project's approval, especially in this context where any impacts to water resources are projected to occur far in the future, if at all, rendering monitoring and adaptive management an appropriate approach. *Great Basin Res. Watch*, 844 F.3d at 1107 (BLM's "wait and see" mitigation approach reasonable "given the relatively low probability and temporal remoteness of adverse impacts to ground water").

---

[65] *See* WWP Resp. at 25–27, 35.

[66] *See* Fed. Defs.' Opp'n at 35–38.

That *additional* groundwater mitigation and monitoring measures were adopted after the Project was approved does not violate NEPA. Nor would subsequent adoptions of such measures after approval render this a case where BLM changed its analysis between the DEIS and the FEIS without providing information to the public or failed to analyze any mitigation or monitoring measures at all, as Plaintiffs suggest.[67] Finally, Plaintiffs are simply wrong to suggest that BLM was obligated to take further action in response to the Environmental Protection Agency's comments on the FEIS.[68] BLM complied with the law with respect to those comments.[69] None of the cases Plaintiffs now rely on—all of which address other agencies' comments on *draft* documents—required more. *See Davis v. Mineta*, 302 F.3d 1104, 1123 (10th Cir. 2002) (addressing agency responses to comment on *draft* EIS); *Silva v. Lynn*, 482 F.2d 1282, 1285 (1st Cir. 1973) (same as to *draft* plan); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 184 F. Supp. 3d 861, 903 (D. Or. 2016) (same as to *draft* biological opinion); *N. Spotted Owl v. Hodel*, 716 F. Supp. 479, 482–83 (W.D. Wash. 1988) (addressing comments during species listing review period).

### 2.    Air quality

Plaintiffs' reiterated arguments with respect to air quality mitigation likewise miss the mark and exhibit a fundamental misunderstanding of the record and the law. In short, BLM evaluated the sulfuric acid plant as it was described in the Mining Plan and concluded that the Project would meet applicable air-quality standards.[70] That additional details about the specific tail-gas-scrubbing technology Lithium Nevada

---

[67] WWP Resp. at 35 (citing *Western Exploration LLC v. U.S. Dep't of Interior*, 250 F. Supp. 3d 718 (D. Nev. 2017)).

[68] WWP Resp. at 27–28.

[69] *See* Fed. Defs.' Opp'n at 39–40.

[70] TPEIS-0384, FEIS at 4-82 (AR-045630) ("[A]ll pollutant concentrations within the project would be less than the NAAQS and Nevada standards, and that effects on AQRVs in Class I areas would be negligible. Therefore, no mitigation is required.").

intended to use were later provided is immaterial, as Plaintiffs point to no evidence that it would alter the plant's emissions to exceed those standards. Further, BLM required Lithium Nevada to comply with state air-quality regulations and obtain the necessary air-quality permits from NDEP.[71] Because of this, BLM did not need to address the engineering of the "tail gas scrubber" or its effects to conclude that air-quality standards would be met or to satisfy NEPA's "hard look" requirement.

Plaintiffs' remaining arguments are unavailing. First, Plaintiffs rehash arguments already addressed, offer no authority for the proposition that BLM was required to evaluate *how* the tail gas scrubbing technology operates, and ignore BLM's reasonable conclusion that it need not do so because BLM "do[es] not evaluate the details (engineering) of [the plant's] processing" in making that determination.[72] Second, in requiring Lithium Nevada to comply with NDEP's permitting requirements, BLM is not substituting a "non-NEPA document" for its obligation to evaluate effects on the environment, as Plaintiffs now argue.[73] Plaintiffs here have argued that BLM's decision would allow Lithium Nevada to violate air-quality standards. BLM has not done so, because it conducted its own air-quality analysis during the NEPA process and *also* required Lithium Nevada to obtain the appropriate permits from NDEP.

---

[71] TPEIS-0452, ROD at 21 (AR-052537) ("No work is authorized under the Plan until LNC has complied with all federal, state, and local regulations, including obtaining all necessary permits from [NDEP] and other federal, state, and local agencies."); *see also* TPEIS-0384, FEIS at 2-9 (AR-045527) ("The operation of the sulfuric acid plant would be regulated under a facility Permit to Construct / Permit to Operate that would be issued by the [NDEP] Bureau of Air Pollution Control (BAPC).").

[72] TPEIS-0981 at AR-093830.

