TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

ARWYN CARROLL (MA Bar 675926)
LEILANI DOKTOR (HI Bar 11201)
MICHAEL ROBERTSON (VA Bar 80866)
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Phone: (202) 305-0465
Fax: (202) 305-0506
arwyn.carroll@usdoj.gov
leilani.doktor@usdoj.gov
michael.robertson@usdoj.gov

*Attorneys for Federal Defendants*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| BARTELL RANCH LLC, *et al.*,<br><br>                Plaintiffs,<br><br>        v.<br><br>ESTER M. MCCULLOUGH, *et al.*,<br><br>        Defendants. | Case No. 3:21-cv-80-MMD-CLB<br>Related Case No. 3:21-cv-103-MMD-CLB<br>(Consolidated) |
| WESTERN WATERSHEDS PROJECT, *et al.*,<br><br>                Plaintiffs,<br><br>        v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*,<br><br>        Defendants. | **FEDERAL DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON BARTELL PLAINTIFFS' CLAIMS** |

# TABLE OF CONTENTS

INTRODUCTION..................................................................................................1

ARGUMENT ......................................................................................................2

    I.     BLM's approval of the Project complied with NEPA ................................. 2

          A.    Bartell has not demonstrated any error in the data-collection process .................................................................................... 4

          B.    The Court should reject Bartell's invitation to "flyspeck" the FEIS ................................................................................ 7

          C.    BLM adequately analyzed mitigation measures for the Project. ......... 9

          D.    BLM has complied with its public disclosure requirements ............. 10

          E.    BLM satisfied its obligations to independently evaluate Piteau's work ......................................................................... 13

    II.    BLM's approval of the Project complied with FLPMA ............................ 15

          A.    FLPMA does not require mining operations to comply with the RMP provisions Bartell asserts ......................................... 15

          B.    BLM did not—and was not required to—determine mining claim validity ...................................................................... 18

CONCLUSION ...............................................................................................20

# TABLE OF AUTHORITIES

**Cases**

*Airport Impact Relief, Inc. v. Wykle*,
192 F.3d 197 (1st Cir. 1999) ...................................................................17

*Alaska Env't Ctr. v. Kempthorne*,
457 F.3d 969 (9th Cir. 2006) ............................................................ 11, 12

*California v. Block*,
690 F.2d 753 (9th Cir. 1982) .....................................................................2

*Cascadia Wildlands v. U.S. Forest Serv.*,
937 F. Supp. 2d 1271 (D. Or. 2013) .......................................................14

*City of Roseville v. Norton*,
219 F. Supp. 2d 130 (D.D.C. 2002) .........................................................17

*Cloud Found. v. U.S. Bureau of Land Mgmt.*,
No. 3:11-CV-00459-HDM, 2013 WL 1249814 (D. Nev. Mar. 26, 2013) .................20

*Conservation Northwest v. Rey*,
674 F. Supp. 2d 1232 (W.D. Wash. 2009)..................................................6

*Ctr. for Food Safety v. Vilsack*,
844 F. Supp. 2d 1006 (N.D. Cal. 2012) ...................................................16

*Earth Island Inst. v. U.S. Forest Serv.*,
351 F.3d 1291 (9th Cir. 2003) .................................................................17

*Great Basin Res. Watch v. Bureau of Land Mgmt.*,
844 F.3d 1095 (9th Cir. 2016) ...................................................................2

*Greenwood v. FAA*,
28 F.3d 971 (9th Cir. 1994) ...........................................................1, 6, 21

*Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*,
857 F.2d 505 (9th Cir. 1988).........................................................1, 8, 9

*Idaho Wool Growers Ass'n. v. Vilsack*,
816 F.3d 1095 (9th Cir. 2016) ...................................................................7

*Japanese Vill., LLC v. Fed. Transit Admin.*,
843 F.3d 445 (9th Cir. 2016).................................................................14

*Lange v. Brinegar*,
625 F.2d 812 (9th Cir. 1980).................................................................17

*Marsh v. Or. Nat. Res. Council,*
    490 U.S. 360 (1989) ............................................................................... 15

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife,*
    551 U.S. 644 (2007) ............................................................................... 16

*Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.,*
    625 F.3d 1092 (9th Cir. 2010) ................................................................. 5

*Or. Nat. Desert Ass'n v. Jewell,*
    840 F.3d 562 (9th Cir. 2016) ................................................................. 10

*Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.,*
    No. 2:10-CV-01331-SU, 2014 WL 4832218 (D. Or. Sept. 29, 2014) ....................... 20

*Robertson v. Methow Valley Citizens Council,*
    490 U.S. 332 (1989) ........................................................................... 2, 11

*S. Fork Band v. U.S. Dep't of Interior,*
    643 F. Supp. 2d 1192 (D. Nev. 2009) ................................................... 20, 21

*San Luis & Delta-Mendota v. Jewell,*
    747 F.3d 581 (9th Cir. 2014) ................................................................. 13

*Sierra Club v. Van Antwerp,*
    709 F. Supp. 2d 1254 (S.D. Fla. 2009) ................................................... 16

*Te–Moak Tribe of W. Shoshone v. U.S. Dep't of Interior,*
    608 F.3d 592 (9th Cir. 2010) ................................................................... 2

