1   Laura K. Granier (SBN 7357)
    Jessica L. Freitas (SBN 16079)
2   HOLLAND & HART LLP
    5441 Kietzke Lane, Suite 200
3   Reno, NV 89511-2094
    (775) 327-3000
4   (775) 786-6179 fax
    lkgranier@hollandhart.com
5   jlfreitas@hollandhart.com

6   Hadassah M. Reimer, Esq (Wyo. Bar No. 6-3825)
    *Admitted Pro Hac Vice*
7   Holland & Hart LLP
    P.O. Box 68
8   Jackson, WY 83001
    Tel: 307-734-4517
9   hmreimer@hollandhart.com
    *Attorneys for Defendant-Intervenor*
10  *Lithium Nevada Corp.*

11

12                **UNITED STATES DISTRICT COURT**

13                     **DISTRICT OF NEVADA**

14   BARTELL RANCH, LLC, et al.,              | *Lead Case:*
                                              | **Case No. 3:21-cv-00080-MMD-CLB**
15                          Plaintiffs,
                                              |
16   v.                                       | **LITHIUM NEVADA CORP.'S REPLY
                                              | IN SUPPORT OF ITS CROSS MOTION
17   ESTER M. McCULLOUGH, et al.,             | FOR SUMMARY JUDGMENT**

18                          Defendants,
     and
19   LITHIUM NEVADA CORP.,

20                   Defendant-Intervenor.

21

22          Defendant-Intervenor Lithium Nevada Corp. ("Lithium Nevada") files this reply in

23   support of its cross motion for summary judgment, ECF 242, responding to the Plaintiffs'

24   Western Watersheds Project ("WWP"), Great Basin Resource Watch ("GBRW"), Basin and

25   Range Watch ("BRW"), and Wildlands Defense ("WD", collectively "ENGOs"), arguments

26   filed in opposition.[1] ECF 264.

27   _____

28   [1] Terms and acronyms that are used or capitalized but not defined in this Reply shall have the
     same meanings assigned to them within the counter motion.

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

1

**TABLE OF CONTENTS**

I.      Introduction……………………………………………………………..1

II.     Argument – FLPMA……………………………………………...........1-17

        A.      BLM Complied with FLPMA, BLM Regulations
                & the RMP……………………………………………………...1-10

                1.      *Rosemont* Does Not Apply on Mineralized
                        BLM Lands……………………………………………….2-4

                2.      *Earthworks*—Not *Rosemont*—Is the Relevant
                        Precedent…………………………………………....……….5

                3.      BLM Regulations Govern Surface Use and Occupancy
                        at Mining Projects under FLPMA……………….……………5-7

                4.      The Plain Language of the RMPA FEIS Exempts
                        "Locatable Mineral Development"………………………..7-8

                5.      ENGOs' Approach Contravenes Acts to Address
                        the Domestic Needs for Critical Minerals…………………..8-10

        B.      The ROD Complies with FLPMA and the RMPA…………...........10-17

                1.      BLM Ensured Mitigation for Sage Grouse ("GSG")
                        Habitat………………………………………………….11-12

                2.      The RMP's VRM Standards are Guidelines for
                        Decisoin-making……………………………………….12-13

                3.      BLM Prevented UUD to Sensitive Species……………….13-15

                4.      BLM Ensured no UUD to Groundwater…………………..15-17

                5.      BLM Ensured no UUD of Air Quality……………….....…17

III.    Argument – NEPA…………………………………………………….17-25

        A.      BLM Analyzed and Complied with Air Quality Standards……….17-19

        B.      BLM Analyzed Both Wildlife Baseline and Project
                Impacts to Wildlife…………………………………………….19-21

                1.      Greater Sage Grouse ("GSG"), Pronghorn,
                        & Springsnail…………………………………………….19-20

                2.      Dewatering Impacts………………………………….20-21

        C.      BLM Took a "Hard Look" at the Cumulative Impacts…………….21-23

        D.      BLM Evaluated Mitigation Measures and Adopted
                Adaptive Management……………………………………….23-25

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

i

          E.       Any Remand Should be Without Vacatur or Injunction.................25

IV.     Conclusion.......................................................................................25

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

## TABLE OF AUTHORITIES

**Case Law**:

*Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103 (1983)…………………………………17

*Best v. Humboldt Placer Mining Co.*, 371 U.S. 334, 336 (1963)…………………………...5, 6

*California v. Block*, 690 F.2d 753, 772 (9th Cir. 1982)……………………………………....23

*Cameron v. United States*, 252 U.S. 450, 460 (1920)……………………………………....4

*CBD v. Bernhardt*, 2021 U.S. Dist. Lexis 76657, *18 (D. Nev. April 21, 2021)……………..15

*CBD v. DOI*, 623 F.3d 633, 645 (9th Cir. 2010)……………………………………………...10

*Center for Biological Diversity v. U.S. Forest Service* ("Rosemont"), 33 F.4th 1202
(9th Cir. 2022)………………………………………………………………...1, 2, 3, 4, 5, 6, 7, 8, 13

*Chilkat Indian Klukwan v. BLM*, 399 F. Supp. 3d 888, 919–20 (D. Alaska 2019)…………..22

*Chrisman v. Miller*, 197 U.S. 313, 323 (1905)……………………………………………...4

*Citizens Against Casino Gambling v. Chaudhuri*, 802 F.3d 267, 287 (2d Cir. 2015)…………5

*City of Carmel-by-the-Sea v. DOT*, 123 F.3d 1142, 1153–54 (9th Cir. 1997)……………….24

*Ctr. for Biological Diversity v. Exp.-Import Bank of the U.S.*, 2014 U.S. Dist.
LEXIS 111762, at *19 (N.D. Cal. Aug. 12, 2014)…………………………………………….2

*Earthworks v. DOI*, 496 F. Supp. 3d 472 (D.D.C. 2020)…………………………….5, 10, 14

*Fusion IV Pharms. v. Becerra*, 2018 U.S. Dist. LEXIS 119322, at *12
(C.D. Cal. July 16, 2018)…………………………………………………………………13, 16

*Great Basin Res. Watch v. BLM*, 844 F.3d 1095, 1107 (9th Cir. 2016)……………17, 23, 24

*Irvington Moore v. OSHRC*, 556 F.2d 431, 435 (9th Cir. 1977)………………………….7

*Japanese Village v. FTA* 843 F.3d 445, 461 (9th Cir. 2016)……………………………….24

*Koenig*, 4 IBLA 18, 19, 21 (1971)…………………………………………………………8

*Marsh v. Ore. Nat. Res. Council*, 490 U.S. 360, 378 (1989)……………………………… 21

*Mont. v. Haaland*, 29 F.4th 1158, 1177 (9th Cir. 2022)…………………………………….25

*MPC v. Norton*, 292 F. Supp. 2d 30, 49 (D.D.C. 2003)…………………………………….14

*Nat'l Family Farm Coal. v. EPA*, 966 F.3d 893, 930 (9th Cir. 2020)………………………..25

*Native Ecosystems Council v U.S.,* 428 F.3d 1233, 1244 (9th Cir. 2005)………….……….21

*Nw. Env't Advocates v. EPA*, 2005 U.S. Dist. LEXIS 5373, at *24-25
(N.D. Cal. Mar. 30, 2005)…………………………………………………………………….2

*ONDA v. Rose*, 921 F.3d 1185 (9th Cir. 2019)……………..…………………………24

*Pac. Rivers v. United States*, 942 F. Supp. 2d 1014, 1018 (E.D. Cal. 2013)………………….25

*Peeler v. State Farm*, 2022 U.S. Dist. LEXIS 5911, at *14 (D. Nev. Jan. 12, 2022)…15, 21, 24

*Protect Our Cmtys. Found. v. Jewell*, 825 F.3d 571, 582 (9th Cir. 2016)…………………24

*S. Fork Band Council of W. Shoshone v. DOI*, 2012 U.S. Dist. LEXIS 988, *21–*22
(D. Nev. Jan. 4, 2012)…………………………………………………………………………13

*S. Fork Band Council of W. Shoshone v. DOI*, 588 F.3d 718, 725 (9th Cir. 2009)…….……13

*Selkirk Conservation All. v. Forsgren*, 336 F.3d 944, 958 (9th Cir. 2003)…………………22

*Spotted Owl v. Hodel*, 716 F. Supp. 479, 483 (W.D. Wash. 1988)…………………………16

*Te-Moak Tribe of W. Shoshone of Nev. v. DOI*, 608 F.3d 592, 605 (9th Cir. 2010)………..…22

*Tri-Valley CAREs v. DOE*, 671 F.3d 1113, 1124 (9th Cir. 2012)……………………………18

*United States v. Richardson,* 599 F.2d 290, 294 (9th Cir. 1979)……………………………7

*United States v. Vallee*, 677 F.3d 1263, 1265 (9th Cir. 2012)……………..……………5 14, 23

*United States v. Coleman*, 390 U.S. 599, 600–01 (1968)…………………………………4

*United States v. Nogueira*, 403 F.2d 816, 824 (9th Cir. 1968)……………………………5

*United States v. Shumway*, 199 F.3d 1093, 1103 (9th Cir. 1999)……………….…..…………4

*W. Shoshone Def. Project*, 160 IBLA 32, 55–56 (2003)…………………………………8

*W. Watersheds Project v. Bernhardt*, 519 F. Supp. 3d 763, 778 (D. Idaho 2021)……………11

*W. Watersheds Project v. BLM*, 2011 U.S. Dist. LEXIS 50056, at *8
(D. Nev. Apr. 28, 2011)……………………………………………………………………16

