Laura K. Granier (SBN 7357)
Jessica Freitas (SBN 16079)
HOLLAND & HART LLP
5441 Kietzke Lane, Suite 200
Reno, NV 89511-2094
(775) 327-3000
(775) 786-6179 fax
lkgranier@hollandhart.com
jfreitas@hollandhart.com

Hadassah M. Reimer, Esq (Wyo. Bar No. 6-3825)
*Admitted Pro Hac Vice*
Holland & Hart LLP
P.O. Box 68
Jackson, WY 83001
Tel: 307-734-4517
hmreimer@hollandhart.com

*Attorneys for Defendant-Intervenor*
*Lithium Nevada Corp.*

**HOLLAND & HART LLP**
**5441 KIETZKE LANE, SUITE 200**
**RENO, NV 89511-2094**

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| BARTELL RANCH, LLC, et al., | **Lead Case:** |
| Plaintiffs, | **Case No. 3:21-cv-00080-MMD-CLB** |
| v. | |
| ESTER M. McCULLOUGH, et al., | **LITHIUM NEVADA CORP.'S REPLY TO BARTELL RANCH, LLC AND EDWARD BARTELL'S OPPOSITION TO COUNTER MOTION FOR SUMMARY JUDGMENT** |
| Defendants, | |
| and | |
| LITHIUM NEVADA CORP., | **ORAL ARGUMENT REQUESTED** |
| Defendant-Intervenor. | |

Lithium Nevada Corp. ("Lithium Nevada") files this reply to the opposition filed by Bartell Ranch, LLC and Edward Bartell's ("Bartell," collectively, "BRL") to Lithium Nevada's counter motion for summary judgment.[1] ECF 241.

---

[1] Terms and acronyms that are used or capitalized but not defined in this Reply shall have the same meanings assigned to them within the counter motion.

**TABLE OF CONTENTS**

I.    INTRODUCTION………………………………………………………..1-2

II.   ARGUMENT……………………………………………………….2-25

     A.    BLM Independently Analyzed and Verified the Water Data……….2-4

     B.    The Project's Baseline is Robust…………………………………..4-19

          1.    The Comprehensive Surveys Followed Agreed-Upon Protocols……………………………………………………..6-10

          2.    BLM's Baseline Measurements are Accurate…………….10-19

               a.    Pre-Piteau Spring Measurements…………………10-14

               b.    Piteau's Spring Measurements……………………14-15

               c.    Groundwater Baseline…………………………….15-17

               d.    Pole Creek Baseline………………………………17-18

     C.    BLM Approved an Extensive Effective Monitoring & Mitigation Plan………………………………………………19-20

     D.    BLM Provided Adequate Publicly Available Information………..20-22

     E.    BLM Complied with FLPMA…………………………………….22-25

     F.    BRL Lacks Standing under NEPA……………………………….25

III.  CONCLUSION……………………………………………………….25

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

i

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

## TABLE OF AUTHORITIES

*Airport Impact Relief, Inc. v. Wykle*, 192 F.3d 197, 208 (1st Cir. 1999)……………..4

*AWARE v. Colo. DOT*, 153 F.3d 1122, 1129 (10th Cir. 1998)..…………………..…..7

*Bohmker v. Oregon*, 903 F.3d 1029, 1038 (9th Cir. 2018)…………………………..22

*Cal. Coastal Com v. Granite Rock Co.*, 480 U.S. 572, 587–88 (1987)……………..22

*Cal. Trout v. Schaefer*, 58 F.3d 469, 474 (9th Cir. 1995)………………………….…4

*Center for Biological Diversity* v. USFWS, 33 F.4th 1202, 1218 (9th Cir. 2022)……24

*City of Fernley v. Conant*, 2021 U.S. Dist. LEXIS 237595, at *11–12
(D. Nev. Dec. 13, 2021)……………………………………………………………….25

*Cloud Found. v. BLM*, 2013 U.S. Dist. LEXIS 43371, at *20
(D. Nev. Mar. 26, 2013)………………………………………………………….18, 22

*Conservation Nw. v. Rey*, 674 F. Supp. 2d 1232, 1252 (W.D. Wash. 2009)…………..15

*Ctr. for Biological Diversity v. BLM*, 2017 U.S. Dist. LEXIS 137089, at
*30–32 (D. Nev. Aug. 23, 2017)………………………………………………………20

*Drakes Bay Oyster Co. v. Jewell*, 729 F.3d 967, 985 (9th Cir. 2013)…………………15

*Duval Ranching Co. v. Glickman*, 965 F. Supp. 1427, 1441 n.7 (D. Nev. 1997)………25

*Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1301 (9th Cir. 2003)….12, 15, 16

*Earthworks v. DOI*, 496 F. Supp. 3d 472, 492 (D.D.C. 2020)………………….22, 23, 24

*Fallon Paiute-Shoshone Tribe v. U.S. DOI*, 2022 U.S. App. LEXIS 21194, at
*8 (9th Cir. Aug. 1, 2022)……………………………………………………………19

*Friends of Earth v. Hintz*, 800 F.2d 822, 835 (9th Cir. 1986)……………………………3

*Gardner v. BLM*, 633 F. Supp. 2d 1212, 1227 (D. Or. 2009)…………………………..22

*Grand Canyon Trust v. Provencio*, 26 F.4th 815, 824 (9th Cir. 2022)…………………24

*Havasupai Tribe v. Robertson*, 943 F.2d 32, 34 (9th Cir. 1991)…………………………9

*Inland Empire Pub. Lands Council v. Schultz*, 992 F.2d 977, 981 (9th Cir. 1993)…10, 14

*Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008)……………………………6

*Lange v. Brinegar*, 625 F.2d 812, 818–19 (9th Cir. 1980)………………………..……4

*League of Wilderness Defs.- Blue Mts. Biodiversity Project v. U.S. Forest
Serv.*, 2004 U.S. Dist. LEXIS 24413, at *22 (D. Or. Nov. 19, 2004)……………………6

*Maddalena v. United States*, 2010 U.S. Dist. LEXIS 145857, at *23–25
(S.D. Cal. Aug. 5, 2010)………………………………………………………………19

*McCall v. Las Vegas Metro. Police Dep't*, 2020 U.S. Dist. LEXIS 52264, at *5 n.1 (D. Nev. Mar. 23, 2020)……………………………………………………...…7

*Mineral Policy Center v. Norton*, 292 F. Supp. 2d 30, 48 (D.D.C. 2003)……………..…22

*Nat. Res. Def. Council, Inc. v. Jamison*, 815 F. Supp. 454, 462 (D.D.C. 1992)…………22

*Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1053 (9th Cir. 2012)……..9, 10, 17

*ONDA v. BLM*, 2014 U.S. Dist. LEXIS 137154, at *1–2 (D. Or. Sep. 29, 2014)………..22

*ONDA v. Shuford*, 2007 U.S. Dist. LEXIS 42614, at *21–22 (D. Or. June 8, 2007)…….18

*ONDA v. Jewell*, 840 F.3d 562 (9th Cir. 2016)……………………………………………5

*Protect Our Cmtys. Found. v. Jewell*, 825 F.3d 571, 582 (9th Cir. 2016)…………………5

*Rags Over the Ark. River v. BLM*, 77 F. Supp. 3d 1038, 1044 (D. Colo. 2015)…………..22

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989)………………22

*Roseville v. Norton*, 219 F. Supp. 2d 130, 166 (D.D.C. 2002)……………………………4

*Save Our Wetlands, Inc. v. Sands*, 711 F.2d 634, 643 (5th Cir. 1983)……………………4

*Save the Peaks Coal. v. U.S. Forest Serv.*, 2010 U.S. Dist. LEXIS 127441, at *58 (D. Ariz. Nov. 30, 2010)……………………………………………………………1

*Sierra Club v. Marsh*, 714 F. Supp. 539, 557 (D. Me. 1989)……………………………4

*Sierra Club v. Van Antwerp*, 709 F. Supp. 2d 1254, 1265 (S.D. Fla. 2009)………………3

*Theodore Roosevelt Conservation P'ship v. Salazar*, 605 F. Supp. 2d 263, 283 (D.D.C. 2009)………………………………………………………………………..22

*Tribal Vill. of Akutan v. Hodel*, 869 F.2d 1185, 1190 (9th Cir. 1988)……………………2

*Trout Unlimited v. Lohn*, 559 F.3d 946, 958 (9th Cir. 2009)…………………………12, 19

*Utahns v. U.S.*, 305 F.3d 1152, 1165 (10th Cir. 2002)……………………………………3

Ventana Wilderness All. v. Bradford, 2007 U.S. Dist. LEXIS 48366, at *13 (N.D. Cal. June 27, 2007)…………………………………………………………10

*W. Expl., LLC v. DOI*, 250 F. Supp. 3d 718, 750 (D. Nev. 2017)…………………………23

*W. Radio Servs. Co. v. Espy*, 79 F.3d 896, 903 (9th Cir. 1996)…...……………………25

*W. Watersheds Project v. Bernhardt*, 519 F. Supp. 3d 763, 775 (D. Idaho Feb. 11, 2021)…………………………………………………………...23

*Yount v. Salazar*, 2013 U.S. Dist. LEXIS 2673, at *59 (D. Ariz. Jan. 8, 2013)……………25

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

**Regulations**

43 U.S.C. § 1701……………………………………………………….…………….23

43 U.S.C. § 1712(e)(3)…………………………………………………………………23

43 U.S.C. § 1714………………………………………………………………………23

43 C.F.R. § 3715.0-5…………………………………………………………………...24

43 C.F.R.§§ 3809.100……………………………………………………………………24

43 C.F.R.§§ 3809.411(d)(3)……………………………………………………………24

43 C.F.R. §§ 3715.2………………………………………………………………………24

**Articles**

Scientific and Political Integrity in Environmental Policy, 86 Tex. L. Rev.
1601, 1624 (2008)…………………………………………………………………15

19594252_v2

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

iv

**HOLLAND & HART** LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

## I. INTRODUCTION

BLM substantively responded to BRL's numerous DEIS comments and demonstrated its thorough and extensive analysis of the water system in and around the Project that considered thousands of water level/surface flow data points, hundreds of water quality measurements, and hundreds of spring flow measurements collected over numerous years. TPEIS-0713 AR067628. BLM required a comprehensive water monitoring plan be provided for it and two state agencies to review and approve prior to project initiation and will use adaptive management to modify and adjust the monitoring program as necessary, and "[a]dditional monitoring data provided by other sources may always be added to the database and considered." AR067623, AR067588. BLM even expanded the monitoring and mitigation with an additional one-mile buffer beyond projected effects to identify potential impacts over the life of the Project. Extensive monitoring is ongoing and will continuously "refine the understanding of the groundwater and surface water system." AR067587. BRL's belated attempts to cast doubt on individual measurements that were verified through this comprehensive approach fails to overcome the agency's more than "reasonably thorough," approach. *Save the Peaks Coal. v. U.S. Forest Serv.*, 2010 U.S. Dist. LEXIS 127441, at *58 (D. Ariz. Nov. 30, 2010). Even if BRL's complaints had merit, they would simply amount to harmless error. TPEIS-0713 AR067628.

