1
2
3                    UNITED STATES DISTRICT COURT
4                         DISTRICT OF NEVADA
5                              * * *
6    BARTELL RANCH LLC, *et al.*,              Case No. 3:21-cv-00080-MMD-CLB
7                            Plaintiffs,              ORDER
8         v.
9    ESTER M. MCCULLOUGH, *et al.*,
                             Defendants.
10
11   **I.    SUMMARY**

12         Plaintiffs[1] and Plaintiff-Intervenors[2] challenge the Bureau of Land Management of

13   the U.S. Department of Interior's[3] approval of Intervenor-Defendant Lithium Nevada

14   Corporation's plan to build a lithium mine near Thacker Pass, Nevada and engage in

15   further exploration for lithium (the "Project"). They ask the Court to review BLM's Record

16   of Decision ("ROD") under the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.*

17   ("APA"), challenging BLM's compliance with three federal statutes.[4] While this case

18   encapsulates the tensions among competing interests and policy goals, this order does

19   _____

20        [1]Bartell Ranch LLC and Edward Bartell (collectively, the "Rancher Plaintiffs"), along
     with Western Watersheds Project, Wildlands Defense, Great Basin Resource Watch, and
21   Basin and Range Watch (collectively, the "Environmental Plaintiffs").

22        [2]Reno-Sparks Indian Colony ("RSIC") and the Burns Paiute Tribe. The Court refers
     to both tribes collectively as the Tribal Plaintiffs.
23
24        [3]Ester M. McCullough, the District Manager of BLM's Winnemucca office, along
     with the Department of the Interior, are also named Defendants. The Court refers to them
25   collectively as the Federal Defendants.

26        [4]The National Environmental Policy Act, 42 U.S.C. §§ 4321-61 ("NEPA"), the
     Federal Land Policy and Management Act, 43 U.S.C. §§ 1701-1787 ("FLPMA"), and the
27   National Historic Preservation Act, 54 U.S.C. § 300101, *et seq.* ("NHPA"). (ECF Nos. 1,
     46, 83.) *See also Western Watersheds Project, et al. v. Bureau of Land Management of
28   the U.S. Department of the Interior, et al.*, Case No. 3:21-cv-00103-MMD-CLB, ECF No.
     1 (D. Nev. Filed Feb. 26, 2021) (since consolidated into this case).

1   not somehow pick a winner based on policy considerations. That is not this Court's role.

2   The Court's role instead is to carefully apply the applicable standard of judicial review to

3   consider the decision of a federal agency that is generally entitled to deference, based

4   entirely on the contents of the records before the agency at the time of its challenged

5   decision.

6       This order addresses the parties' dispositive motions seeking judgment on the

7   merits.[5] (ECF Nos. 202, 203, 204, 205, 241, 242.) The Court explains below its resolution

8   of the pending motions, and, thus, this case. To preview, the Court finds that *Ctr. for*

9   *Biological Diversity v. United States Fish & Wildlife Serv.*, 33 F.4th 1202 (9th Cir. 2022)

10  ("*Rosemont*") applies. This in turn leads the Court to conclude that BLM's approval of the

11  Project violated FLPMA as it relates to the approximately 1300 acres of land Lithium

12  Nevada intends to bury under waste rock because BLM did not first make a mining rights

13  validity determination as to those land. The Court otherwise affirms BLM's decision,

14  rejecting arguments that the Project will cause unnecessary and undue degradation to the

15  local sage grouse population and habitat, groundwater aquifers, and air quality in violation

16  of FLPMA, that BLM failed to adequately assess the Project's impacts on air quality,

17  wildlife, and groundwater in violation of NEPA, that BLM failed to adequately consider the

18  Project's impacts as to the area's contemporary cultural or religious significance to local

19  tribes also in violation of NEPA, and that BLM unreasonably or in bad faith decided not to

20  consult with Tribal Plaintiffs before approving the Project in violation of the NHPA. In sum,

21  the Court concludes that BLM's decision as it relates to approval of land to be used for

22  waste dumps violated FLPMA (43 U.S.C. § 1732(b)) and is therefore arbitrary and

23  capricious under the APA. But the Court otherwise rejects Plaintiff and Plaintiff-

24  Intervenors' claims.

25

26       [5]These motions are fully briefed, and the Court has reviewed all of the briefing the

27   parties submitted. In addition, the Court held an in-person hearing ("Hearing") on the
     pending motions on January 5, 2023. (ECF Nos. 273 (setting hearing), 277 (hearing

28   minutes).) The Court accordingly discusses *infra* some arguments and concessions the
     parties made at the Hearing.

The Court has also determined this is the rare case where remand without vacatur is appropriate primarily because the records suggest BLM could fix the error the Court identifies and Plaintiffs fail in their other legal challenges to BLM's decision to approve the Project. The Court will remand for BLM to fix the error—to determine whether Lithium Nevada possesses valid rights to the waste dump and mine tailings land it intends to use for the Project. But the Court declines to vacate the ROD pending BLM's review of the mining plan of operations portion of the Project.

## II.    LEGAL STANDARD

The Court reviews BLM's decision to issue the ROD based entirely on the contents of the Administrative Record ("AR") under the APA. "The APA does not allow the court to overturn an agency decision because it disagrees with the decision or with the agency's conclusions about environmental impacts." *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010). But "[u]nder the [APA], a reviewing court shall 'hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law....'" *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (quoting 5 U.S.C. § 706(2)(A)). An agency's decision may be reversed as arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "To make this finding, the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971).

But in reviewing an agency's decision under this standard, "the reviewing court may not substitute its judgment for that of the agency." *Envtl. Def. Ctr., Inc. v. U.S. Envtl. Prot. Agency*, 344 F.3d 832, 858 n.36 (9th Cir. 2003); *see also Rosemont*, 33 F.4th at 1216

(same). And the Court's "review is limited to 'the grounds that the agency invoked when it took the action.'" *Id.* (citation omitted). Although this review is narrow, "a reviewing court must conduct a searching and careful inquiry into the facts." *Nw. Motorcycle Ass'n*, 18 F.3d at 1471. "A satisfactory explanation of agency action is essential for adequate judicial review, because the focus of judicial review is not on the wisdom of the agency's decision, but on whether the process employed by the agency to reach its decision took into consideration all the relevant factors." *Asarco, Inc. v. U.S. Envtl. Prot. Agency*, 616 F.2d 1153, 1159 (1980).

The Court reviews for substantial evidence the agency's factual conclusions based on the administrative record. *See Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1068 (9th Cir. 2018). "Where 'evidence is susceptible of more than one rational interpretation,' [the Court upholds] the agency's finding if a 'reasonable mind might accept [it] as adequate to support a conclusion.'" *Id.* (citation omitted).

## III. DISCUSSION

The Court primarily organizes this discussion by plaintiff group, first discussing Environmental Plaintiffs' claims, then Rancher Plaintiffs' claims, and then Tribal Plaintiffs' claims. However, the Court notes when two plaintiff groups have essentially the same claims and considers those claims together. And the Court concludes by explaining its decision to remand without vacatur.

### A. Environmental Plaintiffs

Environmental Plaintiffs argue BLM's decision to approve the Project in the ROD violates FLPMA and NEPA. The Court addresses below Environmental Plaintiffs' arguments under both statutes after first describing the pertinent factual background.

### 1. Factual Background

Lithium Nevada submitted two plans of operations (one for exploration, and the other for mining and reclamation) to BLM for approval in September 2019. (TPEIS-0452 at AR-052517.) BLM approved both plans in the ROD. (*Id.*)

///

4

The pertinent NEPA process began when BLM issued a notice of intent to prepare an environmental impact statement on January 21, 2020. *See* Notice of Intent To Prepare a Draft Environmental Impact Statement and Resource Management Plan Amendment, for the Lithium Nevada Corp., Thacker Pass Project Proposed Plan of Operations and Reclamation Plan Permit Application, Humboldt County, Nevada, 85 FR 3413-02, 2020 WL 279646 (Jan. 21, 2020). BLM then went through a scoping period where it held two virtual public meetings in Winnemucca and Orovada, Nevada on February 5 and 6, 2020, and received 26 comment letters. (ECF No. 237 at 11-12.)

BLM provided a draft environmental impact statement with underlying data and analysis to stakeholders including the Nevada Department of Wildlife ("NDOW") in the spring of 2020, and made the draft environmental impact statement available for public comment on July 29, 2020. *See* Notice of Availability of the Draft Environmental Impact Statement, 85 FR 45651-01, 2020 WL 4340040 (Jul. 29, 2020). BLM held two additional public meetings in August 2020 and received 63 letters commenting on the draft environmental impact statement. (ECF No. 237 at 12.)

BLM then issued the final environmental impact statement ("FEIS") on December 4, 2020. *See* Notice of Availability of the Final Environmental Impact Statement for the Proposed Thacker Pass Project, Two Plans of Operations Submitted by Lithium Nevada Corporation for Mining and Exploration in Humboldt County, Nevada, 85 FR 78349-01, 2020 WL 7075441 (Dec. 4, 2020). BLM considered additional comments submitted in the 30 days that followed, including from Plaintiffs, NDOW, and the United States Environmental Protection Agency ("EPA"). And as noted, BLM issued the ROD approving the Project on January 15, 2021. (TPEIS-0452 at AR-052515.)

### 2.    FLPMA

Environmental Plaintiffs argue BLM violated FLPMA in two different ways: (1) by approving the Project, which does not comply with the Nevada and Northeastern California Greater Sage-Grouse Approved 2015 RMP Amendment ("ARMPA"), the applicable, regional land-use plan, based on the erroneous presumption that Lithium Nevada

possessed valid rights under the Mining Law of 1872 (codified as amended at 30 U.S.C. §§ 21 to 54) (the "Mining Law") to the land that Lithium Nevada intends to use as waste dumps;[6] and (2) because the Project will cause unnecessary and undue degradation ("UUD") prohibited by FLPMA in any event. (ECF No. 202 at 15-31, 43-48.) The Court addresses each of Environmental Plaintiffs' FLPMA arguments in turn.

### a.   Mining Law

More than a year after BLM issued the ROD, and indeed after briefing on the pending motions began, the United States Court of Appeals for the Ninth Circuit issued its opinion in *Rosemont*, 33 F.4th 1202. The Court indicated to the parties that it was interested in hearing argument at the Hearing on the extent to which *Rosemont* controls the outcome of this case. (ECF No. 276.) And, indeed, much of the argument at the Hearing focused on the application of *Rosemont* to this case. As further explained below, the Court finds that *Rosemont* applies, which means that BLM must have, but did not, determine whether Lithium Nevada has valid rights under the Mining Law to occupy the approximately 1300 acres it plans to occupy with waste rock dumps and tailings piles outside the mine pit before issuing the ROD.

*Rosemont* is about a copper mine on Forest Service land, not a lithium mine on BLM land. But the language of the regulations at issue in *Rosemont* is so similar to the language of the regulations at issue here, and the reasoning of *Rosemont* otherwise so applicable to these facts, that the Court finds *Rosemont* controlling. As further explained below, the *Rosemont* court's analysis focused on the Mining Law. The Mining Law "gives to United States citizens free of charge, except for small filing and other fees, mining rights upon discovery of 'valuable minerals' on federal land." *Rosemont*, 33 F.4th at 1208. The

---

[6]Rancher Plaintiffs also make this argument so the Court's analysis of this argument also applies to Rancher Plaintiffs. The Court notes in its discussion any ways in which Rancher Plaintiffs' argument differs from Environmental Plaintiffs' argument. In addition, Rancher Plaintiffs joined Environmental Plaintiffs' motion for summary judgment. (ECF No. 212.) Thus, the Court's discussion of Environmental Plaintiffs' NEPA claims also applies to Rancher Plaintiffs' arguments that overlap with Rancher Plaintiffs' NEPA claims because Rancher Plaintiffs have joined Environmental Plaintiffs' motion.

scope of the Mining Law has been reduced since its enactment, following withdrawals of federal land from mining, later statutory declarations that some minerals are not "valuable mineral deposits" within the meaning of the Mining Law, and the enactment of environmental laws such as NEPA. *See id.* at 1208-09. The Mining Law treats exploration and occupation for purposes of mining differently. *See id.* at 1209. To occupy federal land for mining purposes, a miner must have a valid claim. *See id.* at 1209-10.