[73] WWP Resp. at 38.

### 3.    Sage-grouse

Finally, Plaintiffs now challenge BLM's analysis of mitigation for sage-grouse and their habitat.[74] But the FEIS presented "two distinct options for implementing compensatory mitigation to offset residual impacts to greater sage-grouse habitat under the selected alternative," including compensatory mitigation through purchase of credits under Nevada's conservation-credit system and conducting habitat enhancement efforts at offsite parcels near the Project.[75] BLM discussed both of these alternatives.[76] Ultimately, BLM's approval of the Project required Lithium Nevada to comply with state laws related to the conservation-credit system and to work with SETT to develop a mitigation plan consistent with that system and the State's requirements.[77] This satisfies the requirement that BLM consider possible mitigation measures.

## III.    The Court should not vacate the ROD and EIS

As explained above, the record demonstrates that the Project's approval complied with applicable law and was not arbitrary or capricious, so no remedy is called for here. But should the Court grant Plaintiffs' motion for summary judgment and conclude that the Project's approval was insufficient in some aspect, the ROD and FEIS should not be vacated.

Under the APA "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Ultimately, however, "[t]he decision whether to vacate depends on the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be

---

[74] WWP Resp. at 37.

[75] TPEIS-0709 FEIS App'x N at N-23–N-25 (AR-066106–08).

[76] Id.

[77] See Fed. Defs.' Opp'n at 15–16.

changed." *Allied–Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) (internal quotation marks and citation omitted). Thus, "when equity demands," the challenged agency action can be "'left in place while the agency follows the necessary procedures' to correct its action." *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) (per curiam) (quoting *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995)). Equity so demands, for example, where vacatur would "lead to impermissibly disruptive consequences in the interim." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F. Supp. 3d 91, 97 (D.D.C. 2017) (citing *Williston Basin Interstate Pipeline Co. v. FERC*, 519 F.3d 497, 504 (D.C. Cir. 2008).

Vacatur is also "not appropriate" where "nothing in the record indicates[,] that on remand the agency will necessarily fail to justify its decisions . . . ." *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 84 (D.D.C. 2019) (quoting *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1049 (D.C. Cir. 2002), *opinion modified on reh'g,* 293 F.3d 537 (D.C. Cir. 2002)); *see also Standing Rock*, 282 F. Supp. 3d at 97 (vacatur inappropriate when "there is at least a serious possibility that the [agency] will be able to substantiate its decision on remand" (alteration in original) (internal quotation marks and citation omitted)); *WildEarth Guardians v. U.S. Office of Surface Mining, Reclamation & Enf't*, 104 F. Supp. 3d 1208, 1232 (D. Colo. 2015) (finding that "the benefits of immediate vacatur [did] not outweigh the potential harms" and allowing the agency a period of time to complete corrective NEPA, while deferring vacatur pending timely compliance), *order vacated and appeal dismissed on other grounds,* 652 F. App'x 717 (10th Cir. 2016); *Black Rock City LLC v. Haaland*, No. 19-CV-3729 (DLF), 2022 WL 834070, at *8 (D.D.C. Mar. 21, 2022) (remanding without vacatur when requiring BLM to determine whether assessed fees were reasonable under FLPMA).

Thus, should the Court conclude that remand is appropriate on any basis here, whether vacatur is also appropriate should be illuminated by a factual discussion in

the context of the particular errors (if any) that the Court identifies. It should thus afford the parties an opportunity to address those specific questions through further, focused briefing.

## **<u>CONCLUSION</u>**

For the reasons set forth above, BLM's approval of the Thacker Pass project complied with applicable law and was not arbitrary or capricious. Plaintiffs have not carried their burden of demonstrating otherwise. The Court should therefore deny Plaintiffs' motion for summary judgment and grant Federal Defendants' motion.

Respectfully submitted this 11th day of August, 2022.

TODD KIM
Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Div.

*/s/ Arwyn Carroll*
ARWYN CARROLL (MA Bar 675926)
LEILANI DOKTOR (HI Bar 11201)
MICHAEL ROBERTSON (VA Bar 80866)
Trial Attorney
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Phone:  202-305-0465
Fax:  202-305-0506
arwyn.carroll@usdoj.gov
leilani.doktor@usdoj.gov
michael.robertson@usdoj.gov

*Attorneys for Federal Defendants*