**Statutes**

30 U.S.C. § 22 ........................................................................................... 21

43 U.S.C. § 1712(e)(3) ............................................................................. 18

43 U.S.C. § 1714 ...................................................................................... 18

**Regulations**

40 C.F.R. § 1506.5 .................................................................................... 15

40 C.F.R. § 1506.5(a) (2020) .................................................................... 15

40 C.F.R. § 1506.5(a), (c) ......................................................................... 16

40 C.F.R. § 1506.5(c) ................................................................................ 15

40 C.F.R. § 1506.6 .................................................................................... 12

43 C.F.R. § 3809.100 ................................................................................ 21

43 C.F.R. § 3809.411(d)(3) ....................................................................... 21

**Other Authorities**

85 Fed. Reg. 3413 (Jan. 20, 2020) ............................................................................12

85 Fed. Reg. 45,651 (July 29, 2020) .......................................................................12

85 Fed. Reg. 78,324 (Dec. 4, 2020) ........................................................................13

## TABLE OF ABBREVIATIONS

| APA | Administrative Procedure Act |
|-----|------------------------------|
| ARMPA | Approved Resource Management Plan Amendment |
| BLM | United States Bureau of Land Management |
| DEIS | Draft Environmental Impact Statement |
| EPA | United States Environmental Protection Agency |
| ESA | Endangered Species Act |
| FEIS | Final Environmental Impact Statement |
| FLPMA | Federal Land Policy and Management Act of 1976 |
| FWS | United States Fish and Wildlife Service |
| LCT | Lahontan Cutthroat Trout |
| NDOW | Nevada Department of Wildlife |
| NEPA | National Environmental Policy Act |
| RMP | Resource Management Plan |
| ROD | Record of Decision |
| VRM | Visual Resource Management |

# INTRODUCTION

Plaintiffs Bartell Ranch LLC. and Edward Bartell ("Bartell") disagree with the outcome of the United States Bureau of Land Management's (BLM) review of the Thacker Pass Project (Project). But the National Environmental Policy Act (NEPA) only requires an agency take a hard look at the potential impacts of its decision and provide for public notice and comment—both of which BLM did here. Bartell has failed to show that BLM did not meet NEPA or the Federal Land Policy and Management Act's (FLPMA) requirements in approving the Project or that its decision was arbitrary or capricious. Instead, Bartell obfuscates the legal standard governing agency decision-making by inviting the Court to delve into matters of agency expertise, which are entitled to strong deference. *See Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 508 (9th Cir. 1988). While Bartell attempts to convince this Court that he presents an unbiased view of the record, his continued focus on minor or immaterial data points highlight that he has few substantive legal arguments. But even those arguments are riddled with distortions of the process and data considered by the agency. Bartell also raises several arguments for the first time in his Reply that should be summarily rejected.[1]

This Court is charged with determining whether BLM took a hard look at environmental impacts under NEPA and provided a reasoned explanation for its decision. The Court should decline Bartell's invitations to speculate on matters within BLM's expertise and deny Bartell's motion for summary judgment.

---

[1] Bartell Pls.' Reply/Resp. Br. Re Mots. for Summ. J. 17-18, 22-25, 30-32, ECF No. 262 ("Bartell Reply"). *See Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994) (issues not "argued specifically and distinctly in a party's opening brief" are waived).

## ARGUMENT

### I.    BLM's approval of the Project complied with NEPA

NEPA imposes procedural requirements that serve the dual purpose of informing agency decision-makers of the potential environmental effects of proposed major federal actions and ensuring that relevant information is made available to the public. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). NEPA requires an agency to take a "hard look" at the proposed action's effects on the environment prior to making it decision. *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1104 (9th Cir. 2016) (quoting *Te–Moak Tribe of W. Shoshone v. U.S. Dep't of Interior*, 608 F.3d 592, 603 (9th Cir. 2010)). In reviewing the sufficiency of an EIS, a court should evaluate whether the agency has presented a "'reasonably thorough discussion of the significant aspects of the probable environmental consequences.'" *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982) (citation omitted). The Court should reject Bartell's invitation to "flyspeck" the EIS or conduct a "fact-intensive" inquiry into the agency's analysis of water or wildlife resources.[2] Here, the process itself satisfied NEPA's requirements and Bartell has not demonstrated otherwise.

BLM took a hard look at the impacts to water resources and wildlife, as evidenced by the thousands of pages of analysis and data contained in the administrative record. Beginning with water resources,[3] the FEIS analyzed the effect of the Project on groundwater levels and the springs and streams in the Project area.[4] It disclosed potential effects to water quality and quantity include modifications to existing water rights and the potential for mine related groundwater aquifer

---

[2] Bartell Reply 10 n.15.

[3] TPEIS-384, FEIS at 4-6–4-33 (AR-045554–81).

[4] *See id.* at 4-7–4-11 (AR-045556–59).

drawdown.[5] But, after taking a hard look, BLM concluded that any mine related drawdown is not expected to have a significant effect on water flows and that any effects to the quantity of water available will likely recover in twenty five years after pumping ceases.[6] These conclusions satisfy NEPA's hard-look requirement.

The FEIS also fully explains the anticipated impacts of the Project on wildlife resources. After studying effects to the creeks that Lahontan Cutthroat Trout (LCT) occupy in the Project area, BLM reasonably concluded that there will be no anticipated direct effects to the species.[7] The FEIS also analyzes the Project's impacts to the greater sage-grouse. While there are few signs of sage-grouse in the Project area, BLM was alerted by the Nevada Department of Wildlife (NDOW) that there is a concentration of sage-grouse habitat in the high Montana Mountains adjacent to the Project area.[8] BLM responded to NDOW's comments and required Lithium Nevada to have a biological monitor present to assess noise impacts to wildlife.[9] Further, consistent with BLM policies, BLM analyzed the Project's potential impacts in light of the sage-grouse mitigation provisions in the Nevada and Northeastern California Greater Sage-Grouse Approved 2015 RMP Amendment (the 2015 ARMPA)— resulting in Lithium Nevada committing to instituting buffers around sage-grouse habitat to minimize impacts from the Project.[10] Finally, the FEIS contained the

---

[5] *Id.* at 4-8 (AR-045556).