*Western Exploration LLC v. United States*, 250 F. Supp. 3d 718, 750 (D. Nev. 2017)..9, 14, 15


**Regulations**

30 U.S.C. § 1602(7)……………………………………………………..………………9
30 U.S.C. § 1602(8)…………………………………………………………………………9
30 U.S.C. § 28j(c)…………………………………………………………………………5
30 U.S.C. § 42(a)……………………………………………………………………………3
 30 U.S.C. § 1602…………………………………………………………………………9
30 U.S.C. § 21a…………………………………………………………………………9
 30 U.S.C. § 42……………………………………………………………………………4
30 U.S.C. § 612(a)…………………………………………………………………………8
43 C.F.R. § 3809.420…………………………………………………………………14
43 C.F.R. § 3715.0……………………………………………………………………5, 6

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

iv

43 C.F.R. § 3809.415(a)……………………………………………………14
43 C.F.R. § 3809.420……………………………………………………….13
43 C.F.R. § 3809.420(a)(3)………………………………………………...10
43 C.F.R. § 3809.420(a)(3)………………………………………………...13
43 C.F.R. § 3809……………………………………………………………14
43 C.F.R. § 3809.100………………………………………………………...6
43 C.F.R. Part 3800………………………………………………………5,6
43 C.F.R. Part 3809………………………………………………………5, 6
43 U.S.C. § 1712(e)(3)……………………………………………………... 6
61 Fed. Reg. 37116, 37118 (July 16, 1996)……………………………...6,8
65 Fed. Reg. 69998, 70052 (Nov. 21, 2000)………………………………13
66 Fed. Reg. 54834, 54845 (Oct. 30, 2001)……………………...…10, 13
83 Fed. Reg. 46451, 46457 (Sept. 13, 2018)……………………………….6

**Legislation**

H.R. 5376, 117th Cong. §§ 13401, 13502 (passed by Senate, August 7, 2022)………………..9
Infrastructure Investment and Jobs Act, 2021 Enacted H.R. 3684, 117 Enacted
H.R. 3684, Part 2 of 3, §40206(b)(3)……………………………………………...9
P.L. 116-260, Div. Z, Title VII, § 7002(b)(1), (m)(2), 134 Stat. 2563, 2576………………….9

**Other Materials**

Expand Domestic Critical Mineral Supply Chains, DOE (Aug. 2022),
https://bit.ly/3JNh5c3……………………………………………………………25

Global Supply Chains of EV Batteries, IEA 3, 18 (July 2022), https://bit.ly/3P9MgiJ ………….9, 25

Pet. for Hardrock Mining Rulemaking, Attach. 5 at 4 (2022),
https://www.regulations.gov/document/DOI-2022-0003-14647 ………………………2

U.S. Gov't Accountability Off., GAO-20-461R, Department of Interior: Mining on Federal
Lands 5 (2020) ………………………………………………………………5

19596688_v1

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

# I. Introduction

ENGOs' reliance on the *Center for Biological Diversity v. U.S. Forest Service ("Rosemont")*, 33 F.4th 1202 (9th Cir. 2022) is misplaced and inaccurate. The *Rosemont* Court did not consider FLPMA, the RMP applicable here, BLM's regulations, or a project such as Thacker Pass with known mineralization throughout the Project area. ENGOs' alleged errors under FLPMA rest on a fundamental misunderstanding of BLM's authority under Federal law governing locatable mining projects. ENGOs' remaining NEPA arguments repeat their initial motion with no response to Lithium Nevada's detailed arguments; none undermine the robust "hard look" analysis in the FEIS (TPEIS-0384) that amply supports the ROD. The attacks on BLM's judgment calls during the Project's NEPA review merely question technical determinations left to BLM's discretion. As explained herein, the ROD should be affirmed.

# II. ARGUMENT – FLMPA

## A. BLM Complied with FLPMA, BLM Regulations & the RMP.

Based on inapplicable caselaw, ENGOs request a novel interpretation of FLPMA and a judicial repeal of BLM's regulations that is procedurally barred. The issue before this Court is whether BLM complied with FLPMA in approving exploration and use of lands with known lithium throughout the Project area to develop critical minerals to meet our Nation's needs. The outcome ENGOs seek would impermissibly repeal BLM's longstanding regulations that differ substantially from those at issue in *Rosemont*, where the Court remanded the case for the Forest Service to determine whether its mining regulations apply. ENGOs argue BLM was required to determine claim validity but ignore that BLM's regulations do not require a validity determination on the Project lands and that the Court defers to BLM's interpretation of the Mining Law—particularly where that interpretation reflects Congressional intent to refrain from requiring such a determination for permitting decisions. ECF 242 at 4–6. ENGOs do not respond to Lithium Nevada's observation that they do not directly challenge BLM's regulations and any such claim is waived. ECF 242 at 4 & n.5. Any direct challenge[2] to BLM's regulations are time-

---

[2] ENGOs seek different relief in this case than in their currently pending petition before DOI to amend the regulations they ask this Court to revise. ECF 242 at 5 n.7. The petition states its

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

barred under the statute of limitations. *Ctr. for Biological Diversity v. Exp.-Import Bank of the U.S.*, 2014 U.S. Dist. LEXIS 111762, at \*19 (N.D. Cal. Aug. 12, 2014) ("facial challenge to the validity of an agency's regulation on the ground that the agency exceeded constitutional or statutory authority … must be brought within six years after publication ….").[3]

The *Rosemont* decision applies to National Forest System lands and does not apply to projects on mineralized BLM lands because the agencies have different rules and statutory authorities governing surface uses at locatable mining projects. The *Rosemont* Court ruled that the Forest Service erroneously assumed the mining claims where waste rocks and tailings were to be stored were valid where that "assumption [was] contradicted by the evidence." Here, BLM did not "assume" mining claim validity because BLM's regulations are clear it had no authority to evaluate claim validity for a proposed Mine Plan of Operations ("MPO") because the subject lands are neither segregated nor withdrawn from mineral entry. 43 C.F.R. § 3809.100. Based on inapplicable caselaw pertaining to unlawful, non-mining uses of mining claims or disputes between rival locators, and a different statutory and regulatory framework governing mining projects on Forest Lands, ENGOs request a novel and incorrect interpretation of FLPMA.

### 1.     Rosemont Does Not Apply on Mineralized BLM Lands

Contrary to the undisputed evidence in Rosemont that "no valuable minerals have been found"—the record here is replete with evidence of widespread lithium mineralization across the entire Project area.[4] ECF 242 at 6–10. ENGOs ignore Lithium Nevada's record evidence of this

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

---

"proposed language does not require that a full claim validity examination be conducted by BLM for every plan of operations," *Pet. for Hardrock Mining Rulemaking*, Attach. 5 at 4 (emphasis in original), https://www.regulations.gov/document/DOI-2022-0003-14647, arguing for "at least a preliminary inquiry" into mineralization. *Id.*

[3] ENGOS are not making an "as applied" challenge of BLM's regulation because ENGOs "are directly challenging the validity of [BLM's] regulation itself. They contend the regulation violates the [Mining Law] because it 'unlawfully exempts [agency] actions [approving mining projects] from" the Mining Law's valid mineral deposit "requirements." *Id.* at \*20–21. ENGOs are therefore making an untimely facial challenge to BLM's regulations that must be dismissed. *Cf. Nw. Env't Advocates v. EPA*, 2005 U.S. Dist. LEXIS 5373, at \*24-25 (N.D. Cal. Mar. 30, 2005) (allowing "as applied" challenge where plaintiffs brought a petition to EPA requesting rescission of the regulation" and the EPA rejected it allowing the Court to review the arguments).

[4] Citing evidence of mineralization is not a post-hoc rationalization. BLM addressed mineralization in the context of moving the project to avoid GSG habitat. FEIS AR045517 ("The

2

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

and focus on a single figure from a 2018 Pre-Feasibility Study ("PFS") that shows some "known zones of mineralization." This does not contradict the record evidence showing mineralization throughout the Project. The PFS was prepared under Canadian National Instrument 43-101 which defines how "mineralization" is used for seeking investments in a project (including at the permitting and exploration stages). TPEIS-0234 AR033855. What the PFS identifies as "known zones of mineralization" under Securities law is not equivalent to lands identified in the that and other documents as "mineralized" under the Mining Law. This is demonstrated by the text of the PFS itself which describes drilling results showing "continuous high grade sub-horizontal … lithium across the project area." AR033885.[5]

ENGOs ignore that even in *Rosemont*, the Court only discussed some "factual basis upon which the Forest Service can determine rights." 33 F.4th at 1229. Unlike the geologic facts in *Rosemont* where lack of mineralization was "[u]ndisputed," *id.* at 1221, this Project's evidence of mineralization is substantial and includes maps, drilling results, and multiple surveys.[6] *Rosemont* does not indicate that mineralization "appear[ing] throughout" is an insufficient factual basis for BLM to recognize mineral rights,[7] and ENGOs cite no other caselaw supporting this bold jump. Notably, ENGOs *themselves* assert that their proposed amendment to BLM's regulations does not require BLM to conduct "a full claim validity examination," but just a preliminary inquiry into mineralization. Pet. Attach. 5 at 4–5.

---

objective of the 2017 exploration program was to identify a resource of scale …. [t]he results indicated a larger lithium deposit than was previously identified," changing Project location).

[5]*Id.* (further noting continuing exploration in 2018 the results of which were not available nor included in the Study); AR033936 ("Li-enriched interval is laterally extensive throughout the southern portion of the caldera"); AR033971 (Figure 14-5 showing inferred mineral resource well beyond the pit, but identifying the boundaries used to confine the scope of the analysis).