Rather than address Lithium Nevada's citations to BLM's thorough responses to BRL's challenges of Piteau's work, BRL raises new unexhausted issues with a collection of *prior* hydrogeological teams incorporated as historical data into the Project analysis. BRL does not contest that issues it failed to exhaust with the BLM are waived.[2] ECF 239 at 25 n.22. As such, all points where Lithium Nevada noted that BRL was raising unexhausted issues are conceded and BRL's new arguments should be rejected. BRL now expands its challenge from a few spring measurements near BRL's property to an additional 14 springs, many of which are far away from BRL's property, in a different hydrologic basin, and outside even the 1-mile buffer area that extends outside of the 10-foot drawdown contour. BRL mischaracterizes these measurements

---

[2] Claims BRL raised after the DEIS comment period concluded are also unexhausted, as the agency was not required to analyze such comments. ECF 239 at 13–14.

with unsubstantiated claims that previous contractors observed flow and simply chose not to record it. But the field data forms show that the prior hydrogeologists justified their decisions not to attempt certain flow measurements, whether it was because there was "minimal water present" or the only water "observed was dripping from the well head." TPEIS-0027 AR002372, AR002387. BRL's new attempts to discredit the baseline present misleading exaggerations that are revealed when the citation is reviewed. *See, e.g.*, ECF 262 at 11 n.19 ("surveyors observed significant stream flow"); TPEIS-0027 AR002387 (1Q 2012 field sheet for SP-029, surveyor observing "multiple channels" but "[a] sample was not taken as there was minimal water present. The water that was observed was muddy and filled with clover.").

BRL leaves Lithium Nevada's explanations of the record and opposing caselaw nearly unchallenged, conceding their merits. BRL's fly specked disagreements with data "uncover[] no fundamental flaws or irrationality; rather, [BRL] only succeeds in showing it prefers the results reached by a different methodology," *Tribal Vill. of Akutan v. Hodel*, 869 F.2d 1185, 1190 (9th Cir. 1988), and does not demonstrate that BLM omitted or misused information.

## II. ARGUMENT

Rather than rebutting Lithium Nevada's identified record evidence and arguments, BRL repeats the same assertions and now argues that Piteau's measurements aside, there were errors in the *previous* contractors' measurements that were included in the historical baseline. BRL never raised this in its NEPA comments, and the argument therefore waived and, in any event crumbles in light of the field data sheets. Contrary to BRL's arguments, BLM provided BRL's requested information, closely evaluated the hydrogeologic data, and BRL's complaints about that data do not demonstrate errors in the analysis. Lastly, BRL lacks standing and its FLMPA claims misapply the law and improperly attempt to elevate the RMP Visual Resource Management ("VRM") guidelines to regulatory mandates. BLM complied with NEPA and FLPMA in authorizing the Project and the ROD should be affirmed.

### A.   BLM Independently Analyzed and Verified the Water Data.

Piteau's measurements demonstrate rigorous scientific and professional integrity, confirmed by BLM's oversight. BRL admits that BLM and coordinating agencies "evaluated

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

reports and analysis prepared by Piteau." ECF 262 at 9. BRL does not contest that BLM

requested more information and analysis after that evaluation—fulfilling its "independent

evaluation" obligation. ECF 239 at 6–10; *Friends of Earth v. Hintz*, 800 F.2d 822, 835 (9th

Cir. 1986) (agency fulfilled its independent evaluation obligation where it requested reports,

consulted various agencies, analyzed the information, and asked the consultant questions).

BRL reargues that the record must demonstrate "BLM['s] independent evaluation," but ignores

Lithium Nevada's record citations to precisely that evidence. ECF 262 at 8–9, 32. As Lithium

Nevada previously identified, ECF 239 at 2, BLM's hydrologist Daniel Erbes asked Piteau for

the "model dataset," TPEIS-1022 AR094720, and confirmed that he "review[ed] the model

input and output datafiles" and "re-r[a]n the model." TPEIS-1417 AR104464.[3] BLM's

rigorous review and subsequent defense of the "robust" nature of that data, TPEIS-1399

AR104151, is entirely distinguishable from the "uncritical[]" review that BRL points to in out-

of-circuit cases. *Sierra Club v. Van Antwerp*, 709 F. Supp. 2d 1254, 1265 (S.D. Fla. 2009)

(agency failed to evaluate claims in a report that there was no alternative project site); *Utahns

v. U.S.,* 305 F.3d 1152, 1165 (10th Cir. 2002) (agency "d[id] not assert that they … verified

the cost [disputed] estimates"). BLM thus independently evaluated Piteau's baseline data.

BRL pulls back from its argument that BLM was *required* to "independently measure[]

springs" and now contends only that such "visits can be integral to the court's analysis" and

were "critical" here. ECF 262 at 9, 20, 31. But "[t]he AR is clear that Piteau responded to

Bartell's concerns and, in every instance, confirmed its own data on review or through

additional evaluation." ECF 239 at 9. BRL does not dispute citations explaining that even

where other "equally reasonable" measurement assumptions exist, the agency is not required

---

[3]BRL reargues that "BLM did not have time to visit springs locations." ECF 262 at 31.  But the
cited TPEIS-1411 email states "[m]ore time to review the baselines and to see the sites in the
field would have been helpful." As BLM did review the baselines, this email does not
demonstrate that no spring site visits occurred. The email is at best more evidence of BLM
employee inconsequential comments that, as even the writer acknowledged, did not make the
model unhelpful. *Id.* BRL contests that although the employee said that "it is still useful data,"
she could not have meant it was useful for the baseline, only for the model. ECF 262 at 27 n.44.
But a baseline is needed for the model, so data useful in the model is useful for the baseline.
Furthermore, the field survey forms included photographs to give reliable evidence of the
location, conditions, and seasonal variations at the time of each visit. *See generally* TPEIS-0076.

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

to "duplicate the work already done" where the assumptions were "reasonable." *Id.* at 8; *cf. Cal. Trout v. Schaefer*, 58 F.3d 469, 474 (9th Cir. 1995) ("Requiring the Corps to duplicate the[] efforts" of another agency conducting applicable studies "would be nonsensical"). BRL admits that in "work[ing] with Piteau on baselines," BLM reviewed Piteau's reports and analysis.[4] ECF 262 at 31, 9. Those reports presented the data and compared it to the photographs and descriptions in the spring forms, leading BLM to determine the data reasonably reflected the conditions observed. None of BRL's cases provide an example where the agency conducted its own measurements to double-check a NEPA contractor's data.[5] And BLM made a Project site visit in 2018. TPNHPA-0043 AR-000591. Identifying examples of agencies sometimes making site visits does not demonstrate that BLM was obligated to reconstitute Piteau's data set through multi-seasonal re-measurements.[6] BLM demonstrably conducted a statutorily reasonable independent evaluation of Piteau's work, did not identify data adequacy issues, and approved its inclusion into the FEIS. The fact that BRL disagrees does not erase that effort or reflect agency error. ECF 262 at 32 n.50.

## B. The Project's Baseline is Robust.

BRL impliedly admits that its prior arguments were flyspecking—rather than substantively respond to issues, BRL identified *new* alleged inconsistencies in pre-Piteau measurements to

---

[4]BRL claims that BLM proved it did not evaluate Piteau's work because in its briefing BLM stated it "evaluated … the reports and models." ECF 262 at 32. The reports contained the data, and BRL does not contest Lithium Nevada's record citations where the BLM hydrogeologist affirmatively stated that he reviewed the data itself. BLM also stated that "BLM … independently evaluate[d] the data underlying that analysis." ECF 238 at 26.

[5] *Lange v. Brinegar*, 625 F.2d 812, 818–19 (9th Cir. 1980) (agency "made four or five field trips of the route" for planned road); *Roseville v. Norton*, 219 F. Supp. 2d 130, 166 (D.D.C. 2002) (staff attended "site reviews"); *Save Our Wetlands, Inc. v. Sands*, 711 F.2d 634, 643 (5th Cir. 1983) (official relied on "knowledge of the area" and "viewed … photographs of the area" to evaluate contractor's assessment); *Airport Impact Relief, Inc. v. Wykle*, 192 F.3d 197, 208 (1st Cir. 1999) ("staff visits to the East Boston area to examine the … locations"); *Sierra Club v. Marsh*, 714 F. Supp. 539, 557 (D. Me. 1989) (agency personnel toured the project location).