In approving the copper mine at issue in *Rosemont*, the Forest Service "either assumed that Rosemont's mining claims on that land were valid or (what amounted to the same thing) did not inquire into the validity of the claims." *Id.* at 1212. "Based on its assumption that the mining claims were valid, the Service concluded that Rosemont's permanent occupation of the claims with its waste rock was permitted under the Mining Law." *Id.*

The *Rosemont* court found the Forest Service erred, instead finding in pertinent part that the Mining Law did not give Rosemont "the right to dump its waste rock on thousands of acres of National Forest land on which it has no valid mining claims." *Id.* at 1218. As the Forest Service abandoned its rationale based on 30 U.S.C. § 612 on appeal, *see id.*, the *Rosemont* court largely focused its analysis on 30 U.S.C. § 22 ("Section 22") of the Mining Law. *See id.* at 1218-1221. And the *Rosemont* court found that Section 22 required a discovery of valuable minerals before a project proponent could permanently occupy any land, including with waste dumps or tailings piles. *See id.* at 1220. The *Rosemont* court also rejected the argument that burying land with waste rock was somehow not permanent. *See id.* at 1220-21.

Even more pertinent to this case, the *Rosemont* court went on to reject the Forest Service's argument that the Forest Service's founding statute and its own regulations created no implicit requirement that the Forest Service determine whether a proponent of a mining project had discovered valuable mineral deposits in land it planned to occupy with waste dumps and tailings piles before approving those uses because that statute and regulation both referred back to the Mining Law itself. *See id.* at 1221-22. The *Rosemont*

court found that the Mining Law accordingly controls, not the Forest Service's founding statute or its regulation. And the Mining Law only gives a right of occupation to lands within which valuable mineral deposits have been found—the question is "not whether valuable minerals might be found." *Id.* at 1222. Said otherwise, the *Rosemont* court found that it was only the Mining Law that could permit the project proponent "to dump its waste rock on its mining claims [but] only if those claims are valid[,]" not the Forest Service's contrary interpretation of its founding statute or its regulations. *See id.* at 1221.

More specifically, the *Rosemont* court interpreted the Forest Service's founding statute as generally intended to protect against depredations to National Forest lands while also specifying that it permitted the continuation of mining activities authorized by federal mining laws, including the Mining Law. *See id.* at 1210. And the Part 228A regulations upon which the Forest Service also relied in *Rosemont* to support its view that it did not have to determine mining claim validity applied to uses of National Forest lands ""in connection with *operations authorized by the United States mining laws*[.]" *Id.* at 1211 (citation omitted, emphasis in original). Thus, both the statute and regulation upon which the Forest Service relied to support its approach to approving the copper mine referred back to the Mining Law.

Like the statute and regulation at issue in *Rosemont*, the statute (FLPMA) and regulations that Federal Defendants and Lithium Nevada rely on to argue BLM was not required to determine whether Lithium Nevada had discovered valuable mineral deposits under the approximately 1300 acres of land Lithium Nevada intends to use for waste dumps and tailings piles also refer back to the Mining Law. (ECF Nos. 237 at 14-16, 18-31, 242 at 11-18.) Federal Defendants first rely on FLPMA itself, specifically 43 U.S.C. § 1732(b). (ECF No. 237 at 27.) The pertinent portion of this section of FLPMA is:

> Except as provided in section 1744, section 1782, and subsection (f) of section 1781 of this title and in the last sentence of this paragraph, no provision of this section or any other section of this Act shall in any way amend the Mining Law of 1872 or impair the rights of any locators or claims under that Act, including, but not limited to, rights of ingress and egress. In

> managing the public lands the Secretary shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands.

43 U.S.C. § 1732(b). As Environmental Plaintiffs argue, this refers back to the Mining Law, much like the Forest Service's founding statute at issue in *Rosemont*. (ECF No. 264 at 22-23.) Indeed, this portion of FLPMA interacts with the Mining Law in two ways. It applies the prohibition on UUD even to rights of any locators or claims under the Mining Law,[7] but more pertinent here, it otherwise explains that interpretation of rights under the Mining Law controls the analysis of whether an agency violated FLPMA in taking an action not sanctioned by the Mining Law. *See* 43 U.S.C. § 1732(b). And the *Rosemont* court recently provided a binding interpretation of the Mining Law, finding that its Section 22 requires a discovery of a valuable mineral deposit for a mining project proponent to have rights under Section 22 before that proponent may permanently occupy any land. *See* 33 F.4th at 1223-24. Thus, contrary to Federal Defendants' argument, 43 U.S.C. § 1732(b) requires BLM to look to Section 22 of the Mining Law, and accordingly make a determination about claim validity, before authorizing a project proponent to occupy non-mill site lands outside a mine pit with waste dumps and tailings piles under *Rosemont*. (ECF No. 237 at 27-28.)

Federal Defendants next proffer BLM's surface-management regulations at 43 C.F.R. subpart 3809 as not requiring any determination from BLM as to whether Lithium Nevada located any valuable mineral deposits under the waste dump land to support BLM's decision not to make any such determination. (*Id.* at 28.) Federal Defendants also point to a BLM handbook interpreting those regulations stating that BLM need not make any validity determination when the land is open to access under the Mining Law.[8] (*Id.* at

---

[7]This is why Environmental Plaintiffs have a distinct argument discussed *infra* that Federal Defendants' decision to approve the Project caused UUD under FLPMA.

[8]"Provided the subject land is open to entry under the Mining Laws, a validity examination is not required to process a Plan of Operations and the NEPA analysis does not need to address mining claim status or validity. Nor does the NEPA analysis need to

29.) Of course, the *Rosemont* court did not address these BLM regulations or its handbook. And it is also true that the *Rosemont* court did not rule on whether the Forest Service could rely on its analogous regulations to support its decision because the Forest Service had not done so in the decision challenged in that case. *See* 33 F.4th at 1223-24. Thus, *Rosemont* does not cleanly foreclose Federal Defendants' argument based on its own regulations and handbook in the way that it does Federal Defendants' argument based on FLPMA (43 U.S.C. § 1732(b)) itself.

However, Environmental Plaintiffs point to one of BLM's surface-management regulations, 43 C.F.R. § 3809.420(a)(3), which specifies that a mining plan of operations must comply with applicable BLM land-use plans, "[c]onsistent with the mining laws[.]" (ECF No. 264 at 13.) And the purpose of the surface-use regulations Federal Defendants rely on to make their argument is to, "[p]revent unnecessary or undue degradation of public lands by operations authorized by the mining laws." 43 C.F.R. § 3809.1(a). Moreover, these surface use provisions are all within a subpart titled, "Part 3800—Mining Claims Under the General Mining Laws[.]" In addition, the specific excerpt of the Handbook Federal Defendants rely on also includes the caveat, "[p]rovided the subject land is open to entry under the Mining Laws[.]" (TPEIS-0714 at AR-067896.) So, overall, BLM's surface-management regulations refer back to the Mining Law, much like the Forest Service regulations the *Rosemont* court discussed. *See* 33 F.4th at 1221 ("The regulations in Part 228A apply to "operations authorized by the United States mining laws.") (citation omitted).

The Court accordingly finds that the appropriate analysis under *Rosemont* looks through BLM's surface-management regulations to the Mining Law itself, and *Rosemont* makes clear that the approving federal agency must evaluate the mining project proponent's rights under lands they intend to use for waste dumps before they approve

_____

discuss how the information gained under a Plan of Operations could support an application to patent a particular mining claim. The issuance of mineral patents is a separate nondiscretionary action not subject to NEPA review." (TPEIS-0714 at AR-067896.)

the use of that land for that purpose. *See generally id.* It is undisputed that Federal Defendants did not do that before issuing the ROD, and indeed Federal Defendants continue to argue they were not required to perform such an evaluation. But the Court cannot simply ignore *Rosemont* even in the face of longstanding BLM policy reflected in its regulations and handbook.[9] Thus, the Court finds that under *Rosemont*, BLM was required to make a validity determination as to the waste dump and mine tailings land before issuing the ROD, regardless of BLM's regulations and handbook.

However, the Court agrees with Federal Defendants and Lithium Nevada that this case differs from *Rosemont* in at least one crucial way that suggests Federal Defendants could cure their issue created by *Rosemont* on remand. In *Rosemont*, there was "no evidence that valuable minerals have been found on Rosemont's mining claims" covering the waste dump land. *Id.* at 1222. "Because no valuable minerals have been found, the claims are necessarily invalid." *Id.* But here, as Federal Defendants and Lithium Nevada point out, there is evidence in the record of lithium mineralization throughout the Project area, including the area slated for burial under waste rock and mine tailings. (ECF Nos. 237 at 31, 31 n.52, 242 at 15-17; *see also, e.g.*, TPEIS-0702 at AR-065693, TPEIS-0234 at AR-033935, TPEIS-0672 at AR-063882 ("More than 40 drill holes throughout the caldera have encountered lithium-mineralized rocks in caldera-fill sedimentary rocks at grades that are potentially economic (Tetra Tech, 2014). In addition, geochemical anomalies and mineralogical studies reported by Glanzman and others (1977), Rytuba and Glanzman (1979), and Stillings (2012) demonstrate that there are occurrences of lithium-mineralized rocks throughout the caldera-fill sedimentary rocks.").)

Accordingly, at least as to Federal Defendants' decision not to analyze whether Lithium Nevada had discovered valuable minerals within the land it plans to bury under waste rock and tailings piles, there is "at least a serious possibility that the [agency would]

---

[9]The *Rosemont* court seemed poised to find invalid regulations inconsistent with its interpretation of the Mining Law, even if it technically did not reach arguments based on the Forest Service's regulations in *Rosemont*. *Compare id.* at 1221 *with id.* at 1223-24.

be able to substantiate its decision on remand[.]" *Pollinator Stewardship Council v. U.S. E.P.A.*, 806 F.3d 520, 532 (9th Cir. 2015) (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)). Said otherwise, BLM simply declined to make any determination as to whether Lithium Nevada had discovered valuable minerals in the land it plans to bury under waste dumps and tailings piles. But BLM could conduct such an analysis on remand, and evidence already in the record suggests that BLM could permissibly allow Lithium Nevada to occupy those land under *Rosemont*, which dealt with the admittedly different situation where no evidence of valuable minerals had been found in the waste dump land.[10]

The Court also finds—based on Environmental Plaintiffs' clarification at the Hearing as to *Rosemont*'s application—that Environmental Plaintiffs only challenge the land approved for waste dumps and tailings piles as part of the Project, not any prior authorizations that Lithium Nevada is already operating under or the plan of exploration also approved in the ROD. Indeed, based on *Rosemont*, such a challenge to approved exploratory activities would be difficult because the *Rosemont* court found a distinction in the Mining Law between exploration and occupation that formed a key plank of its analysis. *See Rosemont*, 33 F.4th at 1209-1210, 1219-21. But the point here is that Environmental Plaintiffs rely on *Rosemont* to only challenge—successfully, as explained herein—a portion of the activities approved in the ROD, further suggesting that remand without vacatur may be appropriate.

///

---

[10]While it appears that BLM could fix its *Rosemont* issue on remand, the fix would nonetheless further illustrate a key tension discussed in *Rosemont*. As the *Rosemont* court explains, the Mining Law "allows the owner of a valid mining claim on land containing valuable minerals to obtain possessory rights to other land for use as a 'mill site.'" *Id.* at 1210. And implementing regulations specify that mill sites can be used for waste dumps and tailings piles. *See id.* But unfortunately for mining project proponents like Lithium Nevada, the statute limits mill sites to five acres, though regulations permit the potential authorization of the use of multiple mill sites. *See id.*; *see also* 30 U.S.C. § 42(b). This is not enough land for modern mining projects like the one Lithium Nevada is pursuing here. However, as the *Rosemont* court explained, that is a problem with the statute best fixed by Congress. *See* 33 F.4th at 1224.

The Court now addresses some additional arguments it finds unpersuasive. At the Hearing, Rancher Plaintiffs argued *Rosemont* also requires BLM to make a validity determination as to all land required for the Project beyond the mine pit—and hinted at this argument in a cursory way in their brief as well.[11] (ECF No. 204 at 49 ("Moreover, BLM failed to show that mine infrastructure cannot be located outside the PHMA and GHMAs, as required by the 2015 and 2019 ARMPA.").) The Court does not read *Rosemont* as extending beyond land a mining project proponent intends to cover with waste rock and mine tailings. Such lands were squarely *Rosemont's* focus. *Rosemont* does not address production wells, water lines, or power transmission lines. Lithium Nevada's counsel asserted at the Hearing that those facilities are covered under separate authorizations. And Rancher Plaintiffs have not proffered a case to support their argument that *Rosemont* extends beyond land for proposed burial under waste dumps and mine tailings for which no validity determination has first been completed as to the discovery of valuable minerals.