[6] *Id.*

[7] *Id.* at 4-47, G-15 (AR-045595, AR-046028).

[8] TPEIS-0359, NDOW Comments at AR-045043–52; TPEIS-0384, FEIS at G-18 (AR-046031) (noting that "sage-grouse activity has been documented within the Project area by NDOW" and that "one sage-grouse was observed in the Project area" during baseline surveys).

[9] TPEIS-0384, FEIS App'x N at N-17 (AR-046487).

[10] TPEIS-0384, FEIS at 4-52–4-53 (AR-045600–01) (analyzing noise impacts on sage-grouse).

Biological Assessment, which provided additional discussion and analysis of potential impacts to threatened or endangered species.[11] In sum, the record amply demonstrates that BLM took a hard look at the wildlife impacts, and Bartell has waived this argument by not raising it in his opening brief, so the Court should find that BLM complied with NEPA's requirements for this claim.

A.   **Bartell has not demonstrated any error in the data-collection process**

Bartell's narrow focus on the Stevens Protocol is misplaced,[12] as Piteau Associates ("Piteau") was not required to follow the Stevens Protocol. As thoroughly explained in Federal Defendants' prior briefs, Piteau set out a workplan, which included certain surveying guidelines, and was designed to meet the BLM's Data Adequacy Standards.[13] The workplan's guidelines are cited by Bartell[14] and are the only survey guidelines Piteau was required to follow. And Bartell has not demonstrated that the *workplan's* guidelines or BLM's Data Adequacy Standards were not met.

Bartell's "statement of facts"[15] and argument that Piteau did not comply with the workplan is misleading.[16] Each administrative record citation in Bartell's argument refers to the Stevens Protocol reference materials—not the workplan guidelines.[17] Nowhere does Bartell even argue that Piteau did not follow the elements

---

[11] TPEIS-0480, Biological Assessment (AR-053092).

[12] Bartell Reply 3-4.

[13] TPEIS-0054; Fed. Defs.' Opp'n to Bartell Pls.' Mot. for Summ. J. 13-20, ECF No. 238 ("Fed. Defs.' Opp'n").

[14] Bartell Reply 4. TPEIS-0054, AR-005702-03.

[15] Bartell Reply 6-8.

[16] Bartell Reply 22–24.

[17] Bartell Reply 6-8.

in the *workplan* that it submitted. Rather, Bartell describes how Piteau did not follow the *Stevens Protocol*, which nothing—no law, regulation, BLM handbook, or the workplan itself—required Piteau to follow.[18]

Bartell then contends that certain baseline measurements were "inaccurate" solely because Piteau did not follow the Stevens Protocol and measure the spring at the point of maximum discharge.[19] But, "NEPA's requisite 'hard look' does not require adherence to a particular analytic protocol." *Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1121 (9th Cir. 2010) (citation omitted).[20] The Stevens Protocol's methodologies were not required, and the fact that the agency used a different methodology does not render the data obtained "inaccurate" or demonstrate a NEPA violation. *See also Protect Our Cmtys. Found. v. Salazar*, No. 12-cv-2211-GPC (PCL), 2013 U.S. Dist. LEXIS 159281, at *25–26 (S.D. Cal. Nov. 6, 2013).

Bartell also raises a novel argument—not asserted in its opening brief, and based not on statute, regulation, or case law but on a law review article and a dictionary definition—that Piteau's taking of measurements on Bartell's land on four occasions somehow undermines the "integrity" of the NEPA process.[21] But he has cited no case where a NEPA process was found deficient on this basis. In the main

---

[18] Fed. Defs.' Opp'n 14-16.

[19] Bartell Reply 8, 23-24.

[20] Moreover, the workplan itself contemplates that data collection techniques may evolve. TPEIS-0642, (AR-60683) ("Inventory techniques will continue to evolve as scientific understanding of this nascent field develops, as methods improve, and as these techniques are used to address specific and more sophisticated questions about springs ecology and stewardship. Further testing and refinement of these protocols are necessary and desired, particularly in boreal and subaqueous environments. Therefore, inventory protocol development is an ongoing process, and we welcome suggestions for improving them.").

[21] Bartell Reply 19-20, 23-34. Because all arguments based on the "integrity" of the NEPA process appear for the first time on reply, they are waived and should be rejected. *See Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994).

---

case cited by Bartell, *Conservation Northwest v. Rey*, the court found the agency's data unreliable because the challenged NEPA analysis had *not* included site visits. 674 F. Supp. 2d 1232, 1253 (W.D. Wash. 2009). Here, Piteau visited and measured the springs and Bartell has not demonstrated that those measurements were deficient in any way.