[6]ENGOs claim Lithium Nevada did "not refute" the evidence that only certain zones of the Project area are mineralized," ECF 264 at 12 n.5, but ENGOs ignore four pages discussing broad mineralization. ECF 242 at 6–10. ENGOs' cited analysis is from 2018 and does not account for further exploration and analysis that led the FEIS to conclude that lithium clay "comprises 40 to 90 percent" of the sedimentary section under the caldera lake. AR045776. ENGOs concede that Lithium Nevada demonstrated mineralization throughout the area. ECF 264 at 12.

[7]*Rosemont* says where there is **no** mineralization the solution is using a mill site for waste rock storage. *Rosemont* did not address that mill sites cannot be used where there is mineralization, as is the case here, 30 U.S.C. § 42(a) and, therefore, is inapposite under these circumstances.

3

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

Here, ENGOs rely on inapposite cases determining property rights between competing claimants as establishing a requirement for validity determination,[8] ECF 264 at 12, but neither case cited deals with MPO approvals. *Chrisman v. Miller*, 197 U.S. 313, 323 (1905) ("controversy [that] is between two mineral claimants"); *United States v. Coleman*, 390 U.S. 599, 600–01 (1968) (claim patent application). And in stark contrast to 1.9 billion tons of waste rock in *Rosemont*, 33 F.4th at 1207, the waste rock expected here is only 190 million tons, FEIS AR045799, split into two storage sites that will be re-vegetated allowing for similar pre- and post-mining use of the area, *id.* at AR045562, AR046450. While the *Rosemont* Court concluded the waste rock there could be stored on mill sites, that "solution" is inapplicable here because Lithium Nevada cannot locate mill sites on mineralized lands, 30 U.S.C. §42, and must mine waste rock incident to its mining operations, meaning under the applicable BLM regulations, the waste rock here must be stored on mining claims properly located on mineralized lands.[9]

The *Rosemont* Court did not reach the issue of whether a validity determination or (as the District Court concluded) "some consideration of mineralization" was required on mineralized lands because it was unnecessary in *Rosemont* where "[u]ndisputed evidence in the record shows that no valuable minerals have been found on Rosemont's claims." 33 F.4th at 1212. The *Rosemont* decision does not authorize, much less require, that this Court rewrite BLM's permitting and surface use regulations that were not even considered by the *Rosemont* Court.

---

[8] *But see United States v. Shumway*, 199 F.3d 1093, 1103 (9th Cir. 1999) ("It has long been established that if the applicants are in compliance with the mining laws, then their right to the unpatented claim … is vested"). Because mining claims vest due process rights, this Court cannot determine that claims are "invalid." *Cameron v. United States*, 252 U.S. 450, 460 (1920) (government "has no power to strike down any claim arbitrarily," only upon "proper notice and … adequate hearing" may the government "determine whether the claim is … invalid").

[9] ENGOs do not argue Lithium Nevada is prohibited from exploring the mining claims that will site the waste rock storage given the mineralization of those lands; as is development of those minerals. Because this will be the first mine in this newly-identified Lithium district, there is significant potential for future development, including underground mines. This is consistent with the development history of several Nevada mining districts which started as open-pit and evolved into underground mining. Placement of waste rock on the surface does not preclude future underground mining under the waste rocks or upon relocating the material.

4

2.       ***Earthworks***—not ***Rosemont***—is the Relevant Precedent[10]

ENGOs ignore the recent relevant precedent from *Earthworks v. DOI*, 496 F. Supp. 3d 472 (D.D.C. 2020), which considered an ongoing challenge to BLM's 43 C.F.R. Part 3809 Regulations and held that claims of unknown validity (that have not undergone a validity exam) must be *presumed* valid. As noted by *Earthworks*, validity determinations take years. *Id.* at 493. Imposing such a new requirement on BLM would inject unnecessary permitting delays to producing critical minerals in conflict with Congress's directives, our Nation's needs,[11] and more than forty years of BLM's application of its 3809 regulations[12] to authorize locatable mineral projects during which BLM has *not* conducted validity determinations except when required pursuant to 43 CFR § 3809.100.[13] Congress has acknowledged its agreement with BLM's regulations not requiring claim validity determinations for MPO approvals unless lands are segregated or withdrawn—had Congress disapproved, it would have required such determinations when it amended the Mining Law to require annual claims maintenance fees regardless of discovery status.[14] 30 U.S.C. § 28j(c) (1993).

3.       **BLM regulations govern surface use and occupancy at mining projects under FLPMA**

ENGOs contend that *Rosemont* "rejected the same position taken by" Lithium Nevada here, but *Rosemont* involved a challenge of the Forest Service's assumption that claims were "valid"

---

[10]Plaintiffs in *Earthworks* argued BLM must determine mining claim validity under FLPMA but the Court noted that a claim of unknown validity has rights and "the government cannot find such a claim invalid without a degree of process." *Id.* at 492. Like in *Earthworks*, this Court should reject ENGOs' alternative interpretation that would require upending sub silento "the current claim system under the Mining Law." *Id.*

[11]"If in each instance [of submission of an MPO] the government would have to await a validity determination of mining claims … the [proponent] could thus be forever kept out of" use of the land. *United States v. Nogueira*, 403 F.2d 816, 824 (9th Cir. 1968).

[12]GAO report, GAO-20-461R, shows BLM approved 589 hardrock MPOs as of September 30, 2018. Department of Interior: Mining on Federal Lands 5 (2020).

[13]*Rosemont* acknowledged BLM's exclusive jurisdiction over such adjudicatory determinations through due process proceedings. 33 F.4th at 1210. "[T]he only tribunal which … establish[es]" the validity of mining "rights against the United States as [DOI]," not the courts. *Nogueira*, 403 F.2d at 822; *Best v. Humboldt Placer Mining Co.*, 371 U.S. 334, 336 (1963).

[14]*Citizens Against Casino Gambling v. Chaudhuri*, 802 F.3d 267, 287 (2d Cir. 2015)(Congress is presumed familiar with existing law including regulations when it legislates); *U.S. v. Vallee*, 677 F.3d 1263, 1265 (9th Cir. 2012).

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

1    absent any evidence of mineralization on those claims. Because there were no known minerals

2    on the claims in *Rosemont*, 33 F.4th at 1221, the Court deemed claim validity irrelevant.

3    Furthermore, the same requirements do *not* apply to both agencies, ECF 264 at 9, because BLM

4    only considers validity for MPO approval if the project is proposed on lands segregated or

5    withdrawn from mineral entry. ECF 242 at 3–4; 43 C.F.R. §3809.100. BLM's 3809 regulations

6    discuss required MPO elements, but do not mandate a particular discovery status of the subject

7    mining claim. *Id.* Conversely, the Service does not even have regulations governing "claims that

8    embrace segregated or withdrawn lands." 83 Fed. Reg. 46451, 46457 (Sept. 13, 2018). *Rosemont*

9    considered whether the Service applied the correct regulation, Part 228A or Section 251. Here

10   ENGOs do not claim BLM should have used a different regulation—they seek to invalidate

11   BLM's regulations without ever stating such a claim in their complaint (which would be time

12   barred in any event). ECF 1 at 5. The Forest System lands in *Rosemont* were not governed by

13   specific regulations defining "use" and "occupancy for hardrock mining projects.[15] In contrast,

14   under FLPMA, BLM promulgated Surface Use and Occupancy regulations, 43 C.F.R. § 3715.0-

15   5, which define waste rock storage facilities as "use," and define "occupancy" to mean "full or

16   part-time residence on the public lands." The surface management requirements of 43 C.F.R.

17   Part 3800 govern the uses that are reasonably incident.[16] The *Rosemont* decision did not consider

18   and does not apply to BLM's regulations governing use[17] of public lands under FLPMA.

19        Nor did *Rosemont* consider or decide BLM's implementation of FLPMA. FLPMA explicitly

20   notes that "[a]ll actions by the Secretary concerned under this Act shall be subject to valid

21   existing rights." 43 U.S.C. § 1712(e)(3). Because Lithium Nevada's mineralized claims are

22   presumptively valid and do not require a validity determination, FLPMA's application does not

23

24   [15] The Forest Service is conducting a rulemaking to consider whether it should revise its
25   regulations to be more similar to BLM's surface use and occupancy regulations, highlighting the
     very different regulatory regime considered in *Rosemont* from that applicable here. 83 Fed. Reg.
26   at 46452–53.

     [16] 61 Fed. Reg. 37116, 37118 (July 16, 1996).

27   [17] Even where "[a] locator … does not carry his claim to patent" via a validity determination, the
28   locator "does not lose his mineral claim." *Best*, 371 U.S. at 336. Such determination must also
     comply with due process with "proper notice and upon adequate hearing." *Id.* at 337.

6

impair the Project or BLM's regulations. ECF 242 at 6, 11. *Rosemont* did not require a validity determination because it deemed the nonmineralized claims invalid and did not analyze the interplay between FLPMA and BLM's regulations. The Ninth Circuit recognizes the distinction between BLM's and the Service's regulations,[18] *U.S. v. Richardson*, 599 F.2d 290, 294 (9th Cir. 1979), and here the Court's only consideration (were it to question the regulations) is "whether the agency's reading of the regulations is reasonable and whether the regulations are not unduly vague." *Irvington Moore v. OSHRC*, 556 F.2d 431, 435 (9th Cir. 1977).

BLM's regulations harmonize FLPMA and other applicable Federal statutes. When Congress amended the Mining Law in the 1955 Surface Use Act, it did not limit the use of mining claims for just the mine pit but expressly allowed uses reasonably incident to mining. ECF 242 at 8.[19] The Ninth Circuit recognizes BLM's post-Surface Use Act regulations (which did not require validity determinations) as allowing any activity on BLM lands "directly related to mining."[20] *Richardson*, 599 F.2d at 294. BLM developed its Surface Use and Occupancy regulations under FLPMA and other relevant Federal laws to implement Congress' directives regarding allowable mining uses on public lands and encouraging development of critical minerals.