[6]BRL quotes BLM's brief to argue BLM did not evaluate Piteau's "compliance with the Workplan." ECF 262 at 9. But BLM made clear that it "exercised the requisite oversight," ECF 238 at 26, and Lithium Nevada explained in detail how Piteau complied with each element of the Workplan. ECF 239 at 19–25. Piteau's compliance with the workplan is evident in its reports, which show that the workplan's elements were followed. BRL's assertion that BLM did not analyze the Piteau reports in the context of the Workplan is belied by the fact that Piteau's reports provided all the Workplan's requested information. *See infra* § II.B.1.

4

inflate the percentage of "objectionable" streams. These claims are unexhausted and waived, but also mischaracterize the measurements taken. It is <u>false</u> that 40% of the spring flow measurements are "unknown," as the referenced pre-Piteau water surveys clearly identified that while there was water present, there was no flow to measure. BRL misinterprets the surveyors' observations and disagrees with their expert interpretation: the record shows each spring was properly documented as having zero flow. And despite the lack of observed *measurable* flow, the baseline was not set at zero but instead reflected presence of water taking a conservative approach. BRL does little to contest Lithium Nevada's evidence that Piteau's measurements complied with the approved workplan and incorporated even BRL's additional Stevens Protocols elements. The AR demonstrates that Piteau did not knowingly trespass on BRL's land, and the belatedly-raised older measurements explicitly noted that for springs on BRL's land "right-of-way access is granted." TPEIS-0027 AR002396 (1Q 2012 SP-035 field sheet). And both surveyors' measurements were based on their documented observations.

BRL's attempt to "flyspeck" particular measurements over years of surveying are insufficient to show a NEPA violation. *Protect Our Cmtys. Found. v. Jewell*, 825 F.3d 571, 582 (9th Cir. 2016) ("Plaintiffs merely 'fly speck' the EIS rather than identify consequential flaws that would prevent the agency from sufficiently grasping the Project's potential environmental consequences."). BRL does not demonstrate gaps in Piteau's data.[7] All of the surveyors made detailed observations over multiple years at key sites in the Project on field sheets that vindicate the decision to measure certain springs as "no flow." Bartell does not argue he would have measured the 2011–2013 springs differently, he contends that someone could have measured flow where the consultants determined there was inadequate flow to do

---

[7] BRL's repeated cite to *Oregon National Desert Association ("ONDA") v. Jewell*, 840 F.3d 562 (9th Cir. 2016) is still misplaced—where *ONDA* identified data gaps, BRL proffers different data points. BRL challenges where prior surveyors determined "no flow" was measurable but that does not equate to failing to survey an area and then assuming a figure that was not accurate. *Id.* at 567 (no surveys conducted to determine if GSG were present at the site).

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

so accurately. BRL's disagreements with Piteau's process, measurements, and use of prior measurements, remain meritless.

### 1. The Comprehensive Surveys Followed Agreed-Upon Protocols.

Piteau followed BLM-identified protocols and BRL's disagreements simply misinterpret the underlying recommendations. BRL accepts that BLM directed Piteau to follow specific Level 1 protocols. But where the flow measurement requirement, listed as a "Level 1" protocol, may have incorporated related Level 2 elements, BRL contends that BLM therefore required Piteau to follow *all* of the Level 2 Protocols. ECF 262 at 4 n.5. Where elements of the Workplan correspond to specific Level 2 Protocols it does not incorporate BRL's entirely unreferenced Protocols, and the Court is "'most deferential' when the agency is 'making predictions, within its [area of] special expertise'" using a model. *Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008) (citation omitted). AR evidence demonstrates Piteau fulfilled all identified Protocols, required or not. Piteau did not omit measurements, and instead increased the monitoring locations from prior surveys to ensure a robust baseline. TPEIS-0711 AR067399–400.[8] BLM's confirmation of Piteau's compliance with the applicable protocol elements *and* BLM Guidelines[9] demonstrates reasonable analysis of the baseline.[10]

Piteau followed the specific Stevens Protocols Level 2 survey recommendations that BRL argues were violated—to avoid trespass, utilize sketch maps, take physical notes during surveys, and measure flow in a seasonally and locationally appropriate manner. BRL argues that its own emails alleging trespass constitute "evidence" and repeats that it has "no trespassing" signs on the property. BRL does not contest that Piteau did not see the signs,[11] but

---

[8]While Piteau's baseline utilized "collected data from 56 seeps and springs," BRL is correct that some data was collected by prior surveyors. TPEIS-0711 AR066149.

[9]BRL does not dispute that Piteau fulfilled the BLM Guidelines for "Data Adequacy Standards," Water Resources Analysis, Data, and Groundwater Modeling Guidance. ECF 239 at 20–21.

[10]BRL's examples where agencies used faulty methodologies are inapposite—BRL and BLM both agree that certain Stevens Protocols apply to the Workplan. *Cf. League of Wilderness Defs.-Blue Mts. Biodiversity Project v. U.S. Forest Serv.*, 2004 U.S. Dist. LEXIS 24413, at *22 (D. Or. Nov. 19, 2004) (determining a model "inadequate for use" because "it was explicitly recognized as being inapplicable" to the data used).

[11]The AR does not demonstrate the signs were in place during Piteau's measurements.

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

6

claims that Piteau should not have relied on the map it used and should have known from older reports in 2013 that the land was private. But although those reports noted that SP-023 and SP-035 were on private land, the field sheets that BRL cites to reveal those surveyors had "right-of-way[12] access … granted." TPEIS-0027 AR-002396 (1Q 2012 SP-035 measurement)—which explains why BRL does not now allege that previous surveyors trespassed.

At some point, access was granted and the springs on BRL's property were considered publicly accessible due to the proximity to the perceived public road. AR002119 (2Q 2012 note that "SP-023 … SP-035 … are also located on private property but are easily accessible from the road and fall within the right-of-way. Thus, permission is not required."). Piteau did not see "no trespassing" signs and BRL alleges that Piteau read these field reports, which state that "permission was not required." There is no evidence of Piteau "'willfully going onto another's property' after having been warned … not to trespass" as required for "trespass" under Nevada law. *McCall v. Las Vegas Metro. Police Dep't*, 2020 U.S. Dist. LEXIS 52264, at *5 n.1 (D. Nev. Mar. 23, 2020).[13] In any event, the Stevens Protocols recommend landowner outreach to benefit the survey by "focus[ing] monitoring" and "ensure the security and ownership of the inventory data." TPEIS-0642 AR060685. There is no question that Piteau focused its monitoring on BRL's concerns and there was never fear for data security.[14] Therefore, BRL cannot demonstrate Piteau trespassed, or call the data collected into

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

---

[12]BRL asserts that the right-of-way is "non-existent," but does not address these prior statements.

[13]BRL's 1880 caselaw is superseded by statute and the remaining out of state cases inapposite. ECF 262 at 25. No evidence shows Piteau trespassed or mismeasured streams or why he would. It makes no sense for Piteau to spend over a year accessing springs to build a case that the area would be unaffected, then commit to the extensive monitoring plan, TPEIS-1408 AR104274, risking the results would contradict prior work. While BRL abandons its initial argument that Piteau was dishonest for money, this argument provides no reason for trespass, and no "corrupt[] or impur[e]" motive." *Id.* Piteau demonstrated integrity, and BLM's "substantial *supervision*" and use of Piteau "only … for technical expertise or to supplement staff" corroborated that integrity. *AWARE v. Colo. DOT*, 153 F.3d 1122, 1129 (10th Cir. 1998); *supra* § II.A.

[14]BRL does not contest Bartell was provided data from his springs. TPEIS-0406 AR048358.

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

1   question—the public or private nature of the two springs' measurements does not alter

2   photographs or disrupt flow measurements, meaning the veracity of Piteau's data remains.[15]

3       BRL argues that "[f]ield data sheets" and "sketchmaps" are important Stevens Protocols

4   but does not dispute Lithium Nevada's identification of AR evidence that Piteau used both.

5   Piteau identified its springs on "more efficient and accurate" digital sketch maps, TPEIS-0642

6   AR060701, and used detailed survey forms to compile notes taken in field notebooks during

7   surveys, fulfilling the purpose of the Stevens Protocols' recommendation to use field data

8   sheets to record data "on hard copy sheets." AR060687.[16] BRL's extra-record testimony is not

9   to the contrary, and the cited pages do not address this argument. ECF 208-2 at 12, 20.

10      BRL's final claim under the Stevens Protocols is that Piteau should have measured in

11   different places to obtain the "appropriate" maximum discharge. BRL contests Piteau's SP-

12   035 measurements as taken at the orifice, but does not respond to Lithium Nevada's

13   explanation that, although another part of the "groundwater upwell on the property" had higher

14   flow, that area was "categorized separately," which explained why Piteau's SP-035

15   measurement was lower than the one BRL's Dr. Powell obtained. TPEIS-0713 AR067619–

16   20.[17] As for SP-036, BRL reargues that Piteau mis-measured it, but does not contest that the

17   Stevens Protocols' flow measurement recommendations allow that such measurements are

18   influenced by the type of flow at issue. TPEIS-0642 AR060709. Given "actual contribution

19   from SP-036," as opposed to flow intermingled from other identified springs, any baseflow

20

[15]Nor would the hydrogeological model change *even if* these two springs were omitted. TPEIS-

21  0406 AR048356. These springs are not "vital to BLM's conclusion that the [Project] would not impact water rights." ECF 262 at 24 n.37. BRL does not contend trespass for SP-023, also on

22  his property but measured by pre-Piteau surveyors. When informed of BRL's concern, LNC apologized to Mr. Bartell and instructed its staff and consultants to stay off this road. *Id.* BRL

23  does not contend that Piteau trespassed to access SP-035 or SP-042 after this conversation.