That brings the Court to two of Lithium Nevada's arguments based on other Ninth Circuit opinions, neither of which the Court finds ultimately persuasive. At the Hearing, Lithium Nevada's counsel argued the outcome of this case is controlled by *United States v. Richardson*, 599 F.2d 290 (9th Cir. 1979), not *Rosemont*. Lithium Nevada relies on *Richardson* because it draws a distinction between BLM and Forest Service regulations when it comes to interpretation of the Mining Law. *See id.* at 294 (stating that BLM "regulations do not, however, apply to national forest lands under the jurisdiction of the Secretary of Agriculture"). This aspect of *Richardson* no doubt supports Lithium Nevada's argument that *Rosemont* is distinguishable. But it would be quite a leap to simply ignore *Rosemont*, binding precedent from this past year—and where the *Rosemont* court's reasoning clearly applies to the facts of this case—because of a single point in an opinion

---

[11]Environmental Plaintiffs' counsel walked a line at the Hearing, agreeing he joined Rancher Plaintiffs' counsel's argument on this point, but consistently reiterating that Environmental Plaintiffs' argument focused on the waste dump and mine tailings land. And indeed, the Court understands Environmental Plaintiffs' argument based on *Rosemont* as limited to the approximately 1300 acres of waste dump land, and the plan of operations approved in the ROD.

from 1979.[12] Moreover, the difference between the facts of this case and *Richardson* is much deeper than the difference between the facts of this case and *Rosemont*.

The *Richardson* court affirmed the decision of a district court entering an injunction against a couple who was attempting to prospect for minerals on their mining claims on National Forest land using a bulldozer and a backhoe, prohibiting them from continuing to prospect that way, and requiring that they restore the land they had torn up. *See generally id.* In the key portion of its analysis, the *Richardson* court held that the Forest Service had the power under 30 U.S.C. § 612 to prohibit and enjoin 'excessive bulldozing' by looking to the legislative history of that statute. *See id.* at 294-25. "In summary," the *Richardson* court concluded, "we suggest that each case of this kind is controlled by the facts of each particular case." *Id.* at 295.

Thus, the facts of and analysis in *Richardson*—an opinion explicitly limited to its facts from 1979—are very different from the facts pertinent to this case and the analysis the Court conducted comparing these facts to *Rosemont*, *supra*. For the reasons provided *supra*, *Rosemont* is a much better fit to the facts of this case, and issued this past year. The Court declines to entirely discount the applicability of *Rosemont* because the *Richardson* court stated that BLM regulations do not apply to analysis of Forest Service actions.

Lithium Nevada also relies on *Grand Canyon Trust v. Provencio*, 26 F.4th 815, 824 (9th Cir. 2022) to support its argument that, "[b]ecause the Mining Law does not expressly address whether a validity determination is required prior to authorization of a mine plan BLM's interpretation is entitled to deference." (ECF No. 242 at 12.) That is an accurate citation to *Provencio*, but the Court views this as a different situation. The *Provencio* court held that the Department of the Interior's interpretation of "valuable mineral deposit" was entitled to *Chevron* deference, and was neither arbitrary nor capricious, but the *Provencio* court did not face a situation where the Ninth Circuit had recently offered a conflicting

---

[12]Incidentally, *Richardson* was authored by the namesake of the Reno Courthouse, Bruce R. Thompson, sitting by designation.

interpretation of "valuable mineral deposit." *See generally* 26 F.4th 815. Here, and as discussed *supra*, the *Rosemont* court recently held that the Mining Law requires the approving agency to determine whether a mining project proponent has discovered 'valuable mineral deposits' before permitting that proponent to permanently occupy those federal lands with waste dumps and tailings piles. Thus, the Court cannot evaluate BLM's regulations not requiring such a validity determination in a vacuum. And the Court is of course bound by the published opinions of the Ninth Circuit. Said otherwise, the Court must conduct a somewhat different analysis than the *Provencio* court because of *Rosemont*. And the conclusion the Court draws from its analysis is that BLM's regulations requiring no validity determination are invalid because they conflict with *Rosemont*. The Court accordingly follows *Rosemont*, not BLM's regulations written before *Rosemont* issued, and does not defer to BLM's regulations as *Provencio* may otherwise suggest.

In sum, BLM's approval of the plan of operations portion of the Project specifically regarding the approximately 1300 acres Lithium Nevada intends to occupy with waste dumps and mine tailings—and that land only—was arbitrary and capricious under the APA and violated FLPMA (43 U.S.C. § 1732(b)) because BLM did not first determine whether Lithium Nevada had discovered valuable mineral deposits within those lands—a violation of the Mining Law as interpreted in *Rosemont*.[13] But for clarity, and in line with the allegations in this case, the violation is of FLPMA, not the Mining Law directly,[14] because 43 U.S.C. § 1732(b) does not, in pertinent part, "amend the Mining Law of 1872 or impair the rights of any locators or claims under that Act[.]" *Id.* So as described *supra*, the Court essentially looks through FLPMA to the Mining Law, and finds Federal Defendants violated

---

[13]For this reason, the Court need not—and does not—address Lithium Nevada's alternative argument forcefully pressed at the Hearing that the Project complies with the ARMPA in any event. (*See also* ECF Nos. 278, 278-1 (additional AR citations generally offered in support of that argument).)

[14]As Federal Defendants and Lithium Nevada point out, no Plaintiffs or Plaintiff-Intervenors have brought a claim under the Mining Law directly. Environmental Plaintiffs allege a violation of FLPMA as to their *Rosemont* argument.

1  FLPMA under *Rosemont* in issuing the ROD as it relates to the approval of the land for
2  waste dumps and mine tailings.

3                              **b.    UUD**

4          Regardless of whether Lithium Nevada has valid rights under the Mining Law,
5  Environmental Plaintiffs also argue the Project will cause UUD impermissible under
6  FLPMA in several ways. Specifically, Environmental Plaintiffs argue the Project
7  impermissibly: (1) fails to affect a net conservation gain for sage grouse or improve the
8  condition of their habitat; (2) will eventually degrade the local groundwater aquifer with
9  antimony; and (3) violates air quality standards because the Project includes a 'black box'
10 air pollution scrubbing mechanism for compliance with those standards. (ECF No. 202 at
11 43-48.)

12         Federal Defendants counter that: (1) BLM was not required—or even permitted to—
13 require additional conservation measures for sage grouse because they are not listed as
14 a threatened or endangered species; (2) as to groundwater, the ROD does not authorize
15 any violation of groundwater contamination standards, BLM reasonably decided that
16 approving the Project would not impermissibly pollute the groundwater, and a potential,
17 future violation of groundwater standards does not constitute a violation of applicable law
18 in any event; and (3) the Project as approved does not violate any applicable federal or
19 state air quality standards. (ECF No. 237 at 31-35.)

20         Lithium Nevada echoes these arguments and further argues that this Court's
21 decision in *W. Expl., LLC v. U.S. Dep't of the Interior*, 250 F. Supp. 3d 718, 747 (D. Nev.
22 2017) ("*Western Exploration*") does not support Environmental Plaintiffs' argument that
23 BLM must require the Project to affect a "net conservation gain" on the local sage grouse
24 population, instead arguing that there, the Court merely concluded that the greater
25 protection for sage grouse included in the ARMPA was not inconsistent with FLPMA's
26 multiple-use mandate. (ECF No. 240 at 42-44.) As to groundwater, Lithium Nevada
27 supplements Federal Defendants' argument, insisting that the very documents
28 Environmental Plaintiffs rely on to support their argument instead show that the Project

will comply with—and even exceed—applicable water quality standards. (*Id.* at 44-46.) As to air quality, Lithium Nevada mostly echoes Federal Defendants' argument in urging the Court to defer to BLM's reasonable decision finding that Lithium Nevada's proffered air quality plan will not cause UUD. (*Id.* at 46-47.) The Court agrees with Federal Defendants and Lithium Nevada in pertinent part.

The Court begins with Environmental Plaintiffs' sage grouse UUD argument. Federal Defendants are correct that BLM's regulations only require Lithium Nevada to "prevent adverse impacts to threatened or endangered species, and their habitat which may be affected by operations." 43 C.F.R. § 3809.420(b)(7). Sage grouse are not listed as a threatened or endangered species. (ECF No. 237 at 35.) And Environmental Plaintiffs do not rely on any binding authority to the contrary, instead pointing to a brief that the federal government parties filed in *Western Exploration* and BLM's Special Status Species Management Manual.[15] (ECF No. 202 at 44-45.) However, as both Federal Defendants and Lithium Nevada argue, the primary source Environmental Plaintiffs rely on to support this argument instead explains that the protections for sage grouse BLM included in the ARMPA are more protective of sage grouse than would be required to prevent UUD. (ECF Nos. 237 at 35, 240 at 42-44.) *See also Western Watersheds*, Case No. 3:21-cv-00103-MMD-CLB, ECF No. 23-16 at 27 ("Seeking a net gain to Sage-Grouse habitat is fully consistent with FLPMA's guiding principles. The unnecessary or undue degradation standard is a minimum standard for BLM's land management policy, but it does not restrain BLM's discretion to implement a mitigation standard that calls for improvements in land conditions beyond the status quo."). Thus, Environmental Plaintiffs' sage grouse UUD argument is insufficiently supported to be persuasive.

And the Court's ruling in *Western Exploration*, where the Court found that BLM could go further than strictly necessary to prevent UUD to protect the sage grouse, further

---

[15]As to the Special Status Species Management Manual, being listed as a special status species is not the same as being listed as a threatened or endangered species under the federal regulations. Federal Defendants do not dispute that the greater sage grouse is a special status species. (ECF No. 237 at 35.)

supports Federal Defendants' and Lithium Nevada's arguments. Indeed, there, the Court indicated it was persuaded by the federal defendants' argument that, "the 'unnecessary or undue degradation' standard in the statute does not preclude the agency from establishing a more protective standard that seeks improvements in land conditions that 'go beyond the status quo.'" *Western Exploration*, 250 F. Supp. 3d at 747. Thus, failure to require compliance with the ARMPA does not necessarily constitute UUD. And in any event, "FLPMA prohibits only unnecessary or undue degradation, not *all* degradation." *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 78 (D.C. Cir. 2011) (emphasis in original). The Court accordingly rejects Environmental Plaintiffs' argument that Federal Defendants caused impermissible UUD to the pertinent sage grouse population by approving the Project.

As to groundwater, the Court agrees with Federal Defendants and Lithium Nevada that the ROD does not authorize violation of any state water quality standard, and Environmental Plaintiffs do not identify any federal water quality standards that the Project violates. (ECF Nos. 237 at 31-34, 240 at 44-46, 267 at 16-17.) Indeed, the ROD requires Lithium Nevada to maintain water quality and quantity to State of Nevada standards. (TPEIS-0452 at AR-052527.[16]) Thus, regardless of any concerns expressed about potential water pollution by a BLM employee during the process that ultimately culminated in the ROD (ECF No. 202 at 13 (citing TPEIS-1061 at AR-095381)), Federal Defendants did not authorize UUD to water quality in approving the Project because, as noted, the ROD does not authorize Lithium Nevada to violate state water quality standards. (TPEIS-0452 at AR-052527.)

A similar analysis applies to Environmental Plaintiffs' UUD argument regarding air quality because they have not identified a federal or state air quality standard that the Project violates, and BLM's own applicable regulations require compliance with federal

---

[16]Environmental Plaintiffs refer to another condition of approval included in the ROD in their argument (no. 4), but decline to mention this condition of approval (no. 3). (*Compare* ECF No. 202 at 41 *with* TPEIS-0452 at AR-052527.)

and state air quality standards. (ECF No. 237 at 34 (making this argument).) *See also* 43 C.F.R. § 3809.420(b)(4) ("All operators shall comply with applicable Federal and state air quality standards, including the Clean Air Act"). Thus, Environmental Plaintiffs have not shown that Federal Defendants' approval of the Project will cause UUD as to air quality.

In sum, the Court rejects Environmental Plaintiffs' UUD arguments. Federal Defendants did not violate FLPMA's UUD requirements in approving the Project.

### 3. NEPA

NEPA is a procedural statute that requires federal agencies to "assess the environmental consequences of their actions before those actions are undertaken." *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 993 (9th Cir. 2004). NEPA provides for public participation in assessing a proposed action's environmental consequences, enabling the public to "play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). Although NEPA lacks a substantive mandate, its "action-forcing" procedural requirements help carry out a "national commitment to protecting and promoting environmental quality." *Id.* at 348. As part of these action-forcing requirements, NEPA mandates that agencies considering "major Federal actions significantly affecting the quality of the human environment" must, to the fullest extent possible, prepare an environmental impact statement. *See* 42 U.S.C. § 4332(C).