Bartell dwells on the fact that Piteau's employee visited sites on his land on four occasions without receiving his permission. Even if Bartell's objections to Piteau's sampling on his property were somehow legally relevant, however, Bartell has not demonstrated any injury from data collection on those lands; or that Piteau's employees willfully entered Bartell's land after being warned not to; or that BLM was aware of any alleged trespass before or at the time thereof. Importantly, Bartell has not demonstrated that the NEPA process was rendered deficient in any way by the fact that he was not consulted before measurements from two springs on his property were taken on four occasions.[22] Finally, even if there were some *material* error in the collection of this data—one that affected the integrity and reliability of the data itself—omitting the data would not impact the groundwater model,[23] and thus any such error would be harmless. *Idaho Wool Growers Ass'n. v. Vilsack*, 816 F.3d 1095, 1104 (9th Cir. 2016) (citation omitted) ("The harmless-error analysis asks whether the . . . error caused the agency not to be fully aware of the environmental consequences of the proposed action, thereby precluding informed decision-making and public participation, or otherwise materially affected the substance of the agency's decision.").

---

[22] Bartell twice alleges that Piteau failed to "comply with BLM's data adequacy standards," *see* (Bartell Reply 23–24, 31–32), but has not identified any standard with which Piteau's work failed to comply. Bartell equates Piteau not using the Stevens Protocol with a violation of those standards, but can point to nothing in those standards requiring compliance with the Stevens Protocol.

[23] TPEIS-0406 at AR-048356.

**B.      The Court should reject Bartell's invitation to "flyspeck" the FEIS**

The methodologies used to collect the water resource data and the agency's scientific analysis of that data are exactly the type of highly specialized decisions entrusted to the agency's expertise. Each iteration of Bartell's claims merely invites the Court to improperly "flyspeck" the agency's scientific analysis, in contravention of the deference owed to an agency's expertise. *See Half Moon Bay*, 857 F.2d at 508.

The purported "errors" cited by Bartell are actually differences of methodology explained by BLM in its response to comments.[24] For example in Facts Section H, Bartell alleges errors or insufficiencies in the baseline for 12 of the 22 springs: BLM-02, SP-006, SP-008, SP-010, SP-029, SP-030, SP-031, SP-032, SP-03514, SP-042, SP-047, and SP-048.15.[25] Bartell complains that a baseline of "zero" is attributed to seven of the springs despite those springs being characterized as "perennial." But Piteau's *Lithium Nevada Corporation Seep and Spring Survey Report*[26] provides far more comprehensive information on how the springs were characterized and monitored. The Report explains that it is common practice among hydrologists and ecologists to characterize a spring as "perennial" based on characteristics other than flow volume,[27] such as when there is diffuse flow (where it is difficult to obtain a useful measurement) or the regular presence of standing water or viable wetland/riparian vegetation. For example, the Report photos show that springs SP-035 and SP-042 have diffuse flow

---

[24] Bartell Reply 23; Fed. Defs.' Opp'n 21-24.

[25] Bartell Reply 9-12.

[26] TPEIS-0076 (AR-008601), table at AR-008613.

[27] TPEIS-0384, FEIS Water Quantity and Quality (AR-045556). Indeed, even the Stevens Protocol itself acknowledges: "seeps, and other springs with highly diffuse discharge are sites at which surface flow *cannot be focused and directly measured.* Measurement and photography of the wetted area may be the only option for estimating the extent of springs flow." TPEIS-0642, The Stevens Protocol (AR-060712).

or standing water, coupled with observed wetland vegetation, but no particular surface flow away from the site.[28] Thus, an observed flow rate of zero gallons per minute is accurate and not a result of any error. The "fact-intensive inquiry" Bartell proposes into the hydrological and scientific choices made by the agency, developed for the first time in his reply, is exactly the type of flyspecking courts are instructed to avoid under the APA because an agency's scientific analyses are entitled to agency deference. *See Half Moon Bay*, 857 F.2d at 510.

Further, Bartell's hyper-focus on the flow rates for springs identified in Table 4.2 in the FEIS—measured at <1 gallon per minute, the equivalent of an open spigot on a household sink—fails to acknowledge that the significant modeling analysis in the FEIS uses multiple sources of data to measure the quantity of water in the watershed and potential drawdowns.[29] Bartell misconstrues the use of the hydrological data collected by Piteau as the sole source for baseline data. As stated in Lithium Nevada's Baseline and Model Workplan, the data collected by Piteau was used to build upon previous investigations such as the data collected by Western Lithium and the State of Nevada. This previously collected data, in addition to the data collected by Piteau, was incorporated into Piteau's numerical groundwater model that established the average baselines.[30] This is why, as BLM explained,[31] data collected by Piteau at the wrong locations is still useful for the model. From those multiple sources, Piteau was able to model accurate baselines and predict impacts of

---

[28] *See* TPEIS-0076, AR-008498 and AR-008504 (showing pictures of diffuse spring flow and riparian vegetation at SP-035 and SP-042 with no evidence of focused surface flow from perennial springs for measurement).

[29] *See* TPEIS-0054, Piteau Report Baseline Data Sources (AR-005703-4); TPEIS-0384, FEIS Map of Model of Potential Maximum Groundwater Drawdown from Proposed Action (AR-0045714).

[30] TPEIS-0054, Lithium Nevada Corp. Baseline and Model Workplan (AR-005704).

[31] TPEIS-1411, BLM Email commenting on errors in Piteau data collection.

the Project on water resources.

Unlike in *ONDA v. Jewell*, Bartell has not proven that the baseline data is so severely erroneous as to be a NEPA violation.[32] There, the Ninth Circuit found that BLM had impermissibly extrapolated baseline data from two sites to conclude that sage-grouse did not exist in the project area and vacated a wind energy project due to that erroneous baseline. *Or. Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 570 (9th Cir. 2016). There, the baseline used in the EIS indicated a lack of sage-grouse despite evidence in the record of sage-grouse presence. Here, the record accurately portrays the baseline through field descriptions from individual water resource site visits. While there are seasonal differences that the model accounts for using multiple data sources, Bartell has failed to show that the baseline is erroneous. BLM established the baseline conditions using its knowledge of the area and expertise. This Court should decline Bartell's repeated invitation in its "Facts Sections D, E, F, and J" to flyspeck BLM's scientific analysis when the record shows the observed conditions are consistent with the baseline reported to the public in the FEIS.