Under FLPMA, BLM has distinctly defined "occupancy" and "use." While the Surface Use Act ("Section 612") did not expand rights under Section 22 of the Mining Law, Section 612

---

[18] The Service contemplated changing its regulations to bring them in line with BLM's surface use regulations. 83 Fed. Reg. at 46452.

[19] While *Rosemont* discusses the Surface Use Act, 33 F.4th at 1210, it does not hold (as ENGOs urge) that mining-related use such as waste rock storage are unauthorized on mining claims with known mineralization. The Rosemont Court did not interpret Sec. 612, other than to conclude it does not grant new rights under the Mining Law because the purpose was to curb unlawful, non-mining uses of mining claims for facilities like saloons. The *Rosemont* Court did not address the harmonization of authorized use under Sec. 612 as applied to the BLM regulations governing use of mining claims. Nor did that Court address or require a validity determination at all. 33 F.4th at 1222 ("a validity determination by the BLM is irrelevant for purposes of this case").

[20] The Ninth Circuit quoted legislative history recognizing the Mining Law limited the government's control of the surface "so 'as not to Endanger or Materially interfere with prospecting, mining ... or uses Reasonably incident thereto.'" *Richardson*, 599 F.2d at 295. *Richardson* concluded that in managing surface resources the government could limit "exploitation ... 'except to the extent Required for ... uses Reasonably incident'" for mining. *Id.* Thus, use of located claims for waste rock storage as a use "reasonably incident" to mining cannot be prohibited. *Rosemont* is inapplicable because it did not interpret FLPMA and on "BLM lands…any activity is permissible which is directly related to mining or prospecting." *Id.* at 294.

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

clarified what surface uses are allowed under the Mining Law—anything "reasonably incident" to mining, 30 U.S.C.S. § 612(a). BLM thus properly applied its 3809 regulations to this Project's waste rock storage sites, as uses that are "reasonably incident and do not involve occupancy." Use and Occupancy Under the Mining Law - Final Rule, 61 Fed. Reg. 37116, 37118 (July 16, 1996). On BLM lands, occupancy is defined as "activities that involve residence" and BLM explained that occupancy in this Project would consist of a process facility, administration office, and wells—not waste rock storage. FEIS AR045839. Thus, waste rock placement on mining claims constitutes "reasonably incident" use for mining operations. *Cf. Koenig*, 4 IBLA 18, 19, 21 (1971) (roads necessary to mining activities needed "no authorization" from BLM to build); *W. Shoshone Def. Project*, 160 IBLA 32, 55–56 (2003) (rejecting plaintiff's argument that "claim validity" must be part of BLM's analysis of an [MPO]" the Board noted "BLM generally does not determine the validity of the affected mining claims before approving a plan of operations").

### 4. The Plain Language of the RMPA FEIS Exempts "Locatable Mineral Development."

ENGOs re-argue that BLM must apply every aspect of the RMP without regard to "valid existing rights"—ignoring that the 2015 RMPA FEIS itself[21] states that its "[s]tipulations *do not apply to locatable mineral development*" consistent with BLM's longstanding regulations. ECF 242, Ex. 1 at 3-139 to 3-140. ENGOs do not respond to Lithium Nevada's argument that where the RMP defines "valid existing rights" as including "mineral rights," the RMP does *not* equate "mineral rights" to "valid claims." ECF 242 at 3. ENGOs instead argue that this language represents an incorrect view of the Mining Law and point to *Rosemont*. But *Rosemont* does not address FLPMA, BLM regulations, BLM land, or RMPs at all. Nor did ENGOs bring any claim in this case challenging the RMPA, meaning such challenges are waived. ENGOs argue that BLM must enforce the RMPA, but then disregard specific portions of it they don't like. The

---

[21]ENGOs claim Lithium Nevada misleadingly contended that this language came from the ARMPA or FLPMA. This is untrue, as Lithium Nevada specifically cited to the FEIS, which expressly disclaims application to locatable mining projects.

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

RMPA is valid and controlling because this Court did not vacate the FEIS in *Western Exploration LLC v. United States*, 250 F. Supp. 3d 718, 750 (D. Nev. 2017).[22]

### 5. ENGOs' approach contravenes Acts to Address the Domestic Needs for Critical Minerals

ENGOs' novel mandate that BLM determine claim validity for MPO approvals is unfounded in statute, regulation, or caselaw, and would frustrate Congressional directives to eliminate delays in permitting critical mineral projects. In December 2020, Congress amended the National Materials and Minerals Policy, Research and Development Act of 1980 to require Federal agencies such as BLM "minimize delays in … the issuance of permits and authorizations necessary to explore for, develop, and produce critical minerals."[23] 30 U.S.C. § 1602(8). This recent Act confirmed prior directives to "promote an adequate and stable supply of materials necessary to maintain national security, economic well-being and industrial production." *Id.* §§ 1602; 21a. The Project's importance in producing lithium to meet National security and energy needs is undisputed.[24] BLM's regulations properly implement FLPMA, the Mining Law and Congress' repeated and recent directives to encourage domestic mineral development, especially for critical minerals such as lithium. ENGOs' requested relief would repeal BLM's valid regulations and frustrate past and current Congressional directives to encourage domestic mining.[25] ENGOs' requested relief would undermine Congress' directive to BLM to find efficiencies in permitting and instead bog down the process with needless delay to satisfy a judicially-created rule to determine validity prior to approval, a process that would add *years* of

---

[22]There is no purpose of a mineral withdrawal discussion in the RMPA if "valid claims" are the only permissible mining activity, because all "valid claims" survive a withdrawal. ECF 242 at 2.

[23] P.L. 116-260, Div. Z, Title VII, § 7002(b)(1), (m)(2), 134 Stat. 2563, 2576.

[24]The International Energy Agency's (IEA's) new report, "Global Supply Chains of EV Batteries" states "Lithium is the most critical metal for EVs as it has no commercially available substitute at scale." https://www.iea.org/reports/global-supply-chains-of-ev-batteries.

[25] 30 U.S.C. § 1602(7) ("It is the continuing policy of the United States to …. facilitate the … production of domestic resources to meet … critical mineral needs"); Infrastructure Investment and Jobs Act, 2021 Enacted H.R. 3684, 117 Enacted H.R. 3684, Part 2 of 3, §40206(b)(3) ("critical mineral needs of the United States should be satisfied by minerals responsibly produced and recycled in the United States"); H.R. 5376, 117th Cong. §§ 13401, 13502 (passed by Senate, August 7, 2022) (incentivizing domestic lithium mining by providing a "Clean Vehicle Credit" for those EV batteries "extracted, processed, or recycled in the U.S." and an "Advanced Manufacturing Production Credit" for critical minerals "produc[ed] in the United States").

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

9

1   delay. BLM acknowledged in a 2007 Notice of Proposed Rulemaking "validity examinations"

2   for all mining claims were impractical and that declining to do so was consistent with the Mining

3   Law and FLPMA, "[b]ecause Congress authorizes mining claimants to locate mining claims

4   under the Mining Law and maintain them by making annual payments to the BLM while the

5   validity of the claims is unknown or undetermined."[26]  *Earthworks*, 496 F. Supp. 3d at 483.

6   ## B.   The ROD Complies with FLPMA and the RMPA.

7        BLM's decision satisfied 43 C.F.R. § 3809.415(a) and mitigated the impacts of the

8   Project where possible, stopping short of denying the Project.  ROD AR052537. ENGOs claim

9   that the Court should apply BLM's new mitigation policy from a Solicitor Opinion reinstated on

10  April 15, 2022, but the policy was "revoked in 2017," before BLM commenced formal review

11  of this Project in 2019 and was not reinstated until after the ROD issued. ECF 264 at 17. ENGOs

12  present no legal basis for this Court to apply revoked policy guidance to this Project and should

13  disregard such arguments. The 2016 Opinion does not change BLM regulations or the Mining

14  Law. Nor can a Solicitor Opinion require a project be abandoned where it cannot be constructed

15  in compliance with a particular mitigation measure, because that withdraws the land from mining

16  in violation of FLPMA and ignores language in BLM's 2001 rulemaking discussion explaining

17  "total prohibition on mining activity" is "beyond the [regulatory] scope." 66 Fed. Reg. 54834,

18  54845 (Oct. 30, 2001). This Project provided mitigation in compliance with the RMPs "as

19  appropriate" while still allowing it to move forward, and that is all that FLPMA requires. *Id.*

20  § 3809.420(a)(3).[27]  BLM has limited authority to impose RMPA conditions when authorizing

21  uses under the Mining Law. This limitation stems from FLPMA, which specifies that it does not

22

23

---

24  [26]Congress' multiple amendments to FLPMA and the Mining Law since 1980 never requiring
    claim validity for permitting further demonstrate its approval of BLM's existing regulations and
25  permitting MPOs without determining claim validity. ECF 242 at 6 n.8.

26  [27]This is not a "backtrack" from prior commitments. The entire Project was relocated to avoid
    environmental impacts; BLM exerted its authority to require multiple types of mitigation and
    established monitoring requirements to prevent UUD. ENGOs' cited case is irrelevant to the
27  present consideration of the intersection of land-use plan provisions and valid existing rights.
    *CBD v. DOI*, 623 F.3d 633, 645 (9th Cir. 2010) (BLM claimed that its evaluation of a project on
28  private land would not change even if it applied NEPA to evaluate the project on public land).