24  [16]BRL does not contest the photos on the Spring Survey forms are reliable. ECF 239 at 23–24.

[17]As for BRL's argument that Piteau incorrectly measured SP-035 as having no flow, ECF 262

25  at 10, there is no alternative explanation for Piteau's observation that "[n]o surface flow was observed discharging from these areas at the time of Piteau's survey." TPEIS-0713 AR067619–

26  20; TPEIS-0076, AR008498 (Q1 2018 SP-035 "[n]o flow"); *id.*, (Q2 2018 at 15 (SP-035 "[n]o flow"); AR008819 (Q3 2018, SP-035 "[n]o flow"); AR008642 (Q4 2018, SP-035 "[n]o flow").

27  Although BRL still disagrees, ECF 262 at 10 n.14, were SP-035 to have flow, Piteau mapped it as contributing to Crowley Creek.  TPEIS-0711 AR066321 (map identifying SP-035 as forming

28  part of the middle of Crowley Creek).

was "masked" and Piteau appropriately measured no flow. TPEIS-0713 AR067622.[18] Piteau determined its measurement point for SP-036 applying its expert judgment as to where best to measure flow, and BRL's contrary measurement is simply taken at a different place. TPEIS-1489 AR106690; TPEIS-0713 AR067622 (agreeing that Upper and Middle reaches of Pole Creek were flowing … from 25-95 gpm).[19] BRL's "disagree[ment] with the methodology does not constitute a NEPA violation" and this Court should defer to Piteau's measurement at the point it deemed the maximum measurable discharge. *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1053 (9th Cir. 2012).

BRL repeats its argument that SP-047 (Sheep Creek) was mis-measured but does not respond to Lithium Nevada's evidentiary or procedural defenses. First, BRL did not raise issues with SP-047's measurement in its NEPA comments so this argument is waived. *Havasupai Tribe v. Robertson*, 943 F.2d 32, 34 (9th Cir. 1991). Second, BRL's argument that "a different hydrogeologist['s]" flow record more accurately reflected maximum discharge is incorrect and another expert battle. ECF 262 at 8. While SP-047 may be a "gaining reach," it is located far from the Project "on the other side of the [Kings River Valley] divide" and Piteau made the decision to measure at the "[s]pring orifice found along rangefront exposure in the hillside." TPEIS-0076 AR008509. Whether BRL's alternative measurement is connected to the spring and constitutes the same reach is unclear and immaterial to the Project's impacts.

Similarly, BRL's new challenge of SP-048 measurements is unexhausted and waived. But even were the Court to analyze the claim that SP-048 should have been measured at a point where BRL claims the highest flow occurs (in a culvert under the road), TPEIS-0076 AR-008510, that flow rate did not change across four seasons and does not represent SP-048's flow. AR008510 (Q1); Q2 2018, App. A at 41 (Q2); AR008845 (Q3); AR008668 (Q4). Piteau reasonably measured downstream of the orifice where there were "good channel conditions"

---

[18]But the hydrogeological model conservatively assumes a potential risk to certain springs within a 10-foot contour and Lithium Nevada will still monitor SP-036 as part of an additional 1-mile buffer zone beyond the 10-foot contour. TPEIS-0384 AR045714.

[19]Piteau's measurements of SP-036 in 2020 validated the model's predictions. TPEIS-0713 AR067622. This information is in Piteau's report which BLM reviewed and understood.

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

to record SP-048's flow. An expert decision on where to measure flow is reserved to BLM's discretion and entitled to deference.[20] *Native Ecosystems*, 697 F.3d at 1053 (disagreeing with the agency's methodology does not constitute a NEPA violation.).

### 2. BLM's Baseline Measurements are Accurate.

BRL disputes, for the first time in either the NEPA review or this case, certain measurements from pre-Piteau surveys. These unexhausted arguments are waived. *Ventana Wilderness All. v. Bradford*, 2007 U.S. Dist. LEXIS 48366, at *13 (N.D. Cal. June 27, 2007). As revealed below, BRL challenges one or two measurements per spring, which cannot amount to concerns about "40 percent" of the flow measurements. Each spring's flow average is the result of *multiple quarters* of flow measurements, meaning BRL still ultimately challenges only a fraction of the data collected for the baseline. BRL's challenges are meritless because the survey forms match the surveyors' recorded observations. BRL asserts that responding to these new arguments "will require a fact-intensive inquiry," boldly asserting the prejudice. ECF 262 at 10 n.15. But even if the Court considered these new arguments, the older stream measurements document the surveyors' recorded observations reflected in the survey forms. Where BRL contests the proper way to measure particular springs, NEPA does not "require [the Court] to resolve disagreements among various scientists as to methodology" and defers to the agency. *Inland Empire Pub. Lands Council v. Schultz*, 992 F.2d 977, 981 (9th Cir. 1993).

### a. Pre-Piteau Spring Measurements

In asserting that there was "documented flow" to argue unreliability or error in spring surveying, BRL fails to acknowledge that the past surveyors were simply noting that, while there was some evidence of water, there was insufficient "flow" to accurately record a measurement. Extensive monitoring, both previous and ongoing, ensure that BLM can observe and mitigate any impacts of the Project to the surrounding environment. TPEIS-0384 AR047986 ("Monitoring during the early stages of the project would provide opportunities to refine the understanding of the groundwater and surface water system"); AR045573 ("monitoring plan

---

[20]It is therefore *not* "admitted or well established that Piteau … fail[ed] to follow the Stevens Protocols."  ECF 262 at 8.

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

would be provided by LNC to the BLM, NDWR, and NDOW for review and approval prior to project initiation"). BRL now challenges hydrology measurements that are mostly of springs far away from its property and the Project, asserting that of over 50 springs measured,[21] 12 have alleged "[e]rrors or insufficiencies." ECF 262 at 10. BRL is incorrect. BRL first claims seven springs (BLM-02, SP-008, SP-029, SP-030, SP-032, SP-035, and SP-042) incorrectly have a "baseline flow of zero" because there was "observed flow," which was "documented flow at all quarters of the year" for five (unidentified) of the seven. *Id.* at 10.[22] But the survey records show that while each spring was properly documented as having zero flow,[23] the baseline was still not set at zero. Instead, "[b]ased on comments provided," Piteau and BLM "assigned non-zero flux targets" in the hydrogeological model for SP-055, SP-036, a spring in Rock Creek, and springs in Pole Creek." TPEIS-0713 AR067664. BRL also challenges the observed baselines of "<1 gpm" for SP-006,[24] SP-010, and SP-031,[25] claiming the prior surveyors "never actually

[21]BRL argues Lithium Nevada "falsely asserted Piteau measured" all 56 springs. Where Lithium Nevada referenced "Piteau's measurements" it was ascribing the data already collected as "Piteau's" due to Piteau's use of the data in the hydrogeological model. As is clear in this section, Piteau did not take the measurements BRL now challenges, but did use them in the model.

[22]BRL argues that because these springs are classified perennial, they cannot have "zero average flow." ECF 262 at 10. Piteau accurately documented presence of standing water as "perennial" but the absence of measurable water *movement* meant the average gpm was zero. Conservatively terming these springs "perennial" means they are identified for possible monitoring. If those springs were termed ephemeral, it would be expected they may dry up intermittently.

[23]TPEIS-0027 (1Q 2012) AR002358 (BLM-02 "A flow measurement was not taken because the water was not concentrated in one area."); AR002372 (SP-008 "minimal water present[,] [but] [w]ater was observed dripping from the well head"); AR002387 (SP-029 "minimal water present"); AR002388 (SP-030 "grasses … observed in the [multiple] spring channels," implying insufficient water); AR002391 (SP-032 grasses and clover …observed in the [multiple] spring channel[s]," implying insufficient water); AR002396 (SP-035 "clover … observed in the [multiple] spring channel[s]," implying insufficient water); TPEIS-0076 AR008656 (SP-042 "no flow"); TPEIS-0027 (2Q 2012) AR002156 (SP-008 "spring origin [only] damp"); AR002156 (SP-029 "water flowed … under common reed grass[,] [c]attle had trampled a path to the spring source, but that path was not an acceptable location to sample the water"); AR002158 (SP-030 "cattle disturbed the spring channel[,] [t]he water that had pooled was murky and muddy"); AR002160 (SP-032 "water flowed through many channels under cover" of vegetation).

[24]BRL argues that the surveyor should have recorded SP-006's flow via the pipes present, but the spring form's observation attributed that flow to "watering troughs with plastic piping developed by a local rancher," not natural spring flow.  TPEIS-0027 AR002553 (2Q 2011).

[25]BRL contends that when surveyors recorded SP-031 flows, it was "always greater than 1 gpm," meaning the "<1" gpm was incorrect. But math-wise, five measurement attempts producing only two instances of flow does indeed come out to less than 1 gpm. TPEIS-0027 AR002159 (2Q 2012, SP-031 "Flow (gpm): 1.98"); AR002088 (2Q 2013, SP-031 "Flow (gpm): 1.59"); *but see*

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

measured" the flow. ECF 262 at 10–11.[26] Oddly, this seems to be the approach BRL would prefer with its first set of springs—BRL noted there was water but the surveyors determined it was not enough to measure. But for these three springs, the experts determined there was sufficient water movement for the surveyors to conservatively indicate above-zero flow, but not enough to take a measurement.[27] "[T]he manner in which an agency resolves conflicting evidence is entitled to deference so long as it is not arbitrary and capricious." *Trout Unlimited v. Lohn*, 559 F.3d 946, 958 (9th Cir. 2009). The photos and measurements belie BRL's claim that the surveyors "observed significant flow." BRL provides no evidence or reason why these previous surveyors would intentionally under-measure flow or evidence. The surveyors measured flow when they identified that it was present and measurable. *Compare* TPEIS-0027 AR002159 (2Q 2012 SP-031 "Flow (gpm): 1.98"); AR002169 (2Q 2012 SP-038 "Flow (gpm): 0.34"); *with* AR002390 (1Q 2012 SP-031 no measurement due to "minimal presence of water"); AR002401 (1Q 2012 SP-038 no measurement due to "standing and muddy" water). BRL's disagreement, based solely on its misinterpretation of the surveyors' notes, does not show a NEPA violation, and BRL's attempt to increase its contested spring measurements to 55% "of the [22] perennial springs" are unexhausted and unavailing. *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1301 (9th Cir. 2003) (agency "entitled to wide discretion in assessing the scientific evidence").[28] BRL does

AR002390 (1Q 2012, "minimal presence of water," no measurement); AR002340 (4Q 2012 measured "N/A"); AR002296 (1Q 2013, "flow was minimal," measured "N/A"). Piteau accurately calculated an average of less than 1: (1.59+1.98+[0 x 3])/5 = .714.