"NEPA [further] imposes a procedural requirement on federal agencies to "take [ ] a 'hard look' at the potential environmental consequences of the proposed action."' *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1075 (9th Cir. 2011) (citation omitted). To take a sufficiently hard look, federal agencies must have available and carefully consider detailed information concerning significant environmental impacts, and make relevant information available to the wider public. *See id.*

That said, in its NEPA review, the Court must employ "a 'rule of reason' that asks whether an EIS contains a reasonably thorough discussion of the significant aspects of

1  the probable environmental consequences." *Great Basin Res. Watch v. Bureau of Land*

2  *Mgmt.*, 844 F.3d 1095, 1101 (9th Cir. 2016) (citation omitted). "Under this standard, once

3  satisfied that a proposing agency has taken a 'hard look' at a decision's environmental

4  consequences, the review is at an end." *Id.* (citation omitted).

5         Environmental Plaintiffs argue Federal Defendants violated NEPA in several

6  distinct ways. They first argue the FEIS included claims that the Project's sulfuric acid

7  processing plant would meet air quality standards based on impossible assumptions

8  regarding an unspecified scrubbing system. (ECF No. 202 at 31-33.) Environmental

9  Plaintiffs next argue Federal Defendants failed to adequately analyze baseline wildlife

10  conditions for sage grouse, pronghorn, and springsnails. (*Id.* at 33-35.) They then argue

11  Federal Defendants failed to adequately analyze the Project's potential impacts on these

12  wildlife species. (*Id.* at 35-38.) Environmental Plaintiffs next argue Federal Defendants

13  inadequately analyzed the Project's cumulative impacts on local wildlife considering other

14  proposed activities within the cumulative effects study area. (*Id.* at 38-40.) Finally, they

15  argue Federal Defendants failed to adequately analyze mitigation measures in the NEPA

16  review documents, specifically regarding groundwater and wildlife impacts from the

17  Project. (*Id.* at 40-43.) The Court addresses each of these contentions, in turn, grouped

18  below by air quality, wildlife, and groundwater.

19                           **a.    Air Quality**

20         First as to the FEIS' alleged assumptions about a tail gas scrubbing system,

21  Federal Defendants respond that they were not required to thoroughly consider the

22  effectiveness of the scrubber because they otherwise reasonably concluded the Project

23  would meet air quality standards even without the scrubber. (ECF No. 237 at 47-48.)

24  Lithium Nevada adds that the FEIS actually did describe the tail gas scrubber, and that

25  emissions limits will be enforced through a state air quality permit that Federal Defendants

26  required Lithium Nevada to obtain as well. (ECF No. 240 at 24-27.) The Court agrees with

27  Federal Defendants.

28  ///

Environmental Plaintiffs' primary argument is that BLM did not understand how the tail gas scrubber on the sulfur-burning plant would work—but BLM legally had to understand. They make much of a quote from Ken Loda, the BLM Project lead, but selectively quote the email that it comes from. (ECF No. 202 at 32 (quoting Mr. Loda as saying "[T]he process plant is pretty much a black box.").) However, the full sentence reveals a different meaning and is consistent with Federal Defendants' responsive argument. The full sentence from the email is, "For our regulations, the process plant is pretty much a black box." (TPEIS-0981 at AR-093830.) And Mr. Loda goes on to build on this understanding in the rest of the email that the regulations applying to BLM's environmental review do not require him, or BLM, to know exactly how the scrubber system works. (*Id.*) This is very different than saying you do not understand something. And indeed, Mr. Loda's understanding of the applicable regulations is consistent with Federal Defendants' argument: "[b]ecause BLM reasonably determined that the Project would not cause any exceedance of the NAAQS, and thus would not have significant air quality impacts, BLM was not required to thoroughly examine the effectiveness of Lithium Nevada's additional mitigation plans." (ECF No. 237 at 47.)

And Federal Defendants' argument is also consistent with the FEIS, in which BLM stated no mitigation was required because its air quality analysis demonstrated that all pollutant concentrations with the Project would be less than the NAAQS and Nevada standards, with negligible effects on AQRVs in Class I areas. (TPEIS-0384 at AR-045630.) This is the sort of scientific determination on which the Court must defer to BLM. *See Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 993; *see also N. Plains Res. Council, Inc.*, 668 F.3d at 1075 ("A court generally must be 'at its most deferential' when reviewing scientific judgments and technical analyses within the agency's expertise.") (citation omitted). Under this highly deferential standard of review, BLM's determination in the FEIS was reasonable. *See Edwardsen v. U.S. Dep't of Interior*, 268 F.3d 781, 789 (9th Cir. 2001) (finding agency's determination that a project would have a negligible to minor impact on air quality reasonable where the analysis was based in part on the fact that the

area will remain in compliance with NAAQS). And because BLM determined that no mitigation was required, it is immaterial how well the tail gas scrubber works, as information about the tail gas scrubber is not essential to a reasoned choice among alternatives. *See Native Vill. of Point Hope v. Jewell*, 740 F.3d 489, 496 (9th Cir. 2014) ("If the missing information is 'relevant to reasonably foreseeable significant adverse impacts' and is 'essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant,' the agency must include that information in the EIS."). Said otherwise, this is not the situation described in the quote from *Native Vill. of Point Hope*.

That said, and as Lithium Nevada points out (ECF No. 242 at 24), Appendix K of the FEIS does identify that the sulfur-burning plan will use a tail gas scrubber and that Lithium Nevada has committed "to installing a state-of-the-art scrubbing control, which is above customary industry standard." (TPEIS-0706 at AR-065829.) "While the exact scrubbing system has not yet been determined, LNC has committed to installing a control that, at the minimum, meets the emission levels used in this analysis." (*Id.* at AR-065829-30.) Again, Environmental Plaintiffs rely on this quote for their argument but omit the second two clauses. (ECF No. 202 at 32.) The full quote further supports the point that it does not matter exactly how the tail gas scrubber works because Lithium Nevada has committed to installing a control system that meets the specified emissions level. *See Great Basin Res. Watch*, 844 F.3d at 1106 (describing "applicant committed practices" as measures that the project proponent "promised to take and that are 'considered part of the operating procedures'" and crediting them in rejecting a NEPA challenge). In addition, the comment responses included as Appendix R to the FEIS indicate that Lithium Nevada had selected a scrubber system by the time the FEIS issued. (TPEIS-0384 at AR-048044.)

In sum, the Court finds Environmental Plaintiffs' air quality NEPA argument unpersuasive.

**b.    Wildlife**

When it comes to wildlife, Environmental Plaintiffs argue that Federal Defendants got multiple steps of the NEPA analysis wrong—that Federal Defendants used inadequate

baselines, misjudged the impacts of the Project on wildlife, inadequately considered the cumulative impact of this Project along with other approved projects in the geographic area Federal Defendants should have used, and inadequately explained how Lithium Nevada could sufficiently mitigate noise impacts from the Project on sage grouse. (ECF No. 202 at 33-43.)

Beginning with the baseline portion of Environmental Plaintiffs' argument, and as noted, they argue that the FEIS contains no information about how sage grouse use the Project area, similarly lacks information about how pronghorn use the area, does not mention the King's River Pyrg's risk of extinction, and more generally does not provide sufficient information about springsnails, including which springs they were found in and how predicted groundwater drawdown will affect them. (*Id.* at 33-34.) Environmental Plaintiffs' inadequate baseline argument is grounded in precedential NEPA cases. '"Without establishing the baseline conditions which exist ... before [a project] begins, there is simply no way to determine what effect the [project] will have on the environment and, consequently, no way to comply with NEPA."' *Great Basin Res. Watch*, 844 F.3d at 1101 (citation omitted). While an agency need not conduct actual baseline measurements, the agency must assess baseline conditions based on accurate and defensible reasoning. *See id.*

However, as to the sage grouse baseline, Federal Defendants persuasively counter that Environmental Plaintiffs appear to have overlooked Appendix G of the FEIS, which explains that baseline surveys were conducted for sage grouse, along with the results of those surveys. (ECF No. 237 at 37; *see also* TPEIS-0702 at AR-065647.) Thus, Environmental Plaintiffs' statement that "there are no details about sage-grouse use of the area" in the FEIS is simply inaccurate. (ECF No. 202 at 33.) And Federal Defendants' response is similar—and similarly persuasive—as to pronghorn, where Federal Defendants point out that the FEIS included discussion about how pronghorn use the Project area, and explained that the Project will have an adverse impact on local pronghorn. (ECF No. 237 at 37-39.) The Court agrees the FEIS included a sufficient, but

1   succinct, baseline for pronghorn. (TPEIS-0384 at AR-045586-87; *see also* TPEIS-0696 at

2   AR-065508 (showing how the Project is basically located at a connection point between

3   summer and winter pronghorn range).)

4       The same goes for springsnails. In response to Environmental Plaintiffs' argument

5   that Federal Defendants' springsnails baseline was deficient because it did not mention

6   their high risk of extinction and did not list the number of springsnails found in each spring

7   surveyed (ECF No. 202 at 34-35), Federal Defendants counter that they sufficiently

8   described a baseline for springsnails. (ECF No. 237 at 39, 39 n.84, 39 n.85.) The Court

9   agrees. The AR indicates both that BLM had baseline surveys conducted, and springsnails

10  were found in the springs surveyed. (TPEIS-0702 at AR-065642 ("Springsnails common

11  to the region were collected from some of the seeps, springs and wetlands in and around

12  the Project area (WRC 2018a; 2019a)."), *id.* at AR-065646 (describing springsnails

13  surveys conducted).) Environmental Plaintiffs argue for a more detailed baseline, but

14  proffer no pertinent caselaw in support of that argument, and fail to persuasively explain

15  how the springsnails baseline Federal Defendants constructed was statutorily deficient.

16  And here, unlike *Great Basin Res. Watch*, 844 F.3d at 1101, BLM used actual baseline

17  surveys. The Court accordingly finds Environmental Plaintiffs' wildlife baseline NEPA

18  argument unpersuasive.

19      That brings the Court to Environmental Plaintiffs' related argument that the FEIS

20  did not adequately analyze and disclose the Project's long-term impact on wildlife. (ECF

21  No. 202 at 35-38.) But Environmental Plaintiffs argument here is not that the FEIS did not

22  discuss the Project's potential impacts on wildlife—it did. (*Id.*) Indeed, Federal Defendants

23  point to that discussion—in the FEIS and its Appendix G—in their response. (ECF No. 237

24  at 39-40, 40 at n.86 (first citing TPEIS-0384 at AR-045581-614, then citing TPEIS-0702 at

25  AR-065641-49).) The Court overall agrees with Federal Defendants that their cited

26  portions of the FEIS contain a "a reasonably thorough discussion of the significant aspects

27  of the probable environmental consequences[,]" *Half Moon Bay Fishermans' Mktg. Ass'n*

28  *v. Carlucci*, 857 F.2d 505, 508 (9th Cir. 1988), and are thus sufficient under NEPA.

1    Moreover, this portion of Environmental Plaintiffs' argument is primarily based on

2    comments from NDOW on a preliminary version of the draft environmental impact

3    statement. (ECF No. 202 at 35 (relying on TPEIS-1114 at AR-097080 (though the correct

4    citation would be to AR-097079) and AR-097082-83; TPEIS-1493 at AR-108859).) But as

5    Federal Defendants also point out in response (ECF No. 237 at 40-41), BLM addressed

6    some of these comments during the environmental review process, which NDOW

7    acknowledged in subsequent comments submitted in response to the FEIS. (*See, e.g.*,

8    TEPIS-0384 at AR-048176 ("We appreciate the incorporation of our previous comments

9    and applaud the BLM for recognizing that the direct disturbance will result in loss of habitat,

10   displacement, and indirect effects to wildlife resulting from displacement.").) Thus,

11   Environmental Plaintiffs' argument based on NDOW's comments is somewhat inflated

12   because it relies on comments submitted in response to preliminary documents that

13   NDOW even acknowledged were later (at least partially) addressed.

14       In addition, to the extent Environmental Plaintiffs and NDOW disagree with BLM's

15   analysis of the longer term impacts of the Project on wildlife, that disagreement does not

16   necessarily constitute a NEPA violation. The Court "must also be mindful to defer to

17   agency expertise, particularly with respect to scientific matters within the purview of the

18   agency." *Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 993. Analysis of impact of the

19   Project on wildlife over the longer term is also the sort of scientific matter on which the

20   Court must defer to BLM.

21       Turning to cumulative impacts, Federal Defendants counter that they satisfied their

22   obligations to conduct a cumulative-impacts analysis by identifying, describing, and

23   mapping the cumulative effects study area for each resource, identifying past, present,

24   and reasonably foreseeable future actions, and then describing the impacts of these other

25   projects in its detailed analyses of the Project's cumulative impacts on various resources.