### C.   BLM adequately analyzed mitigation measures for the Project.

Bartell's mitigation argument[33] depends on the Court finding inaccuracies in the baseline data which, for the reasons explained above, it cannot and should not do. Bartell's mitigation arguments also fail because BLM appropriately analyzed proposed actions to mitigate the impacts of the Project in the FEIS at Appendix P. NEPA "requires only that an EIS contain 'a reasonably complete discussion of possible mitigation measures,'" and "does not require an agency to formulate and adopt a complete mitigation plan" before project approval. *N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 979 (9th Cir. 2006) (quoting *Robertson*, 490 U.S. at 352). Under the monitoring plan, Lithium Nevada would extensively monitor groundwater

---

[32] Bartell Reply 27 n.43.

[33] Bartell Reply 28-30.

levels between the Project and the Montana Mountains both during and after mining operations. If monitoring shows that pre-determined impact thresholds are met, that would trigger further mitigation efforts.[34] This plan is subject to final approval through a Water Pollution Control Permit issued by Nevada Department of Environmental Protection, which is delegated primacy from the United States Environmental Protection Agency (EPA) on water-quality compliance.

Bartell's argument about possible drawdowns during exploratory drilling once again misconstrues flow rates as the only determining measurement of a perennial water resource.[35] As described in the mitigation plan, impacts from exploratory drilling and the production well will be monitored for changes in standing water or vegetation, and if functionality or water rights are affected then a mitigation action may be taken.[36] The mitigation plan also contains actions to address potential impacts to wildlife such as creating noise buffer areas between the Project and known populations of sage-grouse.[37] Because the FEIS contains more than a "reasonably complete discussion of possible mitigation measures," it satisfies the requirements of NEPA, and Plaintiffs claims should be denied. *N. Alaska Env't Ctr.,* 457 F.3d at 979.

### D. BLM has complied with its public disclosure requirements

BLM provided public notice of NEPA–related meetings and made the environmental documents and analysis publicly available in accordance with its regulations. 40 C.F.R. § 1506.6. It issued its Notice of Intent to prepare an EIS on

---

[34] TPEIS-0384, FEIS at 4-24 (AR-045572). The monitoring and mitigation plan includes mitigation options to support surface water features in the Montana Mountains, including at spring locations for the benefit of wildlife, as well as Pole Creek and the nearest stockwater well that could be impacted TPEIS-0711, FEIS App'x P, Part 1 at 154, 157–58 (AR-066297, AR-066300–01).

[35] Bartell Reply 29-30.

[36] TPEIS-0384, FEIS Appendix P (AR-047872).

[37] TPEIS-0384, FEIS App'x N at N-17 (AR-046487).

January 21, 2020.[38] It then engaged in a scoping period, during which it held public scoping meetings.[39] It then made the DEIS available to the public for comment on July 29, 2020, and held two additional public meetings in August 2020.[40] BLM made the FEIS available on December 4, 2020[41] and considered comments submitted during the ensuing 30-day review period. During that period, BLM received several additional comments on the FEIS, including from Bartell, NDOW, and the EPA, which BLM duly evaluated in compliance with NEPA.[42]

Notwithstanding the above, Bartell contends that BLM violated NEPA's public involvement requirements by not disclosing the Biological Assessment or the mitigation plan prior to issuing the FEIS. But that argument fails because the law did not require an earlier disclosure of either document.[43] First, the Endangered Species Act (ESA) does not require public involvement in the Section 7 consultation process. *San Luis & Delta-Mendota v. Jewell,* 747 F.3d 581, 649 (9th Cir. 2014) ("[T]he ESA's Section 7 consultation process fails to provide for public comment in the same way that NEPA does." (citation omitted)). And Bartell has not rebutted Federal Defendants' explanation that no law or regulation required public disclosure of the Biological Assessment itself (a component of the ESA Section 7 consultation process), so long as the relevant *environmental information* was presented to the public—as it was here.[44] Second, Bartell has not identified any information in the Biological

---

[38] TPEIS-0126, 85 Fed. Reg. 3413 (Jan. 20, 2020) (AR-017867)

[39] TPEIS-0142, Public Scoping Report (AR-019130-019221).

[40] TPEIS-0458, Notice of Availability of the Draft Env't Impact Statement, 85 Fed. Reg. 45,651 (July 29, 2020).

[41] TPEIS-0696, 85 Fed. Reg. 78,324 (Dec. 4, 2020).

[42] TPEIS-0448 at AR-052467.

[43] Bartell Reply 13, 32–34.

[44] *See* Fed. Defs.' Opp'n 30-31.

Assessment that was not included in the EIS. Bartell only mentions in passing "how[ ] LCT could be impacted,"[45] but the EIS evaluated that issue—and concluded that LCT habitat would likely not be affected.[46] Because BLM's discussion of that information in the EIS satisfies NEPA's public notice requirements, *Cascadia Wildlands v. U.S. Forest Serv.*, 937 F. Supp. 2d 1271, 1277 (D. Or. 2013), Bartell has not demonstrated that BLM failed to comply with NEPA by not publishing the Biological Assessment before the ROD issued.