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

amend the Mining Law, except in four discrete ways, none of which apply to land-use planning.[28] BLM ensured the Project complied with RMPA provisions to the extent consistent with the Mining Law. *Cf. W. Watersheds Project v. Bernhardt*, 519 F. Supp. 3d 763, 778 (D. Idaho 2021).

### 1.    BLM Ensured Mitigation for Sage Grouse ("GSG") Habitat.

ENGOs' response to Lithium Nevada's arguments regarding the Project's compliance with 3% disturbance cap, required design features ("RDFs"), lek buffers, seasonal restrictions, noise limits, and net-conservation-gain was to repeat that there is no "blanket exemption" for "valid existing rights." ECF 264 at 15. Because those arguments fail, their assertions that BLM had to impose restrictions in the RMPA that would interfere with such valid existing rights also fail. ENGOs continue to misread the RMPA's statement that activities under the Mining Law "may not be subject" to the 3% disturbance cap. TPEIS-0849, RMPA at E-2 (AR080692). Because the cap cannot interfere with valid existing rights, this use of "may not" *necessarily* is proscriptive (i.e., shall not) rather than permissive (might not). ENGOs misconstrue Lithium Nevada's and BLM's position regarding RDFs under MD SSS 1, which requires BLM to work with applicants on siting issues "whether in accordance with a valid existing right or not." Lithium Nevada explained that BLM worked with the applicant on siting, the outcome of which was reduced GSG impacts. BLM likewise explained that the project complied with MD SSS 1 (ECF 237 at 12 n.21), which is supported by the FEIS statement that, consistent with MD SSS 1, "LNC has worked with the BLM to avoid effects of human activity on GRSG and habitat." AR046475.[29]

---

[28] 43 U.S.C. § 1732(b), *see also* 43 U.S.C. § 1701, note (h).

[29] ENGOs cite, for the first time (at 20-21), RMPA provision MD MR 18, which states:
> Subject to valid existing rights … authorize locatable mineral development activity, by approving plans of operation and apply mitigation and best management practices that minimize the loss of PHMAs and GHMAs … by applying the 'avoid, minimize and compensatory mitigation' process through an applicable mitigation system, such as the Nevada Conservation Credit System ....

TPEIS-0298 AR037783. Because ENGOs have not previously cited this, their assertion (at 21) that BLM argued in its brief that it did not have to comply with MD MR 18 is wrong. The cited BLM argument referred to the net-conservation-gain standard in MD SSS 9a, which BLM explained did not apply here. ECF 237 at 15–16. And, MD MR 18 merely requires that, when approving locatable MPOs and subject to valid existing rights and applicable law, BLM must apply mitigation (which includes avoidance and minimization) and best management practices that minimize the loss of PHMAs and GHMAs. TPEIS-0298 AR037783. BLM did that here.

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

ENGOs' argument (at 21–22) about adaptive management triggers in the Lone Willow PMU continues to compare apples to oranges. The FEIS explains that the Lone Willow PMU crossed habitat and population triggers established *by the state under the state conservation plan*. ECF 242 at 11–12, FEIS AR045591. The state established a habitat "warning" based on new wildfire disturbance of 1,000 acres or more and anthropogenic disturbance; based on these warnings, an expert panel uses scientific judgment to determine if a trigger is tripped. TPEIS-0739 AR069094.[30] By contrast, the RMPA habitat triggers are based on percentages of reduction in GSG habitat. TPEIS-0849, J-7 AR080867. The FEIS's acknowledgement that a habitat trigger was crossed under the state plan does not equate to crossing an RMPA habitat trigger. And even if RMPA adaptive management triggers had been crossed, BLM correctly explained the RMPA does not require BLM to incorporate these actions into a specific project. ECF 237 at 15. And the RMPA's response to a hard trigger for locatable minerals is "no change." J-8, AR080868.

ENGOs erroneously assert that the ROD did not require Lithium Nevada to purchase conservation credits from the CCS. A ROD condition of approval recognizes that state law requires mitigation through the CCS and states that a mitigation plan will be developed by the SETT consistent with the Nevada CCS. ROD AR052527. This state-required mitigation was analyzed as part of the proposed action that BLM approved. FEIS AR045592-93, AR045613–14. Any suggestion that Lithium Nevada could continue coordinating with the SETT and elect not to purchase credits is specious and ENGOs do not respond to Lithium Nevada's explanation of the mitigation efforts to minimize effects to GSG, ECF 242 at 10–13, even though the Project is properly exempted from the RMPA's GSG mitigation requirements.

## 2. The RMP's VRM Standards are Guidelines for Decision-making.

Lithium Nevada did not rely on the character of the Project as a "locatable mineral resource project" when answering ENGOs' complaints on VRM compliance, ECF 264 at 15, meaning

---

This provision also allows BLM to approve locatable mineral projects that enhance GSG habitat through use of the CCS, but use of disjunctive "or" shows such enhancement is not required.

[30] The *2015* RMPA sets populations triggers based on rates of change over one or two years. TPEIS-0849, J-6 AR080866-67. Thus, NDOW's statement in *2014* regarding GSG populations under the state plan could not have triggered the RMPA's later adaptive management provisions.

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

ENGOs failed to respond to and thus concede Lithium Nevada's actual argument. *Fusion IV Pharms. v. Becerra*, 2018 U.S. Dist. LEXIS 119322, at *12 (C.D. Cal. July 16, 2018).[31] The visual classes in the RMP are guidelines, such that BLM may "determine[] that the adverse visual impacts [are] not significant enough to justify disapproving the project." *S. Fork Band Council of W. Shoshone v. DOI*, 588 F.3d 718, 725 (9th Cir. 2009). BLM's approval of a project not compliant with visual impact standards does not violate FLPMA because the court "will not second-guess the agency's" decision "in light of its experience and expertise." *Id.* ENGOs commented on BLM's VRM decision, BLM explained its reasoning, and the FEIS incorporated visual mitigation, demonstrating the reasonableness of BLM's decision.  ECF 242 at 13–14.

### 3.    BLM Prevented UUD to Sensitive Species.

BLM properly applied the RMP's UUD requirements given Lithium Nevada's mineral rights and *Rosemont* does not change that. Because RMPA compliance falls under the § 3809.420 performance standards, "[c]onsistent with the mining laws," the Project's "operations and post-mining land use must comply with the applicable BLM land-use plans and activity plans … as appropriate." 43 C.F.R. § 3809.420(a)(3). ENGOs attempt to convert this recognition that an operator must comply with BLM-imposed mitigation measures into a *requirement* that BLM impose specific measures. But this Court rejected that argument, concluding that the regulations *did not* "impose[] any duty on BLM to specify any particular mitigation measures." *S. Fork Band Council of W. Shoshone v. DOI*, 2012 U.S. Dist. LEXIS 988, *21–*22 (D. Nev. Jan. 4, 2012).[32]

ENGOs rely on the Solicitor's Opinion for their misinterpretation, but the Opinion is inapplicable due to its date and cannot carry the weight ascribed to it. The footnote cited simply

---

[31]ENGOs failed to respond and concede SO 3355 did not impact BLM's VRM analysis.  *Id.*

[32]ENGOS again cite preamble of the November 2000 Part 3809 regulations, which were revised in 2001 and claim that the "rule section … remains in force," implicitly acknowledging that the specific preamble language cited no longer appears with that rule section.  ECF 264 at 17, *compare* 65 Fed. Reg. 69998, 70052 (Nov. 21, 2000) *with* 66 Fed. Reg. at 54834 (Oct. 30, 2001). The 2001 regulations substantially revised the UUD definition and the performance standards in Section 3809.420. *Id.* Setting aside the fact that this preamble was to a final rule that was replaced, and this language was not repeated in the preamble to the final rule that retained that portion of the prior rule, ENGOs' cited language implies that *any* degradation of the public lands is unnecessary, because *any* impact can be mitigated through avoidance by not undertaking the action. Since that is clearly contrary to BLM's multiple-use mandate, and was logically deleted.

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

13

states BLM may specify mitigation to prevent UUD, which BLM did here. ROD AR052527–30. The Opinion does not establish a new "unique habitat"-based UUD standard setting a particular threshold for mitigation to protect Priority Habitat, it presents a hypothetical in which mitigation cannot prevent UUD. ECF 264 at 18. But this "unique habitat" consideration has no basis in regulation—the 3809 regulations provide that an operator prevents UUD by complying with the enumerated performance standards, which do not discuss impacts to "unique habitat." The UUD standard does not impose a net-conservation-gain ("NCG") standard, and the Solicitor Opinion is not "controlling policy" for this Project. The controlling policy is the 2015 RMPA, which only applies the NCG standard "consistent with valid existing rights and applicable law," meaning it cannot mandate the standard where it would effectively withdraw lands from mineral entry by preventing a project's operation. TPEIS-0298 AR 037760–61.

ENGOs misapply case law, contending that prior decisions elaborate on their novel conception of UUD requirements, but those cases stand for uncontroversial positions. *MPC v. Norton* simply concluded that BLM prevents UUD by ensuring compliance with the applicable BLM land-use plan. 292 F. Supp. 2d 30, 49 (D.D.C. 2003).[33] This decision restates BLM's §3809 regulations, indicating that an operator prevents UUD by complying with §3809.420, 43 C.F.R. § 3809.415(a), which in turn requires that the mining operations comply with the applicable land-use plans—"[c]onsistent with the mining laws" and "as appropriate." *Id.* § 3809.420(a)(3). This Project *does* comply with the RMP, because the RMP itself acknowledges valid existing rights and only applies to the extent allowed by law. ENGOs further ignore Lithium Nevada's explanation of the holding in *Western Exploration* and contend that the case requires future projects to rigidly adhere to the RMPA's GSG standards. But again, while the Court in *Western Exploration* affirmed that BLM could apply a NCG standard to a project, it did not mandate such an approach in future cases, observing "some degradation to public land [may] occur for multiple

---

[33] "MPC says nothing about the practical process of determining whether a claim is valid, whether the government has an affirmative obligation to do so, or when such an obligation, if it exists, might attach." *Earthworks*, 496 F. Supp. 3d at 492.