[26]BRL complains that where the surveyor saw *extensive* flow through multiple channels" it should have measured SP-010. ECF 262 at 11 n.18. BRL exaggerates and substitutes its opinion. TPEIS-0027 AR002373 (1Q 2012 observing SP-010 flow "through many channels" but noted "snow present near the spring origin," causing doubt as to the impetus for the flow); AR002623 (2Q 2011 estimating SP-010 flow as "<1 gpm" because it was "influenced by Thacker Creek").

[27]TPEIS-0027, AR002553, AR002520 (2Q 2011 SP-006 is "not measurable" but "discharge … drains westward"); AR002561, AR002623 (2Q 2011 SP-10 is "not measurable" but "runoff … is … discharged generated from snow melt"); AR002051 (4Q 2011 SP-006 "spring origin was wet" but "water in the spring channel was frozen"); AR002054 (4Q 2011 SP-010 "water flowed freely through many channels … under a section of ice").

[28]BRL attempts to differentiate its "factual accuracy" attacks from its disagreement with Piteau's methodology. But where BRL is arguing nuance and the best interpretation of data that is difficult to measure, "[t]he agency plausibly explained that apparent differences" in the data arose from measurement locations, interpretation of negligible flow, and measurement methodology, it was not "arbitrary and capricious in relying on its own data and discounting [BRL's] alternative evidence." *Earth Island Inst.*, 351 F.3d at 1302.

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

not identify errors, but just presents its own interpretation. BLM explained that where "there is some uncertainty regarding potential reductions in baseflow" BLM "require[s] monitoring and mitigation measures to address any unforeseen impacts." TPEIS-0713 AR067587.

BRL also now argues that BLM-03 and SP-023 were not classified as "perennial"[29] but had "four straight quarters" of "documented flow." ECF 262 at 11–12. But the surveyors' notes show BRL's characterization of these streams as having "documented flow" is another exaggeration.[30] BRL argues that where there was too little flow, measurements should not have been recorded as "zero" flow, and thus, Piteau should have determined the baseline "insufficient." ECF 262 at 12 n.22. But where the prior surveyors clearly indicated "<1 gpm" where they believed it appropriate, Piteau reasonably interpreted that estimate as describing dampness or insufficient flow as a "zero" measurement.[31] As the Stevens Protocols states, "flow measurements at springs

---

[29]BRL raises another unexhausted argument, that springs BLM-002, BLM-003, SP-029, SP-030, SP-031, SP-032, SP-035, SP-047, and SP-048 deemed "ephemeral" must be perennial because it was observed that they contained springsnails. ECF 262 at 12 n.20. But the document that BRL relies on to assert that springsnails cannot occur in ephemeral springs is a post-FEIS submission from the ENGO plaintiffs and was not before BLM during the NEPA process. TPEIS-0826. But even if it were, the report only says ephemeral springs "rarely" support springsnails and they "generally" occur in perennial springs but acknowledged that "spring ecosystems are highly individualistic." AR072172, AR072100. Furthermore, the report identifies the types of springs where springsnails *are* found (helocrenes, hillslope springs, and rheocrenes), AR072099, which are the same environments within the identified ephemeral springs. TPEIS-0076 2019 GPS Shape Files, Datasheet at Table 5.1 (identifying BLM-002, BLM-003, SP-029, and SP-048 as Rheocrene; SP-030, SP-031, SP-032, SP-047 as hillslope; SP-035 as heleocrene). Even were this post-FEIS report reviewable, it does not call into question the surveyors' measurements.

[30] TPEIS-0027 AR002630, AR002581 (2Q 2011, SP-023 "estimated FLOWS: none," "seep was covered with crushed rock"); AR002485 (3Q 2011, SP-023 "water movement minimal," "[w]ater had pooled in many areas"); AR002064 (4Q 2011, SP-023 "pooled areas were stagnant," no measurement taken); AR002383 (1Q 2012, SP-023 a "clear pool" but "water movement minimal"); AR002152 (2Q 2012, SP-023 "a clear pond" but "movement was minimal"); AR002041 (1Q 2012, BLM-03 "water was completely frozen," no measurement taken); AR002360 (2Q 2012, BLM-03 "minimal water was observed," no measurement taken); AR002131 (3Q 2012, BLM-03 "flow very low," no measurement taken).

[31]BRL identifies that while the 2012–2013 "no flow" measurements of SP-030 and SP-032 were listed as "0" in Table 5.1 of Piteau's January 11, 2019 datasheet, TPEIS-0076 2019 GPS Shape Files at Table 5.1, the FEIS lists those baselines as "<1 gpm." The January 11, 2019 data sheet was a working copy that Piteau updated after incorporating further analysis, resulting in an updated version of Table 5.1 in the Q4 2018 Report submitted January 25, 2019. AR008613–14. The January 25 Table 5.1 figures were updated again in the August 2019 Baseline Report in Table 3.4, incorporating four additional springs. TPEIS-0081 AR010632–34. The August 2019

13

can be challenging," "[f]low measurement techniques vary in relation to site and season," and while variability in measurements is expected it "improves with multi-decadal monitoring," which Lithium Nevada committed to in this Project. TPEIS-0642 AR060708–09. BRL presents no reason why Piteau should have interpreted the prior surveyors' "no flow" measurement— which is logically less than the "<1 gpm" measurement—as zero flow. Furthermore, prior to operations monitoring of spring flow both inside and outside the simulated 10-foot drawdown isopleth will begin, TPEIS-0384 AR046679, AR046681, continually updating the model and preparing for mitigation if needed. AR046685. The Court cannot "second-guess methodological choice made by an agency in its area of expertise." *Inland Empire*, 992 F.2d at 981.

### b. Piteau's Spring Measurements

BRL extends certain[32] prior criticisms of the SP-55 measurement and makes a new argument that SP-042's baseline was "misrepresented as 0 gpm." BRL's new criticism is unfounded, as every visit demonstrated standing water, not flow.[33] BRL also criticizes Piteau's characterization of SP-055 as ephemeral, claiming it "feeds 10 miles of pipelines during all months of the year." But the record does not bear out BRL's argument. Although BRL has made this assertion since the DEIS comment period, Piteau welcomed BRL to provide information regarding these pipes and said it would add such information "to the database" to inform continuous monitoring efforts, but noted that both the 10-foot drawdown isopleth and the 1-mile buffer area were still "several miles away from SP-055" and that "additional data at [SP-055] is not sufficient to change the impacts associated with mining at Thacker Pass Project." TPEIS-0713 AR067623. Both SP-055 and -042 are far beyond the additional 1-mile buffer around the zone of impact. TPEIS-0384 AR045714. BRL fails to show how such a measurement at a spring far beyond the additional 1-mile buffer around the zone of impact would make any difference, amounting to

Report's Table 3.4 matches the FEIS's Table 3.4. TPEIS-0384 AR047815. The fact that an old spreadsheet does not match the final product says nothing about its accuracy or reliability.

[32]BRL does not dispute Piteau's accurate observation that SP-001 is no longer "a natural stream," which is unrelated to Lithium Nevada's prior exploration activities. ECF 239 at 28.

[33]The photos and spring forms demonstrate the truth of these measurements. TPEIS-0076, AR008504 (Q1 2018 "[s]tanding water"); at 29 (Q2 2018 "[s]tanding water"); AR008833 (Q3 2018 "[s]tanding water"); AR008656 (Q4 2018 "[s]tanding water").

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

1  fly-specking or, at most to harmless error. *Drakes Bay Oyster Co. v. Jewell*, 729 F.3d 967, 985

2  (9th Cir. 2013) ("Relief is available under the APA only for 'prejudicial error.'").

3      BRL fails to show Piteau lacked integrity. To "ensure" the integrity of an EIS an agency must

4  "identify any methodologies used and shall make explicit reference by footnote to the scientific

5  and other sources relied upon." 40 C.F.R. § 1502.24 (2019).   The FIES properly cites all

6  references and BRL does not argue Piteau's data is unavailable. An EIS lacks integrity when it

7  relies on surveys that were "not conduct[ed]" for a large number of identified sites, *Conservation*

8  *Nw. v. Rey*, 674 F. Supp. 2d 1232, 1252 (W.D. Wash. 2009), but when measurements *were* taken

9  "[s]cientific integrity allows for the honest difference of opinion."  Holly Doremus, *Scientific*

10  *and Political Integrity in Environmental Policy*, 86 Tex. L. Rev. 1601, 1624 (2008); *Earth Island*

11  *Inst.*, 351 F.3d at 1302 (agency was "entitled to use the data it collected" where it was "obtained

12  in compliance with the … methodology" and reasonably addressed "unreliable or preliminary"

13  evidence). Piteau conducted highly variable measurements under the prescribed protocols and

14  developed and reality-tested the model. TPEIS-0713 AR067622. Piteau's data and analysis is

15  "sound" and of high "quality." ECF 262 at 17.