26   (ECF No. 237 at 43-44 (citing TPEIS-0384 at AR-045671-90).) The Court agrees with

27   Federal Defendants that the cumulative impacts analysis BLM provided in the FEIS was

28   sufficient, as BLM provided more thorough analysis in the pertinent portion of the FEIS

than the agencies provided in the decisions reviewed in the two primary cases upon which Plaintiffs rely. (TPEIS-0384 at AR-045671-90; *see also* ECF No. 202 at 39-40 (relying on *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 973 (9th Cir. 2006) and *Great Basin Res. Watch*, 844 F.3d at 1104).)

For example, the *Great Basin Mine Watch* court found that a handful of "vague and conclusory statements, without any supporting data" in the cumulative impacts section of a final EIS did not constitute the requisite hard look under NEPA. 456 F.3d at 973. But here, BLM provided pages of analysis of the cumulative impacts of the Project on various resources supported by data, and at least did more than BLM did in *Great Basin Mine Watch*. (TPEIS-0384 at AR-045671-90.) Similarly, the *Great Basin Res. Watch* court found BLM erred because it "made no attempt to quantify the cumulative air impacts of the Project together with the Ruby Hill Mine and vehicle emissions[,]" did not "attempt to quantify or discuss in any detail the effects of other activities" affecting air quality, and chose a baseline value of zero for certain pollutants without justification. 844 F.3d 1104-06. In contrast, here, BLM attempted to quantify the air quality impacts of the Project together with estimated emissions from all sources in Humboldt County.[17] (TPEIS-0384 at AR-045682-84 (incorporating by reference discussion and analysis of air quality impacts of the Project (Section 4.9.1.1, Appendix K, and Table 4.12) into the broader discussion).) BLM also did not use baseline pollutant levels of zero without justification. (TPEIS-0384 at AR-045683 ("The resulting pollutant concentrations are reflected in the measured ambient data which support the background concentrations used in the analysis (Section 4.9.1.1 and Appendix K.). Accordingly, the air quality effects of these past and present activities are considered to be captured in the background concentrations.").) Thus, the cumulative

---

[17]This discussion may fit more logically under the 'air quality' subheading because of the *Great Basin Res. Watch* court's focus on BLM's air quality analysis but the Court addresses and distinguishes *Great Basin Res. Watch* here because Environmental Plaintiffs generally rely on this case in the cumulative impacts portion of their argument—as to "wildlife, air quality, and other potentially affected resources." (ECF No. 202 at 39.)

1    impacts analysis as to air quality in the FEIS was more detailed that the analysis found

2    insufficient in *Great Basin Res. Watch*.

3           As to the wildlife portion of Environmental Plaintiffs' mitigation argument,

4    Environmental Plaintiffs argue that BLM ignored input from EPA and NDOW regarding the

5    purported lack of wildlife mitigation measures and noise impacts to sage grouse. (ECF No.

6    202 at 42-43.) Federal Defendants generally counter that BLM considered and responded

7    to the pertinent comments from both agencies, but was not required to agree with them,

8    and specifically counter that the comments upon which Environmental Plaintiffs rely for

9    this argument were made on the FEIS—so BLM did not have to consider them at all. (ECF

10   No. 237 at 48-49.) The Court again agrees with Federal Defendants. To the general point,

11   NEPA only requires that BLM consider and respond to criticisms and concerns raised by

12   other agencies during the environmental review process, as well as those from the general

13   public—but BLM is not required to agree with other agencies. *See Ctr. for Biological*

14   *Diversity v. Bureau of Land Mgmt.*, 833 F.3d 1136, 1150 (9th Cir. 2016). And to the specific

15   point, Federal Defendants are correct that both parties' comments on which Environmental

16   Plaintiffs rely post-date the FEIS, so BLM was not required to consider them.[18] *See*

17   *Japanese Vill., LLC v. Fed. Transit Admin.*, 843 F.3d 445, 467 (9th Cir. 2016) ("Appellees

18   were not required to accept public comments after publishing the FEIS.") (citing 40 C.F.R.

19   § 1503.1(b)). (*See also* TPEIS-0695 at 1 ("EPA Comments on the Final Environmental

20   Impact Statement for the Thacker Pass Lithium Mine Project, Humboldt County, Nevada"),

21   TPEIS-0446 at AR-052420 (providing comments on FEIS and noting that they have

22   worked with BLM since 2018 on the planning process for the Project).)

23          In sum, the Court is unpersuaded by Environmental Plaintiffs' NEPA arguments

24   regarding wildlife.

25   ///

26

27          [18]Moreover, the Court further addresses BLM's engagement with EPA and NDOW
28   during the planning process in other portions of this order, finding BLM adequately
     engaged with EPA and NDOW's comments.

### c.   Groundwater

Environmental Plaintiffs also attack the adequacy of Federal Defendants' analysis as to the impact of the Project on groundwater, both to the extent that they did not adequately consider the impacts of dewatering on local wildlife, and because Federal Defendants adopted what Environmental Plaintiffs characterize as a 'wait and see' approach to mitigation of potential groundwater pollution. (ECF No. 202 at 35-37, 40-42.) Environmental Plaintiffs further argue that Federal Defendants essentially ignored comments from EPA regarding the insufficiency of the groundwater monitoring plan in the FEIS. (*Id.* at 41-43.) Federal Defendants counter that they—contrary to Environmental Plaintiffs' argument—included a plan for monitoring potential contamination of groundwater resources as an appendix to the FEIS, which also contemplated additional monitoring and mitigation before mining operations could start. (ECF No. 237 at 45-47.) As to the EPA's comments, Federal Defendants argue that they adequately responded to them, because they had no obligation to accept or adopt EPA's comments. (*Id.* at 48-49.) Lithium Nevada goes a bit farther, arguing that the adaptive management approach Federal Defendants blessed in the FEIS is environmentally preferable. (ECF No. 240 at 37.) Indeed, Lithium Nevada argues, this approach makes sense because any impacts on groundwater are speculative and will not occur for years, if at all. (*Id.* at 37-38.) The Court again agrees with Federal Defendants.

Setting aside BLM's responses to NDOW's comments—addressed *supra*—the Court construes Environmental Plaintiffs' pertinent arguments as having two remaining components. First, that the groundwater monitoring and mitigation plan BLM included in the FEIS is inadequate, and second, that BLM did not sufficiently respond to EPA's comments.

Beginning with the groundwater monitoring and mitigation plan, the Court cannot say that it is so inadequate as to violate NEPA under the governing deferential standard of review. *See Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 993. And contrary to Environmental Plaintiffs' argument, the FEIS does contain a groundwater quality

monitoring and mitigation plan. (TPEIS-0384 at AR-045572-76; *see also* TPEIS-0711 (Appendix P).) Indeed, as Federal Defendants point out (ECF No. 237 at 46), Environmental Plaintiffs appear to overlook the existence of the primary groundwater quality mitigation and monitoring plan and instead challenge an additional groundwater quality monitoring plan also described in the FEIS. (*Compare* TPEIS-0384 at AR-045572-76 (describing various groundwater quality monitoring and mitigation requirements imposed on Lithium Nevada) *with* TPEIS-0384 at AR-045574-75 (describing an additional groundwater quality monitoring and mitigation plan that Lithium Nevada would prepare "[i]n the event that constituent concentrations exceed established regulatory thresholds at one or more established compliance monitoring points, and the exceedance is attributable to contamination originating from mine facilities or operations.").) Environmental Plaintiffs' argument thus appears to miss that there are two groundwater quality monitoring and mitigation plans described in the FEIS, not one—and that omission undermines their argument. Moreover, the Ninth Circuit has upheld a "wait and see" approach to groundwater quality monitoring "given the relatively low probability and temporal remoteness of adverse impacts to ground water." *Great Basin Res. Watch*, 844 F.3d at 1107. And according to the Water Quantity and Quality Impacts Assessment Report attached as Appendix P to the FEIS, "[b]ecause the projected timeline is long, it is anticipated that any mitigation action, if necessary, would not occur for years to decades after closure." (TPEIS-0711 at AR-066297.) Thus, *Great Basin Res. Watch*, 844 F.3d at 1107, applies here.

As to BLM's responses to EPA's comments, the Court concludes they were sufficient. While Environmental Plaintiffs are correct that an agency may not simply ignore comments from a cooperating agency, *see W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 492-93 (9th Cir. 2011), an agency's responses to a cooperating agency's comments are sufficient when, "the record indicates that BLM did indeed consider and respond to criticisms and concerns raised by other agencies[.]" *Ctr. for Biological Diversity*, 833 F.3d at 1150. And the record here indicates that BLM considered EPA's comments.

(*See, e.g.*, TPEIS-0384 at AR-048166-68 (responding to EPA's comments on the draft environmental impact statement in an appendix of comments included as part of the FEIS).) Environmental Plaintiffs' citation of a letter EPA sent after BLM issued the FEIS (TPEIS-0695) certainly indicates that EPA did not agree with some of BLM's conclusions and perhaps BLM's decision to approve the Project, but BLM is not required to agree with EPA, *see Ctr. for Biological Diversity*, 833 F.3d at 1150, and Environmental Plaintiffs' focus on EPA's post-FEIS letter does not capture the full scope of the back-and-forth between BLM and EPA throughout the environmental review process. (ECF No. 202 at 41-43 (making the argument).)

The Court is accordingly unpersuaded by Environmental Plaintiffs' NEPA argument regarding groundwater.

### 4.    Summary as to Environmental Plaintiffs' Claims

Environmental and Rancher Plaintiffs[19] are entitled to summary judgment that Federal Defendants violated FLPMA because BLM failed to first make a validity determination under *Rosemont* before approving Lithium Nevada's use of some 1300 acres of public land for waste dumps and tailings piles. Their motions for summary judgment are accordingly granted on that issue, and Federal Defendants' and Lithium Nevada's corresponding cross motions are accordingly denied. Environmental Plaintiffs' motion for summary judgment is otherwise denied, and Federal Defendants' and Lithium Nevada's cross motions are otherwise granted except as to the *Rosemont* issue.

### B.  Rancher Plaintiffs

Having already addressed Rancher Plaintiffs' FLPMA claim in the section addressing Environmental Plaintiffs' FLPMA claims, along with Rancher Plaintiffs' NEPA

---

[19]Because of Rancher Plaintiffs' joinder and because they make substantially the same argument based on *Rosemont*.

claims to the extent they reflect their joinder of Environmental Plaintiffs' claims,[20] the Court now addresses Rancher Plaintiffs' remaining NEPA claim.[21]

Rancher Plaintiffs make several NEPA arguments that all turn on one core contention—that the water resource baselines prepared by a contractor were inadequate, failing to capture the true impact of the Project on nearby streams, springs, groundwater, and the Lahontan Cutthroat Trout ("LCT"). (ECF No. 204 at 22-48.) Federal Defendants essentially respond that Rancher Plaintiffs are asking the Court to impermissibly flyspeck BLM's environmental analysis, and Rancher Plaintiffs' arguments as to data collection methodologies and purported errors in data collection "do not demonstrate a NEPA violation because the agency is entitled to heightened deference on matters of scientific expertise and reasonably relied on the contractor's analysis." (ECF No. 238 at 13-14.) Lithium Nevada echoes Federal Defendants' basic argument. (ECF No. 241 at 7-9.) As further explained below, the Court agrees with Federal Defendants in pertinent part.

In addition, at the Hearing, Rancher Plaintiffs argued this case is analogous to *Oregon Nat. Desert Ass'n v. Jewell*, 840 F.3d 562 (9th Cir. 2016), and the FEIS and ROD should be vacated and remanded based on *Jewell*'s application to this case. The Court disagrees. At the outset, the Court notes that this is not a case like *Jewell* where the pertinent FEIS relied on an assumption that was contradicted by a baseline survey. *See id.* at 568-71. In *Jewell*, the FEIS assumed that no sage grouse were present at the site of a wind farm when in fact that assumption overlooked a survey showing that some sage grouse spent the winter there. *See id.* at 569. The Ninth Circuit accordingly found that

---

[20]That said, Environmental Plaintiffs also joined Rancher Plaintiffs' motion. (ECF No. 211.) Thus, this discussion of Rancher Plaintiffs' NEPA claim also applies to Environmental Plaintiffs' claim to the extent necessary to reflect that joinder.