Further, BLM's analysis of monitoring and mitigation in the FEIS satisfied the hard-look requirement of NEPA. Bartell contends that the additional mitigation proposals included in the administrative record needed to be published before the ROD issued.[47] But, as the Ninth Circuit Court of Appeals acknowledged in *Japanese Village,* "an agency need not supplement an EIS every time new information comes to light after the EIS is finalized." 843 F.3d 445, 459 (9th Cir. 2016). Here, BLM provided addition mitigation proposals after the FEIS was published based on feedback from the comments received by the agency, but reasonably did not provide a specific post-FEIS comment period for those proposals or otherwise conduct supplemental environmental analysis of those proposals. "To require [additional time for comments] would render agency decision-making intractable, always awaiting updated information only to find the new information outdated by the time a decision is made." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 373 (1989). Rather, supplemental environmental analysis is necessary "if the new information is sufficient to show that the remaining action will 'affec[t] the quality of the human environment'

---

[45] Bartell Reply at 33.

[46] TPEIS-0384, FEIS at 4-9, 4-47, 4-53–4-55 (AR-045557, AR-045595, AR-045601–03); TPEIS-0696, FEIS App'x A Fig. 4.3-8 (AR-065488).

[47] Fed. Defs.' Opp'n at 32 (citing *Japanese Vill., LLC v. Fed. Transit Admin.*, 843 F.3d 445, 459 (9th Cir. 2016)).

in a significant manner or to a significant extent not already considered[.]" *Id.* at 374. Because the environmental information contained within both these documents already existed within the FEIS, BLM did not withhold information from the public in violation of NEPA's regulations.

### E. BLM satisfied its obligations to independently evaluate Piteau's work

The record demonstrates that BLM independently evaluated Piteau's work and exercised the requisite oversight. NEPA regulations provide that "[i]f an agency requires an applicant to submit environmental information for possible use by the agency in preparing an environmental impact statement, . . . [t]he agency shall independently evaluate the information submitted and shall be responsible for its accuracy." 40 C.F.R. § 1506.5(a) (2020). The regulations further require that, if an agency uses a contractor to prepare an EIS, the agency "shall independently evaluate the [EIS] prior to its approval and take responsibility for its scope and contents."[48] *Id.* § 1506.5(c). Bartell argues that the BLM did not independently evaluate Piteau's data because the BLM did not visit the streams that Piteau measured or recreate its measurements.[49] Nothing in the law requires the BLM to do so. To the contrary, "the purpose of the regulation is that 'acceptable work not be redone.'" *Ctr. for Food Safety v. Vilsack*, 844 F. Supp. 2d 1006, 1023 (N.D. Cal. 2012), *aff'd*, 718 F.3d 829 (9th Cir. 2013).

Instead, BLM must independently evaluate the EIS prior to its approval and take responsibility for its scope and contents. *Id.* § 1506.5(a) and (c). And the record contains ample evidence that BLM did so.[50] BLM participated in a series of

---

[48] Notably, Bartell has not brought any claim challenging BLM's oversight of the EIS process or asserting a violation of 40 C.F.R. § 1506.5.

[49] Bartell Reply 8-9, 29-32

[50] TPEIS-1022 at AR-094719–20; TPEIS-1061 at AR-095479 (providing comments on the hydrological impacts report); TPEIS-1205 (providing comments on addendum

presentations and calls concerning Piteau's work.[51] And the record shows that BLM saw substantive improvement over time with respect to the water resources analysis.[52] Even the document that Bartell cites for the contrary proposition supports the fact that BLM *did* independently evaluate Piteau's work. And Bartell's alleged minor discrepancies in the data are at most harmless error that did not materially affect the outcome of the NEPA process.[53] *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 659 (2007).

BLM had several meetings with Piteau to discuss its work and provide constructive feedback, which was more than was done in *Sierra Club v. Van Antwerp*, 709 F. Supp. 2d 1254, 1265 (S.D. Fla. 2009), *aff'd*, 362 F. App'x 100 (11th Cir. 2010). This evaluation and iterative process is distinguishable from *Sierra Club*, where the agency adopted without further evaluation the permit applicants' report on the non-viability of alternative mining sites and evaluation of the environmental consequences of mining at those sites. While BLM did not conduct independent visits to the sites studied by Piteau, it did evaluate Piteau's work. Moreover, none of the cases cited by Bartell—all of which found the agency's oversight sufficient—required the agency to repeat any measurement of data already acquired by a contractor. *See Lange v. Brinegar*, 625 F.2d 812, 818–19 (9th Cir. 1980); *Airport Impact Relief, Inc. v. Wykle*, 192 F.3d 197, 208 (1st Cir. 1999); *City of Roseville v. Norton*, 219 F. Supp. 2d 130, 166

---

to water quantity and quality impacts report); TPEIS-1131 at AR-097595–95 ("Dan Erbes (BLM geohydrologist) and Patrick Plumlee (hydrology/geochemistry subcontractor to ICF) have been working with Piteau and [Lithium Nevada] with regard to these baselines as well as the issues with the modeled affects on water quality and quantity . . . .").

[51] TPEIS-0986; TPEIS-1013; TPEIS-1072.

[52] TPEIS-1330 at AR-101586 ("The revised water resources section in the 6/19/2020 Thacker Pass ADEIS constitutes a vast improvement over the previous version and I only have a few comments . . . .").

[53] Bartell Reply at 13-14.

---

(D.D.C. 2002), *aff'd*, 348 F.3d 1020 (D.C. Cir. 2003).