14

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

use purposes." 250 F. Supp. 3d at 747.[34] BLM correctly applied the RMPA to require mitigation and was not compelled to apply a NCG standard or conclude that compliance with all of the generally applicable RMPA GSG standards was required. *Id.*[35] BLM ensured the Project's mitigation addressed impacts to GSG and other Sensitive Species. *See supra* § II.B.2.

### 4.     BLM ensured no UUD to groundwater

BLM ensured compliance with water quality standards and will monitor and mitigate antimony impacts to groundwater and prevent UUD. The ROD requires Lithium Nevada "monitor groundwater sources" and "maintain water quality … to State of Nevada standards." ROD AR052527. Lithium Nevada previously answered ENGO's claims that antimony will exceed the pit boundary,[36] that BLM failed to provide a monitoring plan for public comment, and that BLM did not require source control, and ENGOs do not refute the evidence provided.

The Project is not predicted to violate Nevada groundwater standards, because BLM approved the FEIS with "effective control[s] to counter [antimony] contaminant migration."  FEIS AR046682. These controls would be overseen by a technical advisory group ("TAG")[37] that regularly monitors water quality and quantity. ROD AR052530. ENGOs claim this plan did not require source control, ignoring and conceding the evidence to the contrary—the publicly available Appendix P plan stated that BLM would choose between three options, each of which

---

[34]Furthermore, the two sentences the ENGOs quoted did not constitute the "holding"—the first quote recites language in the RMP FEIS, the second a summary of BLM's arguments in that case supporting the NCG standard. After those citations, the Court determined "that the Agencies allow some degradation to public land to occur for multiple use purposes." *Id.*

[35]ENGOs continue to overstate the language of BLM's SSS Manual and BLM's characterization of that language. This Court recently recognized that BLM's SSS Manual "only outlines broad objectives and duties—it does not dictate specific action." *CBD v. Bernhardt*, 2021 U.S. Dist. Lexis 76657, *18 (D. Nev. April 21, 2021). Thus, it does not, as ENGOs suggest, require every project to improve the habitat of sensitive species. Nor did BLM take that position in *Western Exploration*; it merely recognized that NCG is consistent with the Manual. ECF 242 at 33. There is no support for ENGOs' assertion that any project approval that does not improve the habitat condition of a sensitive species violates the policy or UUD standard.

[36]ENGOs contend again that "backfill outflow" will exceed the "regulatory threshold," but the cited FEIS page explains "arsenic concentrations … *would not degrade* groundwater because the concentrations … would be within the range of concentrations that naturally occur within the downgradient groundwater system."  FEIS AR045562 (emphasis added).

[37]ENGOs' claim that BLM ignored staff recommendations does not answer and concedes the evidence that BLM's hydrologist changed his opinion after reviewing the updated DEIS. ECF 242 at 35; *Peeler v. State Farm*, 2022 U.S. Dist. LEXIS 5911, at *14 (D. Nev. Jan. 12, 2022).

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

would "<u>provide source control during backfilling</u>." FEIS AR046682–83; *Fusion IV Pharms.*, 2018 U.S. Dist. LEXIS 119322, at *12.[38] The mitigation plan was built out over the following months and BLM's ultimately approved plan "was not substantially changed" from the DEIS plan. ROD AR052517. Final mitigation requirements will be memorialized in the State WPCP, along with final monitoring locations and is therefore mandated under the ROD. AR052527. BLM required Piteau to conduct "[t]wo additional fate and transport sensitivity models," which provided detailed information about mitigation and its efficacy, confirmed the mitigation plans were robust, TPEIS-1406 AR104230–32, and were supplemented with an additional 1-mile buffer of monitoring. TPEIS-0713 AR067607–08.[39]

Ultimately, the FEIS adaptive management approach ensures timely mitigation through continual updates to the groundwater model, ROD AR052527, ensuring that if at any time there is a need for antimony mitigation BLM and Lithium Nevada will be prepared. FEIS AR046867. BLM arrived at this approach after subsequent comments from EPA. TPEIS-1408.[40] The model will be updated every five years and Lithium Nevada will monitor the updates and adopt mitigation strategies early if the model continues to support the assumption that backfilled pits would exhibit flow-through at low rates with minimal water quality degradation if unmitigated.

---

[38] ENGOs claim BLM cannot mitigate impacts without knowing which "options for blending/discharge" the mine will use, ECF 264 at 26, referencing the May 2020 Mitigation Plan's Option 1, using a pump back system to address possible exceedances. FEIS AR046683. The pump back option has four sub-options as to how pump back wells will manage the discharge, and one of those sub-options is blending discharge with fresh water. *Id.* (listing alternatives). While BLM indicates it has not fully vetted that sub-option, there is no caselaw supporting ENGOs' allegation that every option BLM considers under adaptive management (for impacts 65 years away) must be fully developed. *W. Watersheds Project v. BLM*, 2011 U.S. Dist. LEXIS 50056, at *8 (D. Nev. Apr. 28, 2011).

[39] Asking for additional analysis prior to the ROD's approval, BLM "obtained sufficient information" to analyze "reasonably foreseeable significant adverse impacts." *Island Mountain Protectors*, 144 IBLA 168, 201 (1998).

[40] ENGOs cite out-of-circuit cases claiming that BLM's engagement with EPA demonstrated a "conclusory assertion of agency 'expertise.'" ECF 264 at 27. But BLM continued to work with EPA and seek its input on subsequent drafts of the mitigation plan, only approving a plan in February 2021 after further EPA review. TPEIS-1408. BLM did not ignore "stinging criticism," it substantively continued engaging with EPA to ensure a robust mitigation plan. And BLM's hydrologist agreed with its approach, unlike *Spotted Owl v. Hodel* where "the agency disregarded all the expert opinion … including" its own. 716 F. Supp. 479, 483 (W.D. Wash. 1988).

16

*Id.*[41] In so doing, Lithium Nevada will minimize or eliminate the risk of groundwater impairment through strategies determined by BLM with NDEP concurrence. Continuing to develop adaptative management responses to possible future mitigation needs is "reasonable … given the relatively low probability and temporal remoteness of adverse impacts to ground water" and prevents UUD. *Great Basin Res. Watch v. BLM*, 844 F.3d 1095, 1107 (9th Cir. 2016).

### 5.    BLM ensured no UUD of air quality.

BLM conducted an extensive emissions inventory, modeled "potential effects on pollutant concentrations," and concluded that "the project would not have a substantial effect on air quality," avoiding UUD under FLPMA. FEIS AR045624, 045628; *see* ECF 242 at 37–38.  This review included the source of emissions factors, FEIS AR046250; electronic emissions inventory spreadsheets, TPEIS-0468, the tail gas scrubber technology, ECF 242 at 15–16, and the manufacturer's guidance and specifications for the sulfuric acid planAR048044. The detailed process descriptions, flow diagrams, and emissions calculations enabled BLM to confirm that its "Air Quality Impact Analysis … included *manufacturer guaranteed emission levels*." *Id.* The Project's compliance with applicable air quality standards was properly supported and entitled to deference. *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103 (1983).

### III.    Argument – NEPA

### A.    BLM Analyzed and Complied with Air Quality Standards.

Having dropped its false assertion that the control technology for the sulfuric acid plant was not identified, ENGOs now claim again that the air quality review was based upon "undetermined methods" that were not subject to public review. ENGOs continue to ignore the extensive documentation showing the basis for the emissions inventory while also attempting to impose nonexistent substantive obligations onto the BLM's approval. Contrary to ENGOs'

---

[41]Modeling shows antimony impacts will not occur for decades allowing for preparation of robust mitigation in adaptive management. ENGOs cite NDEP's October 2020 concerns about "excavation below the water table," but the updated October 23, 2020 plan completed just before receipt of those comments states "[b]ecause mining is not anticipated to encounter meaningful groundwater until 2060, LNC would install bedrock monitoring wells prior to mining below the water table." TPEIS-1407 AR104254. Lithium Nevada will not be able to mine below the water table without the NDEP permit and will continue working with NDEP during the FEIS's monitoring program to demonstrate the safety of operations to receive that permission in 2060.

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

assertions, the FEIS and the DEIS clearly documented how emissions from the sulfuric acid plant were estimated and the source information was available for public scrutiny. FEIS AR046237, 046240, 046231. These documents were clearly identified and ENGOs specifically requested and were provided the emissions inventory references for the sulfuric acid plant by BLM. TPEIS-1476, AR105448; TPEIS-1400, AR104155. Therefore, the public—and specifically ENGOs—were afforded the opportunity to review and scrutinize the data underlying the estimate of emissions from the sulfuric acid plant.

BLM's reliance upon manufacturers' guidance and specifications to estimate emissions from the sulfuric acid plant and model air quality impacts was also reasonable and within its discretion. *Tri-Valley CAREs v. DOE*, 671 F.3d 1113, 1124 (9th Cir. 2012). Unlike the "short email" in *Great Basin*, 844 F.3d at 1103, the manufacturer's guidance and specifications here—totaling one hundred pages—was reliable and contained detailed support for the emissions limits and calculations. TPEIS-0577. ENGOs provide no reasonable basis for questioning the authenticity of these numbers and any "uncertainties" or updates to the initial scrubbing system design would not fundamentally alter the emissions levels or the impacts upon which BLM based its analysis. ECF 242 at 16. BLM reasonably relied on the sulfuric plant manufacturer's emissions levels which were "based on accurate information and defensible reasoning," *Great Basin*, 844 F.3d at 1103.