### c.  Groundwater Baseline

17      BRL again challenges one measurement from Piteau and one from the Stringham Report in

18  the groundwater baseline. BRL reargues Piteau's datum correction of a single sensor (PZ17-01)

19  but does not challenge that that "[t]he adjustment *did not occur to data collected during the*

20  *pumping test* in October 2018," meaning it "has effectively no bearing on the groundwater

21  impacts." TPEIS-0713 AR067621 (emphasis added). BRL argues this insignificant correction

22  merited more attention but fails to show why and, BLM oversaw and managed Piteau.[34] BRL's

23  only response is to argue that Lithium Nevada incorrectly claimed Piteau monitored 100 wells.

24  ECF 262 at 13.[35] That is false, as Lithium Nevada quoted the FEIS's explanation that Piteau

**HOLLAND & HART LLP**
**5441 KIETZKE LANE, SUITE 200**
**RENO, NV 89511-2094**

---

25  [34]It is not credible to contend that Piteau acted throughout the process like it could "get away"

26  with something by neglecting "self-investigation"—it was clear BRL might challenge the Project. If anything, Piteau was incentivized to follow all industry standards to be vindicated.

27  [35]BRL includes a citation to TPEIS-0448, repeating its suspicions of the graph PW18-01. BRL

28  raised this issue in its untimely post-FEIS comments. But BRL fails to respond to Lithium

collects data from "over 100 groundwater monitoring *locations*," TPEIS-0713 AR067621 (emphasis added), meaning monitoring multiple parts of springs, creeks, and wells. Notably, the very NDWR database BRL accuses Piteau of ignoring in its criticism of the Stringham report was incorporated into the FEIS list of 111 monitoring locations. TPEIS-0711 AR-066170.

BRL again objects to BLM's use of Piteau's measurements and Stringham's 2020 report in assessing the groundwater baseline and asserts that NDWR's historical monitoring of a particular location[36] should have been used instead. ECF 241 at 30–31. BRL misunderstands the import of the numbers he cites. Had Stringham relied solely on NDWR's single shallower depth-to-groundwater measurement of 6.7ft to characterize the entire 640 acres within Section 33, she would have determined that the estimated 5ft drawdown (i.e., the increase of depth-to-groundwater increasing from 6.7 to 11.7ft) would mean the vegetation of concern (basin wildrye) could still easily reach the groundwater because its roots can extend to a depth of 19ft. TPEIS-0343 AR044864. Instead, the deeper depth-to-groundwater range of 14-30ft means that a 5ft drawdown could "have a negative impact on basin wildrye production," resulting in monitoring that BRL's recommended measurement would not. *Id.* Piteau and Stringham's analysis[37] was more recent than NDWR's and resulted in specific monitoring for BRL's area of concern. TPEIS-0343 AR044870. "[W]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Earth Island Inst.*, 351 F.3d at 1301. BRL challenges Piteau's groundwater measurements, although such measurements are "highly variable," TPEIS-0713 AR067607, by pointing to measurements of a different area nearby. This

---

Nevada's explanation that the key is the graph's depiction of the "drawdown over time," TPEIS-0711 AR066185, which does not change between the two graphs regardless of the starting water level. Piteau ran simulations confirming that "[t]he model reasonably matches the drawdowns and recovery observed during aquifer testing." AR066184–86. BRL does not address this.

[36]BRL argues Piteau described the monitoring location as the "NW 1/4 of Section 33" and because NDWR's measurement was also in the NW portion, it must be the same place. But the AR does not reflect the exact location of either measurement within this 160-acre quarter of a section for "high variable" measurements. TPEIS-0713 AR067607. This evidence was only provided post-FEIS and is therefore unexhausted and should be disregarded.

[37]BRL claims it's "false" that Piteau's data supported Stringham's report, but Stringham explicitly relied on Piteau's groundwater levels. TPEIS-0343 AR044858–59.

resulted in the FEIS identifying "specified monitoring and mitigation measures to protect these resources." AR067607–08. BRL simply disagrees and cites its own post-FEIS comments for support. ECF 262 at 14 n.25. In such a difference of opinion on highly variable measurements, the Court defers to the agency and its specialists. *Native Ecosystems*, 697 F.3d at 1053.

### d.   Pole Creek Baseline

As with other measurements, each of BRL's allegations of error and unreliability regarding the Pole Creek baseline are mischaracterizations or misunderstanding of the extensive data collected and BLM's expert's interpretation of that data. BRL faults Piteau for terming "Pole Creek [as] an ephemeral stream," but the FEIS section cited focuses on the "lower reaches … [which] are seasonally dry," because only those lower reaches extend into the Project's area of impact. TPEIS-0384 AR047803.[38] The FEIS acknowledges that "upper reaches of [Pole] creek may flow perennially in intermittent sections," AR046536, which is why the groundwater model "simulates perennial flow to the Upper and Middle reaches of Pole Creek." AR046564. The simulated flows support the "belief that Pole Creek has perennial reaches, although not observed down-gradient of SP-036" into the Project area. *Id.* Even with the conservative model calibration assuming 65 gpm, 32 gpm, and 19 gpm in Upper, Middle, and Lower Pole Creek, AR046565,[39] the model predicts "[n]o measurable impacts to the Upper and Middle reaches of Pole Creek"—simulated groundwater flow reductions are <1gpm. AR046582. Therefore, BRL's concerns carry no weight. While BRL contends Bartell's expert's measurements "should have

---

[38]BRL makes an unexhausted argument citing to post-FEIS comments regarding Lower Pole Creek claiming there are "late season flows." Dr. Powell's dispute with Piteau fails. BRL contends that Pole Creek's lower reach is "critical for LCT migration," citing NDOW comments that request the FEIS clarify that the "*upper sections* … [of] Pole Creek are perennial streams occupied by LCT." TPEIS-1114 AR097073. While Piteau's analysis does not disagree that portions of Upper Pole Creek are perennial, BRL does not dispute that the BA only notes that the northern Upper Pole Creek area supports LCT, TPEIS-1396 AR104047. NDOW has not identified LCT in Pole Creek since 2015. ECF 239 at 33 n.28; TPEIS-0384 AR046138 ("No LCT occur in Thacker Creek or lower reaches of Pole Creek").

[39]While the actual inputs to the groundwater model were the observed 0 gpm, Piteau calibrated the conceptual model to conservative higher estimates of flow. TPEIS-0384 AR046565. Even with those conservative estimates, Pole Creek's "surface water flow components are unaffected" and the "baseflow decline" to Upper and Middle Pole is so small it is "beyond the ability to effectively quantify with field measurements." AR046579.

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

1   been included as part of the baseline" BLM does not err when it chooses to rely on its expert

2   instead. *ONDA v. Shuford*, 2007 U.S. Dist. LEXIS 42614, at *21–22 (D. Or. June 8, 2007).

3       The hydrogeological model is robust, based on defensible extensive measurements, and a

4   reasonable use of modeling software in the NEPA process.[40] Piteau's additional measurements

5   were incorporated into the model with "[a] total of 150 water level targets" and "35 flux targets

6   … for the pre-mining calibration." TPEIS-0711 AR066170.[41] BRL does not dispute Piteau

7   conducted supplemental surveys but disputes those surveys were relevant to the hydrogeological

8   model, claiming Piteau only took three more measurements. ECF 262 at 14. But those

9   measurements were across three different seasons, meaning Piteau followed the Steven's

10  Protocol recommendation to measure across seasons. TPEIS-0642 AR060719. These flow

11  measurements were scrutinized for accuracy, causing Piteau to determine that the "[h]igher flow

12  … observed in the June visit" were "part of spring runoff and not representative of baseflow

13  conditions." TPEIS-0374 AR-045396.[42] Analyzing measurements to ensure they reflect true

14  conditions is what BRL wants, but only if that scrutiny would produce a higher flow. Because

15  this analysis identifies the (over double) June flow as an outlier, BRL contends it is wrong—

16  based on decades-old NDOW measurements and its distrust of Piteau.[43] BLM used "its technical

17  _____

18  [40]BRL cites its unexhausted post-FEIS comments on Piteau's incorporation of
    evapotranspiration ("ET") into the baseline. But the FEIS explains that "[g]roundwater ET was

19  simulated with the evapotranspiration package in MODFLOW-USG," considering ET for all
    measurements. TPEIS-0384 AR046550 (explaining "[t]he simulated groundwater budget for
    pre-mining conditions" incorporates "[d]ischarge occur[ring]" from ET).

20  [41]"[T]he model was calibrated to baseflow in Crowley Creek," not Pole Creek. TPEIS-0406

21  AR048356. Where BRL claims to contest the other pre-mining flux targets, he is repeating its
    unmerited attacks on pre-Piteau flow measurements. ECF 262 at 14 n.28; *supra* § II.B.2.a.

22  [42]BRL repeats its concern that Lower Pole Creek will have a "50-percent reduction in flow." But
    the FEIS clearly states when combining the flows from the "several ephemeral springs" making

23  up Lower Pole Creek (including "SP-039 which flows seasonally at rates greater than 150 gpm")
    "[t]he magnitude of seasonal spring flow (>150gpm) is much greater than simulated groundwater

24  flow declines (14 gpm)." TPEIS-0711 AR066194. This means "[t]he potential reduction in
    groundwater flow to Lower Pole Creek should be interpreted as i) potential reduction in peak

25  flows and/or ii) the duration of spring discharge is slightly shortened." *Id.*

26  [43]BRL reiterates that BLM should have used NDOW measurements from 1987 without including
    the date of those measurements. *Cloud Found. v. BLM*, 2013 U.S. Dist. LEXIS 43371, at *20

27  (D. Nev. Mar. 26, 2013) (holding Plaintiffs failed to show that BLM's use of data was unreliable
    where plaintiffs relied on data that was only three years old). Agencies may differ in their

28  measurements, and "the manner in which an agency resolves conflicting evidence is entitled to

expertise to draw reasonable inferences from the available scientific information," and using this data in the model was not arbitrary or capricious. [44] *Fallon Paiute-Shoshone Tribe v. U.S. DOI*, 2022 U.S. App. LEXIS 21194, at *8 (9th Cir. Aug. 1, 2022).