[21]The APA and NEPA legal standards summarized *supra* apply to the discussion of Rancher Plaintiffs' NEPA claim *infra* as well. In addition, the factual background pertinent to Rancher Plaintiffs' motion is also the same as the factual background provided towards the beginning of the Court's discussion of Environmental Plaintiffs' claims, with the additional note that Rancher Plaintiffs actively participated in the Project's environmental review process, submitting comments on both the draft environmental impact statement and the FEIS. (TPEIS-0388, TPEIS-0516, TPEIS-1499, TPEIS-0448.)

BLM's assumption of no sage grouse present was arbitrary and capricious, and neither a harmless error nor saved by the mitigation measures also adopted by the pertinent FEIS. *See id.* at 569-71.

Here, in contrast, Rancher Plaintiffs do not argue that the water resource portions of the environmental impact statements and ROD contradict the results of a baseline study, instead arguing that the water resource baseline studies are wrong. (ECF No. 204 at 22-48.) This is also not a case where BLM failed to conduct a baseline study as to water resources, as BLM did (*see* TPEIS-0384 at AR-046513 - AR-047130, TPEIS-0711 at AR-066146-47, AR-067399-401, and TPEIS-081), and Lithium Nevada even had the water resources contractor prepare memoranda specifically responding to concerns Rancher Plaintiffs raised during the environmental review process similar to the arguments they make now (*see* TPEIS-0403, TPEIS-0406). Moreover, this is not a case where BLM concluded—like in *Jewell*—that there would be no impact to an important resource without any basis. Indeed, BLM concluded there will be some impact on groundwater resources (and the wildlife that depends on it) from the Project, both explaining those predicted impacts and including mitigation measures intended to remedy them. (TPEIS-0384 at AR-045554 - AR-045581.) The Court accordingly does not find that *Jewell* requires remand and vacatur.

Turning to some of Rancher Plaintiffs' more specific arguments, Rancher Plaintiffs argue that the baseline seep and spring data lacks scientific and professional integrity because the contractor who collected the data did not adhere to something called the Stevens Protocol.[22] (ECF No. 204 at 23, 25-30.) But the contractor, Piteau and Associates, did not state it would follow the entire Stevens Protocol, instead specifying in its work plan that its spring and seep inventory would use certain elements of Level 1 of the Stevens Protocol. (TPEIS-0054 at AR-005702-03.) Thus, Rancher Plaintiffs' argument that the spring surveys did not follow the Stevens Protocol does not really apply and is

[22]The parties agree what the Stevens Protocol is and further explanation of it is not strictly necessary for the Court's analysis.

1
2
3
4
5
6

inconsequential. (ECF No. 204 at 36-40.) The same goes for Rancher Plaintiffs' argument that Piteau should have followed Levels 2 and 3 of the Stevens Protocol (*id.* at 35-36); Piteau never said it was going to (TPEIS-0054 at AR-005702-03).[23] Moreover, Federal Defendants were not required to follow the Stevens Protocol in any event because NEPA, "does not require adherence to a particular analytic protocol." *Oregon Nat. Desert Ass'n v. Rose*, 921 F.3d 1185, 1191 (9th Cir. 2019) (citation omitted).[24]

7
8
9
10
11
12
13
14
15
16
17

Rancher Plaintiffs otherwise argue that the baseline surveys regarding springs, seeps, groundwater, and Pole Creek contain various inaccuracies such that Federal Defendants' environmental review lacks an adequate baseline—and accordingly the FEIS underestimates the negative impact of the Project on local water resources. (ECF No. 204 at 40-46.) The Court finds that—at most—these arguments reflect a technical or scientific disagreement on which the Court must defer to BLM. Indeed, Rancher Plaintiffs largely rely on comments they submitted during the environmental review process, which in turn rely on the comments of their expert, Dr. Erick Powell. (*See, e.g., id.* at 46 n.29 (citing TPEIS-0516 at AR-056387).) Dr. Powell raised substantially the same points in comments submitted to BLM during the environmental review process that Rancher Plaintiffs now proffer, and BLM substantively responded to Dr. Powell's comments, further suggesting

18

_____

19
20
21
22
23
24
25

[23]Rancher Plaintiffs' argument about trespass similarly is based on a principle from the Stevens Protocol—consultation with pertinent private property owners before conducting spring surveys (ECF No. 204 at 36-38)—that Piteau did not state it would follow (TPEIS-0054 at AR-005702-03). And in any event, as Federal Defendants point out, Rancher Plaintiffs have not shown, "how any alleged trespass affects the sufficiency or accuracy of the baseline data or rises to the level of a NEPA violation, even if BLM were aware of it—which [Rancher Plaintiffs have] not established." (ECF No. 238 at 24.) There is at most a dispute about whether Piteau trespassed, but even if that were the case, it is unclear to the Court how that necessarily means the measurements collected at the two springs subject to the trespass dispute are inaccurate or unreliable. That said, while trespass is not an issue relevant to the Court's review of BLM's decision in this APA case, the Court of course does not sanction trespass.

26
27
28

[24]Rancher Plaintiffs rely on this case to support their argument that Federal Defendants violated NEPA by failing to comply with the Stevens Protocol (ECF No. 204 at 39-40), but the portion of *Rose* upon which they rely describes a situation where BLM said it would do something—complete a prompt on Route Analysis Forms—but did not. *See Rose*, 921 F.3d at 1192. In contrast, and as noted, Piteau never wrote it would entirely follow the Stevens Protocol.

1  that Rancher Plaintiffs' argument primarily reflects scientific or technical disagreement on

2  which the Court must defer to BLM. (TPEIS-0713 at AR-067655 - AR-067668.) Indeed,

3  the Court does not sit as a referee on a professional, scientific journal, but as a generalist

4  judge acting pursuant to congressionally delegated authority. *See San Luis & Delta-*

5  *Mendota Water Auth. v. Jewell*, 747 F.3d 581, 621 (9th Cir. 2014).

6       An unreported district court case upon which Rancher Plaintiffs rely illustrates why

7  their core NEPA arguments about the unreliability of the water baseline surveys are

8  ultimately unpersuasive, despite the italicization and overheated rhetoric throughout their

9  briefs. (ECF No. 204 at 38, 42 (citing *League of Wilderness Defs./Blue Mountains*

10 *Biodiversity Project v. Connaughton*, Case No. 3:12-CV-02271-HZ, 2014 WL 6977611, at

11 *21 (D. Or. Dec. 9, 2014) ("*Blue Mountains*")).) The *Blue Mountains* court found that a

12 dispute about the agency's estimated age of implicated Grand Fir trees was, "a situation

13 where experts differ in their testimony and the Court is being asked to guess if public

14 opinion would change based on adding several years to the average age of grand firs. In

15 such a situation, the Court defers to the agency and, therefore, there is no NEPA violation."

16 *Id.* at *23; *see also id.* at *21-*23 (containing the rest of that court's analysis). Similarly,

17 here, the Court can discern nothing more from Rancher Plaintiffs' NEPA arguments than

18 a situation where they and their expert substantively disagree with BLM's scientific and

19 technical conclusions regarding the water resource baselines and the predicted impacts

20 of the Project that flow from those baselines. This does not constitute a NEPA violation.

21      And to the extent Rancher Plaintiffs argue the ROD must be vacated because BLM

22 did not independently evaluate the data that Piteau collected and analyzed, the Court is

23 unconvinced. (ECF No. 204 at 25-28.) To the contrary, the AR shows that BLM

24 independently evaluated Piteau's work and engaged in an iterative process to improve it.

25 (TPEIS-1022 (requesting underlying model dataset Piteau prepared for review), TPEIS-

26 1205 (providing comments on Piteau report), TPEIS-1131 at AR-097595-96 ("Dan Erbes

27 (BLM geohydrologist) and Patrick Plumlee (hydrology/geochemistry subcontractor to ICF)

28 have been working with Piteau and LNC with regard to these baselines as well as the

issues with the modeled effects on water quality and quantity…"), TPEIS-0986 (organizing in-person meeting between Piteau and BLM employees), TPEIS-1013 (following up on in-person meeting), TPEIS-1072 (passing comments back to Piteau), TPEIS-1330 ("The revised water resources section in the 6/19/2020 Thacker Pass ADEIS constitutes a vast improvement over the previous version and I only have a few comments (included below)."), TPEIS-1411 (describing comments from Rancher Plaintiffs similar to the arguments raised in their briefs, agreeing with Rancher Plaintiffs that some spring data may have been collected from incorrect locations, but providing the opinion that the model Piteau prepared is still useful, though could use some tweaking).)

Rancher Plaintiffs finally argue that BLM did not provide them with sufficient information to engage in meaningful public comment (ECF No. 204 at 28-32), but as Federal Defendants and Lithium Nevada detail in their responses, BLM engaged extensively with Rancher Plaintiffs throughout all stages of the environmental review process, and even after the FEIS issued (ECF Nos. 238 at 36-39, 241 at 16-22). And as for Rancher Plaintiffs' argument regarding the Biological Assessment about LCT (ECF No. 204 at 28-32), the Court agrees with Federal Defendants that the FEIS discussed the potential impacts of the Project on LCT (FEIS-0384 at AR-045595), concluding the Project would not affect nearby LCT, a conclusion consistent with the conclusion reached and discussed in the Biological Assessment BLM shared with the United States Fish and Wildlife Service (TPEIS-0480). The Court accordingly finds that the FEIS sufficiently discussed the Project's impacts on LCT such that BLM was not required to provide for public comment on the Biological Assessment as to LCT. *See Cascadia Wildlands v. U.S. Forest Serv.*, 937 F. Supp. 2d 1271, 1278 (D. Or. 2013) (reaching analogous conclusion). Moreover, the AR indicates that Rancher Plaintiffs made their view that the Project would negatively impact LCT clear to BLM (*see, e.g.*, TPEIS-1489 at AR-106684-85), reducing the persuasiveness of Rancher Plaintiffs' suggestion that they were unable to provide comments to the effect that they believe the Project will have a negative impact on nearby LCT because BLM did not permit them to comment on the Biological Assessment.

In sum, the Court may not "'fly speck' an EIS and hold it insufficient on the basis of inconsequential, technical deficiencies[,]" *Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin.*, 126 F.3d 1158, 1184 (9th Cir. 1997) (citation omitted), despite Rancher Plaintiffs' vigorous invitation to do so. Rancher Plaintiffs' motion for summary judgment is denied to the extent based on its NEPA arguments, and Federal Defendants and Lithium Nevada's corresponding counter and cross motions are granted. However, as noted, Rancher Plaintiffs' motion is granted to the extent necessary to reflect that the Court agrees with the FLPMA argument based on *Rosemont*, and as provided *supra* as to Environmental Plaintiffs' motion, Federal Defendants' and Lithium Nevada's motions are denied to the extent they resist application of *Rosemont*.

### C. Tribal Plaintiffs

RSIC and Burns Paiute Tribe bring essentially the same claim under the NHPA—arguing that BLM should have consulted them before issuing the ROD, but did not—but only Burns Paiute Tribe also brings a NEPA claim, arguing that BLM did not take the requisite "hard look" at the impacts of the Project in terms of whether the Project area is an area of contemporary cultural or religious significance to local tribes. The Court accordingly discusses Tribal Plaintiffs' NHPA claims together, and then addresses Burns Paiute Tribe's NEPA claim.[25] In addition, the Court incorporates by reference its orders denying Tribal Plaintiffs' motions for preliminary injunction and denying reconsideration of that decision because Tribal Plaintiffs' pending motions focus on NHPA arguments the Court has already addressed twice in the context of its likelihood of success on the merits analysis—and Tribal Plaintiffs rely on the same evidence already addressed in these prior orders to support their NHPA arguments.[26] (ECF Nos. 92, 117.)

///

---

[25]The NEPA legal standard described elsewhere in this order applies to Burns Paiute Tribe's NEPA claim.

[26]These orders also describe the pertinent factual background and legal standards that apply to the Court's NHPA analysis.