Finally, in challenging BLM's independent evaluation of Piteau's work, Bartell attempts to create a new claim of "scientific integrity" out of whole cloth.[54] But he offers no compelling authority supporting it. To the contrary, BLM duly evaluated Piteau's work and determined it was satisfactory for BLM's professional and scientific standards. It is not the Court's role to adjudicate the intricacies of data collection or BLM's scientific analysis. Rather, "[b]ecause analysis of scientific data requires a high level of technical expertise, courts must defer to the informed discretion of the responsible federal agencies." *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1301 (9th Cir. 2003). Bartell's allegations that the data suffers from "errors or insufficiencies"[55] are unfounded and his invitations to dissect the agency's analysis are unnecessary. The record shows that, pursuant to NEPA, BLM took a hard look at the impacts of the Project and made a reasonable decision based on the record before it. Therefore, the decision should be upheld and Bartell's motion denied.

## II.   BLM's approval of the Project complied with FLPMA

Finally, Bartell argues that BLM violated FLPMA by not: (1) applying certain RMP provisions to the Project or (2) determining mining claim validity before approving the Mining Plan. Bartell has not carried its burden of demonstrating any violation of FLPMA on either basis.

### A.   FLPMA does not require mining operations to comply with the RMP provisions Bartell asserts

As Federal Defendants have explained, FLPMA does not allow BLM to withdraw lands from operation of the Mining Law through the land-use planning process. *See* 43 U.S.C. § 1712(e)(3). Even Bartell acknowledges that "public lands

---

[54] Bartell Reply at 19-20.

[55] Bartell Reply at 23.

may only be removed from the operation of the Mining Law pursuant to 43 U.S.C. § 1714," which involves a decision-making process distinct from the land-use-planning process.[56] Federal Defendants' argument is thus not, as Bartell frames it, that RMPs are some sort of "'amendment' of the Mining Law," but rather that FLPMA treats land-use planning and withdrawals as separate processes. And applying the two specific location-based RMP provisions that Bartell asserts would have operated to remove lands from operation of the Mining Law through the RMP process because they would have precluded any operations from occurring on those lands.

Bartell first asserts that BLM should have required the Project to comply with MD SSS 1 of the 2015 ARMPA, under which BLM would work with the project proponent to "locate the [project] outside" of priority sage-grouse habitat or general sage-grouse habitat if possible.[57] But as BLM explained in addressing this provision, "[o]re bodies are in place and not flexible in terms of location."[58] So requiring Lithium Nevada to re-site the Project outside of sage-grouse habitat, as Bartell wants, would *in effect* close those lands—and all sage-grouse habitat—to any activity under the Mining Law, which BLM cannot do through application of a land-use plan. Nonetheless, as BLM further explained, Lithium Nevada "worked with the BLM to avoid effects of human activity on GRSG and habitat," and described the efforts undertaken to reduce potential effects on sage-grouse and their habitat.[59]

The same argument prevents Bartell from succeeding on its claim that BLM should have required the project to comply with the visual-resource management (VRM) designations of the Winnemucca RMP.[60] Requiring such compliance here

---

[56] Bartell Reply 35.

[57] Bartell Reply 36 n.56 (citing TPEIS-0384, FEIS at N-5 (AR-046475)).

[58] TPEIS-0384, FEIS at N-5 (AR-046475).

[59] TPEIS-0384, FEIS at N-5 (AR-046475).

[60] *See* Bartell Opening Mot. for Summ. J. 39 ; Bartell Reply 36.

would effectively bar the operations[61]—thus removing the lands from operation of the Mining Law through application of a land-use plan, which FLPMA prohibits BLM from doing. BLM has made reasonable attempts to meet the VRM objectives and minimize the visual impacts of the mining project, which satisfy FLPMA's requirements. *See S. Fork Band v. U.S. Dep't of Interior*, 643 F. Supp. 2d 1192, 1211 (D. Nev. 2009), *rev'd on other grounds*, 588 F.3d 718 (9th Cir. 2009) (declining to preliminarily "second-guess the agency's weighing of the compliant and noncompliant visual resource areas in light of its experience and expertise"). BLM thus has not violated FLPMA through not requiring the Project's compliance with VRM designations or amending the Winnemucca RMP. Neither of the cases Bartell cites alters this analysis.[62]

Finally, as Federal Defendants have explained, the provisions of the Winnemucca RMP and the 2015 ARMPA are mandatory only for discretionary actions—*i.e.*, actions that BLM has decided through the land-use planning process to allow and that BLM may refuse to authorize even if not required to prevent "unnecessary or undue degradation."[63] Disapproval of a plan of operations is not such an action. To the contrary, BLM's regulations do not afford it discretion to disapprove

---

[61] *See* TPEIS-0384, FEIS at 4-98–4-107 (AR-045646–55) (describing effects on visual resources).

[62] *See* Bartell Reply 36. Neither *Cloud Found. v. U.S. Bureau of Land Mgmt.*, No. 3:11-CV-00459-HDM, 2013 WL 1249814, at *10 (D. Nev. Mar. 26, 2013) (wild-horse management), nor *Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, No. 2:10-CV-01331-SU, 2014 WL 4832218, at *26 (D. Or. Sept. 29, 2014) (grazing authorizations), addresses—let alone requires—application of RMP provisions to a locatable minerals project authorized under BLM's surface-management regulations.