ENGOs falsely claim (at 39) that BLM and LNC "rel[y] on Nevada state air permitting as a substitute for full public review" under NEPA. But BLM satisfied its NEPA obligations by assessing air quality impacts based on extensive technical and scientific data. References to NDEP air permitting simply *confirm,* rather than substitute, the conclusions in the air impacts analysis. FEIS AR048044. BLM reasonably "assumed in its determination that regulatory agencies charged with permit enforcement would ensure compliance with the permit requirements." ECF 242 at 17–18. BLM's assessment reasonably concluded that emissions from the sulfuric acid plant "will be well below" the relevant federal performance standard, and will not impact state and federal air quality standards. FEIS AR046215, AR045628. ENGOs ignore the voluminous record in parroting the same two out-of-context and cherry-picked statements

about the sulfuric acid plant and mischaracterize the comprehensive nature of BLM's review of air quality impacts and compliance with applicable standards.

### B. BLM Analyzed Both Wildlife Baseline and Project Impacts to Wildlife.

ENGOS continue to claim the FEIS includes only vague or generalized statements about the affected environment for and impacts to GSG, blithely ignoring the detailed information.

#### 1. Greater Sage Grouse ("GSG"), Pronghorn, & Springsnail

For GSG baseline, the FEIS detailed the location and number of leks in proximity of the project, types of GSG habitat, and the quality of the surrounding GSG habitat, ECF 242 at 18–19, while also describing that the area provides year-round suitable GSG habitat, including winter, nesting, and breeding habitat. FEIS Figure 4.5-10 AR045737. ENGOs argue the FEIS effects analysis does not analyze GSG habitat impacts or how those habitat impacts affect the species. But the FEIS describes how much PHMA and GHMA would be removed; puts that habitat loss in context of how much PHMA is available in the PMU (less than two percent); recognizes the Project would result in decreased quality of habitat and increased fragmentation; discloses potential indirect impacts; acknowledges increased habitat fragmentation could result in barriers to movement; and explains the Project's surface disturbance could also decrease the quantity of insects GSG consume. AR045590–92. ENGOs do not rebut this analysis or case law that does not require "pre-project wildlife populations." ECF 242 at 18.

ENGOs implicitly suggest (at 29) that BLM did not analyze the Project's noise impacts on GSG. But the FEIS provides a robust analysis of the potential noise impacts on nearby leks, recognizing that various ways noise "may affect [GSG]," that "there is potential risk for Project-related noise effects on" both the Montana-10 and Pole Creek-01 lek, and that noise impacts to GSG "could also affect [lek-]adjacent ... habitats." FEIS AR045600–01. BLM also recognized that the CCS calculation would account for noise impacts.[42] AR048066; TPEIS-0084.

---

[42]ENGOs cite RMPA FEIS App. N, which erroneously states that the CCS program does not offset impacts from noise. AR046495. The SETT clarified in its DEIS comments that the CCS program *does* account for indirect impacts from noise. AR048066. BLM revised the main text of FEIS but overlooked that same statement in Appendix N.

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

ENGOs' arguments about BLM's pronghorn baseline similarly fail. This impact analysis was not a single sentence. The FEIS recognizes the Project may impede seasonal pronghorn movement and discloses the amount and location of pronghorn range the Project would impact in the context of the overall hunt unit. FEIS AR045586, 045734. It recognizes indirect effects to big game species (which include pronghorn) habitat, migration, mortality, and resource availability. AR045587, 045600. NDOW supported this impact analysis. AR048176.

ENGOs' Kings River pyrg impact arguments are based on a misapplication of the groundwater model. BLM specifically explained that it "it is [not] reasonable or appropriate to use the regional model to quantify changes in groundwater elevation of less than 10 feet." AR045555. Yet ENGOs cite (at 30) hypothetical model results of less than one foot to assert that BLM overlooked Kings River pyrg impacts. None of the six springs where ENGOs allege impacts are located within the 10-foot drawdown contour or even the conservatively defined 1-mile buffer. AR045559. BLM appropriately concluded no impacts to this species are expected, and ENGOs' extra-record springsnail documents should be disregarded.

## 2.    Dewatering Impacts

ENGOs arguments about water-related effects to wildlife mischaracterize BLM's brief. BLM explained the FEIS's water resources section analyzed the Project's impacts on groundwater levels, seeps, and springs. ECF 237 at 31. As ENGOs note, there is no "reference to any wildlife" in the cited pages. But BLM then identified where the FEIS discussed water resources in the context of wildlife impacts. *Id.* ENGOs' claim that "BLM discounts these effects as insignificant" is belied by the FEIS, which recognizes "[w]ater is a critical resource for many species in the Project area, and any impact to water" could be a "significant impact." AR045602; *id.* (degradation of springs could result in long-term impacts to GSG). BLM satisfied its "hard look" obligation, notwithstanding NDOW's comments likewise noting the potential impacts.[43]

---

[43]Monitoring and mitigation will be adaptively managed with input from a TAG that includes NDOW. AR045610. If BLM identifies unanticipated impacts beyond the drawdown contour it "may require additional monitoring" outside the "model boundary." ROD AR052527.

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

1  Selectively citing the record, ENGOs suggest BLM ignored NDOW's comments about the

2  hydrologic model and the 1-mile buffer.[44] ENGOs claim that BLM's only response was to direct

3  NDOW to a map of the 1-mile buffer,[45] but BLM also pointed NDOW to the WATER-3 response

4  to thoroughly explain the 1-mile buffer. AR048173, AR047984. And BLM noted NDOW's

5  comments in the ROD, explaining "BLM … reviewed these comments in full and determined

6  that the FEIS analysis" used "the best data and science available" and "all reasonable and feasible

7  mitigation" within BLM's authority will be applied. ROD AR052523.[46] The Court cannot "take

8  sides in a battle of the experts," *Native Ecosystems Council v U.S.*, 428 F.3d 1233, 1244 (9th Cir.

9  2005)—other agencies' criticism does not undermine BLM's hard look at wildlife impacts.

10  ## C.   BLM Took a "Hard Look" at the Cumulative Impacts

11  BLM took a "hard look" thoroughly analyzing cumulative impacts of the Project and other

12  proposed activities within the cumulative effects study areas ("CESAs"). ENGOs reargue BLM

13  did not provide enough detail and claim it was not "quantitative."[47] This ignores the quantitative

14  evidence Lithium Nevada cited: the FEIS catalogues the cumulative impact of a new mine in a

15  CESA with 4 other mines of specific acreages, increasing the estimated "cumulative geologic

16  disturbance… to approximately 1,821 acres." FEIS AR045674. ENGOs are not clear what more

17  numbers they need, and simply decry unsubstantiated "data gaps." But each cumulative effects

18  sub-section quantifies the Project impact: "[t]he average water supply required … represents

19  approximately 9[%] of the total estimated perennial yield;" AR045675; it will disturb 5,694.8

20  acres of vegetation before reclamation, "approximately 1.2[%] of the total … disturbance" in the

21  CESA. AR045677. The chapter also quantifies impact to each category of interest. FEIS

---

22  [44] ENGOs assert "BLM's own staff noted the problems with the lack of information about the

23  groundwater system" but the comment cited merely pointed out the uncertainty disclosed in the
   DEIS and asking whether spring monitoring would be required. TPEIS-1320 AR101554.

24  [45] BLM's reference to this map was in response to NDOW's request for such a map. AR048173.

25  [46] ENGOs point to USFWS's hydrologist's concerns about baselines and modeling but BLM
   responded to those concerns in the FEIS. AR048068-81. "When specialists express conflicting

26  views, an agency must have discretion to rely on the reasonable opinions of its own qualified
   experts …." *Marsh v. Ore. Nat. Res. Council*, 490 U.S. 360, 378 (1989).

27  [47] ENGOs do not challenge Lithium Nevada's explanation of the FEIS's quantitative analysis of
   cumulative air impacts or the selection of Hunt Unit 031 as an appropriate geographic area,

28  conceding these arguments. *Peeler*, 2022 U.S. Dist. LEXIS 5911, at *14.

AR045671–90. The FEIS clearly identifies and quantifies the cumulative impacts and impact analysis's "scope and nature" is "committed to [BLM's] sound discretion." *Chilkat Indian Klukwan v. BLM*, 399 F. Supp. 3d 888, 919–20 (D. Alaska 2019).

ENGOs allege two instances where they claim BLM failed to provide sufficient detail: claiming BLM should have analyzed the McDermitt Lithium Project ("MLP") because it "operate[s] on BLM land," and arguing BLM did not quantitatively analyze the cumulative impact on GSG population. But the CESA incorporates the Lone Willow PMU's borders developed by NDOW, and that PMU does not extend into Oregon to cover the MLP. FEIS AR045591. ENGOs do not explain why BLM should disregard NDOW's PMU and arbitrarily expand the CESA into Oregon or how their DEIS comments raised the MLP as a necessary consideration.[48] BLM chose the Lone Willow BSU, developed with multiple agencies because it provided the appropriate density of potentially impacted species based on Nevada biologists' refined understanding of GSG interaction with the landscape as compared to earlier PMUs. FEIS AR045593; TPEIS-0448, AR053184.[49] BLM's determination of the extent of the geographic area to analyze cumulative impacts is entitled to deference. *Selkirk Conservation All. v. Forsgren*, 336 F.3d 944, 958 (9th Cir. 2003). Expanding the study areas as ENGOs urge could "skew the analysis" improperly spreading out the impact to a larger area. *Id.* at 951.