## C.    BLM Approved an Extensive Effective Monitoring and Mitigation Plan.

BRL erroneously argues mitigation is not possible because the baseline is unreliable. As discussed, the model used conservative baseline flow estimates and Piteau and prior surveyors accurately recorded their observations, meaning the baseline is robust. *See* § II.B.2. BRL incorrectly asserts that baselines of "zero flow" mean that there will be no mitigation of potential impacts.[45] But due to the consistent quarterly monitoring within the mitigation plan (which BRL neither attacks nor discusses) the majority of which begins "prior to the commencement of mining," TPEIS-0384 AR046681, Piteau will continuously add data to even better understand the hydrogeological makeup of the Project area and refine the model's inputs and outputs in coordination with the Technical Advisory Group. AR045573; AR047987 (BLM, NDWR, and NDOW will review and approve the monitoring plan). This adaptive management approach can incorporate "data …provided by other sources … [in]to the database." AR048021; AR048026 ("BLM may require reasonable modifications and adjustments to … increase[] monitoring frequencies"). Where BLM "account[s] for … uncertainty" by using conservative projections and adding an additional 1-mile buffer of monitoring, the mitigation plan is reasonable. *Cf. Maddalena v. U.S.*, 2010 U.S. Dist. LEXIS 145857, at *23–25 (S.D. Cal. Aug. 5, 2010). BLM extended monitoring under the mitigation plan 1-mile beyond the area of predicted impacts, demonstrating the "[p]redictive simulations are conservative with respect to drawdown extent …. Even under the simulated conditions the

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

deference." *Trout Unlimited*, 559 F.3d at 958. BLM reasonably relied on Piteau's more comprehensive and recent analysis.

[44] BRL does not contest that FWS agreed in the BA that "the Project is estimated to impact less than 1.0 percent of [Pole and Crowley Creek] stream flows." TPEIS-1396 AR104048.

[45] BRL raises two emails to imply BLM distrusted the baseline, which address different topics altogether. The first shows BLM raised potential issues with Lithium Nevada in 2019, ensuring that it would be addressed. TPEIS-0107 AR109236 ("BLM is interested in [Lithium Nevada's] proposed method of … prevent[ing] draining of water sources to Pole Creek"). The second is BLM's description of BRL's concern about an unrelated operator. TPEIS-1122 AR097325.

predicted impacts to springs and flow in Pole Creek are minor and less than measurement error." TPEIS-0384 AR046597.[46] Where BLM identifies impacts and establishes a monitoring and mitigation plan—even if it does not "entirely eliminate impacts to water"[47]—BLM satisfied its requirement to assess mitigation and "was within its discretion to conclude" the monitoring in the mitigation plan was "the best approach." *Ctr. for Biological Diversity v. BLM*, 2017 U.S. Dist. LEXIS 137089, at *30–32 (D. Nev. Aug. 23, 2017). This conservative monitoring plan and robust baseline demonstrate that BLM's decision was reasonable.

### D.    BLM Provided Adequate Publicly Available Information.

NEPA requires the public be informed regarding the decision-making process. 40 C.F.R. § 1500.1(a). BRL does not contest that BLM provided the documents BRL requested for "all data, models, studies and documents, in any way related to the Final EIS." TPEIS-0874 AR082030; TPEIS-0872 AR081895 (BRL confirmed receipt).[48] Nor does BRL contest that BLM is not legally required to continue responding to comments after the FEIS is complete.[49] ECF 239 at 13–14. BRL complains that BLM "admit[ted]" that Fish and Wildlife Service's BA "was not publicly available," ECF 262 at 13, 32, but does not dispute that there is no legal requirement for public review of the BA or consultation process details. ECF 239 at 14–16.[50]

---

[46]BRL complains that "BLM [did] not address [its] mitigation argument," ignoring Lithium Nevada's response. ECF 239 at 35–36. BRL fails to respond to the fact that the early-warning groundwater monitoring network will flag for mitigation any drawdowns to the extent they affect surface flows or groundwater users. TPEIS-0711 AR066300.

[47]BRL erroneously contends "near immediate drawdowns" are projected to occur. But the graphs cited demonstrate projected drawdowns over the course of *forty plus years*, and BRL does not explain how such a small decrease will noticeably impact the spring flow. TPEIS-0711 066572 (SP-28); AR066580 (SP-036); 066583 (SP-039); 066584 (SP-040); 066587 (SP-043).

[48]BRL repeats the accusation that BLM "discussed … avoid[ing] responding to" BRL. ECF 262 at 13. But Lithium Nevada explained that BLM *did* respond to BRL. ECF 239 at 12 n.8.

[49]Nor did BLM  "falsely suggest[]" that Piteau did not prepare comment responses. *See* ECF 204 at 19 (citing emails that actual show Piteau contributed to the comment Reponses). Piteau was hired as a NEPA contractor. BLM never represented to BRL that BLM alone responded to comments but did state that "[t]he comment response is BLM's point of view" TPEIS-1439 AR104975—because BLM reviewed and approved Piteau's contributions. TPEIS-1405.

[50]BRL argues sulfur use was excluded from the DEIS. Lithium Nevada fully rebutted this. ECF 239 at 5 n.2. Other commenters were able to identify the Phase 2 sulfur amount, TPEIS-0384 AR047995, and BLM responded to BRL's comment on the Phase 2 amount.  AR047998.

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

BRL reargues that the "Mitigation Plan was not publicly available," contending Lithium Nevada incorrectly argued BRL's "FEIS comments" addressed the October 2020 mitigation plan. ECF 262 at 13. Not so—Lithium Nevada cited to BRL's FEIS comments which acknowledged that "LNC… develop[ed] a mitigation plan" and expressed concern with the plan described in FEIS Appendix P (the May 2020 Plan). TPEIS-1489 AR106706.[51] BLM included the plan in the DEIS.[52] The May 2020 Mitigation Plan outlined the same monitoring objectives and mitigation approaches as the October 2020 Plan. ECF 239 at 12–13.

While BRL argues the May 2020 Plan did not specify "mitigation … on [the] Ranch's private lands," BRL cites, not to a new aspect of the mitigation plan, but a specific piezometer monitoring location "at the toe of Crowley Creek Fan," a decision made "in coordination with a local landowner." TPEIS-0454 AR052553; TPEIS-1408 AR104284 (describing the same monitoring of "Crowley Creek['s] sub-irrgat[ion]" of Burns Field via piezometer monitoring"). Strangely, BRL appears to be claiming it was unaware of a change from the DEIS to the FEIS that BRL requested and participated in. As Lithium Nevada previously explained, this detail of the October 2020 Plan simply expanded on the identified strategies in the May 2020 Plan—namely, "measuring piezometric levels adjacent to the gaining reach of Crowley Creek" to monitor "groundwater conditions" and "monitor water levels to the south." TPEIS-0312 AR040744.[53] Therefore, the May 2020 Plan "discussed [mitigation] in sufficient detail to ensure that environmental consequences have been fairly evaluated," while BLM continued to develop the Plan in compliance with the law which does not require "that a

---

[51]BRL contends that it never commented on the mitigation plan in Appendix P because it commented only on "the FEIS in general." But BRL is unnecessarily pedantic—the mitigation plan was *in* the FEIS, and BRL's "FEIS comments" specifically addressed elements of that plan.

[52]*Compare* TPEIS-0312 AR040743 *with* TPEIS-0384 AR046677. BRL disagreed with the May 2020 Plan, providing "knowing[] comments." ECF 262 at 33; TPEIS-1489 AR106757 ("the DEIS is proposing to use monitoring as a substitute for mitigation"); AR106742 (referring to mitigation for stock water, TPEIS-0312 AR040752, and deriding the effort as insufficient).

[53]The expanded October 2020 Plan incorporated BRL's comments to increase protection of BRL's areas of concern. TPEIS-1407 AR104257–58.

complete mitigation plan be actually formulated and adopted" when signing the ROD.[54]

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989).

### E.  BLM Complied with FLPMA.

BRL argues that the Project does not comply with required sage grouse mitigation or the VRM categories under the applicable RMP as amended by the 2015 Greater Sage-Grouse ("GSG") Resource Management Plan Amendments ("RMPA"). Both claims demonstrate a misunderstanding of the law, the AR, and the BLM's decision—which requires significant GSG mitigation.[55] BRL's cited caselaw is inapposite for locatable mining projects.[56] As BRL and the RMPA recognize, the lithium ore bodies are "not flexible in terms of location," and certain limitations or mandates only apply in the context of locatable minerals "to the extent allowed by law." TPEIS-0713 AR067723. The RMPA expressly provides that development of locatable minerals is "allowed under the General Mining Law of 1872 on all BLM-administered ... lands, unless they are withdrawn from mineral entry." ECF 242, Ex. 1, Sec. 3.13 at 3-139.[57] Because "agencies 'have less discretion with respect to when and where

---

[54]BRL argues BLM "hid[] … key documents," naming the Stringham Report and the Sensitivity Analysis. ECF 33 at n.53. But both the additional Pole Creek measurements and September 2020 Stringham analysis were conducted *in response to DEIS comments*, so they were appropriately cited in the FEIS, TPEIS-0384 AR045987, and provided to BRL. TPEIS-0872 AR081895.