Building on that point, the Court has twice ruled that Tribal Plaintiffs may not assert the interests of other tribes who were consulted on the Project to support their arguments. (*Id.*) The Court will accordingly not address any arguments Tribal Plaintiffs make in their pending motions based on that twice-rejected proposition, and explicitly incorporates its reasoning from those prior orders on that point by reference here. (*Id.*) As to Burns Paiute Tribe specifically, it makes some arguments based on letters sent by the tribes who were consulted on the Project after the ROD issued, and based on one letter it sent after the ROD issued. (ECF No. 203 at 28-29.) In addition to violating the Court's prior rulings on asserting the interests of non-party tribes, these arguments also ignore the Court's repeated prior rulings regarding the scope of the administrative record that the Court may not—and will not—consider documents that post-date the ROD. (ECF Nos. 155 at 10-11, 275 at 5-7.) The Court accordingly declines to further address Burns Paiute Tribe's argument based on letters that post-date the ROD, some sent by non-party tribes.

As mentioned, the Court first addresses Tribal Plaintiffs' NHPA claim and then Burns Paiute Tribe's NEPA claim.

**1.    NHPA**

As noted, and as addressed in the Court's pertinent prior orders (ECF Nos. 92, 117), Tribal Plaintiffs' primary NHPA claim is that BLM's decision not to consult them on the Project was not reasonable nor made in good faith in violation of 36 C.F.R. § 800.2(c)(2)(ii)(A) ("It is the responsibility of the agency official to make a reasonable and good faith effort to identify Indian tribes and Native Hawaiian organizations that shall be consulted in the section 106 process."). Federal Defendants counter that BLM's decision not to consult RSIC or Burns Paiute Tribe on the Project was reasonable and made in good faith by offering a chronological narrative of its interactions with both tribes, which led BLM to the understanding that neither tribe would want to be consulted on the Project. (ECF No. 227.) The Court is ultimately persuaded by Federal Defendants' argument that BLM's decision not to consult Tribal Plaintiffs on the Project was reasonable and made in good faith based on the information BLM had at the time it initiated consultation for the

Project. In explaining its decision that BLM's decision not to consult Tribal Plaintiffs was reasonable, the Court follows Federal Defendants' chronology offered in their briefing and at the Hearing, addressing Tribal Plaintiffs' objections and counterarguments as they arise in the context of the narrative described *infra*.

In 2005, BLM began preparing for the ARMPA, a land use plan encompassing the proposed Project area. *See* Notice of Intent To Prepare a Resource Management Plan (RMP) and Associated Environmental Impact Statement (EIS) and Initiate the Public Scoping Process, 70 FR 15348-01, 2005 WL 677030 (Mar. 25, 2005). As part of this process, BLM prepared a document—now part of the AR—called the Ethnographic Assessment, which was finalized in April 2006. (TPNHPA-0003 (filed under seal).)[27] The Ethnographic Assessment describes the reprehensible history of what it describes as the first Euromericans' forays into what is now Northern Nevada, killing vital game, ruining all the best grassland, and killing Native Americans without provocation. (*Id.* at 13-16.) These initial contacts developed into a series of battles and wars between the United States government and the Native Americans who lived in this region that eventually led to the present-day arrangement of recognized tribes and reservations. (*Id.* at 16-21.) This brutal history likely informs the righteous indignation with which Tribal Plaintiffs approach this case.

However, the Ethnographic Assessment also contains information that contributed more directly to BLM's decision not to consult Tribal Plaintiffs on the Project. Specifically, several tribes identified sacred and massacre sites summarized in the Ethnographic Assessment, but none of the tribes who spoke to BLM's consultant who prepared the Ethnographic Assessment identified the Thacker Pass area as either sacred or a massacre site. (*See generally id.*) RSIC's Cultural Resource Coordinator Michon Eben attended a meeting in Nixon, Nevada and offered comments and concerns on behalf of

---

[27]Apparently Federal Defendants were unable to bates-stamp this document, so the pages referenced are the pages in the PDF document.

RSIC reflected in the Ethnographic Assessment. (*Id.* at 95-96.) Burns Paiute Tribe apparently did not respond to any letters requesting consultation on the Ethnographic Assessment, but Charisse Snapp, identified in the Ethnographic Assessment as the tribe's Cultural Resource Representative, is recorded as having said on a telephone call on July 28, 2005, that Burns Paiute Tribe, "would defer consultation to the tribes that had reservations closer to the study area."[28] (*Id.* at 100.) "She said that it would not be necessary to keep the tribe on the mailing list for the RMP/EIS." (*Id.*)

In 2015, RSIC sent BLM a letter explaining its official area of cultural interest, where it expected to be consulted on all projects, and otherwise reserved its rights to request consultation on projects falling outside that area. (TPNHPA-0034.) As the Court discussed this letter and its reading of it extensively in one of its prior orders, the Court again explicitly incorporates by reference that discussion here. (ECF No. 92 at 11-13.) As noted in that order as well, RSIC never requested consultation on the Project until after the ROD issued, so the reservation of rights to consult on other projects outside RSIC's official area of cultural interest described in the letter does not affect the Court's analysis. (ECF No. 205 at 14-15, 19-21 (arguing to the contrary).) Moreover, RSIC's argument that there is insufficient evidence in the AR that a specific employee viewed the letter and made decisions based on it is unpersuasive because the letter is part of the AR, and therefore the Court must presume it was before BLM when BLM decided not to consult RSIC. *See Goffney v. Becerra*, 995 F.3d 737, 748 (9th Cir.), *cert. denied*, 142 S. Ct. 589 (2021) ("[A]n agency's statement of what is in the record is subject to a presumption of regularity."); *Pac. Choice Seafood Co. v. Ross*, 976 F.3d 932, 942 (9th Cir. 2020) (stating that the AR includes, "everything that was before the agency pertaining to the merits of its decision.") (citation omitted).

---

[28]Charisse Snapp submitted a declaration with Tribal Plaintiffs' reply (ECF No. 259) in which disputes that she was authorized to speak on Burns Paiute Tribe's behalf, but the Court cannot consider this declaration as it post-dates the ROD and is not part of the AR. (ECF Nos. 155 at 10-11, 275 at 5-7.) And regardless, she does not dispute that she had the phone conversation with BLM's consultant who prepared the Ethnographic Assessment summarized in the document.

Thus, the records before the BLM show that both Tribal Plaintiffs indicated to BLM that they did not wish to be consulted on projects being considered in a geographic area encompassing the Project—Burns Paiute Tribe in response to invitations to participate in the Ethnographic Assessment, and RSIC in a letter it mailed to BLM. And between 2010 and 2017, BLM consulted with tribes (including, in one instance, RSIC) on four projects implicating the Project area, but BLM did not learn from any of those consultations either that Tribal Plaintiffs had a special interest in the Thacker Pass area, or that the Thacker Pass area was religiously or culturally significant to them. (ECF No. 227 at 31-33 (citing the AR).)

When it came time to initiate the NHPA process for the Project,[29] and as otherwise noted as to the NEPA process, BLM published a notice in the Federal Register. *See* Notice of Intent To Prepare a Draft Environmental Impact Statement and Resource Management Plan Amendment, for the Lithium Nevada Corp., Thacker Pass Project Proposed Plan of Operations and Reclamation Plan Permit Application, Humboldt County, Nevada, 85 FR 3413-02, 2020 WL 279646 (Jan. 21, 2020) ("This notice announces the beginning of the scoping process to solicit public comments and identify issues to be considered in the EIS, and serves to initiate public consultation, as required under the National Historic Preservation Act (NHPA)."). There is no dispute here that neither of Tribal Plaintiffs requested consultation on the Project until after the ROD issued. And this publication renders unpersuasive RSIC's argument that BLM provided insufficient public notice of the NHPA process for the Project (ECF No. 205 at 3, 8-10, 16-19), because "[p]ublication in the Federal Register is legally sufficient notice to all interested or affected persons regardless of actual knowledge or hardship resulting from ignorance." *Shiny Rock Min. Corp. v. United States*, 906 F.2d 1362, 1364 (9th Cir. 1990) (citation omitted).

---

[29]The NHPA process has several components, *see WildEarth Guardians v. Provencio*, 923 F.3d 655, 676-77 (9th Cir. 2019); *Montana Wilderness Ass'n v. Connell*, 725 F.3d 988, 1005-06 (9th Cir. 2013), but, again, Tribal Plaintiffs only challenge the decision not to consult them before issuing the ROD, and not the other steps of the NHPA process.

1    BLM also sent consultation letters to the Fort McDermitt Paiute and Shoshone

2    Tribe, the Summit Lake Paiute Tribe, and the Winnemucca Indian Colony on December

3    12, 2019. (TPNHPA-0010, TPNHPA-0011, TPNHPA-0012.) There is also no dispute that

4    these three tribes did not respond to the consultation letters before the ROD issued.

5        In addition, BLM consulted with the Nevada State Historic Preservation Office

6    ("Nevada SHPO"), as required by NHPA. (TPNHPA-0001.) Nevada SHPO responded

7    some time later indicating that all of its concerns had been addressed, concurring that

8    BLM had initiated tribal consultation, and declining to identify any additional tribes (such

9    as Tribal Plaintiffs) with whom BLM should have consulted. (TPNHPA-0036.) This fact

10   further supports a finding that BLM's decision not to consult with RSIC and Burns Paiute

11   Tribe before issuing the ROD was reasonable. *See Ctr. for Biological Diversity v. United*

12   *States Army Corps of Engineers*, Case No. CV 14-1667 PSG (CWX), 2015 WL 12659937,

13   at *21 (C.D. Cal. June 30, 2015), *aff'd sub nom. Friends of Santa Clara River v. United*

14   *States Army Corps of Engineers*, 887 F.3d 906 (9th Cir. 2018) (finding that the Army Corps

15   of Engineers' decision not to consult the Santa Ynez Band was reasonable in part because

16   the California "SHPO did not advise the Corps to contact the Santa Ynez Band").

17       At the Hearing, Federal Defendants also directed the Court's attention to an email

18   sent by Tanner Whetstone, one of the BLM employees responsible for tribal consultation

19   on the Project, where he retroactively described the factors he considered in

20   recommending to the responsible official which tribes to consult with for the NHPA review

21   process regarding the Project. (TPNHPA-0047.)[30]  He describes those factors as

22

23       [30]The Court includes the full text of the email in this footnote, below, because it is
     pertinent to the Court's analysis.

24

25       David Kampwerth or I may need to be in this side-meeting that was proposed
         in the call today. I say may because I can't really tell if the folks are
26       concerned about reaching out to Pyramid lake Paiute Tribe about the project
         or if they just want to analyze the potential impacts to PLPT, if any. If it's the
27       latter one of us probably needs to be on the call. Not to be rude to the folks
         on the call, but decisions about how the BLM consults with tribes are made

28

1    geographical proximity, historical ties, and whether a particular tribe had previously

2    indicated an interest in the Project area. (*Id.*) He also uses the phrasing reasonable and

3    good faith in several instances, suggesting he was aware of the pertinent regulation's

4    requirements and attempted to comply with them. (*Id.*) The Court infers from this email—

5    part of the AR—that Whetstone decided not to consult Tribal Plaintiffs on the Project

6    because they lacked geographic proximity or historical ties to the Project area and had not

7    otherwise expressed an interest in it. And this inference is consistent with the other

8    evidence before the Court and described *supra.*

9         RSIC's counsel attempted to cast doubt on the probative value of this email at the

10   Hearing by pointing out that it was sent in May 2020, or long after BLM started the

11   consultation process pertinent to the Project, but the Court's reading of the email suggests

12   that Whetstone was describing why he did not recommend consultation with the Pyramid

13   Lake Paiute Tribe—and also described the factors that led to his recommendation about

14   which tribes to consult—at the time that he made his consultation recommendations. He

15   was not writing in the present tense. Thus, the fact that he sent the email long after

16   consultation began is immaterial. Moreover, these factors—particularly absent any

17

18   _____

19       by authorized officers and tribes, not partners or BLM employees. I work with
         our managers on a project-specific basis to help them determine which tribes
20       to reach out to in order to meet our reasonable and good faith effort to
         consider tribal concerns. In this case, based on my input the HRFO Field
21       Manager David Kampwerth determined that the BLM would consult with Fort
         McDermitt Paiute and Shoshone Tribe, Winnemucca Indian Colony, and
22       Summit lake Paiute Tribe. The Pyramid Lake Paiute Tribe is located 120
         miles from the project area and to our knowledge has not concerned itself
23       with the Thacker Pass area before, and historically did not have ties to the
         Thacker Pass area, therefore it was determined not to reach out to them. If
24       there's a concern that traffic generated from the project may have
         implications for PLPT or impact resources that are of concern to PLPT, then
25       I have no issue discussing it with our management and conducting any
         additional outreach/consultation that they see fit, but I'll need to know that
26       soon to make a meaningful effort considering the Draft EIS comes out in a
         month.
27

28   (TPNHPA-0047.)

caselaw to the contrary—are reasonable factors to use in deciding which tribes to consult on a particular project. And this email supports Federal Defendants' argument that it was reasonable not to consult Tribal Plaintiffs on the Project because they lacked geographical proximity and historical ties to the Project area, and had never affirmatively indicated an interest in the Project area. Indeed, as described *supra*, they effectively did the opposite by opting out of consultation on projects in the geographic area of the Project.