[63] *See* TPEIS-0298, 2015 ARMPA at 2-30 (AR-037782) (clarifying that with respect to actions involving locatable minerals, certain management objectives apply "to the extent allowed by law"); TPEIS-0226, Winnemucca RMP at 2-52 (AR-033676) (defining "Discretionary Actions" to "include livestock grazing, mineral leasing, and some lands actions.").

a plan of operations for failure to comply with a land-use plan. *See* 43 C.F.R. § 3809.411(d)(3).

### B. BLM did not—and was not required to—determine mining claim validity.

Finally, Bartell now challenges BLM's compliance with FLPMA on grounds that BLM did not make a validity determination before approving the Project.[64] As an initial matter, Bartell waived this argument because he did not develop it in his opening brief.[65] *See Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994) (issues not "argued specifically and distinctly in a party's opening brief" are waived). Even were it not waived, it does not entitle Bartell to summary judgment.

First, Bartell cites to no provision of BLM's regulations imposing a requirement for BLM to determine that Lithium Nevada possessed valid mining claims before approving the Project. *But see* 43 C.F.R. § 3809.100 (requiring BLM to verify mining claim validity only on withdrawn lands). Bartell nevertheless bases this argument on the Ninth Circuit's recent decision in *Center for Biological Diversity v. U.S. Fish & Wildlife Serv. ("Rosemont")*, 33 F.4th 1202, 1219 (9th Cir. 2022), which is distinguishable from this case.

The Ninth Circuit there concluded that, "[i]f no valuable minerals have been found on the land," the Mining Law "gives no right of occupation beyond the temporary occupation inherent in exploration." *Id.* at 1219 (analyzing 30 U.S.C. § 22). Bartell has brought no claim challenging a lack of compliance with the Mining Law itself, as plaintiffs did in *Rosemont*.[66] Rather, in his only potentially relevant claim

---

[64] Bartell Reply 36–38.

[65] *See* Fed. Defs.' Reply 33, ECF No. 238 (noting lack of development).

[66] *See* First Am. Compl. ¶¶ 51–55 (Count 1 asserting only NEPA violations); *id.* ¶¶ 56–59 (Count 2 asserting only FLPMA violations), No. 3:21-cv-80-MMD, ECF No. 28; *compare* Compl. ¶¶ 218–19 (Claim 4), No. 4:17-cv-576-RCC, ECF No. 1 (Filed Nov. 27, 2017).

for relief, Bartell alleged only that BLM violated FLPMA through "[e]rroneously assuming or concluding that all or some of FLMPA's [sic] requirements, including violations of the RMP, do not apply based on the proposition that LNC possesses 'valid existing rights' without adequate evidence demonstrating that such rights exist as to all or portions of the project area."[67] Bartell has not challenged the Exploration Plan at all under this theory.[68]

    As explained above, BLM did not apply the RMP provisions that Bartell relies on because it was not required to do so—and lacked discretion to do so—where requiring compliance with the RMP provisions would effectively withdraw the lands in question from operation of the Mining Law in *violation* of FLPMA. Put differently, application of the RMP provisions depends on whether those provisions are consistent with applicable law, not on whether Lithium Nevada possessed "valid rights," and so BLM did not need to engage in a "valid rights" analysis.[69] Importantly here, in rendering its decision in *Rosemont*, the Ninth Circuit did not address consistency with FLPMA, its land use planning provisions, or approvals under

---

[67] First Am. Compl. ¶ 58(e).

[68]  The challenged Record of Decision (ROD) approved two separate plans: a Mining Plan of Operations and an Exploration Plan of Operations. ROD, TPEIS-0452 at 1–2 (AR-052517–18). No part of the Ninth Circuit's decision purports to require such discovery of a valuable mineral deposit or a validity determination before approving surface use for *exploratory* purposes. *See Rosemont*, 33 F.4th at 1209.

[69]Even assuming that *Rosemont* applied here and BLM was required to assess the validity of Lithium Nevada's mining claims in approving the Project, the record here contains evidence supporting the potential for valuable minerals—lithium—throughout the Thacker Pass basin. Bartell acknowledges the FEIS's recognition that there is "[l]ithium mineralization" in the "lacustrine sediments of the McDermitt Caldera." Bartell Reply at 37 (citing TPEIS-0384 at page 579, which is the same as TPEIS-0702, FEIS App'x G at AR-065693). Even if the record contained conflicting evidence about the viability of extraction, at most, that the Court should not make a determination—as the Ninth Circuit did—that Lithium Nevada's claims are *invalid*. Rather, if it finds any error on this basis, it should remand the decision to BLM to make the appropriate findings and determinations in the first instance.

BLM's subpart 3809 regulations promulgated under FLPMA. And Bartell has not identified any other requirement of FLPMA that BLM has allegedly not complied with on this basis. Thus, Bartell's FLPMA arguments should be rejected.

## CONCLUSION

For the reasons set forth above, BLM's approval of the Thacker Pass project complied with applicable law and was not arbitrary or capricious. Plaintiffs have not carried their burden of demonstrating otherwise. The Court should therefore deny Plaintiffs' motion for summary judgment and grant Federal Defendants' motion.

Respectfully submitted this 11th day of August, 2022.

TODD KIM
Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Div.

 /s/ Leilani Doktor
LEILANI DOKTOR (HI Bar 11201)
ARWYN CARROLL (MA Bar 675926)
MICHAEL ROBERTSON (VA Bar 80866)
Trial Attorney
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Phone: 202-305-0465
Fax: 202-305-0506
arwyn.carroll@usdoj.gov
leilani.doktor@usdoj.gov
michael.robertson@usdoj.gov

*Attorneys for Federal Defendants*