ENGOs incorrectly argue the FEIS neglected to provide "quantified, detailed information about the status of [GSG] population." But under the cumulative effects analysis of "Wildlife and SSS, the FEIS acknowledges again that the Project would result "in up to 1,209 acres of additional disturbance" to all SSS in the area, including GSG. This disturbance would cause an

---

[48]ENGOs' generalized complaints about the cumulative impact analysis do not mean that they can now claim that BLM ignore *specific* complaints regarding the MLP that they only raised on summary judgement. The case ENGOs cite to claim they can spring new arguments in litigation without raising them during public comment is inapposite: *Te-Moak Tribe* simply notes that where the agency completes *no* cumulative effects analysis, a plaintiff need not identify a specific project to claim that the agency's cumulative impacts analysis was deficient. *Te-Moak Tribe of W. Shoshone of Nev. v. DOI*, 608 F.3d 592, 605 (9th Cir. 2010). And even on Reply the ENGOs do not request judicial notice of their new information regarding the MLP.

[49] ENGOs note that some BSUs cross state lines, and the ARMPA correspondingly urges a "broader analysis." ECF 264 at 34.  But the applicable BSU here doesn't cross state lines, and ENGOs do not explain why BLM should disregard those borders.

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

"incremental" temporary additional impact to habitat "for the majority of the project disturbance" until successful reclamation. FEIS AR045678. This disturbance is detailed and quantified in the "Environmental Effects, Wildlife" section discussing GSG, AR045590–93, and constitutes "approximately 1.2[%] of the total past, present, and RFFAs disturbance." AR045677. BLM reasonably selected the CESA using updated GSG information and took a "hard look" at cumulative impacts for natural resources within those areas. *Great Basin Res. Watch*, 844 F.3d at 1106.

## D.    BLM Evaluated Mitigation Measures and Adopted Adaptive Management

ENGOs ignore Lithium Nevada's responses; record evidence and caselaw rebut each of their arguments on the mitigation and monitoring plan. ENGOs claim "BLM refused" to provide plans for mitigating predicted water pollution, citing a comment where BLM responded how the plan in Appendix P and Mitigation WR-3 provided mitigation. AR048109.[50] While ENGOs claim the water monitoring plans were not developed or disclosed in the DEIS, this exchange and Appendix P in the DEIS belie that claim. The "proposed plan" provided the public the opportunity to comment on mitigation options and subsequent plans refined those options -- the plan did not change so drastically as to preclude "intelligent public participation." *W. Expl., LLC*, 250 F. Supp. 3d at 749–50. The EIS process alerted the public of what BLM intends to do, providing mitigation options under consideration and refined those options. *California v. Block*, 690 F.2d 753, 772 (9th Cir. 1982); ROD AR052517 (BLM incorporated "corrections identified by BLM and NDEP, and [updated] mitigation measures"). ENGOs falsely claim they "never had the opportunity to comment on any actual mitigation plan" when Appendix P's "Monitoring and Mitigation Plan" was included in the DEIS. TPEIS-0312 AR040743–53; ECF 242 at 31 n.29.

This *is* a case where BLM drafted "mitigation measures" that were not "in final form" but incorporated "field studies conducted by [Piteau] over several years in the proposed Project area" to "inform[] the BLM's development of a number of mitigation measures," which "compl[ies]

---

[50]ENGOs contend BLM "admitted" that active treatment options "have not yet been evaluated," but that referenced a specific sub-option for treating pumped-back water. BLM is not required to have every impact of every mitigation option entirely developed in the DEIS. *Infra* fn.38.

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

with NEPA's procedural requirements." *Protect Our Cmtys. Found. v. Jewell*, 825 F.3d 571, 582 (9th Cir. 2016).  A robust adaptive management approach can utilize a "conceptual" framework for monitoring and mitigation, particularly where future impacts are uncertain to occur years in the future. *City of Carmel-by-the-Sea v. DOT*, 123 F.3d 1142, 1153–54 (9th Cir. 1997). Hydrological modeling predicts that drawdown of the local water table will not begin until 2035, FEIS AR045555–57, and collecting data in the meantime enables the water model to increase in accuracy prior to any anticipated impacts. *Great Basin Res. Watch*, 844 F.3d at 1107.[51] ENGOs do not rebut Lithium Nevada's detailed explanation of the monitoring program or the Project's impacts.  ECF 242 at 29–32. BLM analyzed the effectiveness of the proposed mitigation to water quality and GSG. ENGOs repeat concerns EPA voiced about water quality,[52] but ignored that EPA agreed that new mitigation approaches with greater effectiveness continue to be developed. TPEIS-0695 at 3–4. EPA raised the concern cited *before* reviewing the updated December 2020 plan, which EPA later agreed "could substantially decrease the modeled 300-year impacts." *Id.*, EPA Comments at 1. Again, the adaptive management plan evolves in response to data collection and direction from the Water Resources TAG organized and managed by BLM. FEIS AR045573. The proposed groundwater monitoring network will provide an early warning system for drawdowns that may occur beginning in 2035 and mitigate any such drawdowns with replacement water. AR046685.  Mitigation such as pump back capture would be triggered if it appears thresholds would be exceeded. TPEIS-0409, AR051740–44.

Like *Japanese Village v. FTA*, this monitoring and mitigation plan incorporated scientific analysis (i.e., Piteau's fate and transport modeling) and robust baseline data into detailed mitigation options. 843 F.3d 445, 461 (9th Cir. 2016); *see, e.g.*, FEIS AR045574–75. BLM ensured mitigation of GSG impacts and ENGOs do not contest a noise monitoring plan will be

---

[51] While *Great Basin* emphasized the "low probability" of impacts, the plan approved by that Court "discussed only monitoring" and did not address mitigation. 844 F.3d at 1107. The plan here discusses and refines mitigation approaches throughout Project development, going beyond the *Great Basin* standard. This Project is unlike *ONDA v. Rose*, because the monitoring and mitigation was developed in concert with water expert Piteau and applied the baseline data to create comprehensive mitigation options. AR046686–87 (discussing geochemical studies).

[52] ENGOs concede Lithium Nevada's explanation of BLM's mitigation measures addressing EPA comments on wildlife. ECF 242 at 31 n.30; *Peeler*, 2022 U.S. Dist. LEXIS 5911, at *14.

developed. FEIS AR048171; ECF 242 at 32 n.31. The water mitigation plan ensures no changes to the GSG water supply, FEIS AR046685; TPEIS-1407 AR104258, and the required CCS credits will additionally "offset impacts to GRSG … habitat," FEIS AR045593, by preventing "habitat degradation of springs in the Montana Mountains" during the life of the mine and within a prescribed buffer zone. AR046685, 048066. The Project demonstrably commits to monitoring and mitigating impacts to groundwater, water quality, and GSG.

### E. Any Remand Should Be Without Vacatur or Injunction.

ENGOs make no attempt to save any injunctive relief request. ENGOs agree that vacatur is "not automatically applied" under the APA but argue remand without vacatur is "rare," so the Court should vacate the ROD. But the Ninth Circuit observed that "[r]emand without vacatur is common," *Nat'l Family Farm Coal. v. EPA*, 966 F.3d 893, 930 (9th Cir. 2020), and the frequency is irrelevant: vacatur "depends on how serious the agency's errors are and the disruptive consequences of an interim change." *350 Mont. v. Haaland*, 29 F.4th 1158, 1177 (9th Cir. 2022). The Court must consider the "environmental, economic, and energy-related consequences of vacatur." *Id.* Remand without vacatur is appropriate in circumstances beyond undesirable environmental consequences. *Pac. Rivers v. U.S.*, 942 F. Supp. 2d 1014, 1018 (E.D. Cal. 2013) (it is "not correct" to withhold vacatur "only in situations where environmental harm is likely to flow from" vacatur). The disruptive consequences and harms to Lithium Nevada, its employees, surrounding communities, and the Nation would be severe, ECF 242 at 38-40. The alleged errors are minimal; BLM could substantiate its decision on remand. The economic and energy-related concerns at stake are grave: current and future jobs, financial investment, and lithium our Nation desperately needs.[53] *Id.* The ROD should not be vacated because it would create "a disruptive," "expensive" consequence harmful to the public. *Pac. Rivers*, 942 F. Supp. 2d at 1022.

### IV. Conclusion

For all these reasons, Lithium Nevada's motion for summary judgment should be granted.

---

[53]TPEIS-0672 AR 063882; *Global Supply Chains of EV Batteries*, IEA 3, 18 (July 2022), https://bit.ly/3P9MgiJ ("Lithium demand has almost doubled since 2017 … in 2021" resulting in lithium developing "the largest projected demand-supply gap" of any commodity by 2030); *Expand Domestic Critical Mineral Supply Chains*, DOE (Aug. 2022), https://bit.ly/3JNh5c3 ("Global demand for critical materials expected to increase by 400-600% over next decades.").

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

Dated: August 11, 2022.

/s/ *Laura K. Granier*
Laura K. Granier (SBN 7357)
Jessica L. Freitas (SBN 16079)
HOLLAND & HART LLP
5441 Kietzke Lane, 2nd Floor
Reno, Nevada 89511

*Attorneys for Defendant-Intervenor*
*Lithium Nevada Corp.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 11, 2022, I filed the foregoing using the United States District Court CM/ECF, which caused all counsel of record to be served electronically.

*/s/ Laura K. Granier*
Laura K. Granier (SBN 7357)