[55]BRL incorrectly claims that BLM "never attempted to locate the mine outside sage grouse … habitat." ECF 262 at 36 n.56. But Lithium Nevada moved the project previously, TPEIS-0384 AR045794 specifically to "site[] the Project facilities away and south of the high Montana Mountains area to specifically avoid high-value sage-grouse habitat." AR045844.

[56]*Rags Over the Ark. River v. BLM*, 77 F. Supp. 3d 1038, 1044 (D. Colo. 2015) (art installation); *Gardner v. BLM*, 633 F. Supp. 2d 1212, 1227 (D. Or. 2009) (ORV use); *Nat. Res. Def. Council, Inc. v. Jamison*, 815 F. Supp. 454, 462 (D.D.C. 1992) (coal lease); *Theodore Roosevelt Conservation P'ship v. Salazar*, 605 F. Supp. 2d 263, 283 (D.D.C. 2009) (oil lease); *Cloud Found.*, 2013 U.S. Dist. LEXIS 43371, at *32–33 (wild horses); *Cal. Coastal Com v. Granite Rock Co.*, 480 U.S. 572, 587–88 (1987) (considering if state environmental laws were preempted by federal law); *Bohmker v. Oregon*, 903 F.3d 1029, 1038 (9th Cir. 2018) (same); *ONDA v. BLM*, 2014 U.S. Dist. LEXIS 137154, at *1–2 (D. Or. Sep. 29, 2014) (lacking jurisdiction to evaluate FLPMA claims).

[57]BRL contends that BLM claimed it would ensure full compliance with RMPs in *Mineral Policy Center ("MPC") v. Norton*, 292 F. Supp. 2d 30, 48 (D.D.C. 2003).  *MPC* did not evaluate a proposed project and observed that future projects would comply with RMPs "[c]onsistent with the mining laws." *Id.* at 49. BLM could not deny approval of the Project solely because of GSG habitat because it would work an implicit withdrawal of the area from mining in violation of FLPMA. Therefore, "[c]onsistent with the mining laws," BLM reasonably applied certain requirements. *Earthworks v. DOI*, 496 F. Supp. 3d 472, 492 (D.D.C. 2020) ("*MPC* says nothing

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

mineral exploration and mining under the Mining Law is conducted,'" *W. Watersheds Project v. Bernhardt*, 519 F. Supp. 3d 763, 775 (D. Idaho Feb. 11, 2021), most stipulations do not apply to locatable mineral development. ECF 242 Ex. 1, Sec. 3.13 at 3-139.[58] BLM terms this "nondiscretionary" under FLPMA which expressly amended the Mining Law in four ways, none of which apply to RMPs.  ECF 242 at 6 (quoting 43 U.S.C. § 1701, note (h) ("All actions by the Secretary concerned under this Act shall be subject to valid existing rights"). FLPMA does not amend the Mining Law of 1872 to impair the rights of any locators. *Earthworks*, 496 F. Supp. 3d 472, 493 n.14.  Oddly, BRL relies on 43 U.S.C. § 1712(e)(3) to argue that an RMP can "regulate" mining rights when that section makes express that any impairment of mining rights can only be achieved through a mineral withdrawal under 43 U.S.C. § 1714. Nor does BRL's cited case support that an RMP is an "environmental regulation" which governs how mining occurs as the RMP itself does not purport to do that but instead recognizes that most stipulations do not apply to nondiscretionary locatable mineral projects.[59] And the Project still engages in comprehensive GSG mitigation strategies that BRL does not refute. Lithium Nevada will offset GSG impacts through use of the BLM-approved Nevada Conservation Credit System ("CCS"). TPEIS-0384 AR045592–93. The CCS observed that although neither highly suitable habitat nor breeding habitat occur in the Project area, it used an area over twice the size of the Project area to analyze indirect effects to GSG and used the highest possible score for each map unit to determine the "debits" for the Project. TPEIS-0060 AR006249, AR006267, AR006272. This is in addition to Lithium Nevada re-locating the Project to avoid "potential direct impacts to resources []in the Montana Mountains." TPEIS-0384 AR045794.

---

about the practical process of determining whether a claim is valid, whether the government has an affirmative obligation to do so, or when such an obligation, if it exists, might attach").

[58]While this Court remanded the ARMPA for NEPA violations, it did not vacate the ROD. *W. Expl., LLC v. DOI*, 250 F. Supp. 3d 718, 750 (D. Nev. 2017).

[59]Were "State laws or regulations [to] conflict with this subpart regarding operations on public lands, [Lithium Nevada] must follow the requirements of this subpart." 43 C.F.R. § 3809.3. Where BLM regulations supersede conflicting state laws, the RMP—not a law or regulation -- would similarly only apply where allowed by BLM regulations.  ECF 270 at 1-11.

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

BRL argues that more GSG requirements should apply because there has not been a "discovery of valuable minerals" under certain mining claims. BRL concedes that the mine pit is mineralized. ECF 262 at 37 n.57. BRL ignores there is mineralization throughout the Project. TPEIS-0660 AR061833 (mineralization "throughout the caldera"); TPEIS-0234 AR033937. While mine construction and exploration is entirely within the caldera, BRL argues that there are parts of the Project "located outside the McDermitt Caldera, where lithium is not found," citing to his DEIS comments challenging Lithium Nevada's lode claims under the land used exclusively for constructing a water line.[60] But this powerline constitutes allowable occupancy of "structure[s] fixed to the ground by … poles," authorized under 43 C.F.R. § 3715.0-5.

Contrary to BRL's construction, "the Mining Law, its implementing regulations, and related case law have never required BLM to verify the validity of a claim by independently confirming discovery." *Earthworks*, 496 F. Supp. 3d at 492. BLM's regulations consider validity of mining claims only for lands segregated or withdrawn, 43 C.F.R.§§ 3809.100, 3809.411(d)(3); and expressly allow use of public lands under the Mining Law so long as the use is reasonably incident to and calculated to lead to the extraction of minerals. *Id.* § 3715.2; ECF 242 at 3–6.[61] Consistent with the law and BLM regulations, BLM has never required a validity determination on BLM public lands that are neither segregated nor withdrawn despite unsuccessful challenges to its mining regulations requesting that it do so. *Earthworks*, 496 F. Supp. 3d 492–93. BRL mistakenly relies on *Center for Biological Diversity v. USFWS*, 33 F.4th 1202, 1218 (9th Cir. 2022), but that case is inapposite as it does not consider FLPMA or BLM's regulations and involves distinguishable facts from this case as detailed in ECF 270 at 1-11 incorporated by reference. BLM required mitigation and required design features that avoid surface disturbance during GSG breeding season, anti-perch devices to prevent predation, TPEIS-0384 AR045844, and reclaim of disturbed areas to "pre-disturbance

---

[60]BRL contends that BLM needed to investigate the validity of Lithium Nevada's lode claims under the proposed powerline. This irrelevant argument can only be raised by a rival mine claimant, *see* ECF 237 at 4, and the use of the land is authorized under a § 3715.0-5 in any event.

[61]Courts defer to BLM's interpretation of the Mining Law. *Grand Canyon Trust v. Provencio*, 26 F.4th 815, 824 (9th Cir. 2022).

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

conditions," AR045577, so that "[c]oncurrent reclamation will be maximized to the extent practicable to accelerate revegetation of disturbed areas." AR045826.[62] BLM properly applied FLPMA and its Mining Regulations to authorize the Project.

### F.  BRL Lacks Standing under NEPA.

BRL is concerned about having less groundwater available for commercial purposes. *City of Fernley v. Conant*, 2021 U.S. Dist. LEXIS 237595, at *11–12 (D. Nev. Dec. 13, 2021). Mr. Bartell's[63] scoping comments noted two environmental concerns both in the context of his economic concerns. TPEIS-1489 AR106854; AR106853. These two asides in 9 pages of commercial concerns do not change that "the gravamen of the harm alleged is economic." *Fernley*, 2021 U.S. Dist. LEXIS 237595, at *13. Although after obtaining a lawyer Mr. Bartell's complaints began making a point of alleging concern for the health of the environment, it does not change that the only manner in which he is claiming injury to himself is by the feared impact to his ranching operations. *W. Radio Servs. Co. v. Espy*, 79 F.3d 896, 903 (9th Cir. 1996) (later attempts to characterize economic harms as environmental did not establish standing). His declaration[64] begins and ends with economic concern. ECF 206 ¶¶ 1, 41. Adding environmental claims once litigation seemed likely does not demonstrate that his ranching interests are "'systematically, not fortuitously' … aligned with those that 'Congress sought to protect'" under NEPA. *Yount v. Salazar*, 2013 U.S. Dist. LEXIS 2673, at *59 (D. Ariz. Jan. 8, 2013) (citations omitted).  Mr. Bartell therefore lacks standing under NEPA.

### III. Conclusion

For all these reasons, Lithium Nevada's Motion should be granted.

Dated: August 11, 2022.

/s/ *Laura K. Granier*

---

[62]BRL does not contest that VRM "classes are informational in nature," nor rebut caselaw concluding that the Court "will not second-guess the agency's weighing of the … visual resource areas in light of its experience and expertise." ECF 239 at 39. BLM reasonably determined that "the adverse visual impacts were not significant enough to justify disapproving the project." *Id.*

[63]It is "physically impossible for commercial ranches to enjoy the beauty of … natur[e]." *Duval Ranching Co. v. Glickman*, 965 F. Supp. 1427, 1441 n.7 (D. Nev. 1997).

[64]BRL's contention that it cited to the "entire[ty]" of Mr. Bartell's standing section is for briefing on the motion to strike that has concluded. These untimely arguments on it should be disregarded.

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Laura K. Granier (SBN 7357)
Jessica Freitas (SBN 16079)
HOLLAND & HART LLP
*Attorneys for Lithium Nevada Corp.*

HOLLAND & HART LLP
5441 KIETZKE LANE, SUITE 200
RENO, NV 89511-2094