More broadly, all of this evidence supports the Court's finding that BLM's decision not to consult with Tribal Plaintiffs before issuing the ROD was reasonable and made in good faith within the meaning of 36 C.F.R. § 800.2(c)(2)(ii)(A). The Court tentatively made that decision in connection with Tribal Plaintiffs' motions for preliminary injunction, and makes the same decision on the merits now.

The Court also notes that the gist of Tribal Plaintiffs' contrary argument has no limiting principle. The gist seems to be that BLM must consult every tribe on every project. But Tribal Plaintiffs do not quite argue that BLM must consult every tribe on every project, and must persist in repeated contact even when faced with silence or affirmative indications that a particular tribe does not wish to be consulted on projects in a particular area. Tribal Plaintiffs likely do not quite make that argument because it is not the law. And Tribal Plaintiffs offer no analogous caselaw (much less any binding precedent) to support their argument that BLM should have consulted more tribes, including them, on this Project. It is instead the law that the responsible BLM employee must make a reasonable and good faith effort to identify which tribes to consult with. *See* 36 C.F.R. § 800.2(c)(2)(ii)(A). BLM made the requisite effort.

This distinction also applies to Tribal Plaintiffs' more specific arguments that they are both descended from Northern Paiutes forcibly dispersed from land including the Project area, and that the Thacker Pass area contains features like water and rock outcroppings sacred to them—so BLM should have consulted them. As Federal Defendants respond, these arguments are insufficiently linked to Tribal Plaintiffs, such that "BLM would have had reasonable notice that [Tribal Plaintiffs] had a relationship with

places of cultural or religious significance in the Thacker Pass area" (ECF No. 227 at 40)—particularly considering the evidence to the contrary discussed *supra*. Or perhaps the more honest answer is that the Court lacks the authority to equitably right historical wrongs perpetrated against Tribal Plaintiffs in the context of the deferential review it is required to conduct of a single decision BLM employees made constituting Tribal Plaintiffs' legal claim here, especially where the pertinent statute does not require any particular outcome. *See Connell*, 725 F.3d at 1005 ("Section 106 of NHPA is a 'stop, look, and listen' provision that requires each federal agency to consider the effects of its programs.") (citation omitted).

In sum, BLM made a reasonable decision not to consult RSIC or Burns Paiute Tribe on the Project before issuing the ROD. BLM did not violate NHPA in making that decision. Tribal Plaintiffs' motions are accordingly denied as to this claim, and Federal Defendants' and Lithium Nevada's cross motions are correspondingly granted.

### 2. NEPA

Setting aside evidence that post-dates the ROD and is thus not properly part of the AR, Burns Paiute Tribe's NEPA claim is that the FEIS did not discuss current uses of the Project area by tribes or the area's significance to local tribes.[31] (ECF No. 203 at 30.) However, as Federal Defendants counter (ECF No. 227 at 49, 49 n.133), the FEIS incorporated by reference the Previous Cultural Resources Inventories in Appendix J (TPEIS-0384 at AR-045630), which included the Class III Inventory of 12,963 Acres for Lithium Nevada's Thacker Pass Project, Humboldt County, Nevada for Lithium Nevada's Thacker Pass Project, Humboldt County, Nevada (TPEIS-0705 at AR-065807), which, in turn, includes an explanation of how the area near the Project area was used by bands of Northern Paiutes from around the middle of the 19th century through present (TPEIS-0269

---

[31]This argument accordingly also runs afoul of the Court's ruling that the Burns Paiute Tribe cannot assert the interests of third-party tribes based on the prudential prohibition against allowing one to assert the legal interests of another known as the third party standing doctrine, but the Court summarizes Burns Paiute Tribe's argument here as the Burns Paiute Tribe makes it in an attempt at clarity.

44

(filed under seal) at AR-035386-87). Thus, Burns Paiute Tribe's NEPA argument is based on either an oversight or an incorrect premise.

To the extent Burns Paiute Tribe more generally argues that BLM failed to take the requisite hard look by failing to specifically consider the impact of the Project on historic and cultural resources, the Court is unpersuaded. (ECF No. 203 at 30.) To the contrary, the Court agrees with Federal Defendants that they "took the requisite hard look at the potential impacts to cultural resources from the Thacker Pass Project." (ECF No. 227 at 44; *see also id.* at 44-50 (supporting the statement).)

More specifically, BLM reviewed 38 cultural resource inventories conducted over 49 years that investigated the Project area (both mining and exploration), along with the area of indirect effects. (TPEIS-0705 at AR-065805 - AR-065807.) These inventories included a 2018 survey that inventoried 12,963 acres for the Project. (TPEIS-0269.) This was a Class III inventory (*see generally id.*), meaning that it was an:

> "[i]ntensive" survey that involve[d] "a professionally conducted, thorough pedestrian survey of an entire target area ... intended to locate and record all historic properties" and that "provides managers and cultural resource specialists with a complete record of cultural properties." BLM Manual 8110.2.21.C.1, C.3. This alternative requires an on-the-ground survey of the entire subject area. The Manual explains that an "[i]ntensive survey is most useful when it is necessary to know precisely what historic properties exist in a given area." BLM Manual 8110.2.21.C. The Class III survey is the most frequently employed method of inventory. See *BLM* Manual 8110.2.21.

*Connell*, 725 F.3d at 1006. This and the prior inventories identified that the Project would negatively impact some 1000 cultural resource sites, including 56 eligible for inclusion on the National Register of Historic Places. (*See generally* TPEIS-0269.)

And BLM considered all of this in the FEIS. (TPEIS-0384 at AR-045630-33.) To somewhat mitigate the harm to cultural properties that BLM stated the Project would cause, BLM chose "an approved Historic Properties Treatment Plan (HPTP), currently in development." (*Id.* at AR-045633.) BLM also noted in this portion of the FEIS that the tribal consultation to which had engaged up to that point in time had not yielded any concerns,

1   but also stated that it would engage in more tribal consultation before issuing the final
2   HPTP, along with consulting with the Nevada SHPO. (*Id.*)

3   Under the deferential standard of review, *see Great Basin Res. Watch*, 844 F.3d at
4   1101, BLM took a hard enough look at the Project's impacts on cultural and historical
5   resources, and the Court's review must accordingly end, *see id.* The NEPA portion of
6   Burns Paiute Tribe's motion is accordingly denied, and Federal Defendants' and Lithium
7   Nevada's competing motions are granted to a corresponding extent.

8   **D.  Remand and Vacatur**

9   "The remaining issue is whether to vacate the [ROD] or remand while leaving the
10   [ROD] in place." *Pollinator*, 806 F.3d at 532. While the parties did not extensively brief this
11   issue, the Court heard extensive argument on it at the Hearing after informing the parties
12   it was interested in hearing such argument in advance of the Hearing. (ECF No. 276.) The
13   Court also stated at the Hearing, primarily in response to Federal Defendants' request,
14   that it would only permit further briefing on this question if it found it necessary. The Court
15   does not so find.

16   The Court may only order remand without vacatur in limited circumstances, and
17   only when equity so demands. *See Pollinator*, 806 F.3d at 532. The Court must generally
18   weigh the seriousness of the agency's errors against the disruptive consequences of
19   vacating the ROD. *See id.* Examples of where it is appropriate to remand without vacatur
20   include situations where environmental harm will result from vacatur, and situations where
21   the Court reasonably expects the agency could reach the same result on remand but either
22   offer better reasoning or comply with procedural rules to essentially fix the error the Court
23   has identified in its review. *See id.*

24   The Court finds that this is the rare case where remand without vacatur is
25   appropriate because, as described *supra* in the section of the order addressing *Rosemont*
26   in depth, BLM could fix the error—it could find on remand that Lithium Nevada possesses
27   valid rights to the waste dump and mine tailings land it intends to use for the Project. There
28   is at least some evidence in the record of sufficient lithium mineralization in those land

such that BLM could find Lithium Nevada had discovered 'valuable mineral deposits' in them.[32] This is accordingly the rare case where BLM could fix its *Rosemont* issue on remand and still reach the same outcome that it reached in the ROD. Said otherwise, this case presents a situation like the situation where remand without vacatur was found appropriate in *Allied-Signal,* 988 F.2d at 151 ("there is at least a serious possibility that the Commission will be able to substantiate its decision on remand"), described as a situation where remand without vacatur would be acceptable in *Pollinator*, 806 F.3d at 532.

Moreover, as also described *supra*, the *Rosemont* argument the Court agrees with only applies to the waste dump and mine tailings land subject to the mining plan of operations, and not the exploration plan of operations at all. The ROD approved both plans. In addition, the Court does not find that Plaintiffs or Plaintiff-Intervenors prevail on any of the several other claims they advanced in this case. Thus, BLM substantially complied with the applicable legal requirements here. This too suggests remand without vacatur is appropriate. *See Ctr. for Food Safety v. Regan*, 56 F.4th 648, 664 (9th Cir. 2022) ("EPA's failure to comply with FIFRA's notice and comment requirement also does not warrant vacatur, 'especially in light of' EPA's 'substantial compliance' with FIFRA.") (citation omitted). And *Rosemont* did not issue until well after the ROD issued in any event. Thus, remand with vacatur would be inequitable because it would sweep in many aspects of the ROD as to which the Court identified no issue, and would not acknowledge that would be unfair to expect BLM to follow *Rosemont*—in contravention of its own regulations—before *Rosemont* had issued.[33]

---

[32]As noted *supra*, Federal Defendants and Lithium Nevada also argue the Project already complies with the ARMPA in any event, but the Court need not—and does not—reach that argument.

[33]Lithium Nevada also argues that "the disruptive impact of vacatur would be severe" because "there is no other U.S. alternative to the Project that provides the scale, grade, or timeline to production required to keep pace with transportation electrification and carbon reduction, in addition to providing lithium products needed for national security." (ECF No. 242 at 48.) This argument finds at least some support in binding precedent. *See California Communities Against Toxics v. U.S. E.P.A.*, 688 F.3d 989, 993-

1  **IV.    CONCLUSION**

2        The Court notes that the parties made several arguments and cited to several cases

3  not discussed above. The Court has reviewed these arguments and cases and determines

4  that they do not warrant discussion as they do not affect the outcome of the motions before

5  the Court.

6        It is therefore ordered that Environmental Plaintiffs' motion for summary judgment

7  (ECF No. 202) is granted in part, and denied in part, as specified herein.

8        It is further ordered that the Burns Paiute Tribe's motion for summary judgment

9  (ECF No. 203) is denied as specified herein.

10        It is further ordered that Rancher Plaintiffs' motion for summary judgment (ECF No.

11  204) is granted in part, and denied in part, as specified herein.

12        It is further ordered that RSIC's motion for summary judgment (ECF No. 205) is

13  denied as specified herein.

14        It is further ordered that Lithium Nevada's counter motion for summary judgment

15  (ECF No. 241) as to Rancher Plaintiffs' claims is granted in part, and denied in part, as

16  specified herein.

17        It is further ordered that Lithium Nevada's cross motion for summary judgment (ECF

18  No. 242) as to Environmental Plaintiffs' claims is granted in part, and denied in part, as

19  specified herein.

20        It is further ordered that Federal Defendants' cross motions for summary judgment

21  (ECF Nos. 227, 237, 238) are granted in part, and denied in part, as specified herein.

22        It is further ordered that Lithium Nevada's cross motions for summary judgment as

23  to Tribal Plaintiffs' claims (ECF No. 230) are granted as specified herein.

24        It is further ordered that this case is remanded—but without vacatur of the Record

25  of Decision—to BLM to determine whether Lithium Nevada possesses valid rights to the

26

27  94 (9th Cir. 2012). However, the Court declines to reach this argument because it does
   not need to in order to adequately support its decision that remand without vacatur is
28  appropriate here.

waste dump and mine tailings land it intends to use for the Project to support BLM's decision to issue the ROD described herein.

The Clerk of Court is directed to enter judgment accordingly and close this case.

DATED THIS 6th Day of February 2023.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE